**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**NO. 1:15-cv-00399**

SANDRA LITTLE COVINGTON; HERMAN BENTHLE LEWIS, JR.; VIOLA RYALS FIGUEROA; CRYSTAL GRAHAM JOHNSON; MARCUS WALTER MAYO; JULIAN CHARLES PRIDGEN, SR.; GREGORY KEITH TUCKER; CYNTHIA C. MARTIN; JOHN RAYMOND VERDEJO; DEDREANA IRENE FREEMAN; MILO PYNE; VALENCIA APPLEWHITE; DAVID LEE MANN; MARY EVELYN THOMAS; JAMAL TREVON FOX; CHANNELLE DARLENE JAMES; CATHERINE WILSON KIMEL; VANESSA VIVIAN MARTIN; SUSAN SANDLER CAMPBELL; MARSHALL ANSIN; ROSA H. MUSTAFA; ANTOINETTE DENNIS MINGO; RUTH E. SLOANE; CLAUDE DORSEY HARRIS III; BRYAN OLSHAN PERLMUTTER; LA'TANTA DENISHIA MCCRIMMON; and CATHERINE OREL MEDLOCK-WALTON,

Plaintiffs,

v.

THE STATE OF NORTH CAROLINA; ROBERT A. RUCHO, in his official capacity only as the Chairman of the North Carolina Senate Redistricting Committee; DAVID R. LEWIS, in his official capacity only as the Chairman of the North Carolina House of Representatives Redistricting Committee; PHILIP E. BERGER, in his official capacity only as the President Pro Tempore of the North Carolina Senate; TIMOTHY K. MOORE, in his official capacity only as the Speaker of the North Carolina House of Representatives; NORTH CAROLINA STATE BOARD OF

**COMPLAINT**

ELECTIONS; JOSHUA B. HOWARD, in his official capacity only as a member of the State Board of Elections; RHONDA K. AMOROSO, in her official capacity only as a member of the State Board of Elections; JOSHUA D. MALCOLM, in his official capacity only as a member of the State Board of Elections; PAUL J. FOLEY, in his official capacity only as a member of the State Board of Elections; and MAJA KRICKER, in her official capacity only as a member of the State Board of Elections,

Defendants.

## NATURE OF THE ACTION

1. In this action, Plaintiffs challenge the constitutionality of North Carolina General Assembly Senate Districts 4, 5, 14, 20, 21, 28, 32, 38, and 40 (the "Challenged Senate Districts") and North Carolina House of Representatives Districts 5, 7, 12, 21, 24, 29, 31, 32, 33, 38, 42, 43, 48, 57, 58, 60, 99, 102, and 107 (the "Challenged House Districts") as racial gerrymanders in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. (Collectively, the foregoing districts will sometimes be referred to hereinafter as the "Challenged Senate and House Districts" or simply as the "Challenged Districts.")

2. The Challenged Districts were enacted in July 2011 as part of redistricting plans for the North Carolina Senate[1] and House of Representatives.[2] The enacted plans

[1] Session Law 2011-402 (July 27, 2011), also known as "Rucho Senate 3."

[2] Session Law 2011-404 (July 28, 2011), also known as "Lewis-Dollar-Dockham 4."

were administratively pre-cleared by the United States Attorney General on November 1, 2011.[3]

3. The Challenged Districts are the product of two race-based policies adopted by leaders of the General Assembly at the start of the 2011 redistricting process and publicly announced by them in written statements first released on June 17, 2011. These were (1) a policy of racial proportionality for both the Senate and House plans and (2) a policy that each district drawn to achieve racial proportionality should encompass within its borders at least an absolute majority of black voting age citizens.

4. The General Assembly implemented the race-based policies established by its leaders. It enacted nine state senate districts as majority-black districts where previously none of the state's senate districts were majority-black, and twenty-three majority-black state house districts where previously only ten of those districts were majority-black.

5. The General Assembly implemented its racial-proportionality policy and its >50%-BVAP policy without justification, including any determination that either policy was reasonably necessary to comply with the Voting Rights Act of 1965, properly interpreted, or that racially polarized voting was sufficient to prevent black citizens from electing their candidates of choice.

[3] The General Assembly passed legislation on November 7, 2011 to cure a technical defect in Rucho Senate 3 and Lewis-Dollar-Dockham 4. Session Laws 2011-413 ("Senate Curative") and 2011-416 ("House Curative"). The United States Attorney General pre-cleared those revised plans on December 8, 2011. Hereinafter, the enacted redistricting plans (as revised and corrected) will be referred to as follows: for the Senate plan, the "2011 Senate Plan" or the "Enacted Senate Plan"; for the House plan, the "2011 House Plan" or the "Enacted House Plan"; and for both plans collectively, as the "2011 Enacted Plans" or simply as the "Enacted Plans."

6. The General Assembly's racial gerrymander is further evidenced by the objective characteristics of the Challenged Districts in which traditional districting principles were plainly subjugated to race, resulting in bizarrely shaped and highly non-compact districts that cross natural geographical boundaries and split political subdivisions with impunity.

7. Dividing precincts on racial lines was one means the General Assembly used to implement its race-based polices. These actions were contrary to legislation enacted by the General Assembly which recognized that dividing precincts in the formation of electoral districts compromises the integrity of the voting process and should be avoided. This legislation limited the General Assembly's capacity to implement its race-based policies and was ignored.

8. Drawn with race as their predominant purpose, without compelling justification or narrow tailoring, the Challenged Districts cannot pass constitutional muster.

9. Plaintiffs seek a declaration that the Challenged Districts are invalid and an injunction prohibiting the Defendants from calling, holding, supervising, or taking any action with respect to elections for the North Carolina General Assembly based on the Challenged Districts as they currently stand.

## PARTIES

10. Plaintiff Sandra Little Covington is a United States citizen and registered voter in the State of North Carolina. She currently resides in North Carolina House District 42.

11. Plaintiff Herman Benthle Lewis Jr. is a United States citizen and registered voter in the State of North Carolina. He currently resides in North Carolina Senate District 4 and North Carolina House District 24.

12. Plaintiff Viola Ryals Figueroa is a United States citizen and registered voter in the State of North Carolina. She currently resides in North Carolina Senate District 5 and North Carolina House District 21.

13. Plaintiff Crystal Graham Johnson is a United States citizen and registered voter in the State of North Carolina. She currently resides in North Carolina Senate District 5 and North Carolina House District 24.

14. Plaintiff Marcus Walter Mayo is a United States citizen and registered voter in the State of North Carolina. He currently resides in North Carolina Senate District 5.

15. Plaintiff Julian Charles Pridgen Sr. is a United States citizen and registered voter in the State of North Carolina. He currently resides in North Carolina Senate District 5 and North Carolina House District 12.

16. Plaintiff Gregory Keith Tucker is a United States citizen and registered voter in the State of North Carolina. He currently resides in North Carolina Senate District 5 and North Carolina House District 24.

17. Plaintiff Cynthia C. Martin is a United States citizen and registered voter in the State of North Carolina. She currently resides in North Carolina Senate District 14 and North Carolina House District 33.

18. Plaintiff John Raymond Verdejo is a United States citizen and registered voter in the State of North Carolina. He currently resides in North Carolina Senate District 14 and North Carolina House District 38.

19. Plaintiff DeDreana Irene Freeman is a United States citizen and registered voter in the State of North Carolina. She currently resides in North Carolina Senate District 20 and North Carolina House District 29.

20. Plaintiff Milo Pyne is a United States citizen and registered voter in the State of North Carolina. He currently resides in North Carolina Senate District 20 and North Carolina House District 29.

21. Plaintiff Valencia Applewhite is a United States citizen and registered voter in the State of North Carolina. She currently resides in North Carolina Senate District 21.

22. Plaintiff David Lee Mann is a United States citizen and registered voter in the State of North Carolina. He currently resides in North Carolina Senate District 21 and North Carolina House District 43.

23. Plaintiff Mary Evelyn Thomas is a United States citizen and registered voter in the State of North Carolina. She currently resides in North Carolina Senate District 21 and North Carolina House District 42.

24. Plaintiff Jamal Trevon Fox is a United States citizen and registered voter in the State of North Carolina. He currently resides in North Carolina Senate District 28 and North Carolina House District 57.

25. Plaintiff Channelle Darlene James is a United States citizen and registered voter in the State of North Carolina. She currently resides in North Carolina Senate District 28 and North Carolina House District 60.

26. Plaintiff Catherine Wilson Kimel is a United States citizen and registered voter in the State of North Carolina. She currently resides in North Carolina Senate District 28 and North Carolina House District 58.

27. Plaintiff Vanessa Vivian Martin is a United States citizen and registered voter in the State of North Carolina. She currently resides in North Carolina Senate District 28 and North Carolina House District 57.

28. Plaintiff Susan Sandler Campbell is a United States citizen and registered voter in the State of North Carolina. She currently resides in North Carolina Senate District 32.

29. Plaintiff Marshall Ansin is a United States citizen and registered voter in the State of North Carolina. He currently resides in North Carolina Senate District 38 and North Carolina House District 107.

30. Plaintiff Rosa H. Mustafa is a United States citizen and registered voter in the State of North Carolina. She currently resides in North Carolina Senate District 38.

31. Plaintiff Antoinette Dennis Mingo is a United States citizen and registered voter in the State of North Carolina. She currently resides in North Carolina Senate District 40 and North Carolina House District 99.

32. Plaintiff Ruth E. Sloane is a United States citizen and registered voter in the State of North Carolina. She currently resides in North Carolina Senate District 40 and North Carolina House District 107.

33. Plaintiff Claude Dorsey Harris III is a United States citizen and registered voter in the State of North Carolina. He currently resides in North Carolina House District 5.

34. Plaintiff Bryan Olshan Perlmutter is a United States citizen and registered voter in the State of North Carolina. He currently resides in North Carolina House District 31.

35. Plaintiff La'Tanta Denishia McCrimmon is a United States citizen and registered voter in the State of North Carolina. She currently resides in North Carolina House District 48.

36. Plaintiff Catherine Orel Medlock-Walton is a United States citizen and registered voter in the State of North Carolina. She currently resides in North Carolina House District 60.

37. Defendant State of North Carolina is one of the fifty sovereign states in the United States of America. Article I of the State's Constitution establishes "principles of

liberty and free government," which the General Assembly and its members must honor in enacting legislation for the State and its citizens.

38. Defendant Robert A. Rucho is a member of the North Carolina Senate, having been elected to that office by the voters residing in Senate District 39. At all times pertinent to this action, Defendant Rucho served as Chair of the Senate Redistricting Committee. Defendant Rucho is sued in his official capacity only.

39. Defendant David R. Lewis is a member of the North Carolina House of Representatives, having been elected to that office by the voters in House District 53. At all times pertinent to this action, Defendant Lewis served as Chair of the House Redistricting Committee. Defendant Lewis is sued in his official capacity only.

40. Defendant North Carolina State Board of Elections ("SBE") is responsible for the regulation of North Carolina elections, including issuing rules and regulations for the conduct of all elections in the State.

41. Defendant Joshua B. Howard is the Chairman and a member of the SBE, which is responsible for administering North Carolina's election laws. Mr. Howard is sued in his official capacity only.

42. Defendant Rhonda K. Amoroso is the Secretary and a member of the SBE, which is responsible for administering North Carolina's election laws. Ms. Amoroso is sued in her official capacity only.

43. Defendant Joshua D. Malcolm is a member of the SBE, which is responsible for administering North Carolina's election laws. Mr. Malcolm is sued in his official capacity only.

44. Defendant Paul J. Foley is a member of the SBE, which is responsible for administering North Carolina's election laws. Mr. Foley is sued in his official capacity only.

45. Defendant Maja Kricker is a member of the SBE, which is responsible for administering North Carolina's election laws. Ms. Kricker is sued in her official capacity only.

## JURISDICTION AND VENUE

46. This Court has jurisdiction to hear Plaintiffs' claim pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331, 1343(a)(3), and 1357. This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

47. A three-judge district court is requested pursuant to 28 U.S.C. § 2284(a), as Plaintiffs' action "challeng[es] the constitutionality of the apportionment of a statewide legislative body."

48. Venue is proper under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### Overview of the 2011 Senate and House Redistricting Process

49. It is undisputed in this case that the legislature employed a racial-proportionality policy and a >50%-BVAP policy from the very beginning of the

redistricting process. The General Assembly concluded that because African Americans constitute 21.2% of the State's voting age population, approximately 10 of the State's 50 senate districts should be majority-black districts to achieve racial proportionality, and approximately 24 of the State's 120 house districts should be majority-black districts. These districts were drawn first, and all remaining districts were thereafter filled in.

50. Defendant Rucho and Defendant Lewis were appointed Chairs of the Senate and House Redistricting Committees, respectively, on January 27, 2011 and February 15, 2011. Senator Rucho was responsible for developing the Challenged Senate Plan. Representative Lewis was responsible for developing the Challenged House Plan. Dr. Thomas Brooks Hofeller ("Hofeller") was retained by the law firm Ogletree Deakins to design and draw the Senate and House plans for Senator Rucho and Representative Lewis. He began working for Senator Rucho and Representative Lewis in December 2010 and began drawing plans in March 2011, following the receipt of new census data. Senator Rucho described Hofeller as the "chief architect" of the plans, and Hofeller described himself the same way.

51. Senator Rucho and Representative Lewis were the sole sources of instructions to Hofeller regarding the design and construction of the Senate and House plans. These instructions were all oral. Senator Rucho and Representative Lewis told Hofeller: "[D]raw a 50% plus one district wherever in the state there is a sufficiently compact black population" to do so. Rucho and Lewis also directed Hofeller to draw

House and Senate plans that provide African-American citizens "with a substantial proportional and equal opportunity to elect their candidates."

52. Hofeller used the same process and criteria to draw the House and Senate plans. He began the process by calculating how many majority-black state House and state Senate districts would need to be drawn to achieve proportionality between the percentage of the state's population that is black and the percentage of districts that would be majority-black.

53. Hofeller made this calculation as soon as the 2010 Census data was released, long before the General Assembly had compiled any data about the extent to which voting is still racially polarized in the state, and without any knowledge of where in the state candidates of choice of African-American voters had been elected.

54. Senator Rucho first filed a Senate plan and first made that plan public on June 17, 2011. That plan was a partial plan drawn by Hofeller. It was labeled "Rucho Senate VRA Districts" and contained only 11 districts. Each of the 11 districts had a >50% BVAP, except SD 32 in Forsyth County and SD 13 in Robeson and Columbus Counties. Nine of these 11 districts (SD 3, 4, 5, 13, 14, 20, 28, 38, and 40) were enacted on July 27, 2011, essentially as first filed and made public on June 17, 2011.[4]

[4] Senate District 21 as first made public was located entirely in Cumberland County. It was modified prior to enactment to include Hoke County as well as part of Cumberland County. That modification increased the number of split precincts from 27 to 33 and increased the TBVAP from 50.08% to 51.53%. District 32 in Forsyth was also modified. That modification increased the number of split precincts from 1 to 43 and increased the total black voting age population (hereinafter "TBVAP") from 39.32% to 42.53%.

55. Following Senator Rucho's example, Representative Lewis first filed and made public a proposed House plan on June 17, 2011.[5] That plan was a partial plan drawn by Hofeller; it was labeled "Lewis House VRA Districts" and contained only 27 districts, 24 of which had a >50% BVAP. Twenty-one of these 24 districts were enacted on July 28, 2011, essentially as first filed and made public on June 21, 2011.[6]

**<u>The Public Statements Made by Senator Rucho and Representative Lewis Describing the Criteria that Shaped the Challenged House and Senate Districts</u>**

56. Defendants Rucho and Lewis issued joint written public statements on June 17, June 21, and July 12, 2011, in which they described the factors that had determined the number, location, and shape of the "VRA districts" challenged in these cases. These public statements reflect the oral instructions Senator Rucho and Representative Lewis had earlier given Hofeller to apply in drawing the districts. Those instructions were:

i. To draw each "VRA District" where possible so that African American citizens constitute at least a majority of the voting age population in the district; and

ii. To draw "VRA Districts" in numbers equal to the African American proportion of the State's population.

57. Senator Rucho and Representative Lewis also publicly stated that any alternative plan that compromised or strayed from strict adherence to these instructions to

---

[5] Due to an error, the June 17 plan was slightly modified on June 21, 2011.

[6] HD 8 was reconfigured prior to enactment to include parts of Wilson and Pitt Counties and renumbered as HD 24, but the TBVAP remained above 50%, at 57.33%. HD 21 was also reconfigured prior to enactment to include pieces of Wayne, Sampson, and Duplin Counties, instead of pieces of Wayne, Sampson, and Pender Counties. The TBVAP, however, remained above 50% at 51.90%. HD 20 was eliminated prior to enactment. That proposed district was formed out of pieces of Bladen, Columbus, Brunswick, and New Hanover Counties and would have had a TBVAP of 50.44%.

Hofeller would be rejected. In their June 21, 2011 public statement, Senator Rucho and Representative Lewis said:

> We would entertain any specific suggestions from the Black Caucus or others identifying more compact majority black populations to form the core of alternative majority black districts, provided the total districts proposed provide black voters with a substantially proportional state-wide opportunity to elect candidates of their choice. Moreover, any such districts must comply with *Strickland v. Bartlett*, and be drawn at a level that constitutes a true majority of black voting age population.

58. African-American legislators did not share Defendant Rucho and Defendant Lewis' views about the State's Voting Rights Act ("VRA") obligations or potential liability. Numerous African-American legislators spoke out against all plans proposed by Defendants Rucho and Lewis. No African-American Senator or Representative voted in favor of any of the plans proposed by Defendants Rucho and Representative Lewis, including the Enacted Plans.

**<u>A Comparison of Districts in the Enacted Plans and Previous Plans</u>**

59. The legislative record contained data regarding the number of majority-black districts drawn by the 1992 and 2003 sessions of the General Assembly and by the courts in 2002. The following chart compares the number of Senate districts deemed necessary by the 1992 and 2003 sessions of the General Assembly, and adjudged by the courts in 2002 as necessary, to meet the State's obligations under the Voting Rights Act, compared to the number of districts deemed necessary for that purpose by the 2011 General Assembly.




60. The following chart compares the number of House districts deemed necessary by the 1992, 2003, and 2009 sessions of the General Assembly, and adjudged necessary by the courts in 2002, to meet the State's obligations under the Voting Rights Act, compared to the number of districts deemed necessary for that purpose by the 2011 General Assembly.



All of these plans were precleared by the United States Department of Justice, and none of these plans was challenged on Section 2 grounds.

61. The record before the legislature also established the counties in which past sessions of the General Assembly and the courts in 2002 had determined that either Section 2 or 5 required the creation of one or more majority African-American districts. Notably, the 2011 Senate Plan increased from 0 to 2 the number of majority-black Senate districts in Mecklenburg County and added new majority-black Senate districts in 11 different counties for the first time, including Wake, Durham, Guilford, and Cumberland Counties. The 2011 House Plan increased the number of majority-black districts in Mecklenburg from 2 to 5; in Guilford from 2 to 3; in Wake from 1 to 2; in Cumberland from 0 to 2; and in Durham from 0 to 2. It also created a majority-black House district for the first time in 10 counties: Pasquotank, Franklin, Duplin, Sampson, Wayne, Durham, Hoke, Richmond, Robeson, and Scotland.

62. The legislative record also included alternative plans introduced during the 2011 session of the General Assembly by the Democratic Caucus and the Legislative Black Caucus that reflected the judgment of their members about the scope of the State's obligations under the Voting Rights Act. Those plans contained far fewer majority-black House and Senate districts. The Legislative Black Caucus proposed zero majority-black Senate Districts and ten majority-black House Districts; the Democratic Caucus proposed one majority-black Senate District and nine majority-black House Districts.

**The Evidence Known to the General Assembly About**
**Elections Won by the Candidates of Choice of Black Voters**

63. In an after-the-fact effort to justify its racial proportionality policy and its greater-than-50% TBVAP policy, the General Assembly commissioned a study of racially polarized voting. This study revealed that in North Carolina, as in all other states, white voters tend to vote for white candidates, and black candidates tend to vote for black candidates. It also revealed that in North Carolina, as in all other states, the degree to which voters tend to vote for candidates of their own race varies widely across the state. This study did not address whether racially polarized voting was sufficient in any of the counties in which the General Assembly located the challenged districts usually to deny black voters the opportunity to elect their candidates of choice.

64. The General Assembly in fact did have, but ignored, extensive information about the electoral success of the candidates' of choice of black voters generally and in the areas where it had located the challenged districts including the following:

a. That fifty-six times between 2006 and 20011, black candidates won election contests in legislative districts that were not majority-black, and that twenty two-times those candidates were running in majority-white districts;

b. That seven African-American State Senators were elected from eight of the prior Senate districts with black voting percentages between 42.52% and 49.70% in the past four election cycles;

c. That in the 40%+ black voting age population Senate districts relevant to this litigation, African-American candidates or the candidates of choice of African-American voters prevailed in all elections in 7 of 8

districts in the 2008 and 2010 primary and general elections, for a win rate of 88 percent;

d. That in the 40%+ black voting age population State House Districts relevant to this litigation, black candidates or a white candidate of choice of black voters prevailed in 19 out of 21 districts in the 2008 and 2010 primary and general elections, for a win rate of 90 percent;

e. That in the State House districts that were above 40% black voting age population but below 50% black voting age population, the candidate of choice of black voters prevailed in all elections in 10 of the 11 districts, and prevailed in 3 out of 4 of the elections in the 11th district, for a win rate of 91%.;

f. That in the State House districts that were above 50% black voting age population, the candidate of choice of black voters prevailed in 8 of the 10 majority-black districts, for a win rate of 80%, which is lower than the win rate in districts between 40% and 50% black voting age population;

g. That Congressional Districts 1 and 12 previously were less than 50% black in voting age population and that both districts elected candidates of choice of black voters in the 2008 and 2010 primary and general elections; and

h. That in all districts, state legislative and Congressional, the candidate of choice of black voters prevailed in 28 of 31 districts with 40%+ black voting age population, for a win rate of 90%. This win rate is no different than the win rate for African-American candidates and white candidates of choice of African-American voters in districts that are 50%+ in black voting age populations.

65. The General Assembly also had available information about the margin of victory of African-American candidates in the earlier elections under prior plans and the extent to which African-American candidates were unopposed in those elections.

66. An alternative plan entitled "Senate Fair and Legal" was introduced by Senator Martin Nesbitt on July 25, 2011. That plan was not drawn to create majority African-American districts proportional to the African-American population. It would have divided fourteen counties, or five fewer counties than the enacted 2011 Senate Plan. Another alternative plan entitled "Possible Senate Districts" was introduced by Senator Floyd McKissick on July 25, 2011. That plan was not drawn to create majority African-American districts in numbers proportional to the State's African-American population. It would have divided 16 counties, or 3 fewer counties than the enacted 2011 Senate Plan.

67. Representative Grier Martin introduced an alternative House plan on July 25, 2011 entitled "House Fair and Legal." That plan did not create majority African-American districts in numbers proportional to the State's African-American population. It would have divided forty-four counties, or five fewer counties than the challenged 2011 House Plan. Representative Kelly Alexander introduced another alternative plan on July 25, 2011 entitled "Possible House Districts." That plan was not drawn to create majority African-American districts in numbers proportional to the State's African-American population. It would have divided four fewer counties than the challenged 2011 House Plan.

## County-Based Analysis of Challenged Senate Districts

## Senate District 4

68. SD 4 has a TBVAP of 52.75%.

69. The General Assembly constructed SD 4 from all of Vance, Warren, and Halifax Counties and pieces of Nash and Wilson Counties. It assigned Nash and Wilson citizens to the districts in those counties on the basis of race.

70. Nash is divided between SD 4 and SD 11. The TBVAP in that part of SD 4 in Nash (51.03%) is twice the TBVAP in that part of Nash in SD 11 (25.78%).

71. The boundary the General Assembly drew to separate the citizens of Nash into racially identifiable districts is depicted below. That boundary is bizarrely shaped and visually not compact.



72. Wilson is also divided between SD 4 and SD 11. The TBVAP in that part of Wilson in SD 4 (63.62%) is more than twice the TBVAP in that part of Wilson in SD 11 (24.10%).

73. The boundary the General Assembly drew to separate the citizens of Wilson County into racially identifiable districts is depicted below. It is bizarrely shaped and visually not compact.



74. SD 4 as a whole is depicted below. It is bizarrely shaped and visually not compact.




75. In drawing SD 4, Defendants knew that the candidate of choice of black voters had been elected in each of the four general elections held under the 2003 Senate Redistricting Plan (in 2004, '06, '08, and '10) and that in the 2010 election, the candidate of choice of black voters won with 62.55% of the vote. Under the Challenged Senate Plan, the candidate of choice of black voters won in 2012 with 72.32% of the vote.

76. SD 4 is the product of the General Assembly's two race-based policies: racial proportionality in the number of Senate Districts and a minimum 50% TBVAP in each Senate District drawn to achieve proportionality. It is not narrowly tailored to serve any compelling state interest.

**Senate District 5**

77. SD 5 has a TBVAP of 51.97%.

78. The General Assembly constructed SD 5 by joining pieces of Lenoir, Pitt, and Wayne Counties with Greene County. It assigned citizens in Lenoir, Pitt, and Wayne Counties to the districts in those counties on the basis of race.

79. Lenoir County is divided between SD 5 and SD 7. The TBVAP in that part of Lenoir County in SD 5 (64.49%) is 4 times the TBVAP in that part of Lenoir County in SD 7 (16.16%).

80. The boundary that the General Assembly drew to separate the citizens of Lenoir County into racially identifiable districts is depicted below. That boundary was constructed using eight split precincts. It is bizarrely shaped and visually not compact.



81. Pitt is also divided between SD 5 and SD 7. The TBVAP in that part of Pitt County in SD 5 (49.28%) is three times the TBVAP in that part of Pitt County in SD 11 (16.07%).

82. The boundary the General Assembly drew to separate the citizens of Pitt County into these racially identifiable districts is depicted below. That boundary was constructed using 16 split precincts. It is bizarrely shaped and visually not compact.



83. Wayne County is also divided between SD 5 and SD 7. The TBVAP in that part of Wayne County in SD 5 (55.95%) is more than three times the TBVAP in that part of Wayne County in SD 11 (16.17%).

84. The boundary that the General Assembly drew to separate the citizens of Wayne County into these racially identifiable districts depicted is below. That boundary was constructed using 16 split precincts. It is bizarrely shaped and visually not compact.



85. SD 5 as a whole is depicted below. It is bizarrely shaped and visually not compact.




86. SD 5 is the product of the General Assembly's two race-based policies: racial proportionality in the number of Senate districts and a minimum 50% TBVAP in each Senate district drawn to achieve proportionality. It is not narrowly tailored to serve any compelling state interest.

## Senate District 14

87. No redistricting plan enacted by the General Assembly or adopted by the courts before 2011 included any majority black Senate district in Wake County. SD 14 is located in Wake County. The TBVAP in SD 14 as enacted by the General Assembly in 2011 is 51.28%.

88. SD 14 is one of five Senate districts in Wake County. SDs 14, 15, 16 and 17 are entirely within Wake County; part of SD 18 is in Wake County.

89. The General Assembly assigned Wake County citizens to SD 14 and the other districts in Wake County on the basis of race. The TBVAP in SD 14 is 51.23% and exceeds the TBVAP in SD 15 (10.07%) by 41.16%; in SD 16 by 36.20%; in SD 17 (9.48%) by 41.75%; and in SD 18 in Wake (17.96%) by 33.27%.

90. The boundaries drawn by the General Assembly to assign the citizens of Wake County to these racially identifiable districts contains 34 split precincts, 29 of which were used to construct SD 14, the majority-minority district. Those boundaries are depicted below. They are bizarrely shaped and visually not compact.



91. SD 14 is depicted below in greater detail.




92. Wake County was not covered by Section 5 in 2011.

93. In 1997 the North Carolina Attorney General, acting on behalf of the North Carolina General Assembly, informed the United States Attorney General that except for the area covered by new Congressional District 1, the "General Assembly did not have sufficient evidence to conclude, and believes that sufficient evidence does not exist to conclude, that Gingles factors exist in any other area of the State … ." Wake County is not in the area of the State covered by Congressional District 1 in 1997.

94. In drawing SD 14, Defendants knew that SD 14 as drawn by the General Assembly in 2003 had a black voting age population substantially lower than in their plan (42.62% in the prior plan; 51.28% in the Defendants' 2011 Senate Plan). Defendants also knew that the candidate of choice of black voters had been elected in each of the four general elections held under the 2003 Senate Redistricting Plan (in 2004, '06, '08, and '10) and that in the 2010 election, the candidate of choice of black voters won with 65.92% of the vote. Defendants also knew that in the 2002 general election, the candidate of choice of black voters won under the version of this district drawn by a state superior court judge. Under the Challenged Senate Plan, the candidate of choice of black voters won in an uncontested race.

95. SD 14 is the product of the General Assembly's two race-based policies: racial proportionality in the number of Senate Districts and a minimum 50% TBVAP in each Senate District drawn to achieve proportionality. It is not narrowly tailored to serve any compelling state interest.

**Senate District 20**

96. No redistricting plan enacted by the General Assembly or adopted by the courts before 2011 included a majority black Senate district in Durham County. SD 20 is located in Durham County. The TBVAP in SD 20 as enacted by the General Assembly in 2011 is 51.04%.

97. SD 20 is one of two Senate Districts located in Durham County: SD 22 is entirely within Durham, and part of SD 21 is in Durham.

98. The General Assembly assigned Durham County citizens to SD 20 and 22 on the basis of race. The TBVAP in SD 20 in Durham is 59.18% and exceeds the TBVAP in SD 22 (17.73%) by 41.45%.

99. The boundary drawn by the General Assembly to assign the citizens of Durham to these racially identifiable districts contains thirty-five split precincts. That boundary is depicted below. It is bizarrely shaped and visually not compact.



100. SD 20 as a whole is depicted below.




101. Durham County was not covered by Section 5 in 2011.

102. In 1997, the North Carolina Attorney General, acting on behalf of the North Carolina General Assembly, informed the United States Attorney General that except for the area covered by new Congressional District 1, the "General Assembly did

not have sufficient evidence to conclude, and believes that sufficient evidence does not exist to conclude, that Gingles factors exist in any other area of the State … ." Durham County is not in the area of the State covered by Congressional District 1 in 1997.

103. In drawing SD 20, Defendants knew that SD 20 as drawn by the General Assembly in 2003 had a black voting age population substantially lower than in their plan (44.64% in the prior plan; 51.04% in Defendants' 2011 Senate Plan). Defendants also knew that the candidate of choice of black voters had been elected in each of the four general elections held under the 2003 Senate Redistricting Plan (in 2004, '06, '08, and '10) and that in the 2010 election, the candidate of choice of black voters won with 73.11% of the vote. Defendants also knew that in the 2002 general election, the candidate of choice of black voters won under the version of this district drawn by a state superior court judge. Under the Challenged Senate Plan, the candidate of choice of black voters won in an uncontested race.

104. SD 20 is the product of the General Assembly's two race-based policies: racial proportionality in the number of Senate Districts and a minimum 50% TBVAP in each Senate District drawn to achieve proportionality. It is not narrowly tailored to serve any compelling state interest.

**Senate District 21**

105. No redistricting plan enacted by the General Assembly or adopted by the courts before 2011 included a majority black Senate district in Cumberland County. SD

21 is located in Cumberland County. The TBVAP in SD 21 as enacted by the General Assembly in 2011 is 51.53%.

106. Two Senate Districts are located in Cumberland County: SD 19 is entirely within Cumberland, and part of SD 21 is in Cumberland.

107. The General Assembly assigned Cumberland County citizens to SD 19 and SD 21 on the basis of race. The TBVAP in SD 21 in Cumberland is 56.92% and exceeds the TBVAP in SD 22 (22.49%) by 34.43%.

108. The boundary drawn by the General Assembly to assign the citizens of Cumberland to these racially identifiable districts contains thirty-three split precincts. That boundary is depicted below. It is bizarrely shaped and visually not compact.



109. SD 21 as a whole is depicted below.




110. In 1997, the North Carolina Attorney General, acting on behalf of the North Carolina General Assembly, informed the United States Attorney General that except for the area covered by new Congressional District 1, the "General Assembly did not have sufficient evidence to conclude, and believes that sufficient evidence does not exist to conclude, that Gingles factors exist in any other area of the State … ." Cumberland County is not in the area of the State covered by Congressional District 1 in 1997.

111. In drawing SD 21, Defendants knew that SD 21 as drawn by the General Assembly in 2003 had a black voting age population of 44.93%, or 6.6% lower than the

black voting age population encompassed within their SD 21. Defendants also knew that the candidate of choice of black voters had been elected in each of the four general elections held under the 2003 Senate Redistricting Plan (in 2004, '06, '08, and '10) and that in the 2010 election, the candidate of choice of black voters won with 67.61% of the vote. Defendants also knew that in the 2002 general election, the candidate of choice of black voters won under the version of this district drawn by a state superior court judge. Under the Challenged Senate Plan, the candidate of choice of black voters won in 2012 in an uncontested race.

112. SD 21 is the product of the General Assembly's two race-based policies: racial proportionality in the number of Senate Districts and a minimum 50% TBVAP in each Senate District drawn to achieve proportionality. It is not narrowly tailored to serve any compelling state interest.

**Senate District 28**

113. No redistricting plan enacted by the General Assembly or adopted by the courts before 2011 included a majority black Senate district in Guilford County. SD 28 is located in Guildford County. The TBVAP in SD 28 as enacted by the General Assembly in 2011is 56.49%.

114. Three Senate districts are located in Guilford County. SD 27 and 28 are entirely within Guilford, and part of SD 26 is in Guilford.

115. The General Assembly assigned Guilford County citizens to these districts on the basis of race. The TBVAP in SD 28 is 56.49% and exceeds the TBVAP in SD 26 in Guilford (11.63%) by 44.86% and exceeds the TBVAP in SD 27 (17.01%) by 39.48%.

116. The boundary drawn by the General Assembly to assign the citizens of Guilford County to racially identifiable districts contains sixteen split precincts. That boundary is depicted below. It is bizarrely shaped and visually not compact.



117. SD 28 is depicted below in greater detail.




118. In 1997 the North Carolina Attorney General, acting on behalf of the North Carolina General Assembly informed the United States Attorney General that except for the area covered by new Congressional District 1, the "General Assembly did not have sufficient evidence to conclude, and believes that sufficient evidence does not exist to conclude, that Gingles factors exist in any other area of the State … ." Guilford County is not within the area of the State covered by Congressional District 1 in 1997.

119. In drawing SD 28, Defendants knew that SD 28 as drawn in the 2003 Senate Redistricting Plan had a black voting age population of 47.20%, which is 9.29% lower than the black voting age population encompassed within their SD 28. Defendants

also knew that the candidate of choice of black voters had been elected in each of the four general elections held under the 2003 Senate Redistricting Plan (in 2004, '06, '08, and '10) and that in the 2010 election, the candidate of choice of black voters won with 47.84% of the vote. Defendants also knew that in the 2002 general election, the candidate of choice of black voters won under the version of this district drawn by a state superior court judge. Under the Challenged Senate Plan, the candidate of choice of black voters won in 2012 in an uncontested race.

120. SD 28 is the product of the General Assembly's two race-based policies: racial proportionality in the number of Senate Districts and a minimum 50% TBVAP in each Senate District drawn to achieve proportionality. It is not narrowly tailored to serve any compelling state interest.

**Senate District 32**

121. The TBVAP in SD 32 is 42.53%.

122. Two Senate districts are located in Forsyth County. SD 32 is entirely within Forsyth, and part of SD 31 is in Forsyth

123. The General Assembly assigned Forsyth County citizens to these districts on the basis of race. The TBVAP in SD 32 is 42.53% and exceeds the TBVAP in SD 31 in Forsyth (7.19%) by 35.34%.

124. The boundary drawn by the General Assembly to assign the citizens of Forsyth County to racially identifiable districts contains forty-three split precincts. That boundary is depicted below. It is bizarrely shaped and visually not compact.



125. SD 32 is depicted below in greater detail.




126. In 1997, the North Carolina Attorney General, acting on behalf of the North Carolina General Assembly, informed the United States Attorney General that except for the area covered by new Congressional District 1, the "General Assembly did not have sufficient evidence to conclude, and believes that sufficient evidence does not exist to conclude, that Gingles factors exist in any other area of the State … ." Forsyth County is not within the area of the State covered by Congressional District 1 in 1997.

127. In drawing SD 32, Defendants knew that the candidate of choice of black voters had been elected in each of the four general elections held under the 2003 Senate Redistricting Plan (in 2004, '06, '08, and '10) and that in the 2010 election, the candidate of choice of black voters won with 65.37% of the vote. Defendants also knew that in the 2002 general election, the candidate of choice of black voters won under the version of this district drawn by a state superior court judge. Under the Challenged Senate Plan, the candidate of choice of black voters won in 2012 with 72.99% of the vote.

128. SD 32 is the product of the General Assembly's two race-based policies: racial proportionality in the number of Senate Districts and a minimum 50% TBVAP in each Senate District drawn to achieve proportionality. It is not narrowly tailored to serve any compelling state interest.

**Senate Districts 38 and 40**

129. No redistricting plan enacted by the General Assembly or adopted by the courts before 2011 included two majority black Senate districts in Mecklenburg County. The plan enacted by the General Assembly in 2011 includes two majority black districts in Mecklenburg County. The TBVAP in SD 38 is 52.51% and in SD 40 is 51.84%.

130. Five Senate districts are located in Mecklenburg County: SD 37, SD 38, SD 39, SD 40, and SD 41.

131. The General Assembly assigned Mecklenburg County citizens to these districts on the basis of race. The TBVAP in SD 38 is 52.51% and in SD 40 is 51.84%.

Those percentages are almost twice the TBVAP in SD 37 (26.34%); 7 times the TBVAP in SD 39 (6.99%); and 4 times the TBVAP in SD 41(13.15%).

132. The boundaries drawn by the General Assembly to assign the citizens of Mecklenburg County to these racially identifiable districts contain 30 split precincts, 24 of which were used to construct the two majority minority districts. Those boundaries are depicted below. They are bizarrely shaped and visually not compact.



133. SD 38 and 40 are depicted below in greater detail.

<u>SD 38</u>




<u>SD 40</u>




134. Mecklenburg County was not covered by Section 5 in 2011.

135. In 1997 the North Carolina Attorney General, acting on behalf of the North Carolina General Assembly, informed the United States Attorney General that, except for the area covered by new Congressional District 1, the "General Assembly did not have sufficient evidence to conclude, and believes that sufficient evidence does not exist to conclude, that Gingles factors exist in any other area of the State … ." Mecklenburg County is not within the area of the State covered by Congressional District 1 in 1997.

136. In drawing SD 38, Defendants knew that SD 38 as drawn in the 2003 Senate Redistricting Plan had a lower black voting age population than in the Challenged Senate Plan (46.97% in the 2003 plan; 52.51% in Defendants' 2011 Senate Plan). Defendants also knew that the candidate of choice of black voters had been elected in

each of the four general elections held under the 2003 Senate Redistricting Plan (in 2004, '06, '08, and '10) and that in the 2010 election, the candidate of choice of black voters won with 68.67% of the vote. Defendants also knew that in the 2002 general election, the candidate of choice of black voters won under the version of this district drawn by a state superior court judge. Under the Challenged Senate Plan, the candidate of choice of black voters won in 2012 with 80.21% of the vote.

137. In drawing SD 40, Defendants knew that SD 40 as drawn in the 2003 Senate Redistricting Plan had a substantially lower black voting age population than in the Challenged Senate Plan (35.43% in the 2003 plan; 51.84% in Defendants' 2011 Senate Plan). Defendants also knew that the candidate of choice of black voters had been elected in each of the four general elections held under the 2003 Senate Redistricting Plan (in 2004, '06, '08, and '10) and that in the 2010 election, the candidate of choice of black voters won with 58.16% of the vote. Under the Challenged Senate Plan, the candidate of choice of black voters won in 2012 with 84.11% of the vote.

138. SD 38 and 40 are the product of the General Assembly's two race-based policies: racial proportionality in the number of Senate Districts and a minimum 50% TBVAP in each Senate District drawn to achieve proportionality. It is not narrowly tailored to serve any compelling state interest.

**<u>County-Based Analysis of Challenged House Districts</u>**

**<u>House District 5</u>**

139. The TBVAP in HD 5 is 54.17%.

140. The General Assembly constructed HD 5 from all of Bertie, Hertford and Gates Counties and part of Pasquotank County. It divided Pasquotank County's citizens between HD 5 and HD 1 on racial lines.

141. The TBVAP in the part of Pasquotank County assigned to HD 5 (52.64%) is three times the TBVAP in the part of Pasquotank County assigned to HD 1 (17.33%.)

142. The boundary drawn by the General Assembly drew to separate citizens assigned to HD 5 and HD 1 is depicted below. It is bizarrely shaped and visually not compact.



143. In drawing HD 5, Defendants knew that the candidate of choice of black voters had been elected in general elections held under the 2003 House Redistricting Plan (in 2004, ‘08, and ‘10) and that in the 2010 election, the candidate of choice of black voters won with 58.99% of the vote. Under the Challenged House Plan, the candidate of choice of black voters won in an uncontested race.

144. HD 5 is the product of the General Assembly’s two race-based policies: racial proportionality in the number of House Districts and a minimum 50% TBVAP in each House District drawn to achieve proportionality. It is not narrowly tailored to serve any compelling state interest.

**House District 7**

145. The TBVAP in HD 7 is 50.67%.

146. The General Assembly constructed HD 7 from pieces of two counties: Nash and Franklin Counties. It divided both of these counties on racial lines.

147. The citizens of Nash County were separated by the General Assembly into two racially identifiable House Districts. The TBVAP in HD 7 (52.92%) in Nash County is more than 3 times the TBVAP in HD 25 (15.02%) in Nash.

148. The General Assembly split 15 precincts in Nash County in drawing the boundary between HD 7 and HD 25. That boundary is depicted below. It is bizarrely shaped and visually not compact.



149. The citizens of Franklin County were also separated into two racially identifiable districts by the General Assembly. The TBVAP in HD 7 (45.07%) in Franklin is almost 3 times the TBVAP in HD 25 (17.17%) in Franklin.

150. The General Assembly split seven precincts in Franklin County in drawing the boundary between HD 7 and HD 25. That boundary is depicted below. It is bizarrely shaped and visually not compact.



151. HD 7 as a whole is depicted below. It is bizarrely shaped and visually not compact.




152. In drawing HD 7, Defendants knew that the candidate of choice of black voters had been elected in each of the four general elections held under the 2003 House Redistricting Plan (in 2004, ‘06, ‘08, and ‘10) and that in the 2010 election, the candidate of choice of black voters won in an uncontested race. Under the Challenged House Plan, the candidate of choice of black voters won in 2012 in an uncontested race.

153. HD 7 is the product of the General Assembly’s two race-based policies: racial proportionality in the number of House Districts and a minimum 50% TBVAP in each House District drawn to achieve proportionality. It is not narrowly tailored to serve any compelling state interest.

## **House District 12**

154. The TBVAP in HD 12 is 50.60%.

155. The General Assembly constructed HD 12 from pieces of three counties: Craven, Lenoir, and Greene. It divided each of these three counties on racial lines.

156. The citizens of Craven County were separated into three racially identifiable House Districts by the General Assembly. The TBVAP in HD 12 (44.70%) in Craven is almost 4 times the TBVAP in HD 3 (12.93%) in Craven and in HD 10 (13.66%) in Craven.

157. The General Assembly split 23 precincts in Craven County in drawing the boundary between HD 12 and 3 and between HD 12 and 10. That boundary is depicted below. It is bizarrely shaped and visually not compact.

Craven County




158. The citizens of Lenoir County were separated into two racially identifiable districts by the General Assembly. The TBVAP in HD 12 (59.84%) in Lenoir is almost four times the TBVAP in HD 10 in Lenoir (15.74%).

159. The General Assembly split 7 precincts in Lenoir County in drawing the boundary between HD 10 and 12. The boundary the General Assembly drew to separate the citizens of Lenoir County into racially identifiable districts is depicted below. It is bizarrely shaped and visually not compact.



160. The citizens of Greene County were separated into racially identifiable districts by the General Assembly. The TBVAP in HD 12 (42.52%) in Greene is almost twice the TBVAP in HD 10 in Greene (24.49%).

161. The boundary the General Assembly drew to assign Greene County citizens to racially identifiable districts is composed entirely of divided precincts. That boundary is depicted below. It is bizarrely shaped and visually not compact.



162. HD 12 as a whole is depicted below. It is bizarrely shaped and visually not compact.




163. In drawing HD 12, Defendants knew that the black voting age population in the prior plan was substantially lower than in their plan (46.45% in the prior plan; 50.60% in the Defendants' 2011 House Plan). In drawing HD 12, Defendants also knew that the candidate of choice of black voters had been elected in each of the four general elections held under the 2003 House Redistricting Plan (in 2004, '06, '08, and '10) and that in the 2010 election, the candidate of choice of black voters won with 60.21% of the vote. Defendants also knew that in the 2002 general election, the candidate of choice of

black voters won under the version of this district drawn by a state superior court judge. Under the Challenged House Plan, the candidate of choice of black voters won in 2012 with 65.85% of the vote.

164. HD 12 is the product of the General Assembly's two race-based policies: racial proportionality in the number of House Districts and a minimum 50% TBVAP in each House District drawn to achieve proportionality. It is not narrowly tailored to serve any compelling state interest.

**House District 21**

165. The TBVAP in HD 21 is 51.90%.

166. The General Assembly constructed HD 21 from pieces of three counties: Duplin, Sampson, and Wayne. It divided each of these counties on racial lines. No redistricting plan enacted by the General Assembly or adopted by the courts before 2011 drew a majority black House district in any of these counties.

167. The citizens of Duplin County were separated into two racially identifiable districts by the General Assembly. The TBVAP in HD 21 (45.75%) in Duplin is 3 times the TBVAP in HD 4 (15.13%) in Duplin.

168. Duplin County was not covered by Section 5 in 2011.

169. The boundary the General Assembly drew to separate Duplin citizens into racially identifiable distracts is composed entirely of split precincts. That boundary is depicted below. It is bizarrely shaped and visually not compact.




170. The citizens of Sampson County were separated into two racially identifiable districts by the General Assembly. The TBVAP in HD 21 (53.71%) in Sampson is more than twice the TBVAP in HD 22 (21.28%) in Sampson.

171. Sampson County was not covered by Section 5 in 2011.

172. The boundary the General Assembly drew to assign Sampson County citizens to these racially identifiable districts is composed of nine precincts, eight of which are split. That boundary is depicted below. It is bizarrely shaped and visually not compact.



173. The citizens of Wayne County were separated into three racially identifiable districts by the General Assembly. The TBVAP in HD 21 (54.08%) in Wayne is four times the TBVAP in HD 4 (16.91%) in Wayne, as well as HD 10 in Wayne (13.83%).

174. The boundary the General Assembly drew to assign Wayne County citizens to these racially identifiable districts is composed of 13 split precincts. That boundary is depicted below. It is bizarrely shaped and visually not compact.



175. HD 21 as a whole is depicted below. It is bizarrely shaped and visually not compact.




176. In drawing HD 21, Defendants knew that HD 21 as drawn in the previous House Redistricting Plan had a substantially lower black voting age population than in their plan (46.25% in the prior plan; 51.90% in Defendants' 2011 House Plan).

Defendants also knew that the candidate of choice of black voters had been elected in each of the four general elections held under the 2003 House Redistricting Plan (in 2004, '06, '08, and '10) and that in the 2010 election, the candidate of choice of black voters won with 65.59% of the vote.

177. HD 21 is the product of the General Assembly's two race-based policies: racial proportionality in the number of House Districts and a minimum 50% TBVAP in each House District drawn to achieve proportionality. It is not narrowly tailored to serve any compelling state interest.

**House District 24**

178. The TBVAP in HD 24 is 57.33%.

179. The General Assembly constructed HD 24 from pieces of two counties: Wilson and Pitt. It divided each of these counties on racial lines.

180. The citizens of Pitt County were separated into two racially identifiable districts by the General Assembly. The TBVAP in HD 24 (54.74%) in Pitt is almost twice the TBVAP in HD 8 (34.13%) in Pitt.

181. The boundary the General Assembly drew to assign Pitt County citizens to these racially identifiable districts is composed of pieces of 10 precincts. That boundary is depicted below. It is bizarrely shaped and visually not compact.




182. The citizens of Wilson County were separated into two racially identifiable districts by the General Assembly. The TBVAP in HD 24 (61.58%) in Wilson is more than twice the TBVAP in HD 8 (23.42%) in Wilson.

183. The boundary the General Assembly drew to assign Wilson County citizens to these racially identifiable districts contains four split precincts. That boundary is depicted below. It is bizarrely shaped and visually not compact.




184. HD 24 as a whole is depicted below. It is bizarrely shaped and visually not compact.



185. In drawing HD 24, Defendants knew that the candidate of choice of black voters had been elected in each of the four general elections held under the 2003 House Redistricting Plan (in 2004, ‘06, ‘08, and ‘10) and that in the 2010 election, the candidate of choice of black voters won with 64.84% of the vote. Under the Challenged House Plan, the candidate of choice of black voters won in an uncontested race.

186. HD 24 is the product of the General Assembly’s two race-based policies: racial proportionality in the number of House Districts and a minimum 50% TBVAP in each House District drawn to achieve proportionality. It is not narrowly tailored to serve any compelling state interest.

**House Districts 29 and 31**

187. No redistricting plan enacted by the General Assembly or adopted by the courts before 2011 included any majority black House district in Durham County. The plan enacted by the General Assembly in 2011 drew two majority black districts in Durham County. The TBVAP in HD 29 is 51.34% and in HD 31 is 51.81%.

188. Four racially identifiable districts are located in Durham County. The TBVAP in HD 29 (51.34%) and in HD 31 (51.81%) is three times the TBVAP in HD 30 (18.43%) and in HD 50 in Durham (15.34%).

189. The boundaries the General Assembly drew in assigning Durham County citizens to these racially identifiable districts contain 21 split precincts. The boundaries of those districts are depicted below. They are bizarrely shaped and visually not compact.



190. HD 29 and 31 are depicted in greater detail below.

HD 29




HD 31




191. Durham County was not covered by Section 5 in 2011.

192. In 1997 the North Carolina Attorney General, acting on behalf of the North Carolina General Assembly informed the United States Attorney General that, except for the area covered by new Congressional District 1, the "General Assembly did not have sufficient evidence to conclude, and believes that sufficient evidence does not exist to conclude, that Gingles factors exist in any other area of the State … ." Durham County is not in the area of the State covered by Congressional District 1 in 1997.

193. In drawing HD 29, Defendants knew that HD 29 as drawn by the General Assembly in the previous plan was significantly lower than in their plan (39.99% in the prior plan; 51.34% in Defendants' 2011 House Plan). Defendants also knew that the candidate of choice of black voters had been elected in general elections held under the

2003 House Redistricting Plan (in 2006, '08, and '10) and that in the 2010 election, the candidate of choice of black voters won in an uncontested race. Defendants also knew that in the 2002 general election, the candidate of choice of black voters won under the version of this district drawn by a state superior court judge. Under the Challenged House Plan, the candidate of choice of black voters won in an uncontested race.

194. In drawing HD 31, Defendants knew that HD 31 as drawn by the General Assembly in the previous plan was significantly lower than in their plan (47.23% in the prior plan; 51.81% in Defendants' 2011 House Plan). Defendants also knew that the candidate of choice of black voters had been elected in each of the four general elections held under the 2003 House Redistricting Plan (in 2004, '06, '08, and '10) and that in the 2010 election, the candidate of choice of black voters won with 75.50% of the vote. Defendants also knew that in the 2002 general election, the candidate of choice of black voters won under the version of this district drawn by a state superior court judge. Under the Challenged House Plan, the candidate of choice of black voters won in 2012 in an uncontested race.

195. HD 29 and 31 are the product of the General Assembly's two race-based policies: racial proportionality in the number of House Districts and a minimum 50% TBVAP in each House District drawn to achieve proportionality. None of them are narrowly tailored to serve any compelling state interest.

**House District 32**

196. The TBVAP in HD 32 is 50.45%.

197. The General Assembly constructed HD 32 from all of Vance and Warren Counties and a piece of Granville County. It divided Granville County between HD 2 and 32 on racial lines

198. The TBVAP in the part of Granville County in HD 32 (54.26%) is twice the TBVAP in the part of Granville in HD 2 (26.57%).

199. The boundary the General Assembly drew to divide the citizens of Granville County into racially identifiable districts is depicted below. That boundary is visually bizarre and visually not compact.



200. HD 32 is the product of the General Assembly's two race-based policies: racial proportionality in the number of House Districts and a minimum 50% TBVAP in each House District drawn to achieve proportionality. It is not narrowly tailored to serve any compelling state interest.

**<u>House Districts 33 and 38</u>**

201. No redistricting plan enacted by the General Assembly or adopted by the courts before 2011 included two majority black House districts in Wake County. The plan enacted by the General Assembly in 2011 drew two majority black House districts in Wake County.

202. In 2011 the General Assembly divided Wake County into 11 racially identifiable districts. The TBVAP in HD 33 (51.42%) and in HD 38 (51.37%) is a minimum of 3 times the TBVAP in nine other districts. In HD 11 the TBVAP is14.84%, in HD 34 it is 17.03%, in HD 35 it is17.41%, in HD 36 it is 7.74%, in HD 37 it is 13.83%, in HD 40 it is 9.76%, in HD 41 it is 7.40% and in HD 49 it is 8.87%.

203. The boundaries the General Assembly drew in assigning Wake County citizens to these racially identifiable districts contain 43 split precincts, 24 of which were used to construct the two majority minority districts. The boundaries of those districts are depicted below. They are bizarrely shaped and visually not compact.



204. HD 33 and 38 are depicted below in greater detail below.

HD 33




HD 38




205. Wake County was not covered by Section 5 in 2011.

206. In 1997 the North Carolina Attorney General acting on behalf of the North Carolina General Assembly informed the United States Attorney General that, except for the area covered by new Congressional District 1, the "General Assembly did not have sufficient evidence to conclude, and believes that sufficient evidence does not exist to conclude, that Gingles factors exist in any other area of the State…". Wake County is not in the area of the State covered by Congressional District 1 in 1997.

207. In drawing HD 33, Defendants knew that the candidate of choice of black voters had been elected in each of the four general elections held under the 2003 House Redistricting Plan (in 2004, '06, '08, and '10) and that in the 2010 election, the candidate of choice of black voters won with 77.79% of the vote. Defendants also knew that in the

2002 general election, the candidate of choice of black voters won under the version of this district drawn by a state superior court judge. Under the Challenged House Plan, the candidate of choice of black voters won in 2012 in an uncontested race.

208. In drawing HD 38, Defendants knew that HD 38 as drawn by the General Assembly in the previous plan was significantly lower than in their plan (27.96% in the prior plan; 51.37% in Defendants' 2011 House Plan). Under the Challenged House Plan, the candidate of choice of black voters won in 2012 in an uncontested race.

209. HD 33 and 38 are the product of the General Assembly's two race-based policies: racial proportionality in the number of House Districts and a minimum 50% TBVAP in each House District drawn to achieve proportionality. None of them are narrowly tailored to serve any compelling state interest.

**House Districts 42 and 43**

210. No redistricting plan enacted by the General Assembly or adopted by the courts before 2011 included any majority black House district in Cumberland County. The plan enacted by the General Assembly in 2011 drew two majority black House districts in Cumberland County.

211. In 2011 the General Assembly divided Cumberland County into 4 racially identifiable districts. The TBVAP in HD 42 (52.56%) and in HD 43 (52.45%) is twice the TBVAP in HD 44 (25.38%) and in HD 45 (19.57%).

212. The boundaries the General Assembly drew in assigning Cumberland County citizens to these racially identifiable districts contain 27 split precincts, all of

which were used to construct the two majority minority districts. The boundaries of those districts are depicted below. They are bizarrely shaped and visually not compact.



213. HD 33 and 38 are depicted below in greater detail below.

HD 42




HD 43




214. In 1997 the North Carolina Attorney General, acting on behalf of the North Carolina General Assembly informed the United States Attorney General that except for the area covered by new Congressional District 1, the "General Assembly did not have sufficient evidence to conclude, and believes that sufficient evidence does not exist to conclude, that Gingles factors exist in any other area of the State … ." Cumberland County is not in the area of the State covered by Congressional District 1 in 1997.

215. In drawing HD 42, Defendants knew that HD 42 as drawn by the General Assembly in the previous plan was significantly lower than in their plan (47.94% in the prior plan; 52.65% in Defendants' 2011 House Plan). In drawing HD 42, Defendants knew that the candidate of choice of black voters had been elected in each of the four

general elections held under the 2003 House Redistricting Plan (in 2004, '06, '08, and '10) and that in the 2010 election, the candidate of choice of black voters won in an uncontested race. Defendants also knew that in the 2002 general election, the candidate of choice of black voters won under the version of this district drawn by a state superior court judge. Under the Challenged House Plan, the candidate of choice of black voters won in 2012 with 77.45% of the vote.

216. HDs 42 and 43 are the product of the General Assembly's two race-based policies: racial proportionality in the number of House Districts and a minimum 50% TBVAP in each House District drawn to achieve proportionality. None of them are narrowly tailored to serve any compelling state interest.

**House District 48**

217. The TBVAP in HD 48 is 51.27%.

218. The General Assembly constructed HD 48 from pieces of Hoke, Robeson, Richmond, and Scotland Counties, creating racially identifiable districts in all four counties. No redistricting plan enacted by the General Assembly or adopted by the courts before 2011 included a majority black House district in any of these four counties.

219. Hoke County is divided between HD 48 and HD 66. The TBVAP in the part of HD 48 in Hoke is 45.51% and in the part of HD 66 in Hoke is 27.51%.

220. The boundaries the General Assembly drew in assigning Hoke County citizens to these racially identifiable districts contain 5 split precincts. The boundary of those districts is depicted below. It is bizarrely shaped and visually not compact.




221. Richmond County is also divided between HD 48 and HD 66. The TBVAP in the part of HD 48 in Richmond is 50.91% and in the part of Richmond in HD 66 is 15.16%.

222. The boundary the General Assembly drew in assigning Richmond County citizens to these racially identifiable districts contains10 split precincts. The boundary of those districts is depicted below. It is bizarrely shaped and visually not compact.




223. Robeson County is divided among HD 46, HD 47, HD 48, and HD 66. The TBVAP in the part of Robeson in HD 48 is 57.97%; in HD 46 in Robeson is 13.69%; and in HD 47 is 17.36%; and in HD 66 in Robeson is 29.53%.

224. The boundary the General Assembly drew in assigning Robeson County citizens to these racially identifiable districts contains 20 split precincts. The boundaries

of those districts are depicted below. They are bizarrely shaped and visually not compact.




225. Scotland County is divided between HD 48 and 66. The TBVAP in HD 48 is 49.84% and in HD 66 is 16.62%

226. The boundary the General Assembly drew in assigning Scotland County citizens to these racially identifiable districts contains five split precincts. The

boundaries of those districts are depicted below. They are bizarrely shaped and visually not compact.



227. HD 48 as a whole is depicted below. It is bizarrely shaped and visually not compact.




228. In drawing HD 48, Defendants knew that the black voting age population in the prior district was substantially lower than in their plan (45.56% in the prior plan; 51.27% in the Defendants' 2011 House Plan). Defendants also knew that the candidate of choice of black voters had been elected in each of the four general elections held under the 2003 House Redistricting Plan (in 2004, '06, '08, and '10) and that in the 2010 election, the candidate of choice of black voters won with 74.80% of the vote.

Defendants also knew that in the 2002 general election, the candidate of choice of black voters won under the version of this district drawn by a state superior court judge. Under the Challenged House Plan, the candidate of choice of black voters won in 2012 in an uncontested race.

229. HD 48 is the product of the General Assembly's two race-based policies: racial proportionality in the number of House Districts and a minimum 50% TBVAP in each House District drawn to achieve proportionality. It is not narrowly tailored to serve any compelling state interest.

**House Districts 57, 58, and 60**

230. The General Assembly divided Guilford County into six racially identifiable districts. The TBVAP in HD 57 (50.69%), in HD 58 (51.11%), and in HD 60 (51.36%) is more than 3 times the TBVAP in HD 59 (13.58%), in HD 61 (15.33%), and in HD 62 (13.30%). Prior to 2011, no plan enacted by the Genial Assembly or adopted by the courts had drawn three majority black House districts in Guilford County.

231. The boundaries the General Assembly drew in assigning Guilford County citizens to these racially identifiable districts contain 37 split precincts, 34 of which were used to construct the three majority minority districts. The boundaries of those districts are depicted below. They are bizarrely shaped and visually not compact.



232. HD 57, 58, and 60 are depicted below in greater detail.

HD 57




HD 58




HD 60




233. In 1997, the North Carolina Attorney General, acting on behalf of the North Carolina General Assembly, informed the United States Attorney General that, except for the area covered by new Congressional District 1, the "General Assembly did not have sufficient evidence to conclude, and believes that sufficient evidence does not

exist to conclude, that Gingles factors exist in any other area of the State … ." Guilford County is not in the area of the State covered by Congressional District 1 in 1997.

234. In drawing HD 57, Defendants knew that the benchmark plan was already proportional. Although a white candidate won in 2010 (under the 2003 House Redistricting Plan), the same white candidate won in 2012 (under the Challenged House Plan) in an uncontested race, which evidences that she was the candidate of choice of black voters.

235. HD 57, 58, and 60 are the product of the General Assembly's two race-based policies: racial proportionality in the number of House Districts and a minimum 50% TBVAP in each House District drawn to achieve proportionality. None of them are narrowly tailored to serve any compelling state interest.

**House Districts 99, 102, and 107**

236. The General Assembly divided Mecklenburg County into 12 racially identifiable districts. The TBVAP in five of those districts is more than 50%—specifically, 54.65% in HD 99; 51.31% in HD 101; 53.53% in HD 102; 51.12% in HD 106; and 52.52% in HD 107. In all but one of the remaining districts, the TBVAP is 18% or less—7.94% in HD 88; 18.18% in HD 92; 13.07% in HD 103; 8.17% in HD 104; and 9.54% in HD 105. The TBVAP in HD 100 is 32.01%.

237. Prior to 2011 no plan drawn by the General Assembly or adopted by the courts drew more than two majority black districts in Mecklenburg County. The 2011 plan includes five majority black House districts in Mecklenburg..

238. The boundaries the General Assembly drew in assigning Mecklenburg County citizens to these racially identifiable districts contain 49 split precincts, 27 of which were used to construct the five majority-minority districts. The boundaries of HD 99, 102, and 107 are depicted below. They are bizarrely shaped and visually not compact.



239. HD 99, 102, and 107 are depicted below in greater detail.

<u>HD 99</u>




<u>HD 102</u>




<u>HD 107</u>




240. Mecklenburg County was not covered by Section 5 in 2011.

241. In 1997 the North Carolina Attorney General acting on behalf of the North Carolina General Assembly informed the United States Attorney General that, except for

the area covered by new Congressional District 1, the "General Assembly did not have sufficient evidence to conclude, and believes that sufficient evidence does not exist to conclude, that Gingles factors exist in any other area of the State…". Mecklenburg County is not in the area of the State covered by Congressional District 1 in 1997.

242. In drawing HD 99, the Defendants knew that the black voting age population in the present plan was substantially lower than in their Plan (41.26% in the prior plan; 54.65% in the Defendants' 2011 House Plan). Defendants also knew that the candidate of choice of black voters had been elected in general elections held under the 2003 House Redistricting Plan (in 2008 and '10) and that in the 2010 election, the candidate of choice of black voters won with 72.01% of the vote. Under the Challenged House Plan, the candidate of choice of black voters won in 2012 in an uncontested race.

243. In drawing HD 102, Defendants knew that the candidate of choice of black voters had been elected in general elections held under the 2003 House Redistricting Plan (in 2008 and '10) and that in the 2010 election, the candidate of choice of black voters (who was white) won in an uncontested race. Defendants also knew that in the 2002 general election, the candidate of choice of black voters won under the version of this district drawn by a state superior court judge. Under the Challenged House Plan, the candidate of choice of black voters won in 2012 in an uncontested race.

244. Defendants also failed to narrowly tailor HD 107 to serve any compelling interest they may have had, including any compelling interest they may have had in complying with Section 2 of the Voting Rights Act. In drawing HD 107, Defendants

knew that the black voting age population in the previous plan was substantially lower than in their Plan (47.14% in the prior plan; 52.52% in Defendants' 2011 House Plan). Defendants also knew that in the four elections held under the previous plan, the black candidate soundly defeated his opponent. Defendants also knew that the candidate of choice of black voters had been elected in each of the four general elections held under the 2003 House Redistricting Plan (in 2004, '06, '08, and '10) and that in the 2010 election, the candidate of choice of black voters won with 67.26% of the vote. Under the Challenged House Plan, the candidate of choice of black voters won in 2012 in an uncontested race.

245. HD 99, 102, and 107 are the product of the General Assembly's two race-based policies: racial proportionality in the number of House Districts and a minimum 50% TBVAP in each House District drawn to achieve

## CAUSE OF ACTION

### Violation of the Equal Protection Clause of the United States Constitution

246. Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations the preceding paragraphs.

247. The Fourteenth Amendment of Section I of the United States Constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

248. Race was the predominant factor in the creation of the Challenged Districts.

249. The use of race as the predominant factor with respect to the Challenged Districts is not narrowly tailored to serve a compelling state interest.

250. Accordingly, the Challenged Districts violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

251. Plaintiffs have no adequate remedy at law other than the judicial relief sought here. The failure to temporarily and permanently enjoin the conduct of elections based on the Challenged Districts will irreparably harm Plaintiffs by violating their constitutional rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1. Convene a court of three judges pursuant to 28 U.S.C. § 2284(a);

2. Declare that the Challenged Districts under the 2011 Enacted Plans are racial gerrymanders in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

3. Issue a permanent injunction enjoining Defendants from enforcing or giving any effect to the boundaries of the Challenged Districts as drawn in the 2011 Enacted Plans, including an injunction barring Defendants from conducting any further elections for the North Carolina General Assembly based on the Challenged Districts;

4. Hold hearings, consider briefing and evidence, and otherwise take actions necessary to determine and order a valid plan for new Senate and House districts in the State of North Carolina; and

5. Grant such other or further relief the Court deems to be appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs.

Respectfully submitted, this the 19th day of May, 2015.


POYNER SPRUILL LLP

/s/ *Edwin M. Speas, Jr.*
Edwin M. Speas, Jr.
N.C. State Bar No. 4112
espeas@poynerspruill.com
John W. O'Hale
N.C. State Bar No. 35895
johale@poynerspruill.com
Caroline P. Mackie
N.C. State Bar No. 41512
cmackie@poynerspruill.com
P.O. Box 1801 (27602-1801)
301 Fayetteville St., Suite 1900
Raleigh, NC 27601
Telephone: (919) 783-6400
Facsimile: (919) 783-1075

*Counsel for Plaintiffs*

SOUTHERN COALITION FOR SOCIAL JUSTICE

/s/ *Anita S. Earls*
Anita S. Earls
N.C. State Bar No. 15597
anita@southerncoalition.org
Allison J. Riggs
State Bar No. 40028
allisonriggs@southerncoalition.org
Southern Coalition for Social Justice
1415 Highway 54, Suite 101
Durham, NC 27707
Telephone: 919-323-3380
Facsimile: 919-323-3942

*Counsel for Plaintiffs*

TIN FULTON WALKER & OWEN, PLLC

*/s/ Adam Stein*
Adam Stein (Of Counsel)
N.C. State Bar # 4145
astein@tinfulton.com
312 West Franklin Street
Chapel Hill, NC 27516
Telephone: (919) 240-7089

*Counsel for Plaintiffs*