# EXHIBIT A

- Doc. Ex. 1866 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

```
STATE OF NORTH CAROLINA   IN THE GENERAL COURT OF JUSTICE
                              SUPERIOR COURT DIVISION
COUNTY OF WAKE                     11 CVS 16896
                                   11 CVS 16940


MARGARET DICKSON, et al.,          )
                                   )
            Plaintiffs,            )
     vs.                           )
ROBERT RUCHO, in his               )
official capacity only as          )
the Chairman of the North          )
Carolina Senate                    )
Redistricting Committee,           )
et al.,                            )
                                   )
            Defendants.            )
_____        )
NORTH CAROLINA STATE               )
CONFERENCE OF BRANCHES OF          )
THE NAACP, et al.,                 )
                                   )
            Plaintiffs,            )
     vs.                           )
STATE OF NORTH CAROLINA,           )
et al.,                            )
                                   )
            Defendants.            )
                                   )



          DEPOSITION OF THOMAS HOFELLER, Ph.D.

_____

                    9:31 A.M.

              THURSDAY, JUNE 28, 2012

_____

                  POYNER SPRUILL
              301 FAYETTEVILLE STREET
                    SUITE 1900
                 RALEIGH, NC 27601


By:  Denise Myers Byrd, CSR 8340, RPR
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES      tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com           fax: 919.847.2265**

```
 1                    A P P E A R A N C E S

 2

 3    For the Plaintiffs, NAACP:

 4            SOUTHERN COALITION FOR SOCIAL JUSTICE
              BY:  ANITA EARLS, ESQ.
 5                 ALLISON RIGGS, ESQ.
                   CHRIS KETCHIE, Policy Analyst
 6            1415 West Highway 54
              Suite 101
 7            Durham, NC  27707
              (919) 323-3380
 8            anita@southerncoalition.org
              allison@southerncoalition.org
 9

10            FERGUSON STEIN CHAMBERS GRESHAM & SUMTER
              BY:  ADAM STEIN, ESQ.
11            312 West Franklin Street
              Chapel Hill, NC  27516
12            (919) 933-5300

13
      For the Plaintiffs, Margaret Dickson, et al.:
14
              POYNER SPRUILL
15            BY:  EDWIN M. SPEAS, JR., ESQ.
              301 Fayetteville Street
16            Suite 1900
              Raleigh, NC  27601
17            (919) 783-2881
              espeas@poynerspruill.com
18

19    For All Defendants:

20            N.C. DEPARTMENT OF JUSTICE
              BY:  ALEXANDER McC. PETERS,
21                 SPECIAL DEPUTY ATTORNEY GENERAL
              114 W. Edenton Street
22            Raleigh, NC  27603
              (919) 716-6900
23            apeters@ncdoj.gov

24

25
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609         ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 3 of 181

```
 1

 2

 3    For the Legislative Defendants:

 4              OGLETREE DEAKINS
               BY:  THOMAS A. FARR, ESQ.
 5             4208 Six Forks Road
               Suite 1100
 6             Raleigh, NC  27609
               (919) 789-3174
 7             thomas.farr@ogletreedeakins.com

 8
               DALTON L. OLDHAM, ESQ.
 9             1119 Susan Street
               Columbia, SC  29210
10             803-772-7729

11

12                    --o0o--

13

14

15              INDEX OF EXAMINATION

16                                      Page

17   By Ms. Earls...........................    9

18                    --o0o--
19

20

21

22

23

24

25
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 4 of 181

```
 1                    INDEX OF EXHIBITS

 2    EXHIBIT NO.   DESCRIPTION                      Page

 3       429    Declaration of Thomas Brooks Hofeller,
               Mississippi State Conference of the
 4             NAACP vs. Haley Barbour                 24

 5       430    Undated, typed letter to Dear Legislative
               Leaders from Chris Jankowski            32
 6
         431    E-mail to Tom Farr from Tom Hofeller,
 7             May 21, 2012, Subject: TBH Travel to
               Raleigh                                 36
 8
         432    Geographic Strategies LLC invoices to
 9             Tom Farr                                38

10       433    Data Report 1-25-11 to "All" from
               Dan Frey                                44
11
         434    Remaining Redistricting Preparation
12             Tasks - Feb 2nd, 2011                   46

13       435    Affidavit of Thomas B. Hofeller, Ph.D.  54

14       436    Carolina Proportionality Chart          80

15       437    Tom House First Cut 20110322            88

16       438    NC House 2 map and statistics           97

17       439    NC Without Odd Minority Districts
               map and statistics                      98
18
         440    NC House Less Convoluted map and
19             statistics                             107

20       441    Map:  NC Senate with Extension into
               Wayne Another Variation of Above       133
21
         442    Hof-Con-2 map and statistics           134
22
         443    NC Cong 9-4 Adjusted map and statistics 135
23
         444    NC Cong Delegations 9-4 May 11 map
24             and statistics                         138

25       445    NC 10-3 CD map and statistics          140
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com              fax: 919.847.2265**

- Doc. Ex. 1870 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

5

| | | | |
|---|---|---|---|
| 3 | 446 | NC Cong 10-3 Delegation map and statistics | 141 |
| 4 | 447 | Map:  Proposed 10-3 Map | 142 |
| 5 | 448 | NC Congress Whole Precinct 1st map and statistics | 143 |
| 7 | 449 | NC Congress Residue Analysis map and statistics | 144 |
| 8 | 450 | Map:  1st Change | 153 |
| 9 | 451 | Map:  Robeson 2 | 157 |
| 10 | 452 | Map:  Robeson 2 - zoomed in | 157 |
| 11 | 453 | NC Data from Hofeller docs | 159 |
| 12 | 454 | NC House Forsyth Experimental map and statistics | 160 |
| 14 | 455 | WinstonSalemCVAP ACSplace | 161 |
| 15 | 456 | Buncombe County detail map | 163 |
| 16 | 457 | Guilford County map with inset | 165 |
| 17 | 458 | E-mail to Joel Raupe from Tom Hofeller, April 19, 2011, Subject:  Interesting Map with attached map | 167 |
| 19 | 459 | E-mail to Joel Raupe from Tom Hofeller, June 19, 2011, Subject:  NC Congressional Plan | 168 |
| 21 | 460 | E-mail string between Tom Farr and others, dated June 30, 2011, Subject: Attorney Client Communication | 168 |
| 23 | 461 | E-mail strings, Subject:  Attorney Client Communication; Subject: NC Map Request | 169 |

1
2
6
13
18
20
22
24
25

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com          fax: 919.847.2265**

- Doc. Ex. 1871 -

**Thomas Hofeller, Ph.D.**                **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

6

1

2

3      462      E-mail string between Tom Hofeller and
               Joe Raupe, June 19 & 20, 2011,
4              Subject:  NC Congressional Plan           171

5      463      Martin House Fair & Legal map and
               statistics                               174
6
       464      Senate Fair and Legal - Nesbitt map and
7              statistics                               175

8
                          --oOo--
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609         ctrptr4u@aol.com               fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 7 of 181

- Doc. Ex. 1872 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

7

```
 1                    STIPULATIONS

 2

 3        It is hereby stipulated and agreed between the

 4     parties to this action, through their respective

 5     counsel of record:

 6        1.  That the deposition of the Thomas Hofeller,

 7     Ph.D., may be taken on June 28, 2012, at 9:30 a.m. in

 8     Raleigh, NC, before Denise Myers, CSR 8340, RPR.

 9        2.  That the deposition shall be taken and used

10     as permitted by the applicable North Carolina Rules

11     of Civil Procedure.

12        3.  That any objections of any party hereto as to

13     notice of the taking of said deposition or as to the

14     time or place thereof, or as to the competency of the

15     person before whom the same shall be taken, are

16     deemed to have been met.

17        4.  That objections to questions and motions to

18     strike answers need not be made during the taking of

19     this deposition, but may be made for the first time

20     during the progress of the trial of this case, or at

21     any pretrial hearing held before any judge of

22     competent jurisdiction for the purpose of ruling

23     thereon, or any other hearing at which said

24     deposition shall be used, except that objections to

25     the form of the question must be made at the time
```

**5813 Shawood Drive  VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com        fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 8 of 181

- Doc. Ex. 1873 -

**Thomas Hofeller, Ph.D.**                    **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

8

1       such question is asked or objection as to the form of

2       the question is waived.

3       5.   That the witness reserves the right to read and

4       sign the transcript prior to it being sealed.

5       6.   That the sealed original of the transcript shall

6       be mailed First Class Postage Paid or hand-delivered

7       to the party taking the deposition for preservation

8       and delivery to the Court if and when necessary.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com            fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 9 of 181

- Doc. Ex. 1874 -

**Thomas Hofeller, Ph.D.**      **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

9

```
 1                    THOMAS HOFELLER, Ph.D.,
 2   having been first affirmed by the Certified Shorthand
 3   Reporter and Notary Public to tell the truth, the whole
 4   truth and nothing but the truth, testified as follows:
 5                         EXAMINATION
 6   BY MS. EARLS:
 7   Q.   Good morning, Dr. Hofeller.  As we introduced
 8        ourselves before the deposition, my name is Anita
 9        Earls.  I represent the NAACP, several other
10        organizations and a large number of citizens in
11        North Carolina who have filed suit challenging the
12        legislative and Congressional redistricting maps.
13             Would you state your name for the record,
14        please.
15   A.   Thomas Brooks Hofeller.
16   Q.   And, Dr. Hofeller, you've been deposed before, I
17        take it.
18   A.   Yes.
19   Q.   Can you give me a rough estimate of how many times
20        you've had your deposition taken.
21   A.   Probably 10 or 12 times.
22   Q.   And how many times have you testified in court?
23   A.   About the same.  I would say, 10 or 12 times.  It's
24        all on my resume.
25   Q.   I ask mainly to clarify that you know it's
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES      tel:919.847.5787**
**Raleigh, NC 27609      ctrptr4u@aol.com           fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 10 of 181

- Doc. Ex. 1875 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

10

```
 1        important to speak your answers, not nod your head,
 2        I take it.
 3   A.   Yes.
 4   Q.   And will you please let me know if you don't
 5        understand my question?
 6   A.   I will.
 7   Q.   And also I would ask that you allow me to finish my
 8        question before you start your answer so that the
 9        court reporter can get down what both of us are
10        saying.
11   A.   I will.
12   Q.   And finally, I'm going to ask you if there's a
13        document that you're aware of that would assist you
14        in answering a question I have, would you please
15        let me know what it is?
16   A.   I will.
17   Q.   We have with us today in electronic form all of the
18        documents that have been produced in this case in
19        response to the subpoena that was issued as well as
20        discovery requests, so I may either have it in
21        paper form or electronically, but we will be sure
22        to try to find any documents that would be useful
23        in getting answers to the questions we have.
24              I want to start --
25              (Brief interruption.)
```

1   BY MS. EARLS:

2   Q.   I finally should be clear that if you need to take

3        a break, please let me know.

4   A.   Thank you.

5   Q.   As you alluded to earlier, your resume has already

6        been produced as an exhibit to an affidavit that

7        was filed in this matter, so I won't belabor it but

8        I would like to briefly go through your background.

9             As I understand it, your academic

10       background is that you graduated with a Bachelor of

11       Arts degree in 1970 from Claremont McKenna College;

12       is that right?

13  A.   Yes.  It was actually then Claremont Men's College,

14       but it's since then changed its name.

15  Q.   In 1980 you received a Ph.D. in Government from

16       Claremont Graduate University?

17  A.   I did.

18  Q.   Am I right that you've never been a tenured member

19       of a university faculty?

20  A.   Yes.

21  Q.   And is it also true that you've never been the sole

22       author of an article published in a referred

23       journal?

24  A.   Yes.

25  Q.   And you don't have a law degree?

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com          fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 12 of 181

```
 1   A.   No.
 2   Q.   I want to talk a little bit about your employment.
 3             From your resume it appears that currently
 4        you have three employments, that you are partner
 5        with Geographic Strategies, LLC, and you've had
 6        that since May 2011 to present; is that correct?
 7   A.   Yes.
 8   Q.   And can you tell us briefly what Geographic
 9        Strategies is?
10   A.   It's an LLC, as is stated, and it assists clients
11        in redistricting work and helps them with
12        redistricting plans and legal work.
13   Q.   And are there other partners in Geographic
14        Strategies?
15   A.   Yes.
16   Q.   How many partners do you have?
17   A.   Two others besides myself.
18   Q.   Then you are also redistricting consultant to the
19        State Government Leadership Foundation and you've
20        had that role since April of 2011 to the present;
21        is that correct?
22   A.   Geographic Strategies has been retained by that
23        organization, and that contract expired at the end
24        of March of this year.
25   Q.   And what is the State Government Leadership
```

**5813 Shawood Drive**  **VIVIAN TILLEY & ASSOCIATES**      **tel:919.847.5787**
**Raleigh, NC 27609**         **ctrptr4u@aol.com**          **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 13 of 181

- Doc. Ex. 1878 -

**Thomas Hofeller, Ph.D.**      **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

13

```
 1        Foundation?

 2   A.   It's associated with the Republican State -- RSLC,

 3        the Republican State Leadership Group.

 4   Q.   And then you're also redistricting consultant to

 5        the Republican National Committee and you've had

 6        that role from May 1999 to the present; is that

 7        correct?

 8   A.   Yes, although first I was a direct consultant to

 9        the Republican National Committee.  Now it's a

10        contract with Geographic Strategies.

11   Q.   So both of your redistricting consultant positions

12        are through contracts that those organizations have

13        with Geographic Strategies?

14   A.   Yes.

15   Q.   How long has Geographic Strategies, LLC, been in

16        existence?

17   A.   Since, I believe, May of 2011.

18   Q.   So your prior consulting work with State Government

19        Leadership Foundation and the Republican National

20        Committee, was that in an individual capacity?

21   A.   Our contract with the State Leadership Group was

22        always, I believe, through the LLC.  That's my

23        recollection.

24   Q.   Did the LLC exist in a different name?

25   A.   No.
```

**5813 Shawood Drive**   **VIVIAN TILLEY & ASSOCIATES**      **tel:919.847.5787**
**Raleigh, NC 27609**         **ctrptr4u@aol.com**              **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 14 of 181

- Doc. Ex. 1879 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

14

```
 1   Q.   So I'm just trying to understand.  If you've been
 2        the redistricting consultant to the Republican
 3        National Committee since May of 1999 and Geographic
 4        Strategies has existed since May of 2011, it's kind
 5        of a long period in there.
 6   A.   I think the association with the RSLC is newer than
 7        that with the RNC.
 8   Q.   My question is:  Prior to the formation of
 9        Geographic Strategies in May 2011, was your
10        redistricting consultant work with the Republican
11        National Committee done in your individual
12        capacity, that is, they contracted with you, or was
13        there some other entity that you were involved
14        with?
15   A.   I'm sorry, you said the Republican National
16        Committee?
17   Q.   Yes.
18   A.   Yes, I was contracted with directly.  I'm sorry, I
19        misunderstood your question.
20   Q.   And again, as I said, your resume is an exhibit,
21        but I did want to ask you specifically about your
22        prior employment as staff director at the U.S.
23        House Subcommittee on the Census.  And it indicates
24        you had that role from February 1998 to July 1999.
25   A.   I did.
```

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 15 of 181

- Doc. Ex. 1880 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

15

```
 1   Q.   And when you were the staff director, did you work
 2        with Dr. Brunell?
 3   A.   I did.
 4   Q.   And did you work with Joel Raupe?
 5   A.   No.
 6   Q.   What about Mr. Morgan, John Morgan?
 7   A.   In my role in that committee?
 8   Q.   Yes.
 9   A.   No.
10   Q.   But did you know him at that time?
11   A.   Oh, yes.
12   Q.   And were you working with him in other capacities?
13   A.   I don't really understand what you mean by "work
14        with."  He was a person who did redistricting work
15        and I have known him for a number of years.  We've
16        never worked together specifically on a project.
17   Q.   And did you also work with Dale Oldham when you
18        were staff director at the U.S. House Subcommittee
19        on the Census?
20   A.   No.
21   Q.   But did you know him at that time?
22   A.   Yes.
23   Q.   And had you worked with him on other projects?
24   A.   Yes.
25   Q.   What other projects did you work with Dale Oldham
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES      tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com          fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 16 of 181

- Doc. Ex. 1881 -

**Thomas Hofeller, Ph.D.**       **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

16

```
 1      on?
 2  A.  Dale was redistricting counsel for the Republican
 3      National Committee in the last redistricting cycle
 4      and I worked with him in that cycle.
 5  Q.  I do want to talk a little bit about your
 6      experience with redistricting.
 7              As I understand it from your resume, your
 8      earliest experience was -- began in 1970 when you
 9      developed the first computerized geographic mapping
10      and data retrieval system used by the California
11      State Assembly; is that right?
12  A.  Well, that's what's on my resume.  I actually did a
13      little bit of work for -- not for pay but with
14      building a very rudimentary database for
15      redistricting in California in the mid '60s as
16      California was trying to cope with the one-person,
17      one-vote rule and had to do a mid decade
18      redistricting.
19  Q.  While it was not for pay, in what capacity were you
20      working on developing the database for
21      redistricting in the mid '60s?
22  A.  Essentially matching census geography with
23      political geography.
24  Q.  Were you doing that -- who did you do that work
25      for?  You may have just said.
```

**5813 Shawood Drive**   **VIVIAN TILLEY & ASSOCIATES**    **tel:919.847.5787**
**Raleigh, NC 27609**      **ctrptr4u@aol.com**      **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 17 of 181

```
 1   A.   Well, I worked with my brother-in-law, actually,

 2        and he was working with State Senator -- or maybe

 3        Assemblyman at that point -- Jim Mills was

 4        Democratic Chairman, I believe, of the

 5        Redistricting Committee, so it's been a long time

 6        ago.  I don't remember what all the connections

 7        were.

 8   Q.   Sure.  Did you have any -- can you just briefly

 9        describe what your role was in the 1970 round of

10        redistricting or the round of redistricting that

11        followed the 1970 Census?

12   A.   Again, as you stated, we developed a set of

13        software to assist redistricting, which by today's

14        terms is pretty rudimentary, but it was really kind

15        of advanced for that time, and people were able to

16        digitize boundaries of prospective districts and

17        get statistics out of the computer as to what the

18        districts were.

19   Q.   Was it used anywhere other than California?

20   A.   No.

21   Q.   Then were you involved in redistricting following

22        the 1980 Census?

23   A.   Yes.

24   Q.   What did you do in that round of redistricting?

25   A.   Can I go back to my previous answer?
```

**5813 Shawood Drive**   **VIVIAN TILLEY & ASSOCIATES**    **tel:919.847.5787**
**Raleigh, NC 27609**      **ctrptr4u@aol.com**      **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 18 of 181

```
 1   Q.   Please.

 2   A.   Okay.  We also drew maps, too.

 3   Q.   Okay.

 4   A.   Again, I was involved with the development of a

 5        more advanced redistricting system, and again, the

 6        combination of demographic data and election

 7        history data, registration data to load into the

 8        system -- again, another GIS system -- and assisted

 9        in drawing maps in court cases, et cetera.

10   Q.   So following the 1980 Census and that round, in

11        that round of redistricting you were involved as an

12        expert witness in litigation; is that correct?

13   A.   Well, actually, I was an expert -- I'm sorry.  An

14        expert witness, yes.

15   Q.   And the Summary of Participation in Lawsuits that's

16        in your resume, is that a complete list or sort of

17        the highlights of the cases you've been involved

18        in?

19   A.   There may have been some more cases this year and

20        last year, but up until then it was complete.

21   Q.   It's a complete list.  Thank you.

22             And then following the 1990 Census,

23        generally what was your involvement in

24        redistricting?

25   A.   I was retained by the Republican National Committee
```

```
 1        in a role similar to the role that I performed as a
 2        consultant in this redistricting cycle, which was
 3        to assist in -- I'm sorry, '90, you said '90?
 4   Q.   We're done with 1980.
 5   A.   Right.  1990 I was actually working for the
 6        National Republican Congressional Committee and,
 7        again, there assisting particularly members of
 8        Congress, getting them educated about
 9        redistricting, which only occurs every ten years,
10        and developing software -- actually, not developing
11        but guiding the development of software for
12        redistricting, aiding them in drawing plans and any
13        other redistricting needs that they had.
14   Q.   Then I did look carefully through your list of
15        lawsuits and I could not find -- it doesn't appear
16        to me that you were an expert witness in any
17        litigation in the 2000 round of redistricting.  Is
18        that right or have I missed something?  And I'm
19        happy to show you the resume.
20   A.   I can't remember anything right now that may have
21        happened, but I don't remember.
22   Q.   So what was your role in the post 2000 round Census
23        in redistricting?
24   A.   In 2000?
25   Q.   Yes.
```

- Doc. Ex. 1885 -

**Thomas Hofeller, Ph.D.**    **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.    11 CvS 16896 & 11 CvS 16940

20

1    A.    Then I was back at the Republican National

2          Committee, and we had an extensive program of

3          representation, both technical, legal, demographic,

4          and really all aspects of redistricting, held

5          seminars, trained people, assisted GOP stakeholders

6          in states when they needed help and assistance and

7          really represented the national party in that

8          process.

9    Q.    Is there a reason why you weren't involved as an

10         expert witness in litigation following the 2000

11         Census?

12   A.    No.

13   Q.    Then I'd like to get more clarity on what

14         litigation you've been involved in in this round of

15         redistricting following the 2010 Census.  And your

16         resume does list two cases.  It lists the Boone

17         versus Nassau County Legislature, New York case,

18         and then the case in Texas, Petteway versus Henry.

19              Are there other cases in litigation where

20         you have participated as an expert other than the

21         North Carolina --

22   A.    You mean testified or by affidavit?

23   Q.    Either way, just any case other than the

24         North Carolina case which we'll get to in a minute.

25   A.    There was a case in Nueces County in Texas.

**5813 Shawood Drive**   **VIVIAN TILLEY & ASSOCIATES**        **tel:919.847.5787**
**Raleigh, NC 27609**         **ctrptr4u@aol.com**              **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 21 of 181

```
 1                    Did you mention the Missouri case?
 2    Q.    No.
 3                    So let's start with the Texas case.  What
 4          was your role in that case?
 5    A.    There were actually two Texas cases, one in
 6          Galveston and one in Nueces county.
 7    Q.    And the Petteway verse Henry, that's the Galveston
 8          case?
 9    A.    I assume so, yes.
10    Q.    Because on your resume you explain that you
11          prepared an alternative redistricting plan in that
12          case.
13                    What did you do in the Nueces County?
14    A.    The same function.
15    Q.    And who were you retained by in the Nueces County
16          case?
17    A.    Defendant intervenors.  I don't actually recall who
18          specifically.  I'm sorry.
19    Q.    Then you mentioned a Missouri case.
20    A.    Yes.  There were, again, defendant intervenors, and
21          I testified as an expert witness and prepared some
22          sample maps -- although I don't believe they were
23          entered -- and testified on compactness.
24    Q.    And were you involved in both the Missouri case
25          dealing with the Congressional redistricting and
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com          fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 22 of 181

- Doc. Ex. 1887 -

**Thomas Hofeller, Ph.D.**                    **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

22

1      the Missouri case dealing with legislative

2      redistricting?

3   A.  The House, the House specifically.

4   Q.  So you were involved --

5   A.  The Senate went down a different legal path than

6      the House and I put in an affidavit.

7   Q.  In the House case?

8   A.  Yes.

9   Q.  But did you also -- wasn't there also -- were you

10      also involved in a case dealing with Congressional?

11   A.  I was involved in the Congressional case.  That's

12      where I testified in court.

13   Q.  Any other litigation experience this round of

14      redistricting?

15   A.  I've just recently submitted an affidavit in an

16      Arizona case, plaintiffs have filed against the

17      legislative map --

18   Q.  And who is --

19   A.  -- and the Congressional map.

20   Q.  And who's retained you in that case?

21   A.  I'm sorry?

22   Q.  Who's retained you in the Arizona case?

23   A.  Again, plaintiff intervenors.  Plaintiff

24      intervenors.

25              And also I just recently put in an

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com            fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 23 of 181

- Doc. Ex. 1888 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

23

1       affidavit on a Maryland case.

2   Q.  In the Arizona case, do you recall the name of the

3       case?

4   A.  No, I don't.  I'm sorry.

5   Q.  In the Maryland case, who retained you in that

6       case?

7   A.  Plaintiffs, I believe.

8   Q.  And what work have you done in the Maryland case?

9   A.  I did analysis of the splits of counties and I did

10      an analysis of compactness.

11  Q.  Do you know if that case is in Federal or State

12      Court?

13  A.  It's in Federal Court.  No, I'm sorry.  It's in the

14      State Court, I believe, actually.

15  Q.  Do you recall the attorneys who retained you in

16      that case?

17  A.  Jason Torchinsky.

18          Do you need that spelling?

19  Q.  If you know the spelling.

20  A.  T-O-R-C-H-I-N-S-K-I, I think.

21  Q.  Any other litigation post 2010 Census that you've

22      been involved in?

23  A.  Again, not that I can recall right now.

24  Q.  Do you recall being involved in a case in

25      Mississippi following the 2010 Census?

**5813 Shawood Drive  VIVIAN TILLEY & ASSOCIATES     tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com          fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 24 of 181

```
 1   A.   No, actually, I don't.

 2   Q.   Other than -- I'm sorry.  Let me go back to

 3        Mississippi for just a minute.

 4             Mississippi State Conference of the NAACP

 5        versus Haley Barbour, does that refresh your

 6        recollection?

 7   A.   If you have a document there, it probably would be

 8        best to --

 9   Q.   To show it to you.

10             (WHEREUPON, Exhibit 429 was marked for

11        identification.)

12   BY MS. EARLS:

13   Q.   You've been handed an exhibit marked 429, and this

14        is a declaration.  Am I correct that this is a

15        declaration that you prepared and that was filed in

16        a case in Mississippi?

17   A.   Yes.  I'm sorry.

18   Q.   That's all right.

19             Does this refresh your recollection?

20   A.   Yes.

21   Q.   And do you recall who retained you in this case?  I

22        don't think it actually says that in the document

23        that we have.

24   A.   Well, it was the defendants.  I don't really recall

25        exactly who it was.
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com          fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 25 of 181

1  Q.   I may have questions about that later so hold onto

2       it.

3  A.   Okay.

4  Q.   Any other cases that you have been involved in in

5       the post 2010 Census round of redistricting?

6  A.   Again, not that I can recall.

7  Q.   Other than being retained to testify in various

8       litigation around the country, can you describe

9       generally the other work that you've done around

10      redistricting following the 2010 Census?

11 A.   We've been particularly involved with various state

12      efforts in looking at maps, devising maps and

13      giving advice to stakeholders on the process,

14      giving technical assistance on the process.

15 Q.   When you say "we," are you referring to Geographic

16      Strategies, LLC?

17 A.   Well, yes, both in that role and before that role

18      and in my capacity as the consultant to the

19      Republican National Committee.

20 Q.   And you described how you have been giving advice.

21      Generally, who is it that you're working with in

22      the various states in providing that advice and

23      technical assistance?

24 A.   I'm sorry, I don't think that question is -- who?

25      In what respect?

**5813 Shawood Drive**    **VIVIAN TILLEY & ASSOCIATES**     **tel:919.847.5787**
**Raleigh, NC 27609**      ctrptr4u@aol.com       **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 26 of 181

```
 1   Q.   State legislators, Republican Party officials, who

 2        is it that you're working with?

 3   A.   We have worked with all of the people who are

 4        involved in the process and around the process,

 5        attorneys, legislators, commission members, state

 6        parties, in some cases other outside interested

 7        people.

 8   Q.   In the post 2010 round of redistricting, you've

 9        been the redistricting consultant to the Republican

10        National Committee.  Is it correct that you have

11        not provided any advice to any Democratic state

12        party?

13   A.   No.  Yes, it's correct that I haven't.  I'm sorry.

14   Q.   So let me turn to the work that you've done in

15        North Carolina.

16             And it's clear that in North Carolina you

17        were involved -- you were involved in drafting the

18        plans that were ultimately enacted; is that

19        correct?

20   A.   Yes.

21   Q.   And you also have been designated as an expert

22        witness in this litigation?

23   A.   Yes.

24   Q.   In any of the other cases that you've been involved

25        in -- and I'll start with just this round of
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 27 of 181

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

27

1        redistricting since the 2010 Census -- did you

2        similarly have that kind of role?  And

3        specifically, I mean were you drawing plans for a

4        legislature that were enacted and at the same time

5        serving as an expert witness in litigation?

6    A.  In one case which you did not mention, which was

7        the Mississippi case, Connor v Finch in 1977, '78,

8        I actually served as an expert and a fact witness,

9        although that was my first time testifying in

10       court, my ability to render opinions on the case

11       was challenged by the plaintiffs and the judges

12       allowed that I was just as qualified as anybody

13       else to give those opinions so I guess that would

14       be counted as expert testimony.

15   Q.  In any case other than that case have you served in

16       that dual role as a fact witness and expert

17       witness?

18   A.  Not specifically, no.

19   Q.  Now, you were -- I'm correct that you were involved

20       in North Carolina in the 1990 round of

21       redistricting.  Were you involved in redistricting

22       in North Carolina prior to 1990?

23   A.  Yes.

24   Q.  What did you do in North Carolina prior to 1990?

25   A.  I was retained by the State and testified in

```
 1       Gingles.

 2   Q.  And that was in the 1980 round of redistricting?

 3   A.  Yes.

 4   Q.  Prior to 1980, were you involved in North Carolina?

 5   A.  No.

 6   Q.  Other than the testimony that you gave in the

 7       Gingles case, did you have any other involvement in

 8       North Carolina in the 1980s?

 9   A.  I'm sorry.  In the 19 --

10   Q.  '80s.

11   A.  '80s, not that I remember.

12   Q.  What did you do in the 1990s round of redistricting

13       in North Carolina?

14   A.  I testified in Shaw and, of course, throughout that

15       round also compiled databases and devised

16       redistricting plans, advised the plaintiffs.

17              (Brief interruption.)

18   BY MS. EARLS:

19   Q.  Many of us in the room know this, but just for the

20       record, who retained you in the Shaw litigation?

21   A.  The plaintiffs.

22   Q.  And in that case there were plaintiffs and

23       plaintiff intervenors?

24   A.  Right.  Robinson Everett, I believe, Judge Everett.

25   Q.  Other than your involvement as an expert in the
```

```
 1        Shaw versus Reno, then Shaw versus Hunt litigation

 2        in North Carolina, were you -- did you have any

 3        other involvement in redistricting in

 4        North Carolina in the 1990s?

 5   A.   Again, not that I can recall.  Sometimes it merges.

 6   Q.   I'm trying to keep us straight by decade.

 7   A.   Right.  There have been a lot of decades.

 8   Q.   I appreciate that.

 9             For the post 2000 round of redistricting,

10        did you have any involvement in statewide

11        redistricting in North Carolina?

12   A.   Yes.

13   Q.   What was your involvement?

14   A.   Again, in associating -- in assisting GOP

15        stakeholders in their activities in the state and

16        also in involvement in Strickland.

17   Q.   Did you draw any redistricting maps for

18        North Carolina in the post 2000 round of

19        redistricting?

20   A.   Do you mean specifically for the State of

21        North Carolina or just for North Carolina in

22        general?

23   Q.   So you've explained that you were advising GOP

24        stakeholders --

25   A.   Yes.
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES      tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com            fax: 919.847.2265**

- Doc. Ex. 1895 -

**Thomas Hofeller, Ph.D.**    **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

30

```
 1   Q.   -- in the 2000 round of redistricting.

 2   A.   I did draw statewide maps in that capacity.

 3   Q.   And what work did you do in connection with the

 4        Stephenson litigation?

 5   A.   Again, I assisted in the preparation of maps for

 6        court purposes.

 7   Q.   Did you testify in that case?

 8   A.   Let's see.  That was 2000.  I don't recall,

 9        actually.  I'm sorry.

10   Q.   Do you recall in preparing the maps that you

11        prepared in connection with the Stephenson

12        litigation what the focus of your analysis was?

13   A.   It was very similar to this round in looking at the

14        relationship between counties and the Voting Rights

15        Act.

16   Q.   Were you looking at Congressional districts as well

17        as state legislative districts?

18   A.   Not really to any great extent that I remember.

19   Q.   Then in this round of redistricting following the

20        2010 Census you've been described by various people

21        we've deposed as being the principal architect or

22        the principal map drawer.

23             Is that a fair description of your role in

24        North Carolina?

25   A.   I have no problem with that description.
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com           fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 31 of 181

**Thomas Hofeller, Ph.D.**      June 28, 2012
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

```
 1   Q.   Do you recall when you were first retained to be
 2        involved in redistricting in North Carolina
 3        following the 2010 Census?
 4   A.   Again, what do you mean specifically by "retained"?
 5   Q.   Well, maybe I should back up and say in what
 6        capacity have you been involved in the 2010 round
 7        of redistricting in North Carolina?
 8   A.   That's a very long answer.  The first involvement
 9        was in assisting the chairman of the Redistricting
10        Committees and assisting the state staff in
11        bringing together a database for use on the state
12        system and also for public distribution.
13             That was the first phase because we were
14        all waiting for the Census data, and you have to
15        merge the Census data and the election history and
16        registration data together in one database so that
17        it can be properly used in GIS systems which are
18        used to draw maps.  So there was that.
19             There was also discussion about criteria
20        and how that would be -- how the plan would be
21        architected, I guess if you were going to use the
22        description architecture, and then acted in
23        actually drawing districts in plans and acted as
24        kind of a manager, gatekeeper of the technical
25        aspects of the redistricting processes.  The
```

```
 1       chairmen were trying to bring the plans to

 2       completion and work them through the legislative

 3       process.

 4   Q.  And then just to finish the different stages of

 5       your involvement, at some point, then, you were

 6       also retained to provide expert testimony in this

 7       litigation?

 8   A.  Yes.

 9   Q.  So let me go back to the first capacity and that is

10       assisting the chair.  Was --

11   A.  Chairs.

12   Q.  Chairs.  Who specifically are you referring to?

13   A.  Senator Rucho and David --

14   Q.  Lewis?

15   A.  Lewis, yes, David Lewis.  I had known David Lewis

16       prior to that, too.

17   Q.  And who retained you to provide that assistance to

18       Senator Rucho and Representative Lewis?

19   A.  Well, they did through counsel.

20   Q.  And that's through Mr. Farr?

21   A.  Yes.

22   Q.  And then -- well, let me -- I do want to ask you

23       one thing about that.

24              (WHEREUPON, Exhibit 430 was marked for

25       identification.)
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com                fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 33 of 181

```
 1   BY MS. EARLS:

 2   Q.   I'm handing you a document that's been marked as

 3        Exhibit 430.  This was among the documents that

 4        were produced to us.  Do you recognize this?

 5   A.   I do.

 6   Q.   And can you tell us what it is?

 7   A.   I think it speaks for itself.  It's a letter to

 8        legislative leaders introducing our relationship

 9        with the SGLF and also saying that those resources

10        were available to them if they so wished.

11   Q.   And so when you say "we" --

12   A.   Well, that -- I'm sorry.  I'm interrupting your

13        question.

14   Q.   -- you're referring to the State Government

15        Leadership Foundation?

16   A.   Excuse me for a minute.

17            (Discussion held off the record.)

18            MR. FARR:  Adam, I apologize for my bad

19        manners.  This is Adam Hofeller.  This is Adam

20        Stein who is counsel with Anita for the NAACP

21        plaintiffs.

22            THE WITNESS:  Good morning.

23            MR. STEIN:  Good morning.  We met 20 some

24        odd years ago and I was the questioner.

25            THE WITNESS:  Okay.
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES      tel:919.847.5787**
**Raleigh, NC 27609         ctrptr4u@aol.com            fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 34 of 181

**Thomas Hofeller, Ph.D.**                    **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

```
 1                MR. STEIN:  And I just got to spend an
 2         hour and 45 minutes on I40.  Excuse me for being
 3         late.
 4                MS. EARLS:  I apologize.  I get so caught
 5         up.
 6    BY MS. EARLS:
 7    Q.   So I was asking you about this Exhibit 430 and
 8         wanting to know if this -- if this document comes
 9         from the State Government Leadership Foundation.
10    A.   My recollection is your question was what I meant
11         by "we."
12    Q.   Okay.
13    A.   Is that true?
14    Q.   Yes, we can start with that one.
15    A.   Well, Dale Oldham and myself and a person named
16         Mike Wild were the three people who were involved
17         in that work.
18    Q.   And when you say "in that work," what do you mean?
19    A.   In advising both the SGLC -- SGLF and anybody who
20         wished to ask for assistance in their redistricting
21         efforts on their process.
22    Q.   So this mentions the RSLC.  And what does that
23         stand for?
24    A.   Republican State Leadership Council.
25    Q.   Do you know who this letter went to?
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com               fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 35 of 181

```
 1    A.   Specifically, no.

 2    Q.   In general how it was distributed.

 3    A.   I think it went to the people whom it was

 4         addressed, legislative leaders.  Whether or not

 5         they had a more extensive mailing list, I don't

 6         know.

 7    Q.   Do you know if it went to the legislative leaders

 8         in North Carolina that you worked with, that is,

 9         the Chairs Senator Rucho and Representative Lewis?

10    A.   As a fact?

11    Q.   Well, first, yes.

12    A.   No, I don't know as a fact.

13    Q.   Is it possible that they are among the group of

14         legislative leaders that this went out to?

15    A.   Yes.

16              MR. FARR:  Dr. Hofeller, try to let her

17         finish her questions.

18              THE WITNESS:  Yes.

19    BY MS. EARLS:

20    Q.   I was going through the various capacities that you

21         were retained to work in North Carolina, and am I

22         correct that in each of these capacities, that is,

23         assisting the chair and the state staff and

24         compiling the database prior to the Census data

25         being released, working on the criteria and sort of
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 36 of 181

```
 1        the architecture of the plans, drawing the
 2        districts in the plans, managing the process and
 3        then being retained as an expert witness, in each
 4        capacity were you retained by Senator Rucho and
 5        Representative Lewis through their counsel Tom
 6        Farr?
 7   A.   Yes.
 8   Q.   Do you remember when you were first contacted to do
 9        this entire body of work?
10   A.   Actually, discussions about North Carolina
11        redistricting started in earnest shortly after the
12        2010 election and have worked from there.
13   Q.   When you say discussions, do you mean your
14        discussions with Senator Rucho and Representative
15        Lewis?
16   A.   I did speak with them during that period.  I don't
17        know specifically the dates.
18   Q.   So we're talking roughly November, December 2010?
19   A.   November, December, January and then more
20        extensively thereafter.
21             (WHEREUPON, Exhibit 431 was marked for
22        identification.)
23   BY MS. EARLS:
24   Q.   You're being handed an exhibit that's marked 431.
25        This is an e-mail that was sent to me and Mr. Speas
```

**5813 Shawood Drive**    **VIVIAN TILLEY & ASSOCIATES**     **tel:919.847.5787**
**Raleigh, NC 27609**        **ctrptr4u@aol.com**       **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 37 of 181

 1      from Tom Farr and it includes an e-mail from you to

 2      Mr. Farr with the -- am I correct this is your best

 3      reconstruction based on expense reports of the time

 4      that you spent in North Carolina in 2011?

 5  A.  Yes.

 6  Q.  And to the best of your recollection now, this is a

 7      fairly complete listing of the dates that you were

 8      in North Carolina?

 9  A.  Yes.

10  Q.  Did you -- when you came to North Carolina, was all

11      of your work done in Raleigh?

12  A.  Yes.

13  Q.  Did you -- on any of these occasions on this

14      Exhibit 431 did you travel to any other part of the

15      state?

16  A.  No.

17  Q.  And where in Raleigh did you do your work?

18  A.  I worked at least on these dates both at the

19      legislative office building and at the Republican

20      Party headquarters in Raleigh.

21  Q.  Did you attend any of the public hearings that were

22      held on redistricting in 2011 in North Carolina?

23  A.  No.

24  Q.  Did you review the transcripts of those hearings at

25      any point?

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 38 of 181

```
 1   A.   No.

 2   Q.   Did you attend any of the Redistricting Committee

 3        hearings?

 4   A.   No.  I may have briefly looked in on one, but I

 5        wouldn't have considered it attending because I

 6        didn't hear what was going on.

 7   Q.   Did you review any of the transcripts of the

 8        Redistricting Committee hearings or any notes of

 9        those hearings?

10   A.   No.

11   Q.   You previously testified that for all four of these

12        phases you've been retained by Representative Lewis

13        and Chairman Senator Rucho.  Who's paid you for

14        this work?

15   A.   I received a check from Ogletree which to the best

16        of my knowledge came from the state government.

17   Q.   Have you been paid by the RNC for any of this work

18        that you've done in North Carolina?

19   A.   No.

20              (WHEREUPON, Exhibit 432 was marked for

21        identification.)

22   BY MS. EARLS:

23   Q.   You've been handed an exhibit marked 432, and this

24        is several pages of invoices on your letterhead.

25              Am I correct that these are the invoices
```

- Doc. Ex. 1904 -

**Thomas Hofeller, Ph.D.**          June 28, 2012
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940
39

```
 1        for work that you've done in North Carolina?
 2   A.   They are.
 3   Q.   I note that the first invoice -- attached here in
 4        date -- well, that's not correct.  There's a
 5        January 27th invoice.  It's dated January 27th
 6        but -- the last page.  If you could look at the
 7        last page of Exhibit 432.  The date of the invoice
 8        is January 27, 2011, but then the description is
 9        for services from December 1, 2011, to January 31,
10        2012.
11             Am I correct that this is in fact an
12        invoice that should have been dated January 27,
13        2012?
14   A.   Yes.
15   Q.   So if that's right, then these are attached in date
16        order.  And the first invoice we have is August 9,
17        2011.
18   A.   Yes.
19   Q.   And it states that this is an invoice for work
20        beginning April 1st, 2011.
21             My question is:  Is there an invoice for
22        work that was done any time between November 2010
23        and April 1st, 2011?
24   A.   No.
25   Q.   And if we look back at Exhibit 431, your first trip
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609            ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 40 of 181

- Doc. Ex. 1905 -

**Thomas Hofeller, Ph.D.**       **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

40

```
 1        to North Carolina would have been in -- what's the
 2        date there of the first trip to North Carolina?
 3   A.   The date?
 4   Q.   Yes.
 5   A.   On the exhibit is February 1st through
 6        February 2nd.
 7   Q.   Were you compensated for the time that you spent in
 8        North Carolina February 1st to February 2nd?
 9   A.   No.
10   Q.   So you were not compensated by Ogletree Deakins for
11        any work done prior to April 1st, 2011?
12             MR. FARR:  Objection to form.
13   BY MS. EARLS:
14   Q.   You can answer.
15   A.   The work that I did that was on the first invoice
16        was essentially a flat fee for those services that
17        were rendered on the dates mentioned by the
18        invoice.
19             I'm sorry, ask your question again so I can
20        give you a yes-or-no answer.
21   Q.   Were you compensated by anyone for the work that
22        you did in North Carolina prior to April 1st, 2011?
23   A.   No.
24   Q.   Each of these invoices in Exhibit 432 have a
25        statement that sets out the rates that you charge
```

**5813 Shawood Drive**   **VIVIAN TILLEY & ASSOCIATES**      **tel:919.847.5787**
**Raleigh, NC 27609**         **ctrptr4u@aol.com**         **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 41 of 181

```
 1           for litigation preparation and court testimony.

 2                 Am I understanding you right that the first

 3           invoice, the August 9th invoice, was a flat fee so

 4           you weren't charging these hourly rates?

 5    A.     Correct.

 6    Q.     Then the next invoice, August 31st, are you

 7           charging hourly rates at that point?

 8    A.     Yes.

 9    Q.     And then the successive invoices are all based on

10           your hourly rates?

11    A.     Yes.

12    Q.     So you described how the first step was assisting

13           the chair and the state staff in constructing a

14           database and that you did that while you were

15           waiting for the Census data.

16                 So am I correct that all of that was done

17           prior to mid March 2011?

18    A.     Yes.

19    Q.     No one compensated you for that work?

20    A.     No.

21    Q.     What data were you -- what data were you gathering?

22    A.     I wasn't gathering the data.  The state was

23           gathering the data.

24    Q.     What data were they gathering?

25    A.     They were gathering the results of past elections
```

**5813 Shawood Drive**  **VIVIAN TILLEY & ASSOCIATES**      **tel:919.847.5787**
**Raleigh, NC 27609**          **ctrptr4u@aol.com**        **fax: 919.847.2265**

1       and past voter registration.

2   Q.  And why did you -- why was it important for them to

3       gather that data?

4   A.  It's important because this data -- it's felt this

5       data is required in order to draw lines and make

6       the decisions that need to be made, a standard

7       practice.

8   Q.  How did you -- or who made the decision about which

9       past election results the state staff should gather

10      for the database?

11  A.  That was the responsibility of the chairman of the

12      committees.

13  Q.  So Senator Rucho and Representative Lewis?

14  A.  Yes.

15  Q.  And did you have any role in advising them as to

16      which elections data they should gather?

17  A.  Yes.

18  Q.  And what advice did you give them?

19  A.  My general advice was to gather everything that

20      could be gathered.  There were -- there was not an

21      ongoing process of gathering data specifically for

22      redistricting through the previous decade in

23      North Carolina, and the legislative staff was

24      behind on that process, and they were also -- the

25      data needed to be formatted such that it could be

**Thomas Hofeller, Ph.D.**     **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

```
 1        put into a redistricting system and merged with the

 2        expected PL 94 Census data, and since the chairmen

 3        were unfamiliar with that process, we advised

 4        them -- I advised them in that process.

 5   Q.   Did anyone other than state staff assist in that

 6        process?

 7   A.   I'm sorry.  Which process?

 8   Q.   Of gathering -- we're talking now pre-Census data

 9        being released, gathering the election results and

10        voter registration data that you were advising the

11        chairman should be gathered and made part of the

12        state database.  And I'm just saying were any other

13        outside consultants, data crunchers, experts, was

14        anyone else involved?

15   A.   Okay.  I'm clear now.  Thank you.

16             We recommended that they hire a person by

17        the name of Ben Friedman who was familiar with this

18        process who worked under the direction of state

19        staff to help them with certain aspects of that

20        database build.

21   Q.   And what is Ben Friedman's background or

22        experience?

23   A.   His experience then was that he worked for a period

24        of time in the RNC's data IT shop called Strategic

25        Analysis and did similar work there and so was very
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES**     **tel:919.847.5787**
**Raleigh, NC 27609**          **ctrptr4u@aol.com**          **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 44 of 181

1      familiar with that process specifically.

2  Q.  And do you know how long Ben Friedman worked with

3      the state staff to compile the database?

4  A.  I don't know what the exact dates were, but it was

5      a very brief period of time.  It was a single

6      process, single project process, and I'd have to

7      say measured in weeks.

8  Q.  Was there anybody else that was involved in this

9      process other than state legislative staff?

10 A.  Certainly not that came to my attention that I can

11     recall.

12            MR. FARR:  Can we take a break when it's

13     convenient?

14            MS. EARLS:  Sure, if I can just finish up

15     general data questions.

16            (WHEREUPON, Exhibit 433 was marked for

17     identification.)

18 BY MS. EARLS:

19 Q.  I believe you have in front of you what's been

20     marked as Exhibit 433, and this is a file that was

21     produced to us with the file name that you see at

22     the bottom, "Data Report 1-25-11."

23            Do you recall seeing this document?

24 A.  I believe I did, yes.

25 Q.  And do you know who Dan Frey is?

**5813 Shawood Drive  VIVIAN TILLEY & ASSOCIATES      tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP  Document 23-2  Filed 10/07/15  Page 45 of 181

```
 1   A.    I do.
 2   Q.    Did you -- was he the principal person on the state
 3         staff that you were working with to gather the data
 4         as you described it?
 5   A.    I would not say necessarily gather the data but to
 6         merge the databases and work with the various data
 7         sets.
 8   Q.    And does this memo deal with the subject of that
 9         work?
10   A.    Yes.
11   Q.    So you received this memo?
12   A.    I believe so, yes.
13   Q.    And do you know what he's referring to when he says
14         "in case it might help with discussions in DC, for
15         those of you that are there"?
16   A.    I think he's referring to myself and Mr. Oldham and
17         Mr. Wild.  I don't think he was quite clear on what
18         our association was at that point, but very
19         helpful, I might add, and competent.
20   Q.    Mr. Frey was?
21   A.    Yes.
22   Q.    That was actually going to be one of my questions
23         was whether to your knowledge -- this memo is kind
24         of a status report on the database building task
25         and he's reporting on the progress with various
```

**5813 Shawood Drive**   **VIVIAN TILLEY & ASSOCIATES**        **tel:919.847.5787**
**Raleigh, NC 27609**            **ctrptr4u@aol.com**              **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 46 of 181

- Doc. Ex. 1911 -

**Thomas Hofeller, Ph.D.**      **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.  11 CvS 16896 & 11 CvS 16940

46

1    aspects of that task, and I just wanted to ask you

2    whether his -- whether, to your knowledge, these

3    tasks were done ultimately.

4  A.   Yes.

5         I would like to clarify this was not a

6    report to me.

7  Q.   Do you know who it was a report to?

8  A.   The chairman of the two committees.

9  Q.   But to your knowledge the work was done?

10  A.   Yes.

11  Q.   And it was done adequately?

12  A.   Yes.

13         (WHEREUPON, Exhibit 434 was marked for

14    identification.)

15  BY MS. EARLS:

16  Q.   Exhibit 434 is a two-page document with the title

17    Remaining Redistricting Preparation Tasks --

18    February 2nd, 2011.

19         Have you seen this document before?

20  A.   Yes.

21  Q.   And can you tell me what it is.

22  A.   I think it's pretty much described by its header.

23    It was the tasks remaining to prepare for

24    redistricting on February 2nd.

25  Q.   Did you review this as part of your role in

**5813 Shawood Drive**  **VIVIAN TILLEY & ASSOCIATES**  **tel:919.847.5787**
**Raleigh, NC 27609**  **ctrptr4u@aol.com**  **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 47 of 181

- Doc. Ex. 1912 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

47

1      assisting the chairs in setting up the databases

2      they needed?

3  A.   Yes.

4  Q.   And does this accurately reflect the work that

5      ultimately was done?

6  A.   Yes.

7  Q.   And to your knowledge, was it done properly?

8  A.   It appears so to me and on time, I might add.

9  Q.   Very good.

10           MS. EARLS:  This is a good place to take a

11      break.

12           (Brief Recess:  10:32 to 10:45 a.m.)

13  BY MS. EARLS:

14  Q.   I have a few more questions about this data

15      project.  And I want to understand you were merging

16      election returns from the North Carolina -- well,

17      not you personally, but the point of the project

18      was to merge election returns from the

19      North Carolina Board of Elections and voter

20      registration data with the -- eventually with the

21      PL 94-171 Census data; is that correct?

22  A.   Yes.

23  Q.   And that would allow you when you're drawing --

24      would allow anyone using that database -- and just

25      so I'm clear, in the work that you were doing in

**5813 Shawood Drive  VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 48 of 181

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

```
 1        North Carolina, were you using Maptitude?
 2   A.   Yes.
 3   Q.   And the state legislative system used Maptitude?
 4   A.   Yes, although a different version thereof.
 5   Q.   And the Maptitude that you were using, was that
 6        on -- was that a personal copy or was that on a
 7        computer in some other place?
 8   A.   It was a stand-alone copy, yes.  My computer,
 9        essentially.
10   Q.   What version of Maptitude were you using?  You said
11        it was different from the legislature's.
12   A.   The legislative version had been modified to run on
13        the state's system and interface with outside
14        software to do maps and reports and things such as
15        that, but the part of the system that actually did
16        the line drawing was -- the core of it was
17        Maptitude.
18   Q.   So the project to merge the election returns and
19        voter registration data with the Census data would
20        allow someone using Maptitude, when they're drawing
21        maps, to determine the voter registration data for
22        the districts that they were drawing; is that
23        correct?
24   A.   Yes.
25   Q.   And it would allow someone to look at election
```

- Doc. Ex. 1914 -

**Thomas Hofeller, Ph.D.**      **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

49

```
 1        returns in the district that they were drawing?
 2   A.   Well, not only for the districts they were drawing,
 3        but if you selected a certain area that you wanted
 4        to move, you could tell what the characteristics of
 5        that work was too.
 6   Q.   And by characteristics, when we're referring to
 7        election returns, you mean specifically what the
 8        vote totals were -- whether a primary or general
 9        election what the vote totals were for the various
10        candidates?
11   A.   And also the demographics, yes.
12   Q.   When you say demographics, what are you referring
13        to?
14   A.   The Census data.
15   Q.   And what data -- what demographic data does the PL
16        94-171 file give?
17   A.   It's a breakdown of the racial and ethnic data by
18        all units of Census geography, essentially.
19   Q.   And it gives you voting age population as well; is
20        that correct?
21   A.   Yes.
22   Q.   In this project of being able to merge the data, am
23        I correct that the Census data, as you said, goes
24        to all levels of geography so you have -- down to
25        the Census block you can tell the race and voting
```

**5813 Shawood Drive**    **VIVIAN TILLEY & ASSOCIATES**      **tel:919.847.5787**
**Raleigh, NC 27609**      **ctrptr4u@aol.com**      **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 50 of 181

- Doc. Ex. 1915 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

50

1       age and total population data for every Census

2       block in the state?

3   A.  There is a record in the PL 94 data for every piece

4       of geography up and down the whole hierarchy and

5       that would be incorporated in part in the

6       redistricting system.

7   Q.  And the smallest level of geography is the Census

8       block level?

9   A.  It is.

10  Q.  The election data, when you receive it from the

11      Board of Elections, does not go down to the Census

12      block level, does it?

13  A.  No.

14  Q.  The Board of Elections keeps their election returns

15      by precinct; is that correct?

16  A.  They keep it by precinct and I think also by VTD.

17  Q.  And what's the difference between precinct and VTD?

18  A.  Well, the VTD is a unit which is established in

19      partnership -- in a partnership between the state

20      government and the Census Bureau for the state's

21      convenience to report out demographic data.

22          It's a level of hierarchy which requires

23      the states' participation across the nation to

24      identify those -- the boundaries of those pieces of

25      geography to the Bureau so they can incorporate

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 51 of 181

- Doc. Ex. 1916 -

**Thomas Hofeller, Ph.D.**    **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

51

```
 1        them into their TIGER system.
 2   Q.   Does the Maptitude program that you were working
 3        with in North Carolina, did that have information
 4        about the VTDs in North Carolina as opposed to the
 5        precincts?
 6   A.   In many cases they were synonymous, but, yes, it
 7        was VTD level.
 8   Q.   Do you have any sense of to what degree -- how
 9        often or to what extent, rough percentage, across
10        the state of North Carolina where the precincts are
11        different from VTDs?
12   A.   No, not specifically, but I know they are in some
13        cases.
14   Q.   Isn't it -- and to your knowledge in North Carolina
15        when a VTD is not the same as a precinct, isn't it
16        usually the case that that's because a VTD has been
17        divided into two or more smaller precincts?
18   A.   That's my understanding, yes.
19   Q.   So when you have Census data down to the block
20        level but you have election returns at the VTD
21        level, if you draw a redistricting plan that's
22        based on VTDs so that you have whole VTDs in every
23        district, then you would be able to tell using the
24        election data what the voters' performance was in
25        the district; is that correct?
```

```
 1   A.   Yes.

 2   Q.   When you divide a VTD in drawing a redistricting

 3        map -- because the Census blocks are smaller than

 4        VTDs, right?

 5   A.   Yes.

 6   Q.   So it's possible to -- in drawing a district using

 7        Maptitude it's possible to divide a VTD and use the

 8        Census blocks that make up that VTD?

 9   A.   Yes.

10   Q.   When you divide a VTD, how did you determine what

11        the election results are for that divided VTD?

12   A.   Maptitude proportionalizes the election and

13        registration data within the blocks of the VTD.

14   Q.   And what does that mean "proportionalizes"?  Can

15        you describe that?

16   A.   It was the same for the state system as well, for

17        the system that we were using.  You disaggregate --

18        is usually the common term of art that's given to

19        the process -- the election history and

20        registration data down to the Census block using

21        some demographic figure.  Usually it's the adult

22        voting age population.

23   Q.   Just so I understand clearly, by proportionalize,

24        does that mean if I have a VTD that is a thousand

25        people -- and you said voting age population -- so
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 53 of 181

- Doc. Ex. 1918 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.  11 CvS 16896 & 11 CvS 16940

53

1          let's say a thousand people 18 or over and you're

2          dividing that VTD and you take 400 of those

3          thousand and they're in one district and 600 are in

4          the other district, your election returns don't

5          tell you anything about the 400 different than the

6          600, you just have election returns for the entire

7          1,000 population in that VTD?

8     A.   No.  The system will proportionalize the returns,

9          the data, for that VTD in proportion to the adult

10         population on each side of the line.

11    Q.   So for both sides -- so for the 400 and the 600,

12         you'll get 40 percent of the -- well, explain how

13         the proportionalize works.  I do want to understand

14         it.

15    A.   It's a little complex, but I guess in the simplest

16         terms, each element of the registration and

17         election data is multiplied by the percentage that

18         that block's population represents of the entire

19         district population, and then in the process of

20         that, the sums are rounded up or down depending on

21         how you view the disaggregation by -- in one of the

22         units to correct for the rounding errors.

23    Q.   So in a sense, it assumes that you are -- that the

24         entire -- that the entire VTD is uniform, by

25         proportionalizing, it's assuming that it's sort

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com          fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP  Document 23-2  Filed 10/07/15  Page 54 of 181

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

54

```
 1       of -- the Democrats and Republicans registered in
 2       that VTD are uniformly spread throughout the VTD?
 3  A.   Yes.
 4  Q.   So using my 1,000 voting age population earlier, if
 5       it's 75 percent Republican in that VTD by
 6       registration, the 400 would be shown as 75 percent
 7       Republican even if in fact all of those Republicans
 8       lived in the 600 side of the VTD that's split?
 9  A.   That's a good example, yes.
10  Q.   I want to turn now to the second stage.  You said
11       that there was a criteria discussion.
12            Did that happen prior to the Census data
13       being released or after the Census data was
14       released?
15  A.   Both.
16  Q.   And who were those discussions with?
17  A.   We had discussions with the chairman.
18            (WHEREUPON, Exhibit 435 was marked for
19       identification.)
20  BY MS. EARLS:
21  Q.   I marked as 435 a copy of your affidavit that was
22       filed earlier in this action.  Do you want to take
23       a minute just to make sure -- this is dated
24       January 19, 2012 -- just to make sure that's
25       correct and this is your affidavit.
```

1          Am I correct that Exhibit 435 is a copy of

2     your affidavit with appendices and exhibits

3     attached?

4  A.  It is.

5  Q.  And the first exhibit is your resume we were

6     referencing earlier.

7  A.  Yes.

8  Q.  If you would look at paragraphs 12 to 14 of your

9     affidavit, which begins on page 4, this section is

10    headed Primary Criteria Used to Draw Plans.

11         And is this a summary of the criteria that

12    you followed in drawing the redistricting plans in

13    North Carolina?

14 A.  I need to look at it, please.

15 Q.  Please do.

16         So my question is:  Is this an accurate and

17    complete statement of the criteria that you used in

18    drawing redistricting plans in North Carolina?

19 A.  It certainly has the important elements.

20 Q.  Did you write the entire affidavit yourself or did

21    someone else draft any parts of it that you then

22    reviewed?

23 A.  I drafted the affidavit primarily myself.  It was

24    reviewed by counsel.

25 Q.  And in particular, paragraphs 12 to 14, did counsel

**5813 Shawood Drive**   **VIVIAN TILLEY & ASSOCIATES**     **tel:919.847.5787**
**Raleigh, NC 27609**     **ctrptr4u@aol.com**      **fax: 919.847.2265**

- Doc. Ex. 1921 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

56

```
 1        write the first draft of those or did you write

 2        those?

 3   A.   Now I don't rightly remember, to tell you the

 4        truth.

 5   Q.   In here -- in paragraphs 12 through 14 you say

 6        that -- I'm looking now at the first sentence of

 7        paragraph 12 -- "I was directed by leadership of

 8        the General Assembly."

 9             Are you referring there to Senator Rucho

10        and Representative Lewis?

11   A.   Yes.

12   Q.   Is there anyone else you would -- who was involved

13        in directing you as described in that paragraph?

14   A.   Not directly, no.

15   Q.   Each time you say "I was instructed, I was also

16        instructed," the people doing the instructing were

17        Senator Rucho and Representative Lewis?

18   A.   Yes.

19   Q.   Did anyone else participate in the -- you know, in

20        providing those instructions to you?

21   A.   The instructions came from the chairman of the

22        committees.

23   Q.   Were these in writing or orally?

24   A.   No.

25   Q.   It was oral instructions?
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 57 of 181

 1  A.  Yes.

 2  Q.  And did this occur at a particular meeting or over

 3      the course of several meetings?

 4  A.  The latter.

 5  Q.  Other than the verbal instructions as you've

 6      described them in paragraphs 12 through 14, were

 7      there any other sources of information that you

 8      received about what criteria you should follow in

 9      constructing North Carolina's redistricting plans?

10  A.  I was familiar with the Stephenson cases and with

11      the Strickland case and, of course, I've had a lot

12      of experience with the Voting Rights Act, and the

13      primary architecture of the plan, as you might say,

14      was to harmonize the requirements of the Stephenson

15      cases with the Voting Rights Act and taking into

16      account the Strickland case.

17  Q.  So do I understand you to say that you were -- in

18      addition to receiving the instructions from the

19      Chairman Rucho and Lewis, you were also applying

20      your own understanding of various cases about

21      redistricting and your years of experience in

22      drawing redistricting plans?

23  A.  That was the instruction I received from the

24      chairman.  I don't believe at any point we were not

25      in agreement about what those requirements were.

**5813 Shawood Drive**   **VIVIAN TILLEY & ASSOCIATES**    **tel:919.847.5787**
**Raleigh, NC 27609**      **ctrptr4u@aol.com**     **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 58 of 181

```
 1   Q.   Did you receive any advice from anyone else about

 2        what the legal criteria are that you should follow?

 3             MR. FARR:  To the extent that calls for

 4        any testimony about what you were told by counsel,

 5        I instruct you not to answer the question on the

 6        grounds that it's protected by attorney-client

 7        privilege and work product.

 8   BY MS. EARLS:

 9   Q.   But I'm not asking you what they told you.  I'm

10        just asking you did you receive that advice.

11   A.   I had discussions.

12   Q.   Who did you have -- and just to be clear, you had

13        discussions in which you received legal advice

14        about what criteria you should follow in drawing

15        North Carolina's redistricting maps?

16             MR. FARR:  Objection.

17             Because that explains what the discussions

18        were about, I instruct you not to answer the

19        question.

20             MS. EARLS:  Just to be clear, my question is

21        not -- I don't want to know what that advice was.  I

22        just want to establish that you had discussions in

23        which you received legal advice.

24             MR. FARR:  I'll instruct you not to answer

25        that question.
```

**5813 Shawood Drive**   **VIVIAN TILLEY & ASSOCIATES**        **tel:919.847.5787**
**Raleigh, NC 27609**         **ctrptr4u@aol.com**              **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 59 of 181

- Doc. Ex. 1924 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

59

1              Yes, you can say you received legal advice.

2              THE WITNESS:  I received legal advice.

3    BY MS. EARLS:

4    Q.   Okay.  In the discussions at which you received

5         that advice, who was present?

6    A.   Tom Farr was present at some.  Mr. Oldham was

7         present at others.  I think that's primarily what I

8         can remember.

9    Q.   Anyone else in the room when you were discussing

10        these matters with Mr. Farr and Mr. Oldham?

11   A.   Well, there were numerous discussions.  I don't

12        recall in those types of discussions that we may

13        have had some of those discussions in the presence

14        of one or the other of the chairman of the

15        committees.

16   Q.   So Chairman Rucho or Lewis may also have been

17        present?

18   A.   Yes.

19   Q.   Is there any --

20   A.   But I don't really recall which ones or where.

21   Q.   Is there anyone else who might have been present?

22   A.   Not that I can recall.

23   Q.   I want to show you a document that was among the

24        material that you provided but it has also been

25        previously marked in this deposition as Exhibit 46.

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com          fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 60 of 181

- Doc. Ex. 1925 -

**Thomas Hofeller, Ph.D.**                    **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

60

```
 1          This is, I believe, from Erika Churchill's
 2     deposition.
 3               First I want to ask you, Exhibit 46 is the
 4     Legislator's Guide to North Carolina Legislative
 5     and Congressional Redistricting.  Did you see that
 6     at any point while you were working on the
 7     redistricting plans in North Carolina?
 8   A.   I did.
 9   Q.   Did you review it?
10   A.   I was asked to review it with regard to technical
11        statements that were made in it.
12   Q.   So you actually saw a draft before it was made
13        final?
14   A.   Yes.
15   Q.   And you reviewed the technical statements?
16   A.   I did.
17   Q.   And then did you also receive a copy of the final
18        version?
19   A.   Yes.
20   Q.   And did you review the portions of that guide that
21        talk about the legal standards governing
22        redistricting?
23   A.   I did.
24   Q.   Did you consider those to be guidance in how you
25        should draw --
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES         tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 61 of 181

1　A.　There were certainly -- I read them and had them in

2　　　mind, yes, but my primary instructions were those

3　　　that were given to me by the chairman.

4　Q.　Well, did the chairman give you instructions that

5　　　were different from your view than what was in the

6　　　Legislator's Guide?

7　A.　I don't know.  I would have to read it in full to

8　　　know that.  It was written by a different set of

9　　　people, legislative staff, I believe.

10　Q.　You'll see there's a tab there and it's marking, I

11　　　believe, page 4 of the guide where the discussion

12　　　begins about the Voting Rights Act of 1965.

13　A.　Yes.

14　Q.　There's a paragraph there on Section 2 of the

15　　　Voting Rights Act, and I want to draw your

16　　　attention to that paragraph.  And you can take a

17　　　minute to read it.

18　A.　Is that the first paragraph of the section?

19　Q.　Yes, the first paragraph.

20　A.　(Witness complying.)

21　Q.　And I'm not quoting it verbatim, and I will if you

22　　　need me to, but am I correct that that paragraph

23　　　asserts that under Section 2 of the Voting Rights

24　　　Act there's no legal right to strict

25　　　proportionality for minority voters?

**5813 Shawood Drive**　**VIVIAN TILLEY & ASSOCIATES**　　**tel:919.847.5787**
**Raleigh, NC 27609**　　　ctrptr4u@aol.com　　　　**fax: 919.847.2265**

     1                    MR. FARR:  Objection.

     2                    MS. EARLS:  Well, then, I'm sorry, I don't

     3          have an extra copy.

     4   BY MS. EARLS:

     5   Q.   Okay.  The sentence here that says, "while

     6          Section 2 does not establish a right to have

     7          members of a protected class elected in numbers

     8          equal to their proportion of the population."

     9                    Did you see this portion of the manual when

    10          you were drawing the redistricting plans?

    11   A.   I read the manual.  I was aware of that section of

    12          the act.  I didn't have it by my side as I was

    13          drawing the map, if that's what you mean.

    14   Q.   And did you disagree with that statement?

    15   A.   It doesn't matter whether I disagree or don't

    16          disagree.  It's the law.

    17   Q.   Well, okay.

    18   A.   I subscribe to the law.

    19   Q.   But is that --

    20   A.   I think that statement speaks for itself, and I

    21          don't have -- there's no reason for me to disagree

    22          with it, but even if I did it would be irrelevant.

    23   Q.   Let me ask you about the next page, page 5, where

    24          the manual goes through the establishment of a

    25          Section 2 violation.  And I realize that you

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com            fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 63 of 181

- Doc. Ex. 1928 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

63

1       testified in the Gingles case so this is probably

2       old news to you, but --

3    A.   It's been revised since then.

4    Q.   Right.  But I want to focus in particular on the

5       part of the Section 2 requirements that recite the

6       totality of the circumstances evidence and

7       that's -- yes, the second half of the page, page 5

8       there.

9             And my question is:  In drawing

10      North Carolina's redistricting plans, did you have

11      available to you or were you aware of any data or

12      information relating to the totality of the

13      circumstances evidence?  And as you know, it

14      continues onto page 6.

15   A.   I believe you presented a statement to that regard

16      to the committee about racial block voting and I

17      saw a report that Mr. Brunell made with regard to

18      that.

19   Q.   So other than my statement and Dr. Brunell's report

20      on racial block voting, was there any other

21      information that you had available to you regarding

22      the totality of the circumstances evidence?

23   A.   No.

24            Do you want this back now?

25   Q.   Well, yes.  I have some specific questions about

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES      tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com            fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 64 of 181

```
 1        racially polarized voting.
 2              Do you understand or believe there to be a
 3        difference between statistically significant
 4        racially polarized voting and legally significant
 5        racially polarized voting?
 6   A.   Well, first of all, I'm not here to testify about
 7        law, but I think that distinction has been made in
 8        cases.
 9   Q.   Well, I believe that you do in your affidavit at
10        some point talk about racially polarized voting,
11        and I just want to ask you -- you said you believe
12        the distinction has been made.  What is the
13        distinction?
14   A.   I would have to refer back to a specific comment.
15        I'm sorry.
16   Q.   Well, my question is just, generally, what's the
17        difference between statistically significant
18        racially polarized voting and legally significant
19        racially polarized voting?
20   A.   I think as a general rule, you could have polarized
21        voting in any election if any group has a pattern
22        of voting more strongly for a candidate than
23        another group.  That's polarization of the vote.
24        It could be Republican versus Democrat.  There's
25        all sorts of polarizations.
```

**5813 Shawood Drive**  **VIVIAN TILLEY & ASSOCIATES**    **tel:919.847.5787**
**Raleigh, NC 27609**        ctrptr4u@aol.com       **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 65 of 181

**Thomas Hofeller, Ph.D.**        **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

65

```
 1                And the polarization may become an issue in
 2        a court case, and if the court case -- the support
 3        of the analysis is upheld by the court, then
 4        there's legally sufficient.
 5   Q.   One of the totality of the circumstances factors is
 6        the extent to which voting in elections of the
 7        state of political subdivisions are racially
 8        polarized but also the extent to which members of
 9        the minority group in the state or political
10        subdivision bear the effects of discrimination and,
11        in particular, the extent to which members of the
12        minority group have been elected to public office
13        in the jurisdiction.
14                My question to you is what impact on your
15        analysis of whether or not a particular plan might
16        violate Section 2 of the Voting Rights Act, what
17        impact does it have that a candidate of choice of
18        black voters can be elected in a district that's
19        less than 50 percent black after the Strickland
20        decision?
21                MR. FARR:  Objection to the form of the
22        question.
23                THE WITNESS:  Let's have you repeat that
24        again.  I'm sorry.
25   BY MS. EARLS:
```

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 66 of 181

**Thomas Hofeller, Ph.D.**                    **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

```
 1   Q.   What impact on the Section 2 analysis -- and by
 2        that I mean when you're drawing a district and
 3        you're trying to determine whether or not a
 4        majority black district is required by Section 2 of
 5        the Voting Rights Act, what impact on your analysis
 6        does it have if a candidate of choice of black
 7        voters has been elected in a district that's less
 8        than 50 percent black in voting age population?
 9             MR. FARR:  Objection to the form of the
10        question.
11             THE WITNESS:  I wasn't making an analysis
12        as I was drawing the districts so I can't really
13        answer that question as you posed it.
14   BY MS. EARLS:
15   Q.   Well, are you saying that even though one of your
16        instructions was -- and now I'm referring back to
17        your affidavit.  And it does say regarding
18        legislative districts under paragraph 12 that you
19        were directed to follow the criteria established by
20        the United States Supreme Court and the
21        North Carolina Supreme Court in Strickland v.
22        Bartlett and then in paragraph 13 regarding
23        Congressional districts you were instructed to
24        comply with the United States Supreme Court's
25        holding in Strickland v. Bartlett.
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES         tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com                      fax: 919.847.2265**

- Doc. Ex. 1932 -

**Thomas Hofeller, Ph.D.**　　　　　**June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.　11 CvS 16896 & 11 CvS 16940

67

```
 1              So it's my understanding that you were
 2       instructed to comply with those decisions.  So in
 3       the course of drawing redistricting plans that
 4       comply with those decisions, what impact did it
 5       have on your assessment that a candidate of choice
 6       of black voters was elected in a district less than
 7       50 percent black voting age population?
 8              MR. FARR:  Objection to the form of the
 9       question.
10              THE WITNESS:  Do you want me to answer?
11              MR. FARR:  Yes.
12              THE WITNESS:  The way that that
13       conformance was taken care of in the drafting of
14       the plan was the instruction that I was to draw
15       majority-minority districts, so where that was
16       possible I drew them.
17  BY MS. EARLS:
18  Q.   So then it was your understanding that Section 2 of
19       the Voting Rights Act as interpreted or explained
20       in those Supreme Court decisions required you to
21       draw a majority black district wherever it was
22       possible?
23              MR. FARR:  Objection.
24              THE WITNESS:  I was not making a judgment
25       on what was required by Section 2 of the Voting
```

**5813 Shawood Drive**　**VIVIAN TILLEY & ASSOCIATES**　　**tel:919.847.5787**
**Raleigh, NC 27609**　　　**ctrptr4u@aol.com**　　　**fax: 919.847.2265**

**Thomas Hofeller, Ph.D.**      **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   **11 CvS 16896 & 11 CvS 16940**

68

```
 1        Rights Act with regard to the percentage that the

 2        district would be.

 3             I was executing the instructions given to

 4        me by the chairman of the committee that a minority

 5        district needed to be 50 percent plus one in

 6        accordance with Strickland to place the legislature

 7        in a safe harbor with regard to the Voting Rights

 8        Act.

 9   Q.   But I believe you also said that you drew those

10        wherever it was possible.

11   A.   Well, not wherever it was possible.  When I drew a

12        district, it would be 50 percent plus one.

13   Q.   So are you saying that it was actually possible to

14        draw additional 50 plus one percent black districts

15        in North Carolina in any of the three plans that

16        you did not draw?

17   A.   Yes.

18   Q.   Which plan -- in which plan is that true?

19   A.   The House plan and the Senate plan and actually --

20        well, no.

21   Q.   In your view, does Section 2 require the

22        maximization of the black districts in a

23        redistricting plan?

24             MR. FARR:  Objection to form.

25             THE WITNESS:  I'm sorry.  Are you asking
```

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

69

```
 1        that as a general statement or in the context of

 2        this plan?

 3                 MS. EARLS:  As a general statement.

 4                 MR. FARR:  Objection to form.

 5                 THE WITNESS:  The section of the Voting

 6        Rights Act which you read to me about

 7        proportionality would clearly state that in

 8        some -- it would come to be that in some states it

 9        would be possible to draw more districts than the

10        proportion of the population, in some case it would

11        be less, in some case it would be equal, so it

12        would not be my understanding that the act required

13        maximization.

14   BY MS. EARLS:

15   Q.   And in your view does Section 5 of the Voting

16        Rights Act require that?

17   A.   Section 5 is about a totally different set of

18        circumstances.  Section 5 is in my judgment to

19        preserve Section 5 districts or districts which

20        enter into Section 5 counties in one way or

21        another.

22   Q.   Another question about racially polarized voting.

23                 In your view, can a white candidate be the

24        candidate of choice of black voters?

25   A.   Yes.
```

**Thomas Hofeller, Ph.D.**          June 28, 2012

Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

```
 1   Q.   And are white-versus-white, that is, elections

 2        involving two white candidates, are those useful in

 3        analyzing racially polarized voting?

 4             MR. FARR:  Objection to the form.

 5             You may answer it.

 6             THE WITNESS:  I'm sorry.  What type of

 7        racially -- racially polarized voting, you said?

 8   BY MS. EARLS:

 9   Q.   Yes.

10   A.   Probably less helpful.

11   Q.   And do you know what I mean by exogenous and

12        endogenous elections?

13   A.   Yes.

14   Q.   So are endogenous elections more useful than

15        exogenous ones?

16   A.   With regard to legislative redistricting?

17   Q.   Yes, and with regard to analyzing racially

18        polarized voting.

19   A.   Well, they're certainly more helpful in regard to

20        analyzing existing districts in the context of the

21        district that was there when the election took

22        place.

23   Q.   And what about analyzing districts that you're

24        drawing as new districts?

25   A.   I think when you start shifting districts, so to
```

- Doc. Ex. 1936 -

**Thomas Hofeller, Ph.D.**　　　　　**June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.　11 CvS 16896 & 11 CvS 16940

71

1　　speak, on the state's landscape so that you have a

2　　proportion of one district -- one old district in

3　　the new district and a portion of another district

4　　in the new district and such as that that it

5　　becomes much less a factor because precincts or

6　　VTDs, whatever unit you're measuring this in, can

7　　behave radically differently as they are moved from

8　　one district to another, so it wouldn't be possible

9　　to do that on the fly, so to speak.

10　Q.　So am I understanding you to say that it's your

11　　view that because when a precinct is in a different

12　　district, voters behave differently that you can't

13　　use past elections to say anything about what

14　　racially polarized voting patterns might be in

15　　future elections in different districts,

16　　differently drawn districts?

17　A.　For those of us who draw districts in general, the

18　　general rule is that statewide elections are more

19　　helpful in predicting future voting behavior than

20　　are local and district elections because of what I

21　　mentioned before.

22　Q.　So, in other words, you don't agree that endogenous

23　　elections for state legislative office are more

24　　useful than exogenous ones?

25　A.　In what way?

**5813 Shawood Drive**　**VIVIAN TILLEY & ASSOCIATES**　　**tel:919.847.5787**
**Raleigh, NC 27609**　　　　**ctrptr4u@aol.com**　　　　**fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP　Document 23-2　Filed 10/07/15　Page 72 of 181

**Thomas Hofeller, Ph.D.**      **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

```
 1   Q.   For analyzing racially polarized voting.

 2   A.   To what end?

 3   Q.   To determine whether or not it's necessary to draw

 4        a majority black district.

 5   A.   Okay.  As I now understand your question, okay, I

 6        think it's valid and necessary to make a

 7        polarization analysis of both the existing

 8        districts, what I would say the baseline

 9        districts -- do you understand?

10   Q.   Uh-huh.

11   A.   Okay -- and other local elections that may be in

12        areas such as county elections, city elections, a

13        number of those elections, in determining whether

14        or not polarized voting is present in a specific

15        geographic area, and that geographic area would be

16        the area that was covered by the election.

17             So, yes, I agree with you on that question.

18   Q.   I also have a couple questions about compactness.

19             What do you understand about the

20        requirement -- or let me ask it this way:  Is

21        compactness a consideration in any of the criteria

22        that you used in drawing North Carolina's

23        redistricting plans?

24   A.   To some degree, yes.

25   Q.   In what way did it play a role?
```

- Doc. Ex. 1938 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

73

```
 1   A.   For the most part, where it could be done, my

 2        practice would be to make lines smoother when it

 3        could happen, and that's one degree of compactness.

 4        It was not the major criteria because the major

 5        criteria were the Voting Rights Act and Strickland

 6        and Stephenson and manifested in the county

 7        grouping rule.

 8   Q.   And how did you evaluate compactness when you were

 9        drawing the North Carolina plans?

10   A.   Well, by sight, S-I-G-H-T.

11   Q.   The Maptitude program that you were using had built

12        into it some mathematical measures of compactness;

13        is that right?

14   A.   Yes.  Seven, I believe.

15   Q.   Did you use those at all in assessing the relative

16        compactness of districts?

17   A.   No.

18   Q.   Did you run any compactness measures at all on any

19        of the plans that you were drawing?

20   A.   Before or after enactment?

21   Q.   No, before enactment.

22   A.   No.

23   Q.   Why not?

24   A.   Because I was very busy just trying to get the

25        plans done and get them into a form where they
```

**5813 Shawood Drive  VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com            fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 74 of 181

- Doc. Ex. 1939 -

**Thomas Hofeller, Ph.D.**      **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

74

```
 1       could be approved by the chairman and turned into
 2       legislation and passed.
 3   Q.  So by that I take it that you would have done them
 4       if you had more time?
 5   A.  That's a hypothetical.  I don't really -- I don't
 6       really know.
 7   Q.  Did you conclude it was not a priority to look at
 8       the mathematical measures of compactness?
 9   A.  Well, remember, compactness is a very vague
10       concept.  It's almost a concept in search of a
11       definition and it's also a concept which is
12       different from state to state within the tradition
13       of the state, and being as it was not a major
14       component of the criteria of the redistricting
15       process, I probably wouldn't have done that unless
16       I was instructed to do it.  I knew that the state
17       legislative staff had the ability to run those
18       tests and they could be run by them.
19   Q.  When you say it was not a major component of the
20       criteria in North Carolina, are you basing that on
21       the instructions you received from the leadership?
22   A.  Specifically that it was not a major factor?
23   Q.  Yes.
24   A.  No.
25   Q.  What do you base it on?
```

**5813 Shawood Drive**   **VIVIAN TILLEY & ASSOCIATES**    **tel:919.847.5787**
**Raleigh, NC 27609**      **ctrptr4u@aol.com**      **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 75 of 181

**Thomas Hofeller, Ph.D.**     June 28, 2012
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

```
 1   A.   I based it on my judgment as to what they were
 2        concerned with and considered in their discussions
 3        with me.
 4   Q.   So did your prior role in redistricting in
 5        North Carolina, including analyzing prior
 6        Congressional districts for compactness, play any
 7        role in your consideration of compactness as a
 8        criteria in this round of redistricting?
 9   A.   Not specifically.
10   Q.   Other than the verbal instructions that you had
11        from Senator Rucho and Representative Lewis and the
12        Legislator's Guide, were there any other -- and
13        your own experience and knowledge of the law from
14        your years of engaging in redistricting, are there
15        any other sources that you had for what legal
16        standards should be followed in drawing the
17        redistricting maps in North Carolina?
18   A.   Well, as particularly the draft maps were released,
19        the chairman released statements concerning the
20        draft maps which I read and would be checking in my
21        own mind what -- how those -- how the plans were
22        conforming to those statements.
23   Q.   Just so we're clear, I'm going to show you what's
24        been marked -- previously marked as Deposition
25        Exhibit 55 and ask you if those are the statements
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com                fax: 919.847.2265**

- Doc. Ex. 1941 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

76

1      you're referring to.

2   A.   Are those the ones with the purple tabs?

3   Q.   Well, the entire exhibit is behind tab 55.

4   A.   I'm sorry.

5   Q.   If you want to take a minute and look through them.

6   A.   (Witness complying.)

7   Q.   Are those the statements you were just referring

8        to?

9   A.   Yes.

10  Q.   Did you review those statements prior to them being

11       issued publicly?

12  A.   No.

13  Q.   Thank you.

14            Was there any other source of criteria or

15       guidance on what standards you should follow in

16       drawing the redistricting plans that you haven't

17       already discussed?

18  A.   Not that I can recall.

19  Q.   So I think we're ready to turn to the third stage

20       of your involvement which you described as drawing

21       districts and plans and managing -- being a

22       gatekeeper of the process.

23            Going back to your Exhibit 431 which has

24       the date you were in North Carolina, did that stage

25       of the process start when you came on April 13th?

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609         ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 77 of 181

- Doc. Ex. 1942 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

77

```
 1   A.   Yeah, let's repeat that again.  I'm sorry.

 2   Q.   That's all right.  I'm trying to establish a

 3        timeline for when you started drawing districts and

 4        plans and just -- first let me ask you:  Did you

 5        work on North Carolina redistricting at times other

 6        than when you were physically in Raleigh?

 7   A.   Yes.

 8   Q.   Where else did you work on the plans?

 9   A.   Sometimes I worked on them in the RNC office that

10        they provided me as a consultant.

11        Sometimes -- most of the time I worked on them at

12        home.  I have a portable computer.  Sometimes I

13        worked on the train.  Sometimes I worked on the

14        plane.  You know, the beauty of having a portable

15        computer is you can work anywhere.

16   Q.   Just in terms of proportion, then, is it fair to

17        say that greater than 50 percent or greater than

18        75 percent, what proportion of the time that you

19        actually put in working on drawing districts for

20        North Carolina's redistricting maps was spent doing

21        that outside of North Carolina?

22   A.   You know, I couldn't give you an accurate percent

23        because I didn't keep tabs on it at all times, but

24        I would say a majority of the work was done here in

25        Raleigh.
```

**5813 Shawood Drive  VIVIAN TILLEY & ASSOCIATES      tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com             fax: 919.847.2265**

- Doc. Ex. 1943 -

**Thomas Hofeller, Ph.D.**     **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

78

1  Q.  Then can you give me some idea of when you started
2      actually drawing the plans.
3  A.  Okay.  Would it answer your question to say that
4      when the Census data became available and the
5      databases became available from the state
6      legislative staff, I began looking at the maps?
7  Q.  And do you recall roughly when that was?
8  A.  I believe it was in the last two weeks of March of
9      2011.  We were all eagerly awaiting the release of
10     the data.
11 Q.  Did you draw them in any particular order?  Did you
12     start with the Congressional or start with the
13     House or Senate?  How did that process work for
14     you?
15 A.  My recollection is is that the House was the first
16     body that I looked at with regard to the data and
17     the information.  The House plan is the most
18     complex of the plans.  And then the Senate plan and
19     then finally the Congressional maps.
20 Q.  When you came to North Carolina on April 13th --
21     this was after the Census data was available and
22     after the database had been built -- did you
23     already have a draft of any of those plans?
24 A.  By a draft do you mean a complete map that I would
25     treat as a map that I deliver to the chairman or do

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 79 of 181

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

79

```
 1        you mean a partial map?  Or what form do you want

 2        to --

 3  Q.    Why don't I ask you what did you have when you came

 4        to Raleigh on April 13th?

 5  A.    I don't rightly remember exactly what I had, but

 6        the way that the process unfolded was -- and was

 7        instructed in my understanding of Stephenson is the

 8        first mission, so to speak, was to see what

 9        minority districts could be drawn in the state, and

10        that was the first task.

11             And at the same time, investigations were

12        going on as to what sort of county groupings could

13        be done.

14             And then, again, as instructed by

15        Stephenson, there's a process of harmonizing the

16        two requirements of the Voting Rights districts and

17        the county groupings, and this begins a rather long

18        and involved and intricate and iterative process

19        between those two branches until at least one full

20        map is present that at least has the minority

21        districts in it and has the groupings established,

22        the most difficult part of the plan being that

23        harmonization.

24             After that, it's really filling in the

25        remaining districts within each county grouping.
```

```
 1                (WHEREUPON, Exhibit 436 was marked for

 2        identification.)

 3   BY MS. EARLS:

 4   Q.   I have marked as Exhibit 436 another document that

 5        was provided to us and it wasn't dated, but can you

 6        tell me what this is?

 7   A.   Provided to us?

 8   Q.   To the plaintiffs in discovery.  This was on a disc

 9        that was labeled "Hofeller."

10   A.   Okay.  By me?

11   Q.   Counsel provided it.

12   A.   Okay, yes.  It was a chart which contained the

13        percentage that the -- what we would call the 18

14        plus AP black population on one side of the chart

15        and the 18 plus black only population was of the

16        state's population, the number of seats in each

17        House and what the exact proportionality would be

18        for each chamber of the General Assembly.  And

19        since you can't build 10.6 districts, as an

20        example, in this chart, whether you rounded it up

21        or whether you rounded it down.

22   Q.   Did you prepare this chart?

23   A.   Yes.

24   Q.   And did you do that fairly early on in the process

25        of drawing maps?
```

**5813 Shawood Drive**   **VIVIAN TILLEY & ASSOCIATES**        **tel:919.847.5787**
**Raleigh, NC 27609**          **ctrptr4u@aol.com**          **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 81 of 181

1  A.  As soon as the Census data came out.

2  Q.  And did you --

3  A.  There's another factor that's, of course, relevant

4      here and that's the citizen voting age population.

5  Q.  Did you have citizen voting age population data?

6  A.  There was another data set which was available

7      which was the, I believe, 2010 release of the 2009

8      American Community Survey.

9          Are we through with this?

10 Q.  Well, you can leave it right there.

11         I want to just pursue a little bit further

12     this citizen voting age population.

13         Did you have that 2009 -- at what level of

14     geography did the 2009 American Community Survey

15     data on citizenship go down to?

16 A.  I think for purposes of this discussion, it comes

17     at the state level, the county level, the track

18     level and the block group level.  There are also

19     some records in there for Census county places of

20     certain size.

21 Q.  And am I correct that these are estimated numbers,

22     the American Community Survey?  It doesn't survey

23     every single person?

24 A.  They're estimated from a roughly I think about

25     one-in-eight sample over a period of five years.

**5813 Shawood Drive**  **VIVIAN TILLEY & ASSOCIATES**    **tel:919.847.5787**
**Raleigh, NC 27609**      **ctrptr4u@aol.com**      **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP  Document 23-2  Filed 10/07/15  Page 82 of 181

- Doc. Ex. 1947 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.  11 CvS 16896 & 11 CvS 16940

82

 1       The ACS was touted to replace the long-form
 2       Decennial Census Questionnaire.
 3   Q.  And the 2009 release, was that the five-year --
 4       they also do -- am I correct they also do one-year
 5       and three-year samples as well?
 6   A.  Yes.
 7   Q.  And does citizen voting age population data you're
 8       referring to from the 2009 ACS, that was a
 9       five-year sample?
10   A.  Yes.
11   Q.  Did you have that data on your computer in
12       Maptitude when you were drawing districts?
13   A.  No, nor does anybody else.
14   Q.  And why is that?
15   A.  You really want me to explain that in full?
16   Q.  Well, can you give a general summary so people
17       understand.
18            MR. FARR:  Only one or two people that
19       know the answer are the two of you.
20            THE WITNESS:  When the Justice Department
21       asks the Census Bureau to produce this extraction
22       from the American Community Survey, they didn't ask
23       for enough information to allow it to be taken down
24       to lower levels proportionally.
25            I would advise them differently, but that's

**5813 Shawood Drive**  **VIVIAN TILLEY & ASSOCIATES**        **tel:919.847.5787**
**Raleigh, NC 27609**          **ctrptr4u@aol.com**          **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP  Document 23-2  Filed 10/07/15  Page 83 of 181

- Doc. Ex. 1948 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

83

1       not my business.

2               Therefore, it was not possible to put it

3       into a Maptitude system.  In Maptitude, you

4       actually have to one way or the other break

5       everything down to the block level or Maptitude

6       can't take it.  You have to have all levels of

7       geography.

8   BY MS. EARLS:

9   Q.  Did you make any assessment of the reliability of

10      the citizen voting age population data at any level

11      of geography for redistricting purposes?

12  A.  Reliability?

13  Q.  Right.  In other words --

14  A.  Well, the records that come in the American

15      Community Survey give a confidence level, an

16      interval, essentially, for each cell that they

17      produce data, each geographic level.

18  Q.  In fact, they give you a number and then they give

19      you a range it can be within?

20  A.  Yes, and some of them are interesting.

21  Q.  And by interesting, you mean they're so large that

22      they are illogical, the range is so large?

23  A.  Sometimes the bottom range, for instance, would

24      create a negative number.

25              The reliability increases as the level of

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609         ctrptr4u@aol.com            fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 84 of 181

1    geography contains more and more population because

2    the sample size is bigger.

3        The same sort of factor actually was

4    present in the long-count Census data in previous

5    Censuses from long form but no one ever looked at

6    it.

7  Q.  Did you use the citizen voting age population from

8    the 2009 American Community Survey in drawing

9    redistricting plans in North Carolina?

10 A.  The answer to that question would be no.

11 Q.  Okay.  So going back to the proportionality chart,

12   as you began this stage of drawing maps for

13   North Carolina -- and I really want to focus first

14   on the initial stages, so the first couple of

15   visits in April, and I want to ask you who else was

16   working with you in drawing maps.

17 A.  At that time?

18 Q.  Yes, like in April and May.

19 A.  It was pretty much me.

20 Q.  Okay.

21 A.  Joel Raupe, who you are familiar with, was working

22   in Raleigh during that period, too, but in that

23   stage it was really myself.

24 Q.  And then at a later point was there anyone else

25   assisting you in preparing maps?

**5813 Shawood Drive**   **VIVIAN TILLEY & ASSOCIATES**     **tel:919.847.5787**
**Raleigh, NC 27609**     **ctrptr4u@aol.com**      **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 85 of 181

- Doc. Ex. 1950 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

85

```
 1   A.   What do you mean by "assisting"?
 2   Q.   Working with you to -- actually sitting down at a
 3        computer and looking at options for drawing
 4        districts.
 5   A.   By that do I understand that you mean by taking
 6        hold of the mouse and actually moving it around and
 7        working on Maptitude?
 8   Q.   Was anyone else working on Maptitude, yes.
 9   A.   I'm sorry.  I'm trying to answer your question.
10   Q.   Yes.
11   A.   Well, throughout the process, Joel -- Joel worked
12        on maps.  John Morgan worked on maps.
13   Q.   Anyone else?
14   A.   Not that I recall right at the moment.
15   Q.   Did you provide this proportionality chart to the
16        team that you described was working on maps?
17   A.   I don't know that I provided the chart to them.  I
18        think we were all familiar in our discussions with
19        this -- the conclusions of this chart.
20   Q.   So you may not have provided them this exact
21        document, but they knew the general numbers that
22        are reflected here?
23   A.   That would also be known by the chairman, too.
24   Q.   So fairly early on in the process you communicated
25        this information to the chairman about the
```

**5813 Shawood Drive  VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609         ctrptr4u@aol.com             fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 86 of 181

1          proportionality for the Senate and the House?

2     A.   Yes.  I would have been a bad consultant if I

3          hadn't done so.

4     Q.   So let's start with the House maps because you

5          started drawing with those.

6     A.   What time do you think we can leave?

7               MR. FARR:  We can take a short break.

8               THE WITNESS:  If I could just have a short

9          break.  I'm sorry.

10              MS. EARLS:  No.  This is fine.

11              (Brief Recess:  11:51 to 12:01 p.m.)

12    BY MS. EARLS:

13    Q.   Before the break, you were describing the iterative

14         process of drawing the Voting Rights Act districts

15         and then looking at the clusters and going back and

16         forth about how to harmonize those.

17              Can you -- as you started looking at the

18         House maps, is it right that the first thing you

19         did was figure out where there were concentrations

20         of black population in the state and decide where

21         there should be majority-minority African American

22         districts?

23    A.   Yes.

24    Q.   And how did you decide what was a Voting Rights Act

25         district?

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com            fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 87 of 181

**Thomas Hofeller, Ph.D.**          June 28, 2012
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

```
 1   A.   Well, that's an interesting term.  Voting Rights

 2        district means many, many things to many, many

 3        different people.

 4             I was operating under the Strickland ruling

 5        that a minority district is 50 percent plus one

 6        voting age population or in some cases it could be

 7        AP voting.

 8   Q.   I agree that term can mean many things to many

 9        people.  I was using it because the Stephenson

10        decision uses that and says the Voting Rights Act

11        districts should be drawn first.

12             So in complying with and implementing the

13        instructions you received to follow Stephenson,

14        what did you understand Voting Rights Act districts

15        to mean?

16   A.   Well, then we're harmonizing Stephenson with

17        Strickland --

18   Q.   Right.

19   A.   -- with the Voting Rights Act.

20   Q.   Yes.

21   A.   I was instructed that we were going to build

22        districts at 50.1 or higher.

23   Q.   I understand that, but how did you decide -- what

24        did you understand to be Voting Rights Act

25        districts under the cases you've just mentioned,
```

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 88 of 181

- Doc. Ex. 1953 -

**Thomas Hofeller, Ph.D.**       **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

88

```
 1      under Stephenson?

 2  A.  I don't understand how that differs from my answer

 3      that I gave you.  A district that's more than

 4      50 percent, a majority-minority district.

 5  Q.  Did you consider districts that elected candidates

 6      of choice of black voters in Section 5 covered

 7      counties to be Voting Rights Act districts?

 8              MR. FARR:  Objection to form.

 9              THE WITNESS:  In the plan I was drafting?

10  BY MS. EARLS:

11  Q.  No.  In looking at the existing plan and where you

12      needed to preserve Voting Rights Act districts

13      under Section 5 of the Voting Rights Act.

14  A.  You're talking about the baseline map?

15  Q.  Right or benchmark.

16  A.  Benchmark.  I'm sorry.  Certainly I looked at those

17      districts.

18  Q.  So it will probably be easier if I look at a map.

19              (WHEREUPON, Exhibit 437 was marked for

20      identification.)

21  BY MS. EARLS:

22  Q.  What I marked as Exhibit 437 is a printout, and

23      it's obviously a lot of numbers, a large Excel file

24      on the disc that we were provided that was entitled

25      Hofeller docs and the file name appears at the top,
```

**5813 Shawood Drive**    **VIVIAN TILLEY & ASSOCIATES**      **tel:919.847.5787**
**Raleigh, NC 27609**          **ctrptr4u@aol.com**        **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 89 of 181

1       Tom First Cut 20110322.

2                Do you know when this document is?

3   A.   It appears to be a printout of pretty much all the

4        data from a plan.

5   Q.   And is it true that pages 3 and 4 continue on from

6        1 and 2 and 5 and 6 continue on from 3 and 4?

7   A.   So works their way from left to right on a

8        spreadsheet, yeah.

9   Q.   Did you use a naming convention in saving your

10       files that would suggest the date of this file is

11       March 22, 2011?

12  A.   The name does not necessarily correlate with the

13       date that the map from which the data was produced

14       was that date.

15                It was more correlated to when the plan was

16       first started on the computer.  You start a new

17       plan and you give it a name.  You can't -- at least

18       I don't know, maybe you know, how to change that

19       name.

20  Q.   So the date would be when you started but not

21       necessarily when you finished, finished meaning you

22       had a complete, fully drawn plan?

23  A.   No, that I didn't change it any more.  Plans

24       evolve.

25  Q.   So the date is the date you started, but the data

**5813 Shawood Drive**  **VIVIAN TILLEY & ASSOCIATES**      **tel:919.847.5787**
**Raleigh, NC 27609**          **ctrptr4u@aol.com**          **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 90 of 181

1       may be from a more evolved or changed version than

2       from what existed on March 22nd?

3   A.  Yes, that's a true -- that's true.

4   Q.  This is from an Excel file, and we can show you the

5       file.  We could not find -- and it appears while

6       it's not sorted that way that this is in fact 120

7       districts, so this would be a House map, and the

8       title suggests also that this was a State House

9       plan; is that true?

10  A.  Yes, although I would note that one of the

11      districts is out of deviation range that I can spot

12      right out of the gate.

13  Q.  We couldn't find a map that corresponded to this,

14      and my question is whether you recall or if you can

15      help us figure out what map corresponds to this

16      data set.

17  A.  You know, I gave you every map that I had on the

18      two computers that had maps, and I really can't say

19      any more.

20  Q.  So --

21  A.  This has been well over a year and a quarter and I

22      just don't remember.  I'm sorry.

23  Q.  So this Excel -- just to be clear, this Excel file

24      wasn't something that we created using a block

25      assignment file for a map that you provided.  This

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787**
**Raleigh, NC 27609            ctrptr4u@aol.com                  fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 91 of 181

```
 1       Excel file was a separate file on the Hofeller docs
 2       CD and you're saying that we have every block
 3       assignment file for every map that you had, so if
 4       we can't match this to any map, then you don't have
 5       any maps that it might --
 6  A.   That's right.  I don't even -- I just don't know.
 7       I'm sorry.
 8  Q.   Okay.  But it does at least suggest that on
 9       March 22nd you had started drawing maps?
10  A.   That's what it would suggest.
11  Q.   I want to show you what's previously been marked as
12       Exhibit 195 and ask you if you can identify -- I
13       just want to know if you can identify what that
14       exhibit is.
15              MR. FARR:  Anita, do you know which
16       deposition that was in?
17              MS. EARLS:  Lewis.
18              THE WITNESS:  Well, it's a House map of
19       North Carolina labeled April 6.
20  BY MS. EARLS:
21  Q.   And "Tom," so does that refer to you?
22  A.   I would -- I would assume yes.
23  Q.   So is that one of the --
24  A.   That's a map that came off my computer.
25  Q.   Yes.
```

- Doc. Ex. 1957 -

**Thomas Hofeller, Ph.D.**        **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.    11 CvS 16896 & 11 CvS 16940

92

```
 1   A.   Yes.

 2   Q.   And is April 6th the date at which you at least had

 3        that version of the map?

 4   A.   April 6th was the date that you -- all I can say

 5        that would indicate the date that that particular

 6        plan was first entered onto the computer.  I can't

 7        tell you for certain that that plan didn't evolve

 8        further after that date.  We already went over

 9        that.

10   Q.   But so you're saying that the plan that's

11        represented by the data that's attached to this

12        exhibit, to Exhibit 195 --

13   A.   Yes.

14   Q.   -- and the map of districts that is represented on

15        that map labeled Tom House April 6 may in fact have

16        not been completed until after April 6th?

17   A.   Yes.

18   Q.   Then I want to show you Exhibit 196.

19             MR. FARR:  Is this from Lewis, too?

20             MS. EARLS:  Yes.

21   BY MS. EARLS:

22   Q.   These are statistics and a map labeled NC House

23        April 22.  Do you recognize that?

24   A.   Yes.  Could I just make a note.  I think there are

25        some blue stars there and that's maybe something
```

**5813 Shawood Drive**  **VIVIAN TILLEY & ASSOCIATES**    **tel:919.847.5787**
**Raleigh, NC 27609**      **ctrptr4u@aol.com**      **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP  Document 23-2  Filed 10/07/15  Page 93 of 181

**Thomas Hofeller, Ph.D.**       **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.  **11 CvS 16896 & 11 CvS 16940**

93

```
 1         that you all added to my exhibit.
 2    Q.   Well, I will say that the map and the statistics we
 3         produced from the block assignment file.
 4    A.   Right.
 5    Q.   So we both chose what data to show on the
 6         attachment as well as the handwritten notes, but it
 7         was produced from the block assignment file, map
 8         file.
 9    A.   Right.  The chart is not my data.
10    Q.   Well, let me --
11    A.   It's data produced from the plan that I gave you.
12         I'm not contesting the data.  I'm just making it
13         clear that I did not produce this chart or mark it.
14    Q.   Correct.  Thank you.
15    A.   Same with the last map incidentally, Exhibit 195.
16    Q.   Right.  But since it was a map on the disc of maps
17         that you provided to us, it was a map that you drew
18         during the redistricting process?
19    A.   That's correct.
20    Q.   And with the same caveats about this data sheet and
21         handwritten notes on it, is Exhibit 197, NC House
22         May 25, also a version of a map that you drew
23         during the redistricting process?
24    A.   Yes, with the same proviso that the chart is yours.
25    Q.   Well, I want to ask you about those three exhibits.
```

1          I believe I'm correct that not only do we have

2     block assignment files for them but we had PDFs of

3     the map itself on the data that you -- on the file

4     that you provided.

5               Did you show those maps in PDF form to

6     anyone else while you were working on these plans?

7  A.   Not necessarily.  When the plan opens up in

8     Maptitude, I felt it would be helpful for you all

9     as part of the discovery to make a picture of the

10    map.  You may want to take that block assignment

11    file and present it in a different light, so I

12    wasn't necessarily trying to show anything, but I

13    felt that the PDF was more for your benefit than it

14    was for anybody else's, but it doesn't mean that I

15    necessarily displayed that map or that PDF to

16    anybody else.  It's what was on the computer at the

17    time.

18               Do you understand what I said?

19  Q.   I do.  Thank you.

20               Looking at Exhibits 195, 196 and 197 -- and

21    you can take as much time as you like, but our

22    review suggested that in Exhibit 195, the map

23    labeled April 6, there were 20 districts with a

24    total black voting age population of 50 percent or

25    greater; that in the next version, whenever it was

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com          fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 95 of 181

```
 1          finished -- the date on the paper map says NC
 2          House, April 22 -- that had 21 districts with a
 3          total black voting age population with greater than
 4          50 percent; and the May 25th map, Exhibit 197, had
 5          22 districts with the total black voting age
 6          population of 50 percent or greater.
 7                   Does that roughly reflect the progression
 8          as you were looking at House options in terms of
 9          numbers of majority black districts?
10    A.    It would be an example of the iterative process
11          that was going on with the Voting Rights districts
12          and the county groupings and the harmonization
13          thereof, and as a redistricting person works more
14          and more with the state, you want to learn more and
15          more about the state and may find things that one
16          didn't find before.
17                   So it's part of that process, ongoing
18          process of trying to figure out what we may then
19          show to the chairman and say here's what we've come
20          up with.
21    Q.    And based on the numbers in the proportionality
22          chart, which I think is in front of you as
23          Exhibit 436.  If you could look at Exhibit 436 for
24          a moment.
25    A.    Oh, proportionality chart.
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com                   fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 96 of 181

- Doc. Ex. 1961 -

**Thomas Hofeller, Ph.D.**    **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

96

1    Q.   Right.  I just want to ask you, it shows there that

2         your House proportionality truncated, that is, a

3         little bit less than exact was 25 and rounded up

4         was 26.

5              So as you were looking at options and

6         possibilities and learning more about what might be

7         possible in the House map, you were trying to get

8         to that number of 26?

9    A.   I didn't really have a goal.  I was just seeing

10        what was possible to do.

11             The point at which we would settle on the

12        districts was a decision that would be made by the

13        two chairs.

14   Q.   Well, I thought that your affidavit indicated that

15        you were instructed to achieve rough

16        proportionality.  You say in paragraph 12, "I was

17        instructed to explore the possibility of creating a

18        sufficient number of majority African American

19        districts so that African American voters could

20        have a roughly proportional opportunity to elect a

21        preferred candidate of choice."

22             So weren't you trying to explore the

23        possibility of getting up to 25 or 26 districts in

24        the House that would be 50 percent or one greater

25        in black voting age population?

**5813 Shawood Drive**  **VIVIAN TILLEY & ASSOCIATES**        **tel:919.847.5787**
**Raleigh, NC 27609**          **ctrptr4u@aol.com**            **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 97 of 181

- Doc. Ex. 1962 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

97

```
 1   A.   Roughly, yes.

 2              (WHEREUPON, Exhibit 438 was marked for

 3        identification.)

 4   BY MS. EARLS:

 5   Q.   Exhibit 438 is a partial map and statistics that

 6        was among the documents provided to us.

 7              Do you recognize this map?

 8   A.   Yes.

 9   Q.   What is it?

10   A.   It's somewhat hard for me to look at it fully

11        because it's not big enough in some areas, but it's

12        another map showing minority districts -- possible

13        minority districts in the House.

14   Q.   If it would make it easier, we can pull it up in

15        Maptitude and you can look at it on the computer

16        screen, but I don't know if that will be necessary.

17   A.   It depends on what question you ask me.

18   Q.   I just wanted you to know that possibility existed.

19   A.   Thank you.

20   Q.   Can you explain what the labels are, the numbering

21        system and the labels on this map?

22   A.   The number that's -- the top number is a district

23        number.  The bottom number is a deviation,

24        numerical deviation for ideal district size.

25   Q.   And this is -- again, would this have been a map
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES      tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com          fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 98 of 181

- Doc. Ex. 1963 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

98

1       that you were looking at earlier on in the process?

2   A.  I think, but I'm not sure.  It was maybe a little

3       later in the process than the maps you've already

4       shown me just by the configuration of the districts

5       that are there.

6   Q.  And what does the shaded part of the map show?

7   A.  The minority districts.  You get that by using

8       locking on the Maptitude program.

9   Q.  So in preparing this partial map, you were

10      attempting to determine where it was possible to

11      drew majority-minority districts in the state?

12  A.  Yes.  There were some other districts on it, but

13      they were -- they were just there.

14  Q.  Right.

15              (WHEREUPON, Exhibit 439 was marked for

16      identification.)

17  BY MS. EARLS:

18  Q.  I've marked as Exhibit 439 another map that was

19      among the maps provided to us, and I understand the

20      same caveat that the data report wasn't something

21      you produced.

22              Do you recognize this exhibit?

23  A.  Yes.

24  Q.  And can you explain the title, NC Without Odd

25      Minority Districts?

**5813 Shawood Drive  VIVIAN TILLEY & ASSOCIATES     tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com          fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 99 of 181

```
 1   A.   I mean, basically, this was yet another part of the
 2        iterative process that was going on and it was kind
 3        of a side line to say, well, could they look better
 4        and still fit in this harmonization scheme, and the
 5        conclusion was, no.  So it's a failed offshoot.
 6                 By odd -- I'm sorry, you ask your question.
 7   Q.   Please.  I think you're about to answer it.
 8   A.   You ask the question.
 9   Q.   What do you mean by odd?
10   A.   Less -- more compact.
11   Q.   And why was it not possible?
12   A.   Because it wouldn't meet the requirements that were
13        given to me by the chairman which were to create
14        majority-minority districts in accordance with
15        Strickland.
16   Q.   And by that you mean it didn't create as many
17        majority-minority districts as other maps?
18   A.   Well, and they wouldn't fit within the context of
19        the Stephenson county grouping criteria.
20   Q.   In what way --
21   A.   I don't know that it was ever actually fully -- if
22        I can use the term -- grouped.  I think this was
23        just like a one off little process of saying, okay,
24        is there something else possible.
25   Q.   But the data does come from the block assignment
```

**5813 Shawood Drive**  **VIVIAN TILLEY & ASSOCIATES**        **tel:919.847.5787**
**Raleigh, NC 27609**          **ctrptr4u@aol.com**        **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 100 of 181

**Thomas Hofeller, Ph.D.**     June 28, 2012

Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

```
 1        file and it shows that -- am I right that these 120
 2        districts are all within plus or minus five percent
 3        deviation?
 4   A.   Yes.
 5   Q.   So this was a complete district map?
 6   A.   If that's your definition of a complete district
 7        map, that it has 120 districts within the deviation
 8        range.  I don't know that it was a complete map in
 9        that it harmonized Stephenson with the Voting
10        Rights Act.
11   Q.   And can you tell me why it did not harmonize?
12   A.   I really can't.  There isn't enough information on
13        this map.  I would really have to have a map that
14        would have an overlay of the county groupings and
15        look at them to recognize where they were,
16        et cetera.
17   Q.   Did you have the capacity in Maptitude to overlay
18        county groupings?
19   A.   It wasn't -- it would have been very labor
20        intensive to do it.  There was no function that you
21        pressed in Maptitude that said give us the
22        North Carolina -- the outlines of the
23        North Carolina county groups.  That was not a
24        Maptitude function.
25             And I also was very cognizant of the fact
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES       tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 101 of 181

1      that the state's computer had that capacity.  How

2      they did it, I don't know.

3  Q.  But you just said that this -- this option was a

4      failed map and that was a conclusion that you came

5      to during the redistricting process.  And I

6      understand --

7  A.  Maybe "failed" is the wrong term.  It was an

8      experiment.  I decided it was not -- it was just

9      not going in any direction that we were instructed

10     to go in so I abandoned it.

11 Q.  And I understood you to say that you abandoned it

12     because it didn't comply with the instructions you

13     were given to follow Strickland and the Stephenson

14     Whole County Provision.

15 A.  And the Voting Rights Act.

16 Q.  And the Voting Rights Act?

17 A.  Yes.

18 Q.  And I'm trying to understand how you came to that

19     conclusion.  If Maptitude -- because you said you

20     can't tell me now looking at it; you need to know

21     the county grouping overlay.

22          When you were working on this map during

23     the redistricting process, you weren't working on

24     the state's computer, right?

25 A.  No.

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES      tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com             fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 102 of 181

- Doc. Ex. 1967 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

102

1  Q.   So you didn't have the capacity in Maptitude to

2       overlay the county groupings.

3  A.   Not as a direct function of Maptitude.

4  Q.   So how did you assess the county groupings in that

5       map?

6  A.   Well, I had access to mapping charts that had

7       groupings on them.

8  Q.   And where did those mapping charts come from?

9  A.   Mr. Oldham.

10 Q.   And so you took the mapping charts and compared

11      them to this map?

12 A.   I would say this:  I'm working intensely on this

13      state and particularly on the House plan because

14      it's the most difficult plan, and I have in my mind

15      where things are, which is what you have to do.

16      You have to be an effective line drawer if you're

17      not paying attention.

18           I looked at this and said this isn't going

19      to go anywhere because this isn't where our

20      grouping plan is headed, but I was thinking you

21      wanted me to get more specific about it and I was

22      just saying there isn't enough detail on here for

23      me to get more specific.  It's very difficult to

24      trace on a map of this size where the groups are.

25      We'd be here for a long time.

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES         tel:919.847.5787**
**Raleigh, NC 27609           ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 103 of 181

1    Q.    Right.

2    A.    And I don't think it's really that productive, but

3          that's up to you because you're asking the

4          questions.

5    Q.    I do have the county grouping maps which I'd be

6          happy to show you.  They've been previously marked

7          as exhibits because I would like to understand why

8          this map without odd minority districts did not

9          work from your point of view.

10              I'm going to show you both Exhibit 401 and

11         402 and let you tell me if these are the county

12         grouping maps -- I'm sorry to move your stuff

13         here -- that Mr. Oldham provided to you that you

14         were just referring to.

15   A.    These are the county grouping maps that Mr. Oldham

16         had and provided to you.  I didn't see every one of

17         these grouping maps because he may have decided

18         independently that the grouping that was on a

19         specific map was just not going to work.  Again,

20         that's part of the iterative process of harmonizing

21         Stephenson and Strickland and the Voting Rights

22         Act.

23              So in my mind, I know you say this is a

24         grouping map, but for me to be able to opine with

25         any accuracy on this map, we would have to have a

```
 1          map such as the maps that the state staff produced
 2          which had the outlines of the districts usually
 3          colored and an added blue overlay that showed the
 4          groupings.
 5    Q.    Did you have those state-produced maps before any
 6          redistricting maps were made public?
 7    A.    No.
 8    Q.    So were there some other county grouping maps that
 9          you were working from other than --
10    A.    No.  What there was is what you see except once in
11          a while I might look at one of Mr. Oldham's charts
12          and attempt to put it in a more organized fashion,
13          but I soon gave that up.
14    Q.    And in order to make this assessment, am I right
15          that you had to have all of the districts -- you
16          had to have 120 districts drawn?
17    A.    Not necessarily, no.  You could have -- you could
18          have the county groups, you could have the minority
19          districts, and it wasn't necessary to have filled
20          in the rest of the districts.
21    Q.    In this map all of the rest of the districts are
22          filled in.
23    A.    Yes, but not necessarily in the context of what
24          would be a final map product delivered to the
25          chairman or presented publicly.
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 105 of 181

- Doc. Ex. 1970 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

105

```
 1                 In constructing these districts, sometimes
 2       I would put in a full 120 districts with the
 3       knowledge that the non-minority district lines
 4       would be subject to a lot of give and play by
 5       members of the House in the chairman's interplay
 6       with them; in other words, they would see something
 7       and say, "I don't want that."
 8   Q.  Do you recall when you first showed a map to the
 9       chairman, a House map?
10   A.  A full House map?
11   Q.  Well, let's start with any map.
12   A.  I think that in late April, early May we came down
13       to Raleigh and we showed them a minority district
14       map, a map with minority districts on it.  It
15       was -- I don't recall whether it was fully
16       districted out for 120 districts, but we told them
17       at the time don't worry about the other districts.
18                 One of the problems you have when you give
19       a map to a legislator is they have trouble
20       discriminating between a hypothetical map and a
21       real map.
22   Q.  So you made the choice to only show him the
23       majority-minority districts initially?
24   A.  I honestly don't remember whether that map had
25       other districts on it or not.  I just don't
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787**
**Raleigh, NC 27609            ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 106 of 181

```
 1        remember at this point.

 2                I certainly wouldn't have had any problem

 3        with that, but the main goal at that point was to

 4        complete that harmonization phase as directed in

 5        Stephenson of first doing the examination of the

 6        minority districts and then going through the

 7        iterative process of harmonizing them with the

 8        Stephenson Whole County groupings, and at that

 9        point the map became -- it would have been easier

10        to start drawing the rest of the districts.  Other

11        than that, you would just be drawing them and you

12        would be redrawing them and you would be redrawing

13        them because they have to be drawn within those

14        groupings.

15                I can tell you right off this was not the

16        final set of groups --

17   Q.   Right.

18   A.   -- that I can see.

19   Q.   And actually, I'm interested in knowing which map

20        was the first full map that you drew and showed to

21        the leadership, but let me show you a few more maps

22        before we get to that.  I'll take those two

23        exhibits back.

24   A.   Could I get another drink?

25   Q.   Please.  Help yourself.
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609           ctrptr4u@aol.com             fax: 919.847.2265**

1           (WHEREUPON, Exhibit 440 was marked for

2       identification.)

3   BY MS. EARLS:

4   Q.   I'm handing you an exhibit that we marked as

5        Exhibit 440, and that consists of three pages of

6        statistics and two maps, one full map and one a

7        partial map.  Again, the statistics are -- we

8        printed these out after loading the block

9        assignment file that was on your disc into our

10       system and we also printed out the full map after

11       loading the block assignment file, but the partial

12       map was a PDF that was on the disc, and the title

13       is NC House Less Convoluted.

14           Can you describe for me what this map is.

15  A.   I think I'd be going through the same explanation

16       as I went through with your previous exhibit.  It

17       was another segment of the analysis of the

18       harmonization of the Stephenson county grouping

19       criteria with the Voting Rights Act and Strickland.

20  Q.   And the same labeling conventions apply, so the top

21       number is the district number and the bottom is the

22       population deviation?

23  A.   Yes.

24  Q.   And the shaded areas are majority-minority

25       districts?

**5813 Shawood Drive**   **VIVIAN TILLEY & ASSOCIATES**      **tel:919.847.5787**
**Raleigh, NC 27609**        **ctrptr4u@aol.com**          **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 108 of 181

1    A.    I don't know that they're majority-minority

2          districts.  Let's just say they're minority

3          districts at this point.  They're the districts

4          that I wanted to highlight in this particular map.

5    Q.    And as with the previous map, this is a map that

6          has 120 districts, at least.  I'm asking you about

7          Exhibit 440.

8    A.    I know.  I was just looking back.

9    Q.    Okay.  Take your time.

10   A.    What exactly is your question?

11   Q.    Is this a map that has 120 districts?

12   A.    So it appears.

13   Q.    And what did you mean by "less convoluted" on the

14         top of this map?

15   A.    It was the same explanation as odd.  And again, it

16         was another kind of sidebar look at possibilities.

17         You're always looking at possibilities.

18               Now, one of the things that I wish to

19         remark about this and some of the preceding maps is

20         you'll notice that in these maps, Wilson county is

21         a one-county, one-district county group, and that

22         was certainly not going to provide the incumbent in

23         that county with a minority -- a Strickland-based

24         or any based majority-minority district.  And one

25         of our goals, too, would be to minimize to the

- Doc. Ex. 1974 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

109

```
 1        greatest possible extent leaving minority
 2        incumbents in non-minority districts or paired --
 3        or paired together with other members.
 4              I can just tell you this was not -- again,
 5        the clustering system was not the final clustering
 6        system.
 7   Q.   But you can determine something about the
 8        clustering system by just looking at the map
 9        because you could tell me that Wilson was a
10        single-county cluster?
11   A.   Well, that's a pretty easy thing to identify.
12        Again, it would be a lot more helpful if these maps
13        were in the format that the state puts them in when
14        they add the county groupings on top.  It's a
15        separate line file.
16   Q.   But just to be clear, during the redistricting
17        process when you were working on these maps, you
18        weren't using that state system?
19   A.   No.
20   Q.   The title of both this map and the last --
21        certainly this one less convoluted suggests that it
22        was less convoluted than something.  Can you tell
23        me what it was being compared to?
24   A.   I think the current, best version of the map that
25        was in existence at the time.
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com          fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 110 of 181

**Thomas Hofeller, Ph.D.**      **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

110

1   Q.   And do you know which map that would have been?

2   A.   No.

3   Q.   I want to look -- can I just finish up with the

4        House?

5                  MR. FARR:  How long?

6                  MS. EARLS:  I just want a few more maps.

7                  MR. FARR:  Okay.  Is that okay with you?

8                  THE WITNESS:  I'm fine.

9   BY MS. EARLS:

10  Q.   Exhibit 400 was introduced in the deposition

11       yesterday, and it's entitled NC House HOMP - 2

12       20110525.  Do you recognize that map?

13  A.   Yes.  I first saw it actually yesterday.

14  Q.   So this is not a map that you --

15  A.   I don't know whether it is or not.  It doesn't look

16       that it has a name like I would have put on the

17       map.

18  Q.   So you don't know what the name means, the H-O-M-P?

19  A.   Actually, I don't.

20  Q.   Because we were assured yesterday we could ask you

21       about these maps.

22  A.   Okay.  Well, you've asked me about the map, and I

23       said I'm not sure that this specific map -- I just

24       don't recall it.

25  Q.   I want to show you what previously was marked as

1          Exhibit 406 and ask you if you recognize that map.

2    A.    Yes.  That's a county cluster map.

3    Q.    And did you have that map or had you seen that map

4          while you were working on the redistricting in

5          2011?

6    A.    My hunch is that, again, very early in the process

7          I stopped trying to keep up with each different

8          county grouping map that was being produced and

9          make a prettier map of it because I didn't have

10         time.

11   Q.    Exhibit 411 is a map titled NC House 16 District

12         Pod.  Can you tell us what that map shows?

13   A.    I would assume that somewhere in here there is a 16

14         district pod.  I don't know if I could pick it out

15         right away.  It would take me some time to figure

16         that out.

17   Q.    All right.

18               MS. EARLS:  All right, we can stop.  Thank

19         you.

20               (Lunch Recess:  12:48 to 1:38 p.m.)

21   BY MS. EARLS:

22   Q.    Before the break, I was asking you about the first

23         map that you showed to the leadership, the first

24         House redistricting map that you showed to the

25         leadership, and I want to ask you if you remember

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609         ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 112 of 181

- Doc. Ex. 1977 -

**Thomas Hofeller, Ph.D.**            **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.  11 CvS 16896 & 11 CvS 16940

112

```
 1        roughly when that would have been you first showed
 2        them a map.
 3   A.   It would have been sometime close by the date that
 4        the first map showing the VRA districts was
 5        released, but I'm not sure that all our districts
 6        were even finalized at that time.  In other words,
 7        there was a period between when the VRA map was
 8        released and the full map was released, so I don't
 9        know exactly what that date was.
10   Q.   Well, I believe that it was roughly June 17th when
11        the VRA districts for the House and Senate were
12        released to the public.
13             So are you saying that it was sometime in
14        June that you showed them the -- first showed them
15        a House map?
16   A.   A House map?
17   Q.   Yes.
18   A.   I think it would probably have been more in May
19        sometime.
20   Q.   And were you -- was this an in-person meeting?
21   A.   Yes.
22   Q.   So it would have been one of the times that you
23        were in North Carolina?
24   A.   Oh, yes.
25   Q.   So your Exhibit 431 suggests that you were here
```

**5813 Shawood Drive  VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com        fax: 919.847.2265**

- Doc. Ex. 1978 -

**Thomas Hofeller, Ph.D.**　　　　　**June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.　11 CvS 16896 & 11 CvS 16940

113

1　　　from May 22nd to May 27th, Exhibit 431 in front of

2　　　you there.  You can flip them back over.

3　A.　That could have been, although I don't know for

4　　　sure when it would have been.

5　Q.　And at least one of the earlier maps was dated

6　　　May 25, one of the earlier exhibits of past

7　　　districts.  Can I just look through and find the

8　　　May 25th map?

9　A.　Do you want me to look?  You look.

10　Q.　Actually, I think I know where it is.

11　　　　　　What was previously marked in the

12　　　deposition of Representative Lewis as Exhibit 197

13　　　has a title of May 25th.  Is it possible that that

14　　　was the first map that you showed the leadership?

15　A.　It's possible, but I can't definitely say.

16　Q.　How did you show them the map?  Was there a hard

17　　　copy map like that or did they just come in and

18　　　look at a computer screen?

19　A.　Well, sometimes one, sometimes the other.  The

20　　　problem with one of these maps, as you see here, is

21　　　that they are pretty small and so you can't see

22　　　where the districts are, so I think it would be

23　　　more likely we would have printed a larger map and

24　　　then again they might have wanted to look at

25　　　specific spots on the map.

**5813 Shawood Drive**　**VIVIAN TILLEY & ASSOCIATES**　　**tel:919.847.5787**
**Raleigh, NC 27609**　　　　**ctrptr4u@aol.com**　　　**fax: 919.847.2265**

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

114

1   Q.   Do you recall who was present at that meeting where

2        you first showed them a House map?

3   A.   No.

4   Q.   And did you receive further instructions from the

5        leadership after showing them that map?

6   A.   Further instructions between the time I first

7        showed them the map and between the time the full

8        map was shown to the public?

9   Q.   No.  I'm saying at the meeting where you showed

10       them the map.

11  A.   I don't rightly recall.

12  Q.   Then between the time that you showed them the map

13       and roughly June 17th when it was shown to the

14       public, did anyone else see any versions of a House

15       map?

16  A.   I believe so, yes.

17  Q.   Who else saw the map?

18  A.   Well, certainly Joel would have seen them and Dale

19       would have seen them and the respective chairmen

20       would have seen them.  They were not terribly

21       interested in the other side -- the other chamber's

22       maps.  And some limited members would see them.

23  Q.   And who were the members who saw the maps?

24  A.   Well, Representative Dollar was quite interested in

25       the maps as they were progressing.  Obviously much

```
 1        more in Wake county.
 2   Q.   Then can you tell me what happened with regard to
 3        the House maps after the House and Senate maps were
 4        released to the public in terms of your involvement
 5        in drawing and looking at alternatives?
 6   A.   You mean specifically?
 7   Q.   What did you do --
 8   A.   Well, I mean, there were changes made to the maps
 9        clear up until the day before the next version was
10        released.  As would be the case in any legislative
11        redistricting, the map is not a static.  It goes
12        through revisions, so there were a lot of things
13        that were done, but some of them were minor, some
14        of them were not minor, but I'd have to have the
15        two maps in front of me to tell you what some of
16        the differences were and it's likely I wouldn't
17        even remember them all.
18   Q.   I would like to ask you if you met with any other
19        members after the maps were released publicly.
20   A.   Yes.
21   Q.   And who do you recall meeting with?
22   A.   I met with a large number of members who were asked
23        by the chairman or told by the chairman -- since I
24        don't know what he told them exactly -- to come
25        down and look at the maps particularly for their
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com        fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 116 of 181

**Thomas Hofeller, Ph.D.**          June 28, 2012
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

```
 1        county grouping, and his admonition to them was to
 2        come as a group, a grouping group, so to speak, and
 3        look at the maps and I could answer any questions
 4        they had and they would make comments about the
 5        maps.
 6   Q.   At the time at which the Voting Rights Act
 7        districts were made public for the House map, from
 8        that time until the maps were enacted, were there
 9        any changes made in terms of the county groupings
10        or had you decided on the final county groupings by
11        the time the Voting Rights Act districts were
12        released?
13   A.   I believe it's possible there were.  Again, I'd
14        have to see the two maps and the grouping maps, but
15        I would not preclude that that happened.
16   Q.   You don't remember?
17   A.   I don't remember really.  I remember through the
18        maps.  That's the way I keep it in my mind.
19   Q.   Well, let me show you -- I will show you the map
20        that was enacted.  I actually don't think that I
21        have here a map, although we could possibly pull --
22   A.   Could we go back and have you re-ask the previous
23        question.
24   Q.   I wanted to figure out if you had decided on the
25        county groupings by the time the Voting Rights Act
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609           ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 117 of 181

```
 1          districts were first released to the public.
 2     A.   Between the time the Voting Rights Act was released
 3          and the full map was released to the public?
 4     Q.   No.  At the time the -- June 17th roughly when the
 5          Voting Rights Act maps were released to the public
 6          had you already decided on the county groupings?
 7     A.   No.  Some of them changed.
 8     Q.   Okay.  Thank you.
 9               And I will show you the final map.  I do
10          have that here so that you have that to refer to.
11          I want to understand what motivated or caused the
12          change in the county groupings after the first VRA
13          House districts were released to the public.
14     A.   Could I see the first VRA map also?
15               MS. EARLS:  Can you get it off the
16          website?
17               We can show it to you on the computer.
18               MR. KETCHIE:  VRA Corrected.
19               MR. FARR:  That would be fine.
20     BY MS. EARLS:
21     Q.   I'm showing you on our laptop the VRA Corrected
22          districts that are available on the General
23          Assembly website, and you have in front you
24          Lewis-Dollar-Dockham 4 which is also available on
25          the General Assembly website.
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609           ctrptr4u@aol.com               fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 118 of 181

- Doc. Ex. 1983 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

118

```
 1                  MS. EARLS:  Thank you, Allison.

 2                  I can also show you a paper copy if that's

 3         easier.

 4                  THE WITNESS:  It's certainly safer.

 5    BY MS. EARLS:

 6    Q.   I'm showing you Exhibit 189 from Representative

 7         Lewis's deposition, and it's a multi-page exhibit,

 8         but the first page I believe are the VRA districts

 9         that were released.

10    A.   Well, the group in which Beaufort was included

11         would have been shifted because on the VRA

12         Corrected, District 9, I believe -- although I

13         don't know.  I really can't read that number.  My

14         eyes aren't good enough.

15                  The minority district in Pitt County had --

16         was withdrawn from Beaufort and also the

17         Wilson/Pitt group had been established.  It wasn't

18         in the original Lewis House VRA.

19                  You can observe that the District 21,

20         instead of going down into Pender county was now

21         made up -- instead of being made up of portions of

22         Wayne, Sampson and Pender was now made up of

23         portions of Wayne, Sampson and Duplin.  That was a

24         regrouping of those county groups.

25                  The district --
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com              fax: 919.847.2265**

```
 1                    MR. FARR:  Can I help you?
 2                    THE WITNESS:  This district right here --
 3                    MR. FARR:  Is it the pink district?
 4                    THE WITNESS:  It's the pink district.
 5                    MR. FARR:  I think it says District 20 on
 6          VRA Corrected.
 7                    THE WITNESS:  District 20 was dissolved,
 8          essentially, which also caused a major regrouping
 9          of that area.
10                    That's all I can spot with the comparison
11          of those maps.
12     BY MS. EARLS:
13     Q.   And so starting with the first change you
14          identified, the Beaufort shift, that involved a
15          change in the Pitt county minority district, is
16          that what -- was it a change in the majority-
17          minority district that caused a change in the
18          county grouping?
19     A.   Yes.
20     Q.   In the Wilson/Pitt change, what was the motivating
21          factor there?
22     A.   It was motivated primarily by incumbencies of
23          minority members and not leaving the incumbent --
24          taking the incumbent in Wilson county in a
25          different direction and also being able to reunite
```

**5813 Shawood Drive**  **VIVIAN TILLEY & ASSOCIATES**    **tel:919.847.5787**
**Raleigh, NC 27609**        **ctrptr4u@aol.com**      **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 120 of 181

```
 1        the Martin/Edgecombe, two-county group, form

 2        another two-county group out of Wilson and Pitt

 3        which was more compliant with Stephenson.

 4             The -- well, go ahead, I should let you

 5        ask your questions.

 6   Q.   Well, I want to know all of the -- what factors

 7        motivated the change so if there's more you need to

 8        tell me about, go ahead.

 9   A.   When the 20th District in Lewis House VRA Corrected

10        was objected to, the chairman made a decision that

11        that district would not be created in the map.

12             Because that district was no longer

13        created, the Stephenson Whole County criteria

14        mandated that a county grouping consisting of

15        Brunswick and New Hanover county would have to be

16        put back together again, and in order to do that

17        and in order to handle the large multi county group

18        to resolve the populations of the districts in

19        Mecklenburg had to be moved and in order to make

20        that work, the combination of Onslow and Duplin had

21        to be replaced with Onslow and Pender and thus a

22        changed 21st District.

23   Q.   On the 20th District, do you know what the basis of

24        the objections were that led to the chairman

25        deciding that you would not draw that as a majority
```

**5813 Shawood Drive**   **VIVIAN TILLEY & ASSOCIATES**        **tel:919.847.5787**
**Raleigh, NC 27609**           **ctrptr4u@aol.com**            **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 121 of 181

- Doc. Ex. 1986 -

**Thomas Hofeller, Ph.D.**       **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.  11 CvS 16896 & 11 CvS 16940

121

```
 1        black district?

 2   A.   Not specifically, but they I think were as a result

 3        of public hearings or statements made.

 4   Q.   And do you know anything more about why Chairman

 5        Rucho decided not to draw a majority black district

 6        in that part of the state?

 7              MR. FARR:  I think you meant Chairman

 8        Lewis.

 9              MS. EARLS:  I'm sorry, Chairman Lewis.

10        Thank you.

11              THE WITNESS:  I would advise that probably

12        you should ask Chairman Lewis that question.

13   BY MS. EARLS:

14   Q.   Well --

15   A.   I can't speak for what was totally in his mind.

16   Q.   What did he tell you?

17   A.   "Change it."

18   Q.   He didn't give you any other reasons?

19   A.   No.  He didn't need to give me any more reasons.

20   Q.   Right, but he might have.

21   A.   He was in charge of the plan.

22   Q.   I understand that.

23              And then District 21, are you saying

24        District 21 was changed because it was impacted by

25        the changes in District 20?
```

**5813 Shawood Drive**  **VIVIAN TILLEY & ASSOCIATES**    **tel:919.847.5787**
**Raleigh, NC 27609**       **ctrptr4u@aol.com**     **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP  Document 23-2  Filed 10/07/15  Page 122 of 181

- Doc. Ex. 1987 -

**Thomas Hofeller, Ph.D.**      **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.  11 CvS 16896 & 11 CvS 16940

122

1  A.  It was -- as it was necessary to recreate the

2      two-county pod of Brunswick and New Hanover, it was

3      necessary to re-shift some of the other clusters,

4      groupings, whatever.

5          This is often the case when you're trying

6      to harmonize the county grouping and Stephenson.

7      Again, with voting rights, you just can't say,

8      well, we'll just do away with this boundary line

9      and all will be well.

10         You have to regroup the county groups to

11     conform to the maximum extent with the requirements

12     of Stephenson, and that's what was happening there.

13  Q.  In the county -- in the VRA district map that was

14     first released, that is, Exhibit -- what's the

15     Exhibit Number?

16  A.  189.

17  Q.  -- 189, you testified earlier that there were some

18     majority black districts that could have been drawn

19     in the state that were not.

20         Looking at that exhibit, can you tell me

21     where in the state it could have been possible to

22     draw another majority black district that didn't

23     show up in that map?

24  A.  I don't believe so.

25  Q.  And is that because you don't have -- are you

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 123 of 181

- Doc. Ex. 1988 -

**Thomas Hofeller, Ph.D.**                    **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

123

 1       saying you just can't tell or is that --

 2   A.   I didn't find one.

 3   Q.   Okay.  Thank you.

 4            So then Lewis-Dollar-Dockham 4 that was

 5       finally enacted, am I right that it has just one

 6       less majority black district than the June 17th

 7       Voting Rights Act districts map?

 8   A.   No.  I can think of another one.

 9   Q.   What's the other one?

10   A.   You could have made one of the districts in Forsyth

11       county a 50 percent district.

12   Q.   A House district?

13   A.   Yes.

14   Q.   Do you know what draft of any of these maps shows

15       that district?

16   A.   There isn't one.

17   Q.   So how do you know that it was possible to draw the

18       district?

19   A.   Believe me, when you've gone through drafting plans

20       of a county such as Forsyth and looked at the

21       demographics displayed on the screen and you have

22       two districts side by side which are in the 40s,

23       you know if you took the heaviest concentration of

24       one and added it to the other you could draw a

25       district over 50 percent.  It would not take long

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES       tel:919.847.5787**
**Raleigh, NC 27609         ctrptr4u@aol.com            fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 124 of 181

```
 1       to do that.
 2   Q.  So you didn't actually draw the district, but based
 3       on what you were seeing about the concentrations
 4       you believe it's possible?
 5   A.  You know, I don't know whether or not I did, but if
 6       I did, I wouldn't have kept -- there wouldn't have
 7       been a map to keep because it would have been drawn
 8       and then you would have looked at it and said, yep
 9       and you would push the undo button in Maptitude,
10       there's a little thing you can push and it will
11       take you back however many steps you want to go
12       back and since it probably would have only been a
13       two-step process to make those shifts.
14   Q.  Why did you decide not to draw that district?
15   A.  That was a decision that was made by the chairman.
16   Q.  But did you actually show him that district?
17   A.  I told him that it could be done.
18   Q.  I understand that in the documents you produced
19       there was a map titled Forsyth Experimental, and we
20       have it on the computer.  I'm sorry, I don't have a
21       hard copy, but if you looked at that, could you
22       possibly -- can you show it to him?
23           MR. KETCHIE:  Yes.
24           THE WITNESS:  Do you want me to come over
25       there and look at it over his shoulder?
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES       tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com           fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 125 of 181

```
 1              MS. EARLS:  That's fine with me.

 2              MR. FARR:  How about we do it over here.

 3              THE WITNESS:  Are we finished with this?

 4      I'll just move it.

 5              Okay, I've looked at it.  Could you repeat

 6      the question?

 7  BY MS. EARLS:

 8  Q.  Does that map which was one of the maps that was on

 9      the disc of documents and maps that we received

10      from you, does that map illustrate the House

11      district in Forsyth county that you believed

12      demonstrates possible drawing of majority black

13      districts in that county?

14  A.  If I could rephrase your question to say I knew.

15  Q.  Okay.

16  A.  No.

17  Q.  Okay.  All right.  Thank you.

18              Other than the -- so I'd like you to take

19      a look again at the enacted map.  Other than the

20      possible majority black district in Forsyth county

21      that you say Chairman Lewis directed you not to

22      draw and the majority black District 20 that

23      originally in the first VRA districts was

24      illustrated as a majority black district and was

25      not in the enacted plan, is there any other place
```

**5813 Shawood Drive  VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com              fax: 919.847.2265**

1      where it was possible to draw a majority black

2      district but was not drawn?

3  A.  By that you mean an additional district?

4  Q.  Right, an additional district.

5  A.  Okay.  No.

6  Q.  Thank you.  I think we're done with those.

7  A.  Am I going to need this more?

8  Q.  Not right now.  I'll take it out of your way.

9          Let's talk now about the Senate maps.  Can

10     you tell me who was involved in drawing the Senate

11     maps.

12 A.  I was involved, Joel Raupe was involved to a

13     certain extent and John Morgan was involved.

14 Q.  I'm showing you what's been marked as Exhibit 213.

15     It's a map titled NC Senate April 22.

16          Do you recognize that map?

17          MR. FARR:  Which deposition was that in?

18          MS. EARLS:  Rucho.

19          THE WITNESS:  Yes.

20 BY MS. EARLS:

21 Q.  Do you recall when you first drew a map that showed

22     all of the Senate districts?

23 A.  No.

24 Q.  But is it -- does the April 22nd indicate that that

25     map was at least started on that date?

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES      tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com           fax: 919.847.2265**

```
 1   A.   It would be close to that timeframe.  As I said

 2        before, these maps would change but the titles

 3        wouldn't change.

 4   Q.   Well, Exhibit 214 is a map that is titled NC Senate

 5        May 13.

 6   A.   Yes.

 7   Q.   Do you recognize that map?

 8   A.   I think so, yes, but I'd have to see a little bit

 9        more detail on it, but I think, yes, it is a map I

10        had on my computer.

11   Q.   And you started at least the April 22nd map before

12        starting the May 13th map; is that correct?

13   A.   I'm not actually sure that that was my map.  It

14        quite possibly could have been a map sent to me.

15   Q.   From who?

16   A.   Well, if it was sent to me, it would have been sent

17        to me by Joel.

18   Q.   But does that mean that he drew it?

19   A.   Possibly.  Again, I'd have to see more specificity

20        to tell you that.  Either Joel or John Morgan.

21   Q.   This is Exhibit 215.  This is a map that's entitled

22        NC Senate May 23, 3NE No SE.

23             Do you recognize that map?

24   A.   Yes.

25   Q.   Did you draw that map?
```

**Thomas Hofeller, Ph.D.**          **June 28, 2012**

Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

```
 1    A.   Yes.

 2    Q.   And what does the title mean?

 3    A.   It means it's a Senate map where one of the

 4         districts that was drawn that went from Wilmington

 5         up to the center of the state was not present on

 6         that map.

 7    Q.   And when you say -- that district that you just

 8         described, was that a majority black district?

 9    A.   Yes.

10    Q.   And then this Exhibit 216, does that have the

11         district that you just described?  It's entitled

12         NC Senate 3 NE with SE black.

13    A.   Yes.

14    Q.   Do I understand that in the process of drawing the

15         Senate maps there was an effort to find three

16         majority black Senate districts in northeastern

17         North Carolina?

18    A.   Yes.

19    Q.   And what was motivating that effort?

20    A.   That there was sufficient minority population in

21         that area to justify the drawing of three

22         districts.

23    Q.   And is it correct that in drawing the Senate

24         districts you went through the same

25         process -- well, just describe for me the process
```

```
 1        generally that you went threw in drawing the Senate

 2        districts.

 3   A.   It was the same process as I went through drawing

 4        the House districts.  Do you want it described

 5        again?

 6   Q.   Well, I assume it was -- was it easier for the

 7        Senate districts?

 8   A.   Oh, yes.

 9   Q.   Do you know when you --

10   A.   I'd say easier mechanically, okay.

11   Q.   Is there some way in which it wasn't easier?

12   A.   All plans that are drawn come into public view,

13        members see them, there are always issues.

14   Q.   Do you remember when you first showed the

15        leadership the Senate redistricting plan?

16   A.   You mean a Senate redistricting plan?

17   Q.   Yes.

18   A.   I'm sure that it would have been at the same time

19        that we would have shown a House plan.

20   Q.   So it was in that same time period, end of May,

21        that you had a Senate plan to show the leadership?

22   A.   A Senate plan, yes.

23   Q.   And did that Senate plan that you showed them only

24        have the majority black districts illustrated on

25        it?
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES       tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com            fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 130 of 181

- Doc. Ex. 1995 -

**Thomas Hofeller, Ph.D.**                    **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

130

```
 1   A.    I'm not sure, but it's very possible it could have

 2         been filled out with a full complement of

 3         districts, but, again, with the knowledge that they

 4         were almost placeholders and would be subject to

 5         change.

 6   Q.    And do you know if the pod or clusters changed any

 7         after the Senate VRA districts were made public

 8         between that time and the final map being drawn and

 9         enacted?

10   A.    I don't rightly remember at this time.  I'd have to

11         look at that map and look at the other map to see.

12               Again, one would have had the same issue

13         with the decision not to proceed forward with

14         what's labeled District 51 because -- it doesn't

15         have an exhibit number on it.

16               MR. FARR:  It's this, Tom.

17               THE WITNESS:  I'm sorry.  On Exhibit 216.

18         When the decision was made not to move forward with

19         that map, the county groupings would have had to

20         have been changed because it would have been

21         necessary to group differently because there would

22         have been no justification for the group that was

23         there because there was no minority district at

24         issue.

25   BY MS. EARLS:
```

**5813 Shawood Drive**   **VIVIAN TILLEY & ASSOCIATES**        **tel:919.847.5787**
**Raleigh, NC 27609**        **ctrptr4u@aol.com**        **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 131 of 181

- Doc. Ex. 1996 -

**Thomas Hofeller, Ph.D.**      **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.  11 CvS 16896 & 11 CvS 16940

131

1   Q.   I see.  I'm sorry, can I look at Exhibit 216 for a

2        minute.

3             And what's the 18 and above all -- any part

4        black percentage for District 51?

5   A.   47.40.

6   Q.   So in your view, would that have satisfied the

7        Strickland criteria?

8   A.   We would have found a solution that would have been

9        up above 50 percent plus one if we had proceeded

10       forward with this district, so it would be more

11       appropriate to look at the map that was released to

12       the public with that district on it.

13  Q.   With -- I'm sorry, with which district?

14  A.   With District 51 on it.

15            (Discussion held off the record.)

16            MR. FARR:  Anita, if you can't find it, I

17       could stipulate to something.

18            MS. EARLS:  Well, he says he wants to look

19       at it.  Oh, I think I have it.  Yes, I do have it.

20  BY MS. EARLS:

21  Q.   I'm showing you what was marked in the deposition

22       of Senator Rucho as Exhibit 199, and those are the

23       Senate VRA districts that were released.

24  A.   Okay.  I just want to qualify, restate my answer

25       last time that Senator Rucho had already said to

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES**          **tel:919.847.5787**
**Raleigh, NC 27609**          **ctrptr4u@aol.com**          **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 132 of 181

```
 1        remove this district from the map before this
 2        public plan was released.
 3   Q.   And did he tell you why he decided to remove that
 4        district from the map?
 5   A.   Not specifically.  He didn't like it.  He didn't
 6        like the idea of it.  It could have been drawn at
 7        just barely over 50 percent.
 8   Q.   And when you say he didn't like it, what didn't he
 9        like about it?
10   A.   He didn't like the shape of it.  He didn't like the
11        politics of it.
12   Q.   Were there any other districts in the Senate map
13        that could have been drawn at 50 percent or greater
14        black -- any part black voting age population that
15        were not drawn?
16   A.   There could have been a Forsyth/Guilford district
17        drawn over 50 percent.
18   Q.   Are you aware of a map that illustrates that
19        possible district?
20   A.   I believe I gave you one.
21   Q.   Okay.  Because we can't identify what you might be
22        referring to, these -- this is a printout of one of
23        the file folders, so this is Hofeller map 3 and it
24        appears to be some Senate maps.  Do you mind taking
25        a look and see if you can find the map you're
```

**5813 Shawood Drive**   **VIVIAN TILLEY & ASSOCIATES**      **tel:919.847.5787**
**Raleigh, NC 27609**           **ctrptr4u@aol.com**              **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 133 of 181

- Doc. Ex. 1998 -

**Thomas Hofeller, Ph.D.**                    **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

133

1      referring to in that.

2  A.   First one.

3  Q.   Okay.  Let's mark that as an exhibit.

4           MR. FARR:  Just pull it out.

5           THE WITNESS:  I know.  I understand that.

6      Do you want me to look through the others?

7  BY MS. EARLS:

8  Q.   If you found the one you're referring to, that's

9      good enough for me.

10 A.   That's not necessarily the one I was referring to,

11     but it is a map.

12           Do you want the rest back?

13 Q.   Yes.

14           (WHEREUPON, Exhibit 441 was marked for

15     identification.)

16 BY MS. EARLS:

17 Q.   We've marked the map as Exhibit 441, and can you

18     explain to me what that shows.

19 A.   It shows a district primarily based in Forsyth

20     county which goes down into the southwest corner of

21     Guilford county which is, I believe, a

22     majority-minority district.

23 Q.   When you say majority-minority, are you saying --

24     are you combining African American population with

25     any other minority population?

**5813 Shawood Drive**  **VIVIAN TILLEY & ASSOCIATES**      **tel:919.847.5787**
**Raleigh, NC 27609**        **ctrptr4u@aol.com**          **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 134 of 181

- Doc. Ex. 1999 -

**Thomas Hofeller, Ph.D.**        **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

134

1   A.   No.

2   Q.   So it would be 50 percent or better in any part

3        black voting age population?

4   A.   Yes.

5   Q.   Anywhere else in the Senate map where you're aware

6        it was possible to draw a 50 percent or above any

7        part black district that was not drawn?

8   A.   No.

9   Q.   I'm just taking back the ones we previously marked.

10            MR. FARR:  That's fine.

11  BY MS. EARLS:

12  Q.   I want to talk now about the process for drawing

13       the Congressional maps.

14            Do you recall roughly when you began

15       looking at what district configurations might be

16       possible for the Congressional districts?

17  A.   I believe it would have been shortly after the

18       release of the Census data.

19  Q.   And we have been trying to identify what the first

20       full Congressional map might have been, so I'm

21       going to show you -- if the reporter can mark that.

22            (WHEREUPON, Exhibit 442 was marked for

23       identification.)

24  BY MS. EARLS:

25  Q.   You have in front of you Exhibit 442.  This was a

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES       tel:919.847.5787**
**Raleigh, NC 27609         ctrptr4u@aol.com          fax: 919.847.2265**

- Doc. Ex. 2000 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

135

```
 1        map that was titled HOF-CON-2.

 2                Do you recognize this map?

 3   A.   Yes.

 4   Q.   And is this a Congressional district map that you

 5        drew?

 6   A.   I think -- although I don't know right off, I think

 7        this is actually -- it was the existing map.  I

 8        think I just copied the map that was in existence

 9        and renamed it and never really did anything with

10        it.

11   Q.   I see.  Thank you.

12                (WHEREUPON, Exhibit 443 was marked for

13        identification.)

14   BY MS. EARLS:

15   Q.   You have now in front of you what's been marked as

16        Exhibit 443, and this is a map titled NC Congress

17        9-4 Adjusted.

18                Do you recognize this map?

19   A.   Yes.

20   Q.   Is this a map that you drew?

21   A.   It's a map that I adjusted.  It was, I believe,

22        given to me by Adam Kincaid from the NRCC.  He was

23        assisting the delegation and asked me to look at

24        it.  And I said, "Well, I could do a few things to

25        it that would make it a little better and send it
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com        fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 136 of 181

- Doc. Ex. 2001 -

**Thomas Hofeller, Ph.D.**                    **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

136

```
 1        back."
 2   Q.   And what things, if you recall now, did you do that
 3        made it a little better?
 4   A.   I don't recall specifically, but I think there was
 5        some city or CCD splits or maybe there was a county
 6        line situation.  There were just what almost would
 7        be considered in the realm of technical
 8        corrections.
 9   Q.   Who was involved in looking at options for drawing
10        Congressional maps in North Carolina?
11   A.   Do you mean in drawing them or --
12   Q.   Well --
13   A.   -- looking at them and making comments?
14   Q.   Let's start with drawing them.
15   A.   The only people who had Maptitude systems available
16        to them were myself and Joel Raupe and Mr. Oldham
17        had a system.
18   Q.   So they were the three people who were actually
19        drawing Congressional maps with you for
20        North Carolina?
21   A.   Well, not complete maps.  I can tell you this, that
22        the process of drawing the House maps and the
23        Senate maps was much more complicated than drawing
24        a Congressional map.  There was much more emphasis
25        placed on that in the early stages of the line
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com                fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 137 of 181

```
 1        drawing down here in Raleigh and my work with the
 2        Raleigh people.  That's all.
 3   Q.   This map that is Exhibit 443 that you -- I'm sorry,
 4        I'm blanking on who you said you received that
 5        from.  That was --
 6   A.   Adam.
 7              MR. FARR:  Adam Kincaid.
 8   BY MS. EARLS:
 9   Q.   Is there anyone other than Adam Kincaid who sent
10        you maps to examine for North Carolina
11        Congressional districts?
12   A.   Not that I can recall right now.
13   Q.   And do you understand, again, with Exhibit 443, the
14        9-4 in the title of that map?  Does that refer to
15        the partisan balance of the North Carolina
16        Congressional delegation that it was anticipated
17        would result from this map?
18   A.   I don't specifically think that it actually
19        represents a 9-4 partisan balance.  If you look at
20        the registrations of districts, it's certainly not
21        a 9-4 registration balance, but I guess you would
22        say that the 9 would be districts that Republicans
23        would consider they either had a very good shot at
24        keeping or had a shot at -- fair shot at taking
25        control of.
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609            ctrptr4u@aol.com            fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 138 of 181

```
 1   Q.   In this 9-4 Adjusted map, if you look at the first
 2        page, am I correct that both District 1 and
 3        District 12 are just over 50 percent in voting age
 4        any part black population?
 5   A.   Yes.
 6   Q.   Did that map, the 9-4 Adjusted map, did you show
 7        that to any of the leadership in North Carolina?
 8   A.   I don't believe so.  I think there was another map
 9        very similar to this that I did show to them.
10   Q.   Okay.
11             (WHEREUPON, Exhibit 444 was marked for
12        identification.)
13   BY MS. EARLS:
14   Q.   Exhibit 444 is a map entitled NC Congressional
15        Delegation 9-4 May 11.
16             Do you recognize this map?
17   A.   I do.
18   Q.   And where did this map come from?
19   A.   That came from Adam Kincaid.
20   Q.   Is it another version of the map in Exhibit 443?
21   A.   It depends on how close you want to say it was to
22        the other one to say it's another version or a
23        different version.
24   Q.   Do you know why he sent you the second map, the
25        May 11th map?
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com                fax: 919.847.2265**

- Doc. Ex. 2004 -

**Thomas Hofeller, Ph.D.**    **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

139

```
 1   A.   This map, along with the map I'm sure you're going
 2        to give me next, are two maps which the delegation
 3        had desired for the leadership to see down here.
 4   Q.   When you say the delegation, you mean the
 5        Republican delegation?
 6   A.   Yes.  Well, the Republican part of the delegation,
 7        yes.  And they asked me if I would carry these maps
 8        down and show them to the chairman.
 9   Q.   And the 9-4 designation was their assessment that
10        it would create 9 districts in which Republicans
11        had an opportunity and 4 districts for Democrats?
12   A.   Yes, although that's their label.
13   Q.   Did you show --
14   A.   Remember, they are a campaign committee.
15   Q.   Did you show that map to Senator Rucho?
16   A.   Yes.
17   Q.   And who else was --
18   A.   And to Delegate Lewis.
19             MR. FARR:  Representative Lewis.
20             THE WITNESS:  I'm sorry, I'm in the wrong
21        state.
22   BY MS. EARLS:
23   Q.   I'd like to know if they -- if either Senator Rucho
24        or Representative Lewis gave you any feedback about
25        this -- about this map, the 9-4 May 11 map?
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609         ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 140 of 181

```
 1   A.   I think what I would say is their reaction was that
 2        we're happy to know what the delegation is looking
 3        at.  We're capable of drawing our own map.
 4   Q.   Did you look at any data for either the map that's
 5        Exhibit 444 or 443 about the compactness of those
 6        districts?
 7   A.   No.
 8   Q.   Why not?
 9   A.   Well, these maps were just maps that I was asked to
10        pass on to the chairman down here.  And the answer
11        is I was busy and I was -- they speak for
12        themselves.
13             (WHEREUPON, Exhibit 445 was marked for
14        identification.)
15   BY MS. EARLS:
16   Q.   Exhibit 445 is a map titled NC 10-3 CD.
17             Do you recognize this map?
18   A.   Yes.
19   Q.   What is this map?
20   A.   This is another map which was generated, I believe,
21        through Mr. Kincaid that I looked at.
22   Q.   And the 10 --
23   A.   He would send me maps.
24   Q.   So this is one he sent you?
25   A.   Yes.
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES      tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com           fax: 919.847.2265**

- Doc. Ex. 2006 -

**Thomas Hofeller, Ph.D.**　　　　　**June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.　11 CvS 16896 & 11 CvS 16940

141

```
 1    Q.   Do you know if you showed this map to Senator Rucho

 2         and Representative Lewis?

 3    A.   I know I did not.

 4    Q.   You did not.  Okay.

 5              And I'm correct that this map also has two

 6         majority black districts that is 18 voting age

 7         population, any part black over 50 percent,

 8         District 1 and District 12?

 9    A.   That's certainly what the statistics show.

10              (WHEREUPON, Exhibit 446 was marked for

11         identification.)

12   BY MS. EARLS:

13    Q.   Exhibit 446 is a map titled NC Congress 10-3

14         Delegation.

15              Do you recognize this map?

16    A.   I do.

17    Q.   And where did this one come from?

18    A.   This was from Mr. Kincaid.  It was the accompanying

19         map to Exhibit 444 that was sent down by the

20         delegation to be shown to the two chairmen.

21    Q.   And when you say accompanying, you mean they were

22         both sent at the same time?

23    A.   Yes.

24    Q.   And did you show that map, which is Exhibit 446,

25         did you show that to Senator Rucho and
```

**5813 Shawood Drive**　**VIVIAN TILLEY & ASSOCIATES**　　**tel:919.847.5787**
**Raleigh, NC 27609**　　　　　**ctrptr4u@aol.com**　　　　**fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP　Document 23-2　Filed 10/07/15　Page 142 of 181

- Doc. Ex. 2007 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

142

```
 1        Representative Lewis?

 2   A.   I did.

 3   Q.   Did they give you any other response or different

 4        response from the first map?

 5   A.   It was the same response as the other map because

 6        they were shown to them at the same time.

 7   Q.   I have a map that we received that had no --

 8        apparently no corresponding block assignment file

 9        so we don't have statistics for it.  We just have

10        the map.

11             (WHEREUPON, Exhibit 447 was marked for

12        identification.)

13   BY MS. EARLS:

14   Q.   Exhibit 447 is a single page, just a map saying

15        Proposed 10-3 Map.  Do you recognize --

16   A.   I'm not sure that I recognize this map.  I don't

17        really know.

18   Q.   You were comparing it to Exhibit 446.

19   A.   Well, that's the map that's closest in

20        configuration to that map that you've given me so

21        far.

22   Q.   So it is fairly close to the -- there are some

23        differences, but it's fairly close to the

24        Exhibit 446?  That's the one you were just looking

25        at.
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com          fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 143 of 181

- Doc. Ex. 2008 -

**Thomas Hofeller, Ph.D.**      **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.  11 CvS 16896 & 11 CvS 16940

143

```
 1   A.   I know.  Yes.

 2   Q.   But you don't remember seeing it, Exhibit 447?

 3   A.   I don't remember seeing it, but it's quite possible

 4        I did see it.  I don't know.  It's quite possible

 5        it could have come off my computer, but it would

 6        be, I think, just another variant of the map that I

 7        was looking at.

 8   Q.   Do you think it's likely that Mr. Kincaid also

 9        provided that to you as a map that the --

10   A.   I think that's highly likely.

11   Q.   Okay.  Thank you.

12             When he provided these maps to you, did he

13        send you the block assignment files?

14   A.   Usually.  I don't know who else he might have sent

15        information to.  He was not under my direction so

16        it may have come down through a different method.

17        I don't know.

18             (WHEREUPON, Exhibit 448 was marked for

19        identification.)

20   BY MS. EARLS:

21   Q.   Exhibit 448 is a map entitled NC Congress Whole

22        Precinct 1st.

23             Do you recognize this map?

24   A.   Yes.

25   Q.   And what is this map?
```

**5813 Shawood Drive**  **VIVIAN TILLEY & ASSOCIATES**    **tel:919.847.5787**
**Raleigh, NC 27609**    **ctrptr4u@aol.com**    **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 144 of 181

```
 1   A.   It is as it's labeled.

 2   Q.   For the record, would you tell us what it says?

 3   A.   It's a whole precinct map of a possible 1st

 4        District.

 5   Q.   And the block assignment files that we received

 6        produced the statistics that you see as the first

 7        page of the exhibit, and although the map has the

 8        1st District shaded, the rest of the districts were

 9        also drawn in this map and zeroed out for zero

10        deviation.

11             Did you draw this map?

12   A.   I think so, yes.

13   Q.   And so you were demonstrating that it was possible

14        to draw the 1st Congressional District at

15        52.72 percent any part black, 18 and over

16        population using entirely whole precincts?

17   A.   That's what it shows.

18   Q.   Okay.  Thank you.

19             (WHEREUPON, Exhibit 449 was marked for

20        identification.)

21   BY MS. EARLS:

22   Q.   Exhibit 449 is titled NC Congress Residue Analysis.

23             Do you recognize this map?

24   A.   Yes.

25   Q.   And can you explain to me what this shows?
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com          fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 145 of 181

- Doc. Ex. 2010 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.  11 CvS 16896 & 11 CvS 16940

145

```
 1   A.   I'm not sure I exactly remember at this time.  It

 2        may have been -- well, I don't know.  I don't

 3        remember so I'll leave it at that.

 4   Q.   So you don't know when it says "residue" what it's

 5        referring to?

 6   A.   No.  I think I'd have to examine it more in length

 7        to do that.

 8   Q.   Did you take county lines into account in drawing

 9        Congressional districts?

10   A.   Yes.

11   Q.   And why?

12   A.   Well, because that's a criteria of drawing the

13        districts.

14   Q.   Do you remember when you first -- when it would

15        have been in the process that you first showed the

16        leadership, Senator Rucho and Representative Lewis,

17        a Congressional map that you had drawn instead of

18        the ones that Adam Kincaid drew?

19   A.   I think that actually there was some map drawing

20        going on down in Raleigh while I was concentrating

21        on the House map and at a certain point those came

22        to me because part of my job was to be the -- own

23        the computer that had the map on it.

24             It's like having a document and having a

25        master document and other people can go off and
```

Case 1:15-cv-00399-TDS-JEP  Document 23-2  Filed 10/07/15  Page 146 of 181

- Doc. Ex. 2011 -

**Thomas Hofeller, Ph.D.**                    **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

146

```
 1        experiment and write paragraphs and take out
 2        paragraphs, but it all has to come back to the
 3        master document.  I'm sure you've gone through that
 4        when you've written briefs.
 5              And so there was, I believe, some looking
 6        at Congressional maps that I hadn't drawn.
 7   Q.   And who would have been doing that?
 8   A.   Joel would have had those.
 9   Q.   Well, he would have had them -- because I
10        understand he had a separate computer with
11        Maptitude on it.
12   A.   He did.
13   Q.   So he would have -- was his function to be a
14        central repository of all the maps that were being
15        looked at?
16   A.   No.
17   Q.   No.  How would you describe what his function was?
18   A.   Well, at such point as a map -- what his function
19        was?
20   Q.   Yes.
21   A.   He did some experimentation with some maps.  He
22        held his own group of maps on his computer.  He --
23        from time to time members would come to him and
24        look at things.
25              One of his jobs was when a map progressed
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES      tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com            fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 147 of 181

```
 1          to kind of a point where we're saying, okay, we
 2          need to know what this map does politically, he
 3          would -- we would -- I would usually send him a
 4          copy of this map and he would extract from the
 5          database a set of data and make a spreadsheet which
 6          would then be looked at by other people to look at
 7          the politics of the map.
 8     Q.   And what would be on the spreadsheet?
 9     A.   Well, a little bit of everything, but more
10          political races and there was a computation of a
11          political factor.  You would see that if you were
12          watching national news or something like that, R
13          plus 1, R plus 2, D plus 1, et cetera, to try and
14          figure out how the map related to present
15          districts.
16     Q.   I want to show you what was previously marked as
17          Exhibit 416 and ask if you recognize that map.
18     A.   I do.
19     Q.   And what is that map?
20     A.   After a discussion with Dale Oldham I drew this.
21     Q.   And what does it show?  What is it a map of?
22     A.   It's a map -- well, it's a hybrid map.  It has some
23          of the elements of another Congressional map with
24          modifications to the 1st District, and as you can
25          see from the deviations on the map, it's an
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609         ctrptr4u@aol.com                    fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 148 of 181

```
 1        incomplete map.
 2   Q.   Why were you making modifications to the 1st
 3        Congressional District in this map?
 4   A.   To explore different ways it could be drawn.
 5   Q.   And --
 6   A.   You can see, though, for instance, it has
 7        non-contiguous sections.  It's not a completed
 8        investigation.
 9   Q.   What were you trying to do with the 1st
10        Congressional District in looking at this possible
11        alternative?
12   A.   To see another way in which it could possibly be
13        drawn.
14   Q.   So you can't say anything more specific about we
15        were trying to make it -- make sure that it didn't
16        go into Raleigh or Durham, we were trying to make
17        it be all whole precincts, we were trying to make
18        it embody certain county --
19   A.   I don't know what the precinct structure is on this
20        map.  I have no idea.  And also because of the fact
21        it's not a complete and contiguous map, I really
22        couldn't make a judgment.  On the face of it, it
23        speaks to a district that does not go into Raleigh
24        or Durham.
25   Q.   And then let me show you Exhibit 417, and that is
```

**5813 Shawood Drive**  **VIVIAN TILLEY & ASSOCIATES**       **tel:919.847.5787**
**Raleigh, NC 27609**        **ctrptr4u@aol.com**        **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 149 of 181

- Doc. Ex. 2014 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.  11 CvS 16896 & 11 CvS 16940

**149**

 1      entitled NC Congress IV Dale May 18.

 2               Is that a complete map?

 3   A.   No.  In fact, I don't think it represents anything

 4        of any significance.  It was one of those spinoff

 5        maps that I may have spun off to do some work in

 6        but never did it.

 7   Q.   Okay.  This one is titled Dale -- "this one" being

 8        Exhibit 418 is titled Dale IV Recovery.

 9               Do you recognize that map?

10   A.   Yes.

11   Q.   What is this map?

12   A.   That's a map that explores the possibility of

13        creating a Wake/Durham/Greensboro/Winston-Salem

14        minority district and also a Mecklenburg to Robeson

15        county district much like the district in the Shaw

16        case.

17   Q.   Were you able to draw any conclusions about

18        possible options after drawing that map?

19   A.   Well, first of all, it was possible to draw the

20        north central district, and secondly, the 12th

21        District, in order to become a majority-minority

22        district, the African Americans would have to be

23        put -- population would have to be combined with

24        the Native American population.  You can see it's

25        non-Hispanic white percentage of the 12th District

**5813 Shawood Drive**  **VIVIAN TILLEY & ASSOCIATES**       **tel:919.847.5787**
**Raleigh, NC 27609**        **ctrptr4u@aol.com**        **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 150 of 181

1       which is -- the south central district is

2       33.64 percent.  Do you see that?

3   Q.  Yes.

4   A.  Okay.  Which indicates there's a very strong

5       minority component in that district which is not

6       African American.

7   Q.  That district -- am I correct that this map shows

8       14 Congressional districts?

9   A.  Again, it's not a complete map so you would -- one

10      would draw probably the 1st District, the 14th

11      District, the 12th District, and in the process of

12      rectifying the populations and all the districts,

13      one district number would dropout and you would

14      rename the 14th District the 13th District or

15      whatever it was.

16          Lots of times when I was experimenting with

17      any plan you would just put something down in the

18      middle of an existing map knowing if it was even a

19      possibility you would have to work it up on another

20      map.

21  Q.  And so was it significant to you that on the chart

22      of the data that even though this map happens to

23      have 14 districts in it, the deviation of District

24      14 is only .02 percent?

25  A.  Yes.

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES       tel:919.847.5787**
**Raleigh, NC 27609            ctrptr4u@aol.com            fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 151 of 181

1  Q.  And District 14 is 52 percent voting age population

2      any part black and similarly, it looks -- the

3      district that you were just referring to -- thank

4      you -- the district you were just referring to,

5      this Robeson county to Charlotte district, while it

6      is only 33.64 percent non-Hispanic white voting age

7      population, it's also 36 percent too large, right,

8      or .36 percent too large.

9  A.  That means you could probably only improve it.

10 Q.  Right.  So why didn't you ultimately have a

11     district in that part of the state?

12 A.  Because the two chairmen decided they didn't want

13     to do that.

14 Q.  And did they tell you why they didn't want to do

15     that?

16 A.  They wanted to keep the 12th District in the same

17     general configuration that it was.

18 Q.  And Exhibit 419, is that just another version of

19     what we were just looking at basically?

20 A.  Yes.  I think because it says Recovery 2,

21     sometimes, as I'm sure your map drawers know, you

22     have a problem with Maptitude and you have to go

23     back to go with a block file and there it is.

24 Q.  This Exhibit 420 is titled NC Congress Dale Full

25     Orange II.  Do you recognize that map?

**5813 Shawood Drive**  **VIVIAN TILLEY & ASSOCIATES**  **tel:919.847.5787**

**Raleigh, NC 27609**  **ctrptr4u@aol.com**  **fax: 919.847.2265**

- Doc. Ex. 2017 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

152

```
 1   A.   Yes.

 2   Q.   And what does that show?

 3   A.   That's another -- what does it show?  It shows a

 4        zero deviation possible plan for a north central

 5        African American district that includes all of

 6        Orange county.

 7   Q.   And am I correct that it actually only has 13

 8        districts even though the label for that district

 9        you just described is 14?

10   A.   You know, I think probably when you imported it

11        that it probably shifted the District 14 to 13.

12   Q.   For the data?

13   A.   Well, there were only 13 districts in the data.  It

14        assigned them as it got them.

15   Q.   And then Exhibit 421 is another NC Congress IV Dale

16        Full Orange May 24.

17   A.   I think that's probably a fuller view of that same

18        plan.

19   Q.   Why did these plans have the "Dale" in the title of

20        them?

21   A.   Because they were created as a result of a

22        conversation with Dale.

23             MR. PETERS:  When you get to a good point

24        if we could take a break.

25             MS. EARLS:  Well, we can break now.  Go
```

**5813 Shawood Drive  VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com            fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 153 of 181

 1        ahead, that's fine.

 2                  (Brief Recess:  2:55 to 3:09 p.m.)

 3    BY MS. EARLS:

 4    Q.   I wanted to followup on one matter that we were

 5         discussing regarding the Exhibits 421 and 420, all

 6         of the maps that have the name Dale in them.  I

 7         believe you testified that the name Dale is there

 8         because you drew those after communication from

 9         Dale Oldham, and my question to you is was that

10         communication an instruction about a political

11         matter or a legal matter?

12                  MR. FARR:  If that involves legal matters,

13         Dr. Hofeller, I instruct you not to answer that

14         question.

15    BY MS. EARLS:

16    Q.   Well, I'm not asking you to tell me the content of

17         what he said other than to tell me was he talking

18         about political matters or legal matters in asking

19         you to look -- in whatever he said that led you to

20         drawing these maps.

21    A.   In my mind it's a legal matter.

22                  (WHEREUPON, Exhibit 450 was marked for

23         identification.)

24    BY MS. EARLS:

25    Q.   You've been handed an exhibit that's marked number

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES          tel:919.847.5787**
**Raleigh, NC 27609            ctrptr4u@aol.com                fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 154 of 181

```
1        450.  This is one of the maps that was on the disc
2        of materials that you provided.
3              Do you recognize what this is?  And I can
4        also tell you that the file name was "1st Change."
5   A.   I believe it's a 1st Congressional District map.  I
6        could probably place it in better context if I
7        could see the whole map.
8   Q.   This was -- we didn't have a block assignment file
9        for this document.  We just had this as a PDF.
10  A.   From me?
11  Q.   Yes.
12  A.   That seems strange.
13  Q.   I can show you the entire -- the enacted 1st
14       Congressional District map if that would be useful.
15  A.   You know, I would have to -- I would have to
16       speculate on what this is.
17  Q.   Can you tell me what the shading means?  There's a
18       Formula Field box kind of in the lower right-hand
19       corner, but we don't get very much of it.
20             Do you recall what the shading was?
21  A.   You know, I just don't -- again, it would be
22       difficult for me to say precisely what it is
23       without seeing the entire map.
24  Q.   Well, again, I can show you the map that was
25       enacted.  This is all that we received.
```

**5813 Shawood Drive  VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 155 of 181

1          MS. RIGGS:  Yes, it was just a PDF.

2          THE WITNESS:  It would appear to be -- the

3      shading is a change that would have taken place in

4      the 13th District, but -- and that's pretty much

5      it.  That shading may be the entire 13th District

6      in this map, but I can't tell you without seeing

7      the whole thing.

8  BY MS. EARLS:

9  Q.   And do the numbers -- are those the number of

10      people in the Census block?

11  A.   No.  It's the number of the people in the VTD.

12  Q.   In the VTD.  Thank you.

13          And then what does the color of the

14      different VTDs indicate?

15  A.   You know, I don't know for sure without seeing the

16      Formula Field ID box.  I mean, if we had the plan,

17      it would show it.  Well, not yours, I guess.

18  Q.   Is there any way for you to go back and look at

19      your records and determine what block assignment

20      file this might have been dated from?

21  A.   Did you write down the name that was associated

22      with this map?

23  Q.   First map.  In fact --

24          MS. RIGGS:  No, that wasn't in there.

25          MR. FARR:  What's it called, "1st Change"?

**5813 Shawood Drive  VIVIAN TILLEY & ASSOCIATES     tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com            fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 156 of 181

1          MS. RIGGS:  Yes.  It was just on the

2     Hofeller docs disc, not any of the maps with the

3     block assignment files.  Those are on there.

4          THE WITNESS:  It may have been another

5     map.  It was just done using the layout function in

6     Maptitude to show something.

7          The shading would be -- again, the way you

8     put shading on a map is you select the area that

9     you want to shade as if you were going to make a

10     district shift and you don't make the district

11     shift and you can actually change the color and

12     shading level of that particular selection.

13  BY MS. EARLS:

14  Q.   But the colors of the different VTDs -- you know,

15     some are red on this map, some are green, some are

16     yellow, some are orange, some are blue -- that's a

17     layer that you add based on the data set in the

18     Maptitude program; is that right?

19  A.   That's a thematic based on some data in the system.

20  Q.   And the possible themes depend on what you

21     designate when you're looking at this map?

22  A.   You can create a thematic in Maptitude by selecting

23     the level of geography that you want to theme and

24     then either selecting a percentage from the

25     database or you can compute a percentage.

1  Q.  And the data could be race data, it could be

2      election data, it could be voter registration data?

3  A.  That's correct.

4  Q.  And you just sitting here today don't recall what

5      this might show?

6  A.  No, and I don't want to speculate.

7      (WHEREUPON, Exhibit 451 was marked for

8      identification.)

9  BY MS. EARLS:

10  Q.  Exhibit 451 is another map that was on the

11      documents file.  And am I correct that this also

12      shows VTDs and the numbers there are the population

13      of the VTDs?

14  A.  That's correct.

15  Q.  And this was just labeled Robeson 2.

16      I have a second document that we'll mark as

17      452.

18      (WHEREUPON, Exhibit 452 was marked for

19      identification.)

20  BY MS. EARLS:

21  Q.  I believe -- am I correct that Exhibit 452 is a

22      zoom in of the area shown in Exhibit 451?

23  A.  Yep.

24  Q.  And that it's showing the district boundary between

25      Congressional Districts 7 and 8 in Robeson county?

**5813 Shawood Drive**  **VIVIAN TILLEY & ASSOCIATES**    **tel:919.847.5787**
**Raleigh, NC 27609**        **ctrptr4u@aol.com**        **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 158 of 181

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

158

```
 1   A.   It is.

 2   Q.   Do you know what this -- what the color coding on

 3        this map shows?

 4   A.   I'd have to answer that the same way I answered the

 5        question on the previous map.

 6   Q.   And am I right that this is showing -- Exhibit 451

 7        shows the VTDs and when we follow the red border

 8        kind of in the upper middle of the map it's cutting

 9        across a couple of VTDs, dividing a couple of VTDs

10        or at least --

11   A.   Three to be exact.

12   Q.   Right.  And then the Exhibit 452, does that show

13        the Census block populations?

14   A.   Actually, it was just two.

15   Q.   Okay, just two.

16   A.   It shows the block populations and it shows the

17        exact traverse of the boundary.

18   Q.   And do you know why you would have been looking at

19        this particular area of Robeson county between

20        Congressional District 7 and 8?

21   A.   That would probably have been a proposed

22        modification to the boundary between the two

23        districts.

24   Q.   Do you remember now who was proposing that

25        modification?
```

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

159

```
 1   A.   You know, I don't remember for sure who proposed
 2        it, but I remember -- I remember looking at it, but
 3        I don't remember the details around it.  It was not
 4        done.
 5             (WHEREUPON, Exhibit 453 was marked for
 6        identification.)
 7   BY MS. EARLS:
 8   Q.   You're looking at a document that's been marked as
 9        Exhibit 453 and the title is NC Data.  It was
10        provided to us on the CD with your documents.  And
11        the file name included State Released NC Data
12        Discrepancies ABS.
13             Do you know what this is?
14   A.   I think this is a document that was produced very
15        early in the redistricting process by Legislative
16        Services.  It was a summation of election data
17        comparing the data that was in the state's database
18        against the actual state totals.  There was data
19        missing.  I think that's something you would be
20        better off to have asked Frey about.
21   Q.   Unfortunately, we didn't get it until we got your
22        documents.
23   A.   I think you got my documents before you got Frey.
24        Maybe not.
25             Anyway, I think there was some data missing
```

1          from those elections, and I don't recall

2          specifically what it is, but I think it might have

3          to do with absentee voting or some sort of class of

4          voting.  As you well know, none of these databases

5          are perfect, the political databases, and we go

6          with what the state produced.

7     Q.   And can you tell from this whether this was --

8          these were election returns or voter registration

9          data?

10    A.   Again, I'm speculating, but since this says the

11         election of '08, the general election, presidential

12         and governor, that's what I would infer.

13    Q.   Thank you.  I have just a couple more questions

14         about maps.

15              Earlier we were talking about the

16         possibility of drawing a majority black district in

17         the Forsyth/Guilford county area, and I believe we

18         showed you on the computer the map that was NC

19         House Forsyth Experimental, and I want to mark -- I

20         now have a hard copy.

21              (WHEREUPON, Exhibit 454 was marked for

22         identification.)

23    BY MS. EARLS:

24    Q.   Can you describe what Exhibit 454 is.

25    A.   This is a map I've seen before, is it not?

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609           ctrptr4u@aol.com             fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 161 of 181

- Doc. Ex. 2026 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

161

1    Q.    You mean it's another -- we've already introduced
2          it as an exhibit?
3    A.    Right.
4    Q.    I believe this is the one you looked at on the
5          computer earlier.
6    A.    Right.  Okay.  It probably had more to do with the
7          setting of the boundary lines of the non-minority
8          districts in Forsyth county.  I don't think it had
9          anything to do with the configuration of the
10         minority districts.
11   Q.    Okay.  In your affidavit, which is Exhibit
12         Number 435 --
13   A.    435.  Okay.  I'm sorry.
14   Q.    If you look at page 12, paragraph 29, and there you
15         say, "The enacted 2011 House Plan has 23 majority
16         TB" -- does that stand for total black -- "VAP
17         districts."
18   A.    Yes.
19   Q.    "And a 24th district that is a majority African
20         American citizen voting age district (District
21         71)."
22               I want to ask you whether this document --
23         which will be marked as Exhibit 455.
24               (WHEREUPON, Exhibit 455 was marked for
25         identification.)

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES       tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com                fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 162 of 181

1   BY MS. EARLS:

2   Q.   This was also among the documents provided to us

3        from your -- on a disc with your name on it, and it

4        says Winston-Salem CVAP ACS Place.

5             Is this the data that you were using to

6        come to the conclusion in paragraph 29 that the

7        District 71 is majority African American citizen

8        voting age?

9   A.   This is the raw data, yes.

10  Q.   Did you do anything differently with the raw data

11       to be able to come to that conclusion?

12  A.   I believe there's a document in the disc that I

13       sent you that has a further rendition of this data.

14  Q.   So what did you have to do with this data?

15  A.   You have to -- well, okay.  This is the ACS data

16       for the city of Winston-Salem which is the area in

17       which that district was built, and if you apply the

18       citizenship percentages to the voting age

19       population that are on this to the data for the

20       district in the same categories, you can make an

21       estimate of what the CVAP for these groups would

22       have been for citizens.

23             And what you find in North Carolina, if you

24       look at the ACS, is that the citizenship rate of

25       the Hispanic population is pretty low, so if you

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES      tel:919.847.5787**
**Raleigh, NC 27609         ctrptr4u@aol.com           fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 163 of 181

```
 1        adjust the populations of all these groups to match
 2        this, then you come up with new estimated figure of
 3        what the CVAP is for the district if you use the
 4        same percentages that you gain out of this city
 5        level record.
 6   Q.   So it's that estimation that led you to conclude
 7        that it's a majority African American citizen
 8        voting age district?
 9   A.   Yes.
10             (WHEREUPON, Exhibit 456 was marked for
11        identification.)
12   BY MS. EARLS:
13   Q.   Exhibit 456 is another map that was provided on the
14        disc of your maps.  And do you recognize what this
15        map shows?
16   A.   It shows a detail line at the block level between
17        two districts, Congressional districts, Buncombe
18        county.
19   Q.   Between Congressional Districts 10 and 11?
20   A.   Yes.
21   Q.   And because the color coding is by Census block --
22        by color coding, I mean that some areas are yellow,
23        some are orange, some are blue, some are green.
24        Because it is at the block level, am I correct that
25        it has to be some theme based on Census data?
```

**5813 Shawood Drive**   **VIVIAN TILLEY & ASSOCIATES**        **tel:919.847.5787**
**Raleigh, NC 27609**          **ctrptr4u@aol.com**           **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 164 of 181

```
 1    A.    That's true.

 2    Q.    Do you know or recall what the theme was showing on

 3          this map?

 4    A.    Again, I'm not sure.  I'd have to look at the data

 5          for that area.

 6    Q.    Do you know why you were looking at this particular

 7          part of the boundary between Congressional

 8          Districts 10 and 11?

 9    A.    I think it was a proposed change in the boundary of

10          the district and was just showing where that line

11          was probably to show somebody who was interested in

12          the district where that line was exactly.

13                I may also have been bringing it over from

14          a map.  As I explained to you before, oftentimes if

15          we're asked to look at a change, we'll cast off

16          from another map and make the change, and then if

17          we decide that we're interested in incorporating

18          that, I would have to print out a detailed block

19          level map so that I could then go re-enter it back

20          into the master controlling map.

21                It wouldn't have been much -- it wouldn't

22          have been of any importance what the shading was in

23          the precincts.  It would just have been important

24          where the line was specifically because sometimes I

25          couldn't trust my memory to remember exactly what
```

**5813 Shawood Drive**　**VIVIAN TILLEY & ASSOCIATES**　　**tel:919.847.5787**
**Raleigh, NC 27609**　　　**ctrptr4u@aol.com**　　　**fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP　Document 23-2　Filed 10/07/15　Page 165 of 181

```
 1        was done particularly when you were zeroing out on

 2        the Congressional district lines.

 3   Q.   So is it possible that this zoom-in on this part of

 4        the boundary between Congressional Districts 10 and

 5        11 was done to figure out zeroing out the

 6        populations in those districts?

 7   A.   It's probable that the change that was made was

 8        zeroed out on the map that was essentially

 9        generated from the master map and this was my

10        effective way of getting the change back onto the

11        master map.

12                It's not -- there's probably a more high

13        tech way to do it, but it probably takes longer, so

14        this would have maybe taken me -- after I did this

15        map probably taken me ten minutes to enter it into

16        the master map.  There's a lot of that going on at

17        the last minute.

18                (WHEREUPON, Exhibit 457 was marked for

19        identification.)

20   BY MS. EARLS:

21   Q.   Exhibit 457 also shows a boundary and this time in

22        Guilford county, and this appears to be a -- am I

23        correct that this is zooming in and then in the

24        lower right-hand side there's another map that's

25        zoomed out a little bit?  Is that how that works?
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609         ctrptr4u@aol.com             fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 166 of 181

- Doc. Ex. 2031 -

**Thomas Hofeller, Ph.D.**                **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

166

 1   A.   It's an inset of a different area of Guilford

 2        county.

 3               This map was actually created to explore a

 4        request that it made by the incumbent -- potential

 5        incumbent in House District 60 that he wished to

 6        get incorporated in the final map.  Very similar in

 7        nature to the previous Exhibit Number 456 that you

 8        showed me.

 9               It was, again, a way of, one, showing him

10        what could be done and, two, keeping a record so

11        that if they decided to go forward with it, the

12        chairman, that I could get it back into the master

13        map.

14   Q.   This person was not a legislator?

15   A.   Yes.

16   Q.   Oh, a current legislator?

17   A.   Yes.

18   Q.   Who was that?

19   A.   My recollection is it was the incumbent whose

20        residence is located in the new H 60.

21   Q.   And do you know if the change was ultimately

22        incorporated?

23   A.   My recollection is that it wasn't.

24   Q.   And by any chance do you know what the shading --

25        different colors on this map indicate?

**5813 Shawood Drive**  **VIVIAN TILLEY & ASSOCIATES**       **tel:919.847.5787**
**Raleigh, NC 27609**         **ctrptr4u@aol.com**          **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 167 of 181

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

```
 1   A.   Yes.  That's a thematic on African American

 2        demographics.

 3   Q.   And what do the different colors indicate about

 4        African American demographics?

 5   A.   The more red the color -- it's a rainbow spectrum

 6        shading, and the more red the color the higher the

 7        percentage.

 8   Q.   And looking at this map, Exhibit 457, can you

 9        describe -- I know the change wasn't made, but what

10        change was requested?

11   A.   No, I don't remember.

12              (WHEREUPON, Exhibit 458 was marked for

13        identification.)

14   BY MS. EARLS:

15   Q.   Exhibit 458 is an e-mail, am I correct, that you

16        sent to Joel Raupe in April of 2011?

17   A.   Uh-huh.

18   Q.   And the map is a black and white copy of what was

19        attached to the e-mail.

20              Is this -- we talked earlier there was an

21        effort to draw three majority black voting age

22        population State Senate districts.  Was this one of

23        the first attempts that you had made to try to draw

24        that?

25   A.   I was looking at my grammar.
```

**Thomas Hofeller, Ph.D.**                    **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

168

```
 1                  Yes.
 2    Q.    And when you said they are reasonably compact, were
 3          you -- had you run any compactness measures?
 4    A.    No.
 5    Q.    And when you say reasonably compact, what were you
 6          comparing it to?
 7    A.    I don't think there was anything to which it could
 8          be compared at that point.
 9                  Are you through with this?
10                  MR. FARR:  That's fine.
11                  MS. EARLS:  Not entirely.
12                  (WHEREUPON, Exhibit 459 was marked for
13          identification.)
14    BY MS. EARLS:
15    Q.    Exhibit 459 is another e-mail from you.  This is
16          later in the process, June 19th.  And I don't have
17          the attachment, but do you recall sending this
18          e-mail?
19    A.    Well, I don't have to recall.  It was sent by me.
20    Q.    When you say "I hope that the issues on the
21          minority districts in the House Plan get resolved,"
22          what were you referring to?
23    A.    I don't remember.
24                  (WHEREUPON, Exhibit 460 was marked for
25          identification.)
```

**5813 Shawood Drive  VIVIAN TILLEY & ASSOCIATES         tel:919.847.5787**
**Raleigh, NC 27609           ctrptr4u@aol.com           fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 169 of 181

```
 1    BY MS. EARLS:

 2    Q.   Exhibit 460 is an e-mail from -- it's an e-mail

 3         string that starts -- I believe the first e-mail is

 4         June 30, 2011, at 5:39 p.m., but you are copied on

 5         this e-mail conveying -- I guess one of the

 6         attachments is a statement by Rucho and Lewis in

 7         support of the 2011 Congressional plan.

 8              Do you remember receiving this e-mail?

 9    A.   I have to look at it a little more here.

10    Q.   Sure.

11    A.   In the middle of the night.

12              MR. FARR:  Has this been marked

13         previously?

14              MS. EARLS:  It may have been.

15              MR. FARR:  I'm just going to state, again,

16         that this is something we think was improperly

17         produced because it's our position this is a

18         privileged communication to clients.

19              MS. EARLS:  Okay.

20              (WHEREUPON, Exhibit 461 was marked for

21         identification.)

22    BY MS. EARLS:

23    Q.   Exhibit 461 is another e-mail from Tom Farr to you,

24         and this is in response to an e-mail that you sent

25         to him on May 27th about releasing, and it's quite
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES      tel:919.847.5787**
**Raleigh, NC 27609         ctrptr4u@aol.com            fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 170 of 181

- Doc. Ex. 2035 -

**Thomas Hofeller, Ph.D.**       **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

170

1        a chain so if you want a minute to look through it.

2   A.   I remember this.

3   Q.   Can you describe what this e-mail exchange was

4        about.

5   A.   Adam Kincaid, through some source, found out that

6        there was a map, and he on behalf of his clients,

7        which were the Republican members of the House of

8        Representatives from North Carolina, wanted me to

9        send him a copy of this map.

10  Q.   And when you say map, you mean a Congressional --

11  A.   A Congressional map.

12            And I declined to send it on the basis that

13       it was privileged product and that it was not my

14       job to release maps to other people without the

15       permission of the chairman -- in this case, it

16       would be both chairmen because it was a

17       Congressional map.  And there was some fuss about

18       this and that's what this is all about.

19  Q.   Was this --

20  A.   I was even on the train.

21  Q.   Was this before or after Adam Kincaid had sent to

22       you some Congressional maps for you to show to the

23       leadership?

24  A.   I don't really remember.  I mean, we know generally

25       when they were.

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609           ctrptr4u@aol.com                    fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 171 of 181

- Doc. Ex. 2036 -

**Thomas Hofeller, Ph.D.**        **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.    11 CvS 16896 & 11 CvS 16940

171

```
 1   Q.   I want to ask you about the decision to publicly

 2        release the Voting Rights Act districts for the

 3        House and Senate maps before the release of the

 4        full maps.

 5             Who made the decision to release the Voting

 6        Rights Act districts first?

 7   A.   The chairman.

 8   Q.   And did you provide him any political advice about

 9        whether they should be released first or not?

10   A.   You know, I didn't presume to give political advice

11        to either chairman on it unless asked and I wasn't

12        asked.  I think that would be a question better

13        addressed to them.

14             (WHEREUPON, Exhibit 462 was marked for

15        identification.)

16   BY MS. EARLS:

17   Q.   Exhibit 462 is an e-mail from Joel Raupe to you and

18        there's an earlier e-mail from you -- from him to

19        you and then starts with --

20   A.   Which we already looked at, I think.

21             MR. FARR:  Let her finish her question,

22        Tom.

23   BY MS. EARLS:

24   Q.   Well, the first e-mail, Sunday, June 19, 2011, you

25        wrote, second page, "Here is my latest version of
```

**5813 Shawood Drive**    **VIVIAN TILLEY & ASSOCIATES**      **tel:919.847.5787**
**Raleigh, NC 27609**       **ctrptr4u@aol.com**         **fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP    Document 23-2    Filed 10/07/15    Page 172 of 181

```
 1        the Congressional map."  Right, we did look at the
 2        first part, that's right.  "I hope that the issues
 3        on the minority districts in the House Plan get
 4        resolved."
 5              But what we didn't have on the first one
 6        was Mr. Raupe's responses to you.  And then the
 7        June 20th -- so I apologize, it's a repeat because
 8        it's a string, but what --
 9   A.   No need.
10   Q.   In this instance what I want to ask about now is
11        your question to him, "How is the map being
12        received in the African American community" and
13        then his response.
14              And my question is:  Did you believe or was
15        there an attempt to release the Voting Rights Act
16        districts first with the hope that they would be
17        supported by the African American community in the
18        county?
19              MR. FARR:  Objection.
20              You can answer the question.
21              THE WITNESS:  Okay.  Ask it again, please.
22   BY MS. EARLS:
23   Q.   Did you believe it was a good idea -- whether you
24        gave advice or not, did you believe it was a good
25        idea to release the Voting Rights Act districts
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609           ctrptr4u@aol.com             fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 173 of 181

- Doc. Ex. 2038 -

**Thomas Hofeller, Ph.D.**            **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

173

```
 1        first with the hope that they would be supported by

 2        the African American community in North Carolina?

 3               MR. FARR:  Objection.

 4               Go ahead.

 5               THE WITNESS:  No.

 6   BY MS. EARLS:

 7   Q.   So why were you asking about how the map was being

 8        received in the African American community?

 9   A.   Well, I was curious about what the reaction may

10        have been.

11   Q.   And did you think that reaction might make a

12        difference in terms of how you continued your work

13        drawing redistricting maps?

14   A.   Actually, to the extent that the chairman decided

15        as a result of this to change anything, it would

16        change some parts of the map, yes.

17   Q.   I want to now move to the final part of your -- the

18        initial four areas that you outlined of your work

19        in North Carolina and that's when you had been

20        retained to serve as an expert witness.

21               And in that connection let's turn back to

22        your first affidavit that I believe is Exhibit 435.

23        And I first want to make sure -- we've been told

24        that you are designated as an expert in demography,

25        redistricting and voting behavior.
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 174 of 181

**Thomas Hofeller, Ph.D.**        **June 28, 2012**

Margaret Dickson, et al. v. Robert Rucho, et al.    11 CvS 16896 & 11 CvS 16940

174

```
 1                Is that your understanding in terms of what
 2       you are serving as an expert in for the purposes of
 3       this litigation?
 4   A.  I think my expertise is a little more limited in
 5       this -- in the context of this particular case.
 6   Q.  How would you describe your area of expertise in
 7       this case?
 8   A.  I'm looking at the examination of the districts and
 9       was particularly interested in this affidavit of
10       reacting to the affidavits that have been submitted
11       by some of your experts.
12   Q.  In that case, let me ask you about a couple more
13       maps.
14                (WHEREUPON, Exhibit 463 was marked for
15       identification.)
16   BY MS. EARLS:
17   Q.  I think it's just not in the same order but it's
18       the same thing.  Exhibit 463 is a document
19       contained on the General Assembly's redistricting
20       website and it's a map and statistics for the
21       Martin House Fair and Legal Plan.
22                Did you see that plan back when it was
23       first made public during the redistricting process?
24   A.  As I believe it came in at the very tale end of the
25       process.
```

**5813 Shawood Drive**     **VIVIAN TILLEY & ASSOCIATES**       **tel:919.847.5787**

**Raleigh, NC 27609**       **ctrptr4u@aol.com**       **fax: 919.847.2265**

1    Q.   But did you see it when it did come in?

2    A.   Yes, I believe when it was first released either on

3         the floor or came out of the system kind of

4         simultaneously.

5    Q.   And did you do any analysis of this map at that

6         time?

7    A.   Before the enactment of the state's plan?

8    Q.   Right.

9    A.   The only analysis that I actually did was to look

10        at the county grouping structure of the map.

11   Q.   Okay.  So did you look at any information about the

12        number of majority black districts in this map?

13   A.   Not prior to passage.

14   Q.   Then am I correct that all of the work that you did

15        analyzing this map after passage of the

16        redistricting map for the House is reflected in

17        either your first or second affidavits that have

18        been submitted?

19   A.   Yes.

20                  (WHEREUPON, Exhibit 464 was marked for

21        identification.)

22   BY MS. EARLS:

23   Q.   Exhibit 464 is a copy of a map on the General

24        Assembly's redistricting website that shows a map

25        and statistics for the Senate Fair and Legal Plan,

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 176 of 181

```
 1        and I want to ask you the same questions as with

 2        the House.

 3                Did you see this map at the time it was

 4        made public during the redistricting process?

 5   A.   I did.

 6   Q.   And did you perform any analysis of the map at that

 7        time?

 8   A.   The only analysis that I performed was to look at

 9        the county grouping structure prior to passage.

10   Q.   And then the work that you did in connection with

11        this map post enactment is contained in your first

12        and second affidavits filed in this case?

13   A.   Yes.

14                MR. FARR:  Do you want a break?

15                THE WITNESS:  Is it convenient for me to

16        take a break now?

17                MS. EARLS:  That would be fine.

18                (Brief Recess:  3:55 to 4:10 p.m.)

19                MS. EARLS:  In light of the hour of the

20        day and the fact that we know we will not conclude,

21        I'm correct that all counsel agree to suspend the

22        deposition --

23                MR. PETERS:  Recess.

24                MR. FARR:  Recess.

25                MS. EARLS:  -- to recess the deposition to
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES      tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com          fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 177 of 181

- Doc. Ex. 2042 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

177

```
 1      reconvene at a mutually convenient time to work out

 2      given our witness's schedule and counsel's

 3      schedule.   Thank you.

 4                    [SIGNATURE RESERVED]

 5              [DEPOSITION CONCLUDED AT 4:11 P.M.]

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES        tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com          fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 178 of 181

- Doc. Ex. 2043 -

**Thomas Hofeller, Ph.D.**          **June 28, 2012**
Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940

178

```
 1      A C K N O W L E D G E M E N T   O F   D E P O N E N T

 2

 3              I, Thomas Hofeller, Ph.D., declare under the

 4      penalties of perjury under the State of North

 5      Carolina that I have read the foregoing 177 pages,

 6      which contain a correct transcription of answers made

 7      by me to the questions therein recorded, with the

 8      exception(s) and/or addition(s) reflected on the

 9      correction sheet attached hereto, if any.

10      Signed this the      day of               , 2012.

11

12

13                              THOMAS HOFELLER, Ph.D.

14

15

16      State of:

17      County of:

18          Subscribed and sworn to before me

19      this      day of              , 2012.

20

21

22

23                          Notary Public

24      My commission expires:

25
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES      tel:919.847.5787**
**Raleigh, NC 27609         ctrptr4u@aol.com               fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 179 of 181

- Doc. Ex. 2044 -

**Thomas Hofeller, Ph.D.**        **June 28, 2012**
**Margaret Dickson, et al. v. Robert Rucho, et al.   11 CvS 16896 & 11 CvS 16940**

179

```
 1            E R R A T A   S H E E T

 2  Case Name:  NAACP vs. State or North Carolina, et al. and

 3      Margaret Dickson et al. vs. Robert Rucho, et al.

 4  Witness Name:  Thomas Hofeller, Ph.D.

 5  Deposition Date:  June 28, 2012

 6

 7  Page/Line    Reads              Should Read

 8  ____/____|_____|_____

 9  ____/____|_____|_____

10  ____/____|_____|_____

11  ____/____|_____|_____

12  ____/____|_____|_____

13  ____/____|_____|_____

14  ____/____|_____|_____

15  ____/____|_____|_____

16  ____/____|_____|_____

17  ____/____|_____|_____

18  ____/____|_____|_____

19  ____/____|_____|_____

20  ____/____|_____|_____

21  ____/____|_____|_____

22  ____/____|_____|_____

23  ____/____|_____|_____

24

25  Signature                    Date
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES       tel:919.847.5787**
**Raleigh, NC 27609        ctrptr4u@aol.com        fax: 919.847.2265**

```
 1   STATE OF NORTH CAROLINA    )
                                )   C E R T I F I C A T E
 2   COUNTY OF WAKE             )

 3

 4              I, DENISE L. MYERS, Court Reporter and

 5       Notary Public, the officer before whom the foregoing

 6       proceeding was conducted, do hereby certify that the

 7       witness(es) whose testimony appears in the foregoing

 8       proceeding were duly sworn by me; that the testimony

 9       of said witness(es) were taken by me to the best of

10       my ability and thereafter transcribed under my

11       supervision; and that the foregoing pages, inclusive,

12       constitute a true and accurate transcription of the

13       testimony of the witness(es).

14              I do further certify that I am neither

15       counsel for, related to, nor employed by any of the

16       parties to this action, and further, that I am not a

17       relative or employee of any attorney or counsel

18       employed by the parties thereof, nor financially or

19       otherwise interested in the outcome of said action.

20       This the 6th day of July 2012.

21

22

23
                         Denise L. Myers
24                       My commission expires 9/14/2013

25
```

**5813 Shawood Drive   VIVIAN TILLEY & ASSOCIATES      tel:919.847.5787**
**Raleigh, NC 27609          ctrptr4u@aol.com              fax: 919.847.2265**

Case 1:15-cv-00399-TDS-JEP   Document 23-2   Filed 10/07/15   Page 181 of 181