IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

NO. 1:15-CV-00399

SANDRA LITTLE COVINGTON, et al,     )
                                    )
          Plaintiffs,               )
                                    )
     vs.                            )
                                    )
THE STATE OF NORTH CAROLINA, et     )
al.,                                )
                                    )
          Defendants.               )

DEPOSITION OF
ALLAN J. LICHTMAN, Ph.D.

_____

9:14 A.M.

FRIDAY, FEBRUARY 12, 2016

_____

OGLETREE DEAKINS NASH SMOAK & STEWART

4208 SIX FORKS ROAD

SUITE 1100

RALEIGH, NORTH CAROLINA

By:  Denise Myers Byrd, CSR 8340, RPR

1

---

APPEARANCES

For the Plaintiffs:

SOUTHERN COALITION FOR SOCIAL JUSTICE
BY:  ANITA EARLS, ESQ.
1415 W. North Carolina 54
Suite 101
Durham, NC  27707
(919) 323-3380
AnitaEarls@Southerncoalition.org

TIN FULTON WALKER & OWEN
BY:  ADAM STEIN, ESQ.
312 West Franklin Street
Chapel Hill, NC  27516
(919) 240-7089
astein@tinfulton.com

For the Defendants:

OGLETREE DEAKINS NASH SMOAK & STEWART
BY:  THOMAS A. FARR, ESQ.
4208 Six Forks Road
Suite 1100
Raleigh, NC  27609
(919) 787-9700
Thomas.Farr@Ogletreedeakins.com

Also
Present:    Dalton Oldham

The Reporter:

Discovery Court Reporters
and Legal Videographers, LLC
BY:  DENISE MYERS BYRD, RPR, CSR 8340
4208 Six Forks Road
Suite 1000
Raleigh, NC  27609
(919) 424-8242
(919) 649-9998 direct
denise@discoverydepo.com

--o0o--

2

---

INDEX OF EXAMINATION
Page

By Mr. Farr.........................        5

--o0o--

3

---

INDEX OF EXHIBITS

EXHIBIT      DESCRIPTION                Page

1    Intentional Discrimination Against
     African Americans in the Adoption of
     North Carolina's Voter Information
     Verification Act, NAACP v McCrory
     Allan J. Lichtman, Ph.D.
     February 12, 2015              20

2    Barry Burden Expert Report
     NAACP v McCrory, February 12, 2015     30

3    Affidavit of Allan J. Lichtman, Ph.D.
     Dickson v Rucho, consolidated cases    32

4    Racial Data                   63

5    Racial Data                   63

6    Second Affidavit of Allan J. Lichtman
     Dickson v Rucho, consolidated cases    89

7    H-27N Effect of Adoption of Sutton 3
     on Minority Voters            98

8    S-27N Effect of Adoption of Senate
     Plan 1c on Minority Voters     101

9    Sur-Rebuttal Report of Dr. Allan J.
     Lichtman to Reports Submitted by
     Expert for Defendants, January 29, 2016
     Covington v State of North Carolina   146

--o0o--

4

ALLAN J. LICHTMAN, Ph.D.,

having been first duly sworn or affirmed by the

Certified Shorthand Reporter and Notary Public

to tell the truth, the whole truth and nothing

but the truth, testified as follows:

EXAMINATION

BY MR. FARR:

Q.  Could you please state your name.

A.  Allan J. Lichtman.

Q.  May I say Dr. Lichtman?

A.  You may.

Q.  Dr. Lichtman, we've met before, and you've had

many depositions, so I'm not even going to go

through all the preliminaries that some people

go through before a deposition, but I will ask

you, I know you will, to tell me if you

misunderstand or don't understand a question

that I've asked you and I will try to rephrase

it.

A.  Thank you.

Q.  Can you tell me what you did to prepare for the

deposition today.

A.  Just read material and spoke to the attorneys.

Q.  Do you remember what material you reviewed?

A.  Mostly just my reports and I think briefly the

5

Hood report.

Q.  Dr. Lichtman, do you understand what the

plaintiff's theory of this case is?

A.  I can tell you my understanding of it.  I'm not

a lawyer.

Q.  That's fine.

A.  And what I was asked to do.

Q.  Okay.  Tell me.

A.  I was asked to assess whether or not it was

necessary to provide African American voters in

state legislative districts in North Carolina

districts drawn at or above 50 percent black

voting age population in the State of

North Carolina.

It is my understanding -- and it's not

just from the plaintiffs but from my own

knowledge -- that this was established by the

legislature and the legislature leadership as,

in effect, a quota for the districting process

in the State of North Carolina and that this is

an impermissible racial quota according to

plaintiff's theory.

Now, I can't hold plaintiffs to that

because I'm not an attorney.  I'm just giving

you my understanding.

6

Q.  Do you have an understanding or an opinion

about how African Americans have been injured,

if at all, by the legislative plans?

A.  I think African Americans are always injured

when you are, on the basis of race, placing

African Americans in legislative districts.

My understanding -- and I'm not a

lawyer, but I was involved in a lot of the Shaw

cases that this is an inherent injury to

African Americans.  And there may well be other

injuries as well, such as diminished influence

in the legislature, inability to get African

American priorities represented there.

Q.  You say the injury is when someone is placed in

a district because of their race?

A.  When districts are created predominantly on the

basis of race according to a racial quota, yes.

My understanding of the interpretation

of that is that it is inherently injurious and,

as I said, there are other injuries that can

follow from that as well.

Q.  Would that apply to districts that were

intentionally created with a black population

between 40 and 50 percent as well as districts

that are created above 50 percent?

7

A.  Well, that's not a quota when you're dealing

with a broad range of districts.  And that

would also depend upon your analysis under

guidance of the Supreme Court in Thornburg

versus Gingles of the levels of African

American concentration needed to provide

African Americans a realistic opportunity to

elect candidates of their choice.

So there's a second level of analysis

here.  And, again, I'm not a lawyer, but it has

to do with how those districts are tailored.

Q.  Okay.  Dr. Lichtman, can you tell me what your

understanding is of the term polarized voting.

A.  Yes.  Polarized voting exists when there are

differences in the candidate preferences of

different racial groups.  There is a pattern of

polarized voting when, not just in one election

but in a number of elections, voting is usually

polarized along racial lines.

In addition, polarized voting has two

distinct components.  One is what's called

black cohesion, the extent to which blacks or

African Americans cohere behind candidates of

their choice.

And then the other component is bloc

8

1   voting, to what extent do non-African Americans
2   in North Carolina, predominantly whites, in
3   elections vote against the preferences of
4   African American voters. And the degree of
5   polarized voting depends upon the differences
6   between African American cohesion and
7   non-African American or white bloc voting.
8   Q. I'm going to ask you to give me your
9   understanding of two different terms, if you
10   could do that.
11  A. Sure.
12  Q. I'd like to know what you -- how you understand
13  the terms statistically significant racially
14  polarized voting versus legally significant
15  racially polarized voting.
16  A. Two entirely different concepts.
17  Q. Okay. Why don't you start with statistically
18  significant.
19  A. That's a mathematical concept. That simply
20  means, and nothing more, that the differences
21  between African American -- I'll use the word
22  white just for shorthand -- white voting is not
23  due to a chance or random process, that is, if
24  you're looking, say, at VTDs, voting districts
25  or precincts, if you just threw them up in the

9

1   politically significant racially polarized
2   voting would mean that in a district or
3   jurisdiction of a given concentration -- and
4   again, I'll use, for simplicity, African
5   Americans -- that given the cohesion of African
6   Americans, white bloc voting is sufficient to
7   usually defeat the candidates of choice of
8   African Americans.
9        And so that would depend upon a number
10  of components: The degree of cohesion, the
11  degree of bloc voting, turnout and the African
12  American concentration in the district.
13  Q. You said something about turnout.
14  A. Yes.
15  Q. What do you mean by that?
16  A. That is, you cannot assess African American --
17  and, again, I'm using African American, but
18  this could apply to minorities, and I'll use
19  that throughout, but I don't mean to limit it
20  to that since you're asking me generic
21  questions here.
22  Q. And, Dr. Lichtman, I understand that. So you
23  can just -- you don't need to qualify your
24  answers that way unless I ask you a question
25  where you need to qualify it.

11

1   air, what are the chances of getting this
2   pattern or if you're doing an exit poll, what
3   are the chances that the differences are due to
4   sampling error.
5        And you can have statistically
6   significant racially polarized voting if the
7   samples or the number of units that you're
8   analyzing are large enough even when the
9   differences between the races are very small.
10  You could have statistically significant
11  racially polarized voting if the units or the
12  sample is large enough when the difference is
13  51 to 49.
14       So it's critical to understand that
15  statistically significant racially polarized
16  voting says nothing about either the degree of
17  racially polarized voting or the implications
18  of racially polarized voting for the ability of
19  African American to elect candidates of their
20  choice in a district at any given level of
21  African American concentration.
22       I'm using African American here, but it
23  could apply to any racial division.
24       Secondly, I'm not a lawyer, but as I
25  understand legally or sometimes it's called

10

1   A. Okay.
2   Q. So go ahead.
3   A. So turnout is important because you cannot
4   assess whether or not racially polarized voting
5   is legally significant simply by looking at the
6   concentration of African Americans alone in
7   terms of the voting age population or any other
8   population measure.
9   Q. Can you stop for a second. Go off the record.
10       (Discussion held off the record.)
11       (Record Read.)
12       THE WITNESS: So you've got to look at
13  turnout in the particular -- let's call it a
14  district. Could be a jurisdiction. Could be
15  the State of North Carolina.
16       We know, for example, Obama did really
17  well in the 2008 Democratic primary in the
18  State of North Carolina even though the black
19  voting age population was around 21 percent
20  because, in Democratic primaries, the African
21  American turnout is much higher typically than
22  the African American voting age population and
23  therefore your assessment of the legal or
24  political significance of white bloc voting
25  cannot be assessed solely by looking at the

12

3 (Pages 9 to 12)

1    voting age population. The same thing in
2    individual districts.
3         Typically in Democratic primaries, for
4    example, using this as an example, the African
5    American component of the Democratic primary is
6    much higher than the African American component
7    of the voting age population. I can go into
8    reasons for that, which are in my report, if
9    you like.
10   BY MR. FARR:
11   Q. Well, why don't we wait until we get to that
12   part in your report.
13   A. Of course.
14   Q. How do you -- are there different ways to
15   measure turnout as you just described it?
16   A. I don't know what you mean by different ways.
17   Q. How would you -- how would you assess actual
18   turnout of black voters in a district or in the
19   state?
20   A. Well, it depends on the state, but I'll tell
21   you how you do it in the State of
22   North Carolina.
23        Social scientists are fortunate in the
24   State of North Carolina; you have registration
25   by race. So you don't have to actually

13

1    estimate turnout using ecological regression or
2    some other statistical estimation based upon
3    the VTDs or the precincts in a district. You
4    can directly measure turnout because we know
5    not how people voted but we do know their race.
6    Q. So in North Carolina, could you measure actual
7    turnout as a percentage of VAP?
8    A. You certainly could, but that's not the
9    critical element. The critical element is to
10   take the electorate -- and I've been talking
11   about Democratic primaries because it's
12   particularly relevant here and because you know
13   the race of the people who turned out.
14        The critical element is the African
15   American share of the turnout. So, again, I'm
16   speaking hypothetically. You might have a
17   district that's 45 percent African American in
18   voting age population, that is, the share of
19   those of voting age as 45 percent, but in a
20   Democratic primary, the share of those
21   registering Democratic or the share of those,
22   most critically, voting in the primary could be
23   55 or 60 percent, and that's the basis on which
24   nominations are made, not voting age
25   population.

14

1    Q. Okay. Would that same concept be applicable to
2    turnout in the general election?
3    A. Yes.
4        MR. STEIN: Tom, here comes your
5    colleague.
6        (Discussion held off the record.)
7    BY MR. FARR:
8    Q. Okay. We'll come back to this probably when
9    we're going through your report, but I want to
10   ask you a different question now.
11        Do you understand the concept -- I
12   notice in your reports you've mentioned -- were
13   you an expert in DeGrandy?
14   A. I was.
15   Q. Okay. Do you understand -- what's your
16   understanding of what the term substantial or
17   rough proportionality means?
18   A. Right. In a Section 2 case, which I believe
19   DeGrandy was -- it's a long time ago, but I
20   think that's right -- one possible defense that
21   a jurisdiction could make or one possible
22   attack that plaintiffs could make has to do
23   with the election of African American
24   officials, particularly in the type of election
25   being challenged and whether or not those

15

1    numbers relative to the total number of
2    officials in the office is roughly proportional
3    to some measure, say, voting age population or
4    citizen voting age population in the overall
5    population of the district or jurisdiction.
6    Q. Dr. Lichtman, I don't want to go through all
7    your cases because there's too many for me to
8    pronounce or remember --
9    A. Me too.
10   Q. -- but have you ever offered expert testimony
11   in a case in support of plans that would
12   provide rough proportionality or substantial
13   proportionality to a minority group?
14   A. I certainly have offered testimony in support
15   of plans, and I may well have -- in Section 2
16   cases, I may, among many other issues, have
17   examined the issue of rough proportionality,
18   yes, but I can't recall the details of that at
19   the moment.
20   Q. Do you think that you ever testified in support
21   of either an enacted plan or an alternative
22   plan being proposed by a minority group that
23   suggested a sufficient number of districts to
24   provide rough proportionality?
25   A. I probably have in Section 2 cases, yes, but,

16

DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

1    again, I can't recall the details of that at
2    the moment.
3    Q.  If you were advising a jurisdiction, how would
4    you advise them to determine the number -- let
5    me rephrase that.
6         The districts that you talk about in
7    your reports that are 40 percent plus black,
8    did you call those opportunity districts?
9    A.  I think those in the State of North Carolina
10   are districts that satisfy my understanding of
11   the Voting Rights Act to provide realistic
12   opportunities for African Americans to elect
13   candidates of their choice.
14        So put conversely, these are not
15   districts in which white bloc voting usually is
16   sufficient to defeat the African American
17   candidates or candidates of choice of African
18   Americans.
19   Q.  So is it your testimony that these districts
20   that you've testified about in this case, would
21   they satisfy, in your opinion, the Gingles
22   elements?
23   A.  Yes.
24   Q.  And for purposes of this deposition -- well,
25   how should we describe those districts?  Are

17

1    they opportunity districts?  Are they equal
2    opportunity districts?  What is your -- so that
3    we can have a discussion, how would you like
4    for me to describe those districts?
5    A.  I tend to use the same terminology that
6    Dr. Groffman uses, the expert in Thornburg
7    versus Gingles.  These are districts that
8    provide realistic opportunities for African
9    Americans to elect African American candidates
10   or, in the rare instance, white candidates of
11   choice.  Or, if you prefer, you can call them
12   districts in which African Americans have the
13   ability to do so.
14   Q.  Okay.  So I'll try to use the word realistic
15   districts or ability districts when we talk
16   about these going forward.  Is that all right?
17   A.  Yes.
18   Q.  And we'll both know what I'm referring to?
19   A.  And if I'm confused, I'll let you know.
20   Q.  Well, I think I'm more likely to be confused,
21   Dr. Lichtman.
22        If you were advising a jurisdiction,
23   what would you advise them to do to determine
24   the number of ability districts that they
25   should consider enacting?

18

1         MS. EARLS:  Objection to the form.
2    BY MR. FARR:
3    Q.  Okay.
4    A.  I'm not sure I fully understand that.  I don't
5    usually -- and I have advised jurisdictions,
6    and I don't usually tell them to limit the
7    number of districts that provide realistic
8    opportunities for African Americans to elect
9    candidates of their choice.
10        I think they should strive at least
11   rough proportionality, although, again, that's
12   not an exact measure, but I certainly don't
13   tell them they have to limit it to that to
14   avoid Section 2 issues.
15   Q.  So let me ask you a few questions about that.
16        If the prior plan that the General
17   Assembly inherited did not provide rough
18   proportionality, would it be appropriate for
19   the General Assembly in enacting a new plan to
20   consider rough proportionality in your view?
21   A.  Among many other things, that would be
22   appropriate.
23   Q.  And do you think it would be appropriate for a
24   General Assembly to intentionally create a
25   larger number of ability districts than what

19

1    would equate to rough proportionality?
2    A.  I think that would be appropriate, although,
3    again, on all these questions, there are lots
4    of other considerations as well.
5    Q.  I understand.
6         Lichtman Exhibit 1.
7         (WHEREUPON, Defendants' Exhibit 1 was
8    marked for identification.)
9         THE WITNESS:  What is this?
10   BY MR. FARR:
11   Q.  Well, hopefully you'll recognize this.
12   Dr. Lichtman, this originally was a very
13   lengthy report.
14   A.  That's why I didn't recognize it.  This is a
15   piece of my report from the case involving --
16   the case before Judge Schroeder recently.  Is
17   that what this is?
18   Q.  Exactly.  Do you recognize it?
19   A.  Not exactly because it's just a piece.
20   Q.  Well, how about -- what I really want you to
21   look at, Dr. Lichtman, is the section -- I
22   could go get the 200-page exhibit if we need
23   to.
24   A.  No, I don't think we need to.  I don't dispute
25   that this is it.  I just didn't recognize it

20

1     because, as I said, it's a piece of it.

2     Q.  Okay.  I want you to turn to what's -- feel

3         free to look at the entire exhibit,

4         Dr. Lichtman, or if you want me to go get the

5         full thing.

6     A.  No, I don't need to --

7     Q.  I want to ask you about the part that's marked

8         on Page 23.

9     A.  Okay.

10    Q.  All right.  So is it fair to say, then, in this

11        report that you gave some testimony about

12        racially polarized voting in North Carolina?

13    A.  I did.  Not a complete analysis but to the

14        extent it was relevant to the issues in that

15        case.

16    Q.  Okay.  Did you -- in your report, would you --

17        would you turn to Page 23.  I'd just like you

18        to read into the record the sentence that you

19        have that starts with "In the 2013 litigation."

20    A.      "In the 2013 litigation over

21        North Carolina's 2011 plan, both the

22        expert for plaintiffs, Dr. Ray Block,

23        and the expert for the North Carolina

24        General Assembly, Dr. Thomas Brunell,

25        found substantial patterns of racially

21

1     A.  It's one way and it's an accepted way.

2     Q.  And turning back to Page 23, based upon the

3         analysis that you did of the elections that are

4         listed in Table 6, did you conclude that

5         African Americans supported Democratic

6         candidates at a unanimous level whereabouts

7         two-thirds of the whites, on average, support

8         Republican candidates?

9     A.  Near unanimous levels.  Not quite unanimous.

10    Q.  I meant to say near.  I'm sorry.

11            Was that your testimony?

12    A.  Yes.

13    Q.  Now, would you consider that to be

14        statistically significant racially polarized

15        voting?

16    A.  Absolutely.

17    Q.  Is it legally significant racially polarized

18        voting in a statewide election?

19    A.  In a statewide election.

20    Q.  Because all the elections you looked at were

21        statewide, right?

22    A.  Yes.  I didn't address that issue here for

23        statewide, whether it would simply be

24        sufficient statewide to defeat the African

25        American candidate of choice.  I'd have to go

23

1         polarized voting across North Carolina.

2             "The existence of such polarization

3         was a central part of the State's claims

4         in that case."

5     Q.  Okay.  And then having cited that, did you

6         offer data that you described as confirming

7         those findings in this report?

8     A.  For a particular set of elections.  I did not

9         go through a general analysis of racially

10        polarized voting.  I think I looked at it in

11        general elections because that was the issue at

12        stake in this particular litigation, to what

13        extent would Republicans benefit from

14        reductions in African American voting relative

15        to white voting, and therefore it was relevant

16        to assess in general elections the degree of

17        difference between white support for Democratic

18        candidates and African American support for

19        Democratic candidates.

20    Q.  Okay.  And so you looked at exit polls?

21    A.  I did for this report.

22    Q.  For the elections listed in Table 6?

23    A.  Yes.

24    Q.  And is that an accepted way for experts in your

25        field to measure racially polarized voting?

22

1         through the elections and figure that out.

2         That was not my purpose here.

3             My purpose was to show this particular

4         litigation that Republicans would substantially

5         benefit from the reduction of African American

6         relative to white voting.

7             So I'd have to go back through these

8         elections, but certainly in some of them it was

9         legally or politically significant where the

10        white bloc voting in a statewide election

11        where, you know, depending on the year you had

12        an African American voting age population

13        somewhere around 20, 21 percent.

14            It probably would have been usually

15        legally significant but, again, I didn't do

16        that analysis, and I'd have to do it to get a

17        firm opinion on it.

18    Q.  Okay.  Well, for example, Dr. Lichtman, looking

19        at the 2004 presidential election on Table 6,

20        would you think that the racially polarized

21        voting in that election where President Bush

22        received 73 percent of the vote, would you

23        consider that to be legally significant or

24        politically significant?

25    A.  President Bush received 73 percent of the vote

24

6 (Pages 21 to 24)

1    in North Carolina?  I don't think so.
2    Q.  73 percent of the white vote.
3    A.  Of the white vote.  Okay.  I thought you said
4       73 percent of the vote.
5    Q.  Thank you for clarifying that.
6    A.  I think -- again, when you're looking at legal
7       or politically significant, you want to look at
8       a person, but if you want to look at that
9       individual election, you would say, yes, white
10      bloc voting was sufficient in the State of
11      North Carolina to defeat the candidate of
12      choice of African Americans, that's correct.
13      That wouldn't be true of every one of these,
14      but it certainly would be true of that one.
15   Q.  And I just want to ask a few more questions.
16      In the 2008 Senate race, you compared
17      the vote between Senator Hagan and Senator --
18      at the time Senator Dole?
19   A.  Yes.
20   Q.  Is it fair to say Senator Hagan was not an
21      African American candidate?
22   A.  That is correct.
23   Q.  And then in the 2012 presidential election
24      where you've listed that Romney received
25      68 percent of the white vote versus 96 percent

25

1    of the black vote that was received by Obama,
2    would that indicate politically significant
3    racially polarized voting in that election?
4    A.  I believe in that election it would.
5    Q.  Okay.  And you averaged out the white and the
6       black percentages at the bottom of Table 6; is
7       that right?
8    A.  Yeah, rounded numbers, but, yeah, approximately
9       right.
10   Q.  Do you think in a statewide election if the
11      African American candidate of choice received
12      93 percent of the black vote and the
13      non-candidate of choice received 66 percent of
14      the white vote, would that indicate legally
15      significant -- or politically significant
16      racially polarized voting?
17   A.  You would have to look at the individual
18      election.  You can't generically conclude that
19      because it would also depend upon the white and
20      African American shares of the turnout in the
21      general election.
22      It might.  It might not.  As we saw
23      here, in some cases it was; in some cases it
24      was not.
25   Q.  Could that indicate the possibility of the

26

1    existence of politically significant racially
2    polarized voting?
3    A.  In a state where African Americans are 20 to
4       21 percent of the voting age population, in
5       some cases you do get politically significant
6       racially polarized voting, but you could not
7       apply that to districts that are where the
8       African American voting age population is much
9       higher.
10      Again, it's very important in talking
11      about politically or legally significant
12      racially polarized voting to understand it is
13      specific to a jurisdiction or a district.  It
14      is not generic.
15   Q.  Could it be specific to the area in which the
16      district could be drawn versus where it
17      actually was drawn?
18   A.  We'd have to look.  It's possible, but, again,
19      you know, the analysis should be district
20      specific.  In other words, once you propose a
21      district, you can analyze that district.
22   Q.  And you say that one of the things you'd have
23      to actually look at is the actual turnout in
24      terms of the number of black voters who turned
25      out as a percentage of the total electorate in

27

1    an election versus the percentage of white
2    voters?
3    A.  You could look at that or you could simply --
4       particularly in general elections, as we did
5       here, you could look at outcomes.  In other
6       words, if the African American candidate of
7       choice is winning and winning consistently in a
8       district at a particular level, that would
9       indicate that there was not legally significant
10      racially polarized voting as we saw here in
11      some of these elections.
12   Q.  And that wouldn't be impacted by the number of
13      the voters who actually voted who were black
14      versus the number of people that actually voted
15      who were white?
16   A.  The actual outcome of elections are impacted by
17      a number of factors:  Absolutely, the
18      components of the electorate, the degree of
19      African American cohesion and the degree of
20      white bloc voting or, conversely, what we call
21      white crossover voting, which is just the
22      converse of white bloc voting.
23      And as we can see here from these
24      statistics, the African American cohesion in
25      general elections is much higher than the white

28

1    bloc voting.  That's why even in a jurisdiction
2    where the African American voting age
3    population is down around the 20 to 21 percent
4    level approximately, you still get instances of
5    African American candidates of their choice
6    winning.
7    Q.  Just to clarify that, and we may come back this
8        later, but in Table 6, did you measure -- you
9        measured the percentage of support of black
10       voters for a particular candidate?
11   A.  I did.
12   Q.  You did not measure how many blacks voted.
13   A.  No because that was not my purpose here.
14           My purpose here was simply to show that
15       there was a wide disparity between the choices
16       of African Americans and the choices of whites.
17           Remember, this was for a particular
18       litigation, and the table was designed for the
19       purposes of that litigation.
20   Q.  I understand, and I got that, but I'm just
21       clarifying this for my own understanding.
22   A.  Sure.
23   Q.  You didn't look at what percentage blacks
24       represented of the total number of people who
25       voted.

29

1    A.  No, and I didn't look at the percentages
2        received by each candidate, which would have
3        given you, given these racially polarized
4        voting numbers, an indication of whether or not
5        across the State of North Carolina the white
6        bloc voting was sufficient to defeat the
7        candidate of choice of African Americans
8        because that was not my purpose here.
9    Q.  It gets confusing, Dr. Lichtman, and I want to
10       make sure somebody reading this understands
11       what you're talking about.  That's why I'm
12       asking these questions here.
13   A.  I'll clarify it again.  All I'm talking about
14       here for the purposes of this litigation was
15       the gap between African American preference and
16       white preferences --
17   Q.  Right.
18   A.  -- to show that to whatever extent you reduce
19       African American turnout relative to white
20       turnout, that benefits Republicans.
21   Q.  Okay.  All right.  I'm going to hand you
22       something that's going to be Exhibit 2.
23           (WHEREUPON, Defendants' Exhibit 2 was
24       marked for identification.)
25   BY MR. FARR:

30

1    Q.  Okay.  Dr. Lichtman, have you seen this before?
2    A.  Not that I can recall.
3    Q.  Okay.  I'm going to represent to you this was a
4        report that was prepared by Dr. Gary Burden for
5        the same case in which you gave the report we
6        just looked at.
7            Do you know Dr. Burden?
8    A.  Not personally.  I've seen him, but --
9    Q.  Can you turn to Page 8 of this report.  I just
10       want to ask you a question about something that
11       Dr. Burden said in this report.
12   A.  I'll do my best, but I have not seen this
13       before.
14   Q.  I know, but I will just ask you the question.
15       If you can answer it, great.  If not, that's
16       fine.
17   A.  Fair enough.
18   Q.  I'm looking at the paragraph on Page 8 where
19       Dr. Burden is talking about preferences of
20       black and white candidates in the Democratic
21       primary for president in 2008.
22           Do you see that?
23   A.  Yes.
24   Q.  Do you see where he concludes that there was
25       racially polarized voting in the Democratic

31

1    primary for president in 2008?
2    A.  I do.
3    Q.  My question is:  Do you agree that that was so?
4    A.  Yes.
5    Q.  Was that -- that's all I have on that.
6    A.  Are you done with this?
7    Q.  I am.
8            (WHEREUPON, Defendants' Exhibit 3 was
9        marked for identification.)
10   BY MR. FARR:
11   Q.  Could you tell us what this is, Dr. Lichtman.
12   A.  I'm not sure.
13   Q.  Just take your time.
14   A.  I think this was the first affidavit I filed in
15       the Dickson litigation.
16   Q.  Okay.  I think that's right.
17           Did you review this before coming
18       today?
19   A.  Briefly.
20   Q.  Okay.  I'll have a few questions on this.
21   A.  Sure.
22   Q.  Could you turn to -- it says -- it's not
23       numbered, but it looks like it's Paragraph 6,
24       and at the top of the page it says Document
25       Ex. 960.

32

8 (Pages 29 to 32)

1    A.  Yes.  I'm there.
2    Q.  I wanted to ask you about the LULAC case you
3        mention there.
4    A.  Yes.
5    Q.  Did you testify in LULAC?
6    A.  Yes.
7    Q.  Let me ask you, before I go any further, to
8        define some terms for me.
9    A.  Sure.
10   Q.  As a professional in the field, if the single
11       majority race is the -- or single minority race
12       is the majority in a district, as a
13       professional in the field, what was the term or
14       definition that you would use to describe that
15       district?
16   A.  I don't know what you mean by majority because
17       there are many, many ways of measuring
18       majority:  Total population, voting age
19       population, citizen voting age population --
20   Q.  Let me clarify.
21   A.  -- turnout, registration.
22   Q.  Let me clarify that.
23   A.  Sure.
24   Q.  The majority of the voting age population.
25   A.  Yeah.  You call it a single-race majority

                                              33

1        voting age population district.
2    Q.  Would you call it a majority-minority district
3        or just a majority district?
4    A.  Those are less descriptive because you could
5        have a majority-minority district where there
6        is not a single-race majority, which is what I
7        understood your question to be.  So ipso facto,
8        a single-race majority district would also be a
9        majority-minority district, but it is not true
10       that a majority-minority district is
11       necessarily a single-race minority district.
12   Q.  Have you read the Supreme Court decision of
13       Strickland?
14   A.  Yes.
15   Q.  Do you know how Justice Kennedy in his opinion
16       defines what a majority-minority district is?
17   A.  I don't recall specifically, but I do
18       understand in the Bartlett decision that
19       Justice Kennedy spoke of, for a successful
20       Section 2 litigation to satisfy the first prong
21       of Gingles, you needed a majority district with
22       respect to whatever racial group is being dealt
23       with but that that was not necessary for a
24       jurisdiction crafting a redistricting plan.
25       That's my understanding.

                                              34

1    Q.  Okay.  All right.  Do you recall how Justice
2        Kennedy defined a coalition district?
3    A.  Yes.  To the best of my recollection, a
4        coalition district is one where you have not
5        necessarily a single-race majority district but
6        you have a commonality in voting patterns among
7        different minority groups.
8    Q.  Okay.  All right.  In that type of district,
9        would you -- would you believe it would be
10       likely that non-Hispanic whites would be the
11       minority group in that district?
12           MS. EARLS:  Objection to the form.
13   BY MR. FARR:
14   Q.  Okay.  You can answer.
15   A.  Yeah, likely.  Not necessarily.  And again, I
16       assume you're defining minority majority the
17       same way you did in the first place in terms of
18       voting age population, not on some other
19       measure.
20   Q.  Yeah.  We'll just stick to voting age
21       population.  I'm just trying to get some
22       definitions down.
23           So if, say, for example, blacks and
24       Hispanics together represented a majority in
25       the district, do you think it would be likely

                                              35

1        that non-Hispanic whites would be a minority
2        percentage of the voters in that district?
3    A.  Of the voters, not necessarily.
4    Q.  Of the citizen -- or the voting age population.
5    A.  Ipso facto, if minority groups are over
6        50 percent, that means -- if you're comparing
7        whites to that combined minority group as
8        opposed to an individual minority group, it
9        follows automatically that whites are going to
10       be the minority.
11   Q.  Okay.
12   A.  They could still be the plurality.
13   Q.  When you say whites, we're referring to
14       non-Hispanic whites?
15   A.  That's how I understood it.
16   Q.  Okay.  Do you recall how Justice Kennedy
17       defined the term crossover district?
18   A.  Yes.  And as I understand it, that is a
19       district where you have crossover votes from --
20       let's simplify it -- whites for, say, African
21       Americans or another minority group in terms of
22       their candidates of choice.
23   Q.  Under that definition, would non-Hispanic
24       whites be the majority group in such a
25       district?

                                              36

9 (Pages 33 to 36)

1  A. Typically, yes, but, again, there are many,
2  many ways of defining this.
3  Q. Now, that brings me to LULAC.
4  A. Yes.
5  Q. Do you recall how Justice Kennedy defined the
6  term influence district?
7  A. Yes. Again, I'm doing this from memory. The
8  case is over a decade old, but to the best of
9  my recollection, an influence district is a
10  district -- again, I'll use the term African
11  Americans. Some are Hispanics as well.
12  Q. For our purposes, unless one of us says
13  otherwise, we're going to treat whites as
14  non-Hispanic whites and African Americans as
15  the group we're referring to.
16  A. Fair enough.
17      So it would be a district whereby
18  African Americans did not have the ability to
19  usually elect African American candidates or
20  candidates of their choice but were
21  sufficiently numerous in the district to have
22  an influence over the outcome.
23  Q. What does that mean, to have an influence
24  over --
25  A. Well, that could mean many different things,

                                            37

1  but typically, when you talk about influence,
2  it means that, in theory, that their priorities
3  and considerations and interests would be taken
4  into account.
5  Q. Dr. Lichtman, again, correct me if I'm wrong,
6  but you said you were an expert in the LULAC
7  case.
8  A. Yes.
9  Q. Did you testify in support of an influence
10  district in that case?
11  A. I don't recall. I recall my testimony focused
12  on ability-to-elect districts. And what I
13  recall most specifically about the case --
14  again, it's over a decade old -- was that the
15  Supreme Court accepted my opinion based upon
16  the same methodologies used here, that
17  Congressional District 23 did not provide
18  Hispanic voters a realistic opportunity to
19  elect candidates of their choice. And based
20  upon my testimony and analysis, they
21  invalidated that district.
22      I don't recall anything about influence
23  districts, but it doesn't mean it wasn't there.
24  Q. Have you ever given testimony in support of an
25  argument that influence districts could be

                                            38

1  adopted by a jurisdiction to satisfy
2  requirements under Section 2?
3  A. I don't recall having done that. That doesn't
4  mean that I didn't -- you know, that I have
5  never said it might be desirable to create
6  influence districts. I don't ever recall
7  saying you can satisfy Section 2 with influence
8  districts.
9      And again, I'm not a lawyer so all
10  these questions about satisfied legal
11  requirements are my analyses as a social
12  scientists.
13  Q. I want you to turn to Paragraph 9. I think I'm
14  going to have more questions about House
15  District 8 as we look at some of your tables,
16  but do you see the sentence where you say
17  "However, House District 8 is a 50 percent plus
18  black voting age district and the white
19  candidate won with more than 68 percent of the
20  vote"?
21  A. Yes.
22  Q. Did you make any -- what election are you
23  referring to there, just to be clear?
24  A. I don't recall.
25  Q. Can you maybe read the paragraph.

                                            39

1  A. Okay. 2008, 2010.
2  Q. Did you try to study why the white candidate
3  won House District 8?
4  A. Let me look at this. I can't say whether I did
5  elsewhere, but it doesn't appear that I did in
6  this paragraph.
7      My only point here was victory -- I did
8  study that it was not the candidate of choice
9  of African Americans. So, yes, I did study it
10  to that degree using ecological regression.
11      My point here was the victory of a
12  white candidate who is not an African American
13  candidate of choice was not the result of
14  drawing a district below 50 percent plus black
15  voting age population, and, in fact, given the
16  patterns of the vote, even if you had drawn
17  this at 60 percent voting age population, the
18  black candidate would have won.
19  Q. The white candidate?
20  A. I'm sorry. The white candidate. Excuse me.
21  I'm a little dyslexic.
22  Q. Did you look to see if the white candidate
23  would have won if the district had been drawn
24  to 65 percent black voting age population?
25  A. I didn't. I thought 60 was more than

                                            40

1  sufficient to show it was not as a result of an
2  insufficient concentration of black voting age
3  population.
4       I don't believe there are any 65
5  percent black districts in North Carolina under
6  either camp.
7  Q.  Have you testified in support of ability
8  districts that have a black population of
9  65 percent or above?
10  A.  I'm sure I have.
11  Q.  If you didn't study whether the black candidate
12  would have won with 65 percent black voting age
13  population, how do you know that percentage
14  wouldn't have been an appropriate level of
15  black voting age population with that district
16  to give blacks an ability-to-elect district?
17  A.  I'm not sure I understand the question.  Could
18  you repeat it or --
19  Q.  Well, tell me how you decide what the right
20  percentage is for an ability-to-elect district.
21  A.  In any given set of districts, you look at
22  patterns of elections to assess to what extent
23  you need to draw districts with given
24  concentrations to give African Americans a
25  realistic opportunity to elect candidates of

41

1  because that district was drawn below 50
2  percent black voting age population and would
3  certainly not justify a blanket rule that you
4  needed to draw districts at 50 percent plus.
5  Q.  We're getting off topic.
6  A.  Okay.  Sorry.  I thought that's what you were
7  asking me.
8  Q.  First of all, that district was not an
9  under-50-percent district, was it?
10  A.  It was not.  That's right.  That's my point.
11  And the African American candidate of choice
12  still lost.  That was the point of this
13  analysis.
14  Q.  But is there a point at which you could have
15  created that district with sufficient black
16  voting age population to allow the black
17  candidate of choice to be elected?
18  A.  Certainly not at 60.  I don't know if it would
19  have been at 65 or 70.  And it's very unlikely
20  you'd be able to create a 65 to 70 percent
21  black voting age population district without
22  diminishing African American opportunities in
23  other districts.
24  Q.  Have you studied that?
25  A.  No, but my general knowledge is if you're going

43

1  their choice.
2       Realistic opportunity does not mean
3  guaranteed outcomes.  There are going to be
4  cases in which -- even in very heavy African
5  American districts, given the reality of
6  politics, African American candidates of choice
7  may not win, which is why you look at patterns
8  rather than individual elections.
9  Q.  Okay.  Well, I'm going to ask you a lot of
10  questions about Table 1, which is on Page 964,
11  but I do want to ask you a question now about
12  House District 8.
13  A.  Yes.
14  Q.  Am I reading this correctly that you found that
15  there was racially polarized voting in House
16  District 8 in the Democratic primary in 2008,
17  2010?
18  A.  Yes.
19  Q.  And was the black candidate of choice defeated?
20  A.  Yes.
21  Q.  So would that indicate it was legally
22  sufficient or politically significant racially
23  polarized voting?
24  A.  In that particular election in that particular
25  district, a voter would also indicate it's not

42

1  to concentrate at that extreme level, you're
2  going to have to find African Americans to
3  bring in from that district from lots of other
4  districts.  That's a very, very high level of
5  African American concentration, extreme level,
6  and from my general knowledge, that attempt to
7  do so would diminish African American
8  opportunities elsewhere.
9  Q.  But you haven't studied in North Carolina
10  whether creating House District 8, say, for
11  example, at 65 percent would diminish
12  ability-to-elect districts elsewhere?
13  A.  I have not specifically studied that, but, as I
14  said, from my general knowledge of
15  North Carolina and my general knowledge of how
16  you draw districts, which is pretty large, it
17  is virtually certain that you could not create
18  a district that's 65, 70 percent and -- without
19  diminishing African Americans opportunities
20  elsewhere.
21  Q.  But you haven't made a local study of that area
22  of the state to reach that conclusion?
23  A.  No.  And none of your experts have suggested --
24  Q.  I didn't say that our experts --
25  A.  All right.  Fair enough.

44

11 (Pages 41 to 44)

1  Q. In your report, we've heard the term
2  particularized analysis. Did you make a
3  particularized analysis to see what level of
4  black VAP would be needed to create House
5  District 8 as an ability-to-elect district?
6  A. To what I thought was a more than sufficient
7  extent, yes.
8  Q. So what black percentage should have it been
9  created at?
10 A. Well, like as I said, even if it was more than
11 60 percent of the vote, the African American
12 candidate of choice would not have won.
13        Did I go beyond that to say what might
14 have happened at 70 percent, no, and I did not
15 think that was necessary.
16 Q. You didn't look to see what would happen at
17 65 percent?
18 A. No.
19 Q. Or 62 percent?
20 A. I might have. I might have.
21 Q. Is it in your report?
22 A. No.
23 Q. Okay. Have you testified in favor of districts
24 that have a black voting age population of
25 65 percent as being necessary to provide an

45

1  ability-to-elect district?
2  A. Not in the past 30 years.
3  Q. Do you have any cases in Mississippi?
4  A. Yes, way back when.
5  Q. Not recently?
6  A. Not recently. Oh, wait a minute, there was --
7  yes, there was a particularized case in some
8  local jurisdictions where I did testify that it
9  had to be over 65 percent because of the
10 general patterns in those districts, not
11 because of an analysis of a single district.
12        That's why you can't just look at a
13 single district. You've got to look at
14 patterns. Yes, there have been some local
15 cases in Mississippi where the patterns are
16 very different than the patterns here.
17 Q. Statewide patterns or local patterns?
18 A. Local patterns.
19 Q. Okay. Would this House District 8 indicate a
20 local pattern that you needed to create the
21 district with a black voting age population of
22 above 60 percent?
23 A. Not necessarily because, as I said, it may well
24 be even at 65 it would not elect an African
25 American. Plus you don't focus just on

46

1  individual districts like this. You focus on
2  patterns.
3        And as I've explained, if you created
4  this district at 65 percent or above, that
5  would have implications for the entire plan and
6  for the ability of African Americans to elect
7  candidates of their choice elsewhere.
8        MR. FARR: Do you mind if we take a
9  break? I need to take a break.
10        MS. EARLS: Yes.
11        (Brief Recess: 10:41 to 10:46 a.m.)
12 BY MR. FARR:
13 Q. Dr. Lichtman, I wanted to ask you a question
14 kind of about Paragraph 12 in Exhibit 3.
15        So, again, correct me if I use the
16 terms in a way that is not appropriate to your
17 understanding or what you stated before, but
18 stuff gets confusing to me occasionally.
19 A. Sure.
20 Q. You're saying in your reports that an
21 ability-to-elect district can be created with a
22 black voting age population of 40 percent to
23 49 percent?
24 A. That's right. And when I talk about realistic
25 opportunity districts or ability districts, I

47

1  am not -- and maybe this got a little confused
2  and why you're confused -- I am not talking
3  about black voting age population majority
4  districts.
5        The finding in my report is it is not
6  necessary to create 50 percent plus black
7  voting age population districts to create
8  ability-to-elect or realistic-opportunity-to-
9  elect, and that does not mean in every single
10 district that African American candidates or
11 African American candidates of choice are
12 necessarily going to win because you don't
13 guarantee outcomes. You only create
14 opportunities.
15        And so throughout, when I'm talking
16 about rough proportionality, when I'm talking
17 about ability or opportunity districts, that
18 must not be confused with black majority
19 districts. In fact, when I have advised
20 jurisdictions, and we've discussed that, I have
21 advised districts it is not necessary to create
22 black majority districts.
23 Q. I wasn't confused by that.
24 A. Okay. I don't know what you were confused by,
25 then.

48

12  (Pages 45 to 48)

Case 1:15-cv-00399-TDS-JEP   Document 77-29   Filed 03/14/16   Page 12 of 46

Q. That wasn't something I was confused by.

A. I want to make sure it's clear because we got into this rough proportionality and all that, and I did not mean rough proportionality in terms of black majority districts. I meant that in terms of ability-to-elect districts. Sometimes it can get a little confusing.

Q. I think we said that before. I understood that's what your testimony was.

A. All right. Fair enough.

Q. Now, if you created a district in North Carolina above 50 percent, would that give African Americans the ability to elect their candidate of choice?

A. Yes, as would districts above 40 percent. It follows tautologically.

Q. Okay. I want you to read into the record -- just so we get the whole thing, could you read into the record Paragraph 13 of Exhibit 3.

A. [As Read] "Tables 4 to 5, show the results of creating 50 percent plus African American districts for State House and State Senate districts. As compared to the benchmark plan, the proposed plan needlessly packs African Americans into

districts greater than 50 percent in their voting age population. The result was to substantially diminish the influence of African American voters in other House districts.

"As indicated in Table 4, the existing benchmark House Plan has 32 districts that are 30 percent or more black in their voting age population, compared to 26 in the state-passed proposed State House Plan.

"As indicated in Table 5, the existing benchmark Senate Plan has 15 districts that are 30 percent or more black in their voting age population, compared to 10 in the state-passed proposed State Senate Plan."

Q. And then just looking at Paragraph 14, Dr. Lichtman, is it fair to say that in 13 and 14 you're describing the injury resulting to African Americans because of 50 percent districts -- the decline of their influence in districts that are in the 30 percent range?

A. I think we discussed that previously where I said the injury is inherent, but another

possibility is that it could also diminish African American influence overall in the redistricting plan.

Q. Okay. And maybe you've explained this to me before, but when you say injuries inherent, what do you mean by that?

A. The very nature of creating districts predominantly drawn on the basis of race, particularly when it is based upon a particular unnecessary racial quota. That in and of itself, according to my understanding of the Sher decisions and those that followed, that constitutes an injury unto itself independent of any other injuries that might be possible.

Q. So, Dr. Lichtman, here's something that I don't quite understand. If you intentionally would draw a district at what you claim is the percentage needed to create an effective ability district, how is race not predominant in the construction of that type of district?

A. Because it doesn't necessarily mean the subordination of other considerations.

And I am not suggesting a racial quota here. I am suggesting there is a broad range of African American voting age population by

which you can draw districts. Moreover, this is actually based on an analysis of what is necessary to provide African American voters a realistic opportunity or an ability to elect candidates of their choice.

A 50 percent quota is not based on any realistic assessment of the level necessary to provide African American voters a realistic opportunity to elect candidates of their choice and therefore is a racial quota without justification in terms of what is necessary for ability or realistic opportunity to elect.

I'm not a lawyer, but my understanding is it's therefore not narrowly tailored to meet any compelling state interest.

Q. Okay. Let me ask you a few questions about that.

Do you think the fact that the State drew a district -- intended to draw a district at above 50 percent, does that in your mind mean that race predominated just because of that fact?

A. Given the facts in North Carolina, absolutely, yes.

Q. Did you ever study the enacted plans in

1    North Carolina or any of the alternative plans
2    to see what criteria was used to draw the
3    districts besides the 50 percent plus one
4    standard?
5    A.  No.  I simply looked at the 50 percent plus one
6    standard, saw that it was a racial quota and
7    saw that the racial quota was not based upon
8    any realistic assessment of the level of black
9    voting age population needed to provide
10   realistic opportunities.
11   Q.  Okay.  You've told me that.
12       My question is, simply, did you look at
13   any other criteria that was used to construct
14   any of the enacted 2011 districts or the
15   alternative proposals?
16   A.  I simply looked at the 50 percent and whether
17   that was necessary.
18   Q.  Okay.  And you say that using 50 percent plus
19   one is a quota but what you're proposing as a
20   range is not a quota?  Can you explain that to
21   me?
22   A.  Yes.  Two reasons why it's not a quota:
23       One, it doesn't have this talismanic
24   percentage.  It doesn't say it has to be at
25   this percentage or above.

                                                53

1        Secondly, it is based upon an
2    assessment of the level of a district needed to
3    provide realistic opportunities for African
4    American voters to be able to elect African
5    American candidates or candidates of their
6    choice, and therefore it is not a simple quota
7    that says it has to be this percentage or above
8    regardless of what the evidence shows with
9    respect to what is needed to provide African
10   Americans a realistic opportunity to elect
11   candidates of their choice, yes.
12   Q.  Do you think that the range that you support is
13   necessary to provide African American voters a
14   realistic opportunity?
15   A.  I think districts at 40 percent or above, which
16   is a very broad range, does provide African
17   Americans a realistic opportunity to elect
18   candidates of their choice, yes.
19   Q.  Is it necessary to do that at 40 percent or
20   above in North Carolina to provide a realistic
21   opportunity?
22   A.  I think so, yes.  I think the evidence shows
23   that.
24   Q.  Okay.  And, Dr. Lichtman, when you -- let's
25   turn to Table 1.  I have a lot of questions on

                                                54

1    this.
2    A.  Okay.
3    Q.  And let me say I think a lot of your other
4    reports are redundant of this stuff that's in
5    this exhibit.  So I hope to not go over the
6    reports in the same detail because I think you
7    repeat the same tables.
8    A.  Not exactly.
9    Q.  Okay.  Well, then, I'm going to ask you to
10   explain if there's a difference.
11   A.  There are differences.
12   Q.  Okay.  All right.  I wanted to ask you in the
13   analysis you did in Table 1, you were examining
14   elections in the 2003 House districts; is that
15   right?
16   A.  Yes.
17   Q.  Okay.  Did you -- when did you do this report?
18   A.  I don't remember.  It was several years ago.
19   Q.  It was after the 2010 census?
20   A.  I think that's right.  Yes.
21   Q.  All right.  Did you make any inquiry to see
22   whether, when you did this report, the 2003
23   House districts complied with North Carolina's
24   requirements for the population deviation based
25   upon the 2010 census?

                                                55

1    A.  No.
2    Q.  Did you attempt to analyze whether the 2003
3    districts could be created in 2011 based upon
4    any North Carolina constitutional criteria for
5    drawing House districts?
6    A.  Whether the 2003 districts could have been
7    created later?  I don't quite understand the
8    question.
9    Q.  Let me try again.
10       Are you aware of the fact that there's
11   state constitutional criteria for following
12   legislative districts?
13   A.  I know they exist, but I didn't look at them.
14   Q.  So in looking at the 2003 districts, you did
15   not attempt to determine if the 2003 districts
16   in 2011 would comply with the state
17   constitutional criteria for drawing districts?
18   A.  No.  I was simply concerned with the results of
19   the elections of those districts while those
20   districts were in existence.
21   Q.  Okay.  Now, can you tell me in Table 1,
22   percentage black VAP in the 2000 census,
23   there's lots of different ways to measure black
24   VAP.  Do you recall what that -- what category
25   were you using?  Is that single race black or

                                                56

Page 57:

1      multi race black or do you remember?
2   A. I don't remember, but I think it was all
3      blacks.
4   Q. What would that mean?
5   A. Multi race would be included, but I don't
6      remember precisely.  I'd have to check that
7      because it was a while ago.
8   Q. Okay.  And did you attempt to analyze the
9      non-Hispanic white population in the 2003
10     districts under the 2000 census?
11  A. I don't recall if I did or not.  I think I just
12     looked at the black concentration.
13  Q. And then for the -- next column -- let's
14     clarify this.  Table 1, the column on the far
15     left side refers to House districts that were
16     created in the 2003 House Plan?
17  A. Right.
18  Q. And the next column is percentage black VAP in
19     the 2000 census?
20  A. Right, for the same districts.
21  Q. Right.  And you clarified that you think that's
22     any part black voting age population?
23  A. I think so, but it was several years ago.  I'd
24     have to check that.
25  Q. In fairness to you, Dr. Lichtman, I think

57

Page 58:

1      you're right.
2         Then the next column is percentage
3      black VAP 2010 census?
4   A. Yes.
5   Q. And did that also mean any part black in the
6      2010 census?
7   A. I believe that's correct, but, again, I'd have
8      to check that.  That was a number of years ago.
9   Q. And did you look at the non-Hispanic white
10     population in any of these districts under the
11     2010 census?
12  A. I don't recall, but, again, my focus was on the
13     black concentration.
14  Q. Did you look in either 2000 or 2010 the
15     percentage of registered voters in these
16     districts who were African Americans?
17  A. I did later but not at this time.
18  Q. Okay.  So let me ask you this:  Did you -- I
19     think -- I know you did to the extent you
20     looked at the Democratic registration figures.
21  A. Yes.
22  Q. Did you ever look at the entire district to
23     determine whether any of these districts were
24     majority black in terms of the number of
25     registered voters?

58

Page 59:

1   A. I think I just looked at the Democratic
2      primary, African American component of turnout,
3      and I looked at the percentage of African
4      Americans among Democratic registrants.
5   Q. Okay.  I think that's right.
6         Now, I'm going to get into something
7      that could get me into a lot of trouble.  I
8      want you to tell me how you determine the next
9      column.  It says results of the 2008 Democratic
10     primary and then you've got black; white;
11     white: not choice.
12        Tell me what that column represents.
13  A. That represents whether or not the actual
14     results of elections in each of those districts
15     resulted in the nomination of an African
16     American candidate or, in the case of a white
17     candidate, whether that white candidate was the
18     candidate of choice of African American voters
19     or not.
20  Q. Okay.  And how did you determine that?
21  A. Ecological regression.
22  Q. And, Dr. Lichtman, tell me what that means.
23  A. Ecological regression?
24  Q. Uh-huh.
25  A. That's the same methodology that was used by

59

Page 60:

1      Dr. Groffman in the Thornburg versus Gingles
2      case.  It's the same method I used in the LULAC
3      case that was authoritatively cited by Justice
4      Kennedy's opinion in that case.  It's a
5      methodology that I've written about in my book
6      "Ecological Inference" and in numerous
7      methodological articles and have used thousands
8      of times.
9         And it is a methodology whereby you
10     look at the precincts or voter tabulation
11     districts and you look at -- in each, I'll call
12     them precincts, the votes for the various
13     candidates and then you look at the African
14     American and non-African American component of
15     those precincts.
16  Q. And what are you looking at for that part?
17  A. Well, in North Carolina, we have VAP and
18     turnout by race.  So you have -- you have
19     precise measures whereby you can determine the
20     black and non-black component of each precinct
21     and then that gives you an equation which will
22     estimate for each candidate the percentage of
23     blacks and non-blacks voting for each
24     candidate.  And from that ecological regression
25     methodology, you can determine which candidates

60

1  were candidates of choice of the racial groups.
2  Q. Now, I'm going to circle back to what you just
3     told me, but I want to define a couple other
4     things.
5  A. Sure.
6  Q. Is there something call bivariate ecological
7     regression?
8  A. Yes.
9  Q. Is that what you did?
10 A. No.
11 Q. Okay. What's bivariate?
12 A. Two variables. Well, in a sense I did that,
13    yes. I did not include variables other than
14    race, but I did not use just a single equation.
15 Q. Okay. So is it fair to say that you compared
16    the -- you used some data to look at the black
17    vote and compared it to the non-black vote?
18 A. That's exactly right.
19 Q. You didn't try to break out any other groups?
20 A. I did not, and you can't. Because I did look
21    at the turnout with respect to blacks, whites
22    and others in these districts, and the turnout
23    of others is so small that you cannot
24    separately break it out. It's a very minimal
25    component of any of these districts.

61

1  Q. Is that true in all the districts or just some
2     of them?
3  A. I believe it's true in virtually all of them.
4  Q. All right. So how -- what data did you rely
5     upon and where did you get it? Let's first
6     talk about the race data. Have we covered that
7     already?
8  A. I think we've covered that already. In
9     North Carolina, we have breakdowns by race.
10 Q. Okay. And then how did you -- as I understand
11    it, you looked at -- I could be completely
12    wrong, but my understanding is when you do
13    this, you can end up with a graph that's got
14    race on one side and vote in the precinct on
15    the other side. Is that fair to say?
16 A. That's not exactly how I did it, but you can
17    roughly portray it that way. As I said, I did
18    not use a single equation. I used the two
19    equation methodology which I am one of the
20    developers of.
21 Q. How is that different than what you have
22    described as the single equation?
23 A. The single equation would simply look at the
24    percentage of the vote for each candidate as a
25    percentage of the vote, not as a percentage of

62

1  the turnout.
2     The two equation method would look at
3     the percentage of the candidates as a
4     percentage of the turnout.
5  Q. Okay.
6  A. And do it separately for each candidate.
7  Q. All right. So you look at the race of the
8     voters in each precinct and the vote in each
9     precinct?
10 A. Correct.
11 Q. How did you determine the race of the voters in
12    each precinct? Where did you get that data?
13 A. The state, as I said, compiles data on the
14    racial composition of the electorate, and I
15    received that data from counsel.
16 Q. Do you know where they got it from?
17 A. I don't exactly, but I presume they got it from
18    state sources. That is certainly my
19    understanding.
20 Q. Dr. Lichtman, I'm going to mark a couple of
21    exhibits. We will reference these.
22       (WHEREUPON, Defendants' Exhibits 4 and
23    5 were marked for identification.)
24 BY MR. FARR:
25 Q. All right. So, Dr. Lichtman, I think we asked

63

1  that you produce the data that you've used in
2     preparing this report.
3  A. Yes.
4  Q. And as far as I know, Exhibit 4 and Exhibit 5
5     are what we received?
6  A. I don't know, but if you say so.
7  Q. The racial data that you used to prepare
8     Table 1 -- so the racial data by precincts that
9     you used to make your report, is that in one of
10    these two exhibits, 4 or 5?
11 A. I don't know. I have not reviewed these
12    exhibits. I can't say.
13 Q. Can you take your time to look and see if you
14    can tell me. I just want to know what the
15    racial --
16 A. I can't necessarily tell you because this would
17    have been put into my computer, and so I don't
18    exact -- this doesn't look exactly like what's
19    in my computer. And without taking the time to
20    go to my computer and compare it, I can't just
21    verify this based on what you've handed me.
22 Q. Okay. Whatever the racial data was that you
23    received, did you personally make the
24    calculations that led to your conclusions or
25    did you have someone else do that for you?

64

1    A. I did that. I didn't prepare the racial data,
2       but once I got it, I did the ecological
3       regression analysis.
4    Q. So the racial data you got from your counsel
5       and then you actually did all the mathematical
6       calculations yourself?
7    A. Correct.
8    Q. You didn't -- I remember in the other case you
9       had some guy that helped you. Did you use him
10      in this case?
11   A. No.
12   Q. Okay. What did your -- what did you do to
13      account for racial information by precincts for
14      split precincts?
15   A. Typically when you have split precincts, you
16      allocate the racial data according to the
17      percentages of the precincts that are put in
18      the split precinct.
19   Q. Okay. So let me see if I understand that. If
20      there was a precinct that was split that was,
21      say, 30 percent -- the whole precinct was
22      30 percent black, would you assume that the
23      part that was put into the ability-to-elect
24      district was 30 percent black or would you
25      determine if it was a higher percentage?

65

1    A. I am not certain whether they simply did
2       proportional allocation or went to a lower
3       level to determine it or it is more likely that
4       once the precinct was established as a new
5       precinct, you could then estimate directly for
6       that precinct the racial composition.
7    Q. But do you know how the racial data you used
8       accounted for split precincts and what the
9       racial percentage was of the part of the
10      population that was in the ability-to-elect
11      district?
12   A. Well, as I said, if it was split, you would
13      have a new precinct and you could base your
14      racial data upon that new precinct.
15   Q. Okay.
16   A. It wouldn't have to be based upon previous
17      precincts that went into it.
18   Q. So you think that when they enacted the 2011
19      districts and they split precincts, the result
20      of that was they created a new precinct with
21      the 2011 House districts?
22   A. I didn't analyze 2011 House districts so I
23      can't speak to that.
24   Q. Okay. Are you saying that in the 2003
25      districts, when they created the

66

1       ability-to-elect districts in 2003, that if
2       that district included a split precinct that
3       the counties thereafter made a new precinct
4       just based upon the part that was put in the
5       ability-to-elect district?
6    A. I'm not sure I understand your question.
7    Q. That's because I don't understand your answer.
8       So let me try again.
9    A. So you have a precinct that previously existed.
10      Is that what you're saying?
11   Q. Yes.
12   A. And that precinct is split --
13   Q. Right.
14   A. -- in the new redistricting plan.
15   Q. Part of it, in 2003, went into the
16      ability-to-elect district, part of it did not.
17      What I want to know is how did you account for
18      the percentage of black population that was put
19      into the ability-to-elect district.
20   A. I did not do an analysis which compared
21      previous precincts prior to the 2003
22      districting plan to how those precincts were
23      allocated in the post 2003.
24         I simply analyzed the precincts that
25      existed already in the post 2003 plans.

67

1    Q. Okay, but, Dr. Lichtman, do you know whether
2       some of these House districts were based upon
3       split precincts?
4    A. I don't. I didn't study that.
5    Q. Okay. So if it was based upon a split
6       precinct, then you don't know how the black
7       population was allocated in the data that you
8       received since you didn't --
9    A. Now you're asking me a different question.
10   Q. I thought it was the same.
11   A. No. You're asking me how they allocated a
12      split precinct in a redistricting plan as
13      opposed to the precincts that existed within a
14      plan and what the populations were within that
15      new precinct.
16   Q. Okay. Let me try this again.
17   A. Sure.
18   Q. Do you know whether any of the House districts
19      were based upon split precincts?
20   A. No. I did not analyze that.
21   Q. So if they were based on split precincts, you
22      don't know how the race was allocated to the
23      ability-to-elect district?
24   A. I don't know how the redistricters allocated
25      their race.

68

DISCOVERY COURT REPORTERS     www.discoverydepo.com     1-919-424-8242

1    Q.  Well, you also don't know the exact percentage
2        of black population in a district -- black
3        voting age population in a district that is
4        based upon a split precinct.
5    A.  I have provided the black voting age population
6        in all existing precincts within the new
7        districts.  That's all I can tell you.
8            I did not study the transition from one
9        district to another.
10   Q.  Okay.  That's not what I'm asking.
11   A.  Okay.  I don't know what you're asking.
12   Q.  Let me try again.  Do you know whether some of
13       these -- you calm down too.  Okay.
14           Some of these House districts you know
15       whether they're based upon divided precincts.
16   A.  Define what you mean by a divided precinct.  A
17       previous precinct that was divided or an
18       existing precinct that was split?
19   Q.  No.  No.  No.  We have precincts.
20   A.  Right.
21   Q.  And when they drew the maps, they divided one
22       precinct, Precinct A.  Part of it was put in
23       House District 5 and part of it was put in
24       another district.
25   A.  Absolutely possible.

                                              69

1    Q.  Okay.  Do you know whether -- how did the
2        information that you received on the black VAP
3        per precinct deal with the split precinct?  How
4        was the black population allocated to House
5        District 5 versus the other district?
6    A.  I don't know how -- when they drew the plan,
7        the population was allocated from one district
8        to another.
9    Q.  Okay.  I think I'll move on to something else.
10           Did you -- let's talk about the vote
11       per precinct.
12   A.  Okay.
13   Q.  How did -- what information did you rely upon
14       for that?
15   A.  Information provided to me.
16   Q.  By your counsel?
17   A.  Yes.
18   Q.  Is that in any of the documents that --
19       Exhibits 4 or 5?
20   A.  I can't tell.  It might well be, but just
21       looking at these documents as you've given them
22       to me, I can't tell.
23   Q.  What was reported to you for the votes per
24       precinct?
25   A.  The votes per precinct for each candidate.

                                              70

1            MS. EARLS:  If I can just let the
2        record reflect, my review of Exhibit 4 includes
3        material that I don't believe was provided in
4        connection with this litigation because it has
5        information about non-driver's license IDs and
6        it doesn't include information that I'm fairly
7        certain we did produce.  So I just want the
8        record --
9            MR. FARR:  Okay.  Thanks, Anita.  That
10       could be my fault.
11           MS. EARLS:  I don't think this reflects
12       all the material that we provided.
13           MR. FARR:  When we have a lunch break,
14       I will go get exactly what was sent to me.
15   BY MR. FARR:
16   Q.  Is there -- is there anything in here that was
17       used in this case, in Exhibit 4?
18           MS. EARLS:  I can't -- looking at this,
19       I don't recognize this as being what we
20       produced in connection with this analysis.
21   BY MR. FARR:
22   Q.  Okay.
23   A.  I don't recognize it either.  So what can I
24       tell you.
25   Q.  Well, I apologize if I got that confused.

                                              71

1        Somebody gave that to me, and you can see my
2        little yellow sticky that was given to me by my
3        paralegal that says Lichtman backup data.
4            All right.  Now, Dr. Lichtman, I don't
5        right now have what was given to you to show
6        the votes per precinct.  I'll go look later in
7        my e-mail to see if I have that.
8    A.  Fair enough.
9    Q.  Do you know how the information that you relied
10       upon dealt with absentee ballots?
11   A.  As far as I understand, I was provided the sum
12       total of the votes which would include absentee
13       ballots.
14   Q.  Sum total of the votes?
15   A.  For each candidate in each precinct and the
16       racial composition of each precinct as it
17       existed after the 2003 redistricting, which, of
18       course, can be determined at the block level.
19       That's why this whole confusion about the
20       transition as opposed to what these precincts,
21       as they existed, what their racial composition
22       was.
23   Q.  I'll ask questions about precincts in a second,
24       but my question to you is:  Do you know if
25       county boards of elections in North Carolina

                                              72

1    always allocate the absentee ballot vote back
2    to their precinct totals?
3    A. They may not.
4    Q. If they don't, could that have an impact on
5    your analysis?
6    A. Probably not.
7    Q. Okay. What about early vote -- early voting in
8    North Carolina -- and you know a lot about
9    that.
10   A. I do.
11   Q. You realize that's treated as an absentee
12   ballot in North Carolina.
13   A. Yes.
14   Q. Do you know whether or not all county boards of
15   elections allocate the early vote back to the
16   precincts?
17   A. I don't for sure.
18   Q. Are African American voters more likely to use
19   early voting in North Carolina than whites?
20   A. Yes.
21   Q. If the county did not allocate early voting
22   back to the precinct, could that have an impact
23   on your study?
24   A. It might but not necessarily. Probably not.
25   Q. Even though -- I don't remember the

73

1    Q. You're looking at Exhibit 5?
2    A. Yes. You can see all other votes are allocated
3    by precinct, one stop, election day, curbside,
4    provisional, et cetera. The only ones that
5    aren't allocated are a very tiny percentage of
6    absentee-by-mail votes. And if you go through
7    all of these elections in Exhibit 5, it's quite
8    clear that in every instance you do have the
9    votes allocated by precinct except for a very
10   small percentage of votes that were cast
11   absentee by mail. That's true of District 99,
12   District 101 and District 102 in this
13   Exhibit 5.
14   Q. Okay. Well, Dr. Lichtman, let's look at the
15   first page there of Exhibit 5.
16   A. Yes.
17   Q. How do you know that -- it says absentee by
18   mail. There's a category for that. Is there a
19   category for one-stop voting?
20   A. Absolutely. Look at Precinct 004. You can see
21   that there are 131 one stops, 471 election days
22   which add up to 602 total votes by precinct for
23   that precinct. And if you go down all of the
24   precincts, you can see precisely the same
25   allocation by precinct is made in the same sum

75

1    percentages. Do I recall that like in 2008 --
2    I don't know. The record speaks for itself,
3    but I'm recalling 40 or 50 percent of black
4    voters did early voting.
5    A. I don't recall the numbers, but --
6    Q. Well, let's say it was 40 or 50 percent and --
7    A. Just looking at these returns, the number of
8    ballots that were not allocated to precincts
9    are very, very small.
10   Q. Well, how do you know that?
11   A. It's right here. You can see election day and
12   one stop are allocated to precincts.
13   Q. Where is that?
14   A. Right on the first page of Exhibit 5. It's
15   right there.
16        So, yes, they are all allocated to
17   precincts. The only ones that aren't allocated
18   to precincts are a very small number of
19   absentee by mail.
20        If you look at this first one that you
21   handed me, there were 15,591 votes and only 261
22   absentee by mail. That's a tiny, tiny
23   percentage. And if you look at --
24   Q. Let me find where that is first.
25   A. Okay.

74

1    to get the total votes.
2        As I said, out of 15,591, only 261 are
3    not allocated by precinct, far too small to
4    have any impact whatsoever on the analysis.
5    Q. Okay. Now, this -- this exhibit, does it
6    include all of the races you studied?
7    A. No, but it certainly shows what the practice is
8    in allocating by precinct. And the same thing
9    is true of the Senate elections. You can see
10   the election day and one stop are all added
11   together as well.
12   Q. Well, they are in these elections, but you
13   don't -- this doesn't show what's been done in
14   the other elections.
15   A. No, but I did check to make sure that when I
16   got the data, counting absentees -- so, as you
17   can see, very small -- it added up to the
18   correct totals in the elections. That would
19   not have been true if they did not allocate the
20   one stop by precinct.
21   Q. Okay. We don't have the -- we don't have those
22   other sheets right now to confirm that that's
23   true.
24   A. I said I did that test myself --
25   Q. Okay.

76

1    A. -- to confirm that that was true.
2    Q. All right. Now, what calculations did you
3       perform to come up with your conclusions in the
4       fourth and fifth columns of Table 1?
5    A. Can we take a break.
6             MR. FARR: Sure.
7             (Brief Recess: 11:28 to 11:40 a.m.)
8    BY MR. FARR:
9    Q. Dr. Lichtman, on Exhibit 5, do you know how the
10      county boards of elections allocated the
11      curbside votes or the absentee by --
12   A. Yeah. I think my eyes strayed to the wrong
13      thing last time because I haven't looked at
14      these in four years or don't recall them.
15             I think the non-precinct allocations
16      are on the far right, okay, and I see 432 by
17      mail not allocated.
18   Q. Where's that?
19   A. The very far right on the bottom there, you see
20      the number 432 and then there's 93 curbside.
21      So that would be, in my head adding up, 525 and
22      another 52. So that would be 607. And the
23      total votes cast were 21,650. So those that
24      were not allocated were much too small to have
25      any impact whatsoever on the analysis relative

77

1    to the total votes cast.
2    Q. Okay. So you're saying that on the -- do you
3       know what steps the county board took to decide
4       what -- which number of curbside or absentee or
5       one-stop votes they would allocate to the
6       precinct? Do you know how they came up with
7       those figures?
8    A. As I read this -- and again, I don't recall
9       this. I haven't looked at it in four years,
10      but if you look carefully on the right column
11      there, you can see none of the curbside were
12      allocated by precinct. It's all zeros. You
13      can see none of the provisionals were allocated
14      by precinct. It's all zeros. And you can see
15      none of the absentees were allocated by
16      precinct. They're all zeros.
17             So there was no discretionary decision
18      that I can discern here for the small number of
19      votes made by those who were responsible for
20      reporting election results.
21   Q. Okay. I'm going to see if I've got
22      spreadsheets for the other elections. We'll
23      look at those if we do.
24   A. Okay.
25   Q. Now, I wanted to ask you some more questions

78

1    about Table 1.
2    A. Which exhibit are we on?
3    Q. Exhibit 3. Looking at Table 1, can you
4       determine which, if any, of these races you
5       analyzed were uncontested?
6    A. It says right there.
7    Q. Where's that?
8    A. All the ones that say none.
9    Q. Okay. Where does it say none?
10   A. Right in the table.
11   Q. All right.
12   A. If you look at Democratic primary 2008, if you
13      go down to HD 12, it says none, HD 21 says
14      none, unless you're looking at a different
15      document.
16   Q. No. I just didn't know what that meant.
17             So if in the results columns you've got
18      results for 2008 Democratic primary, 2008
19      general election, 2010 Democratic primary, 2010
20      general election, right?
21   A. Correct.
22   Q. But you've got the word none in any of those
23      columns, then that means that the candidate had
24      no opposition?
25   A. Right. Exactly.

79

1    Q. Okay. Fair to say most of these races were
2       uncontested?
3    A. No. I can count. Let's see.
4    Q. You don't need to do that. It speaks for
5       itself.
6             Fair to say that a lot of the races you
7       looked at were uncontested?
8    A. I don't know what you mean by a lot, but there
9       were a number, yes.
10   Q. If we're looking at a non-contested race, does
11      that limit its utility for evaluating racially
12      polarized voting?
13   A. Yes, but it doesn't limit its utility for
14      evaluating the district, which is the purpose
15      here. The purpose here is not to evaluate
16      racially polarized voting.
17             You're getting things confused.
18      Remember, I said racially polarized voting only
19      becomes politically significant if in a
20      particular district white bloc voting results
21      in the inability of African Americans to elect
22      an African American candidate or, in the rare
23      case, a white candidate of choice.
24             If in fact -- and the vast majority of
25      these uncontested elections involve black

80

20 (Pages 77 to 80)

Case 1:15-cv-00399-TDS-JEP   Document 77-29   Filed 03/14/16   Page 20 of 46

1  candidates.  If in fact no whites are even
2  contesting an African American candidate in a
3  district at a given level and many of them are
4  in below 50 percent districts, that is a very
5  powerful indication that this is a district
6  that provides African American voters the
7  ability to elect candidates of their choice.
8  If in fact it was a district where white voters
9  could elect candidates of their choice, you
10  would certainly expect white opposition to
11  black candidates.  So that's a very strong
12  indicator of the ability to elect in these
13  districts.
14  Q.  But if you have an uncontested race, that race
15  can't be used to assess the degree of racially
16  polarized voting in the district?
17  A.  That's correct, but that's not the purpose of
18  this table --
19  Q.  I understand.  I got that.
20  A.  -- or the purpose of my analysis.
21  Q.  Okay.  Now, Dr. Lichtman, in your -- in one of
22  these reports you've done I think as it applied
23  to the Democratic primaries --
24  A.  As what?
25  Q.  As it applied to the Democratic primaries, you

81

1  looked at the actual percentage of the voters
2  who were black.
3  A.  Yes.
4  Q.  Okay.  Did you do that for general elections
5  anywhere in your reports?
6  A.  It was not necessary because in general
7  elections, once -- given that blacks control
8  the primaries, the issue in the general
9  election was can those candidates of choice of
10  the dominant African Americans in the primary
11  be elected in a general election.
12      And I looked at general election
13  results for a range of elections and saw it
14  wasn't close.  Overwhelmingly in general
15  elections, regardless of the levels of
16  turnout -- and, of course, overall votes take
17  into account everything, turnout, black
18  cohesion, white bloc voting -- either nominee
19  of the Democratic party was overwhelmingly
20  elected.
21      Similarly here, as you can see in every
22  single general election, either the black
23  candidate coming out of the primary or the
24  white candidate of choice coming out of the
25  primary was elected.  There's not a single

82

1  example of the failure of a Democratic nominee
2  out of numerous elections -- not just House
3  elections but Senate and Congressional -- ever
4  being defeated in a general election.
5      So the issue of general elections is
6  overwhelmingly established that the critical
7  election is the primary.
8  Q.  Okay.  But in your three reports, you never
9  reported for a general election what percentage
10  of the actual voters were black?
11  A.  No.  I just reported the results for these
12  black candidates coming out of the general --
13  the primary or any Democrats coming out of the
14  primary, and those results would take into
15  account every aspect of the election.
16  Q.  But we don't know, for example, whether the
17  majority of the voters in the general election
18  were black?
19  A.  No, it's not necessary to determine that to
20  assess whether in these districts African
21  Americans can elect candidates of their choice
22  because we already know who those candidates
23  are.
24  Q.  All right.  Turn to Table 2.  Is this the same
25  analysis that you did for the House district

83

1  except for the 2003 Senate districts?
2  A.  Correct.
3  Q.  Is there anything different about this than
4  what you did with the House districts?
5  A.  No.  The only difference is there were no
6  50 percent plus Senate districts.  That's not a
7  difference in the analysis or the format of the
8  table.
9  Q.  There was no 50 percent plus any part black
10  voting age population district in the 2003
11  districts?
12  A.  That's right.
13  Q.  Did you see what the black percentage of
14  registered voters were in any of these
15  districts?
16  A.  I did later -- not in this report but later on
17  in terms of assessing the black voters in the
18  critical Democratic primaries because these
19  districts, like the House districts, both based
20  on this analysis and my subsequent analysis,
21  the critical election is the primary.  Once the
22  primary is selected, the Democratic candidate
23  wins overwhelmingly in these districts.
24      Based upon my subsequent analysis and
25  based upon this analysis, there's also a

84

1    hundred percent win rate for the Democratic
2    nominees in all of these Senate districts, just
3    as there were in all the House districts.
4    Q.  So the answer is you didn't look to see whether
5    in the district at large blacks were a majority
6    of the registered voters?
7    A.  Only for Democrats.
8    Q.  Right.
9    A.  Correct.
10   Q.  Not for the entire district?
11   A.  Right.  Not necessary.
12   Q.  All right.  Let's turn to Table 4.  What was
13   the purpose of Table 4?  What is Table 4?
14   A.  Just to look at the extent to which you had a
15   benchmark as compared to the -- let me look at
16   that again.  As -- I think at this time it was
17   just proposed districts.  I don't recall what
18   the status of the plans were four years ago
19   when I did this report.  Just to show that
20   there were more 30 percent plus districts in
21   the benchmark.
22       And remember, I said that, you know, in
23   my view, based upon all my analysis, 40 percent
24   plus districts would be sufficient to give
25   African Americans the ability to elect

85

1    candidates of their choice.  That did not mean
2    that was a generalized statement for the state.
3    That did not mean that African Americans could
4    not elect candidates of their choice below
5    40 percent in particular areas of the state.
6    And in fact, my report showed that in some
7    areas of the state African Americans were able
8    to elect candidates of their choice below
9    40 percent.
10   Q.  Okay.  Now, I want to ask you a question about
11   House District 21 to start off.
12   A.  Okay.
13   Q.  Flip back to Table 1 for a second.
14   A.  Okay.
15   Q.  You treated House District 29 as --
16   A.  21 I think you said.
17   Q.  No.  I want to ask about 29.  I'm pretty sure
18   that's in Durham County.  You treated that
19   district as a 40 percent plus district in
20   Table 1.
21   A.  Yes.
22   Q.  And so Table 4, if you'll go back to that,
23   you've got the percentage black VAP under the
24   2010 census for House District 29 as
25   39.99 percent.

86

1    A.  Right, which clearly rounds to 40 by one
2    one-hundredth of a percentage point.
3    Q.  Right.  And the reason why I got confused on
4    21, Dr. Lichtman, is because you've got a
5    column that says count.  You see House
6    District 29 on the count is listed as 21.
7    A.  Oh, that's just a count of the numbers.  That's
8    why you got confused.
9    Q.  It is.  Okay.
10   A.  And that district was also -- when it was
11   created was 44.7 percent in House District 29.
12   Q.  So now I want to talk about Table 4 for a
13   second.
14   A.  Okay.
15   Q.  I want to understand what this is.  You've got
16   your count column on the left and then you've
17   got existing district.  Is that referring to
18   the 2003 House districts?
19   A.  Yes.
20   Q.  And in making this chart, did you determine
21   whether those districts were still legal
22   districts as it related to population deviation
23   under the 2010 census?
24   A.  No.
25   Q.  Did you check to see whether they were legal

87

1    districts as it related to any state
2    constitutional criteria for drawing districts?
3    A.  You're talking about post 2010 census in both
4    of those questions?
5    Q.  Yes.
6    A.  No.
7    Q.  Looking at -- starting with count 2, down to
8    count 32, you've got -- starting with -- it's
9    House District 100 down to House District 59.
10   Do you see where I'm referring?
11   A.  No.  I'm sorry.  Which column are you looking
12   at?
13   Q.  I'm looking at existing districts -- I'm
14   looking all the districts below House
15   District 29.
16   A.  Okay.  I'm there.
17   Q.  All right.  The black VAP for the districts in
18   this chart is the any part black voting age
19   population under the 2010 census?
20   A.  Yes.
21   Q.  Now, starting with your count 22 down to 32,
22   did you look at the election history for any of
23   those districts?
24   A.  I think I did, and it's in one of my reports
25   somewhere showing that in some of these

88

1    districts actually did elect African Americans
2    which is why, to be completely clear, because
3    we've gotten some confusion on your questions,
4    when I said 40 percent plus was needed to
5    create opportunity districts, I meant that kind
6    of as a generic issue. That does not mean that
7    you could not create African American districts
8    below 40 percent in particular areas, based
9    upon a particularized analysis of those areas
10   that would give African Americans an ability to
11   elect candidates of their choice. I did not
12   mean 40 percent to be an absolute cutoff for
13   the creation of districts.
14   Q. Okay. Do you recall right now which of those
15     districts in which an African American had been
16     elected?
17   A. Let me see. As you know, this was done four
18     years ago. Might be in my next report.
19   Q. Let me hand you that because I think it is.
20         (WHEREUPON, Defendants' Exhibit 6 was
21     marked for identification.)
22         THE WITNESS: Senate District 5,
23     31 percent African American, elected an African
24     American candidate of choice
25   BY MR. FARR:

89

1    those elections?
2    A. I don't recall. As I said, it's four years
3      ago.
4    Q. What do you know about how much money each
5      candidate spent?
6    A. I don't know, and that's part of my point, you
7      know.
8    Q. Did you look at that for any of these
9      elections?
10   A. No, I did not. Just looked at outcomes of
11     elections. And regardless of the political
12     circumstances -- and there's lots of different
13     political circumstances in 40 percent plus
14     districts -- African American candidates or, in
15     the rare instance, white candidates of choice
16     of African Americans almost always win
17     regardless of particular circumstances in, you
18     know, numerous districts.
19         And here we saw that even in a
20     31 percent it's possible for an African
21     American candidate of choice. And the reason
22     is despite extreme racial polarization, what
23     you had here was much higher African American
24     cohesion behind the African American candidate
25     than you had white bloc voting behind the

91

1    Q. You're looking at Exhibit 6. You're looking at
2      Paragraph 17?
3    A. Yes.
4    Q. And do you recall that candidate of choice was
5      defeated in the 2010 election?
6    A. I don't recall, but let me see if I said that.
7         That is correct. So he won in the good
8      Democratic year but lost in the good Republican
9      year. So depending on political circumstance,
10     African Americans have at least some
11     opportunity to elect a candidate of their
12     choice even in a district that's 31 percent
13     African American VAP.
14         I'm not saying they're always going to
15     win such a district, but they have -- clearly
16     have some opportunity there, which is why I
17     said you can even -- depending upon the
18     particularized area of the state and
19     particularized analysis, while 40 percent is a
20     general guideline, it's not a talismanic
21     absolute line in every district that you might
22     create.
23   Q. Okay. Let me ask you about Senate District 5
24     since we got on that. What do you know about
25     the margins of victory for the candidates in

90

1    non-African American candidate, that is, the
2    African American candidate got 97 percent of
3    the vote but also 30 percent of the white vote.
4         And that is not atypical in
5    North Carolina. If you look at the exit polls,
6    you see African American candidates get votes
7    in the 90 or 90 percent plus range and
8    crossover voting in the 30 or 30 percent plus
9    range is not unusual.
10   Q. Did you look to see what percentage of the
11     electorate African Americans were in the 2008
12     general election or the 2010 general election
13     for Senate District 5?
14   A. No, but whatever percentage they were in the
15     2008, given the patterns of polarized voting,
16     it was sufficient for the African American
17     candidate of choice to win.
18   Q. Right, but that could have been because the
19     black turnout was higher as a percentage of VAP
20     or registered voters than the white turnout; is
21     that true?
22   A. Well, we can work that out. Let's see, I think
23     I have a calculator. So let's assume that
24     isn't the case and we'll see if that's
25     necessary to be the case.

92

Case 1:15-cv-00399-TDS-JEP   Document 77-29   Filed 03/14/16   Page 23 of 46

So say it's 31 percent African
American. They get 97 percent of the African
American vote. That's 30 percent of the vote.
70 percent -- 69 percent, excuse me, white make
it 30 percent of that vote. Then we add it
together. 50.8.

So it was not necessary for African
Americans to exceed the 31 percent of the VAP.
Q. Well, I didn't ask you if it was necessary.

I said did you examine whether the
African American turnout was higher as a
percentage of the VAP or registered voters in
Senate District 5 as compared to white turnout
in 2008.
A. No. I simply looked at the actual results of
the election which take into account
everything, turnout, cohesion and crossover,
and we just did that little exercise showing it
wasn't necessary for African Americans to
turnout even above the 31 percent level to win
in that district.
Q. Okay. I didn't ask you if it was necessary.
A. I'm sorry. I thought you did.
Q. I asked you do you know what the percentage or
did you study the percentage of the African

93

American turnout as a percentage of VAP or
registered voters as compared to white turnout.
A. No, it's not necessary.
Q. Okay, it's not necessary, but you didn't study
it?
A. We can chase that tail all you want. That's
right.
Q. And you didn't -- you didn't study those type
of turnout figures for any of these elections?
A. Turnout would have been taken into account in
the actual results, but I did look at turnout
later in my subsequent report, yes.
Q. For the Democratic primary?
A. Yes, the critical elections in these districts.
Q. But you didn't look at the percentage of black
turnout by VAP or registration and compare that
to the percentage of white turnout by VAP or
registration in any of the general elections?
A. That's right because African Americans or
African American candidates of their choice
prevailed 100 percent of the time in general
elections. And when you looked at
reconstituted elections for statewide
Democratic candidates, the results were
overwhelming.

94

So it wasn't necessary to parse that
out to reach the conclusion that if African
Americans could nominate a candidate of their
choice, it is about as certain as you can get
in politics -- and nothing in politics is a
hundred percent certain, but it's about as
certain as you can get in politics that that
candidate is going to prevail in the general
election.
Q. Okay. Is there any -- in looking at the
Democratic primary, does it make a difference
what type of white voters were in the district,
whether they're Republican voters or all
Democrat white voters?
A. Well, that would be taken into account when I
did the analysis of the share of the Democratic
primary electorate that was black. In other
words, the reason you get much higher
Democratic black percentages than the black VAP
in the district is blacks are overwhelmingly
Democratic whereas whites usually are
Republican.

Even if whites were split between
Republicans and Democrats, you would still get
a much higher African American share of the

95

Democratic primary electorate.

So it certainly can make a difference,
the degree of Republican loyalty of whites in
the district, but that is taken into account in
my results. In other words, my results
indicate the African American share of the
Democratic primary turnout, which is a result
both of African American affiliation with the
Democrats and non-African American affiliation
with Democrats. So all of that is taken into
account because we precisely know what the
African American share of the Democratic
primary electorate was.
Q. Okay. Dr. Lichtman, do you know whether the
primaries in North Carolina are closed?
A. Pardon me?
Q. Do you know if the primaries are closed?
A. I'm not sure. That may vary from election to
election.
Q. You don't know, like are Republicans able to
vote in the Democratic primary in
North Carolina?
A. I'm not certain, but that would be taken into
account as well in all of these turnout
numbers.

96

1    Q.  All right.  Well, let's assume for a second
2         that the primaries are closed, that Republicans
3         can't vote in a Democratic primary.  Would
4         there be a correlation between the number of
5         white Republicans that you put in one of these
6         40 percent plus districts and the percentage of
7         black population that you could kind of drop
8         down to in order to make sure that the black
9         Democrats would control the Democratic primary?
10   A.   You don't need to do that because in
11        North Carolina we can directly, rather
12        indirectly through estimation, we can directly
13        assess in any district you want the African
14        American component of the Democratic primary
15        irrespective of whether it's open, closed,
16        partly open, partly closed.  We know what the
17        turnout is in all of these primaries in all of
18        these elections.
19   Q.   So you don't think it would make a difference
20        at all whether you -- if the state wanted to
21        create an ability-to-elect district at less
22        than 50 percent, it wouldn't have any
23        significance whether or not the state put in
24        additional Republican white voters or
25        additional Democrat white voters?

                                                    97

1    A.   I didn't say that wouldn't make a difference.
2              What I did say was you don't need to
3         use that to provide a rough estimate of what
4         you would expect the Democratic primary turnout
5         to be in terms of its African American
6         component.  You can directly measure that in
7         North Carolina, unlike most other states,
8         because people register by race.  So you know
9         what the African American component is of your
10        Democratic primary electorate in any given
11        district that you draw.
12   Q.   All right.  Can we mark this as the next
13        exhibit.
14             (WHEREUPON, Defendants' Exhibit 7 was
15        marked for identification.)
16   BY MR. FARR:
17   Q.   Dr. Lichtman, you can read this, obviously, but
18        I'm going to represent to you that this is the
19        Section 5 submission that the State of
20        North Carolina made in support of legislative
21        districts in 2002.
22   A.   Okay.  I've not seen this.
23   Q.   Okay.  I want you to read the paragraph that
24        starts on Page 2 about the state's decision to
25        place registered Republicans in minority

                                                    98

1         districts over registered white Democrats.
2    A.   Do you want me to read this aloud or read this
3         to myself?
4    Q.   No.  Just read it to yourself.
5    A.   The paragraph started "Realizing"?
6    Q.   Yes.  I just want to ask you about that.
7    A.   Okay.  I read it quickly.  I don't want to take
8         a lot of your time.
9    Q.   I don't want to take any more of your time than
10        is necessary, too, Dr. Lichtman.  And, again, I
11        apologize for not having all the documents I
12        should have had.
13   A.   That's okay.  You can ask me questions about
14        this.  I think I've got the gist of it.
15   Q.   So in 2002, did the state indicate that in
16        order to create effective minority districts
17        that were under 50 percent, that they thought
18        it was important to add white registered
19        Republicans to those districts instead of white
20        registered Democrats?
21   A.   I see that.
22   Q.   So that was something that the state concluded
23        in 2002?
24   A.   That's what they said.
25   Q.   Okay.  And this was for House districts, right?

                                                    99

1    A.   Yes, but they also said you had to have a
2         delicate balance between putting too many white
3         Republicans in which could jeopardize general
4         elections.
5              So what they said what you wanted to
6         have was blacks being able to control the
7         primaries in the Democratic primaries and then
8         able to win general elections.  And that's
9         exactly what you had in these districts that
10        were 40 percent or more African American.  You
11        had blacks controlling the primaries and more
12        than sufficient Democratic votes for 100
13        percent win rates.
14   Q.   But it's true the state said in these
15        40 percent plus districts there were under
16        50 percent and it was important in some
17        instances to add population to get the district
18        up to the appropriate deviation level by using
19        white Republicans who could not vote in the
20        Democratic primary.  Is that fair to say?
21   A.   I don't see anything about deviations here so
22        you'll have to point me to that.  You're
23        talking about to achieve population equality.
24        Is that what you mean?
25   Q.   Yes.

                                                    100

Case 1:15-cv-00399-TDS-JEP   Document 77-29   Filed 03/14/16   Page 25 of 46

1    A. Yes, that's what they said.

2    Q. Okay. All right.

3    A. And as I said, also, you can directly measure

4       both voting strengths of African Americans in

5       primaries and directly measure general election

6       results.

7          MR. FARR: How about handing him the

8       next exhibit which is Exhibit 8.

9          (WHEREUPON, Defendants' Exhibit 8 was

10      marked for identification.)

11   BY MR. FARR:

12   Q. Do you have Exhibit 8, Dr. Lichtman?

13   A. Yes.

14   Q. I'll represent to you this is a pre-clearance

15      submission by the state in -- given to the

16      Justice Department in 2002. Could you turn to

17      Page 2.

18   A. Yes.

19   Q. Just to make the same point but a little more

20      clearly, can you read into the record the first

21      full paragraph on Page 2.

22   A. Do you want me to read that whole paragraph?

23   Q. Just to get it in the record.

24   A.    "Realizing that the changed

25      demographics would make it difficult to

101

1       maintain the same percentages of black

2       population in every minority district,

3       the co-chairs sought to preserve black

4       voting strength in Section 5 areas by

5       paying close attention to two things:

6       the black percentage of the Democratic

7       primary electorate and the success of

8       Democratic nominees in general elections

9       regardless of race.

10         "Where adding white population was

11      unavoidable to achieve population

12      equality in a district, the co-chairs

13      sought to add precincts with large

14      numbers of white registered Republicans

15      over precincts with large numbers of

16      white registered Democrats.

17         "Under North Carolina law,

18      registered Republicans cannot vote in

19      Democratic primaries. Thus, a white

20      Republican precinct would do less damage

21      to black voting strength in a Democratic

22      primary than would a white Democratic

23      precinct. The co-chairs therefore added

24      white Republican precincts to black

25      districts, to the extent that doing so

102

1       did not jeopardize the chances of black

2       Democratic nominees in the general

3       election.

4          "See chart at Attachment S-27 C-3,

5       which contains black percentages of

6       Democratic voter registration, the

7       success of Democratic nominees regardless

8       of race, and an explanation of voting in

9       North Carolina party primaries."

10   Q. So would you agree that this Exhibit 8 shows

11      the construction of Senate districts in 2002

12      the state determined that in order to maintain

13      these ability-to-elect districts that were

14      under 50 percent but above 40 percent level, it

15      was important to add in some instances

16      Republican precincts over white Democratic

17      precincts?

18   A. That's what they said, but I don't see the

19      40 percent level here.

20   Q. Well, there was no -- in the 2000 era Senate

21      districts, were there any Senate districts that

22      were created by the state with a black VAP

23      above 50 percent?

24   A. No, but this may have been under 40 percent

25      too. I don't know what they're referring to

103

1       here. Remember, I said it might be possible in

2       particular parts of the state to create

3       opportunity districts under 40 percent.

4    Q. Dr. Lichtman, I want to go back to Table 4 of

5       Exhibit 1 and compare it to the districts where

6       you say -- where you talk --

7    A. Table 4.

8    Q. Exhibit 1.

9    A. Wait a minute. Wait a minute. Wait a minute.

10      I've got a lot of exhibits in front of me.

11   Q. Okay. Take your time.

12   A. Exhibit 1 I don't see. Here it is buried.

13      Okay. Table 4?

14   Q. Yes.

15   A. I don't see a Table 4.

16   Q. I'm sorry, Dr. Lichtman. I'm confusing you.

17      It's not Exhibit 1. It's Exhibit 3. It's your

18      first report.

19   A. Thank you.

20   Q. My apologies.

21   A. No problem. I see it.

22   Q. So we're on Table 1 in Exhibit 3, and we were

23      looking at your second affidavit which you had

24      a list of the districts that African Americans

25      had won where the population was under 40

104

Case 1:15-cv-00399-TDS-JEP   Document 77-29   Filed 03/14/16   Page 26 of 46

1    percent, and I think that started on Page 10.
2    A. Which exhibit are we talking about here?
3    Q. That would be Exhibit 6.
4    A. What page are we on?
5    Q. Well, just to answer this question, if you
6       would just kind of like review Pages 10 and 11
7       and 12. You don't have to read it into the
8       record for right now.
9    A. I'm there.
10   Q. And I want to make sure -- I may have confused
11      you again. I wanted -- in Exhibit 3, I wanted
12      to look at Table 4. I want to compare what's
13      in your Exhibit 6 to Table 4. You got that?
14   A. Yes.
15   Q. All right. Now, if you go to the bottom of
16      Table 4, you've got 1, 2, 3, 4, 5, 6, 7, 8, 9,
17      10, 11 -- you've got 11 districts listed that
18      have a black VAP under the 2010 census of under
19      40 percent.
20   A. How many did you say?
21   Q. Well, starting with District 100 --
22   A. Okay.
23   Q. -- you've got 11 there, right?
24   A. Correct.
25   Q. Now, isn't it fair to say that out of those 11

105

1    districts, the only one that you report as
2       having been won by an African American is House
3       District 39?
4    A. That's correct.
5    Q. I'll ask you about House District 39 in a
6       second, but as to the other districts, did you
7       study who had won those elections?
8    A. I did not. I just looked to see which of these
9       districts elected an African American to show
10      that it might be possible, given voting
11      patterns in particular parts of the state, to
12      create districts that give African Americans an
13      opportunity to elect an African American
14      candidate even below the 40 percent general
15      guideline for the state.
16   Q. Did you ever look for any elections in
17      districts that were under 40 percent black VAP
18      where the black candidate lost the election?
19   A. No. I just wanted to see if there were
20      examples of where an African American candidate
21      even in districts under 40 percent was elected.
22   Q. Now, do you think that -- if I told you that of
23      the districts in Table 4, do you have any
24      reason to disagree with me if I told you that
25      the candidates who won those districts, other

106

1    than House District 39, have been white
2       Democrats?
3    A. That wouldn't surprise me at all, and so
4       they're probably candidates of choice of
5       African Americans --
6    Q. Okay.
7    A. -- even though they're not black. So that
8       would establish that.
9    Q. Okay. So is it fair to say that the plan that
10      creates districts -- more districts with
11      population that are between -- black population
12      between 30 percent black VAP and 37.9 percent
13      black VAP is going to result in the election of
14      more Democrats in North Carolina?
15   A. That is correct because districts with
16      substantial concentrations of blacks do tend to
17      be more Democratic given polarized voting
18      patterns than districts with minimal
19      concentrations. It is not a universal pattern,
20      however. There districts with very small
21      concentrations of black that are also heavily
22      Democratic.
23   Q. So creating a redistricting plan with a larger
24      number of districts between 30 percent black
25      VAP and 37.39 percent black VAP would be more

107

1    favorable to Democrats?
2    A. It would depend on the rest of the plans
3       because there are lots of other districts so
4       you can't make any conclusions about the
5       overall plan just from this list of 32
6       districts.
7    Q. Well, isn't it fair to say that the more
8       districts you create in North Carolina with
9       black VAP between 30 and 37.39 percent, those
10      districts are more likely to elect white
11      Democrats than Republicans?
12   A. Absolutely, but that doesn't mean that the plan
13      as a whole, because of the creation of these
14      districts, necessarily favors white Democrats.
15   Q. Would any map-drawer with your level of
16      expertise understand that creating a district
17      in North Carolina with black VAP between
18      30 percent and 38 percent, those districts
19      would be more likely to elect white Democrats?
20   A. Put that way, that's correct.
21   Q. And they're not very likely to elect black
22      Democrats, are they?
23   A. Some might, but overall you wouldn't say
24      there's a pattern of electing black Democrats,
25      no, but there are examples of that.

108

27 (Pages 105 to 108)

Q. And you've given the examples that you could
recall in your second report?

A. That's right. I think there is one example in
the Senate district and one example in a House
district.

Q. I think you actually gave four, at least.

A. Okay, but I thought you were referring only to
the 30 --

Q. That's true.

A. There were others -- yes, there were others in
lower concentrations of African Americans
that -- which is, again, why you can't have an
absolute, you know, talismanic rule.

Q. Now, House District 39 that is reported on
Table 4 --

A. Yes.

Q. -- do you know anything about the racial
breakdown of that district other than the black
voting age population? Did you study anything
else about racial demographics for that
district?

A. No.

Q. Did you look at the democratic registration for
that district?

A. No.

109

Q. Did you look at the percentage of blacks who
were registered Democrats in that district?

A. No.

Q. In any of the elections for House District 39,
did you evaluate how much money was spent by
each candidate?

A. I didn't do that in any district in any
election.

Q. Okay. And did you -- did you confirm whether
or not -- I think you did. After the 2000 --
in the 2010 election, this district did not
elect a black candidate, did it?

A. I think the black candidate retired or resigned
and you had a white Democrat elected.

Q. Okay. Now, let's look back to the section in
your second report about these districts that
are less than 40 percent black.

A. Okay. We're looking at Exhibit 6 now?

Q. Yes.

A. We're finished with --

Q. No, we're not finished with it. I want to stay
on the topic if I can. I'm trying to anyway.
So for -- you report elections where
blacks were elected in districts that were less
than 30 -- 40 percent and you listed Senate

110

District 5, Senate District 24, House
District 39 and House District 41.

A. Yes.

Q. Do you know where those districts are located?

A. I don't.

Q. Do you know -- and I think you've said this,
but just to be clear, you didn't look to see
how much money was spent by either the
candidates or the political parties in these
elections?

A. No.

Q. You didn't look at the actual margin of
victory?

A. No.

Q. Did you look at anything about -- other
political factors that could have gone into
resulting in the election result that you
reported?

A. No. I simply concluded that white bloc voting
in these districts in these elections I pointed
to was not sufficient to defeat an African
American candidate.

Q. Okay. In the elections you looked at?

A. In the elections -- yes, in the elections,
obviously, that I looked at. Can't be in the

111

elections I didn't look at.

Q. Does a black candidate have an opportunity to
get elected in any district? Is there an
opportunity?

A. In principle, anyone can get elected in any
district, that's correct, but obviously
likelihoods vary considerably.

Q. In any of these elections, Senate District 5,
24, House District 39 and House District 41, do
you have any information about the strength or
weakness of the candidate that was opposing --
the political strength or weakness of the
candidate who was opposing the black candidate?

A. Only to the extent that these black candidates
prevailed, even in cases of polarized voting
where the great majority of white voters voted
for the opposition candidate.
Other than that, I did not in any
election go behind the results to parse out the
strengths and weaknesses of any individual
candidate in any election.

Q. So let's walk through these very quickly and
then I'll move off of this.

A. Then I think we should probably break. It's
about 12:30.

112

28 (Pages 109 to 112)

Case 1:15-cv-00399-TDS-JEP   Document 77-29   Filed 03/14/16   Page 28 of 46

1    Q.  All right.  So in Senate District 5, you
2        reported that the black candidate lost in 2010.
3    A.  That is correct.
4    Q.  And do you agree that there was, as you
5        describe it, politically significant racially
6        polarized voting in that election?
7    A.  In that election, yes.  Not in the 2008
8        election.
9    Q.  Now, Senate District 24, do you agree that that
10       black candidate lost in the 2010 election?
11   A.  I have to look.
12           Yes.
13   Q.  Okay.  Did you look at the racial
14       characteristics of that district?
15   A.  Beyond the black VAP?
16   Q.  Yes.
17   A.  No.
18   Q.  And would you agree that in 2010 there was
19       politically significant racially polarized
20       voting in that district?
21   A.  In the 21 percent district, correct.
22   Q.  All right.  We talked about House District 39.
23       You agree there was not a black candidate
24       elected in that district in 2010 elections.
25   A.  Right, but a black candidate of choice was

113

1        elected.
2    Q.  That's because you're describing a black
3        candidate of choice as the white Democrat in
4        the general election?
5    A.  Yes.
6    Q.  Okay.
7    A.  That's where the candidate lost to the
8        Republican, correct?
9    Q.  Okay.  And House District 41, you agree that
10       there was no black candidate elected in that
11       district in 2010.
12   A.  That's correct.
13   Q.  And you don't know any of the circumstances
14       about that election or issues related to the
15       candidates in the prior elections in this
16       district or how much money either candidate
17       spent?
18   A.  That's correct.
19   Q.  Okay.  It's a good stopping point.
20           (Lunch Recess:  12:29 to 1:23 p.m.)
21   BY MR. FARR:
22   Q.  Dr. Lichtman, I've got a few more questions on
23       Exhibit 3 and then we're going to move over to
24       your second affidavit; then I'm going to ask
25       you questions about your surrebuttal and then I

114

1        hope we will be done.
2    A.  I'm on Exhibit 3.  Which page?
3    Q.  Table 5.  Okay.  You've got -- Table 5 is the
4        same thing for the Senate as you did for the
5        House in Table 4?
6    A.  Right.
7    Q.  And you've got seven Senate districts in the
8        old plan that are under 40 percent listed
9        there, correct?
10   A.  I believe that's right.  I haven't counted, but
11       I'll take your word.
12   Q.  Okay.  Fair to say, Dr. Lichtman, that of those
13       seven 2003 districts, the only one in which a
14       black candidate ever won was Senate District 5?
15   A.  Yes, which was way down at 30.99, again,
16       showing for some of these districts you've got
17       to look at local conditions.  And districts
18       below 40 percent in particular localities may
19       be reasonable opportunity districts that give
20       blacks a realistic opportunity to elect
21       candidates of their choice.  I'm not saying
22       this proves that, but it does indicate that
23       possibility.
24   Q.  Right.  Didn't Gingles -- do you recall Gingles
25       said you can't just look at one election to

115

1        make conclusions about racially polarized
2        voting or whether a black has a reasonable
3        opportunity to win a district or not?
4    A.  That's right.  That's right.  When we talked
5        about HD 8 and you kept asking me can you pump
6        it up to 65 and 70, that was one election.  You
7        never would create a district, particularly one
8        at that level, which would affect other
9        districts based on one election.
10           And I'm by no means saying you can
11       conclude from one election in SD 5 that a
12       district at 30 point -- it's 31 percent is
13       going to be a reasonable opportunity district,
14       but it does show, again, the need to look at --
15       you know, if you are in this range below
16       40 percent, it is not impossible -- it's
17       possible that you may be able to create African
18       American opportunity districts in a particular
19       locality below 40 percent.  There's no -- as
20       I've said several times in this deposition,
21       there's no talismanic line.
22   Q.  Do you have to have an expert to figure out
23       what the right percentage is?
24   A.  Well, if you're going down at this level, I
25       think that's right.  As I said, as a generic

116

29  (Pages 113 to 116)

Case 1:15-cv-00399-TDS-JEP   Document 77-29   Filed 03/14/16   Page 29 of 46

1  guideline, 40 percent has proven to be
2  sufficient, but that doesn't mean in any given
3  area it might not be possible to create a
4  district below that.
5       In Florida, a number of districts were
6  created in the 30 percent range that were
7  affective districts that gave African Americans
8  realistic opportunities to elect candidates of
9  choice.
10 Q. Just out of curiosity, did those districts in
11 Florida have a lot of Hispanics in them also?
12 A. Not a whole lot. Some did. Some didn't. Not
13 necessarily because they weren't necessarily in
14 the Miami-Dade area.
15 Q. Is the percentage of black voters that would go
16 into a district connected to the type of white
17 voters that are also in the district? For
18 example, if you had a 30 percent black district
19 with 70 percent Republicans in it, would that
20 likely be an opportunity district?
21 A. Probably not, but, again, you can test that
22 directly, as we've discussed, by looking at the
23 black component of the Democratic primary and
24 then in turn looking at general elections. If
25 in fact you had 30 percent African Americans

117

1  and 70 percent white Republicans, that would
2  probably mean African Americans would dominate
3  the primary, but it will probably also mean
4  they couldn't win a general election, but,
5  again, you wouldn't have to indirectly estimate
6  those things because we can directly determine
7  those calculations.
8  Q. Okay. And, Dr. Lichtman, just to be clear on
9  this, have you -- you haven't studied whether
10 you can draw a 40 percent black district in
11 North Carolina and comply with the state
12 constitutional criteria?
13 A. I haven't studied the state constitution
14 criteria, but I'll leave it at that.
15 Q. That's it. That's all I need.
16 A. That's all you asked me.
17 Q. Let's turn to Exhibit 6.
18 A. Yes.
19 Q. I'm looking at Page 4 in some of your bullet
20 points there, and you say -- there's one bullet
21 point that says the insistence on creating
22 African American ability districts that are
23 over 50 percent or more African American in
24 their voting age population needlessly wastes
25 African American votes and diminishes the

118

1  opportunity for African American voters to
2  influence the political process across the
3  State of North Carolina.
4       Can you tell me what you mean by that.
5  A. I think we discussed that earlier. When you're
6  putting African Americans in a district above
7  and beyond what is necessary to provide a
8  realistic opportunity or an ability to elect,
9  that's sometimes called wasted African American
10 votes that could be allocated elsewhere to
11 expand African American influence without
12 diminishing the ability of those districts to
13 elect African American candidates of their
14 choice.
15 Q. Do you think that's required by the Voting
16 Rights Act?
17 A. I didn't say that is required by the Voting
18 Rights Act, but I think constitutionally the
19 courts have said it is required that you do not
20 have racial quotas and draw districts
21 predominated by race regardless of influence
22 elsewhere, that that creates a stigma on
23 African Americans and is harmful unto itself.
24 It promotes impressions of racial divisiveness
25 and racial divisions.

119

1  Q. So that injury you just described occurs only
2  in a 50 percent plus district? It would not
3  occur in a 40 to 50 percent district?
4  A. I did not say that. I said it occurs when you
5  have a racial quota that results in districts
6  being drawn predominantly on the basis of race,
7  when you have this fixed racial quota,
8  particularly when you have one that is not
9  based upon any assessment of whether or not
10 districts at that level are needed to provide
11 African Americans realistic opportunities to
12 elect candidates of their choice.
13      In that sense, in a procrustean way,
14 forcing the creation of these African American
15 single-race majority districts.
16 Q. Okay. Paragraph 6 you use the word -- there's
17 a word in that paragraph "small number of
18 Asians and members of other races." Do you see
19 the word "small"?
20 A. I do.
21 Q. What do you mean by small?
22 A. Yeah. I think we discussed that previously
23 because I was able to assess that when I looked
24 at turnouts in the Democratic primary
25 elections, and it was, I think in virtually

120

1   every case, low single digits, not enough to
2   have any substantial influence on the analysis
3   or the outcome of elections.
4   Q.  How did you measure the -- there's counties in
5       North Carolina where there's a higher Hispanic
6       population than other places.  Isn't that fair
7       to say?
8   A.  Yes, of course.
9   Q.  All right.  Mecklenburg or Wake County or some
10      of the urban counties have more Hispanics?
11  A.  Of course, but I didn't look at counties.  I
12      did a district-specific analysis.
13  Q.  You are able to look at the Hispanic turnout
14      by --
15  A.  Absolutely.
16  Q.  How did you do that?
17  A.  Because it's the residual -- it's not the
18      Hispanic.  I think I said Hispanics and others.
19      It's more than Hispanics.
20          It's the residual of 100 percent minus
21      the percentage of black turnout plus the
22      percentage of white turnout.  And by percentage
23      of turnout, I mean the components of the
24      turnout that is white and black.
25          So let's say you have a district that

121

1   the components of the turnout are 57 percent
2   African American and 40 percent non-Hispanic
3   white, that means the -- all of the others are
4   3 percent.  So it was not a difficult
5   determination.
6   Q.  Okay.  Let me ask you this question,
7       Dr. Lichtman:  Can somebody draw -- in a
8       redistricting plan draw a district that
9       effectively has the voting population as
10      majority black where the VAP -- black VAP is
11      under 50 percent --
12  A.  I'm sorry.  You said voting population; then
13      you switched to VAP.  Those are two different
14      things.  What are you talking about?
15  Q.  Let me try to re-ask the question, if I can.
16  A.  Please.
17  Q.  Let's say a district has 10 percent Hispanic
18      population for one person/one vote purposes and
19      it's drawn, say, at 42 percent black VAP.
20      Could blacks actually represent a majority of
21      the eligible voters in a district like that?
22  A.  I don't know what you mean by eligible voters.
23      You mean registered voters, voters who turn
24      out, or VAP?
25  Q.  Let's look in various ways.  Isn't it possible

122

1   that they could represent a majority of the
2   citizen age population in a district like that?
3   A.  It's possible but not likely that they would
4       jump more than 8 points from BVAP to CVAP.
5       Anything's possible since we're doing
6       hypotheticals.
7   Q.  Is it possible that they could represent a
8       majority of the registered voters in
9       the district?
10  A.  Anything's possible since we're dealing with
11      hypotheticals.
12  Q.  Did you look for that as a possibility in any
13      of the districts you looked at?
14  A.  I think we've already gone over this.  I
15      absolutely looked at it in the critical
16      Democratic primaries.  It was not necessary to
17      look at it in the general elections because we
18      had the actual results showing a 100 percent
19      win rate over a vast array of elections all
20      over the state and we had the results of the
21      statewide election showing overwhelmingly
22      Democratic majorities in all of the 40 percent
23      plus districts.
24          And so this established that African
25      Americans control the primaries and then

123

1   whatever candidate comes out of the primaries
2   is -- again, nothing is a hundred certain but
3   virtually certain to win the general election.
4   Q.  I'm going to try not to ask that again.
5   A.  Pardon me.
6   Q.  I may slip up but, I'll try not to ask that
7       question again.
8           Now, on Page 4 of Exhibit 6, you say:
9       "Such diminished opportunities are
10      demonstrated by a comparison of previous
11      state legislative districts with current
12      legislative districts enacted by the
13      General Assembly."
14  A.  I'm not sure where that is.
15  Q.  I'm on Page 4 of Exhibit 6.
16  A.  And you're on Paragraph 6.
17  Q.  No.  The third bullet point.
18  A.  Oh, the third bullet point.
19  Q.  And I'll read it again.
20  A.  I see it now.
21  Q.      "Such diminished opportunities are
22      demonstrated by a comparison of previous
23      state legislative districts with current
24      legislative districts enacted by the
25      North Carolina General Assembly."

124

1    A.  I see it.
2    Q.  Did you compare the enacted districts in 2011
3        with any other map that would be considered a
4        legal plan following the 2010 census?
5    A.  I think you already asked me that and I said
6        no.
7    Q.  Okay.  Okay.  I have a question on Paragraph 9.
8        In Paragraph 9, you have a sentence that says:
9            "The results of analyzing these two
10           sets of districts, presented below,
11           clearly reject the need to create 50
12           percent plus African American VAP
13           districts."
14           Do you see that?
15   A.  Yes.
16   Q.  Does your analysis reflect that there's a need
17       to create districts of 40 percent plus African
18       American?
19   A.  I think you asked me that, and I'll give you my
20       answer again because I might have given it to
21       you in several parts.
22           As a generic matter, the results show
23       that a district at 40 percent to 49.9 percent
24       black voting age population will provide
25       African American voters a realistic opportunity

125

1    to elect African American candidates or, in
2    rare instances, white candidates of their
3    choice.  The win rates for those districts are
4    90 percent or above depending on how you look
5    at the analysis.  100 percent in general
6    elections.
7        That does not mean, however, that that
8    is an absolute rule for every single district
9    in every area of the state.  It may well be,
10   and we discussed this in the context -- I
11   forget which of the district it was.  I think
12   it was a Senate district at 31 percent.  It
13   might be possible depending upon the specific
14   analysis in a specific part of the state to
15   create a district below 40 percent African
16   American VAP which does provide African
17   American voters a realistic opportunity to
18   elect candidates of their choice.
19       That's the difference between
20   guidelines, which is what I give when I give
21   redistricting advice, and procrustean, absolute
22   rules that establish quotas.
23   Q.  What's procrustean?
24   A.  It means it's fixed.  You can't move.  It's The
25   Bed of Procrustes.

126

1    Q.  Do you have an opinion on whether the 40
2        percent plus districts that were created in the
3        2003 legislative plans were needed, as you've
4        used that term?
5    A.  What I said about needed was as a general
6        guideline 40 percent, but that's not, you know,
7        a talismanic number.  You could create it
8        below.
9            Was it possible that you could have
10       created districts in that plan below 40 percent
11       that provided realistic opportunities,
12       absolutely possible.  What I found, though, was
13       that looking at the 40 percent and above, if
14       you created districts at that level, those
15       districts that you had created previously
16       demonstrated that such districts provided
17       realistic opportunities so you didn't need to
18       go to the 50 percent rule, but that didn't mean
19       the converse is true, that you could not go
20       below 40 percent.  I don't know if that would
21       have been possible or not, but you'd have to
22       look at that district specific.
23   Q.  I want to turn now to your part of this report
24       about Dr. Brunell.  I've got a few questions
25       about this.

127

1    A.  Sure.  What page are we on?
2    Q.  I'm on 12.
3    A.  Yes.
4    Q.  Throughout this you talk about that Brunell
5        looked at elections in, quote, "counties of
6        interest."
7    A.  Where did I say that?
8    Q.  Look at Page 13.
9    A.  Oh, I was on Page 12.  I'm sorry.  You have to
10       point me to where it is.  It's a pretty dense
11       page.
12   Q.  Okay.  Well, it's on Paragraph 23.  It's like
13       about five lines down.
14   A.  Okay.  Thank you.  That's what he calls
15       counties of interest, that's right.
16   Q.  Did you attempt to figure out why he would have
17       picked the counties he looked at?  Was it like
18       irrational for him to look at the counties he
19       looked at or arbitrary?
20   A.  I think he suggested or maybe he was -- you
21       know, as I recall -- this is a long time ago,
22       but as I recall, those were the ones he was
23       instructed to look at, that he did not pick
24       these counties, that he was told to look at
25       them by either the lawyers or the leaders of

128

1  the state legislature through the lawyers. So
2  this was not something he independently did.
3  Q. Did you look to see whether some of these
4  counties were covered by Section 5?
5  A. I'm sure some of them were, but I'm not sure
6  all of them were.
7  Q. Did you look to see where the concentrations of
8  black populations were in the state where a
9  single-member district could be created?
10  A. I didn't, but you have to understand,
11  single-member districts extend beyond
12  concentrations, that is, districts also
13  incorporate parts -- can also incorporate parts
14  of white areas. So you would want to know
15  voting patterns there as well.
16  Q. Did you look to see whether the counties he
17  looked at were counties that could support the
18  potential creation of a single-member black
19  district based upon a reasonably compact black
20  population?
21  A. What do you mean by a black district?
22  Q. Majority black district.
23  A. Oh, that's certainly possible. And, again, if
24  that's what he was instructed to do, and I
25  believe he was instructed, then that is further

129

1  indication of the fact that, you know, the
2  state was following this racial quota rule that
3  they were only interested in creating 50 plus
4  one percent black voting age population
5  districts.
6  Q. Well Dr. Lichtman, you're familiar with
7  North Carolina. You've been down here and
8  testified in a number of cases.
9  A. I have.
10  Q. Are you familiar with where the black
11  population generally reside?
12  A. No, I have not studied in detail. I mean, I
13  have a vague idea, but, no, I've not drawn a
14  plan for North Carolina.
15  Q. Can you create a 40 percent black district in
16  an area where there are no blacks?
17  A. Of course not, but a 40 percent black district
18  might incorporate part of an area, not where
19  there are no blacks but where there are a small
20  number of blacks, yes.
21  Q. Are you aware of any examples of that?
22  A. No. I didn't go through, as I told you, and
23  try to draw plans.
24  Q. What did you -- what data did you look at to
25  critique Dr. Brunell's report?

130

1  A. I'd have to look and see what my critique is.
2  I think mostly his own -- his own internal
3  results and his own internal problems.
4  Q. Did you -- were you aware of the fact that
5  there was an expert offered by the NAACP and
6  other groups during the redistricting process
7  who provided a report on racially polarized
8  voting?
9  A. I think there was another expert. I don't know
10  who that -- I think his name was Dr. Block, but
11  I don't know who he produced that report on
12  behalf of or if I do, I don't recall.
13  Q. Did you ever look at his report?
14  A. I think I did cursorily looked at it. I don't
15  think I testified about it, but, again, it was
16  a long time ago so I can't be a hundred percent
17  sure, but I don't believe I testified about it,
18  but I do recall looking at it.
19  Q. You didn't offer a critique of Dr. Block's
20  report?
21  A. In my report?
22  Q. Yes.
23  A. No. As I said, I did look at it, though.
24  Q. Why didn't you look at Dr. Block's report?
25  A. I did look at it.

131

1  Q. Why didn't you offer an opinion on it?
2  A. Because I believe the state was relying on
3  Dr. Brunell. And I don't even know if
4  Dr. Block testified. I don't recall him
5  testifying, but, again, you know, we can check
6  that. I'm recalling things from a long time
7  ago.
8  Q. Well, let me represent to you that that report
9  was presented to the legislature before they
10  enacted plans. Is there any reason why you
11  wouldn't have looked at that?
12  A. I did look at it.
13  Q. Did you look to see whether Dr. Block's report
14  supported the legislature's decisions?
15  A. My recollection is Dr. Block's report was
16  fatally inaccurate, that he misapplied his
17  analysis. And Dr. Brunell did so as well.
18      I also recollect in terms of what the
19  legislature had before it, that the legislature
20  was asking, from my recollection of both
21  reports, Dr. Block and Dr. Brunell, the wrong
22  question; that is, the legislature was simply
23  asking is there statistically significant
24  racially polarized voting, frankly, a question
25  they already knew the answer to. You know,

132

Case 1:15-cv-00399-TDS-JEP   Document 77-29   Filed 03/14/16   Page 33 of 46

1  that's the case almost everywhere in the
2  country, in the exit polls, everyone commenting
3  upon before the redistricting showed that. The
4  question -- so it was kind of a
5  self-justifying, self-reinforcing question.
6        The question they should have been
7  asking that neither in my recollection --
8  certainly not Dr. Brunell and in my
9  recollection Dr. Block did not address is the
10  political significance of any racially
11  polarized voting that is found in terms of the
12  ability of African American voters to elect
13  African American candidates or white candidates
14  of their choice in a given district.
15        And I provided that analysis here for
16  Dr. Brunell's results showing even in a
17  district, you know, at a 40 percent African
18  American turnout, you would still be predicting
19  a substantial majority for the African American
20  candidate of choice.
21        So these reports did not answer the
22  right question because the right question was
23  never asked; instead, a self-justifying
24  question was asked by the legislature.
25  Q. Did the legislature ask Dr. Block to submit a

133

1  report?
2  A. I don't know. I'm just telling you what I know
3  from Dr. Brunell and from what I know was in
4  Dr. Block's report.
5  Q. Why didn't you include your critique of
6  Dr. Block in this report?
7  A. I don't recall -- as I said, I don't recall
8  that he was testifying, and I don't recall the
9  circumstances of his report.
10        Now you've refreshed me and I've given
11  you my assessment. Even if accurate, which his
12  report was not, it still didn't ask the right
13  question.
14  Q. Do you know who submitted Dr. Block's report?
15  A. You already asked me that and I said I don't.
16  Q. Okay. Did you review any other testimony
17  before the legislature on racially polarized
18  voting besides those two expert reports?
19  A. Not that I recall. It's not impossible, but
20  not that I recall. If you want to bring up any
21  particular person, I'll be happy to tell you
22  whether I recall anything about them or not,
23  but generically I only recall looking at
24  Brunell and Block.
25  Q. Do you recall any testimony by the very nice

134

1  lady who's sitting next to you right now,
2  Ms. Earls?
3  A. I'm sorry, Ms. Earls, but I don't recall your
4  testimony.
5  Q. Did you -- were you aware of any testimony by
6  members of the public on the issue of racially
7  polarized voting?
8  A. I'm sure there was testimony by the public. I
9  looked at the expert analyses. I'm not aware
10  of any other expert analyses other than Brunell
11  and Block, but if there are, I'd be happy to
12  let you know.
13  Q. You didn't look at any other testimony or
14  evidence on racially polarized voting and put
15  that in your report other than what Brunell
16  did?
17  A. And what I did.
18  Q. Well, your testimony wasn't before the
19  legislature, was it?
20  A. That is correct, it was not before the
21  legislature. I'm not aware of any other expert
22  analysis -- let me finish. I'm not aware of
23  any other expert analyses before the
24  legislature, but if there was, please let me
25  know.

135

1  Q. But the only evidence on racial polarization
2  that you reported on in your report was
3  Dr. Brunell's report?
4  A. That's correct.
5  Q. Did you consider or did you review alternative
6  maps submitted to the General Assembly which
7  included majority black or districts that were
8  over 40 percent black in your study?
9  A. I think you asked me that already and I said I
10  did not review alternative maps.
11  Q. So you don't know where the alternative maps
12  proposed majority black districts or 40 percent
13  districts?
14  A. Or anything about the alternative maps since I
15  didn't look at them.
16  Q. Did you review any opinions offered by the
17  North Carolina School of Government about
18  racial polarization?
19  A. The who?
20  Q. The North Carolina School of Government.
21  A. I don't recall that, but if you have something
22  to present to me, I'll look at it, but I don't
23  recall an analysis by that group.
24  Q. Do you recall that group giving opinions about
25  the Gingles case and whether it's still

136

required in North Carolina to create affective minority districts in the areas covered by Gingles?

A. I don't recall their particularized testimony at this state.

Q. Okay. Were you in the Cromartie case, Dr. Lichtman?

A. I don't believe so.

Q. Do you know whether the court in that case found the existence of legally significant racially polarized voting in counties in North Carolina encompassed by the 1st congressional district?

A. I don't recall their detailed findings on racially polarized voting, no, but if you want to show it to me, I'd be happy to look at it.

Q. That wasn't something you considered in your report?

A. I considered racially polarized voting in my report and, you know, indicated, indeed, racially polarized voting existed in North Carolina, but I went the next step, which Dr. Brunell did not and Dr. Block did not, of assessing the political significance of such racially polarized voting for districts at

137

varying levels of black voting age population. We even discussed, and I discussed in my report, the political significance of racially polarized voting because the state as a whole, which is only 21 percent African American, and in a number of elections, including the Hagan-Dole election, the Obama primary in 2008, the Obama general election in 2008, even statewide racially polarized voting, specifically white bloc voting, was not sufficient to defeat the candidate of choice of cohesive African American voters.

Q. But in the elections you just mentioned, you didn't actually study what percentage of the electorate was black and what percentage was white.

A. You mean those -- no, not specifically, but it was in the exit polls. And I do have some recollection, actually, of what the electorate was. And in the general elections, it was pretty close to the black VAP of about 21 percent. And in the primary election -- I think this may even be in one of my reports -- it jumped up to 40 percent for the reasons we've been discussing, that at a given level of

138

black voting age population, blacks are going to be a much larger share of the Democratic primary electorate. That was true statewide and it was true in every single-district specific analysis that I did.

Q. I don't want to beat a dead horse, Dr. Lichtman but, like, for the 2008 Obama general election in North Carolina, you didn't look at the turnout rate for blacks as compared to the VAP for blacks or the registered voters for blacks and then compare that to the turnout rate for whites in those categories?

A. Actually, I kind of did because when you look at the black share of the electorate and you see that it's about the same as the black share of the voting age population, it follows from that that black and white turnout have to be very close, otherwise you would not have that result.

Similarly, in the primary, the fact that it jumped almost double in terms of the black share of the primary electorate as opposed to the black share of the voting age population indicates that for Democratic primaries, the turnout rate of African

139

Americans is much higher than the turnout rate of whites which is roughly comparable in general elections.

So, yes, that -- I did present part of that analysis in my report and it's also evident from the exit polls.

Q. Okay.

A. And I believe in my North Carolina report, of which you only picked out a part, I did look at the African American share of the electorate.

Q. Which exhibit was that?

A. It's not in your exhibit because it's not part of that North Carolina voter ID -- other elements of the North Carolina VIVA that I looked at, but it was in another part of that report I did look at turnout by race in general elections showing that in fact the white component had declined and the black component had gone up to, you know, around the low 20 percent level, roughly comparable to the black voting age population in North Carolina.

Q. Okay. There's a lot of questions there, but I'm just going to skip over it.

A. Okay. It's your choice.

Q. Don't tempt me.

140

I want to turn to your tables in this
report, Exhibit 6. Dr. Lichtman, I want --
like Table 1, I thought this was the same table
as you had in your previous report, but if not,
explain to me what's different about it.

A. This table is different -- not different data
but it's a different presentation. Here what I
did was I isolated the 40 plus to 49.9 and the
50 plus, from just over 50 to about --

Q. Okay. I understand. So Table 1 and Table 2
are the same as Table 1 in your first
affidavit?

A. Right, but formatted and presented differently.

Q. But otherwise it's the same?

A. Yeah.

Q. All right. Is Table 3 in Exhibit 6 the same as
Table 2 in Exhibit 3?

A. I believe that's right.

Q. I'm skipping over the congressional.
Table 5 in Exhibit 6 is the same as
Table 4 in Exhibit 3?

A. I believe that's correct.

Q. Table 6 in Exhibit 6 are the same as Table 5 in
Exhibit 3?

A. I believe that's correct.

141

Q. Okay. I wanted to ask you about Table 7.

A. Table 7.

Q. This is a new thing, I think.
Did you have this in your prior report,
Table 7 and Table 8?

A. No.

Q. All right. So let's talk about Table 7.
What's Table 7?

A. We talked about this previously when we
discussed Senate District 5 and the fact that
in the good Democratic year the African
American candidate won, but in the very good
Republican year the African American candidate
lost. And it was not the result of any change
in black voting behavior, but in the very good
Republican year you had fewer white voters
voting for the black Democrat by a substantial
margin.

Q. Dr. Lichtman, I'm going to ask you this
question and I may get tongue tied asking it.
The percentages that you're looking at
in Table 7 are the percentage of black and
white voters who voted for the black
candidate -- the percentage of black voters who
voted for the black candidate and the

142

percentage of white voters who voted for the
black candidate.

A. And you've left one word out. The percentage
of white voters who voted -- who voted for the
black candidate, correct.

Q. Right. Can the percentage of the white voters
voting for the black candidate that would
result in the black candidate winning differ or
the turnout rates are higher, for example, say,
for the blacks than the white voters, the
actual turnout rates?

A. It could depending on exactly how the analysis
played out.

Q. Say, for example, if 97 percent of the black
voters voted for the black candidate and
30 percent of the white voters voted for the
black candidate --

A. Correct.

Q. -- could the black candidate still lose if the
actual number of whites who turned out to vote
was higher than the turnout rates for the black
candidate?

A. It would have to be much higher. I can
calculate what it would have to be if you would
like.

143

Q. Go ahead. Tell me how you're doing that.

A. Same methodology I laid out in my report. You
look at the turnout which is composed of
blacks -- not the black turnout rate but what
share of the electorate is black, what share of
the electorate is white and you multiply it by
the cohesion number and the crossover number.
So let's say the turnout for blacks is
35 percent. So it's 65 percent white. So it's
35 times .97, right. Are you with me?

Q. 35.

A. Times .97 is the vote for the black candidate
from blacks alone, in other words, getting
almost all of the 35 percent, 33.95. Then we
take 35 percent and multiply it by .3, right.
That's 10.5. And so that's 44.5. So you would
need black turnout to be a little bit higher.
So let's say it was only 40 percent.
So it's .4 and -- times 97.

Q. So I want to make sure I understand this. .4
is the percentage of what?

A. Is the black component of the turnout.
40 percent of those turning out are blacks.
Under these --

Q. 40 percent of the total people who voted were

144

1  black?
2  A.  That's right.  Would that give you a black
3  victory.  We can work that out.
4       So it's 40 times .97.  40 times .97
5  should be about 39.  Yep.  And then we have 60
6  times .3 --
7  Q.  So what does 60 stand for?
8  A.  The white component, recognizing there may be a
9  few others, but we call it white because you
10  can't -- and that's 18 percent.  So we add that
11  together.  It's a black victory.  So 40 percent
12  is a clear black victory.  30 isn't.  So it's
13  somewhere between 30 and 40.  We can make it
14  more specific if you like.
15  Q.  No, that's fine.  I understand what you're
16  saying.
17  A.  So you absolutely don't need a majority --
18  anywhere close to a majority of the black
19  turnout -- of the turnout being black.
20  Q.  Is Table 8 the same study that you performed
21  for the Senate District 24 --
22  A.  Yes.
23  Q.  -- that we just talked about?
24  A.  Yes.
25  Q.  All right.  Let's move on to your surrebuttal

145

1  report.
2       (WHEREUPON, Defendants' Exhibit 9 was
3  marked for identification.)
4  BY MR. FARR:
5  Q.  Okay.  Exhibit 9, can you tell us what that is.
6  A.  My surrebuttal report.
7  Q.  What data did you look at to prepare this?
8  A.  I looked at Dr. Hood's report, I looked at my
9  previous reports and I looked at exit poll data
10  and I looked at the components district by
11  district of blacks and non-blacks in Democratic
12  primaries in all districts between 40 and
13  49.9 percent voting age African American.
14       I looked at State of North Carolina
15  Board of Election official election returns,
16  and I looked at the Democratic vote
17  reconstituted in each of the 40 to 49.9 percent
18  districts from statewide Democratic versus
19  Republican recent elections based on when those
20  districts existed, that is, 2008 and 2010.
21  Q.  Can you tell me what Table 1 is?  Is this new
22  for this report or is this something you did
23  before?
24  A.  It's something I did before, again,
25  reformatted.  We've been over this already.

146

1  There's nothing new in here.
2  Q.  What about Table 2?
3  A.  Table 2 is new.
4  Q.  All right.  Explain to me what Table 2 is.
5  A.  Table 2 does a statistical comparison of the
6  actual outcomes of elections in districts 40 to
7  49.9 percent BVAP as compared to districts over
8  50 percent BVAP to show that African American
9  candidates and African American candidates of
10  choice of voters fare as well or better in 40
11  to 49 percent African American voting age
12  population districts as compared to districts
13  at 50 percent plus one African American voting
14  age population districts, demonstrating, again,
15  it's not necessary to provide ability districts
16  to have a 50 percent plus one rule.
17  Q.  Okay.  Let's look at the first table.  It says
18  Primary and General Elections.  There's like
19  two tables in Table 2.  As I read it, there's
20  primary and general elections.  Then there's
21  primary elections.
22  A.  That's right.  Then I isolate out primaries.
23  Q.  Again, you included in this analysis
24  uncontested races?
25  A.  Of course.  As we explained, uncontested races

147

1  are perhaps the most powerful indicator of
2  districts that provide African American voters
3  the ability to elect candidates of choice.
4  Almost all the uncontested elections involve
5  African Americans.
6       If in fact these were not ability
7  districts, if in fact these were districts
8  where white voters through their bloc voting
9  had the ability to elect different candidates
10  of their choice, you would certainly expect
11  white contenders.  In fact, if you look at
12  districts, you know, with relatively small
13  percentage of blacks, you virtually always get
14  white contenders.
15  Q.  All right.  Dr. Lichtman, again, I apologize if
16  I asked this before, but if you have an
17  uncontested race, I think you said that can't
18  be used to evaluate racially polarized voting.
19  A.  Of course not.  You have to have an election,
20  but that's not my purpose here.
21  Q.  I know.
22  A.  Remember, I said racially polarized voting is
23  not indicative by itself of whether a district
24  provides ability to elect.
25       I'm looking at ability to elect.  And

148

37 (Pages 145 to 148)

1    uncontested elections are very powerful
2    evidence of ability to elect. That's the
3    bottom line here.
4    Q.   You can't use an uncontested election to try to
5         determine the percentage of black population
6         needed -- the exact percentage of population
7         needed to provide an ability-to-elect district?
8    A.   Certainly you can.
9    Q.   Can you -- you can't use it to determine the
10        level of racial polarization?
11   A.   That's correct. That's two different
12        questions.
13   Q.   Okay. I understand your answer.
14              I'm going to ask you about the top
15        chart on primary and general elections where
16        you have -- explain to me what plus 8 means
17        versus -- at the bottom of that chart. You see
18        where you've got plus 8 in the far right-hand
19        column?
20   A.   Yeah. I'll tell you what that means. That
21        means --
22   Q.   Explain to me how that's calculated.
23   A.   Sure. It's very simple. The win rate, in
24        other words -- out of 40 elections, what is the
25        win rate for black candidates in the 40 to

149

1    49.9 percent districts. It's 90 percent. What
2    is the win rate in the 50 plus one percent
3    districts. It's 82 percent. That means the
4    win rate is 8 percentage points higher in the
5    40 to 49.9 percent African American voting age
6    population districts than it is in the 50 plus
7    one African American voting age population
8    districts.
9    Q.   Now -- so there were 48 -- 44 elections in
10        districts that you reported were 50 percent
11        plus black VAP?
12   A.   Correct.
13   Q.   And 36 won by the black candidate?
14   A.   Yes.
15   Q.   Is the difference between the number of
16        elections and the number of elections won by a
17        black candidate, is that all accounted for by
18        House District 8 and House District 27?
19   A.   I would have to look.
20   Q.   If you would look for me, please. I think
21        that's accurate.
22   A.   House District 102, House District 8 and House
23        District 27. That's correct.
24   Q.   Okay.
25   A.   And -- yes.

150

1    Q.   And you only reported -- as far as the -- does
2         this calculation include uncontested elections?
3    A.   They all do, as well they should.
4    Q.   I know you think that. Do you know why
5         candidates -- the black candidate lost in those
6         elections that you just --
7    A.   HD 27 and HD 8 and 102. In HD 27, there were
8         no black candidates. And, yes, I know why they
9         lost in HD 27 and HD 102, and I provide that
10        analysis in this report.
11   Q.   Okay. So in HD 27 there were no black
12        candidates that ran against a white incumbent?
13   A.   If you say it's an incumbent, that's fine. I
14        don't recall if it's an incumbent or not.
15   Q.   I think it's a guy named Michael Ray.
16   A.   Yeah, most likely.
17   Q.   In HD 8 -- we talked about that if there's an
18        election where the black candidate lost to a
19        white candidate in HD 8.
20   A.   Right. And I said that's not a result of the
21        district being drawn below 50 percent. There
22        just wasn't enough African American cohesion to
23        elect the black candidate. Even at 60 percent
24        there wouldn't have been enough African
25        American cohesion. That was a function of a

151

1    particular election where African Americans
2    were not cohesive. You don't look for a
3    hundred percent patterns. You look for usual
4    patterns.
5    Q.   And HD 102, that election was the result of
6         racially polarized voting in a low turnout
7         election according to you.
8    A.   Let me look. I want to make sure I have it.
9         HD 107 and 102 properly parsed out. I have it
10        in here. I think that's in my other report,
11        but I'll take your assessment there.
12              I don't recall it exactly, but I think
13        that's right. It was a very low turnout
14        election. I think that was -- HD 102 was a
15        very low turnout election in which blacks,
16        again, were not strongly cohesive behind the
17        candidate of their choice. I think it was only
18        53.6 percent that voted HD 102 for the
19        candidate of choice.
20   Q.   So in those elections where the black
21        candidate -- the black candidate lost -- and
22        just to be clear, Dr. Lichtman, what
23        information did you look at?
24   A.   I looked at the actual returns of elections. I
25        looked at the -- I think they all lost in

152

Case 1:15-cv-00399-TDS-JEP   Document 77-29   Filed 03/14/16   Page 38 of 46

1   primaries.  I looked at the Democratic -- the
2   African American component of the Democratic
3   primary as well and the breakdown of the
4   African American and white vote.
5   Q.  Did you do any statistical analysis for those?
6   A.  I did.  That's how I got in HD 102 to the
7   53.6 percent of the African American vote going
8   for the African American candidate.
9   Q.  Did you look at anything else for this
10  election?
11  A.  Yes.  I think I -- beside the breakdown of the
12  vote, I think I said I also looked at the
13  actual results of the elections, and I looked
14  at the African American component of the
15  Democratic primary.
16  Q.  You say that Dr. Hood, on Page 6, incorrectly
17  discounts uncontested elections.
18  A.  Yes.
19  Q.  What did he say about uncontested elections?
20  A.  I think he discounted them by, in his table,
21  focusing on uncontested races only.  He doesn't
22  break it down in terms of the uncontested
23  elections.  And so his focus is on the
24  contested races rather than looking at all the
25  races.

153

1           And as I say in my report and as I told
2   you, they did not provide information on
3   polarized voting but they provide important
4   information on the effectiveness.
5   Q.  Did Dr. Hood criticize you because the
6   uncontested elections didn't provide
7   information on racially polarized voting?
8   A.  I believe he did.
9   Q.  Did he make any other criticisms?
10  A.  Of my report?
11  Q.  Of the use of uncontested elections.
12  A.  I think that was his main criticism.  I would
13  have to go back and look at his report, but
14  that's my recollection.
15  Q.  And you agree with his conclusion that the
16  uncontested races don't give you any evidence
17  on racially polarized voting?
18  A.  Of course not.  We're repeating ourselves.
19  Q.  You don't have to.  I got it.
20          So the point being is the criticism he
21  made of your report for using uncontested
22  elections you agree we; he just didn't go the
23  extra step to give your rationale for using
24  uncontested elections?
25  A.  He didn't do that.  And most critically, his

154

1   analysis of the effectiveness of districts
2   turns primarily upon contested races only and
3   conceals the fact that of the three contested
4   races that the black candidate of choice lost,
5   only one of them was at a 40 to 49 percent
6   district.
7   Q.  Okay.
8   A.  And I don't see, either, where he looked at
9   racially polarized voting for that matter.
10  Q.  All right.  He didn't, like, conceal that, did
11  he?
12  A.  It's concealed -- not that part, but this part
13  is concealed in this table, yeah.
14  Q.  What table is that?
15  A.  Table 8.  In other words, if you look at
16  Table 8 -- and his whole argument is you need
17  50 percent plus districts and he -- first of
18  all, even in contested elections, 80 percent of
19  the time African American candidates of choice
20  wins.  That is a very clear, usual pattern, but
21  what he doesn't tell you is that even in the
22  contested elections, that 20 percent, those
23  three, only one of them is from a 40 to
24  49.9 percent black VAP district.  Two-thirds of
25  them, or two out of three, are in fact from a

155

1   50 percent plus district.
2           And when he gets down later to
3   analyzing the one district, the one example of
4   an African American candidate of choice who
5   didn't win, he gets the analysis factually
6   incorrect.
7   Q.  Which one was that?
8   A.  HD 102.
9   Q.  How did he get that incorrect?
10  A.  It's in my report.  Let me get to it.  In HD --
11  he says in HD 102 was only 42.7 percent black
12  and that, you know, you would need a 50 percent
13  district.  He fails to note, however, that
14  African Americans actually were a substantial
15  majority, 56.5 percent of the 2010 Democratic
16  primary turnout.  Thus, they had effective
17  control over the primary election.  They
18  prevailed.  They did not prevail because they
19  were -- basically split their vote.  Only
20  53.6 percent of them voted for the African
21  American candidate.
22  Q.  So there were 56 percent of the electorate and
23  53 percent voted for the black candidate?
24  A.  Yes.
25  Q.  What percentage is 53 percent of 56 percent?

156

DISCOVERY COURT REPORTERS     www.discoverydepo.com     1-919-424-8242

Case 1:15-cv-00399-TDS-JEP   Document 77-29   Filed 03/14/16   Page 39 of 46

1   A. That means they got 29.9 percent of votes based
2   on African American votes alone.
3   Q. That wasn't what I was asking. I wanted to
4   know what percentage of the African American
5   vote voted for the black candidate when you
6   divide 53 by 56 to get that --
7   A. You can't divide -- that's an apples and orange
8   division. You're dividing -- that is, of a
9   hundred percent of all of those blacks who
10  turned out, only 53 percent of that 56.5
11  percent voted for the black candidate.
12       So if you want to determine the votes
13  that the black candidate got from black voters,
14  you would multiply -- and we've done this
15  exercise several times.
16  Q. I haven't -- I don't remember doing it for 102.
17  So tell me what it would be, then.
18  A. I just did. You multiply 53.6 or .536 times
19  56.5 and you get 29.9.
20  Q. What is that, 29.9 of the blacks voted for the
21  black candidate?
22  A. No. You're misunderstanding.
23  Q. No. I want to know what percentage of the
24  black voters voted for the black candidate.
25  A. 53.6.

157

1   Q. Explain to me on Page 7, the Hood report,
2   Page 8, did you just take this right out of
3   Dr. Hood's report?
4   A. Just copied it.
5   Q. You didn't have any work product on this page?
6   A. No.
7   Q. All right. Turn to Table 3 and tell me what
8   that is. Is this -- yes, okay. What's
9   Table 3?
10  A. That's the win rate.
11  Q. For what?
12  A. Contested -- I think there's a misprint on
13  this. No. Okay.
14       This is contested Democratic primaries
15  win rate in 49 -- 40 to 49.9 percent districts
16  and 50 percent plus districts. These are only
17  contested elections, and it shows there's no
18  difference, that African American candidates of
19  choice or black candidates do not fare any
20  better when elections are contested in 50
21  percent plus districts as compared to 49.9
22  percent districts.
23  Q. Okay. Turn to Table 4. Tell me what that is.
24  A. It's the exit poll results. I believe they
25  were cited in Dr. Hood's report, and I think we

158

1   also had looked at some of those. Maybe this
2   one -- no, I don't think we had looked at
3   presidential primaries in my report from the
4   VIVA case that you showed me.
5        These are exit poll results for
6   primaries showing polarized voting nationally,
7   polarized voting in North Carolina and
8   polarized voting in other states holding
9   primaries within the closest range of the
10  North Carolina primary, which I believe was May
11  that year.
12  Q. Do you report on the percentage of black
13  population VAP in the various states listed
14  here?
15  A. No.
16  Q. Does North Carolina have a higher black
17  percentage of voting age population black than
18  the other states?
19  A. Yes.
20  Q. Do you know what the difference is?
21  A. No, but it certainly does, but this is
22  certainly showing the polarization. That's all
23  it's doing. It's not assessing the
24  polarization relative to the black population.
25       And I didn't pick the other states by

159

1   comparison by population. I picked them by
2   proximity because it makes a difference in a
3   primary election cycle when in that cycle a
4   primary is held. I didn't cherry-pick these
5   states. I simply picked the states that were
6   most proximate chronologically to the
7   North Carolina primary.
8   Q. Okay. So, in other words, the North Carolina
9   primary used to be held in May and so you
10  looked at states that had primaries in a
11  similar timeframe as the North Carolina
12  primary?
13  A. The closest timeframe, right.
14  Q. Why did you decide on just three other states?
15  A. Because there were a few other states that had
16  such low black -- I don't remember exactly what
17  they were. There are not a lot of states in
18  this late stage of the primary process, and
19  these were the only states close to the
20  North Carolina timeframe for which they
21  actually estimated African American preference.
22  Q. I'm looking at Page 12 of your report now,
23  Dynamics of Partisan Legislative Elections for
24  African American Voters.
25  A. Yes.

160

1    Q. Do you agree drawing majority black districts
2    would make the surrounding districts more
3    competitive for Republicans?
4    A. Generally speaking, and I'd have to look at a
5    specific plan, but generically, if you are
6    drawing African American districts, according
7    to some hard-and-fixed line that is generally
8    above what creates ability districts for
9    African Americans, it is likely to make
10   surrounding districts more white and more
11   Republican as a generic rule, yes, but that
12   doesn't mean it's permissible --
13   Q. I didn't ask that.
14   A. -- to do that. Okay. Fair enough.
15   Q. What's Table 5?
16   A. Exit poll for the general election.
17   Q. And what does it show?
18   A. That voting was polarized in North Carolina and
19   voting was polarized nationally as well in the
20   general election.
21   Q. Was the voting more polarized in North Carolina
22   than the national election?
23   A. Slightly, yes.
24   Q. 8 percentage points?
25   A. No. 8 percentage points on the white side.

161

1    A. It did, very close in both elections. And
2    again, we're dealing with not a district at
3    40 percent. We're dealing with a jurisdiction
4    about half that in terms of black voting age
5    population. And always, always when you're
6    assessing political significance, it has to be
7    specific to the concentration of African
8    Americans in the district --
9    Q. Okay.
10   A. -- as well as the dynamics that I describe in
11   this report.
12   Q. What's Table 6? Wait a second. What did you
13   look at to do Table 5? Exit polls?
14   A. Exit polls, purely exit polls.
15   Q. Who did the exit polls?
16   A. The same person who always does the exit polls,
17   Edison Research, and they reported it via all
18   the major networks and news outlets.
19   Q. Are those the same people that the networks use
20   to incorrectly call elections?
21   A. They certainly aren't, Tom. I'm glad they're
22   not. You don't call elections -- these are --
23   the people who call elections are the people
24   who work for the networks. This is an
25   independent group.

163

1    Zero percentage points on the black side.
2    Q. So in the general election, 35 percent of the
3    whites -- and white meaning non-black, right?
4    A. Correct, and not Hispanic.
5    Q. Not Hispanic.
6    A. No. It's all non-blacks. Would include a
7    small number of Hispanics and others as we
8    discussed.
9    Q. So in North Carolina, 35 percent of the whites
10   voted for Obama, 95 percent of the blacks voted
11   for Obama and that compared nationally to
12   95 percent of the blacks who voted for Obama
13   and 43 percent of the whites who voted for
14   Obama.
15   A. That is just pure statistics, but as we've
16   already discussed, the 35 percent crossover
17   combined with the 95 percent cohesion was
18   sufficient even in statewide with just
19   21 percent BVAP in the election for Obama.
20   So in this particular election, even in
21   such a low concentration of African Americans,
22   the white bloc voting was not politically
23   significant.
24   Q. Did it become politically significant in 2012
25   in North Carolina?

162

1    Q. What's Table 6?
2    A. This is the -- according to the exit polls, the
3    breakdown of the 2008 Democratic primary
4    election. It's the first two sections of
5    Table 6 and it does it in two ways.
6    First, it looks at the exit polls and
7    it looks at -- according to the exit polls what
8    were the components of all of those who voted
9    in a Democratic primary, in other words, what
10   component was white, what component was black
11   and what component was all others.
12   And according to the exit poll, 62
13   percent of Democratic primary voters were
14   white, 34 percent were black, 4 percent were
15   Hispanic and others, and both Hispanics and
16   others are underrepresented and blacks are very
17   much overrepresented by almost two-thirds in
18   your Democratic primary turnout.
19   This does the same analysis except
20   rather than looking at exit polls, which is
21   what people report, it utilizes the fact that
22   in North Carolina we have turnout data by race,
23   and this is the actual turnout by race for the
24   Democratic primary in 2008, and it shows even a
25   stronger effect, that in this case, with about

164

41 (Pages 161 to 164)

1    a 21 percent black voting age population
2    statewide, blacks comprise 37 percent of the
3    Democratic primary electorate or more than
4    three-quarters higher.  And then for 2010, we
5    didn't, I believe, have an exit poll do this.
6    This looks, again, at the actual turnout.  And
7    even in a very bad Democratic year, you still
8    get -- in an off year where you tend to get
9    less minority turnout than white, you still
10   have a major jump ahead in the black percentage
11   of Democratic primary voters as compared to the
12   black percentage of the voting age population
13   in North Carolina, an increase of nearly
14   60 percent.
15        So this shows that you would expect as
16   a general rule -- and later I do district-
17   specific analysis -- the black share, the black
18   component, of a Democratic primary to be much
19   higher than the black component of the total
20   voting age population, anywhere from about
21   60 percent higher to about three-quarters
22   higher generically.
23   Q.  And so Table 6 is based upon statewide data?
24   A.  Correct.  I think it says that pretty clearly,
25   state turnout, state turnout.

165

1    A.  I think I explained that, but I'll explain it
2    again.  As we saw in the statewide both by exit
3    poll analysis and by analysis of actual
4    turnout, you expect the black share of a
5    Democratic primary to be much higher than the
6    black share voting age population.
7         By the way, that's not only true in
8    North Carolina.  It's true in every state I've
9    studied.  And the reason is that blacks are far
10   and away the racial group with the strongest
11   Democratic identification.  Virtually all
12   blacks participate in the Democratic primary,
13   whereas whites are quite different.  They
14   participate to a significant extent, sometimes
15   to a majority extent in Republican primaries.
16        So you have one racial group
17   concentrating on one primary and you have the
18   other racial group dividing, to varying
19   extents, between the primaries.  Mathematically
20   that of necessity means the group that focuses
21   on the one primary is going to have a much
22   higher turnout as a share of that primary
23   electorate than their voting age population.
24   And that is true of African Americans in
25   North Carolina, and, as I said, in every state

167

1    Q.  Okay.  Tell me about Table 7.
2    A.  Can we take a break now?
3    Q.  Sure.
4         (Brief Recess:  2:36 to 2:42 p.m.)
5    BY MR. FARR:
6    Q.  Dr. Lichtman, I'm just going to conclude by
7    asking you about these tables.
8    A.  Sure.
9    Q.  So tell me what Table 7 is.
10   A.  It looks at the 40 to 49 percent black voting
11   age population districts for the two primary
12   elections I looked at, and it gives you the
13   actual, based on the voter history, the black
14   percentage of Democratic registrants and the
15   black percentage of the Democratic turnout in
16   both the 2008 and 2010 Democratic primaries.
17        Again, so there's no confusion, this is
18   not the turnout rate of blacks.  This is the
19   black share of all those who turn out.  So
20   where it says 60 to -- 60.6 percent, that means
21   of those registered and of those who turn out
22   in that particular district that year, the
23   black share is 60.6 percent.
24   Q.  Why is the turnout percentage higher than the
25   percentage of VAP in the district?

166

1    I've ever studied.
2    Q.  Okay.  So Table 7 you list the black percentage
3    of Democrat registration and then you list the
4    black percentage of Democratic turnout.
5    A.  That's correct.
6    Q.  How did you get the black percentage of
7    registration for each district?
8    A.  Because you register by race.
9    Q.  Where did you get that data?
10   A.  I think the sources are listed.
11   Q.  Okay.  How did you -- so the sources are listed
12   for both the black percentage of registration
13   and black percentage of turnout?
14   A.  Yes.  And these are state sources.  I didn't
15   come up with this on my own.
16   Q.  What's Table 8?  Is it the same thing for
17   Senate districts?
18   A.  Yes.
19   Q.  What's Table 9?
20   A.  Same thing for congress, congress districts.
21   Q.  Looking back at Table 7 and Table 8, you say
22   African American and non-Hispanic white
23   percentage.  Is that accurate to say
24   non-Hispanic white percentage?
25   A.  Yes.  Where is that?  I'm sorry.

168

42  (Pages 165 to 168)

Case 1:15-cv-00399-TDS-JEP   Document 77-29   Filed 03/14/16   Page 42 of 46

Q. On Table 7 and Table 8. I don't see any

columns in either one of these tables.

A. You're right. That's a typo. I just did the

African American. I looked at, because we

discussed that previously, the non-Hispanic

white component just to indicate that Hispanics

and others were a minuscule percentage of these

primaries, but I didn't include it in the table

because, again, all my focus is on the African

American percentages. It's consistent with my

other tables.

Q. Table 7, 8 and 9 shouldn't have anything in

there about non-Hispanic white percentage?

A. That's right. I looked at it, but it wasn't --

it's not in the table. That's a typo.

Q. All right. What about Table 10, what is this?

A. Just a summary of these tables.

Q. Explain to me how they're summarized.

A. And it should read -- I think I changed the

table numbering. It should read 7 to 9 not 6

through 8, to make it clearer for you up on top

there.

Q. I gotcha.

A. Okay. It's just a summary of the results. In

other words, of all the districts I looked at,

169

how many had a black share of Democratic

registered voters in each of these categories,

how many and what percentage, by the way, as

well, and how many and what percentage were in

these various categories for the Democratic

electorate as opposed to the Democratic

registered voters in the 2008 primary.

And the last two columns are same thing

for 2010 Democratic primary.

Q. Is it important for the ability-to-elect

districts to have a black registration

percentage in excess of 55 percent?

A. It helps. It might not be necessary, but

certainly if you're at 55 percent or greater,

which you have all the time here, that

indicates very strong underlying African

American voting strength in Democratic

primaries.

Q. Looking at all the stuff we've looked at today,

Dr. Lichtman, is it fair to say that most

African Americans who have been elected in

North Carolina have been elected in districts

where the black registration in the Democratic

primaries is in excess of 55 percent?

A. I didn't look here at the 50 percent plus

170

districts, but my assessment, since you're

asking me the question, I'll answer it as best

I can, is that probably true.

Q. We talked about four or so districts where

blacks had won where the percentage of the

black voting age population was below

40 percent. We've already discussed that

today.

A. We have.

Q. You didn't look at the registration statistics

for those districts?

A. I don't believe we did.

Q. And there's a much higher number of blacks than

the four races we've looked at who have been

elected in districts that are 40 percent or

above black voting age population. We could

count it up right here, but it's quite a larger

number, isn't it?

A. Yes. There are some elected in below 40

percent, which is why I stressed 40 percent is

not a magic number, but, yes, overwhelmingly

the substantial majority of elected African

Americans in the State House and State Senate

would have been elected in districts 40 percent

black voting age population or more.

171

Q. And those districts that you just described

also almost always have a registered black

Democratic percentage of 55 percent or above?

A. That's certainly true of the ones I looked at

which stopped at 49.9, but I would suspect

that's likely also true of the 50 percent plus.

Q. Is it pretty safe to say those are going to be

over 50 percent registered black?

A. One would think so, yes.

Q. What's table 11?

A. That is the actual vote for the white

incumbent, Clark Jenkins, and the two black

candidates, Frankie Bordeaux and Florence

Arnold Armstrong, simply duplicated from the

State Board of Elections. And that's in here

because Dr. Brunell -- not Dr. Brunell --

Dr. Hood in his analysis gets the facts wrong

about this district, stating that the two

African American candidates only got I think he

said something like 46 percent of the vote and

that this demonstrates that you need to go over

50 percent BVAP for the two African American

candidates combined to go over 50 percent. In

fact, he's off substantially, that even in this

district which is well below 50 percent, the

172

1    actual results of elections, not what he
2    reports in his report, is already over
3    50 percent.
4    Q. Let me ask you this, Dr. Lichtman, did you ever
5    study election results in the Senate district
6    after the 2011 plans were --
7    A. No.
8    Q. -- were enacted?
9    A. No.
10   Q. Do you know whether the black percentage in
11   this district in 2011 was increased above
12   50 percent?
13   A. When you say this district --
14   Q. Senate District 3.
15   A. I understand that, but Senate District 3 in the
16   old plan and Senate District 3 in the new plan
17   are not going to be the same district. So I
18   don't think you're using the proper terms.
19   They may have the same numbers, but they may be
20   completely different districts. I don't know
21   that, but I know when you create a
22   redistricting plan, you do a lot of shuffling.
23   So do you know if the Senate -- if Senate
24   District 3 in the current plan is above
25   50 percent black?

173

1    A. I don't, and I don't know if that's the same as
2    Senate District 3 in the previous plan.
3    Q. Do you know if Clark Jenkins was defeated in an
4    election after 2011 in Senate District 3 by a
5    black candidate?
6    A. That's very possible because as you can see in
7    the old district, the black candidates got a
8    majority of the vote. They lost because they
9    split it. That's politics. Not the district.
10   Q. Did you look at any elections before 2008 for
11   Senate District 3?
12   A. No.
13   Q. For 2010?
14   A. I'm sorry. You said before --
15   Q. Did you look at any elections before 2008 in
16   Senate District 3?
17   A. No.
18   Q. Do you know that -- have there been any other
19   examples where they had multiple white
20   candidates running against Senator Jenkins?
21   Did you examine that?
22   A. I did not.
23   Q. What's Table 12?
24   A. Now we're getting into another realm of
25   analysis and that's general elections. In

174

1    other words, the question I'm asking here,
2    which I also examined previously in a different
3    context, was, all right, we see that African
4    Americans control the Democratic primary. What
5    if African American candidates of choice get
6    out of the Democratic primaries, what are their
7    prospects in the general election.
8        We already saw district by district
9    that the actual win rate was 100 percent and
10   this looks at it a little differently, looking
11   at statewide elections involving Republicans
12   and Democrats in general elections and seeing
13   what the Democratic two-party percentages are
14   in the districts, and it shows overwhelmingly
15   these are Democratic districts.
16       Nothing is a lock in politics, but the
17   ability of African American candidates of
18   choice coming out of primaries to win general
19   elections is a near certainty in these
20   districts.
21   Q. Table 12 deals with House districts?
22   A. Yes.
23   Q. Table 13 deals with Senate districts?
24   A. Yes.
25   Q. Table 14 is congressional districts?

175

1    A. Yes.
2    Q. What's Table 15?
3    A. It's a summary of -- again, the numbering is a
4    little off because I changed the numbers on my
5    tables and didn't fully reflect it here. It
6    should be 12 to 14. It's the same tables.
7        This shows that 100 percent win rate in
8    80 elections; 93 percent, a 60 percent or more
9    win; and 76 percent of the time a 65 percent or
10   more win.
11   Q. Okay. I'm going to take a short break and then
12   I'm finished.
13       (Brief Recess: 2:56 to 2:58 p.m.)
14   BY MR. FARR:
15   Q. Dr. Lichtman, I've got one, maybe two more
16   questions.
17       We just went through Exhibit 9 where
18   there was a typo in a couple of those pages
19   with charts where you referred to non-Hispanic
20   whites.
21   A. Yeah.
22   Q. Is it fair to say that you didn't determine the
23   non-Hispanic white percentages in these
24   districts in any of your reports that you've
25   done?

176

44 (Pages 173 to 176)

1    A. I did determine it, and we discussed it mostly
2    in terms of the fact that when you add together
3    the non-Hispanic whites and the blacks, it's
4    pretty much, except for low single digits, the
5    entire electorate. So you can very closely
6    approximate it from the African American
7    component, but I was just being consistent
8    since in all my other tables I was looking at
9    the African American concentration. That's
10   what I did here.
11   Q. But you didn't in any of your reports actually
12   report the non-Hispanic white population?
13   A. I believe that's right.
14   Q. Okay. That's all I have.
15        MS. EARLS: I have just one question.
16            EXAMINATION
17   BY MS. EARLS:
18   Q. We can go back to Exhibit 1 to this deposition.
19   A. You have my copy. What page?
20   Q. Page 23.
21   A. I'm there.
22   Q. And you were asked -- I think you read into the
23   record this morning parts of that paragraph.
24   My question is: You in that paragraph
25   reference the expert reports of Ray Block and

177

1    Thomas Brunell and then in your testimony today
2    you've talked about why these reports were
3    inaccurate. Can you explain why you referenced
4    them here in this report?
5    A. Just because the State of North Carolina, who
6    was the defendants in the VIVA case, had
7    affirmed racially polarized voting in this
8    redistricting case. That's the sole reason.
9        I did not in this statement and
10   certainly did not mean in this statement to say
11   I endorsed any of the findings of the Block or
12   the Brunell report.
13        MS. EARLS: That's all I have.
14        [SIGNATURE RESERVED]
15        [DEPOSITION CONCLUDED AT 3:00 P.M.]
16
17
18
19
20
21
22
23
24
25

178

1        A C K N O W L E D G E M E N T   O F   D E P O N E N T
2
3        I, ALLAN J. LICHTMAN, Ph.D., declare under
4    the penalties of perjury under the State of North
5    Carolina that I have read the foregoing pages, which
6    contain a correct transcription of answers made by me
7    to the questions therein recorded, with the
8    exception(s) and/or addition(s) reflected on the
9    correction sheet attached hereto, if any.
10   Signed this the     day of      , 2016.
11
12
13            ALLAN J. LICHTMAN, Ph.D.
14
15
16
17
18
19
20
21
22
23
24
25

179

1        E R R A T A   S H E E T
2    Case Name: Covington, et al. vs. The State of NC, et al.
3    Witness Name: ALLAN J. LICHTMAN, Ph.D.
4    Deposition Date: Friday, February 12, 2016
5
6    Page/Line    Reads         Should Read
7    ___/___|_____|_____
8    ___/___|_____|_____
9    ___/___|_____|_____
10   ___/___|_____|_____
11   ___/___|_____|_____
12   ___/___|_____|_____
13   ___/___|_____|_____
14   ___/___|_____|_____
15   ___/___|_____|_____
16   ___/___|_____|_____
17   ___/___|_____|_____
18   ___/___|_____|_____
19   ___/___|_____|_____
20   ___/___|_____|_____
21   ___/___|_____|_____
22   ___/___|_____|_____
23
24
25   Signature          Date

180

1    STATE OF NORTH CAROLINA   )
                ) C E R T I F I C A T E
2    COUNTY OF WAKE        )

3

4         I, DENISE MYERS BYRD, Court Reporter and Notary

5    Public, the officer before whom the foregoing proceeding was

6    conducted, do hereby certify that the witness whose testimony

7    appears in the foregoing proceeding were duly sworn by me;

8    that the testimony of said witness was taken by me to the

9    best of my ability and thereafter transcribed under my

10   supervision; and that the foregoing pages, inclusive,

11   constitute a true and accurate transcription of the testimony

12   of the witness(es).

13         Before completion of the deposition, review of

14   the transcript [X] was [ ] was not requested.  If requested,

15   any changes made by the deponent (and provided to the

16   reporter) during the period allowed are appended hereto.

17         I further certify that I am neither counsel

18   for, related to, nor employed by any of the parties to this

19   action, and further, that I am not a relative or employee of

20   any attorney or counsel employed by the parties thereof, nor

21   financially or otherwise interested in the outcome of said

22   action.  Signed this 25th day of February 2016.

23

24

          Denise Myers Byrd
25        CSR 8340, RPR, CLR 102409-02

                                    181