IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
NO. 1:15-CV-00399

| | | |
|---|---|---|
| SANDRA LITTLE COVINGTON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **DEFENDANTS' TRIAL BRIEF** |
| | ) | |
| STATE OF NORTH CAROLINA, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## I.     INTRODUCTION

Disappointed with three redistricting losses in North Carolina state court and the political impact of the redistricting plans challenged in those cases, plaintiffs here now invite this Court to "trap" the State of North Carolina between "competing hazards of [redistricting] liability." *Bush v. Vera*, 517 U.S. 952, 977 (1996) (quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 291 (1986)) (O'Connor, J., concurring in part and concurring in Judgment). Redistricting, however, is an inherently difficult and political task, and the federal courts lack authority to play "gotcha" with the reasonable redistricting choices states make. Regardless, the evidence will show that race was not the predominant motive for any of the districts challenged here and that the legislature had good reasons to believe that the challenged districts were reasonably needed to protect the state from liability under Section 2 of the Voting Rights Act ("VRA").

## II. BACKGROUND

### A. History of North Carolina's attempts to comply with the Voting Rights Act.

In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court identified the three "preconditions" plaintiffs must prove to find a violation of Section 2 in redistricting cases. First, "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.* at 50. Second, "the minority group must be able to show that it is politically cohesive." *Id.* Finally, the minority group "must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances – *such as the minority candidate running unopposed* – to defeat the minority's preferred candidate." *Id.* (emphasis added). The term "racially polarized voting" is a synonym for the third element of the *Gingles* preconditions. *Id.* at 53 n. 21.

In *Gingles*, North Carolina was ordered to create majority black legislative districts[1] as a remedy for violations of Section 2 in the following counties: Bertie,

---

[1] The *Gingles* court expressly declined to consider "whether § 2 [of the Voting Rights Act] permits, and if it does, what standards should pertain to a claim brought by a minority group that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a multimember district impairs its ability to *influence* elections." *Gingles*, 478 U.S. at 46 n. 12 (emphasis in the original). Since then, courts have defined four different types of districts that have been described as "voting rights districts" or "VRA districts." These include: (a) "majority minority districts," in which a specific minority group constitutes an actual majority of the voting age population ("VAP"); (b) minority "coalition" districts, in which two minority groups constitute a majority of the VAP and form a coalition to elect the coalition's candidate of choice; (c) majority white "crossover" districts, in which minority voters make up less than a majority of the VAP but are potentially large enough to elect their candidate of choice with the help of some white "crossover" voters; and (d) "influence" districts, in

Case 1:15-cv-00399-TDS-JEP   Document 81   Filed 03/21/16   Page 2 of 22

Chowan, Edgecombe, Forsyth, Gates, Halifax, Martin, Mecklenburg, Nash, Northampton, Wake, Washington, and Wilson. *Gingles v. Edmisten*, 590 F. Supp. 345, 365-66 (E.D.N.C. 1984), *aff'd, Gingles*, 478 U.S. at 80; Judgment and Memorandum Opinion, App. A, p. 77, F.F. No. 1, *Dickson v. Rucho*, Nos. 11 CVS 16896 and 11 CVS 16940 (consolidated) (July 8, 2013)[2] (filed with the Court in this case as an attachment at D.E. 32-1[3]). In 1991, the General Assembly preserved all of the 1984 majority black House districts enacted because of *Gingles* and added four new majority black districts. Similarly, the 1991 General Assembly preserved all of the majority black Senate districts established because of *Gingles*, and created two new Senate districts in which blacks were the majority of all registered voters. This resulted in five Senate districts in which African Americans represented a majority of registered voters. Following a Section 5 objection from the Attorney General to the 1991 House and Senate plans, the General

---

which the minority group is a minority of the VAP but sufficiently large enough to influence the outcome of an election even if the preferred candidate of choice cannot be elected. *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) ("*Strickland*"). In addition to these types of districts, at least two justices of the Supreme Court formerly endorsed a theory that a VRA district could be established where the "minority voters in a reconstituted or putative district constitute a majority of those voting in a primary of the dominant party, that is the party tending to win in the general election." *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 485-86 (2006) (Souter and Ginsburg J.J., concurring in part and dissenting in part) ("*LULAC*").

[2] The Judgment and Memorandum Opinion without appendix is available on Westlaw at 2013 WL 3376658. Because the electronic version does not contain the appendix, for consistency, citations in this memorandum will correspond to the page numbers as they appear in the Memorandum Opinion with the two appendices and not the Westlaw version.

[3] Citations to the *Dickson v. Rucho* Judgment and Memorandum Opinion and appendices will be made to the referenced docket entry in this case, D.E. 32-1.

Assembly modified the 1991 House plan to create three new minority House districts, including one in Guilford County and two in Southeastern North Carolina.

The General Assembly's use of race in this manner was explicit. The motivation for these changes was described in detail in filings it made with USDOJ in preclearance proceedings. (D.E. 33-2 (1991 Section 5 Submission, Section H 27 N, "Effect of Change on Minority Voters"; Section S-27 N "Effect of Plan on Racial Minorities"); D.E. 33-32 (Historical House Map Notebook, Tab 1, 2); D.E. 33-38 (Historical Senate Map Notebook, Tab 16); D.E. 33-42)

Because the Supreme Court in *Gingles* and subsequent cases declined to address the percentage of black population that must be included in a voting rights district, states formerly used two different strategies for creating VRA districts. *See Georgia v. Ashcroft*, 539 U.S. 461 (2003). Under one option, states could create "a certain number of 'safe districts' in which it is highly likely that minority voters will be able to elect their candidate of choice." *Ashcroft*, 539 U.S. at 480. Under an alternative strategy, states could choose to make a political decision to enact a combination of districts, including majority minority, coalition, and influence districts, in the place of a plan based upon safe majority minority districts. *Id.* at 480-83.

At the time of the 2001 redistricting, the General Assembly adopted the political strategy explained in *Ashcroft* and enacted a plan intended to avoid liability under the VRA with a combination of majority black, coalition, and influence districts. Following the theory articulated by Justices Souter and Ginsburg in *LULAC*, the State argued that it had "preserve[d] black voting strength" by creating strong majority Democratic districts

4

in which blacks constituted a majority of registered Democrats. The State further explained that this was accomplished by making districts that adjoin minority districts stronger for Democratic candidates by moving white Democratic precincts out of the minority districts and replacing them with Republican voters who would be submerged in strong majority black or coalition Democratic districts and unable to vote in the Democratic primary. In the 2001 House Plan, the State enacted 10 majority black House districts located in Section 5 counties and increased the number of majority black districts in non-covered counties from four to five to protect the State from liability under Section 2. The State also enacted an additional House district in Cumberland County that was majority black in the number of registered voters (House District 48). The State also argued that the plan should be precleared because it enacted four more House districts in non-covered counties, including Durham, with black majorities in the number of registered Democrats.[4]

The State advocated that the 2001 Senate plan be precleared because it included two majority black districts in Section 5 counties and four districts with a black population between 40% and 50% in counties (Wake, Mecklenburg, and Forsyth) where the State was subject to liability under Section 2. The State described these districts as

---

[4] In *Gingles*, the Supreme Court held that legally significant racially polarized voting was not present in a 1984 multimember district in Durham County. As explained by the Court in *Gingles*, the absence of polarized voting in a multimember district with single shot voting does not mean racially polarized voting is not present in single member districts that might be drawn in that county. (D.E. 32-1, App. A, pp. 100-01, F.F. No. 40(b)) The finding in *Gingles* did not prevent the State from proposing and enacting in Durham a majority black congressional district in 1991 and majority black or coalition legislative districts in 1992, 2001, and 2003. (D.E. 33-2 through D.E. 33-6) No one challenged any of these districts as racial gerrymanders.

5

"effective black voting districts." Once again, the State emphasized that African Americans represented the majority of registered Democrats in these districts, and once again, the State was explicit in describing the extent to which it believed race was a required consideration in the construction of these districts. (D.E. 33-4, D.E. 33-5 (2001 Submission, Section H-27N "Effect of Sutton 3 on Minority Voters"; S-27N "Effect of Adoption of Senate Plan on Minority Voters"); D.E. 33-32 (Historical House Map Notebook, Tab 3); D.E. 33-42))

The legislative plans enacted in 2001 were never used in a general election because they were declared unlawful under the Whole County Provision ("WCP") of the North Carolina Constitution. *Stephenson v. Bartlett*, 355 N.C. 354, 562 S.E.2d 377 (2002) ("*Stephenson I*"); N.C. Const. art. II, §§ 3(3) and 5(3). In 2002, a superior court judge found that a second set of plans enacted by the General Assembly also violated the WCP and the court implemented its own interim plan for the 2002 General Election. (D.E. 33-33, D.E. 33-34 (Historical House Map Notebook, Tabs 4, 5); D.E. 33-39 (Historical Senate Map Notebook, Tabs 19, 20); D.E. 33-42) In 2003, the North Carolina Supreme Court affirmed these rulings by the superior court. *Stephenson v. Bartlett*, 357 N.C. 301, 582 S.E.2d 247 (2003) ("*Stephenson II*"). A third set of legislative plans were enacted in 2003 and used in every general election from 2004 through 2010. (D.E. 33-35 (Historical House Map Notebook, Tab 6); D.E. 33-40 (Historical Senate Map Notebook, Tab 21); D.E. 33-42) The only district from the 2003 plans that was ever subject to constitutional review (House District 18 or "HD 18") was found to be in violation of the WCP. *Pender Cnty. v. Bartlett*, 361 N.C. 491, 649 S.E.2d 364 (2007) ("*Pender County*"),

6

*aff'd*, *Strickland*, supra.  The 2003 House plan was slightly modified in 2009 to correct the violations associated with the 2003 HD 18.  (D.E. 33-35 (Historical House Map Notebook, Tab 7); D.E. 33-42)

The 2003 legislative plans followed the same political strategy reflected in the 2001 plans and included a mixture of majority black, coalition, and influence districts, and again the legislature was explicit in explaining its racial motivation in preclearance submissions.  (D.E. 33-6 (2003 Submission Sections 3H-27N, "Effect of Enactment of 2003 House Redistricting Plan on Minority Voters"; 3S-27N, "Effect of Adoption of 2003 Senate Redistricting Plan on Minority Voters"))  By the time of the 2010 Census, the 2003 House plan contained 23 districts with an "any part black voting age" ("APBVAP") population above 40%.[5]  Nine of these districts were majority black.  The other 14 districts were coalition districts with non-Hispanic whites representing a minority of the voting age population.  In all 23 House districts, Democrats were a majority of the registered voters and African Americans were a supermajority of registered Democrats.  The 2003 House plan also included nine influence districts with majority white population but with black voting age populations between 30.15% and 36.90%.  The influence districts almost always elected white Democrats with the

---

[5] The census categories of "white," "black," "Hispanic," "total black" (or "any part black"), and "non-Hispanic white" were all reported by the General Assembly in its statistical reports published with each redistricting map for the first time in 2011.  (*See* D.E. 33-32 through D.E. 33-41 (Historical House Map Notebook and Historical Senate Map Notebook))  The "white" category is without regard to ethnicity and includes people who are Hispanic or Latino.  The category "non-Hispanic white" excludes that portion of the population. (D.E. 32-1, p. 4, F.F. No. 3; D.E. 33-8 (Second Frey Aff. Ex. 34, Notes)) The term "total black" as used in these reports is equivalent to the census category of "any part black."  *Id.*

7

exception of House District 39 in which a black Democrat was elected in 2006 and 2008. (D.E. 32-1, p. 25; D.E. 33-7 (First Frey Aff. Ex. 11); D.E. 33-8 (Second Frey Aff. Exs. 39, 49, 59); D.E. 33-35 (Historical House Map Notebook, Tab 8); D.E. 33-42)

An identical political strategy for VRA compliance was followed by the General Assembly in the 2003 Senate plan. It included eight districts with a black voting age population between 40% and 50%. Nine districts were created as coalition districts with African Americans representing a very high plurality of the voting age population. Non-Hispanic whites were a minority group in all of these districts. In all nine districts, registered Democrats were a majority of the registered voters and African Americans were a majority of registered Democrats. The 2003 Senate plan also included six influence districts, with black voting age populations between 30.11% and 37.36% which typically elected white Democrats. A black Democrat was elected in one of the influence districts in 2008 (Senate District 5) but was defeated by a white Republican in 2010. (D.E. 32-1, p. 25; D.E. 33-7 (First Frey Aff. Ex. 10); D.E. 33-9, D.E. 33-10 (Second Frey Aff. Exs. 34, 44, 56); D.E. 33-40 (Historical Senate Map Notebook, Tab 22); D.E. 33-42)

The legal landscape regarding VRA districts changed dramatically after the 2003 plans were enacted. First, in 2006, the Supreme Court rejected the argument that Section 2 requires influence districts because "the opportunity 'to elect representatives of their choice' . . . requires more than the ability to influence the outcome between some candidates, none of whom is [the minority group's] candidate of choice." *LULAC*, 548 U.S. at 445-46; *see also Strickland*, 556 U.S. at 13.

8

Another significant legal development occurred when Congress reauthorized Section 5. *See* Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, P.L. 109-246, 120 Stat. 577 (2006). One of the purposes of these amendments was to reverse any portion of *Ashcroft* which gave states the option of selecting coalition or influence districts over districts that allow the minority group to elect their preferred candidates of choice. *See* S. REP. NO. 109-295, at 18-21 (2006) ("Preferred Candidate of Choice"); H.R. REP. NO. 109-478, at 65-72 (2006).

Finally, in *Pender County*, the North Carolina Supreme Court held that Section 2 did not authorize the creation of coalition districts, crossover districts, or influence districts, and that, under the WCP, any district enacted to protect the State from Section 2 liability would need to be established with a true majority minority population. 361 N.C. at 503-07, 649 S.E.2d at 372-74. On appeal, the United States Supreme Court affirmed that crossover districts could not be required under Section 2 because districts designed to protect a state from Section 2 liability must be numerically majority minority. *Strickland*, 556 U.S. at 12-20. While the Court did not squarely address whether coalition districts could be required by Section 2, it stated that such districts had never been ordered as a remedy for a Section 2 violation by any of the circuit courts. *Id.* at 13, 19.[6]

_____

[6] The Court in *Shaw I* recognized a claim that was "analytically district" from a vote dilution claim. *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (citing *Shaw I*, 509 U.S. at 653). Under the Fourteenth Amendment, a vote dilution claim alleges that a particular voting scheme purposefully operates to "'minimize or cancel out the voting potential of racial or ethnic minorities.'" *Id.* (citing *Mobile v. Bolden*, 446 U.S. 55, 66 (1980) (dismissing plaintiffs' claim for vote dilution under the Fourteenth Amendment)). In

9

In *Strickland*, the Court found "support for the majority minority requirement in the need for workable standards and sound judicial and legislative administration." *Id.* at 17. A majority minority rule "draws clear lines for courts and legislatures alike." *Id.* Determining whether a less than majority minority district provides the minority group with an equal opportunity to elect their candidate of choice would "place courts in an untenable position of predicting many political variables and tying them to race-based assumptions." *Id.* Courts would be required "to make predictions or adopt premises that even experienced policy analysts and political experts could not assess with certainty, particularly over the long term." *Id.* For example,

> courts would be required to pursue these inquiries: What percentage of white voters supported minority-preferred candidates in the past? How reliable would the crossover votes be in future elections? What types of candidates have white and minority voters supported together in the past and will those trends continue? Were past crossover votes based on incumbency and did that depend on race? What are the historical turnout rates among white and minority voters and will they stay the same? Those questions are speculative, and the answers (if they could be supposed) would prove elusive. A requirement to draw election districts on answers to these and like inquiries ought not to be inferred from the text or purpose of § 2.
>
> *Id.*

---

contrast, in a racial gerrymandering case the state "has used race as a basis for separating voters into districts" which is prohibited unless justified by a strong basis in evidence. *Id.*; *Shaw II*, 517 U.S. at 190. The injury in a racial gerrymandering case is not the cancelation of voting strength, but instead is the "stigma" that attached to voters separated into different districts because of race. *Shaw I*, 509 U.S. at 643. Based upon this precedent, absent a strong basis in evidence, the State cannot draw and this Court cannot order districts that are still based upon race but at a lower "quota" of something below 50% APBVAP. Thus, should plaintiffs prevail, the remedy is not the replacement of majority black districts with coalition districts. Instead, the remedy is that race may not be used as a factor in the construction of districts enacted to replace any of the challenged VRA districts which the Court finds to be racial gerrymanders.

10

The dissent in *Strickland* clearly understood that the Court's opinion would be construed as requiring states to draw any district designed to protect the state from liability under the VRA with a minority population in excess of 50% black VAP. The dissent stated:

> If districts with minority populations under 50% can never count as minority-opportunity districts to remedy a violation of the state's obligation to provide required electoral opportunity under § 2, states will be required under the plurality's rule to pack black voters into additional majority-minority districts, contracting the number of districts where racial minorities were having success in transcending racial divisions in securing their preferred representatives.

*Id.* at 27 (Souter, J., dissenting).

The dissenting opinion also explained that the Court had already previously held that "the better baseline for measuring opportunity to elect under § 2, although not dispositive, is the minority's rough proportion of the relevant population." 556 U.S. at 29 (citing *Johnson v. De Grandy*, 512 U.S. 997, 1016-17 (1994)).[7] The dissent noted that "the starting point" for assessing Section 2 claims "is a comparison of the number of districts where minority voters can elect their chosen candidates with the group's population percentage." *Id.* (citing *LULAC*, 548 U.S. at 436). Thus, a Section 2 claim "must be assessed by looking at the overall effect of a multidistrict plan" and a Section 2 plaintiff "must look to an entire districting plan (normally statewide) alleging that the

---

[7] Justice Souter was the author of the Court's opinion in *De Grandy*. The plaintiffs' vote dilution claim in *De Grandy* was dismissed because the challenged plan provided proportionality to the minority group in that the number of districts where the group had the ability to elect a candidate of choice was proportional in the minority's percentage to the general population.

challenged plan creates an insufficient number of minority opportunity districts in the territory as a whole." *Id.* (citing *LULAC*, 548 U.S. at 436-37).

### B. North Carolina's history defending claims of illegal racial gerrymandering.

Plaintiffs' legal theories originate from North Carolina's 1992 Congressional Plan and litigation focused on two majority black districts established by that plan, the 1992 versions of Congressional District 1 ("CD 1") and Congressional District 12 ("CD 12"). *Shaw v. Reno*, 509 U.S. 630 (1993) ("*Shaw I*"); *Shaw v. Hunt*, 861 F. Supp. 408 (E.D. N.C. 1994) (three-judge court), *rev'd*, 517 U.S. 899 (1996) ("*Shaw II*"). In *Shaw I*, the Supreme Court found that plaintiffs had stated a claim under the Fourteenth Amendment where congressional districts "separate voters into different districts on the basis of race, and that the segregation lacks sufficient justification." *Id.* at 649. In *Shaw II*, the Supreme Court reversed the district court's holding affirming the constitutionality of CD 12 and found that CD 12 constituted an illegal racial gerrymander. In *Shaw II*, the Court explained that plaintiffs bore the burden of proving that race was the predominant motive for a challenged district, and that once plaintiffs carried that burden, defendants were obligated to show a strong basis in evidence for drawing the district based upon race. The Court assumed, without expressly deciding, that enacting a district to protect a state from Section 2 liability could provide a strong basis for a district predominantly based upon race, but held that North Carolina had failed to make that showing. *Shaw II*, 517 U.S. at 907-18.

12

In 1997, and in response to *Shaw II*, North Carolina enacted a new congressional plan that made substantial changes to CD 1 and CD 12. In *Cromartie v. Hunt*, 133 F. Supp. 2d, 407 (E.D.N.C. 2000) (three-judge court), *rev'd*, *Easley v. Cromartie*, 532 U.S. 234 (2001) ("*Cromartie II*") the Court reversed the district court's judgment that CD 12 constituted an illegal racial gerrymander. The Court found that the district court's factual findings were clearly erroneous because the 1997 version of CD 12 had been predominately based upon politics and not race. *Cromartie II*, 532 U.S. at 241-42, 257-58.

Significantly, in *Cromartie II*, the district court dismissed plaintiffs' allegations that CD 1 constituted an illegal racial gerrymander, and that judgment was not appealed. The 1997 version of CD 1 encompassed the following twenty counties: Beaufort, Bertie, Craven, Edgecombe, Gates, Granville, Greene, Halifax, Hertford, Jones, Lenoir, Martin, Northampton, Person, Pitt, Vance, Warren, Washington, Wayne, and Wilson. As shown below, ten of these twenty counties were divided into different Congressional districts:

13



1997 Congressional Plan - District 1

In each of the ten divided counties, the percent of African American population was higher in the part of the county that was inside CD 1 as compared to the part that was outside CD 1. Nine of the 13 cities and towns split between CD 1 and its neighboring district were also divided so that the African American population was higher in the part of the divided city located in CD 1 as compared to the part of the city located in the adjacent district. *Cromartie II*, 133 F. Supp. 2d at 415-16.

Under the 1990 Census, 1997 CD 1 had a black population of 50.27% and a black voting age population of 46.54%. *Cromartie II,* 133 F. Supp. at 415 n. 6. Despite being less than majority black VAP, the parties stipulated and the Court found that legally significant racially polarized voting was present in CD 1. *Id.* at 422. The Court also found that CD 1 was based upon a reasonably compact minority population that could be

14

a majority in a single number district. In support of this holding, the Court cited a mathematical test for compactness known as the Reock test ("dispersion compactness"). The Reock score for CD 1 was 0.31.[8] The district court found that the General Assembly had a strong basis in evidence for concluding that CD 1 was reasonably necessary to protect the state from liability under Section 2 and dismissed plaintiffs' claims as to this district. *Id.* at 422.

### C.    State Constitutional Requirements.

In North Carolina, in addition to the "competing hazards of liability" of racial gerrymandering and vote dilution, another intertwined "hazard" is compliance with the WCP as interpreted by the North Carolina Supreme Court. The North Carolina Supreme Court established a nine-part formula for compliance with the state's WCP. Significantly, in setting out the test, the Court required that "[t]o the maximum extent practicable, [VRA districts] shall also comply with the legal requirements of the WCP, as herein established" and that redistricting plans "shall depart from strict compliance with the legal requirements set forth herein only to the extent necessary to comply with federal law." *Stephenson II*, 582 S.E.2d at 250-52 (citing *Stephenson I*, 562 S.E.2d at 396-98); *see also Dickson v. Rucho*, 766 S.E.2d 238, 258-59 (N.C. 2014) ("*Dickson I*"); *Dickson v. Rucho*, 781 S.E.2d 404, 438-40 (N.C. 2015) ("*Dickson II*").

---

[8] The district court cited a law review article that explains compactness scores which was cited by the United States Supreme Court. *See* Pildes & Niemi, *Expressive Harms, "Bizarre Districts" and Voting Rights: Evaluating Election-District Appearances After Shaw v. Reno,* 92 Mich. L. Rev. 483, 571-573, Table 6 (1993) (hereinafter, "Pildes & Niemi"); *see also Bush v. Vera*, 517 U.S. at 959-60. The court noted that Pildes and Niemi suggest that 0.15 constitutes a "low" Reock or dispersion compactness score. *Cromartie II*, 133 F. Supp. at 415.

15

## III.    ARGUMENT

### A.    The evidence will show that the legislature properly navigated the many "hazards of liability" and therefore none of the challenged districts are illegal racial gerrymanders.

Nearly five years after the challenged districts were enacted, and after the same group of lawyers chose to challenge these districts in state court and lost, plaintiffs, many of whom were recruited by *Dickson* plaintiffs, an employee of the Democratic Party, or by counsel and who have never seen the complaint and do not know who is paying their legal fees, are attempting to impose impossible legal obligations on the North Carolina General Assembly.  They have articulated no standards or criteria that can be used by the General Assembly to comply with the competing hazards of liability outlined above. They have ignored the established fact that the challenged districts comply with the State's Constitution as well as the substantial evidence – some of which their attorneys provided – giving the state "good reasons" to believe that the challenged districts were reasonably necessary to protect the state from liability under the Voting Rights Act. *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1274 (2015).

Moreover, plaintiffs have failed to meet a common and basic element of their burden of proof with an alternative plan that meets the applicable legal criteria.  Plaintiffs attempt to compare 2003 districts to the challenged 2011 districts even though the 2003 districts no longer satisfy the requirements of one person, one vote or the WCP.  *Dickson II*, 781 S.E.2d at 440.  They also ignore North Carolina's history of voting rights districts, two expert reports (one of which was produced by a group that included the NC NAACP) showing the presence of racially polarized voting in the counties and regions where VRA

16

districts were enacted in 2011, lay testimony during public hearings supporting the need for proportionality and majority black districts, the almost universal lack of success by black candidates running in majority white districts, and the complete lack of evidence to the contrary. When the 2011 redistricting plans were developed, there was no dispute that significant racially polarized voting continued to exist in North Carolina and that VRA districts were still needed to protect the State from a lawsuit for vote dilution. Like the 1997 CD 1, all VRA districts found in the 2003 plans, the enacted 2011 plans, and all 2011 alternative plans divided counties, cities, towns, and precincts to form VRA districts. From a compactness standpoint, no district enacted in 2011 looks more bizarre than the 1997 CD 1 – found to be compact in *Cromartie II* - or the 2003 VRA districts or the 2011 alternative VRA districts. Moreover, almost all of the challenged districts have a Reock compactness score above 0.15, the benchmark used by an authority cited by the United States Supreme Court to identify districts with low compactness.

The only undisputed difference between the 2011 challenged districts and the 2003 districts and all alternative 2011 VRA districts is that the 2011 challenged districts consistently follow legal criteria adopted by the United States Supreme Court and the North Carolina Supreme Court and that the 2003 districts and all 2011 alternative districts do not. In fact, the 2003 districts and all 2011 alternatives do not consistently follow any legal criteria. The 2003 and 2011 alternative districts do not comply with the *Stephenson* formula for grouping counties while the North Carolina Supreme Court has found that the challenged districts do. *Dickson II, supra.* The State relied upon well-established Supreme Court precedent on proportionality as a reference point for the

17

number of VRA districts that might be created, so long as they complied with the *Gingles* preconditions. The 2003 plans and all 2011 alternative plans adopt a politically driven, arbitrary number of VRA districts that advance the political interests of the Democratic Party – and not the ability of African American voters to elect their preferred candidates of choice. For similar political reasons, the 2003 plans and the 2011 alternatives do not follow the Supreme Court's decision in *Strickland* concerning the percentage of black voting age population that should be included in a VRA district. All of the arguments plaintiffs will make to challenge the 2011 enacted districts have already been made and rejected by the Supreme Court in *Strickland*.[9]

## B.      Relief

At the conclusion of the trial in this matter, defendants will request that plaintiffs' claims be dismissed and judgment entered in favor of defendants.

---

[9] After the 2010 election, a total of 18 African Americans were elected to the State House and seven African Americans were elected to the State Senate. All were elected in majority black or coalition districts. As of the 2014 general election, 23 African Americans have been elected to the House and 11 African Americans have been elected to the State Senate. Plaintiffs want this Court to reduce the number of districts in which African Americans have an equal opportunity to elect their candidates of choice based on the political interests of one political party. If the legislature ever enacted plans to reduce the number of VRA districts to benefit the political interests of a political party, it would be guilty of purposeful discrimination in violation of the Fourteenth Amendment. Federal Register, Vol. 76, No. 27, p. 7471 (February 9, 2011) (citing *Busbee v. Smith*, 549 F. Supp. 494, 508 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983)); *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kozinski, J., concurring and dissenting in part), *cert. denied*, 498 U.S. 1028 (1991). Plaintiffs in federal litigation should not be allowed to obtain court-ordered relief that would be blatantly unconstitutional if enacted by a legislature.

18

However, in the event that the Court decides this case in favor of the plaintiffs, the Court should stay its order for the 2016 election cycle and order the General Assembly to propose remedial legislative redistricting plans for the 2018 election cycle. The Court may take judicial notice of the fact that primary elections for all 170 legislative seats in the General Assembly took place on March 15, 2016 and that over two million voters participated in those elections. See http://er.ncsbe.gov/?election_dt=03/15/2016&county_id=0&office=FED&contest=0.

Delaying relief until 2018 would be consistent with this Court's prior order denying plaintiffs' motion for preliminary injunction. In its order, the Court noted that granting an injunction then would "cause an extraordinary disruption to North Carolina's 2016 election cycle." (D.E. 39 at 8) The Court also noted that "enjoining election proceedings until after trial and a final decision on the merits, as Plaintiffs request, would make it impossible for the state to hold its primary elections as scheduled." (D.E. 39 at 9) Of course, implementing any relief for the 2016 election cycle after the trial scheduled for April 11, 2016 would not only disrupt the primary elections, it would cancel the results of elections that have already taken place and disenfranchise the millions of voters who participated in those elections.

Delaying relief would also be consistent with precedent from a prior redistricting case from North Carolina. In *Shaw II*, the Supreme Court found that CD 12 was a racial gerrymander and remanded the case to the district court for further relief. The case was remanded on July 15, 1996. (D.E. 185 in Case No. 92-202-CIV-5-BR (E.D.N.C.)) By that time, the primary elections for congressional seats had already taken place. On July

30, 1996, the district court entered an order "validating" the congressional primary elections that had already taken place and allowing the 1996 elections to proceed uninterrupted by the court. (D.E. 219 in Case No. 92-202-CIV-5-BR (E.D.N.C.)) The court directed the General Assembly to submit a remedial plan to the court by April of the following year. (*Id*.) Thus, "there is precedent in North Carolina for conducting elections under an unconstitutional plan in order to avoid undue disruption of the electoral process." *Cromartie II*, at 434 (Thornburg, J., concurring in part and dissenting in part).

Finally, as this Court noted in its order denying plaintiffs' preliminary injunction request, it was plaintiffs' own delay that has created the potential for substantial disruption to the electoral process in the event plaintiffs prevail. (D.E. 39 at 10 (citing *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 79–80 (4th Cir. 1989)) Moreover, because of their delay in filing this case, the *Dickson* litigation is at a stage where it is ripe for review by the United States Supreme Court. Plaintiffs' delay, combined with a due fairness to the concurrent jurisdiction of the North Carolina Supreme Court over the challenged redistricting plans, warrant proceeding cautiously in this matter.

This the 21st day of March, 2016.

NORTH CAROLINA DEPARTMENT OF JUSTICE

By: /s/ Alexander McC. Peters
Alexander McC. Peters
Senior Deputy Attorney General
N.C. State Bar No. 13654
apeters@ncdoj.gov
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602
Telephone: (919) 716-6900
Facsimile: (919) 716-6763
*Counsel for Defendants*


OGLETREE, DEAKINS, NASH SMOAK & STEWART, P.C.

/s/ Thomas A. Farr
Thomas A. Farr
N.C. State Bar No. 10871
Phillip J. Strach
N.C. State Bar No. 29456
thomas.farr@ogletreedeakins.com
phil.strach@ogletreedeakins.com
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina 27609
Telephone: (919) 787-9700
Facsimile: (919) 783-9412
*Co-counsel for Defendants*

21

## CERTIFICATE OF SERVICE

I, Thomas A. Farr, hereby certify that I have this day emailed the foregoing **DEFENDANTS' TRIAL BRIEF** to the following:

Edwin M. Speas, Jr.
John W. O'Hale
Carolina P. Mackie
Poyner Spruill LLP
P.O. Box 1801 (27602-1801)
301 Fayetteville St., Suite 1900
Raleigh, NC 27601
espeas@poynerspruill.com
johale@poynerspruill.com
cmackie@poymerspruill.com
*Attorneys for Plaintiffs*

Adam Stein
Tin Fulton Walker & Owen, PLLC
312 West Franklin Street
Chapel Hill, NC 27516
astein@tinfulton.com
*Attorney for Plaintiffs*

Anita S. Earls
Allison J. Riggs
Southern Coalition for Social Justice
1415 Highway 54, Suite 101
Durham, NC 27707
anita@southerncoalition.org
allisonriggs@southerncoalition.org
*Attorneys for Plaintiffs*

This the 21st day of March, 2016.

OGLETREE, DEAKINS, NASH
SMOAK & STEWART, P.C.

/s/ Thomas A. Farr
Thomas A. Farr
N.C. State Bar No. 10871
4208 Six Forks Road, Suite 1100
Raleigh, NC 27609
Telephone: 919.787.9700
Facsimile: 919.783.9412
thomas.farr@odnss.com

24243256.1

22