# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### NO. 1:15-cv-00399

SANDRA LITTLE COVINGTON, *et al*.,

                    Plaintiffs,

v.

THE STATE OF NORTH CAROLINA, *et al*.,

                  Defendants.

## **<u>PLAINTIFFS' TRIAL BRIEF</u>**

# i.   TABLE OF CONTENTS

i.   TABLE OF CONTENTS ............................................................................... i

ii.   TABLE OF AUTHORITIES .................................................................... iii

I.   INTRODUCTION ....................................................................................... 1

II.   STATEMENT OF CASE ........................................................................... 5

III.   EXPECTED EVIDENCE AT TRIAL ...................................................... 6

   A.   Background to 2011 Legislative Process ............................................. 8

   B.   The Legislature's Use of Race-Based Criteria in Drawing VRA Districts ........ 10

   C.   The 2011 Legislative Redistricting Process ........................................ 12

   D.   Characteristics of the Enacted Districts ............................................. 18

   E.   Standing and Harm to Plaintiffs ......................................................... 20

IV.   ARGUMENT ............................................................................................ 22

   A.   The Elements of a Racial Gerrymander Claim .................................. 22

   B.   Race Was the Predominant Factor in Drawing the Challenged Districts ............ 24

      1.   Direct Evidence that Race Predominated. ....................................... 25

      2.   Indirect Evidence that Race Predominated. ..................................... 26

      3.   Senate District 32 ............................................................................. 28

   C.   The Defendants' Asserted Compelling Governmental Interest in Compliance with the Voting Rights Act ................................................... 30

      1.   Section 2 of the Voting Rights Act ................................................... 30

      2.   Section 5 of the Voting Rights Act ................................................... 34

   D.   The Defendants Did Not Have A Strong Basis in Evidence to Conclude that Compliance with Section 2 of the Voting Rights Act Requires These Districts ........... 35

i

1. Geographically Compact Black Populations.....................................................36

2. Legally Significant Racially Polarized Voting.................................................37

3. Extent of Election of Black Candidates..........................................................41

E. The Challenged Districts are Not Narrowly Tailored..........................................43

1. The Districts Were Drawn Based on a Proportionality Criterion ...................43

2. The Districts Pack Black Voters More Than Necessary .................................44

3. The VRA Districts are Not Narrowly Tailored Because They Are not Geographically Compact ...........................................................................45

F. There is No Basis for Defendants' Res Judicata Defense ...................................45

G. This Court Should Enjoin Any Further Use of These Districts and Implement an Effective Remedy Including Awarding Plaintiffs' Attorneys' Fees ...........................46

V. CONCLUSION ........................................................................................47

**TABLE OF AUTHORITIES**

**Cases**

*Abrams v. Johnson,* 521 U.S. 74 (1997) ....................................................... 23, 38

*Adarand Constructors v. Pena*, 515 U.S. 200 (1995) ...................................... 23

*Alabama Legislative Black Caucus v. Alabama,* 135 S. Ct. 1257 (2015) ................. passim

*Askew v. City of Rome*, 127 F.3d 1355 (11th Cir. 1997) ................................... 38

*Bartlett v. Strickland,* 556 U.S. 1 (2009) .............................................. 2, 36, 39

*Beer v. United States,* 425 U.S. 130 (1976) ................................................. 34

*Bush v. Vera,* 517 U.S. 952 (1996) ......................................................... passim

*Carolina Power & Light Co. v. Merrimack Mut. Fire Ins. Co.,*
238 N.C. 679, 79 S.E.2d 167 (1953) ...................................................... 46

*City of Richmond v. J.A. Croson Co.,* 488 U.S. 469 (1989) .............................. 21

*Clark v. Putnam County,* 293 F.3d 1261 (11th Cir. Ga. 2002) ......................... 35

*Clarke v. City of Cincinnati,* 40 F.3d 807 (6th Cir. 1994) ............................... 38

*Clay v. Board of Education,* 90 F.3d 1357 (8th Cir. 1996) .............................. 38

*DeGrandy v. Johnson*, 512 U.S. 997 (1994) ............................................... 32

*Fisher v. Univ. of Tex. at Austin*, 133 S. Ct. 2411 (2013) ...................... 23, 24, 34

*Gause v. Brunswick Cnty.,* 92 F.3d 1178 (4th Cir. 1996) .............................. 36

*Gingles v. Edmisten,* 590 F. Supp. 345 (E.D. N.C. 1984) ................................ 3

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ................................................ 24

*Harris v. McCrory,* No. 13-949, 2016 U.S. Dist. LEXIS 14581
(M.D.N.C. Feb. 5, 2016) .................................................................... passim

*Hensley v. Eckerhart,* 461 U.S. 424 (1983) ................................................ 47

*Johnson v. Miller*, 864 F. Supp. 1354 (S.D. Ga. 1994) ............................... 32, 33

*Miller v. Johnson,* 515 U.S. 900 (1995) ................................................... passim

*Moon v. Meadows*, 952 F. Supp. 1141 (E.D. Va. 1997) ............................. 27, 35

*Overton v. City of Austin*, 871 F.2d 529 (5th Cir. 1989) ................................. 39

*Page v. Va. State Bd. of Elections,* 2015 U.S. Dist. LEXIS 73514
(E.D. Va. June 5, 2015) ................................................................... 24, 47

Case 1:15-cv-00399-TDS-JEP   Document 83   Filed 03/21/16   Page 4 of 53

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007).............24

*Pender County v. Bartlett*, 361 N.C. 491 (2007).........................................................30, 40

*Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978) .......................................33, 43

*Ricci v. DeStefano,* 557 U.S. 557 (2009)..........................................................................31

*Shaw v. Hunt,* 517 U.S. 899 (1996) ...........................................................................passim

*Shaw v. Reno,* 509 U.S. 630 (1993)...........................................................................passim

*Shelby County v. Holder,* 570 U.S. ___ (2013) ...........................................................34, 41

*Smith v. Beasley,* 946 F. Supp. 1174 (D.S.C. 1996) ...........................................................35

*Thornburg v. Gingles,* 478 U.S. 30 (1986).................................................................passim

*Troy Lumber Co. v. Hunt*, 251 N.C. 624, 112 S.E.2d 132 (1960)......................................46

*Valladolid v. National City,* 976 F.2d 1293 (9th Cir. 1992)..............................................39

*Vecinos de Barrio Uno v. City of Holyoke*, 960 F. Supp. 515 (D. Mass. 1997)...............38

*Wygant v. Jackson Bd. of Ed.*, 476 U.S. 267 (1986) ........................................................36

**Statutes**

52 U.S.C. § 10310(e)……………………………………………………………………… 47

42 U.S.C. § 1983 ………………………………………………………………………… 47

52 U.S.C. § 10301(b)..................................................................................................... 31

N.C. Gen. Stat. § 120-2.4 ……………………………………………………………… 47

iv

# I.     INTRODUCTION

Over twenty years ago the United States Supreme Court held that racial gerrymandering, based on impermissible racial stereotypes, is akin to "political apartheid" that may "exacerbate the very patterns of racial bloc voting that majority-minority districting is sometimes said to counteract." *Shaw v. Reno,* 509 U.S. 630, 646-47 (1993). Most recently the Supreme Court held that to adopt and apply "a policy of prioritizing mechanical racial targets above all other districting criteria … provides evidence that race motivated the drawing of particular lines in multiple districts in the State." *Alabama Legislative Black Caucus v. Alabama,* 135 S. Ct. 1257, 1267 (2015) (hereinafter "*ALBC*"). The individual Plaintiffs in this case, objecting to political district lines that divide neighborhoods and neighbors into different state house and senate districts based on race, filed suit seeking the implementation of redistricting maps that do not embody race-based proportionality quotas.

In drawing legislative districts, the North Carolina General Assembly explicitly imposed two distinct mechanical racial targets as criteria that could not be compromised. Mot. for Prelim. Inj., Ex. A, Hofeller Dep. 46-47; Ex. C, Lewis Dep. 62; Ex. B, Rucho Dep. 31-32, 137-38; ECF. No. 23, Attachments 1-3.[1] The two criteria were a racial proportionality goal for the number of majority-black districts that must be drawn in each plan and a requirement that each such district must be greater than fifty percent in total

---

[1] At the time of filing this brief, Joint Exhibit Numbers and Plaintiffs Exhibit Numbers for the trial in this case have not been completed. This brief cites to material already in the record from the hearing on the Plaintiffs' Motion for a Preliminary Injunction, ECF No. 23, hereinafter "PI Ex. __"; material from Plaintiffs Deposition Designations; or evidence from the *Dickson v. Rucho* record. For consistency, page number references are to the numbers present in the original document. Plaintiffs will file a corrected Trial Brief with accurate Trial Exhibit numbers as soon as those numbers have been agreed upon with Defendants and finalized.

Case 1:15-cv-00399-TDS-JEP   Document 83   Filed 03/21/16   Page 6 of 53

black voting age population ("TBVAP"). *Id.* This is strong and direct evidence that race predominated in the redistricting process. *See Harris v. McCrory,* No. 13-949, 2016 U.S. Dist. LEXIS 14581, at *34-35 (M.D.N.C. Feb. 5, 2016) (there is "strong, perhaps overwhelming" direct evidence that the North Carolina General Assembly prioritized the use of a mechanical racial target that "operated as a filter through which all line-drawing decisions had to be made," thereby establishing that race predominated).

Even if done for remedial purposes, "race-based districting by our state legislature demands close judicial scrutiny." *Shaw,* 509 U.S. at 657. To survive strict scrutiny, the Defendants must show that at the time they enacted the individual districts challenged here, the North Carolina General Assembly had before it sufficient evidence of the need for a race-based remedy and that its districting plan is narrowly tailored to that need. *Miller v. Johnson,* 515 U.S. 900, 920 (1995). Plaintiffs should prevail in this case because "the defendants did not have a 'strong basis in evidence' for concluding that the creation" of the district challenged here "was reasonably necessary to comply with the VRA." *Harris,* 2016 LEXIS 14581, at *54 (citing *ALBC,* 135 S. Ct. at 1274).

The evidence before the General Assembly in 2011 did not provide a reasonable basis for their belief that in order to remedy discrimination in voting the new redistricting plans must, in their words: "provide black voters in North Carolina with substantial or rough proportionality in the number of VRA districts" and that they "have a legal obligation to draw these districts at true majority levels." PI Ex. N, July 12 2011 Public Statement 5. As the *Harris* court noted, Defendants' assertion of their legal obligation was a complete misreading of *Bartlett v. Strickland,* 556 U.S. 1 (2009). *See Harris,* 2016

2

U.S. Dist. LEXIS at *61 n.10. "[T]he general assembly did not have a 'strong basis in evidence' to conclude that the threshold conditions for Section 2 liability were present." *Id.* On every available measure of the opportunity of African-American voters to participate in the political process, all the indicators before the General Assembly showed increasing, not decreasing, participation.

In the twenty years since the *Shaw* decision, voters in North Carolina made significant progress towards achieving the goals of inclusion and fair representation embodied in the Voting Rights Act. Levels of African-American voter registration and participation in elections since 2008 have been greater than or equal to that of white voters. PI Ex. G, Dickson Trial Transcript vol. II, 384 (testimony of Dr. Lichtman). This is in sharp contrast to the previous factual finding by the District Court in *Gingles* in 1982 that African-American voters as a percentage of voting age population lagged behind whites by 14 percentage points statewide (66.7% white VAP registered vs. 52.7% black VAP registered) and by as much as 23 percentage points in many counties. *See Thornburg v. Gingles,* 478 U.S. 30, 39 (1986); *Gingles v. Edmisten,* 590 F. Supp. 345, 360 n.22 (E.D.N.C. 1984).

Similarly, the increasing willingness of white voters to support black candidates at the ballot box has meant that in the past two decades when black voters go to the polls, they have a reasonable chance of electing their candidates of choice even when those candidates are black and even if black voters are not a majority of the electorate. Indeed, in 2011 the record developed by the General Assembly showed that fifty-six times between 2006 and 2011, African-American candidates won election to the state house

3

and senate from districts that were not majority-black, and twenty-two times those candidates were running in majority-white districts. PI Ex. P, Churchill Deposition Exhibits 82 and 83. Most of these elections involved candidates of different races, where the victorious black candidate defeated a white challenger, and in some notable cases, that white challenger was the incumbent.

By the time of redistricting in 2011, the 2003 Senate redistricting plan (the existing, benchmark plan) had no districts that were greater than 50% TBVAP. Nevertheless, in 2008 a total of nine African-Americans were elected to the Senate. 2011 Senate Section 5 Submission 10, 18. The existing benchmark plan for the House contained ten districts with a majority TBVAP. Following the 2008 general election, there were twenty-two African-American Representatives serving in the General Assembly. 2011 House Section 5 Submission 10, 22. African-American candidates and candidates of choice of African-American voters were being elected to the General Assembly regardless of whether they were in districts with a majority TBVAP.

The ultimate impact of the race-based remedy imposed by Defendants over the objection of almost every African-American voter who testified at a public hearing and without the support of a single African-American legislator, was not to increase the ability of black voters to elect their candidates of choice. This was not a measure that remedied racially polarized voting or corrected a lack of equal opportunity for black voters to participate in elections in North Carolina. The individual districts challenged here methodically packed black voters in even higher concentrations than ever before, using a perverted and completely unsupported interpretation of the Voting Rights Act.

4

The resulting districts reinforce racial stereotypes, perpetuate the myth that voters and candidates alike should be judged by the color of their skin above all else, and "balkanize us into competing racial factions." *Shaw,* 509 U.S. at 657.

Plaintiffs respectfully request that this Court carefully examine the contemporaneous public statements of the redistricting chairs, and the rationales offered for the VRA districts at the time they were enacted, all of which indicate that race predominated in the drawing of the individual districts challenged in this case. Applying strict scrutiny then requires this Court to independently examine whether the challenged districts are narrowly tailored to meet a compelling governmental interest in comply with the Voting Rights Act properly interpreted. *Harris,* 2016 U.S. Dist. LEXIS 14581, at *19 (citing *Miller v. Johnson,* 515 U.S. 900, 916 (1995)). Because neither Section 2 nor Section 5 of the Voting Rights Act justifies the extensive expansion of the use of race in the districts challenged here, those districts are unconstitutional.

## II.     STATEMENT OF CASE

The Complaint in this action was filed on May 19, 2015 by individual citizens who are registered voters in North Carolina. Plaintiffs challenge nine State Senate districts and nineteen State House Districts as racial gerrymanders in violation of the Equal Protection Clause of the Fourteenth Amendment. Compl. ¶1, ECF No. 1. An Amended Complaint was subsequently filed on July 24, 2015, and the Defendants filed an Answer to Amended Complaint on August 14, 2015. Am. Compl. ECF No. 11; Answer to Am. Compl. ECF No. 14. On August 19, 2015, Chief Judge William B. Traxler of the U.S. Court of Appeals for the Fourth Circuit appointed this District Court

5

of three judges to serve in the hearing and determination of this matter as provided by 28 U.S.C. § 2284.

Plaintiffs filed a Motion for a Preliminary Injunction and Defendants filed a Motion to Stay, Defer or Abstain. Mot. for Prelim. Inj., Oct. 7, 2015, ECF No. 23; Def.'s Mot. to Stay, Defer or Abstain, Nov. 9, 2015, ECF No. 31. Following oral argument both motions were denied. Order, Nov. 25, 2015, ECF No. 39. No summary judgment motions were filed by either side; the case is now set for trial beginning April 11, 2016.

### III. EXPECTED EVIDENCE AT TRIAL

Plaintiffs will present direct and indirect evidence that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district," *ALBC,* 135 S. Ct. at 1270 (citing *Miller,* 515 U.S. at 916), for each of the nine senate districts and nineteen house districts challenged here. Some of that evidence, such as the record of past electoral success of candidates of choice of black voters and the geographic compactness of the district, will be district- specific evidence. Additionally, as permitted by *ALBC,* some of that evidence will be statewide evidence, such as the racial proportionality and 50% TBVAP criteria applied to both plans. *See ALBC,* 135 S. Ct. at 1267 ("We recognize that the plaintiffs relied heavily upon statewide evidence to prove that race predominated in the drawing of individual district lines. … Such evidence is perfectly relevant.").

At the most basic level, three sets of facts taken together prove Plaintiffs' case that race predominated in the drawing of the challenged legislative districts without justification:

6

First, that the legislature used not one, but two race-based criteria that could not be compromised: a racial proportionality target for the number of majority-black districts they would draw first and a black population percentage target of 50% plus one. PI Ex. H, June 17, 2011 Public Statement. The legislative leadership imposed these mechanical racial targets before reviewing any data relevant to the current political realities in the state. PI Ex. A, Hofeller Dep. vol I, 66:1–68:8, 78:3–80:25, June 28, 2012. Subsequently they defended them during the legislative process as required by the Voting Rights Act and refused to consider any redistricting plan that failed to meet those targets on the grounds that it was not a legal plan. PI Ex. H, June 17, 2011 Public Statement; PI Ex. N, July 12, 2011 Public Statement.

Second, the legislature enacted nine state senate districts as majority-black districts where previously none of the state's senate districts were majority-black; 2011 Senate Section 5 Submission 10, and twenty-three majority-black state house districts where previously only ten of those districts were majority-black, House Section 5 Submission 10. Doing so required that they disregard other traditional redistricting principles such as compactness and respecting subdivision boundaries.

Third, this all occurred in a state where African-Americans were already electing their candidates of choice to the legislature in numbers roughly proportionate to their percentage in the population. Indeed, while the new plans vastly increased the number of majority-black districts and increased the number of African-Americans in the legislature, the evidence in this case will show that the new plans did not increase the number of legislators elected who were candidates of choice of black voters.

7

These facts demonstrate why the challenged districts were a completely ineffective remedy to a non-existent problem; they illustrate why voters of color in the state for the most part opposed these districts; and they illustrate why the districts are unconstitutional racial gerrymanders.

### A. Background to 2011 Legislative Process

Since the *Gingles* decision in 1986, African-Americans increasingly have been able to elect their candidates of choice to the state legislature, even in districts that were not majority-black in voting age population. The evidence before the General Assembly in 2011 showed that candidates of choice of African-American voters were successful in being elected to the General Assembly roughly 90% of the time they ran between 2006 and 2010 in the existing districts for State House and State Senate that were less than 50% black in voting age population. PI Ex. G, Dickson Trial Tr. vol II, at 405-410.

As the General Assembly pointed out in its Section 5 submissions, "[t]he 2008 General Election represented the high water mark for African-American Senators with a total of nine African-Americans being elected." 2011 Senate Section 5 Submission 19. This was using a redistricting plan that had no majority-black voting age population districts. In that year, African-American Senators Tony Foriest, Don Davis and Malcolm Graham were elected in districts that were 75.17%, 65.13% and 59.89% white in voting age population, respectively. PI Ex. P, Churchill Dep. Exs. 82 & 83, at 30, 32 & 41.

Similarly, as the Section 5 Submission reports, "[t]here were twenty-two African-American Representatives serving in the General Assembly following the 2008 General Election." 2011 House Section 5 Submission 21. This was using a redistricting plan that

8

had only ten districts where the TBVAP was greater than 50%. As in the Senate, there were numerous African-American candidates elected from majority-white voting age population districts, including, for example, Linda Coleman and Ty Harrell, elected in districts that were 67.68% and 82.85% white in voting age population respectively. PI Ex. P, Churchill Dep. Exs. 82 & 83, at 85.

The 2010 election saw only a modest decrease in the number of African-Americans elected to the General Assembly, from nine to seven in the Senate and from twenty-two to eighteen in the House. Even in 2010, however, African-American candidates continued to win election in legislative districts that were not majority black in voting age population. For example, African-American Senator Malcolm Graham held on to his seat in the 59.89% white district in Mecklenburg County, winning 58.16% of the vote and African-American Senator Dan Blue won in a district that was 51.84% white in voting age population. PI Ex. P, Churchill Dep. Exs. 82 & 83, at 22, 35. African-American Representative Rodney Moore won in a district that was 62.20% white in voting age population. PI Ex. P, Churchill Dep. Exs. 82 & 83.

All of the election returns for elections in the previous decade were publicly available long before March of 2011 when the U.S. Census Bureau released the P. L. 97-141 redistricting data for North Carolina. Yet neither the legislative leaders, nor Dr. Hofeller, reviewed this information prior to drawing the VRA districts and releasing them to the public. *See, e.g.,* Hofeller Dep. 808:17-81:4, Feb. 18, 2016.

The 2010 Census data showed that the population of North Carolina had grown significantly over the decade, resulting in an increase of the ideal district size for state

9

house and senate districts. However, that increase was not spread evenly throughout the state. Some legislative districts were overpopulated and others were underpopulated. PI Ex. J, Stat Pack Enacted Senate Plan 1, PI Ex. L, Stat Pack Enacted House Plan 1. While a significant increase in the African-American voting age population, as a percentage of the state's total population, might explain an increase in the number of majority-black districts, in fact, the African-American voting age population remained at roughly the same level, at 21.18% in 2010 compared to 20.29% in 2000. *Compare* PI Ex. J, Stat Pack Enacted Senate Plan, *with* 2003 Stat Pack Enacted Senate Plan.

## B. The Legislature's Use of Race-Based Criteria in Drawing VRA Districts

Dr. Hofeller, retained to design and draw the House and Senate plans, PI Ex. A, Hofeller Dep. vol. 1, 21, 28, began working for Senator Rucho and Representative Lewis in December 2010 and began drawing plans in March 2011 following receipt of new Census data. *Id.* at 68. Senator Rucho described Dr. Hofeller as the "chief architect" of the plans, and Dr. Hofeller described himself the same way. *Id.* at 20; PI Ex. B, Rucho Dep. 21.

Senator Rucho and Representative Lewis were the sole source of instructions to Dr. Hofeller regarding the design and construction of the House and Senate plans. These instructions were all oral. PI Ex. A, Hofeller Dep. 46-47; PI Ex. B, Rucho Dep. 31-32; PI Ex. C, Lewis Dep. 62. Rucho and Lewis directed Hofeller to draw House and Senate plans that provide African-American citizens "with a substantial proportional and equal opportunity to elect their candidates." PI Ex. D, Hofeller Aff. 4, Jan. 19, 2012; PI Ex. C,

10

Lewis Dep., 129-30; PI Ex. B, Rucho Dep. 50-52, 130. To accomplish drawing a number of majority-black districts substantially proportional to the black population in the state, they told Dr. Hofeller: "draw a 50% plus one district wherever in the state there is a sufficiently compact black population to do so." PI Ex. C, Lewis Dep. 217; PI Ex. B, Rucho Dep. 50-52, 130.

Dr. Hofeller used the same process and criteria to draw both the House and Senate plans. PI Ex. A, Hofeller Dep. 128-29. He began by calculating how many majority-black House and Senate districts would need to be drawn to achieve proportionality between the percentage of the state's population that is black and the percentage of districts that would be majority-black. *Id.* at 80-81. PI Ex. E, Dr. Hofeller's Proportionality Chart. Dr. Hofeller calculated that, using voting age population - any part black, exact proportionality for the House plan was 25.44 seats and for the Senate plan was 10.6 seats. Using voting age population - black only, exact proportionality for the House was 24.72 seats and for the Senate plan was 10.3 seats. Hofeller Dep. Ex. 436; PI Ex. A, Hofeller Dep. 80-81.

Dr. Hofeller made this calculation as soon as the 2010 Census data were released, PI Ex. A, Hofeller Dep. 78, long before the General Assembly had examined any data about the extent to which voting is still racially polarized in the state, and without any knowledge of where in the state candidates of choice of African-American voters had been elected. PI Ex. G, Dickson Trial Tr. vol. II 328-29, 331 (testimony of Dr. Hofeller).

Senator Rucho and Representative Lewis issued public statements on June 17, June 21, and July 12 describing the factors that had determined the number, location, and

11

shape of the "VRA districts" challenged in these cases. PI Ex. H, June 17, 2011 Public Statement; PI Ex. M, June 22, 2011 Public Statement; PI Ex. N, July 12, 2011 Public Statement. These public statements reflect the oral instructions Senator Rucho and Representative Lewis had earlier given Dr. Hofeller to apply in drawing the districts. PI Ex. A, Hofeller Dep. 56-57; PI Ex. C, Lewis Dep. 72; PI Ex. B, Rucho Dep. 41-42, 147-48. Those instructions were to draw the VRA districts before any other legislative districts and to:

1. Draw each "VRA District" where possible so that African-American citizens constitute at least a majority of the voting age population in the district.

2. Draw "VRA Districts" in numbers equal to the African-American proportion of the state's population.

*Id.* Senator Rucho and Representative Lewis also publicly stated that any alternative plan that compromised or strayed from strict adherence to these instructions to Dr. Hofeller would be rejected. The primary goal that the redistricting chairs sought to achieve was to enact districts that "would survive any possible legal challenge" under either Section 2 or Section 5 of the Voting Rights Act. PI Ex. N, July 12, 2011 Public Statement 1-2.

### C. The 2011 Legislative Redistricting Process

Although ultimately the districts challenged here were enacted by majority vote of the General Assembly, the process by which they were drawn involved a narrow set of two legislative leaders and their private consultants. From January 27, 2011 until the first public presentation of a proposed map for Senate Voting Rights Act (hereinafter "VRA") districts on June 17, 2011, Senator Rucho and Representative Lewis were

12

responsible for, and determined, for the Senate and House respectively (a) the persons who would design and build the proposed Senate and House maps; (b) the criteria they would use in drawing the proposed maps; (c) the process they would use and the timing of their work; and (d) the security procedures that would be followed to keep the maps confidential. PI Ex. B, Rucho Dep. 23. PI Ex. C, Lewis Dep. 29-33. Senator Rucho made all those decisions independently without the aid, advice or approval of the Senate Redistricting Committee or any other Senator. He did keep Senator Berger informed about the progress of his work. PI Ex. B, Rucho Dep. 22:16-24. The Senate Redistricting Committee never met separately to discuss the redistricting process, criteria or maps prior to the public release of the Senate VRA districts on June 17, 2011. PI Ex. B, Rucho Dep. 25:19-24.

Similarly, Representative Lewis made all these decisions independently without the aid, advice or approval of the House Redistricting Committee or any other Representative. He did keep Speaker Tillis informed of the progress of his work. PI Ex. C, Lewis Dep. 29-33. The House Redistricting Committee met separately on April 7, 2011. No criteria for districts were discussed or proposed at this meeting, no report given with regard to the persons already hired to design and construct the maps and no maps presented for review or comment.

Although the Senate and House Redistricting Committees met jointly on March 30, 2011 and June 15, 2011, no criteria for House, Senate or Congressional districts were discussed or proposed at these meetings, no report given with regard to the persons

13

already hired to design and construct the redistricting maps, and no maps presented for review or comment.  PI Ex. C, Lewis Dep. 32; PI Ex. B, Rucho Dep. 24-26.

From late March until mid-June, Dr. Hofeller drew many drafts of senate district maps in an effort to comply with Senator Rucho's oral instructions.  Some of these maps were reviewed by Senator Rucho but none of these drafts were reviewed by, or made available to, any other member of the General Assembly.  PI Ex. B, Rucho Dep. 56-57, PI Ex. A, Hofeller Dep. 56, 129.  After mid-June three iterations of maps of Senate districts drawn by Dr. Hofeller for Senator Rucho were made available to other legislators and the public:  These were:

I.  "Rucho Senate VRA Districts" was drawn by Dr. Hofeller for Senator Rucho and released to the public on June 17, 2011.  This was not a full map; it included ten districts described by Dr. Hofeller as "VRA districts".  PI Ex. B, Rucho Dep. 55:22-56:23.

II.  "Rucho Senate 1" was drawn by Dr. Hofeller for Senator Rucho and released to the public on July 12.  It was a full map of all 50 Senate Districts and was filed in the General Assembly on July 23, 2011.  PI Ex. B., Rucho Dep. 143:17-18.

III.  "Rucho Senate 2" as drawn by Dr. Hofeller for Senator Rucho was enacted into law as 2011 SL 402 on July 27, 2011.  PI Ex. B, Rucho Dep. 55:22-56:4.

Each of the ten districts in the "Senate VRA Districts" map had a total black voting age population (hereinafter "BVAP") higher than 50% except Senate District 32 in Forsyth.  Nine of these ten districts (3, 4, 5, 13, 14, 20, 28, 38, and 40) were enacted on July 27, 2011, essentially as first filed and made public on June 17, 2011.  Senate District 21 as first made public was located entirely in Cumberland County.  PI Ex. I, Stat Pack Rucho Senate VRA Districts.  It was modified prior to enactment to include Hoke County

14

as well as part of Cumberland County. That modification increased the number of split precincts from twenty-seven to thirty-three and increased the BVAP from 51.03% to 51.53%. PI Ex. J, Stat Pack Enacted Senate Plan. District 32 in Forsyth was also modified. That modification increased the number of split precincts from one to forty-three and increased the BVAP from 39.32% to 42.53%. *Id.* As demonstrated in the maps of the challenged Senate "VRA districts" included in Plaintiffs' amended complaint, these districts were visually and mathematically non-compact.[2]

Dr. Hofeller also drew many draft maps of house districts in an effort to comply with Representative Lewis' oral instructions from late March until mid-June. Some of these drafts were reviewed by Representative Lewis but none were reviewed by, or made available to, any other member of the General Assembly. After mid-June five iterations of House maps drawn by Dr. Hofeller for Representative Lewis were made available to other legislators and the public. These were:

a.      "Lewis House VRA Corrected" released to the public on June 17. This was not a full map; it only included twenty-four districts described by Mr. Hofeller as "VRA districts". PI Ex. C, Lewis Dep. 140:6-12.

b.      "Lewis Dollar Dockham 1" released to the public on July 12. This was a full map. PI Ex. C, Lewis Dep. 142:8-10.

c.      "Lewis Dollar Dockham 2" filed as a bill in the General Assembly on July 21, 2011. PI Ex. C, Lewis Dep. 143:16-20.

d.      "Lewis Dollar Dockham 3" filed as a committee substitute for LDD 2 on July 21, 2011. PI Ex. C, Lewis Dep. 144:17-20.

---

[2] These district maps are reproduced at: Amended Compl, ¶¶ 79 (SD 4), 89 (SD 5), 95 (SD 14), 104 (SD 20), 113 (SD 21), 121 (SD 28), 129 (SD 32), 137 (SD 38 and SD 40), 146 (HD 5), 155 (HD 7), 165 (HD 12), 178 (HD 21), 187 (HD 24), 194 (HD 29 and HD 31), 203 (HD 32), 209 (HD 33 and HD 38), 219 (HD 42), 233 (HD 48), 238 (HD 57), 247 (HD 99, HD 102, HD 107).

e.      'Lewis Dollar Dockham 4" as drawn by Mr. Hofeller was adopted as a committee substitute for LDD 3 on July 24 and enacted into law on July 28, 2011, as 2011 SL 416.  PI Ex. C, Lewis Dep. 145:18-21.

The districts challenged in this case, except for House Districts 21 and 24, were enacted into law without significant or substantial modification from the form in which they were drawn by Dr. Hofeller and first made public in either Lewis House VRA on June 17 or in Lewis Dollar Dockham 1.  The main changes to House Districts 21 and 24 were changes to the counties in which they were located.  The number and percentage of African Americans assigned to these districts and the number of VTD's they split did not significantly change.

The full Senate and House redistricting plans were debated in the Senate and House Redistricting Committees and on the floor of the full chambers on July 21, 22 and 25, 2011.  Numerous members of the General Assembly raised concerns about both the racial proportionality quota and the 50% plus one requirement embodied in the districts. Legislators pointed out that candidates of choice of black voters have been able to win in districts that are not greater than 50% black in voting age population, and asked the bill sponsors to identify for specific districts why there was a need to increase the black voting age population of that district.  In each instance the response was that these districts were "just following the law" and that they were necessary "to foreclose any Section 2 lawsuits."  Tr. of July 21 Senate Redistricting Committee meeting 41:5-19; Tr. of July 22 Senate Redistricting Committee meeting 38:103.

No African-American senator or representative voted in favor of any of the plans proposed by Senator Rucho and Representative Lewis, including the enacted plans.  PI

16

Ex. F, Dickson Trial Tr. vol. I, at 30, 114 (testimony of Sen. Blue, Rep. Hall). Additionally, once the VRA maps were introduced, citizens from around the state testified at public hearings that the districts went beyond what was required for compliance with the VRA. On June 23, 2011, well before the final plans were enacted, Defendants were specifically informed in written testimony on behalf of the Alliance for Fair Redistricting and Minority Voting Rights ("AFRAM") that the VRA districts they were proposing were premised on a fundamental misunderstanding of constitutional and civil rights law. PI Ex. Q, AFRAM Letter. The AFRAM report stated that the VRA does not require proportional representation, that Section 5 does not require maximization of the number of majority-black districts, that Section 5 does not require districts to be more than 50% black in voting age population, and that the districts as drawn "threaten the very principles that the Voting Rights Act exists to promote." *Id.*

In response to the many public comments on the VRA districts, Senator Rucho and Representative Lewis devoted all of their June 23, 2011 public statement and a section of their July 12, 2011 public statement to refuting the claim that the VRA districts they drew packed black voters without justification. PI Ex. N, July 12 2011 Public Statement 3-5. They rejected alternative district plans that fail to reach the rough proportionality requirement and asserted that they have "a legal obligation" to draw all VRA districts at 50% or above "when it is possible to do so." *Id.*

Significantly, none of the public statements offer the justification that the VRA districts were drawn with a partisan goal. In response to the assertion that "the proposed VRA districts plan is solely an attempt to maintain Republicans' political power", the

17

Redistricting Chairs' statement denied that claim, arguing that they have an obligation to comply with the Voting Rights Act and asserting that if "districts that adjoin majority black districts may become more competitive for Republican candidates" it is only because "such competitiveness results from compliance with the VRA."  PI Ex. M, June 22, 2011 Public Statement 4.  There is no suggestion whatsoever in the public statements that the majority black districts they drew were simply the unintended result of an effort to maximize partisan advantage.  *Id.*

### D.    Characteristics of the Enacted Districts

Through admissions, stipulations, exhibits and witness testimony, Plaintiffs will present largely undisputed evidence about the relevant characteristics of each of the districts challenged in this case.  Plaintiffs proposed findings of fact to be filed herein detail this evidence district by district.

Some of the important characteristics of each district include the history of electoral success of candidates of choice of black voters in that area, the increase in the black voting age population in the enacted district as compared to the benchmark plan, maps showing how the districts go block by block to pick up black voters and screen out white voters, and the lack of geographical compactness of the districts demonstrated by the number of split precincts, and the shape of the district.

When precincts were split in the House, and Senate redistricting plans they were split into "black pieces" and "white pieces," and the "black pieces" were almost uniformly assigned to "black districts," while the "white pieces" were assigned to "white districts."   First Aff. of Dr. Theodore Arrington, ¶¶ 23-24, 29.  Majority African-

18

American House and Senate districts have nearly three times as many split precincts as do majority white House and Senate districts. *Id.*, ¶ 34. This assignment on the basis of race would have happened by chance only five times in 10,000. *Id.*, ¶32.

The Defendants have admitted that in order to draw districts with a Black voting age population in excess of 50% they had to use pieces of precincts as a major tool, even though state law discouraged dividing precincts. Dr. Hofeller stated that "splitting VTD lines is often necessary in order to create TBVAP districts." PI Ex. R, Hofeller Dep. vol. 2, 59. Dr. Hofeller further acknowledged that he split precincts for the purpose of increasing the black population in a district, in order to achieve Rucho and Lewis' instruction to create majority African-American districts in numbers proportional to the state's African-American population. PI Ex. R, Hofeller Dep. vol. 2, 57-58.

In addition to the maps of the individual districts challenged here, Plaintiffs will offer comprehensive statistical measures corroborating the lack of geographic compactness of the challenged districts. When tested using eight common measures of compactness and compared against the 2009 plan and House Fair and Legal Plan, the Lewis-Dollar-Dockham 4 House Plan had the least compact score on all eight of eight measures. Fairfax Second Aff. ¶26. When tested using eight common measures of compactness and compared against the 2003 and Senate Fair and Legal Plan, the Rucho Senate 2 Plan had the least compact scores on seven of eight measures. Fairfax Second Aff. ¶24. Compactness scores for each individual district will also be offered as evidence.

19

Senate District 14 as enacted by Defendants provides one example of the district-specific evidence to be offered at trial. Senate District 14 is a bizarrely-shaped, non-compact district wholly within Wake County. *See* Third Aff. of Christopher Ketchie, Map 2. Thus, its shape and racial composition cannot be explained by the state constitutional whole county provision. Racial density maps of the district show that it contains several abnormally shaped appendages, splitting precincts and pulling black voters into the district on the basis of race. *Id.* The district splits twenty-nine precincts where the benchmark plan split eleven. *See* Fourth Aff. of Christopher Ketchie, Tables 4 & 6, Jan. 4, 2013.

The BVAP in SD 14 was drawn in 2011 to be 51.28%, up from 42.62% in the benchmark plan, PI Ex. J, Stat Pack Enacted Senate; PI Ex. U, Stat Pack Benchmark Senate, even though Defendants knew that the candidate of choice of black voters had been elected in each of the four general elections held under the 2003 Senate Redistricting Plan ('04, '06, '08, and '10). In 2010, the candidate of choice of black voters won with 65.9% of the vote. PI Ex. O, Churchill Election Results 5. Dr. Brunell's 2011 analysis demonstrated that the candidate of choice of black voters received 40.3% of the non-black vote in the 2004 State Auditor race, enabling the candidate of choice of black voters to win in Wake County. PI Ex. V, Report of Dr. Brunell, 6-7. In 2011, Wake County was not covered under Section 5 of the VRA, so compliance with Section 5 could not have been an interest in the design of the district. Similar evidence will be presented with regard to each of the challenged senate and house districts.

### E. Standing and Harm to Plaintiffs

The individual Plaintiffs' residence addresses and registered voter status are established by stipulation, demonstrating that they live in the district they are challenging as a racial gerrymander. Deposition testimony to the effect of where each plaintiff lives and their voting history is also designated.

The Supreme Court's opinion in *Shaw v. Reno* and subsequent racial gerrymander cases, as well as the recent district court opinion in *Harris v. McCrory,* No. 13-949, 2016 U.S. Dist. LEXIS 14581 (Feb. 5, 2016), all describe the harm that voters experience when they are assigned to districts on the basis of their race. "Quotas are especially pernicious embodiments of racial stereotypes because they threaten citizens' 'personal rights' to be treated with equal dignity and respect." *Harris,* 2016 U.S. Dist. LEXIS 14581 at *3 (citing *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493 (1989)).

The evidence in this case from the statements of members of the public during public hearings on the VRA districts, statements on the floor of the legislature during debate over the districts, testimony of witnesses and the testimony of the plaintiffs themselves also give voice to the injury that they experience from participating in the political process in a district that has been drawn based on race. Each of the plaintiffs and witnesses articulate the harm in their unique ways, based on their personal life experiences. Whether the harm is reinforcing race-based stereotypes, limiting opportunities for cross-racial collaboration, or simply being assigned to a district because of their race, for each, the excessive use of race in drawing more race-based districts than ever before in a state where increasingly our political process was equally open to white and black voters, had a personal and individual impact. *See, e.g.,* Tr. of July 25 2011

21

Senate Floor Debate 95:14-25, (Statement of Senator Blue); 164:9-165:5, (Statement of Senator Mansfield); July 25 House Debate, 96:6-15, (Statement of Representative Womble); La'Tanta McCrimmon Dep. 16:2-16:16, 18:13-20:3, February 10, 2016; Antoinette Mingo Dep. 15:1-6; 21:1-13, Feb. 5, 2016.

## IV.    ARGUMENT

### A.    The Elements of a Racial Gerrymander Claim

A plaintiff may state a racial gerrymandering claim under the Equal Protection Clause by alleging that a redistricting statute "cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." *Shaw v. Reno,* 509 U.S. at 649; *see also, Bush v. Vera,* 517 U.S. 952, 959 (1996). Indeed, "a state may not, absent extraordinary justification, … separate its citizens into different voting districts on the basis of race." *Miller,* 515 U.S. at 911-12 (internal quotations and citations omitted).

Recently, in *ALBC* the Supreme Court reiterated that "the plaintiff's burden in a racial gerrymandering case is 'to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" 135 S. Ct. at 1267 (2015) (quoting *Miller*, 515 U.S. at 916). Importantly, this means that to establish predominance, the Plaintiffs do not need to prove that every single decision to move an African-American into a particular district was motivated by race, but that a significant number of voters were moved because of their race. *Id.*

22

Once the plaintiff makes the showing that race was the predominant factor, the burden shifts to Defendants to demonstrate that the district was narrowly tailored to advance a compelling state interest. *See Shaw v. Hunt,* 517 U.S. 899, 908 (1996), *Abrams v. Johnson,* 521 U.S. 74, 91 (1997); *Miller,* 515 U.S. at 920 ("the State must demonstrate that its districting legislation is narrowly tailored"). Racial distinctions are "by their very nature odious to a free people … contrary to our traditions…" and must be "subjected to the most rigid scrutiny", therefore, "judicial review must begin from the position that 'any official action that treats a person differently on account of his race or ethnic origin is inherently suspect.' Strict scrutiny is a searching examination, and it is the government that bears the burden to prove 'that the reasons for any [racial] classification [are] clearly identified and unquestionably legitimate,'" *Fisher v. Univ. of Tex. at Austin*, 133 S. Ct. 2411 (2013).

To satisfy strict scrutiny, the Defendants must show that they had a "strong basis in evidence" to support the race-based choices they have made. *ALBC,* 135 S. Ct. at 1274. *See also, Adarand Constructors v. Pena*, 515 U.S. 200, 224 (1995) (Court will demand "any governmental actor subject to the Constitution justify any racial classification" as narrowly tailored); *Grutter v. Bollinger*, 539 U.S. 306, 306 (2003) ("[t]he Law School has the burden of proving, in conformance with the standard of strict scrutiny, that it did not utilize race in an unconstitutional way") (Kennedy, J., dissenting); *Fisher*, 133 S. Ct. at 2420 ("it remains at all times the University's obligation to demonstrate" narrow tailoring). Importantly, this strong basis in evidence must have been before the legislature at the time the plan was enacted. *Shaw v. Hunt*, 517 U.S. at

23

910. Only data considered by the General Assembly prior to enactment is relevant to the inquiry of whether the plans were justified by a compelling governmental interest. *Id.*

Moreover, to demonstrate that the race-based districts they drew were narrowly tailored "the state must establish the 'most exact connection between justification and classification.'" *Page v. Va. State Bd. of Elections,* 2015 U.S. Dist. LEXIS 73514, *41 (E.D. Va. June 5, 2015) (three-judge court) (quoting *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007)).

**B.    Race Was the Predominant Factor in Drawing the Challenged Districts**

Plaintiffs may show that race predominated when the legislature drew a district "either through circumstantial evidence of a district's shape and demographics or through more direct evidence going to legislative purpose." *Shaw v. Hunt*, 517 U.S. at 905 (citations omitted).    "To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, such as compactness, contiguity, and respect for political subdivisions or communities defined by action shared interests, to racial considerations." *Miller,* 515 U.S. at 916.   Contemporaneous public statements, Section 5 submissions by the jurisdiction, and sworn testimony by individuals involved in the redistricting process are not only relevant but often highly probative evidence. *See, e.g., Bush v. Vera,* 517 U.S. at 960-961.

In addition, the Supreme Court has pointed to evidence that race or percentage of race within a district was the single redistricting criterion that could not be compromised, *see Shaw v. Hunt,* 517 U.S. at 906-07; the creation of non-compact and oddly shaped districts beyond what is strictly necessary to avoid retrogression, *see Shaw v. Reno,* 509

24

U.S. at 646-48; the use of land bridges for no other reason than to bring African-American population into a district, *see Miller*, 515 U.S. at 917; and drawing districts that disregard city limits, local election districts and VTD's, *see Bush*, 517 U.S. at 947. All of these types of evidence will be presented in this case, demonstrating that race predominated in each of the districts challenged here. Indeed, the evidence in this case that racial considerations were the only, overriding criterion used to construct the VRA districts is overwhelming.

### 1. Direct Evidence that Race Predominated.

The contemporaneous written public statements by Senator Rucho and Representative Lewis, their deposition testimony, and Dr. Hofeller's deposition testimony and sworn affidavits all explicitly state that in drawing legislative districts in 2011, they employed two race-based criteria as "safe harbors" and refused to consider any alternative plan that did not meet those criteria. PI Ex. A, Hofeller Dep. 56-57; PI Ex. C, Lewis Dep. 72; PI Ex. B, Rucho Dep. 41-42, 147-48. The racial proportionality goal for the number of majority-black districts that must be drawn in each plan and a requirement that each such district must have greater than fifty percent BVAP are "mechanical racial targets" that, in the words of the Supreme Court, constitutes "strong, perhaps overwhelming, evidence that race did predominate as a factor when the legislature drew" the districts challenged there. *See ALBC*, 135 S. Ct. at 1271. These two "mechanical racial targets" are even more egregious than the one used by the legislature in *ALBC*, which was simply to maintain the BVAP in each already-existing majority-minority

25

district. *Id.,* at 1263. They are also comparable to the 55% BVAP racial threshold employed by the Virginia legislature as a means to achieve Section 5 compliance that led the *Page* court to conclude that race predominated in the drawing of Virginia's Third Congressional District. *Page,* 2015 U.S. Dist. LEXIS 73514, \*27-\*28.

The race-based criteria were the only considerations that could not be compromised. In their June 22, 2011 public statement, Senator Rucho and Representative Lewis said that they would entertain alternate plans, but only those in which "the total districts proposed provide black voters with a *substantially proportional* state-wide opportunity to elect candidates of their choice," where that opportunity takes the form of individual districts "drawn at a level that constitutes a *true majority* of black voting age population." PI Ex. M, June 22, 2011 Public Statement 552, (emphasis added). And the legislature accomplished what they publicly said they would do: to meet their racial targets, the General Assembly enacted nine state Senate districts as majority-black districts when the benchmark plan had none; and twenty-three majority-black state House districts when the benchmark plan had only ten. Racial proportionality, as precise as the state's demographics would permit, was the only substantive metric that the Defendants employed to determine how many majority-black districts to create

### 2. Indirect Evidence that Race Predominated.

The available circumstantial evidence dramatically confirms what the direct evidence so clearly shows: race predominated over traditional redistricting criteria in the districts challenged by Plaintiffs. The districts are bizarrely shaped. *See, e.g.,* Third Aff.

26

of Christopher Ketchie at Tables 10, 12, 21. They combine very different areas of the state in one district, ignoring communities of interest. *See, e.g.,* Aff. of Jane Thompson Stephens ¶¶11-13, 18. They disregard city boundaries. The VRA districts result in a plan that splits more VTD's than any prior redistricting plan, and more VTD's than are split in majority-white, non-VRA districts. *See* Fourth Aff. of Christopher Ketchie at 7, 9, Table 8. They use land bridges to reach out and bring pockets of black voters into a district. *See, e.g.,* Third Aff. of Christopher Ketchie at Tables 12, 18, 22, 25. Indeed, it is possible simply by looking the district map to identify every VRA district challenged in this case because they are all strangely shaped, whereas districts in the rest of the state follow traditional redistricting criteria, respect political subdivision boundaries, and are geographically compact.

Like most legislatures, the North Carolina General Assembly had no political data at the sub-precinct level, only racial data. First Aff. of Theodore Arrington ¶¶10-13. For that reason, courts have considered evidence that precincts were split along racial lines to be "substantial evidence that it was race that led to the neglect of traditional districting criteria." *Moon v. Meadows*, 952 F. Supp. 1141, 1147 n.6 (E.D. Va. 1997) (quoting *Bush v. Vera*, 517 U.S. 952, 963 (1996) (plurality op.)); *see also Bush*, 517 U.S. at 971 (splitting of precincts on racial lines "suggests that racial criteria predominated over other districting criteria in determining the district's boundaries"); *Miller*, 515 U.S. at 918 (finding racial gerrymander in part because "[t]o the extent that precincts in the Eleventh Congressional District are split, a substantial reason for their being split was the objective of increasing the black population of the district").

Case 1:15-cv-00399-TDS-JEP   Document 83   Filed 03/21/16   Page 32 of 53

This especially important evidence also shows that when the legislature chose to split a precinct, it most often did so by dividing the heavily black portion from the heavily white portion. First Aff. of Theodore Arrington ¶41. Dr. Hofeller testified that "splitting VTD lines is often necessary in order to create TBVAP districts." Dr. Hofeller further acknowledged that he split precincts for the purpose of increasing the black population in a district, in order to achieve Rucho and Lewis' instruction to create majority African-American districts in numbers proportional to the state's African-American population. PI Ex. R, Hofeller Dep. vol. 2, 295-96, 299. This is additional evidence that race was the predominant factor in drawing the specific districts challenged as racial gerrymanders in this case.

A plaintiff may prove that the legislature had a race-based motive in drawing a district "through circumstantial evidence of a district's shape and demographics." *Shaw v. Hunt*, 517 U.S. at 905. Because "reapportionment is one area in which appearance do matter," *id.*, at 674, the geography of the districts challenged in this case, including the vast number of split precincts, is further evidence that racial considerations predominated in the drawing of those districts.

### 3.     Senate District 32

Plaintiffs' evidence regarding the predominance of race in Senate District 32 is different from the other districts challenged here because it is an example of race predominating without justification in a majority white district. In drawing District 32, Rucho and Lewis publicly "recommend[ed] that the current white incumbent for the

28

Forsyth County Senate district not be included in the proposed Senate District 32." PI Ex. H, June 17, 2011 Public Joint Statement 8. Their explanation was based on the false assumption that only an African-American candidate can be the candidate of choice for African-American voters. As Senator Rucho explained: "we wanted to make sure that the people in that district have an opportunity to choose a candidate of their choice that are of the population in that district." [sic] Aff. of Linda Garrou, attached letter at 4 (quoting Sen. Rucho). However, Sen. Linda Garrou won two primary elections against African-American candidates by margins greater than four to one, showing that Garrou was the candidate of choice for African Americans. *Id.* at 3, *see also*, First Affidavit of Allan Lichtman ¶10. Despite this clear evidence that Senator Garrou was the candidate of choice for African American voters, evidence that was put before the Defendants prior to the plan being enacted, Senator Rucho testified that he would not have drawn her out of the district if she had been black. PI Ex. B, Rucho Dep. 192-193.

The deliberate drawing of a district to unseat a representative based solely on her race is a racial classification subject to strict scrutiny. It also critically fails to acknowledge that a white candidate can be the candidate of choice of black voters. Indeed, previous elections demonstrated that Garrou was in fact the candidate of choice for black voters. Thus, black voters were already electing the candidate of their choice, and no Section 2 remedy was required. Defendants had no compelling interest for using race as the primary criteria in drawing Linda Garrou out of District 32, rendering the district an unconstitutional racial gerrymander.

29

C.     **The Defendants' Asserted Compelling Governmental Interest in Compliance with the Voting Rights Act**

1.     **Section 2 of the Voting Rights Act**

The Defendants argue that the Voting Rights Act districts they drew to achieve racial proportionality were required by Section 2 of the Voting Rights Act.  To establish a Section 2 violation, a plaintiff must prove three threshold factors:  1) that the minority group in question is "sufficiently large and geographically compact to constitute a majority in a single-member district;" 2) that the minority group is "politically cohesive;" and 3) that the majority votes "sufficiently as a bloc to enable it…usually to defeat the minority's preferred candidate."  *Gingles*, 478 U.S. at 50-51.  These are necessary preconditions, and the absence of any one element is fatal to a Section 2 claim, even if other conditions have been met. *Pender County v. Bartlett*, 361 N.C. 491, 499 (2007) *aff'd sub nom. Bartlett v. Strickland*, 556 U.S. 1 (2009). Further, in a suit alleging a racial gerrymander without a compelling government interest, the burden of proving these preconditions falls on the defendants. *Id.* 361 N.C. at 496.

But the analysis of potential Section 2 liability does not end there—after establishing all three preconditions, Senator Rucho and Representative Lewis must also demonstrate that a violation has occurred based on the totality of the circumstances. *Gingles*, 478 U.S. at 79.  One of these factors is the record of election of minority candidates to public office.  *Id.* at 75-76.

The Supreme Court has assumed, without deciding, "that a State may have a compelling interest in complying with the properly interpreted VRA.  But a State must

30

have a strong basis in evidence for believing that it is violating the Act. It has no such interest in avoiding meritless lawsuits." *Shaw v. Hunt*, 517 U.S. at 908 n.4 (internal citations omitted). The Court in *Bush v. Vera* emphasized that once a state, in the course of avoiding § 2 liability, subordinates traditional redistricting principles to race, a serious constitutional issue arises and "[s]trict scrutiny remains, nonetheless, strict." 517 U.S. at 978. Fear of litigation under Section 2 in no way establishes a "strong basis in evidence" that justifies racial classifications. *Shaw v. Hunt,* 517 U.S. at 908. Most recently, in *Ricci v. DeStefano,* 557 U.S. 557, 592 (2009), the Court examined the City of New Haven's justification for taking race into account to avoid litigation and concluded that the City failed to show a "strong basis in evidence" that it would be subject to liability if it failed to take a race-based action. Thus, the state's good faith assertions that they sought to avoid Section 2 liability are not sufficient.

The Defendants' theory that racial proportionality is an acceptable "safe harbor" to avoid potential Section 2 liability runs afoul of the text of the Voting Rights Act and the Supreme Court's decisions on the constitutionality of race-based remedies. The Voting Rights Act states that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 52 U.S.C. § 10301(b). Indeed, Justice Kennedy warned:

> [o]perating under the constraints of a statutory regime in which proportionality has some relevance, States might consider it lawful and proper to act with the explicit goal of creating a proportional number of majority-minority districts in an effort to avoid Section 2 litigation. … Those governmental actions, in my view, tend to entrench the very practices and stereotypes the Equal Protection Clause is set against. As a

31

general matter, the sorting of persons with an intent to divide by reason of race raises the most serious constitutional questions.

*DeGrandy v. Johnson*, 512 U.S. 997, 1012 (1994) (Kennedy, J., concurring) (internal citations omitted).  The *DeGrandy* court could not have been clearer that proportionality of the sort the North Carolina General Assembly asserts as a compelling governmental interest is not a safe harbor:  "[n]or does the presence of proportionality prove the absence of dilution.  Proportionality is not a safe harbor for States; it does not immunize their election schemes from § 2 challenge." *Id.* at 1026 (O'Connor, J. concurring).  And again:  "As today's decision  provides, a lack of proportionality is "never dispositive" proof of vote dilution, just as the presence of proportionality "is not a safe harbor for States [and] does not immunize their election schemes from § 2 challenge." *Id.* at 1028 (Kennedy, J., concurring).

 *DeGrandy* is not the only case raising this issue.  The state defendants in 1990s Georgia redistricting litigation, like the Defendants here, admitted that achieving proportional representation was a goal motivating their decision to create additional majority-minority congressional districts.  *Johnson v. Miller*, 864 F. Supp. 1354, 1378 (S.D. Ga. 1994). Georgia enacted a plan with three majority-black districts—its previous plan contained only one majority-black district.  *Id.* at 1360-61.  Georgia even indicated that it believed it had a compelling interest in achieving proportionality apart from avoiding Section 2 vote dilution.  *Id.* at 1379.  To that, the District Court in *Johnson v. Miller* replied that "[t]o erect the goal of proportional representation is to erect an implicit quota for black voters.   Far from a compelling state interest, such an effort is

32

unconstitutional." 864 F. Supp. at 1379 (citing *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 307 (1978) (Powell, J.)).

Representative Lewis and Senator Rucho were made aware of this very basic legal tenet during the redistricting process, by staff attorneys in the General Assembly. In a memorandum to the chairs of the redistricting committees, under the heading, "Maximization Not Required; Proportionality Not a Safe Harbor—Johnson v. DeGrandy," staff attorneys at the General Assembly explained that:

> In *Johnson v. DeGrandy*, the Supreme Court focused on the 'totality of the circumstances' as articulated in *Gingles*. The Supreme Court rejected a rule that would require a state to maximize majority-minority districts. The Supreme Court also rejected an absolute rule that would bar Section 2 claims if the number of majority-minority districts is proportionate to the minority group's share of the relevant voting age population. The Court rejected this rule, feeling that a "safe harbor" might lead to other misuses.

Churchill Dep. Ex. 58, June 13 Memorandum from O. Walker Reagan, Attorney, General Assembly Research Division, to Sen. Bob Rucho and Rep. David Lewis, 2-3. Defendants ignored very clear precedent that directed them to limit racial remedies in redistricting to the few instances in which a strong basis in evidence indicated that the state had to remedy a Section 2 violation. In 2011, the General Assembly had no evidence before it of Section 2 violations. As such, the Voting Rights Act did not offer the Defendants free license to engage in racial gerrymandering.

Moreover, the Supreme Court has been long been clear that "outright racial balancing … is patently unconstitutional." *Fisher,* 133 S. Ct. at 2419. There is no reason this rule does not apply with equal force in the redistricting context. The Defendants' assertion that rough proportionality was reasonably necessary to protect the

33

State from anticipated liability under § 2 of the VRA is wrong as a matter of law because racial proportionality, whether exact or rough, is never a compelling governmental interest, nor is it required by the Voting Rights Act.

### 2. Section 5 of the Voting Rights Act

In *ALBC,* the Supreme Court expressly declined to decide "whether, given *Shelby County v. Holder,* 133 S. Ct. 2612 (2013), continued compliance with §5 remains a compelling interest." *ALBC,* 135 S. Ct. at 1274. Defendants' asserted during the legislative process that compliance with Section 5 of the Voting Rights Act required drawing the VRA they drew. The Defendants can no longer rely on Section 5 as a compelling state interest after the Court in *Shelby County v. Holder,* 570 U.S. ___ (2013), invalidated the coverage formula and rendered Section 5 inapplicable to North Carolina.

However, this Court need not decide that question because even if Section 5 were still in effect, it does not justify the use of race in the districts challenged here. Section 5 merely prevented retrogression – the intent or effect of making black voters worse off by weakening their ability to elect candidates of their choice. *Beer v. United States,* 425 U.S. 130, 141 (1976). North Carolina hardly needed nine new majority black senate districts and nine additional house districts to avoid retrogression. As the *ALBC* court explained, the relevant question for the state to ask with respect to Section 5 was: "To what extent must we preserve existing minority percentages in order to maintain the minority's present ability to elect the candidates of its choice?" *ALBC,* 135 S. Ct. at

1274. That was not the analysis Defendants applied and the race-based quotas they used to draw the VRA districts were not designed to meet their obligations under Section 5.

### D. The Defendants Did Not Have A Strong Basis in Evidence to Conclude that Compliance with Section 2 of the Voting Rights Act Requires These Districts

In applying strict scrutiny, courts do not simply ask whether the government's use of race was based on any evidence; they examine whether that evidence was credible, probative and sufficient to justify the use of racial classifications. *See, e.g., Clark v. Putnam County*, 293 F.3d 1261, 1270 (11th Cir. 2002) (holding that majority-black districts do not satisfy strict scrutiny, in part because "[t]he evidence is overwhelming that the county decided at the outset to maintain its two black voting districts and to assign as much of the black voting age population as possible to those districts. This agenda was never seriously questioned…"); *Moon v. Meadows,* 952 F. Supp. at 1149-1150 (the court examined evidence and determined that the challenged district was not necessary to avoid § 2 liability, in part because of failure to prove third prong of *Gingles.* "Defendants argue that voting in and around the Third District is racially polarized such that white voters are usually able to prevent black voters from electing candidates of choice. An examination of election results proves this conclusion false."); *Smith v. Beasley,* 946 F. Supp. 1174 (D.S.C. 1996) (holding that nine of twelve challenged electoral districts for the South Carolina General Assembly could not survive strict scrutiny because the State failed to prove that the districts at issue were specifically drawn to achieve a compelling state interest in remedying the effects of past or present discrimination); *cf. Wygant v. Jackson Bd. of Ed.*, 476 U.S. 267, 279 (1986) (state must

35

have ***convincing*** evidence that remedial action is necessary before implementing affirmative action) (emphasis added).

The districts challenged in this case fail the first and third prongs of *Gingles*, and therefore the defendants cannot demonstrate that they had a strong basis in evidence to conclude that they were necessary to comply with Section 2 of the Voting Rights Act. Moreover, the evidence before the General Assembly indicated that, in the totality of circumstances, African-American voters were already electing their candidates of choice and had an equal opportunity to participate in the political process.

### 1. Geographically Compact Black Populations.

As is dramatically evidenced by the tortured district lines that snake in all directions to capture disparate pockets of African-American voters, the districts challenged here are not composed of geographically compact black populations. *See Bush v. Vera,* 517 U.S. at 979 ("If, because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, § 2 does not require a majority-minority district."). Lack of compactness is fatal to a Section 2 claim. *See Bartlett v. Strickland,* 556 U.S. 1, 47 (2009) (inability to draw a compact 50% black district fatal to the legislature's purported Section 2 justification); *Gause v. Brunswick County,* 92 F.3d 1178 (4th Cir. 1996) (rejecting Section 2 claim where black population was not geographically compact). A State cannot use Section 2 to justify its race-based redistricting where it draws a district that combines pockets of minority communities that

36

do not form part of a compact district. *Bush,* 517 U.S. at 979, *Shaw v. Hunt,* 517 U.S. at 916.

Dr. Hofeller did not run any of the mathematical measures of compactness to evaluate the relative compactness of the VRA districts he drew. PI Ex. A, Hofeller Dep. 73:8-74:2. Rucho and Lewis testified that they relied on Dr. Hofeller to determine what the law required. Rucho Dep. 8:25-9:19, 28:13-29:9, Feb. 8, 2016; Lewis Dep. 18:13-18, Feb. 5, 2016. The VRA districts, when compared with benchmark districts or other districts in plans considered by the General Assembly, are obviously not geographically compact.

### 2. Legally Significant Racially Polarized Voting.

To satisfy *Gingles'* third prong, Defendants must present a strong basis in the evidence that there is legally significant racially polarized voting—that is, where the white voting bloc usually defeats minority voters' candidate of choice. *Gingles*, 478 U.S. at 51. If the candidates of choice of minority voters consistently win elections, then the third prong of *Gingles* is not satisfied, and districts do not need to be crafted to increase the minority population in them. *Id.* at 77 (finding that the District Court erred in ignoring the significance of the sustained success black voters had experienced in Durham County). Further, in order to prove that there is legally significant racially polarized voting (hereinafter "RPV"), Defendants must show that it exists in individual districts rather than larger areas that may include the contested district. *See id.* at 59 n.28 (requiring that the RPV inquiry be "district-specific").

37

A mere showing of statistically significant RPV is insufficient to demonstrate a strong basis in evidence for the third prong of *Gingles*. *Abrams*, 521 U.S. at 92-93; *Harris,* 2016 U.S. Dist. LEXIS at *59. Defendants repeatedly assert that there is racially polarized voting in North Carolina, and Plaintiffs agree. However, the crucial question is the one Defendants never answer – the extent to which white voters vote as a block consistently to defeat the candidate of choice of black voters.

There are numerous examples of unsuccessful § 2 plaintiffs who lose because the repeated success of black or Latino candidates means a plaintiff cannot establish legally significant white bloc voting, the third prong of *Gingles. See, Cottier v. City of Martin,* 604 F.3d 553, 558 (8th Cir. S.D. 2010) (en banc) *cert. denied* 562 U.S. 1044 (no Section 2 violation where in countywide elections between candidates of different races, countywide elections between white candidates, and state and federal elections between white candidates, white voters did not vote sufficiently as a bloc usually to defeat the Indian-preferred candidate.); *Askew v. City of Rome*, 127 F.3d 1355 (11th Cir. 1997) (city not sufficiently racially polarized to conclude that Section 2 had been violated where twenty-three of thirty-three African-American preferred candidates were elected); *Vecinos de Barrio Uno v. City of Holyoke*, 960 F. Supp. 515, 526 (D. Mass. 1997) (Hispanic voters failed to establish Section 2 violation where white bloc voting occurred but did not defeat candidate of choice of Hispanic voters); *Clay v. Board of Education,* 90 F.3d 1357, 1362 (8th Cir. 1996) (plaintiffs did not prove white bloc voting when black voters elected their preferred candidates to the Board 57.9 percent of the time); *Clarke v. City of Cincinnati*, 40 F.3d 807, 813 (6th Cir. 1994) (noting the success of black-

38

preferred black candidates implied a lack of white bloc voting, thus leading the court to conclude that "this success rate gives us no reason to find that blacks' preferred black candidates have 'usually' been defeated."); *Valladolid v. National City*, 976 F.2d 1293 (9th Cir. 1992) ("unless minority group members experience substantial difficulty electing representatives of their choice, they cannot prove that a challenged electoral mechanism impairs their ability "to elect"); *Overton v. City of Austin*, 871 F.2d 529, 538 (5th Cir. 1989) ("the sustained history of electoral success by black and Mexican-American candidates … refuted the contention of racially polarized voting").

Standing *Bartlett v. Strickland* on its head, Defendants argue that examples of the success of African-American candidates in coalition districts (districts that are less than 50% majority-black) justifies creating majority-black districts. *But see Strickland,* 556 U.S. at 24 ("States can--and in proper cases should--defend against alleged § 2 violations by pointing to crossover voting patterns and to effective crossover districts. Those can be evidence, for example, of diminished bloc voting under the third *Gingles* factor or of equal political opportunity under the § 2 totality-of-the-circumstances analysis.") In fact, the *Harris* Court explicitly rejected Defendants misplaced reliance on *Strickland* in a footnote. *Harris,* 2016 U.S. Dist. LEXIS 14581 at *61 n.10. The *Harris* court called it "absurd" for the defendants to suggest "that the VRA would somehow require racial balkanization where, as here, citizens have not voted as racial blocs, where crossover voting has naturally occurred, and where a majority-minority district is created in blatant disregard for fundamental redistricting principles." *Id.* at 61.

39

Defendants also seek to deny the significance of the past success of candidates of choice of black voters by introducing irrelevant data showing that the margin of victory for black candidates prior to 2011 was less than the number of people that needed to be added to a district. This compares apples to oranges, actual voters vs. total population of all persons. Moreover, in some of the districts, the number of persons by which the district was over or under populated is actually greater than the total number of voters in past elections. This highlights the folly of Defendants' argument, which has no support in the case law.

In 2007, the North Carolina Supreme Court held that "[p]ast election results in North Carolina demonstrate that a legislative voting district with a total African-American population of at least 41.54 percent or an African-American voting age population of at least 38.37 percent, creates an opportunity to elect African-American candidates." *Pender County v. Bartlett,* 361 N.C. at 494, at 649 S.E. 2d at 367. In these circumstances, generalized statements about racially polarized voting are a starting point, but they are not the end of the inquiry. Defendants must show that the legislature had before it evidence that black voters were not able to elect their candidates of choice, consistently, over several election cycles.

Instead, the evidence will show that in drafting the challenged VRA districts, the Defendants failed to consider the extent to which black voters were currently able to elect the candidates of their choice. PI Ex. G, Dickson Trial Tr. vol. II 328-29, 331 (testimony of Dr. Hofeller). In fact, from 2006 to 2011, black candidates won fifty-six election contests for state legislative office in districts that were not majority-black in voting age

40

population.  PI Ex. O, Churchill Election Results Tables; PI Ex. P, Churchill Dep. Exs. 82

and 83.  Likewise, the alleged fear of litigation that led the state to create its so-called

"VRA districts" was not based on any recent Section 2 claims involving state legislative

districts, since none had been brought since *Thornburg v. Gingles*, 478 U.S. 30 (1986).

*See Alabama Legislative Black Caucus*, 135 S. Ct. at 1274; *Shelby County*, 133 S. Ct. at

2627 ("[A] statute's current burdens must be justified by current needs, and . . . must be

sufficiently related to the problem it targets.") (internal quotations omitted).  No black

legislators, leaders, or community members were demanding such a dramatic increase in

the number of majority-black districts; rather, black legislators, the North Carolina

NAACP, and a number of individual citizens denounced the plan.  Ex. F, Dickson Trial

Tr. vol I, at 30, 114 (testimony of Sen. Blue, Rep. Hall).    Unable to establish the third

prong of *Gingles,* Defendants cannot show that they had a reasonable basis in evidence to

use race in drawing the districts challenged here.

### 3.  Extent of Election of Black Candidates.

This factor relevant to the totality of circumstances is a different question from the

issue of whether black voters can elect their candidates of choice.  It is an easier factor for

the legislature to evaluate.  Members of the General Assembly know their colleagues.

They are active in local politics in their districts, and they know who gets elected and

who is defeated.  They all look at election returns by precinct on election night, and they

know when black candidates are successful.

While this issue is informed by statistics, during the trial Plaintiffs will offer the

testimony of a few of the voters and elected officials who give these statistics meaning.

41

Similar testimony was presented in the two-day trial in the *Dickson* litigation. *See especially* PI Ex. F, Dickson Trial Tr. vol. 1. The picture that emerges from their collective testimony is one of an evolving process whereby black voters and black candidates have increasingly been woven into the fabric of political life in this state. The wealth of stories of their success belies any suggestion that they are aberrations. From Rencher N. Harris' election to the Durham City Council in 1953, and Harvey Gantt's first election to the Charlotte City Council in 1974, to Dan Blue's ascent to the position of Speaker of the House in 1991, Ralph Campbell's statewide election as State Auditor in 2004, Malcolm Graham's defeat of incumbent Fountain Odom in 2006, and to Dr. Eric Mansfield's election to the Senate from Fayetteville in 2010, black candidates have built successful multi-racial campaigns, with strong support from whites and blacks in their communities. Black and white voters have seen their common interests united behind the values that they share, and they have seen their elected leaders, honorable and capable men and women of color, ably represent black and white voters together.

These candidates succeed because North Carolina voters are working across racial lines to find common ground. Politically active citizens at the local level such as Goldie Wells, Albert Kirby and Walter Rogers testified to the vibrant multi-racial coalitions that have been formed in their communities to address common issues. PI Ex. F, Dickson Trial Tr. 140-41 (Wells), 82-84 (Kirby), 128-31 (Rogers). Whether it is the expansion of a landfill in Greensboro or a proposed food tax in Durham, black and white voters now have a shared experience of joining forces across racial lines to advocate for their positions, and to hold their elected officials accountable. When voters are divided street

42

by street into different districts along racial lines, it is much harder for elected officials to represent their natural constituencies. The past success of black candidates, particularly in elections for the General Assembly, shows that under the totality of circumstances test, any theoretical Section 2 case would fail.

### E. The Challenged Districts are Not Narrowly Tailored

#### 1. The Districts Were Drawn Based on a Proportionality Criterion

Drawing districts to meet a proportionality goal cannot meet the requirement that a government's use of race be narrowly tailored. *See, e.g., Bakke*, 438 U.S. at 315-16. What Defendants have done in this case is precisely the kind of blunt, non-narrowly-tailored use of racial quotas repeatedly rejected by the Supreme Court. In *Grutter*, the Court explained that race may only be used, constitutionally, in a "flexible" and "nonmechanical" way because equal protection requires "individualized assessments." 539 U.S. at 334. *ALBC* applied the same requirement in the redistricting context, explaining that the Alabama Legislature's reliance on a mechanically numerical view as to what counts as forbidden retrogression raises serious constitutional concerns on narrow tailoring grounds. *ALBC,* 135 St. Ct. at 1272-73.

Earlier, in *Miller v. Johnson*, the Department of Justice determined that it was possible to draw three majority-black congressional districts in Georgia following the 1990 Census, and the Court found that DOJ set that number as a quota for the number of majority-black districts the state must enact in order to obtain preclearance under Section 5 of the VRA. *Miller*, 515 U.S. at 918. The Supreme Court noted approvingly the District Court's conclusion that because the VRA "did not require three majority-black

43

districts, . . . Georgia's plan for that reason was not narrowly tailored to the goal of complying with the Act." *Id.* at 910 (internal citations omitted).

### 2. The Districts Pack Black Voters More Than Necessary

The Defendants increased the TBVAP in each of the Voting Rights Act districts far more than would be required for a "narrowly tailored" remedy. *See, e.g., ALBC,* 135 S. Ct. at 1272; *Page,* 2015 U.S. Dist. LEXIS 73514, at *53-*56; *Harris*, 2016 U.S. Dist. LEXIS 14581, at *64-*66. For example, the TBVAP in each of the following challenged districts was increased by a minimum of five percentage points, and sometimes substantially more, as set forth in the following chart reflecting the percentage of TBVAP in the foregoing districts before 2011, and after the 2011 Plans were enacted:

| District | TBVAP Pre-2011 | TBVAP 2011 |
|----------|----------------|------------|
| SD14 | 42% | 51% |
| SD20 | 45% | 51% |
| SD21 | 45% | 51% |
| SD28 | 47% | 56% |
| SD38 | 47% | 53% |
| SD40 | 35% | 52% |
| HD5 | 49% | 54% |
| HD24 | 50% | 57% |
| HD29 | 40% | 51% |
| HD48 | 46% | 51% |
| HD99 | 41% | 55% |
| HD102 | 43% | 54% |
| HD107 | 47% | 53% |

*Compare* PI Ex. J, Stat Pack Enacted Senate Plan, *with* 2003 Stat Pack Enacted Senate Plan. The Defendants increased the TBVAP in their VRA districts to a much greater extent than could be considered narrowly tailored to a compelling governmental interest.

44

### 3. The VRA Districts are Not Narrowly Tailored Because They Are not Geographically Compact

The failure to draw compact districts is, by itself, fatal to the narrow tailoring analysis. Indeed, as the Supreme Court has held: "[Noncompact] characteristics defeat any claim that the districts are narrowly tailored to serve the State's interest in avoiding liability under § 2, because § 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact.'" *Bush v. Vera*, 517 U.S. at 979. The challenged districts are by no measure "reasonably compact" and thus are not narrowly tailored. *See also Shaw v. Hunt,* 517 U.S. at 916, 918 ("No one looking at District 12 could reasonably suggest that the district contains a "geographically compact" population of any race," and thus, "District 12 is not narrowly tailored to the State's asserted interest in complying with § 2 of the Voting Rights Act.") (internal citations omitted).

### F. There is No Basis for Defendants' Res Judicata Defense

Plaintiffs anticipate that Defendants will continue to assert that their claims are barred by doctrines of issue or claim preclusion, or both. Defendants have not yet established any evidence of privity between Plaintiffs in this case and the plaintiffs in *Dickson*. *See* Pls.' Opp. to Mot. to Modify Sched. Order, 4-5. ECF No. 70, Mar. 2, 2016. Moreover, their attenuated theory of privity, whereby Defendants seek to preclude Plaintiffs from seeking relief in this court because of some alleged third-party control over both the prior actions and the instant action, is a scenario in which no court has ever found a privity relationship. This Court has already denied Defendants motion to stay, motion to for leave depose Plaintiffs' counsel, and motion to modify the scheduling

45

order, all of which asserted this theory. Order, ECF No. 39, Nov. 25, 2015; Text Order Denying Mot. for Leave, Mar. 9, 2016. Plaintiffs adopt and incorporate herein the legal arguments made in their responses to those motions. Pls.' Opp. to Defs.' Mot. to Stay, ECF No. 33, Nov. 10, 2015; Pls.' Opp. to Defs.' Mot. to Modify Sched. Order, ECF No. 70, Mar. 2, 2016.

In addition, similar res judicata and collateral estoppel arguments were rejected by a three-judge panel in *Harris*. *Harris v. McCrory*, 1:13-cv-949 ECF No. 65 (M.D.N.C. May 22, 2014), (mem order). Defendants' evidence about the extent to which Plaintiffs recall receiving copies of the Complaint in this action, or the number of emails they have received from Counsel does not even begin to rise to the level of what showing is necessary to demonstrate "control" for the purposes of establishing privity under North Carolina law. *See, e.g., Carolina Power & Light Co. v. Merrimack Mut. Fire Ins. Co.*, 238 N.C. 679, 79 S.E.2d 167 (1953); *Troy Lumber Co. v. Hunt*, 251 N.C. 624, 112 S.E.2d 132 (1960). Absent actual participation in the prior litigation, and absent a meaningful opportunity to protect their individual and personal rights to equal protection, *see Harris,* 2016 U.S. Dist. LEXIS 14581 at *2-3, the individual plaintiffs in this case are not estopped from bringing their claims.

### G. This Court Should Enjoin Any Further Use of These Districts and Implement an Effective Remedy Including Awarding Plaintiffs' Attorneys' Fees

Having demonstrated that the districts challenged here are unconstitutional racial gerrymanders, the Plaintiffs are "entitled to vote as soon as possible for their representatives under a constitutional apportionment plan." *Harris,* 2016 U.S. Dist.

46

LEXIS 14581 at *67 (quoting *Page,* 2015 U.S. Dist. LEXIS 73514, at *19).  Under North Carolina law, state courts must give the legislature at least two weeks to remedy constitutional defects identified in a redistricting plan, N.C. Gen. Stat. § 120-2.4, and the same timeframe should apply here.  *See also Wise v. Lipscomb,* 437 U.S. 535, 539-40 (1978).  As prevailing parties in an action under 42 U.S.C. § 1983, Plaintiffs "should ordinarily recover an attorney's fee, *Hensley v. Eckerhart,* 461 U.S. 424, 429 (1983) (citations omitted), and are also entitled to recover their expert fees.  *See* 52 U.S.C. § 10310(e).  Therefore, Plaintiffs respectfully request the opportunity, should they prevail at trial, to file a post-trial motion for attorneys' fees.

## V.    CONCLUSION

For these reasons, Plaintiffs respectfully request that this Court declare that the nine senate districts and nineteen house districts challenged here are impermissibly racially gerrymandered, enjoin their further use in any elections for the state legislature, and implement remedial districts in which racial considerations are not predominate.

47

## CERTIFICATE OF SERVICE

I hereby certify that on this date I served a copy of the foregoing Plaintiffs' Trial Brief, with service to be made by electronic filing with the Clerk of the Court using the CM/ECF System, which will send a Notice of Electronic Filing to all parties with an e-mail address of record, who have appeared and consent to electronic service in this action.

This the 21st day of March, 2016.


*/s/* Anita S. Earls