# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### NO. 1:15-cv-00399

| | |
|---|---|
| SANDRA LITTLE COVINGTON, *et al.*, | |
| PLAINTIFFS, | |
| V. | **PLAINTIFFS' POST-TRIAL BRIEFING ON REMEDY** |
| THE STATE OF NORTH CAROLINA, *et al,* | |
| DEFENDANTS. | |

NOW COME Plaintiffs, by and through their undersigned counsel, and pursuant to the Court's request of the parties and minute entry dated April 15, 2016, submit the following post-trial briefing on remedy and a potential remedial schedule.

## I. **Should this Court Strike Down Any of the Challenged Districts, Plaintiffs Are Entitled to Relief Before the 2016 Election**

Should this Court rule in Plaintiffs' favor, Plaintiffs and millions of North Carolina voters will have already been subjected to two election cycles under the unconstitutional enacted state legislative redistricting plans. Based on their pre-trial brief, ECF No. 81, and briefing in which the same Defendants unsuccessfully sought a stay in remedy in *Harris v. McCrory*, No. 1:13-cv-949, Defendants will certainly seek to delay implementation of remedy until after the 2016 elections. This Court should not allow any delay, and should act quickly to protect the right to vote of people in this state.

Indeed,

> [O]nce a State's…apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan.

*Reynolds v. Sims*, 377 U.S. 533, 585 (1964). This is not an unusual case, particularly in light of North Carolina's long history of redistricting litigation and election year remedies for improper redistricting. This Court has the authority to ensure that the constitutional flaws in the enacted state legislative districts are corrected before the November 2016 election, and equity demands that those wrongs be righted immediately.

## A. The Court Will Retain Jurisdiction to Enforce a Remedy Pending Appeal

Assuming that Defendants will file an immediate appeal should this Court strike down any of the challenged districts, this Court will retain jurisdiction to enforce a remedy pending appeal. It is black letter law that a district court "does retain jurisdiction to enforce the judgment pending appeal." *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 588-89 (6th Cir. 1987) (as cited in *Greater Potater Harborplace, Inc. v. Jenkins*, 935 F.2d 267 (4th Cir. 1991) (unpublished)). Accordingly, when a district court is supervising a "continuing course of conduct," a pending "appeal from the supervisory order does not divest the district court of jurisdiction to continue its supervision." *Roberts v. Colorado State Bd. of Agric.*, 998 F.2d 824, 827 (10th Cir. 1993) (quoting *Hoffman v. Beer Drivers & Salesman Local Union No. 888*, 536 F.2d 1268, 1276 (9th Cir. 1976)); *see also United States v. Hanover Ins. Co.*, 869 F. Supp. 950, 952 (Ct. Int'l Trade 1994) ("absent a stay

pending appeal, a court retains jurisdiction to supervise its judgments and enforce its orders."), *aff'd* 82 F.3d 1052 (Fed. Cir. 1996). Indeed, Federal Rule of Civil Procedure 62(c) expressly authorizes district courts to issue or modify an injunction during the pendency of appeal, and "even after notice of the appeal has been filed, the trial court still has jurisdiction to make an order under Rule 62(c)." 11 Fed. Prac. & Proc. Civ. § 2904 (3d ed.) (collecting cases).

Moreover, in February, the same Defendants failed to convince another three-judge panel in the Middle District of North Carolina or the United States Supreme Court to enter an emergency stay pending appeal after the three-judge panel found two congressional districts to be unconstitutional racial gerrymanders and enjoined their use in the 2016 elections. *Compare Harris v. McCrory*, 1:13-cv-949, ECF No. 145 (Feb. 8, 2015) (Def.'s Emergency Motion to Stay Final Judgment and Modify Injunction) (attached as Appendix A); *with Harris v. McCrory*, 1:13-cv-949, ECF No. 148 (Feb. 9, 2015) (Order Denying Emergency Motion to Stay) (attached as Appendix B); *and McCrory v. Harris*, 136 S. Ct. 1001 (2016) (Order Denying Emergency Stay Application). In short, the law is clear that this Court has the authority to oversee a remedy before the 2016 election.

### B. Staying a Remedy Will Cause Irreparable Harm to Plaintiffs and Is Contrary to the Public Interest

The right to vote is one of the most fundamental rights in our democracy and is thus afforded special protections. *See Reynolds*, 377 U.S. at 554-55, 563; *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("Other rights, even the most basic, are illusory if the

3

right to vote is undermined."). As such, any impediment or abridgment of the right to vote is an irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Plaintiffs and other North Carolina voters will suffer irreparable injury if they are forced to participate in a third election under an unconstitutional redistricting plan. *See Larios v. Cox*, 305 F. Supp. 2d 1335, 1344 (N.D. Ga. 2004) ("If the court permits a stay, thereby allowing the 2004 elections also to proceed pursuant to unconstitutional plans, the plaintiffs and many other citizens in Georgia will have been denied their constitutional rights in two of the five elections to be conducted under the 2000 census figures … . Accordingly, we find that the plaintiffs will be injured if a stay is granted because they will be subject to one more election cycle under unconstitutional plans.").

Less than three months ago, a three-judge panel in the Middle District of North Carolina denied the request of these same Defendants to stay a remedy for the General Assembly's unconstitutional racial gerrymandering of two congressional districts. *Harris v. McCrory*, 1:13-cv-949, ECF No. 148 (Feb. 9, 2015) (Order Denying Emergency Motion to Stay) (Attached as Appendix B). The court there heard the exact same arguments from Defendants, and rejected them, even though voting had already begun in the congressional primaries. That court recognized that the balance of equities and public interest tipped heavily in favor of denying the stay and putting a remedial plan into place immediately. *Id.* at 4.

Likewise, a three-judge panel in a racial gerrymandering case in Virginia late last year recognized that "individuals in [the invalidated district] whose constitutional rights

have been injured by improper racial gerrymandering have suffered significant harm" and are "entitled to vote as soon as possible for their representatives under a constitutional apportionment plan." *Personhuballah v. Alcorn*, No. 3:13-cv-678, ECF No. 171 at 49 (E.D. Va. June 5, 2015) (attached as Appendix C) (quoting *Cosner v. Dalton*, 522 F. Supp. 350, 364 (E.D. Va. 1981)). Even though the remedial process in *Personhuballah* ultimately required the engagement of a special master because the legislature failed to draw a new plan, the court has not delayed implementation of a remedy. *See Personhuballah v. Alcorn,* No. 3:13-cv-678, 2016 U.S. Dist. LEXIS 2054 (E.D. Va. Jan. 7, 2016) (copy attached as Appendix D) *stay denied sub nom. Wittman v. Personhuballah,* 136 S. Ct. 998 (2016) (holding that "the balance of equities favors our immediate imposition of a remedial redistricting plan.")

Indeed, courts have taken aggressive action to ensure that voters already constitutionally harmed by illegal redistricting plans do not further suffer irreparable harm. *See, e.g., Vera v. Bush*, 933 F. Supp. 1341, 1352-53 (S.D. Tex. 1996) (ordering a remedial plan on August 6, 1996, for November 1996 elections); *Johnson v. Mortham*, 926 F. Supp. 1540, 1542 (N.D. Fla. 1996) (denying motion to stay a May 22, 1996, deadline for the legislature to enact a remedial plan for the November 1996 congressional election); *Busbee v. Smith*, 549 F. Supp. 494, 518-19 (D.D.C. 1982) (ordering a court-drawn remedial plan on August 24, 1982, for two congressional districts), *aff'd* 459 U.S. 1166 (1983); *Keller v. Gilliam*, 454 F.2d 55, 57-58 (5th Cir. 1972) (approving the shortening of terms of office as a remedy for a voting rights violation).

Moreover, the fact that the primaries for state legislative seats have already been conducted is no barrier to providing Plaintiffs with a remedy this year. It is clear that "a district court has power to void and order new elections for violations of the Voting Rights Act of 1965, 42 U.S.C.S. § 1973, and the Constitution." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 357 F.3d 260 (2nd Cir. 2004); *see also, Hadnott v. Amos,* 394 U.S. 358 (1969) (federal courts have the power to invalidate elections held under constitutionally infirm conditions); *Pope v. County of Albany*, 687 F.3d 565, 569-70 (2nd Cir. 2012) (citing *Bell v. Southwell*, 376 F.2d 659, 665 (5th Cir. 1967) (holding that district court has power to void and order new elections for violations of VRA and Constitution)); *Stewart v. Taylor*, 104 F.3d 965, 970 (7th Cir. 1997) (stating that, despite holding of challenged election, court could order new election if plaintiff's motion for preliminary injunction has merit); *Hamer v. Campbell*, 358 F.2d 215, 222 (5th Cir. 1966) ("[H]aving concluded that the . . . election should have been enjoined, we now must set it aside in order to grant appellants full relief in the same manner as if the said election had been enjoined." (internal quotation marks omitted)). Indeed, the fact that the Plaintiffs' here sought a preliminary injunction to preserve the status quo until their claims could be heard should weigh in their favor in the balance of equities. *Cf. Gjersten v. Bd. of Election Comm'rs,* 791 F.2d 472, 479 (7th Cir. 1986) (whether plaintiffs sought pre-election request for relief relevant to determination of whether, after decision on merits in their favor, an election should be set aside).

6

In the *Harris* case, Defendants relied heavily on *Whitcomb v. Chavis*, 396 U.S. 1064 (1970), for the proposition that it is fine for elections to proceed under an unconstitutional plan. *McCrory v. Harris*, No. 15A809, (Feb. 10, 2016) Emergency Stay Application at 21 (Attached as Appendix E). In *Whitcomb*, the Supreme Court stayed entry of a three-judge court's remedial order after that court invalidated an Indiana redistricting statute. 396 U.S. at 1064. This case is different for two important reasons. First, the question in *Whitcomb* was whether to proceed under a court-ordered remedial plan or the invalidated legislatively-enacted one for the 1970 election. *Id*. at 1064-65. Here, state law demands that the General Assembly be given a chance to enact a remedial map, and given the speed with which the legislature acted in *Harris*, there is no reason to believe it would not enact its own remedial plan here. Thus, the federal judiciary's general preference for legislatively-enacted plans over court-drawn plans, central to the *Whitcomb* holding, is not instructive here. Second, much has changed with regard to redistricting technology since 1970. The computer software that speeds the drawing of redistricting plans did not exist back then. And again, we know from recent history that this General Assembly is entirely capable of enacted a remedial redistricting plan within two weeks. Thus, some of the equitable factors that may have weighed into the Supreme Court's decision to grant a stay in 1970 are not at play here.

On the question of public interest, Defendants will undoubtedly argue that delayed primaries "result in lower voter participation and that when primaries are bifurcated, the delayed primary will have a lower turnout rate than the primary held on the regular date."

*McCrory v. Harris*, No. 15A809, Emergency Stay Application, at 17 (Attached as Appendix E). However, just last decade, in the *Stephenson* state court litigation, Mr. Farr, counsel for Defendants here, argued that a delayed primary for state legislative districts was in the public interest because "the public interest is served by all appropriate relief necessary to effect the removal of all barriers which affect the right to participate in a constitutionally sound political process." *Stephenson v. Bartlett*, No. 1 CV 02885 (Johnston Co. Sup. Ct.), Plaintiffs' Memorandum Concerning an Appropriate Remedy, at 19 (Feb. 19, 2002) (Attached as Appendix F). Mr. Farr further argued that "because new districts would not be as bizarre as the current districts and would divide substantially fewer counties and precincts, voters would be more easily educated about voting" in such a plan. *Id.* at 20. In that case, he was not wrong—courts in North Carolina have recognized that the public interest "requires the furtherance of the constitutional protections that attach to the franchise" and elections conducted under "easily understood boundaries." *Republican Party of N.C. v. Hunt*, 841 F. Supp. 722 (E.D.N.C.), *aff'd as modified on appeal*, 27 F.3d 563 (4th Cir. 1994) (unpublished opinion). When, as here, the Constitution is violated, "the public as a whole suffers irreparable injury." *Dillard v. Crenshaw County*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986). *See also, Clark v. Roemer,* 725 F. Supp. 285, 305-306 (M.D. La. 1988) ("The public interest is clearly in favor of the discontinuing of an election system which the court has found illegal and surely in a balance of equities, where the court has found

8

encroachments on the exercise of the civil liberties … the state can have no legitimate interest in continuing with a system that causes such encroachment.")

### C. Defendants Will Not Suffer Irreparable Harm from Implementing a Constitutional Remedial Redistricting Plan

Despite these Defendants' suggestions in other election cases, Defendants are not irreparably harmed merely because the State has been enjoined from giving effect to a statute that governs the time, place and manner of elections. *See Harris v. McCrory*, 1:13-cv-949, ECF No. 145 (Feb. 8, 2015) (Defs.' Emergency Motion to Stay Final Judgment and Modify Injunction) (Attached as Appendix A), and *McCrory v. Harris*, No. 15A809, Emergency Stay Application at 14 (Attached as Appendix E). The United States Supreme Court has consistently reaffirmed the role of federal courts in reviewing any legislation, including redistricting plans, which threaten the right to vote. *See, e.g., League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 415 (2006) (Kennedy, J., separate op.) ("Although the legislative branch plays the primary role in congressional redistricting, our precedents recognize an important role for the courts when a districting plan violates the Constitution."); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986) ("The power to regulate the time, place and manner of elections does not justify, without more, the abridgment of fundamental rights, such as the right to vote … ."). And the Supreme Court's denial of the emergency stay application in *Harris* indicates that it did not find that argument compelling. *McCrory v. Harris*, 136 S. Ct. 1001 (2016) (order denying stay).

Additionally, the nature of the harm or burden felt by Defendants here is not such that it outweighs the harm to Plaintiffs and other North Carolinians. "Potential injury of an election in which citizens are deprived of their right to vote negates any damage that may be sustained by [the jurisdiction] in the potential delay of elections." *Dye v. McKeithen*, 856 F. Supp. 303, 306 (W.D. La. 1994).

Indeed, in redistricting cases across the country, immediate implementation of remedial redistricting plans has been allowed, despite the unavoidable burden that such implementation would have on jurisdictions. *Vera v. Bush*, 933 F. Supp. 1341, 1342, 1344 (S.D. Tex. 1996) (after the Supreme Court invalided congressional redistricting plan on June 13, 1996, a three-judge panel in Texas drew a remedial plan on August 6, 1996, for use in November 1996); *Buskey v. Oliver*, 574 F. Supp. 41, 41-42 (M.D. Ala. 1983) (June 10, 1983 order enjoining elections scheduled for October 11, 1983). This is because administrative burden on the government, which is part and parcel of election administration of any sort, does not outweigh irreparable harm to the fundamental right to vote of the citizens that elect that government.

In this case, it is also likely that a remedial plan could be developed that does not affect districts in certain county clusters, meaning the state will only need to conduct a special primary election in certain counties containing gerrymandered districts, not statewide. *Cf. Personhuballah v. Alcorn,* 2016 U.S. Dist. LEXIS 2054 at *7 (E.D. Va. Jan. 7, 2016) ("[O]ur chosen remedial plan should not alter any districts outside of the

Third District and those abutting it"). This will reduce the burden on the state as it implements a remedy in time for the November 2016 elections.

Finally, implementation of constitutional districts that are less torturously shaped and split fewer precincts may actually provide some cost savings to the state. Just as Mr. Farr argued in the *Stephenson* case, the cost of ballots would decrease with fewer precincts, and from an election administration standpoint, districts that are compact and make sense would be easier to implement and easier for voters to understand. Plaintiffs' Memorandum Concerning an Appropriate Remedy at 20, *Stephenson v. Bartlett*, No. 1-CV-02885 (Johnston Co. Sup. Ct., Feb. 19, 2002) (copy attached as Appendix F) (hereinafter "*Stephenson* Plaintiffs' Remedy Brief"). But regardless of the actual costs borne by the state in the implementation of a remedial plan, "administrative burden" and cost "simply cannot justify denial of plaintiffs' fundamental rights." *Johnson*, 926 F. Supp. at 1542. It is indisputable that in this case, any "expense and disruption" that may result from implementation of a remedial plan is "nothing but a consequence of the wrong that has been done" by the General Assembly in engaging in racial gerrymandering. *Jeffers v. Clinton*, 730 F. Supp. 196, 203 (E.D. Ark 1989) (three-judge court), *aff'd* 498 U.S. 1019 (1991).

## II.    A Remedial Schedule Can Be Devised That Allows for Such Relief

### A.    Past Election Experience in North Carolina

There is ample precedent in North Carolina for this Court to order a remedial schedule with primary elections in September, and that precedent is just from the last

decade. In 1998, this state held congressional primaries in September, after a three-judge court in *Cromartie v. Hunt*, 34 F. Supp. 2d 1029 (E.D.N.C. 1998), granted summary judgment to plaintiffs and entered an injunction on April 3, 1998. There the district court and the Supreme Court denied a stay pending appeal, even though the congressional primaries had been scheduled for May 1998 and the injunction was entered after filing had ended and ballots had been prepared. The legislatively-enacted remedial plan was precleared under the Voting Rights Act on June 8, 1998, and primaries proceeded as follows: filing finished July 20, 1998, the primary was on September 15, 1998, and the general election was conducted as planned on November 3, 1998. 1990s Redistricting Chronology, NCGA, available at http://www.ncleg.net/GIS/Download/Maps_Reports/ 1990_Chronology.pdf (Attached as Appendix G).

In *Johnson v. Halifax County*, 594 F. Supp. 161 (E.D.N.C. 1984), the court entered a preliminary injunction in July 1984 in relation to elections scheduled to be held in November 1984. Although it involved a single county commission electoral scheme, the *Halifax County* case is still instructive because candidate filing for the primary elections had already been held, *see Johnson v. Halifax County*, No. 83-48-civ-8, 1984 U.S. Dist. LEXIS 15267 (E.D.N.C. Jul. 3, 1984) (order declaring prior candidate filings void), and because the court held that "the black citizens of Halifax County will suffer irreparable harm in, once again, they are unable to have an equal opportunity to elect county commissioners of their choice," *Johnson*, 594 F. Supp. at 171. The court further remarked that while a implementing a remedial plan would "place administrative and

financial burdens" on defendants, those burdens were outweighed by the irreparable harm to plaintiffs. *Id.*

Finally, in *Stephenson v. Bartlett*, 355 N.C. 354, 562 S.E.2d 377 (2002), the plaintiffs challenged the state legislative redistricting plans enacted in 2001. After denying the plaintiffs' preliminary injunction motion, the trial court ruled for the plaintiffs on February 20, 2002, and permanently enjoined the state legislative redistricting plan that it found violated the state constitution. On March 1, 2002, the filing period for candidates closed for the 2002 elections. On March 7, 2002, the state supreme court enjoined the May 7, 2002, primary elections. Of note, the plaintiffs in *Stephenson*, represented by Mr. Farr, argued to the North Carolina Supreme Court that even though it would require bifurcated and delayed primaries for state legislative districts, it was paramount to correct the irreparable harm that flowed to plaintiffs in that case from being in districts that violated the state constitution. *Stephenson* Plaintiffs' Remedy Brief at 4, 6. On April 30, 2002, the Supreme Court declared the 2002 plans unconstitutional and directed the trial court to determine if the General Assembly could redraw plans in time to allow the November 2002 elections to proceed on schedule, and if they could not, to draw its own plan. The trial court allowed the General Assembly two weeks to redraw, which it did, but on May 31, 2002, the trial court declared the newly enacted plans unconstitutional as well. In June, the trial court drew remedial plans itself, and in July, the General Assembly enacted legislation providing for a primary date of

September 10, 2002, for state legislative districts. Those elections occurred in September, and the general election proceeded as scheduled on November 5, 2002.

**B.    Areas of Agreement Among the Parties**

Pursuant to the Court's instruction, the parties have conferred by telephone conference call and email exchange to determine the extent to which there is agreement on the time lines and deadlines that might govern any possible remedial process in this case. The Plaintiffs believe the basic areas of agreement and disagreement between the parties are as follows:

The Plaintiffs' position is that it is possible to have a remedy in place for the 2016 elections because a primary for certain state house and state senate districts can be held on August 30, 2016. So long as the court rules by June 3, 2016 and the General Assembly redraws districts by June 17, 2016, a primary can be held on August 30, 2016 and all applicable federal laws would be met.

The Defendants' position is that a remedy in time for the 2016 election is impossible because any new remedial district lines would need to be enacted by Monday, May 10, 2016 in order to conduct primaries on Tuesday August 16, 2016 which is the date the Defendants' believe is the latest possible date for a primary in order to be able to conduct the general election on Tuesday, November 8, 2016.

With regard to the schedule necessary to conduct elections, the parties agree on the following points in bold, with some variances noted below certain points:

1. **A new primary is only needed in districts that are affected by any potential remedial map, and there are parts of the state where the districts will not be affected.**

    Plaintiffs believe that significant portions of the western part of the state will be unaffected by any potential remedial map and that numerous two-county clusters in the rest of the state where no districts are challenged will also remain untouched. Defendants recognize that there may be parts of the state where districts are not affected—particularly in one-county "groups" where no district is struck down—but also note the possibility that the striking down of some VRA districts could result in the need to re-group counties under *Stephenson* and therefore are not prepared to speculate on the extent of any potential ruling or the extent of any new plans, other than to say it is possible that less than the entire state will be affected.

2. **The 100 day notice requirement under state law is for ballot measures and offices that will be on the ballot, NOT for candidates, so it doesn't limit the election timing. *See* N.C. Gen. Stat 163-258.16.**

3. **The Federal UOCAVA requirement for sending overseas absentee ballots is 45 days before the election and applies only to federal**

elections, so it does not apply to a new primary for certain state house and senate districts. *See* 52 U.S.C. § 20302 (a)(8)(A).

4.    **State law allows State Board modification of procedures for overseas absentee ballots for "other circumstances"** *See* **N.C. Gen. Stat. 163-258.31.**

        Plaintiffs' position is that this statutory language covers a special primary held by court order and empowers the North Carolina State Board of Elections to modify state law requirements for overseas ballots. Defendants do not agree that it would be the State Board's position that a special primary under the circumstances of this case would fall within the "other circumstances" contemplated by the statute.

5.    **Federal law allows state to administratively seek exemption from the 45-day requirement, NC has in the past extended the date to receive ballots to compensate for a shorter period before they are sent out.** *See* **52 U.S.C. § 20302 (g).**

        Plaintiffs believe that in fact, an August 30th primary date would not require any modification of federal law requirements, but even if it did because of the need to wait until after the canvass to begin ballot coding, federal law explicitly contemplates that UOCAVA deadlines might be waived where "[t]he State has suffered a delay in

16

generating ballots due to a legal contest." 52 U.S.C. § 20302 (g) (2)(B)(ii). Defendants do not agree that seeking such an exemption is advisable in a presidential election year, nor that it is something that the State would think appropriate or seek.

6.   **County Boards of Elections need 21 days to create ballots but can send them out earlier if they are completed earlier.**

Plaintiffs believe that a maximum of 21 days is needed to code and print ballots; Defendants believe that a minimum of 21 days is needed to do so.

7.   **An eight day candidate filing period is sufficient; a 5-day filing period has been used in the past for other modified elections.**

8.   **The Court can eliminate second primary by specifying that candidate with the largest number of votes wins the primary.**

C.   **Plaintiffs' Proposed Election Schedule**

The key election schedule time periods necessary to determine what schedule is possible for a primary are, beginning from the enactment of new districts are:

1.   Candidate filing period: 8 days from enactment of new districts

2.   Preparation of ballots: 21 days from close of candidate filing period

3.   Assignment of voters to new districts: 7-10 days from enactment of new districts

4.   Mailing of absentee ballots: 60 days before election under state law (45 days under federal law for federal offices)

17

To calculate the time needed between the primary election and the general election, the relevant time periods from the date of the election are:

1. Preparation of ballots:  21 days

2. Mailing of absentee ballots:  60 days before election under state law, 45 days under federal law

With these relevant time periods, the following election schedule is possible:

Friday, June 3:  Court rules

Friday, June 17:  Deadline for General Assembly to enact remedial districts

Monday June 20 through Monday June 27:  Filing period

Saturday, July 16:  Primary absentee ballots ready to mail
                              (45 days before primary)

Tuesday, Aug. 30:  Primary election in redrawn districts

Saturday, Sep. 24:  General election absentee ballots must be sent
                              (45 days before general election, and more than
                              21 days after the primary for ballot preparation)

Tuesday, Nov. 8:  General election

This election schedule would require this Court to also order that the primary be determined by a plurality of votes without the need for a run-off election; and that the absentee ballots for overseas voters be sent 45 days before the election (rather than 60 days before the election, which is consistent with federal law but 15 days later than required under state law).

There are two significant areas of disagreement between Plaintiffs and Defendants.  First, Plaintiffs believe that seven to ten days is sufficient time for county

boards of election to assign voters to new state senate and house districts in the areas where districts have been redrawn. Defendants believe that assignment of voters to new election districts requires at least twenty-one days and that it cannot occur while the congressional primary election is being conducted from May 26th and June 7th. Second, Plaintiffs believe that the ballot coding and preparation process can begin before the canvass of votes, and that in fact that routinely happens in many counties. Defendants believe that ballot preparation cannot begin after the primary election until after the canvass and certification of election results has occurred.

Plaintiffs submit herewith evidence supporting their contentions on both of these points. First, the Declaration of Gary Bartlett, dated May 6, 2016, is attached as Appendix H, explains why it is possible to assign voters even during the primary election period, if the court were to rule earlier than June 3rd and new district lines were available prior to June 7th. Mr. Bartlett also explains that the ballot coding and preparation process can begin immediately after the primary election, even while the canvass and certification of election results is proceeding. Most significantly, since the ballot coding and printing process for the primary election in 2012 was accomplished successfully in less than three weeks after the end of the filing period, which was also a presidential election year with many offices and ballot measures on the ballot, surely ballot coding and printing for state legislative seats in fewer than all of North Carolina's counties can be completed in 2016 for a primary with only those offices on the ballot during a similar time frame. *See* Declaration of Gary Bartlett at ¶¶ 7-8.

In addition, plaintiffs submit herewith the 2012 deposition testimony of election directors Kelly Doss (Guilford County) (Attached as Appendix I); Joseph Fedrowitz (Durham County) (Attached as Appendix J) and Gary Sims (Wake County) (Attached as Appendix K) from the *Dickson v. Rucho* litigation regarding the time it takes them to assign voters to election districts. When districts are drawn using whole precincts, the process takes "just a matter of a few hours" (App. I, Doss at pg. 21, line 20-21) or can be completed "in an afternoon." (App. J, Fedrowitz at pg. 29, lines 7-8). Thus, even with some split precincts, counties are fully capable of assigning voters to the election districts in a week, while the filing period is open, and certainly during the 21-day period while the ballots are being prepared.

Therefore, Plaintiffs request that this court order a remedial schedule that allows for new primaries in the affected districts on August 30, 2016.

Respectfully submitted, this the 6th day of May, 2016.


POYNER SPRUILL LLP

/s/ *Edwin M. Speas, Jr.*
Edwin M. Speas, Jr.
N.C. State Bar No. 4112
espeas@poynerspruill.com
John W. O'Hale
N.C. State Bar No. 35895
johale@poynerspruill.com
Caroline P. Mackie
N.C. State Bar No. 41512
cmackie@poynerspruill.com
P.O. Box 1801 (27602-1801)
301 Fayetteville St., Suite 1900
Raleigh, NC 27601
Telephone: (919) 783-6400
Facsimile:  (919) 783-1075

*Counsel for Plaintiffs*

SOUTHERN COALITION FOR SOCIAL JUSTICE

/s/ *Anita S. Earls*
Anita S. Earls
N.C. State Bar No. 15597
anita@southerncoalition.org
Allison J. Riggs
State Bar No. 40028
allisonriggs@southerncoalition.org
George E. Eppsteiner
N.C. State Bar No. 42812
George@southerncoalition.org
Southern Coalition for Social Justice
1415 Highway 54, Suite 101
Durham, NC 27707
Telephone: 919-323-3380
Facsimile: 919-323-3942

*Counsel for Plaintiffs*


TIN FULTON WALKER & OWEN, PLLC


/s/ *Adam Stein*
Adam Stein (Of Counsel)
N.C. State Bar # 4145
astein@tinfulton.com
Tin Fulton Walker & Owen, PLLC
1526 E. Franklin St., Suite 102
Chapel Hill, NC  27514
Telephone: (919) 240-7089

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I have electronically filed the foregoing **PLAINTIFFS' POST-TRIAL BRIEFING ON REMEDY** with the Clerk of Court using the CM/ECF system which will provide electronic notification of the same to the following:

Alexander M. Peters
Special Deputy Attorney General
Office of the Attorney General
P.O. Box 629
Raleigh, NC  27602
apeters@ncdoj.gov

*Counsel for Defendants*

Thomas A. Farr
Phillip J. Strach
Michael D. McKnight
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
4208 Six Forks Road, Suite 1100
Raleigh, NC 27602
thomas.farr@ogletreedeakins.com
phillip.strach@ogletreedeakins.com
michael.mcknight@ogletreedeakins.com

*Counsel for Defendants*

This the 6th day of May, 2016.

/s/ Edwin M. Speas, Jr.
Edwin M. Speas, Jr.