IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SANDRA LITTLE COVINGTON, et al.,  )
                                  )
         Plaintiffs,              )
    v.                            )          1:15CV399
                                  )
THE STATE OF NORTH CAROLINA, et al., )
                                  )
         Defendants.              )

**OPINION and ORDER**

Plaintiffs, individual North Carolina citizens, challenged the constitutionality of nine state Senate districts and nineteen state House of Representatives districts (the "Challenged Districts") "as racial gerrymanders in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution." First Amended Complaint ¶ 1, ECF no. 11. In an opinion filed on August 11, 2016, this Court held that the Challenged Districts, as drawn by the General Assembly in 2011, violated the Equal Protection Clause and, in an accompanying Order and Judgment, directed the legislature to draw new districts. Memorandum Opinion, ECF no. 123; Order and Judgment, ECF no. 125.

While recognizing that the Supreme Court has counseled that "it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan," Reynolds v. Sims, 377 U.S. 533, 585 (1964), this Court granted Defendants' request

1

to allow the 2016 election to proceed under the unconstitutional districts because the finding of racial gerrymandering was made on the eve of that election.ECF no. 123, at 160-63. But in doing so, this Court enjoined Defendants from conducting any elections using the unconstitutionaldistricts after the November 2016 election and requested briefing from the parties regarding the appropriate remedy for the constitutional violations. Memorandum Opinion, ECF no. 123, at 163-64; Order and Judgment, ECF no. 125.

After careful consideration of the briefs submitted by the partieson the appropriate remedy for the constitutional violations, on November 29, 2016, this Court ordered, among other things, that (1) no later than 5 p.m. on March 15, 2017, the State of North Carolina draw new district plans for the Challenged Districts; and (2) in the fall of 2017, the State of North Carolina hold special primary and general elections for the purpose of electing new legislators in the Challenged Districts and any other districts redrawn in order to cure the constitutional defects of the Challenged Districts (the "November 29 Order"). Order, ECF no. 140.

On December 2, 2016, Defendants filed the instant motion to stay the November 29 Order. Defendants' Emergency Motion to Stay Remedial Order Pending Disposition of Jurisdictional Statement, ECF no. 141 (the "Motion").

"'[A] stay is considered extraordinary relief for which the moving party bears a heavy burden,' and '[t]here is no authority to suggest that this type of relief is any less extraordinary or the burden any less exacting in the redistricting context.'" Personhuballah v. Alcorn, 155 F. Supp. 3d 552, 558-59 (E.D. Va. 2016) (quoting Larios v. Cox, 305 F. Supp. 2d 1335, 1336 (N.D. Ga. 2004) (internal quotations omitted)). In determining whether to stay a remedial order, like the November 29 Order, pending appeal the Court must consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Id. at 558 (quoting Hilton v. Branskill, 481 U.S. 770, 776 (1987)). "The movant must establish each of these four elements in order to prevail." Larios, 305 F. Supp. 2d at 1336.

Defendants fail to meet their "heavy burden" under this exacting test. First, regarding likelihood of success on the merits, Defendants principally argue that two decisions cited in our November 29 Order in which courts ordered special elections as a remedy for racial gerrymandering--Smith v. Beasley, 946 F. Supp. 1174, 1212-13 (D.S.C. 1996), and Butterworth v. Dempsey, 237 F. Supp. 302, 306 (D. Conn. 1965) (per curiam)--provide an

3

insufficient basis for this Court to order special elections. But, as Plaintiffs correctly note, numerous other courts have ordered special elections to remedy voting rights violations or recognized their authority to do so. See, e.g., Cousins v. City Council of City of Chi., 503 F.2d 912, 914 (7th Cir. 1974); Bell v. Southwell, 376 F.2d 659, 662, 665 (5th Cir. 1967); Tucker v. Burford, 603 F. Supp. 276, 279 (N.D. Miss. 1985); Cosner v. Dalton, 522 F. Supp. 350, 364 (E.D. Va. 1981). Accordingly, there is ample legal support establishing that ordering special elections is one of the equitable remedies available to district courts to cure voting rights violations, and racial gerrymandering in particular. Indeed, given courts' obligation to remedy unconstitutional apportionment schemes as soon as possible, Reynolds, 377 U.S. at 585, a special election is particularly appropriate in the instant case given that this Court allowed--at Defendants' request--the November 2016 elections to proceed under the unconstitutional districts, Smith, 946 F. Supp. at 1211-12 (ordering special election after allowing elections to proceed in unconstitutional districts due to close proximity between finding of constitutional violation and election day).

Defendants nonetheless argue that this Court abused its discretion in ordering a special election because previous cases in which courts ordered special elections involved far fewer districts. This amounts to little more than a claim that

4

Defendants' racial gerrymandering is "too big to remedy." But courts must "provid[e] remedies <u>fully</u> adequate to redress the constitutional violations which have been adjudicated and must be rectified." <u>White v. Weiser</u>, 412 U.S. 783, 797 (1973) (emphasis added). Accordingly, the expansive scope of Defendants' racial gerrymandering dictates the scope of the remedy this Court imposed. <u>Personhuballah</u>, 155 F. Supp. 3d at 563 (explaining that the scope of a remedial plan "depends on the scope and effect of the constitutional violation"). Indeed, the large number of racially gerrymandered districts weighs in favor of--rather than against--awarding relief as quickly as possible, and therefore requiring special elections. Absent such relief, a large swath of North Carolina citizens will lack a constitutionally adequate voice in the State's legislature, even as that unconstitutionally constituted legislature continues to pass laws that materially affect those citizens' lives. "Those citizens are entitled to have their rights vindicated as soon as possible so that they can vote for their representatives under a constitutional apportionment plan." <u>Smith</u>, 946 F. Supp. at 1212.

Additionally, the authority to craft a remedy for racial gerrymandering, like other forms of race discrimination, lies within this Court's "sound discretion." <u>United States v. Paradise</u>, 480 U.S. 149, 184 (1987); <u>Large v. Fremont Cty.</u>, 670 F.3d 1133, 1139 (10th Cir. 2012). And the Supreme Court will review for clear

5

error our holding that racial factors unconstitutionally predominated in the drawing of the Challenged Districts. Personhuballah, 155 F. Supp. 3d at 559. That the Supreme Court will subject both decisions to deferential review further suggests that Defendants are unlikely to succeed on the merits. Id. (concluding deferential standard of appellate review weighed against finding movants were likely to succeed on merits).[1]

Defendants also fail to show an irreparable injury that outweighs any such injury to Plaintiffs and the public. Defendants principally argue that they will be irreparably injured because the General Assembly will have to spend the first six weeks of its

---

[1] Defendants' suggestion that the possibility of forthcoming Supreme Court review of other North Carolina redistricting decisions militates in favor of their requested stay is similarly misguided. One of these cases--Harris v. McCrory, 159 F. Supp. 3d 600 (2016)--is pending before the Supreme Court following the defendants' direct appeal pursuant to 28 U.S.C. § 1253 of an order holding that two of North Carolina's Congressional districts constitute racial gerrymanders. As such, ongoing proceedings before the Court provide little insight into Defendants likelihood of success on appeal in the present action. Accord Personhuballah, 155 F. Supp. 3d at 559 (explaining that, in the context of a direct appeal, the "Court's decision to hear oral argument indicates only that there is some doubt as to how the case will be decided," and is therefore insufficient to demonstrate a likelihood of success in a separate appeal). The second of these decisions--Dickson v. Rucho, 368 N.C. 481 (2016)--addresses allegations of racial gerrymandering related to those at issue here. However, because the defendants in that case prevailed below, any further action by the Supreme Court would serve only to lessen the likelihood that Defendants' will prevail in their own appeal. Bethley v. Louisiana, 520 U.S. 1259 (1997) ("It is well settled that our decision to deny a petition for writ of certiorari does not in any sense constitute a ruling on the merits of the case in which the writ is sought.").

6

new session drawing new district maps and because the State will have to devote resources to preparing for the special primary and general elections. But, as this Court explained previously, the General Assembly already has had months to "hold[] hearings, commission[] studies, develop[] evidence, and ask[] experts to draw proposed new districts" and has refused to do so. ECF no. 140, at 3; see also Johnson v. Mortham, 926 F. Supp. 1540, 1542 (N.D. Fla. 1996) ("[T]he mere administrative inconvenience the Florida Legislature and Florida elections officials will face in redistricting simply cannot justify denial of Plaintiffs' fundamental rights."). Accordingly, it is the General Assembly's inaction--not this Court's remedial order--that will force the General Assembly to "spend the first six weeks of its already-shortened term drawing new districting maps." Defendants' Reply, ECF no. 144, at 2. Likewise, this Court has previously explained that "[w]hile special elections have costs, those costs pale in comparison to the injury caused by allowing citizens to continue to be represented by legislators elected pursuant to a racial gerrymander." ECF no. 140, at 2-3.

Defendants also fail to acknowledge the considerable irreparable harm that staying the November 29 Order would impose on Plaintiffs and the public at large. It is axiomatic that "[d]eprivation of a fundamental right, such as limiting the right to vote in a manner that violates the Equal Protection Clause,

7

constitutes irreparable harm." Personhuballah, 155 F. Supp. 3d at 560 (internal quotation marks omitted); Johnson, 926 F. Supp. at 1543. Staying implementation of the November 29 Order and thereby prolonging the time during which Plaintiffs and other citizens are represented by legislators elected in racially gerrymandered districts would serve only to exacerbate the irreparable harm the voters have already suffered by allowing an unconstitutionally constituted legislature to continue to act. Accordingly, "the irreparable harm to the plaintiffs, and to all voters in [North Carolina] who have [been represented by legislators elected in racially gerrymandered districts], outweighs the harm the state may encounter by being unable to resolve an appeal of this decision" before drawing new districts and holding a new election. Larios, 305 F. Supp. 2d at 1343.

Finally, the public interest aligns with requiring the State to hold a special election in 2017. The Supreme Court has long-recognized the democratic and dignitary harms resulting from racial gerrymandering. Shaw v. Reno, 509 U.S. 630, 647 (1993). When a legislature relies on race as the predominant factor in drawing district lines--even when based on a flawed understanding of the law, as the General Assembly did here--it "reinforces the perception that members of the same racial group--regardless of their age, education, economic status, or the community in which they live--think alike, share the same political interests, and

8

will prefer the same candidates at the polls." Id. at 647. Likewise, it sends a "pernicious . . . message" to elected representatives that they should represent the interests only of the racial group from which they obtained support, not their constituency as a whole. Id. at 648. To allow such constitutional violations to persist for any longer than necessary would not only harm Plaintiffs, but also the public at large, which has "an interest in having . . . representatives elected in accordance with the Constitution." Personhuballah, 155 F. Supp. 3d at 560-61.

For the foregoing reasons, this Court declines to stay implementation of the November 29 Order. Accordingly, Defendants' Motion is

DENIED.


This 4th day of January, 2017.

/s/ James A. Wynn, Jr.

/s/ Thomas D. Schroeder

/s/ Catherine C. Eagles