IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
NO. 1:15-CV-00399

| | | |
|---|---|---|
| SANDRA LITTLE COVINGTON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **LEGISLATIVE DEFENDANTS'** |
| | ) | **POSITION STATEMENT** |
| STATE OF NORTH CAROLINA, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

On June 8, 2017, prior to the issuance of the Supreme Court's certified judgment in this matter, plaintiffs filed motions seeking deadlines for a remedial redistricting plan and an evidentiary hearing concerning whether additional relief, including special elections, should be granted. The next day, also prior to the issuance of the Supreme Court's certified judgment, this Court issued a "Notice" to the parties seeking "position statements" on plaintiffs' motions as well as several inquiries from the Court.

On June 15, 2017, the Supreme Court denied plaintiffs' Application for Issuance of the Judgment Forthwith. S. Ct. Dkt. 16-649. The legislative defendants notified this Court on June 26, 2017 of their intent to file a statement of position in response to the Court's June 9 Notice by the third business day after the Supreme Court issued its certified judgment.[1] On June 30, 2017, the Supreme Court issued that judgment.

---

[1] Legislative defendants are filing this position statement following the Supreme Court's issuance of the certified judgment because district courts do not have jurisdiction to proceed following the resolution of an appeal to the Supreme Court until the certified judgment has been issued. *See Texas v. United States*, 798 F.3d 1108, 1118 (D.C. Cir. 2015), *cert. denied sub nom. Texas v. Davis*, 136 S. Ct. 981 (2016) ("As a formal matter,

1

Accordingly, the legislative defendants respectfully submit the following position statement in response to the Court's notice.

INTRODUCTION

The General Assembly stands ready and willing to enact new districting plans in ample time for the scheduled 2018 primary and general elections. To that end, both the House and the Senate have created new redistricting committees and appointed new members; have authorized those committees to begin collecting information from the public and from interested stakeholders regarding the appropriate criteria and factors the General Assembly should consider in the remedial redistricting; and have passed an adjournment resolution to continue the legislative session on August 3, 2017, and then again on September 6, 2017. The General Assembly envisions completing the redistricting process no later than November 15, 2017.

Proceeding on that timeline will allow the General Assembly to receive public input, engage in internal discussions about the design of remedial districts, prepare draft remedial plans, receive public responses to those draft remedial plans, and incorporate public feedback into the final plans. In 2011, this process took more than five months. And implicit in this Court's criticism of that process is that the General Assembly should have done even more—more outreach, more public hearings, more testimony, and more debate—so that it could fully consider the views and interests of the citizens of North Carolina. It thus would make no sense to artificially constrain this remedial process by

Supreme Court judgments on review of a federal court decision do not take effect until at least 25 days after they are announced, when the Court issues a certified copy of its opinion and judgment in lieu of a formal mandate.").

2

ordering the General Assembly to proceed on an overly expedited schedule that would foreclose the possibility of a transparent and public process—especially given that ample time remains to complete the redistricting process for the 2018 elections without any prejudice to the plaintiffs.

As for the prospect of a special election in 2017, the Supreme Court has repeatedly signaled that such a remedy would be inappropriate here. After this Court ordered the State to hold special primary and general elections in the Fall of 2017, the State filed an emergency stay application in the Supreme Court, arguing that a special election was an unwarranted and inappropriate remedy under the circumstances. In its stay application, the State advised the Supreme Court that, "if this Court wants to preserve the possibility of a special election," the State was willing to brief and argue the case on an expedited schedule. Application at 4, *North Carolina v. Covington*, No. 16A646 (U.S. Jan. 10, 2017). The Supreme Court granted the State's stay application. Order, *North Carolina v. Covington*, No. 16A646 (U.S. Jan. 10, 2017). And despite the State's offer to expedite briefing, the Supreme Court declined to place the case on an expedited schedule, instead allowing the parties to brief the appeal in the ordinary course. *See id.*

In their jurisdictional briefing on appeal, the plaintiffs urged the Supreme Court to expedite the case, cautioning that holding the case and then vacating and remanding for further proceedings might "render special elections impossible in 2017." Motion to Affirm at 36, *North Carolina v. Covington*, No. 16-1023 (U.S. Feb. 28, 2017). After the jurisdictional briefing was complete, the Supreme Court held the case for nearly three months—from March 14, 2017 to June 5, 2017—and then vacated the special-election

3

order and remanded for further proceedings. In its opinion, the Court emphasized that "there is much for a court to weigh" when "deciding whether to truncate existing legislators' terms and order a special election," including the "the need to act with proper judicial restraint when intruding on state sovereignty." *North Carolina v. Covington*, 137 S. Ct. 1624, 1626 (2017).

Plaintiffs then asked the Supreme Court to expedite issuance of the judgment, arguing that doing so was necessary "so that the trial court can begin to evaluate the parties' arguments about the need for and feasibility of special elections as soon as possible," and warning that denying the application could "run out the clock on the possibility of a special election remedy." Reply at 3-4, *North Carolina v. Covington*, Nos. 16A1202, 16A1203 (U.S. Jun. 14, 2017). In opposing that application, the State urged the Court not to "take any step that might be viewed as implicitly endorsing plaintiffs' efforts" to obtain a special election. Response at 6 n.2, *North Carolina v. Covington*, Nos. 16A1202, 16A1203 (U.S. Jun. 13, 2017). The Supreme Court then denied plaintiffs' application to expedite issuance of the judgment. Order, *North Carolina v. Covington*, Nos. 16A1203 (U.S. Jun. 15, 2017).

In short, the General Assembly will comply with this Court's order to enact new districting plans in ample time for the scheduled 2018 primary and general elections. This Court should not short-circuit that process by forcing the General Assembly to draw new maps without first engaging in the legislative and public consultation that this inherently policy-driven task necessitates—and it especially should not do so where, as

4

here, the Supreme Court has signaled that such a remedy would be inappropriate under the circumstances.

FACTUAL BACKGROUND ON THE REMEDY

The issue of the remedy has been addressed several times already in this case. On May 6, 2016, plaintiffs filed a post-trial brief on remedy. Plaintiffs proposed that the General Assembly be given two weeks to enact new legislative plans starting from the date of any order by the Court enjoining any of the challenged districts. Plaintiffs assumed that the Court would rule on Friday, June 3, 2016 and that the General Assembly would have until Friday, June 17, 2016 to enact new plans. Plaintiffs then proposed that elections be held under new legislative plans on the date of the next scheduled general election (November 8, 2016) or nearly five months after the date proposed by plaintiffs for the enactment of new legislative redistricting plans. Plaintiffs argued that five months was the minimum amount of time needed to hold an election and even that would require the cancellation of second primaries and the reduction of time available for absentee voting from 60 days to 45 days.

On August 11, 2016, this Court entered its decision finding that 28 legislative districts were racial gerrymanders under the Fourteenth Amendment to the United States Constitution. Prior to this Court's ruling, the North Carolina Supreme Court had upheld the same districts on two different occasions. *Dickson v. Rucho*, 367 N.C. 542, 570, 766 S.E.2d 238, 257-58 (2014) ("*Dickson I*"); *Dickson v. Rucho*, 368 N.C. 481, 485-86, 781

5

S.E.2d 404, 410-11 (2016) ("*Dickson II*").[2]  Those same districts had also been

precleared by the United States Department of Justice in 2011 pursuant to Section 5 of

the Voting Rights Act ("VRA").  In striking down the challenged districts this Court

specifically emphasized that "we make no finding that the General Assembly acted in bad

faith or with discriminatory intent."  *Covington v. North Carolina*, 316 F.R.D. 117, 124

n.1 (M.D.N.C. 2016), *aff'd,* 581 U.S. ___ (2017).  Instead, the Court believed that the

General Assembly had not developed sufficient evidence during its legislative

proceedings to justify its use of race in drawing districts.  *Id*. at 178.  In its decision on

the merits, the Court ordered the North Carolina General Assembly to enact remedial

districts in its next legislative session to correct the constitutional deficiencies in the 2011

enacted plans.  *Id*. at 177.  Defendants appealed from this Court's decision.

On September 30, 2016, the issue of remedy was addressed again when plaintiffs

filed a motion for additional relief.  They asked the Court to set a deadline of January 25,

2017, for the General Assembly to enact new plans and to order special elections for any

new legislative districts in the Fall of 2017.  On November 29, 2016, this Court entered a

remedial order directing the General Assembly to enact remedial plans no later than

March 15, 2017, and ordering that special primary and general elections be held for

legislative seats in the fall of 2017.  The Court decreed that the term of any legislators

elected in 2016 and serving in a district modified by the General Assembly in compliance

with the Court's order would be shortened to one year.

---

[2] *Dickson II* was vacated by the United States Supreme Court on May 30, 2017 and remanded to be considered by the North Carolina Supreme Court in light of the Supreme Court's decision in *Cooper v. Harris*, 137 S. Ct. 1455 (2017).

On December 30, 2016, defendants filed an application for stay of this Court's remedial order. On January 10, 2017, this application was granted by the Supreme Court. Defendants subsequently filed their jurisdictional statement regarding the remedial order.

On June 5, 2017, the Supreme Court affirmed this Court's August 11, 2016, decision on the merits. On that same date, the Supreme Court vacated this Court's remedial order of November 29, 2016, and remanded for further consideration. In its opinion, the Supreme Court explained that a district court fashioning relief in a redistricting case must "undertake an 'equitable weighing process' to select a fitting remedy for the legal violations it has identified." *North Carolina v. Covington*, 137 S. Ct. at 1625. When it comes to deciding "whether to truncate existing legislators' terms and order a special election, there is much for a court to weigh." *Id.* at 1625-26. Among the relevant equitable factors are "the severity and nature of the particular constitutional violation, the extent of the likely disruption to the ordinary processes of governance if early elections are imposed, and the need to act with proper judicial restraint when intruding on state sovereignty." *Id.* at 1626. The Supreme Court vacated this Court's remedial order because it "addressed the balance of equities in only the most cursory fashion," placing it "at odds with our demand for careful case-specific analysis" and leaving the Supreme Court without "confidence that the court adequately grappled with the interests on both sides of the remedial question." *Id.* Plaintiffs filed an application to expedite issuance of the judgment, but the Court denied that application.

7

## STATEMENT OF POSITION

The legislative defendants provide the following statement of their position on the matters raised by the Court:

1.  **A special election is not warranted in light of the factors the Supreme Court has directed this Court to consider.**

    (a)  **The likely disruption to the ordinary processes of governance if early elections are imposed is severe.**

Given the large number of districts that will likely have to be redrawn as a result of having to redraw the 28 challenged districts, a special election would work a massive disruption to the ordinary process of governance in North Carolina. In redistricting in North Carolina, legislative plans must comply with the rules for grouping counties established in five different decisions by the North Carolina Supreme Court. *Stephenson v. Bartlett*, 355 N.C. 354, 381, 562, S.E.2d 377, 396-97 (2002) ("*Stephenson I*"); *Stephenson v. Bartlett*, 357 N.C. 301, 582 S.E.2d 247 (2003) ("*Stephenson II*"); *Pender County v. Bartlett*, 361 N.C. 491, 649 S.E.2d 364 (2007), *aff'd*, *Bartlett v. Strickland*, 556 U.S. 1 (2009); *Dickson I; Dickson II*. Any new redistricting plan will need to be drawn in strict compliance with the *Stephenson* rules. This will require compliance with the county grouping rules, in particular, the optimum county groups for the House and Senate maps. D.E. 136-1, p. 16; D.E. 137-1, p. 18.

Many county groupings in the 2011 Plans will need to be modified to the extent departure from the *Stephenson* optimum county groups cannot be justified by the 2011 version of the challenged districts. As a practical matter, this likely means that up to 35 out of 50 Senate districts may need to be changed by the General Assembly; and that up

8

to 81 out of 120 House districts may be modified, for a total of over 60% of the combined House and Senate districts. There is no precedent for a court requiring special elections and truncating the terms of office set by a State Constitution for over 60% of the members of a State legislature. Requiring over 60% of the State's legislature to run for office in three different primary and general elections during a two-year period is, by definition, a substantial disruption in the ordinary process of governance.

Moreover, the legislators elected in November 2016 to a two-year term have already served six months into the term. These legislators have hired staff and have established relationships with their constituents. The State now has a "significant interest in getting on with the process of governing once an electoral cycle is complete." *Bowes v. Ind. Sec'y of State*, 837 F.3d, 813, 818 (7th Cir. 2016). A legislature "elected under an unfair apportionment scheme … is nonetheless a legislature empowered to act." *Baker v. Carr*, 369 U.S. 186, 250 n.5 (1962) (Douglas, J., concurring). Special elections, however, "disrupt the decision-making process" and "place heavy campaign costs on candidates and significant election expenses on local government." *Gjersten v. Bd. Of Election Comm'rs*, 791 F.2d 472, 479 (7th Cir. 1986). Those costs to governance "should not be cavalierly brushed away by other branches of government, whether federal or judicial, that neither pay it nor impose the tax burden on which a remedy depends." *United States v. City of Houston,* 800 F. Supp. 504, 506 (S.D. Tex. 1992) (three-judge panel).

Additionally, because legislators only six months into their terms would have to turn around and compete in special primary elections a few months later, they would be

9

forced to do more campaigning and less governing than they otherwise would have, at the expense of the constituents they were elected to represent. And members with redrawn districts would have every incentive to neglect their current constituents and focus their efforts on voters residing in newly configured districts whose votes would count in the upcoming elections. And even after the special elections, the problems would recur, as the newly elected representatives would have only a one-year term and thus would once again have their attention diverted from governing to re-election in less than a year.

Meanwhile, elections boards would be forced to spend their limited time and resources preparing for the special election – a months-long process which will cost millions of dollars. That is an exceedingly high price to pay under these circumstances. *See Toney v. White*, 488 F.2d 310, 316 (5th Cir. 1973) (reversing remedial order "given both the expense of holding a special election and the short terms of office which would remain"). And because the financial and administrative cost of a special election is so high, "a jurisdiction forced into holding a special election has much less to spend on … other necessities." *City of Houston,* 800 F. Supp. at 506.

Plaintiffs' proposed remedy also will short-circuit the ordinary process for enacting new districting plans—a result that would be incredibly counterproductive given that this Court criticized what it characterized as the "streamlined" sequence of proposal and passage of the 2011 redistricting plans. That 2011 redistricting effort was extensive, spanning approximately five months and including input from countless members of the public across the State. Once the State received the 2010 Census data from the United States Department of Commerce on March 2, 2011, the General Assembly began

10

processing this data and contacting community leaders for advice on redistricting, including the Rev. Dr. William Barber II, President of the NC NAACP, asking him to share his opinions and ideas on redistricting with them and inviting him to attend public hearings once they began. Between April 13 and July 18, 2011, the House and Senate redistricting committees held a total of seventeen public hearings across the State of North Carolina. At all but two of these hearings, from two to eight additional sites were interactively connected with the main site via teleconferencing technology, for a total of 63 opportunities for members of the public to attend. On June 17, 2011, the Senate Redistricting Committee released a map showing Senate districts proposed to comply with the VRA. On June 21, 2011, the House Redistricting Committee released a map showing House districts proposed to comply with the VRA. On July 1, 2012, the committees released a proposed congressional plan, and on July 12, proposed redistricting plans for the House and Senate were released. All of these plans were amended during the committee process, in part because of suggestions made to the Chairmen.

The General Assembly then convened on July 25, 2011 to consider the redistricting plans. During floor debates in the House and Senate on that date, various alternative plans were offered as amendments, none of which had been introduced, shared with the Chairmen or redistricting committees or made public at any earlier time. On July 27, 2011, and July 28, 2011, the House, Senate, and congressional plans were enacted into law. On September 2, 2011, all three redistricting plans were submitted to the United States Department of Justice for preclearance under Section 5 of the VRA.

11

Preclearance was received on November 1, 2011. Thus, between March and November 2011, the General Assembly, state leaders, and interested citizens diligently worked to develop redistricting plans that would meet the preclearance requirements of Section 5 and which were ultimately pre-cleared.

Despite the extensive efforts of the State's public and private leaders, this Court criticized the General Assembly's process as insufficiently robust. In particular, the Court criticized the "streamlined" sequence of proposal and passage of the 2011 redistricting plans by the House and Senate. *Covington*, 316 F.R.D. at 127-28.

> In short, within a month-and-a-half, Dr. Hofeller's draft maps were released in near-final form to the public, presented to the Redistricting Committees, and passed without significant modification by the General Assembly. And because those maps were the work of Dr. Hofeller, who was in turn directed only by the two Redistricting Chairs, it is clear that three individuals substantially carried out North Carolina's 2011 statewide redistricting effort.

*Id.*

The Court also challenged the State's collection of evidence showing that racially polarized voting exists within the State. Based on the Court's interpretation of *Thornburg v. Gingles*, 478 U.S. 30 (1986), "a legislature must give consideration to the actual and potential effect of bloc voting on the electoral outcomes." *Id.* at 168. The legislature only considered the existence of any racially polarized voting and failed to investigate the impact of such voting on election outcomes.[3] *Id.* The failure to fully investigate these issues ultimately limited legislative debate, where legislative leaders felt

---

[3] The Court concluded that the reports of experts Dr. Thomas Brunell and Dr. Ray Block, Jr. were flawed for the same reason – that these experts failed to conduct more analysis on the impact of racially polarized voting on election outcomes. *Id.* at 169-70.

they were taking appropriate action to comply with federal voting laws. *Id.* at 173. The Court further criticized the State's investigation and evidence showing that districts covered by Section 5 were reasonably necessary to prevent retrogression in respect to racial minorities ability to elect their preferred candidates of choice. *Id.* at 174-75.

Implicit in the Court's criticism is the requirement that the General Assembly must do more in the redistricting process. More outreach, more public hearings, more specific testimony, and more debate so that the views and interests of the public may be fully considered by the General Assembly. The General Assembly must collect the necessary evidence and testimony to fully understand the impact of its redistricting plans. Moreover, if some legislators believe that the VRA justifies changes to the plans, they will need time, much more time apparently than what was used in 2011, to prove that racial bloc voting by a white majority prevents a geographically compact and cohesive minority group (that constitutes a majority in a single member district) from having an equal opportunity to elect their candidate of choice. Undoubtedly, the process required to meet the standards stated in the Court's August 11, 2016 Order will take at least as long as it took to prepare and approve the 2011 redistricting plan. Investigating, drawing, debating, and legislatively enacting satisfactory redistricting plans in time to hold elections in November 2017 or January 2018 would not even begin to allow this kind of input by the public and other members of the General Assembly. And if the process and evidence relied upon by the General Assembly in 2011, developed over five months, was insufficient, it would be impossible for the General Assembly to establish a proper record in just a few days or weeks.

13

**(b)  The need to act with proper judicial restraint when intruding on state sovereignty counsels strongly against a special election.**

The remedy of a special election is a "drastic if not staggering" remedy that "courts should grant only under the most extraordinary of circumstances" (if ever). *Gjersten*, 791 F.2d at 478 (quotation marks omitted).  A federal court's invalidation of a state election necessarily "implicates important concerns of federalism and state sovereignty." *Id.; see North Carolina v. Covington*, 137 S. Ct. at 1626 (noting the importance of exercising "proper judicial restraint when intruding on state sovereignty"); *cf. Virginia v. LeBlanc*, 582 U.S. ___, slip op. at 5 (2017) (per curiam) (noting the "federalism interest" that requires federal courts not to "unnecessarily disturb" or intrude on state sovereignty) (case under Antiterrorism and Effective Death Penalty Act of 1996) (citations and quotations omitted).

For example, the State has a sovereign interest in "placing a reasonable limit on the number of times voters are called to the polls," *Gjersten*, 791 F.2d at 479, thereby avoiding "voter confusion and consequent incentive to remain away from the polls," *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006).  A special election here would harm North Carolina voters.  In November 2016, millions of voters went to the polls with the belief that the legislators they elected would serve two-year terms.  A special election would at least cut those terms in half, effectively halving the voting power of millions of North Carolinians.  That is true not just for legislators and voters in the challenged districts, but for those in any of the numerous other districts that may have to be modified in remedial

14

maps.  Compounding this harm is the fact that turnout at special elections in North Carolina has historically been abysmal.

Moreover, the State's sovereign interests are harmed by unnecessarily abrogating multiple provisions of state law.  No one has ever suggested that there is anything suspect about North Carolina's sovereign determinations that legislators should serve two-year terms or that candidates should live in the district they seek to represent for one year before an election.  N.C. Const. art. II, §§ 6-8.  Yet the extraordinary remedy of a special election would cast both those provisions aside.  Furthermore, ordering a special election would contradict North Carolina's sovereign determination that special elections generally are not worth the time and expense.  Under North Carolina law, vacancies that arise in the General Assembly due to resignation or death are filled not by a special election, but by Gubernatorial appointment, with the voters weighing in at the next regularly scheduled election.  N.C. Gen. Stat. § 163-11.  By ordering a special election anyway, the Court would be simply ignoring the State's sovereign determination about how best to structure its own government.  *Cf. Gjersten*, 791 F.2d at 479 (directing district court to "consider the legislative determination in Illinois that, when a vacancy occurs in the last twenty-seven months of a four year term, a special election need not be held").

These are not the only provisions of state law that would need to be abrogated or modified.  Ordering a special election and sitting a new legislature in 2018 would also require this Court to suspend the North Carolina Constitution's process for how the legislature convenes and conducts the public's business.   Under the North Carolina

15

Constitution, legislative sessions for the North Carolina General Assembly are biennial, that is two years. N.C. Const. art. II, § 11(1). The Constitution mandates that the General Assembly "shall sit upon its own adjournment from day to day" and "may jointly adjourn to any future day." N.C. Const. art. II, § 20. A middle-of-the-biennium sitting of a "new" legislature is not only not contemplated by the State Constitution, the Court would need to suspend this requirement to allow the newly-elected legislators to conduct business. Otherwise, legislators arriving in 2018 could find themselves severely limited by the 2017 legislature's adjournment resolution, or, if the 2017 legislature adjourned *sine die*, then without the ability to even convene absent the extraordinary process of an extra session.

The need for judicial restraint when intruding into these areas of state sovereignty is particularly acute where the court has not found that the legislature acted in bad faith or with discriminatory intent. That is precisely the case here, where this Court specifically noted that "we make no finding that the General Assembly acted in bad faith or with discriminatory intent." *Covington*, 316 F.R.D. at 124 n. 1. That is particularly relevant in redistricting where North Carolina finds itself in the untenable position the Supreme Court has sought to avoid: "trapped between the competing hazards of liability" under the VRA and the Constitution. *Bush v. Vera*, 517 U.S. 952, 977 (1996). This case simply is not the extraordinary one that might justify invading state sovereignty by invalidating past election results, truncating constitutionally prescribed legislative terms, and ordering off-year special elections in substantial parts of the State. The remedy should be reserved for only the most egregious of violations, and that is obviously not the case here.

16

Finally, judicial restraint is warranted because of the Supreme Court's repeated refusal to expedite proceedings in this case. Mindful of the time constraints, the General Assembly volunteered in its stay application to brief and argue this case on an expedited schedule, specifically urging the Court to expedite the schedule if it wanted "to preserve the possibility of a special election." Application at 4, *North Carolina v. Covington*, No. 16A646 (U.S. Jan. 10, 2017). The Supreme Court declined the offer, granting a stay but allowing briefing to proceed in the normal course. Plaintiffs likewise urged the Supreme Court to expedite its consideration of the case, including by warning that any delay might "render special elections impossible in 2017." Motion to Affirm at 36, *North Carolina v. Covington*, No. 16-1023 (U.S. Feb. 28, 2017). The Supreme Court once again declined the offer, holding the case for nearly three months and then vacating the special-election order. Plaintiffs then asked the Supreme Court to expedite issuance of the judgment, which they argued would keep intact "the possibility of a special election remedy." Reply at 3-4, *North Carolina v. Covington*, Nos. 16A1202, 16A1203 (U.S. Jun. 14, 2017). And for a third time, the Supreme Court refused. Order, *North Carolina v. Covington*, Nos. 16A1203 (U.S. Jun. 15, 2017).

Given the Supreme Court's consistent and knowing refusal to take steps that would accommodate a special election—and given the significant intrusion on state sovereignty that would result from any special-election order—the proper exercise of "judicial restraint" would be to order the same remedy that has sufficed in every other case in which the Supreme Court has found a *Shaw* violation: ordering that new districting plans be used in the next regularly scheduled election.

17

### (c)    The "severity and nature" of the constitutional violation at issue in this case does not support a special election.

This factor counsels against any relief other than allowing the legislature to adopt new legislative plans in time to be used for the 2018 election cycle. It is not disputed that the legislature's 2011 redistricting attempt was a bona fide effort to comply with the law. This Court took issue with the process and the evidence the legislature used to justify its VRA districts, but never found bad faith. In fact, to the contrary, this Court emphasized that "we make no finding that the General Assembly acted in bad faith or with discriminatory intent." *Covington*, 316 F.R.D. at 124 n. 1. In other contexts, the lack of bad faith is enough to allow the state's normal governance process to take place while correcting a violation. In *Allen v. State Board of Elections*, 393 U.S. 544 (1969), for example, the Supreme Court considered the proper remedy for a State's failure to comply with Section 5's preclearance requirement. Plaintiffs asked the Court to "set aside the elections … and order that new elections be held." *Id.* at 571. The Court, however, "decline[d] to take corrective action of such consequence" because the case involved "issues subject to rational disagreement" and the State did not act in "deliberate defiance" of the VRA. *Id.* at 571-72. Likewise, in *Lopez v. City of Houston*, 617 F.3d 336 (5th Cir. 2010), the Fifth Circuit rejected the plaintiffs' request to invalidate past election results, explaining that such an "extraordinary remedy … can only be employed in exceptional circumstances, usually when there has been egregious defiance of the Voting Rights Act." *Id.* at 340. Because the plaintiffs "made no claim of the kind of egregious or

invidious discrimination that would make invalidation of the 2009 election an appropriate remedy," the Fifth Circuit declined to grant the requested relief. *Id.*

Moreover, it is not surprising that the Court did not find bad faith here. While this Court did not believe sufficient evidence existed to justify the legislature's use of race in the 2011 plans, enough evidence existed to give the legislature a good faith belief that it did. The legislature began the redistricting process by collecting evidence about the extent of racially polarized voting in jurisdictions covered by Section 5 of the VRA and in areas with significant minority populations. All the evidence it collected confirmed that racially polarized voting remains a reality in North Carolina and that, accordingly, the districting plan should include majority-minority districts to ensure compliance with Section 2 of the VRA. That evidence included two expert reports showing statistically significant racially polarized voting; legislative testimony by plaintiffs' counsel that majority-minority districts were still needed; three alternative districting plans (including one submitted by plaintiffs' counsel in this case) that included either majority-minority or coalition districts throughout the State; public testimony confirming the presence of racially polarized voting; and past election results showing that minority-preferred candidates had substantial success in majority-minority and coalition districts, but almost no success in majority-white districts. This Court and the Supreme Court concluded that the evidence cited above did not provide a strong basis in evidence to support the use of race in drawing districts, but no fair assessment would conclude that this evidence was insubstantial.

19

Indeed, the evidence was substantial enough that the government agency with the most experience analyzing the racial impact of redistricting plans – the United States Department of Justice – concluded that the plans should be precleared under Section 5. The evidence was also substantial enough to convince a bipartisan state court three-judge panel and the North Carolina Supreme Court to affirm the districts. *Dickson v. Rucho*, Nos. 11 CVS 16896, 11 CVS 16940 (N.C. Super. Ct. July 8, 2013); *Dickson I*; *Dickson II*. Thus, for the first two election cycles held under the 2011 legislative plans, every court and government agency reviewing them found them legal. The constitutional violation, at a minimum, is certainly "subject to rational disagreement." *Allen*, 393 U.S. at 572. A State's good-faith effort to navigate the relatively narrow channel between the competing demands of the VRA and the Equal Protection Clause should not give rise to the extraordinary remedy of a special election, even if the good-faith effort is ultimately deemed unsuccessful.

Moreover, the plaintiffs must bear their fair share of the price a special election would exact on the State's voters. It was only after the North Carolina Supreme Court's first affirmance in *Dickson I*—*i.e.,* almost four years after the legislature enacted the challenged districting plans and after the State had used the plans in two rounds of elections—that plaintiffs filed the instant suit. The case proceeded to trial in April 2016. More than three months later, long after the North Carolina Supreme Court rejected the nearly identical redistricting challenges for the second time in *Dickson II*, this Court issued its judgment in this case. Although plaintiffs had requested an immediate injunction blocking the use of the districts in the November 2016 election, this Court

20

determined that "there is insufficient time, at this late date, for: the General Assembly to draw and enact remedial districts; this Court to review the remedial plan; the state to hold candidate filing and primaries for the remedial districts; absentee ballots to be generated as required by statute; and for general elections to still take place as scheduled in November 2016." *Covington*, 316 F.R.D. at 177. The Court accordingly "decline[d] to order injunctive relief to require the state of North Carolina to postpone its 2016 general elections," instead allowing the elections to proceed as scheduled under the challenged maps. *Id.* The Court did, however, order the legislature to draw new maps for use in the next round of state legislative elections, which are scheduled for 2018. *Id.* Thus, it is plaintiffs' delay in bringing and prosecuting this action that is directly attributable to the fact that three election cycles have occurred using the 2011 plans. A fourth election cycle under the 2011 plans will not occur. But, to the extent the constitutional violation is severe, plaintiffs allowed it to persist, and the rest of the voters of the State should not now suffer the disruption of a special election because of their delay.

> **2.      Ordering a special election will needlessly truncate voting opportunities under state law and cause other unnecessary disruptions to the State's ability to hold orderly elections.**

In addition to the harm to governance processes and state sovereignty that a special election would cause, the Court should consider the disruption to the elections process and the orderly conduct of voting in North Carolina. As noted above, other courts have rejected special elections because of the State's interest in the number of times voters must head to the polls for elections, and the attendant voter confusion and

likely reduced turnout. *Cf. Purcell*, 549 U.S. at 4-5. However, that is not the only harm voters will suffer.

Any court-ordered special election would almost certainly require a reduction in the voting opportunities and mechanisms that voters have come to expect and increase the potential for election errors. When the issue of a remedy was briefed just after the trial in this matter, the Court was advised by the then-North Carolina State Board of Elections ("State Board") that a new redistricting plan would have to be enacted and shapefiles provided to the elections board no later than May 12, 2016 in order to have time for a legislative primary in August and legislative elections in November 2016. D.E. 117, p. 7. Even under this timeline, it was very likely that the Court would have had to shorten absentee voting, both for in-state voters and for the military. D.E. 117, p. 10. That schedule would have also severely truncated the canvass period under state law, the time in which the state and county elections boards verify the vote totals and resolve election protests. D.E. 117, p. 10 n.2. The combination of the truncated canvass and the hurry-up election process mandated by a condensed election schedule would have left no room for error by elections officials (D.E. 117, p. 10) and almost certainly would have led to mistakes and disenfranchised voters.

Of course, it was one thing to try and squeeze in another legislative primary in 2016 when there was at least a legislative general election on the ballot. But it is surely another, and disastrous to the State's election process, to squeeze in both a primary and a general legislative election, at least two months after the State Board said it would need remedial plans in 2016, and in a year in which the elections boards must administer

hundreds of municipal elections around the State at different times between September and November. See https://www.ncsbe.gov/Election-Information/2017-Election-Information. This Court did not receive the certified judgment from the Supreme Court until June 30, 2017. Assuming the Court allowed plaintiffs' request to give the State two weeks to enact a new plan, no legislative plans could be enacted and sent to elections officials until mid-July at the earliest, two months after the deadline the State Board provided in May 2016. In addition, this Court would require some amount of time to review the plans. Assuming the Court allowed the new plans to be used, elections officials would have to implement a primary, second primary (or run-off) and a general election within a very short time period.

In order to pull off this unprecedented remedy, the Court would have few good options. The Court would almost certainly have to eliminate a second (or run-off) primary, yet another intrusion into state sovereignty and the state's chosen governance method for legislative elections. In addition, the Court would almost certainly have to shorten absentee voting, a move which would impact all voters, especially military voters (D.E. 117, p. 10), and once again would intrude on North Carolina's chosen structure for electing its officials. Given the very tight timeframe of the election calendar this late in the year, however, it seems plausible that the Court might even need to shorten the early voting period. Shortening early voting would impact millions of voters not to mention raise the question of whether doing so would be challenged as having a discriminatory impact on minority voters. *North Carolina NAACP v. McCrory*, 831 F.3d 204, 216-17 (4th Cir. 2016).

In plaintiffs' Motion to Set Deadlines for Remedial Plan, plaintiffs represented that the "State Board of Elections Defendant takes no position on this Motion." D.E. 150, p. 5. In light of the serious and potentially chaos-causing problems that could be unleashed by the imposition of a special election, the legislative defendants request that prior to entering any order mandating a special election or imposing a truncated deadline for enacting remedial plans, the Court take evidence from state elections officials regarding the scheduling and logistical issues associated with a special election, as well as scheduling and logistical issues for implementing a plan in time for the 2018 elections, and provide all parties an opportunity to respond to that evidence.

In applying the test for relief in racial gerrymandering cases mandated by the Supreme Court, this Court should consider the equitable remedy adopted in *Shaw v. Hunt*, 92-202-Civ-BR, slip op. (E.D.N.C. July 30, 1996). In *Shaw*, the United States Supreme Court found North Carolina's Twelfth congressional district to be an unconstitutional racial gerrymander. *See Shaw v. Hunt*, 517 U.S. 899 (1996). In July of 1996, after the Supreme Court's judgment had been issued, the district court exercised jurisdiction to consider an appropriate remedy. Congressional elections in 1996 were not scheduled to be held until November 1996. Under the type of remedy proposed by the plaintiffs in this case, the General Assembly could have been given two weeks to enact a new congressional plan and the election schedule modified to allow elections under the new plan during the 1996 general election. However, unlike here, in *Shaw*, ordering elections under a new congressional plan for the upcoming 1996 general election would

not have resulted in the removal of members of Congress during their term, and would not have required a new unscheduled statewide election.

Even under less draconian circumstances, the district court in *Shaw* found that it would be inequitable to order the State to adopt a new plan for the 1996 general election. Nor did it find it equitable to truncate the terms of office for members of Congress elected under an enjoined plan by ordering a special election in 1997. Instead, the district court determined that the most equitable remedy was to allow elections to take place in 1996 under an enjoined plan, allow persons elected to Congress to serve their full two-year terms, and require North Carolina to enact lawful congressional plans for the 1998 General Election.

Here, plaintiffs again ask this Court to reject the precedent established by *Shaw*, remove a majority of North Carolina's legislators from their offices in the middle of their two-year term, and subject candidates, voters, and election officials to three back-to-back legislative election cycles within two years. If the violations in *Shaw* were not sufficiently severe to require new districts for an upcoming regularly scheduled election, it is hard to fathom how the violations in this case are sufficiently severe to support a remedy that would remove most of the members of the General Assembly in the middle of their terms.

### 3. Which defendant, or group of defendants, has authority under state law to speak on behalf of the State with regard to the remedial issues.

On this issue, state law could not be clearer: in litigation challenging the constitutionality of a state statute, the General Assembly, through the Attorney General and its private counsel, if any, controls litigation positions.

North Carolina law authorizes the North Carolina General Assembly to act on the State's behalf and hire outside counsel where "the validity or constitutionality of an act of the General Assembly" is challenged in any state or federal court. N.C. Gen. Stat. § 120-32.6(b) (2017). The law exempts the General Assembly from provisions limiting the authority of other government entities to hire outside counsel. *Id.* § 120-32.6(a) (providing that N.C. Gen. Stat. §§ 114-2.3 and 147-17(a)–(c), regarding "Use of Private Counsel," "shall not apply to the General Assembly"). When acting pursuant to this authority, the General Assembly is "deemed to be a client of the Attorney General for purposes of that action as a matter of law" and pursuant to express provisions in the North Carolina Constitution. N.C. Gen. Stat. § 120-32.6(b) (2017). Furthermore, the General Assembly's leaders "may jointly designate" retained counsel as "lead counsel," who "shall possess final decision-making authority" with respect to the representation; any other counsel for the General Assembly—including the Attorney General—"shall, consistent with the Rules of Professional Conduct, cooperate with such designated lead counsel." N.C. Gen. Stat. § 120-32.6(c) (2017).

North Carolina law also expressly recognizes that in cases challenging the constitutionality of an act of the General Assembly, the "State" includes both the

executive branch of state government and the legislative branch. N.C. Gen. Stat. § 1-72.2(a) (2017). The Attorney General, whose duties are expressly proscribed by the General Assembly under the North Carolina Constitution (N.C. Const. art. III, § 7(2)) is obligated to ensure that the legislature's proper role as part of the State of North Carolina in such cases is recognized and respected.

Thus, North Carolina law expressly authorizes the General Assembly to act on behalf of the State in retaining private counsel to defend challenged laws and to designate that counsel as lead counsel with "final decision-making authority." N.C. Gen. Stat. § 120-32.6(c). The General Assembly did so with respect to the proceedings in this case, as evidenced by numerous pleadings on the Court's docket in which undersigned counsel were designated as co-counsel for all of the defendants, including the State, along with the Attorney General. Any action by the Attorney General to the contrary violates state law and the Attorney General's obligation to his client the General Assembly.[4]

### 4. Addressing steps taken to satisfy the remedial obligations under the Court's August 11, 2016 decision and whether the State is entitled to additional time to comply.

This Court's August 11, 2016 decision did not mandate any timeline for adopting new legislative redistricting plans, other than to state that the 2011 plans could not be used in any further elections and that the legislature must draw remedial districts in its

---

[4] Notably, the applicable statutes do not provide an exception for the Attorney General when the political party of the Attorney General differs from the political party in control of his client, the General Assembly. Nor does it exempt the Attorney General from representing the General Assembly when a new person is elected to that office. The statute applies to the office of the Attorney General regardless of his person or his political party status.

next "legislative session." *Covington*, 316 F.R.D. at 177. As a legislative session for the North Carolina General Assembly is biennial, that is two years (*see* N.C. Const. art. II, § 11(1)), the General Assembly understood its obligation from the August 11, 2016 decision to be to enact new plans in time for use in the next scheduled legislative elections in November 2018.

There was no reason for the General Assembly to start the laborious process of redistricting earlier for several reasons. First, the United States Supreme Court stayed this Court's attempt to force the General Assembly to do so. In seeking a stay, the defendants specifically noted the disruption to the normal course of the General Assembly's business that this Court's order would have caused. Defendants argued that the Court's order would mean that, instead of acting for their constituents, newly elected legislators would spend weeks of their term in designing and enacting a new districting plan. Defendants explained that the mapdrawing process was guaranteed to be time-consuming, and it would be inequitable to require this disruption to the normal process of governance in North Carolina. The Supreme Court allowed the stay on January 10, 2017 and this Court did not regain jurisdiction from the Supreme Court until June 30, 2017. In that interim, the North Carolina General Assembly did just what the Supreme Court allowed it to do – enact policies and legislation that benefit the State as a whole without the significant distraction of drawing remedial legislative districts.

Second, the General Assembly knew it could enact plans in time for the 2018 elections by waiting until the likely end of the initial part of its 2017 regular session. Working back from November 2018, the General Assembly could begin the process of

compiling a record in July 2017 with a goal of enacting new plans by the end of the year, which would leave time for this Court's review and implementation of the plans in an orderly way in 2018. Thus, it was not necessary to begin the process until at, the earliest, the end of the current Supreme Court term, during which the State would know the status of its appeal from the August 11, 2016 decision. Further guidance was also forthcoming this Supreme Court term in *Cooper v. Harris*, 137 S. Ct. 1455 (2017), a case involving similar issues.

The General Assembly is on track to complete remedial plans on this schedule. The legislature temporarily adjourned its 2017 legislative session on June 30, 2017. Prior to doing so, both the House and the Senate formally created new redistricting committees and appointed new members. See http://www.ncleg.net/gascripts/Committees/committees.asp?sAction=ViewCommittee&sActionDetails=Senate+Standing_154; http://www.ncleg.net/gascripts/Committees/committees.asp?sAction=ViewCommittee&sActionDetails=House+Select_183. Moreover, the legislature passed an adjournment resolution whereby the legislature will continue its session on August 3, 2017, and then again on September 6, 2017. See http://ncleg.net/Sessions/2017/Bills/Senate/PDF/S686v2.pdf. The adjournment resolution provides that committees such as the redistricting committees may meet and otherwise conduct any desired proceedings between these continuances of the regular session. Thus, the redistricting committees are fully authorized to take all steps necessary

29

to collect information from the public and interested stakeholders regarding the appropriate criteria and factors the State should consider in the remedial redistricting. *Id.*

Once the redistricting committees gather this crucial information, as in 2011, draft plans will be released for further public input. Other interested groups and citizens, such as AFRAM in 2011, may submit alternative plans. Further public hearings will need to be held to gather feedback on the initial draft plans. If 2011 is any guide at all, that process will take several months not only for interested stakeholders to draft proposed plans, but also for members of the redistricting committees to study this feedback prior to the completion of the final plans.

In order to accommodate the process anticipated for this remedial redistricting, the adjournment resolution contemplates that the legislature will devote part of its regular session to completing this task no later than November 15, 2017. This will give the legislature time to receive input prior to draft plans being released, as well as time for interested parties to react to any draft remedial plans proposed by the redistricting committees.

Whether or not this Court decides to impose a special election, the legislative defendants request a further opportunity to brief or be heard on an appropriate schedule for enacting remedial plans other than the schedule already established by the General Assembly. In any event, the two-week time period requested by plaintiffs is unworkable and dangerous.[5] Plaintiffs' timeline springs from N.C. Gen. Stat. § 120-2.4. Under this

---

[5] On June 7, 2017, the North Carolina Governor issued a proclamation purporting to call an extra session of the North Carolina General Assembly. There is no precedent for the

statute, a state court in North Carolina is prohibited from adopting interim court-drawn plans until it gives the General Assembly a minimum of two weeks after it enters an order finding legislative districts unconstitutional.

Obviously, N.C. Gen. Stat. § 120-2.4 does not apply to a federal court nor does it mandate that a court only give the General Assembly two weeks to enact new plans before the court adopts its own. Instead, the statute only provides that a state court cannot adopt its own interim plan unless it gives the General Assembly at least two weeks.

Given this Court's criticism of the legislative process and record created by the General Assembly in 2011, the legislature should be allowed until at least November 15, 2017 to enact remedial plans. As explained above, this would provide time for public hearings, an opportunity for members of the minority party to review and comment on draft plans released by the General Assembly, an opportunity for the plaintiffs in this case and members of the General Assembly to present alternative plans, and any necessary follow-up. This schedule would also permit this Court to review the plans prior to their implementation for the 2018 election cycle.

## CONCLUSION

The Court should not order special elections, but should instead allow the North Carolina General Assembly to enact new districts in time for their use in the 2018

---

Governor to call an extra session while a regular session is already convened and his attempt to do so violated the North Carolina Constitution. Accordingly, upon points of order being raised in the House and Senate to the validity of the Governor's call, the attempted extra session call by the Governor was ruled out of order by those chambers.

election cycle. In any event, the Court should not order a special election unless and until elections officials have provided the Court with evidence regarding scheduling and logistical issues posed by a special election and the legislative defendants have had an opportunity to respond to such evidence. The Court should also not order a reduced period of time for the legislature to enact remedial plans without evidence from elections officials regarding the time needed for a plan to be implemented in time for the 2018 elections. Whether or not the Court decides to order a special election, the legislative defendants request an opportunity to be heard, through briefing or otherwise, specifically on the timeline for enacting remedial legislative plans under whatever election schedule the Court intends to adopt.

This the 6th day of July, 2017.

OGLETREE, DEAKINS, NASH
SMOAK & STEWART, P.C.

/s/ Phillip J. Strach
Thomas A. Farr
N.C. State Bar No. 10871
Phillip J. Strach
N.C. State Bar No. 29456
thomas.farr@ogletreedeakins.com
phil.strach@ogletreedeakins.com
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina 27609
Telephone: (919) 787-9700
Facsimile: (919) 783-9412
*Counsel for Legislative Defendants*

## CERTIFICATE OF SERVICE

I, Phillip J. Strach, hereby certify that I have this day electronically filed the foregoing **LEGISLATIVE DEFENDANTS' POSITION STATEMENT** with the Clerk of Court using the CM/ECF system which will provide electronic notification of the same to the following:

Edwin M. Speas, Jr.
Carolina P. Mackie
Poyner Spruill LLP
P.O. Box 1801 (27602-1801)
301 Fayetteville St., Suite 1900
Raleigh, NC  27601
espeas@poynerspruill.com
cmackie@poymerspruill.com
*Attorneys for Plaintiffs*

Anita S. Earls
Allison J. Riggs
Southern Coalition for Social Justice
1415 Highway 54, Suite 101
Durham, NC  27707
anita@southerncoalition.org
allisonriggs@southerncoalition.org
*Attorneys for Plaintiffs*

Alexander McC. Peters
Senior Deputy Attorney General
N.C. Department of Justice
apeters@ncdoj.gov
P.O. Box 629
Raleigh, NC  27602

This the 6th day of July 2017.

OGLETREE, DEAKINS, NASH
SMOAK & STEWART, P.C.

/s/ Phillip J. Strach
Phillip J. Strach
N.C. State Bar No. 29456
4208 Six Forks Road, Suite 1100
Raleigh, NC  27609
Telephone:  919.787.9700
Facsimile:  919.783.9412

30121104.1

33