```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2
    SANDRA LITTLE COVINGTON, et al.,) CASE NO. 1:15CV399
 3           Plaintiffs,           )
                                   )
 4  v.                             )
                                   )
 5  STATE OF NORTH CAROLINA, et al.,) Greensboro, North Carolina
             Defendants.           ) July 27, 2017
 6  _____   10:02 a.m.

 7                  TRANSCRIPT OF THE MOTIONS HEARING
                 BEFORE THE HONORABLE THOMAS D. SCHROEDER
 8                 THE HONORABLE CATHERINE C. EAGLES
                     UNITED STATES DISTRICT JUDGES
 9                              and
                    THE HONORABLE JAMES A. WYNN
10               UNITED STATES FOURTH CIRCUIT JUDGE

11  APPEARANCES:
    For the Plaintiffs:        ANITA S. EARLS, ESQ.
12                             ALLISON J. RIGGS, ESQ.
                               SOUTHERN COALITION FOR SOCIAL JUSTICE
13                             1415 W. Highway 54, Suite 101
                               Durham, North Carolina 27707
14
                               EDWIN M. SPEAS , JR., ESQ.
15                             POYNER SPRUILL, LLP
                               301 Fayetteville Street, Suite 1900
16                             Raleigh, North Carolina.

17  For the Defendants:        PHILLIP J. STRACH, ESQ.
                               MICHAEL D. MCKNIGHT, ESQ.
18                             OGLETREE DEAKINS NASH SMOAK & STEWART
                               P. O. Box 31608
19                             Raleigh, North Carolina 27622

20                             ALEXANDER M. PETERS, ESQ.
                               JAMES BERNIER, ESQ.
21                             N.C. DEPARTMENT OF JUSTICE
                               P.O. Box 629
22                             Raleigh, North Carolina 27602

23  Court Reporter:            BRIANA BELL, RPR
                               Official Court Reporter
24                             P.O. Box 20991
                               Winston-Salem, North Carolina 27120
25
```

```
1                            INDEX

2

3   PLAINTIFFS' WITNESSES:                    PAGE:

4

5   REPRESENTATIVE D. GRIER MARTIN

6       Direct Examination by Mr. Speas          5
        Cross-Examination by Mr. Strach         11
7       Redirect Examination by Mr. Speas       16

8   MILO PYNE

9       Direct Examination by Ms. Earls         16

10  GEORGE N. GILBERT

11      Direct Examination by Ms. Earls         26
        Cross-Examination by Mr. Strach         35
12      Cross-Examination by Mr. Peters         39

13  GEORGE N. GILBERT (REBUTTAL)

14      Direct Examination by Ms. Earls         58
        Cross-Examination by Mr. Strach         60
15

16  DEFENDANTS' WITNESSES:                    PAGE:

17  KIM W. STRACH

18      Direct Examination by Mr. Peters        41
        Cross-Examination by Ms. Earls          55
19

20

21

22

23

24

25
```

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 2 of 117

```
 1                    P R O C E E D I N G S
 2          JUDGE EAGLES:  Good morning.  Just a second.  We
 3   would like to be able to see everybody.  Excuse us just a
 4   moment.
 5          Okay.  Now we're set.  All right.  We're here for the
 6   noticed hearing in Covington against the State of North
 7   Carolina.  The Plaintiffs will have 90 minutes to present any
 8   evidence and make any argument they wish.  The Defendants, the
 9   same.  We plan to call on Plaintiffs first, and if you want to
10   save any time for rebuttal, it's up you.  We are hoping to
11   finish without a lunch break.  So we'll take a short break, I'm
12   sure, at some point, but that's our anticipation in terms of
13   scheduling.
14          If I can have anyone who will be speaking on behalf
15   of the Plaintiffs identify themselves for the record.
16          MS. EARLS:  Good morning, Your Honors, Anita Earls of
17   the Southern Coalition for Social Justice for the Plaintiffs.
18          MR. SPEAS:  Good morning, Your Honors, Edwin Speas
19   with Poyner Spruill for the Plaintiffs.
20          MS. RIGGS:  Good morning, Your Honors, Allison Riggs
21   on behalf of the Plaintiffs.
22          JUDGE EAGLES:  Good morning.  And for the Defendants?
23          MR. STRACH:  Good morning, Your Honor, Phil Strach
24   with Ogletree Deakins for the Legislative Defendants.
25          MR. MCKNIGHT:  Good morning, Your Honors, Michael
```

Covington, et al. v. NC, et al.  Motions  7-27-17

1  McKnight for the Legislative Defendants.

2          **MR. PETERS:**  Good morning, Your Honor, Alexander

3  Peters of the Attorney General's Office for the State of North

4  Carolina and the State Board of Election.

5          **JUDGE EAGLES:**  All right.

6          **MR. BERNIER:**  Good morning, Your Honors, James

7  Bernier from the Attorney General's Office on behalf of the

8  State Defendant and the Board of Elections, Your Honor.

9          **JUDGE EAGLES:**  Thank you.  I believe we are ready to

10  proceed if there is nothing we need to take up before we get

11  started.  I believe you all worked out the motion to squash,

12  and we saw the stipulation.

13          **MS. EARLS:**  That's correct, Your Honor.

14          **JUDGE EAGLES:**  Do the Plaintiffs plan to call any --

15  are you still planning to put on some witnesses?

16          **MS. EARLS:**  Yes, Your Honor, we would like to call

17  some witnesses.

18          **JUDGE EAGLES:**  All right.  I'll let you proceed.

19          **MS. EARLS:**  Thank you, Your Honor.  Just to orient

20  the Court, we filed a motion to set deadlines for a remedial

21  plan.  That's Doc. 150.  And then we filed a separate motion

22  for an expedited evidentiary hearing on Plaintiffs' previous

23  motion for additional relief, and that's Document 151.

24          We filed two separate motions because, in our view,

25  there are two separate and independent decisions for the Court

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 4 of 117

1   to make.  The first one is the timetable by which the General

2   Assembly will have to draw remedial maps.  So our evidence this

3   morning -- we'll start with evidence that relates to that

4   motion, and then the second motion is regarding whether or

5   not -- independent of what the timetable is for drawing a map,

6   whether or not the circumstances equitably justified the

7   granting of Plaintiffs' request for a special election, and we

8   will also offer evidence relating to that second motion and

9   that second issue.

10          That's the issue relating to which the Supreme Court

11  identified three factors:  The severity and nature of the

12  particular constitutional violation, the extent of likely

13  disruption to the ordinary processes of governments if early

14  elections are imposed, and then the need to act with proper

15  judicial restraint when intruding on state sovereignty, and we

16  will also be offering evidence that relates to those three

17  questions.

18          So with that, I think we are ready to call our first

19  witness.

20          **JUDGE EAGLES:**  Go ahead.

21          **MR. SPEAS:**  Your Honors, we would call Representative

22  Grier Martin to the stand.

23  **REPRESENTATIVE D. GRIER MARTIN,** PLAINTIFFS' WITNESS, being

24  first duly sworn, at 10:06 a.m., testified as follows:

25                      DIRECT EXAMINATION

Covington, et al. v. NC, et al.  Motions  7-27-17

1  BY MR. SPEAS

2  Q    Good afternoon.  Would you state your name for the record,

3  please.

4  A    My name is Grier Martin, full name is David Grier Martin.

5  Q    And would you briefly describe your background for the

6  Court.

7  A    Sure.  I'm currently a member of the North Carolina House

8  of Representatives.  I'm in my seventh two-year term.  I am a

9  lawyer, born in North Carolina.  I practiced law for several

10 years, served in the United States Army Reserve, and I'm a

11 veteran of Afghanistan and currently live in Raleigh.

12 Q    And you are a Democrat?

13 A    I am.

14 Q    And a member of the House Democratic Caucus?

15 A    Yes.

16 Q    As a member of the House Democratic Caucus, do you have

17 any responsibility for the upcoming elections to the House of

18 Representatives?

19 A    Yes, I do.  I am our Democratic conference chair, which

20 means that I head up all campaign operation for North Carolina

21 House Democrats.

22 Q    Would you briefly describe for the Court what that role

23 entails, the duties that you will perform?

24 A    Sure.  It includes responsibility for all things campaign

25 related.  A large part of my job is recruiting good candidates

1  ideally in all 120 House districts throughout the state and

2  then equipping them with what they need to succeed and win

3  their races.

4  Q     Okay.  Now, on August 11, 2016, the Court found that 19

5  districts in the House plan and 9 districts in the Senate plan

6  were unconstitutional.  Has the legislature taken any actions

7  since then to put new House districts in place?

8  A     No.

9  Q     Has the legislature taken any action since then to put new

10 Senate districts in place?

11 A     No.

12 Q     Has the legislature been in session since August 11, 2016?

13 A     Yes.

14 Q     Did they meet in special session twice in December of

15 2016?

16 A     Yes, we did.

17 Q     And did the legislature meet in regular session beginning

18 January 11, 2016, and only recently adjourning?

19 A     Yes.

20 Q     And during that time, in fact, did the Governor issue an

21 executive ordering calling on the General Assembly to meet to

22 enact new plans?

23 A     Yes, he did.

24 Q     And did the General Assembly do anything with regard to

25 the Governor's executive order?

1  A     We did not.

2  Q     Now, has the absence of districts, valid districts, had an

3  adverse impact on you in the performance of your duties as

4  chair of the House Democratic Caucus Campaign Committee?

5  A     Yes, it made my life very difficult.

6  Q     Could you explain the difficulty for the Court, please?

7  A     Right.  So this is the third election cycle which I've

8  served in this capacity and previously as a candidate.  The

9  level of interest, not just in general elections, but in

10  actually running as a candidate -- as a Democrat candidate is

11  unlike anything I have ever seen in my involvement in politics.

12  So that's in my mind a good thing, but the problem is these

13  candidates who want to step up and serve -- run and serve do

14  not know which district they might run to represent.  So what

15  that means is when they come to me and say they're interested

16  in running for the North Carolina House as a Democrat, what

17  should they do, what I would love to be able to tell them is

18  that's great.  No time like the present to get started.  If

19  you're taking on an incumbent Republican, you've got to get

20  started right now getting out and meeting your voters, learning

21  more about your district, raising money, doing everything --

22  knocking on doors, do everything it takes to succeed.

23      Right now, though, I have to tell them don't go out and

24  meet your voters.  Don't let the people you seek to represent

25  know that you're running at all.  Lie low until you know what

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 8 of 117

1   the districts are, which sounds strange, but our biggest fear

2   is that we've got a great candidate who can win a seat, who

3   would actually be a great legislator, and the minute they

4   announce that they're running, if the Republicans drawing the

5   district perceive that candidate as a threat, just with a swipe

6   of a pen or the click of a keyboard, they can draw that great

7   candidate, who's a threat, into a noncompetitive district where

8   they'll never win.

9   Q    So is it fair to say, Representative Martin, that at this

10  point, in the absence of districts, you are unable to perform

11  your duties as chair of the campaign caucus committee?

12  A    I am.  I'm spinning my wheels.

13  Q    And the Democratic Party is unable to identify candidates

14  to run for these offices?

15  A    We cannot identify candidates, and candidates can't step

16  up to run.

17  Q    And they can't begin contacting voters?

18  A    No, it would be a bad move.

19  Q    And they can't begin contacting -- raising money?

20  A    No, they can't.

21  Q    So your party is at a distinct disadvantage because of the

22  absence of districts?

23  A    Yeah, absolutely.  We can't do anything.

24  Q    Now, Representative Martin, back in 2003, the General

25  Assembly enacted a statute that says, in effect, in the event a

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 9 of 117

1  Court says a redistricting plan is invalid, the General

2  Assembly needs two weeks to draw districts.

3      In your experience, is that adequate time for the General

4  Assembly to draw districts -- remedial districts?

5  A    Yes, it is.  It is adequate time to draw the districts.

6  Q    And have you had recent experience in that regard?

7  A    I certainly have, yes.

8  Q    And is it accurate that this past -- in February of 2016,

9  in a period of two weeks, the General Assembly drew remedial

10 congressional districts?

11 A    We did, yes.

12 Q    Now, Representative Martin, let me just turn very briefly

13 to the question of special elections.

14      The Legislative Defendants here have suggested in some of

15 their briefs that cutting short the existing terms of members

16 of the General Assembly would disrupt the legislative process.

17 In your experience, is that accurate?

18 A    No, I don't think so at all.  We have proven the ability

19 in the General Assembly -- first of all, every two years, we

20 adapt to an influx in the normal course of things of new

21 members, and we're able every two years to elect new

22 leadership, form a new committee structure almost from scratch,

23 and go about our business there.

24      Also, as long as I've been in the General Assembly, we've

25 had the normal turnover of new members coming in, either

1  through resignations or through deaths of members, and we have

2  no problem moving those new members into our existing

3  structure.

4       Also, I think it's particularly inaccurate to say that it

5  would be a disruption, coming up as we are in our legislative

6  short session.  We work on a two-year cycle.  The first year of

7  that cycle is the long session where we come in and prepare the

8  budget for a two-year period.

9  Q    And you've just completed that part?

10 A    Yes, we have.

11      And then in our short session, we come in, ideally just

12 for two or three months, and just make tweaks and adjustments

13 to the two-year budget that we had previously passed.  So there

14 is a much narrower scope of work to be done by the General

15 Assembly in the upcoming short session.

16          **MR. SPEAS:**  Thank you, Representative Martin.

17          **JUDGE EAGLES:**  Questions by the State --

18          **MR. STRACH:**  Yes, Your Honor.

19          **JUDGE EAGLES:**  -- by the Defendants.

20          **MR. STRACH:**  Phil Strach for the Legislative

21 Defendants.

22                       CROSS-EXAMINATION

23 **BY MR. STRACH**

24 Q    Representative Martin, good to see you.  I'm Phil Strach.

25 I just have a few questions for you based on the examination

1   from Mr. Speas, if I may.

2        Representative Martin, you mentioned that you are, I think

3   you said, the Democratic Conference Chair?

4   A    Yes.

5   Q    Is it fair to say that that is a political role that you

6   serve for your caucus?

7   A    It's involved in recruiting political candidates and

8   assisting in political races.

9   Q    Would agree with me that recruiting candidates is a

10  political role that you play?

11  A    Yes.

12  Q    It's unrelated to any of the policy work that you do as a

13  legislator in the General Assembly; isn't that correct?

14  A    It's -- in this job or in elective office, it's often

15  impossible to completely detach policy from politics, but the

16  focus is on electing candidates, getting Democratic candidates

17  elected.

18  Q    Would you ever let your political role overshadow your

19  policy role in the legislature?

20  A    I'm not sure what you mean by "overshadow."

21  Q    Would you ever allow your political role to dictate what

22  kind of policy you propose in the General Assembly?

23  A    No.

24  Q    Okay.  You mentioned -- you talked a little bit about the

25  two-week time period.  Representative Martin, did you chair the

1  House Redistricting Committee at some point in the prior

2  decade?

3  A    I chaired, I believe it was in 2009, the Pender-New

4  Hanover Redistricting Committee.

5  Q    And what was the purpose of that committee's work?

6  A    The Courts had overturned -- had found a problem with

7  North Carolina House districts in Pender -- with two districts

8  in Pender and New Hanover Counties, and so they ordered us to

9  redraw those two districts.  There were three districts in

10 those two counties.  So the third one was redrawn as a part of

11 that, and I chaired the committee that did that.

12 Q    And tell me a little bit about the process that you

13 followed in redrawing those districts.

14 A    Right.  My recollection is a committee was appointed by

15 House leadership, and I was appointed to chair it.  We held a

16 public hearing and -- which was advertised and noticed.  We

17 had, I believe, at least two meetings of the Pender-New Hanover

18 Redistricting Committee.  At least at the latter of those

19 meetings, maps were presented -- or, rather, I presented maps

20 to the committee.  The committee discussed them, and the

21 committee adopted those maps, and then it went on to the body

22 as a whole.

23 Q    Did you provide any time for the public to comment on the

24 maps that you proposed?

25 A    Yes, we did have a public hearing.

Covington, et al. v. NC, et al.  Motions  7-27-17

1  Q    And isn't it fair to say that that entire process from

2  start to finish took longer than two weeks?

3  A    I don't know that for sure.  From the time the committee I

4  believe had its first meeting, the public hearing was later

5  that week.  I'm not sure of the date at which the second

6  meeting was at which -- or the next meeting at which we adopted

7  the maps.

8  Q    Did you start drawing any proposed maps before the first

9  public hearing?

10 A    We did use the software to become familiar with the

11 geography and, for lack of a better term, to play around with

12 potential scenarios.  At some point before the meeting where we

13 actually unveiled the maps to the committee, we, of course, had

14 them finalized.  I don't remember when that time was.

15 Q    So in your experience, it's not unusual, as you say, to

16 play around with the software and with districts when you're

17 trying to come up with a district to propose in a

18 redistricting?

19 A    It's not unusual to play around with them.  As I recall at

20 the committee, a Republican member asked me if we had had maps

21 drawn, and he and I sat down after that meeting and talked

22 through what maps -- what -- some of the things we were playing

23 around with.  So we did bring in folks from the other party.

24 Q    And just to be clear, as I recall, you stated only two

25 districts were at issue in this redistricting?

        Covington, et al. v. NC, et al.  Motions  7-27-17

1  A    That's correct.  Only two districts had been ruled

2  illegal.  A third district was in Pender-New Hanover County

3  that hadn't been ruled illegal, but because of its geographic

4  proximity of the two illegal districts, it was drawn up in the

5  redrawing.

6  Q    All right.  In your capacity as chair of the Democratic

7  Conference for the House -- are you the chair of the Conference

8  just for the House or for the House and Senate?

9  A    Just for the House.

10 Q    You've known that a redistricting process would have to

11 take place at least since August of 2016 when this Court ruled;

12 correct?

13 A    Yes.

14 Q    Since that time, have you drawn any proposed House maps,

15 remedial maps?

16 A    I have not.

17 Q    Do you know if the Democratic Conference of the House has

18 drawn any maps?

19 A    To my knowledge, they have not.

20 Q    Do you know if the Democratic Conference has retained any

21 experts or consultants to help them analyze racially polarized

22 voting in connection with that process?

23 A    To my knowledge, we haven't.

24         **MR. STRACH:**  That's all I have, Your Honor.

25         **JUDGE EAGLES:**  All right.  Thank you.  Any redirect?

1          **MR. SPEAS:**  One question, Your Honor.

2                        REDIRECT EXAMINATION

3  **BY MR. SPEAS**

4  Q    Representative Martin, you participated in the 2011

5  redistricting process?

6  A    Yes.

7  Q    Did the Republican majority pay any attention whatsoever

8  to the maps you drafted?

9  A    They did not.

10         **MR. SPEAS:**  Thank you.

11         **JUDGE EAGLES:**  All right.  Thank you.  You can step

12  down.

13     (At 10:20 a.m., witness excused.)

14         **JUDGE EAGLES:**  You can call your next witness or

15  proceed.

16         **MS. EARLS:**  Thank you.  Your Honor, the Plaintiffs

17  call Milo Pyne.

18  **MILO PYNE**, PLAINTIFF'S WITNESS, being first duly sworn, at

19  10:21 a.m., testified as follows:

20                        DIRECT EXAMINATION

21  **BY MS. EARLS**

22  Q    Please state your full name for the record.

23  A    Milo Pyne.

24  Q    And where do you live?

25  A    806 Vickers Avenue in Durham, North Carolina.

1  Q    And how long have you lived in Durham?

2  A    I was born in Durham, and I've lived there continuously

3  since 1996.

4  Q    And, overall, how long have you lived in Durham?

5  A    Around two-thirds of my life, which is around 42 years,

6  I'd say.

7  Q    And you are a Plaintiff in this case; correct?

8  A    Yes, ma'am.

9  Q    And how are you employed?

10 A    I work as a botanist and ecologist for a science

11 conservation group, a private not-for-profit called

12 NatureServe.

13 Q    Now, turning to your political involvement, when did you

14 first become involved in political activities?

15 A    Well, I assisted in the campaign of President Lyndon B.

16 Johnson in 1964 as a campaign volunteer, and then I became

17 president of the Durham Teen Democrats in 1965, so it goes back

18 a while.

19 Q    And have you pretty much been engaged in volunteer

20 political activities since then?

21 A    Well, more so consistently since I moved back to Durham in

22 1996.

23 Q    Are you currently involved with the North Carolina

24 Democratic Party?

25 A    Yes, ma'am, I'm currently a member of the State Executive

1   Committee.

2   Q    And what does the State Executive Committee do?

3   A    We manage the affairs of the party between the state

4   conventions.  So that would include filling vacancies in party

5   offices and working on strategy and issues for the party,

6   determining the party rules, for example.

7   Q    Through that volunteer activity, do you come in contact

8   with members of the North Carolina Democratic Party from around

9   the state?

10  A    Yes, I do.

11  Q    And are you generally aware of the issues that members of

12  the party face relating to recruiting candidates to run for

13  state legislative office and fundraising for those campaigns?

14  A    Yes.  There's continual discussion of those matters, and I

15  am aware of the activities of the House and Senate Democratic

16  Caucuses in those efforts as well.

17  Q    Are you involved in any civic organizations?

18  A    Yes, I'm a board member of the Eno River Association,

19  which is a land conservation organization in Durham, and I'm

20  also a member of the Durham People's Alliance and one of the

21  coordinators of its Political Action Committee.

22  Q    Now, what is the Durham People's Alliance?

23  A    We are a community organization in Durham.  We've been in

24  existence for over 40 years.  We work on -- we have a

25  progressive political point of view and work on committee

1  issues like fair housing and income equality and voting rights.

2  Q    What does the Political Action Committee of the Durham

3  People's Alliance do?

4  A    We evaluate candidates for public office for any offices

5  that are voted on by the citizens of Durham County.  We

6  evaluate candidates.  We offer them the opportunity to fill out

7  questionnaires on the issues of the day, and our members then

8  decide on an endorsement in those contests.

9  Q    Now, as a Plaintiff, you're aware that Durham County is

10 one county where both the House and Senate districts must be

11 redrawn?

12 A    Yes, that's correct.

13 Q    And do you remember what counties Durham is clustered with

14 in the current Senate map?

15 A    As far as the Senate is concerned, it goes from Caswell to

16 Person and Granville and then down to Durham, four counties.

17 Q    If you could take a look at the exhibit there that's from

18 the record in this case, Map 3, a comparison of the enacted to

19 optimum Senate county groups, what counties is Durham clustered

20 with in that map?

21 A    Well, in that map, it is just Durham, Person, And

22 Granville.

23 Q    So how does the change in the cluster for Durham County

24 for the Senate districts and the change in the districts within

25 that cluster impact your activities that you described relating

1  to candidate recruitment either for the Democratic Party or

2  through the Durham People's Alliance?

3  A    Well, at the moment, both of the senators from that

4  current district, which is 22, both of those senators reside in

5  Durham County.  So in the new configuration, that might not be

6  the case.  Those senators both might wind up in the same

7  district.  So that complicates efforts to elect Democrats

8  there.  We would have to figure out if those two senators were

9  going to run against each other.  We've endorsed both of them.

10 So then we would have an awkward decision in terms of whom to

11 endorse.

12      And then, again, in that scenario, then we would have to

13 work with people -- with candidates from Person or Granville to

14 figure out who most closely aligned with our principles in

15 order to make an endorsement in that contest if that second

16 district involved any part of Durham County.

17 Q    Now, let's turn to the House side.  Do you know what

18 counties Durham is clustered with in the current House

19 districts?

20 A    Right now, there are four representatives whose districts

21 contain parts of Durham County.  Three of them reside in

22 Durham.  The other one resides in Orange.  So the cluster would

23 be Durham and Orange at this point.

24 Q    Can you see Map 6 there that's an exhibit in the record in

25 this case, the comparison of 2011 enacted to optimum House

1  county groups?

2  A    Yes, ma'am, I can see it just fine.

3  Q    And what counties is Durham clustered with in this

4  configuration for the House?

5  A    Durham is clustered with Chatham rather than Orange.

6  Q    And how does the change in clusters for House districts

7  impact your work relating to candidate recruitment and

8  endorsement?

9  A    Well, again, it would complicate things because there

10  would obviously be people from Chatham running in a district

11  that might include part of Durham.  I mean, you could go

12  various ways.  You could wind up with -- I guess, depending on

13  the population, that fourth district could be entirely within

14  Chatham; in which case, we wouldn't have any concern with it.

15  If it involved part of, say, South Durham, then we would need

16  to evaluate candidates from Chatham.

17       Now, a number of years ago, there was a Senate district

18  that involved Durham and Chatham.

19  Q    So we talked about the Durham clusters and the Durham

20  districts.  Based on your work on the State Executive

21  Committee, can you tell us how the uncertainty about the

22  districts impacts candidate recruitment in other affected areas

23  of the state?

24  A    Well, it makes it difficult for a number of reasons.  I

25  think there is a scenario down there in Hoke and Cumberland

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 21 of 117

1   with the Senate where it's complicated, and obviously with a

2   racially gerrymandered district, then you have a very

3   particular kind of configuration.  If it were no longer

4   racially gerrymandered, then you'd have different issues with

5   constituents and different issues with finding, you know,

6   credible and important candidates than in the two different

7   districts.

8   Q    So how does the incertainty about the districts impact

9   fundraising?

10  A    Well, it creates enormous uncertainty because at this

11  stage in the cycle, candidates would be coming forward.  They

12  would be thinking about running.  They would know what the

13  districts were.  They would know who their constituents were

14  going to be, and they could be knocking on doors and raising

15  money and communicating with the parties and other endorsing

16  groups.

17       Similarly, the parties and other endorsing groups would be

18  trying to evaluate who was available to run in those districts.

19  So it makes it just impossible for an individual candidate to

20  be able assess the lay of the land and plan their campaign and

21  conduct fundraising.

22  Q    So you're saying normally candidate identification and

23  fundraising for the November 2018 elections would already be

24  underway now?

25  A    Yes, it would.  Particularly, in Durham, we have two

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 22 of 117

1  members of our current House delegation who are recently

2  appointed.  So they are in a new process of trying to assess

3  their probabilities of being reelected.  So it creates

4  tremendous uncertainty for them because they could easily be

5  combined into the same district.

6  Q    Can you give any specific examples of how the uncertainty

7  about the state legislative districts has impacted fundraising?

8  A    Well, I had an opportunity to attend the fundraiser for

9  the House Democratic Caucus a couple of weeks ago, and part of

10 the discussion there was about this very uncertainty.  The

11 people I got -- donors were -- donors seemed unwilling to

12 commit additional funds until these issues were better

13 resolved.

14 Q    Now, does it really make a difference to your activities

15 whether you know the district lines in August of 2017 or not

16 until November of 2017?

17 A    From the Democratic Party perspective, yes, it does.  Less

18 so from the People's Alliance perspective, but I think clearly

19 with critical issues involving the legislature and governance

20 in the state right now, the party is very anxious to be able to

21 start making those decisions.

22         **JUDGE SCHROEDER:**  Are you talking about for the 2018

23 election cycle?

24         **THE WITNESS:**  That's correct.

25

Case 1:15-cv-00399-TDS-JEP   Document 181   Filed 08/09/17   Page 23 of 117

1  BY MS. EARLS

2  Q    That's correct.  Whether or not there are special

3  elections, just on the question of when do we know what the

4  districts will be?

5  A    Yes, that's correct.

6  Q    Now, to your knowledge, are there candidates for other

7  offices that will be on the ballot in November 2018 who are

8  already doing fundraising, getting their message out,

9  announcing they're running?

10 A    Well, again, that's the whole problem.  They would be and

11 should be, but they're unable to do so.

12 Q    Well, I mean, I'm sorry, for other -- offices other than

13 state legislature, whether congress --

14 A    Well, yes, certainly --

15 Q    -- anything that's on the ballot --

16 A    -- people --

17          **THE COURT REPORTER:**  I'm sorry.

18          **THE WITNESS:**  Oh, I'm sorry.

19 BY MS. EARLS

20 Q    Let me finish my question so she can get it down.

21      So my question is, to your knowledge, are there candidates

22 for other offices like Congress, county commission, school

23 board, any other offices that are on the ballot in 2018?  Have

24 candidates already announced and begun fundraising?

25 A    I think all that we have in 2018 would be U.S. Congress.

1   I don't think there's other -- in Durham there are not school

2   board -- well, no, I take it back because we've got things like

3   clerk of court and sheriff.  Yes, so, obviously, yes, I know

4   that people for those offices where the districts aren't an

5   issue, they're entirely within Durham County, candidates are

6   definitely planning their campaigns and doing fundraising for

7   sheriff, for example.

8   Q    And what impact does it have on your efforts if the

9   Republican Party is not in the dark about what the remedial

10  districts are while you don't know what they are?

11  A    Well, I think it's entirely obvious that assuming that the

12  Republican Party has been able to draw some preliminary

13  districts, that they are already assessing the candidates who

14  would be available, assessing the chances of the incumbents in

15  those newly drawn districts and already doing their

16  strategizing and fundraising, and the Democratic Party is

17  completely unable to conduct those activities, yes.

18          **MS. EARLS:**  I have no further questions.  Thank you.

19          **MR. STRACH:**  Thank you, Your Honor.  The Legislative

20  Defendants have no questions.

21          **MR. PETERS:**  Nor do we, Your Honor.

22          **JUDGE EAGLES:**  All right.  Thank you.  Now you can

23  step down.

24      (At 10:32 a.m., witness excused.)

25          **JUDGE EAGLES:**  You can call your next witness.

        Covington, et al. v. NC, et al.  Motions  7-27-17

1          **MS. EARLS:**  Your Honors, we'd like to turn now to

2    evidence relating to the question of whether there should be

3    special elections, and the Plaintiffs call George Gilbert.

4    **GEORGE N. GILBERT**, PLAINTIFFS' WITNESS, being first duly

5    affirmed, at 10:33 a.m., testified as follows:

6                        DIRECT EXAMINATION

7    BY MS. EARLS

8    Q     Will you please state your full name for the record.

9    A     George Nixon Gilbert.

10   Q     And where do you reside?

11   A     Currently residing at 1601 Bellevue Road in Salisbury,

12   North Carolina.

13   Q     Now, did you previously live in Greensboro?

14   A     Yes.  And I still have a home in Greensboro at 4018 Hicone

15   Road, which will be my permanent residence as soon as my wife

16   retires.

17   Q     And you are retired now; correct?

18   A     Correct.

19   Q     When did you retire?

20   A     I retired in February of 2013.

21   Q     And prior to retiring, how were you employed?

22   A     I was the director of elections for Guilford County for 25

23   years.

24   Q     When did you start in that role?

25   A     I started in February of 1988.

          Covington, et al. v. NC, et al.  Motions  7-27-17

1  Q    Thank you.  Generally, what were your responsibilities as

2  director of elections?

3  A    I was responsible for anything related to elections.

4  Basically, we conduct all elections.  We conduct all voter

5  registration within the county.  We do all of the candidate

6  filing.  We do all of the ballot setup, voting machine testing,

7  do all of the -- we actually conduct the election.  We do all

8  of the training of precinct officials, locate all of the

9  polling places.  If it had to do with elections in Guilford

10  County, it was my responsibility and that of my staff.

11  Q    And how large was your staff?

12  A    We had about -- about 15 to 17 of us.

13  Q    In addition -- during the time that you were serving as

14  director of elections, did you participate in any other

15  professional organizations relating to election administration?

16  A    Well, yes, we had a state association in which we actively

17  engaged in communications with each other and met quarterly at

18  the district level.  We also -- I also was very active in the

19  Election Center's National Association of Election Officials

20  and served as the chair of the legislative committee of that

21  national association for the last six years of my service.

22  Q    And what did the legislative committee of the national

23  association do?

24  A    We were primarily responsible for determining the needs

25  and concerns of election officials across the country related

1  to legislation that was being considered by the U.S. Congress.

2  Q    And am I correct you've testified before Congress on

3  several occasions?

4  A    Yes, three, four, or five times, yes.

5  Q    Now, Guilford County is an urban county with over 160

6  precincts; is that right?

7  A    That's correct.

8  Q    Do you have any basis from your experience for knowing the

9  practices that might be followed in other counties, whether

10  they are large counties or small counties?

11  A    Yes.  As I mentioned, we met quarterly at the district

12  level among the directors of elections, and many of the

13  counties surrounding Guilford County are smaller counties in

14  our district; and we had extensive conversations on a regular

15  basis regarding the problems and the challenges that we all

16  faced, and at the state level, we met, generally had training

17  sessions at least once and possibly twice a year.  We spent a

18  lot of time together.  We spent a lot of time discussing common

19  problems and unique problems of counties of different sizes and

20  different configurations.

21  Q    Now, turning to the question of a special election, what

22  are the key tasks that would need to be done to prepare to

23  conduct a special election in newly drawn legislative

24  districts?

25  A    The first thing, obviously, would be to change the

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 28 of 117

1  districts in the voter registration system.  That would be

2  using the geocoding system.  Simultaneously with that, we

3  would -- the first thing we would want to do is to notify all

4  of our polling places and our precinct officials and any early

5  voting sites of what the new dates were and when we were going

6  to need those facilities.

7          Next comes filing of candidates.  Next comes -- after

8  the candidates have filed and that period is closed, you lay

9  out the ballot or set up the ballot database and define the

10 ballots.  Then you do all of your testing, generate, you know,

11 samples of what the ballot is and do all of your logic and

12 accuracy testing.  Following that, you have to burn all of your

13 media and make sure that all the voting equipment is operating

14 properly, and then you have to deploy everything and execute

15 the election.

16 Q    Now, talking for a minute about the very first step you

17 described, geocoding, can you tell us a little bit more about

18 what that involves?

19 A    Well, each -- the geocode filing has all of the addresses

20 in Guilford County, and you assign the districts to each of

21 those address ranges.  Generally, it's an address range on a

22 street.  All of the streets are grouped by precinct.  So if you

23 have to change the districts for one precinct, then all the

24 streets within that precinct you can do in one command.

25 Q    One command as in one --

Covington, et al. v. NC, et al.  Motions  7-27-17

1  A    Just say, okay, change all of these from District 2 to

2  District 3.

3          **JUDGE EAGLES:**  Can I ask you what that means?  You're

4  saying if precincts are not split, the geocoding process is

5  simpler?

6          **THE WITNESS:**  That's correct.

7          **JUDGE EAGLES:**  Okay.  Go ahead.

8          **THE WITNESS:**  So you just assign whole precincts, and

9  the process runs very quickly if you've got whole precincts

10 assigned to districts.

11 **BY MS. EARLS**

12 Q    And how does the process differ from when the precincts

13 are split?

14 A    Well, then you have to assign -- generally, now, today, we

15 assign by census block, and so you would have to have the shape

16 files and be able to identify the census blocks that are

17 involved in the splits within that district, and then you would

18 assign those streets by census block, which basically involves,

19 you know, sitting down at a computer and click, click, click,

20 click, click, and then you generate a list of those streets.

21 Q    And if you're doing the geocoding for just one office or

22 two, the House districts and the Senate districts, is that

23 process going to be faster than what you typically do after a

24 census when you're also reassigning for county commission

25 districts and possibly school board districts, city council

Covington, et al. v. NC, et al.  Motions  7-27-17

1  districts, all of the districts that have changed after the

2  census?

3  A     Well, certainly, it's much simpler to just do one or two

4  districts than it is to do all of the districts we deal with.

5  Q     Now, is it possible to have the filing period for

6  candidates open before the geocoding of all voters is

7  completed?

8  A     Well, yes, it's possible.  We like to be able to check the

9  registration record of the candidates against the district

10 assignment in the computer, but it's not required.  You can

11 look at the map or you can look at the -- if we know from the

12 legislation that executed the redistricting that this precinct

13 is in District 1, then we know that that representative or that

14 candidate is in District 1.  So we can go ahead and get started

15 as soon as the bill is passed that sets the new districts.

16 Q     Now, is it also possible to do the geocoding while an

17 election is underway?

18 A     A separate election, let's say?

19 Q     Yes, a separate election.

20 A     Well, yes, because when you do the geocoding, you create a

21 clone of the geocode file, make a copy of it, and you do all

22 the changes in that copy; and then when you're finished with

23 the other election and you're ready to start the new one, you

24 can load the entire geocode file to replace the old one, and

25 you're ready to go.

     Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 31 of 117

1  Q    So, in fact, if the legislature were to pass new

2  redistricting maps by August 11, would it be possible for the

3  local boards of elections in the affected counties to begin the

4  geocoding process at that time?

5  A    Yes, it would.

6  Q    Now, I want to turn just for a minute to the -- a few

7  details about ballot preparation.  Is that faster with a

8  shorter ballot?

9  A    Oh, yes.

10 Q    And how long would it take if there are only two contests

11 on the ballot, a House and a Senate seat?

12 A    Well, I have set up two or three contests ballots

13 following a primary.  Like I say, I have a municipal primary

14 and I've got a municipal election in four weeks, and I have set

15 up those ballots within a couple of days after the primary.  So

16 it doesn't take very long with a short ballot.  You can do it

17 in a day.  You know, for one county, you can do it in a few

18 hours.

19 Q    Then turning to some of the other tasks you talked about,

20 is it possible to start the absentee balloting process while

21 the burning media and logic and accuracy testing is still going

22 on?

23 A    Well, yes.  Now, you have to generate the absentee

24 ballots, and typically those ballots are tabulated using a

25 central tabulator.  So you would burn the media for the central

1  tabulator, do all the testing for the central tabulation

2  system, and then you can start the process of mailing out the

3  absentee ballots.  All of your precinct equipment or any other

4  equipment that you're going to use in the election through

5  early voting, you can then do the media generation and testing

6  of that equipment later after the absentee voting is already

7  underway.

8  Q    And turning to the question of the absentee balloting

9  period, would a 45-day absentee balloting period create

10 problems for military and overseas citizen voters?

11 A    Much less so than it would have in the past because we

12 have electronic communications now authorized in North Carolina

13 between absentee and military voters.  So they can request

14 their ballots electronically and receive their ballots

15 electronically and, even in an emergency case, return those

16 ballots electronically.

17 Q    Now, if the remedial districts were finally approved by

18 the Court on or before September 8, 2017, would it be possible

19 to conduct primaries in the impacted areas on Tuesday,

20 December 5?

21 A    That's roughly a three-month period.  Certainly, that

22 would be no problem.  We do elections with four-week turnaround

23 periods commonly.

24 Q    And then if there were a primary on Tuesday, December 5,

25 would it be possible to have a general election for those seats

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 33 of 117

1  13 weeks later on March 6, 2018?

2  A    That would be ample time.

3  Q    And in your experience, is 13 weeks between the time that

4  new districts are established and a primary is conducted -- is

5  that necessary, to have the 13 weeks before the primary?

6  A    Well, we certainly had to do it in a shorter period of

7  time before.  I mean, as an election administrator, you always

8  want to have more time, and you always want to have certainty,

9  but you always have to do things without all of those benefits

10 sometimes.  So, yeah, we've conducted such elections in shorter

11 periods of time before, and I feel confident that they could

12 continue to do so.

13 Q    Now, do you remember there being a shorter time frame in

14 legislative elections in the past?

15 A    Yes, in the late '90s, we had a congressional runoff or a

16 congressional primary that resulted -- it was held separately

17 as a result of redistricting, and throughout the early 2000s,

18 there were -- I can't remember all the different redistricting

19 that went on throughout that first decade of this century, but

20 it was more than one or two occasions in which we had to make

21 those changes, conduct special elections, reschedule elections,

22 and things like that.

23 Q    Now, you talked about the early 2000s.  Those were state

24 legislative districts that were being changed; is that correct?

25 A    I believe at least the state legislative districts were

1  being changed and possibly congressional as well.

2  Q    And is there anything different about elections in 2017

3  that would prevent a similar schedule today?

4  A    Nothing that I am aware of, no.  We have better technology

5  than we had then.  So some of the processes can go faster, but

6  most of them, I think, are still being conducted pretty closely

7  to the same process.

8  Q    And can you tell us how burdensome this would be on the

9  county's budget to have a special -- a primary and a special

10 general election?

11 A    Well, at the local level, you always feel that it's

12 burdensome, and if it costs a half million dollars to run a

13 primary and general election special, that's considered a huge

14 burden; but in my 25 years as director of elections in Guilford

15 County where we had a well-funded Board of Elections, my budget

16 never proceeded one half of 1 percent of the county's total

17 budget.  I think we have to place that in perspective.

18            **MS. EARLS:**  Those are all my questions.

19            **JUDGE EAGLES:**  Questions for any of the State

20 Defendants?

21            **MR. STRACH:**  Yes, Your Honor.

22                         CROSS-EXAMINATION

23 **BY MR. STRACH**

24 Q    Mr. Gilbert, good morning.

25 A    Good morning.

1  Q    My name is Phil Strach.  I represent the Legislative

2  Defendants.  I have just a few questions for you.

3       Are you aware of the name of the statewide election

4  information database?

5  A    SEIMS.

6  Q    And that's S-E-I-M-S?

7  A    Yes.

8  Q    Do you recall what year SEIMS came online?

9  A    First decade of this century.  I know Guilford County was

10 one of the last counties to adopt SEIMS.  It was done over a

11 period of several years during that decade.

12 Q    Does 2006, 2007 sound right to you?

13 A    That sounds pretty close to about right.

14 Q    Until you retired in 2013, were there periodic updates

15 that were made to SEIMS?

16 A    Yes, there were.

17 Q    And it's true then that any updates to SEIMS since 2013

18 you would not be aware of; is that correct?

19 A    By and large, I am not aware of the details, no.

20 Q    All right.  If there were any updates to SEIMS that would

21 affect the ability to perform the election functions that

22 you've testified about today, you would have to defer to

23 current election officials on those matters, wouldn't you?

24 A    Yes, I would.

25 Q    In your experience for a countywide election, was it

1  generally difficult to find early voting locations?

2  A    Not exceptionally difficult, no.

3  Q    Were you always able to find enough poll workers?

4  A    Yes.

5  Q    Isn't recruiting poll workers a constant process?

6  A    It goes on constantly, yes.

7  Q    Did you ever have to run a municipal election at the same

8  time that you were running a legislative election?

9  A    No, we did not.

10 Q    Don't you agree that if you had to do that, it would be

11 twice as hard to find additional early voting locations?

12 A    Well, I don't believe we would be conducting early voting

13 at the same time for two different elections.

14 Q    Okay.  But would you agree with me that if you had to run

15 two separate elections, municipals and then potentially

16 overlapping legislative elections, that it would make the job

17 of recruiting poll workers more difficult?

18 A    Yeah, the poll workers don't mind working the regular

19 elections that they're scheduled for, but sometimes they hate

20 being called on for extra elections, but we have always found

21 the poll workers that were required to serve.

22 Q    All right.  Have you ever had to run five countywide

23 elections within a 12-month period in your experience?

24 A    Yes, I did the first year I was director of elections.

25 Q    And what year was that?

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP   Document 181   Filed 08/09/17   Page 37 of 117

1  A    1988.

2  Q    All right.  And did you ever have to do that since then?

3  A    No, I don't think we ever had five.  I think we ended up

4  with maybe three or four at several times.

5  Q    All right.  You've testified a little bit about geocoding.

6  A    Yes.

7  Q    And you mentioned something about a clone file?

8  A    Right.

9  Q    You said that's the file that you could geocode in

10 separate and apart from the actual SEIMS system; is that

11 correct?

12 A    Well, it's all part of SEIMS.  It's just that one of the

13 files is active and the other is inactive --

14 Q    All right.

15 A    -- until you make it the active geocode file.

16 Q    All right.  And would you agree with me that you couldn't

17 take the clone file and make it active until any active voting

18 was over?

19 A    That's correct.

20      **MR. STRACH:**  That's all the questions that we have,

21 Your Honor.

22      **JUDGE EAGLES:**  Redirect?

23      **MR. PETERS:**  Your Honor, I did have one.

24      **JUDGE EAGLES:**  Oh, I'm so sorry.  I apologize.

25      **MR. PETERS:**  That's all quite all right.

1                    CROSS-EXAMINATION

2  **BY MR. PETERS**

3  Q    Good morning, Mr. Gilbert.  I'm Alec Peters from the

4  Attorney General's Office.  I think we've met in the past.

5       You testified just now about your experience finding

6  workers and polling places in Guilford County; correct?

7  A    Yes.

8  Q    Are you familiar with what challenges anyone in the other

9  99 counties might face in that regard if they were to have five

10 elections in one year?

11 A    Well, I think they have a very common experience.  A lot

12 of jurisdictions have to work very hard, and they work year

13 around finding -- making sure that they've got all the adequate

14 polling places that meet all of the requirements and making

15 sure that they have qualified election officials.

16 Q    But do you know what challenges people in other counties

17 might face?

18 A    They face the same ones that we face here in Guilford

19 County.

20 Q    Well, would you agree that not all counties in North

21 Carolina are equally situated in terms of population, in terms

22 of resources, and the like?

23 A    Definitely.  And it helps to have staff that's available

24 to do those things, and some counties don't have that.  Then

25 they have a smaller number of election officials that they have

        Covington, et al. v. NC, et al.  Motions  7-27-17

1 to locate.

2 Q    And they might have also smaller budgets; is that true?

3 A    They would have smaller budgets, yes.

4        **MR. PETERS:**  I don't have anything further, Your

5 Honor.

6        **MS. EARLS:**  No redirect at this time, Your Honor, but

7 we would reserve the right to call Mr. Gilbert in rebuttal.

8        **JUDGE EAGLES:**  All right.  Thank you.  You can step

9 down.

10     (At 10:54 a.m., witness excused.)

11        **JUDGE EAGLES:**  You can proceed for the Plaintiff.

12        **MS. EARLS:**  Your Honor, we have no further witnesses

13 for the Plaintiffs.

14        **JUDGE EAGLES:**  I don't believe I saw any witness

15 disclosures from the Defendants; right?

16        **MR. PETERS:**  Your Honor, we did have one.

17        **JUDGE EAGLES:**  I'm sorry.  I overlooked that.

18        **MR. PETERS:**  That's quite all right.

19        **JUDGE EAGLES:**  Okay.  Well, maybe it will be best to

20 go ahead and call your witness now before we start any

21 arguments.

22        **MR. PETERS:**  That's fine, Your Honor.  The State and

23 State Board Defendants would call Kim Strach.

24 **KIM W. STRACH**, DEFENDANTS' WITNESS, being first duly sworn, at

25 10:54 a.m., testified as follows:

     Covington, et al. v. NC, et al.  Motions  7-27-17

DIRECT EXAMINATION

**BY MR. PETERS**

Q    Can you please state your name for the record.

A    Kim Westbrook Strach.

Q    And, Ms. Strach, what is your occupation?

A    I am the executive director of the State Board of
Elections and Ethics Enforcement.

Q    And could you describe just a little bit for the Court
your background in that role, how long you've been working with
the State Board, and the like?

A    Yes, sir.  I came to the State Board of Elections in 2000.
I came as an elections investigator.  In 2001, late 2001, I
became the deputy director of the State Board of Elections for
the Campaign Finance Division, and I served in that capacity
until 2013 when I was appointed to the executive director
position.

Q    And, briefly, could you describe what your duties as
executive director include?

A    It is oversight of elections and campaign finance
compliance.  I'm presently ethics enforcement for the state,
including the 100 county boards of elections and their
administration of elections, and ensuring that all things
within Chapter 163 are complied with.

Q    And, Ms. Strach, have you provided any declarations in
this litigation?

1  A    Yes, I have.

2          **MR. PETERS:**  I have a copy of the most recent one.

3  We have not marked it as an exhibit since it's already been

4  filed with the Court, but if I could just hand it to her so

5  we're all on the same page of what we're talking about.

6          **JUDGE EAGLES:**  That's fine.  I think we have all

7  looked at it.  My notes reflect that it's on the docket at

8  162-1 filed on July 6?

9          **MR. PETERS:**  That's correct, Your, Honor.  You beat

10 me to it.

11 **BY MR. PETERS**

12 Q    Ms. Strach, have you had a chance to look at that?

13 A    I have.

14 Q    Is this the declaration that you executed on the 13th of

15 June, and it was filed on July 6?

16 A    Yes, it is.

17 Q    And to the best of your knowledge, has anything changed

18 with regard to the matters you've discussed in that declaration

19 since you executed the declaration?

20 A    Yes.  One of the things that has changed is when this

21 declaration was done back in June, it was thought that there

22 could be a change to the current municipal schedule because of

23 some statutory conflicts that are in the municipal election

24 schedule for this year, and it was sort of assumed that maybe

25 those would be addressed, and, therefore, the declarations were

1 to take some of -- takes that assumption into account when I

2 made that declaration.

3 Q    And so we're clear, when you say the "statutory conflicts"

4 --

5 A    Yes.

6 Q    -- that the statute -- that are presented for the

7 municipal elections this year, could you describe what you mean

8 by that?

9 A    Yes, I could.  Currently for 2017 -- or it's when all

10 municipal elections take place or most municipal elections take

11 place in odd number of years, there are four different types of

12 municipal elections.  There are partisan municipal elections,

13 there are nonpartisan elections, which can either have a

14 primary or they can be plurality, and then there are also some

15 municipalities that conduct what we call elections with

16 runoffs.  Those four types of elections are held on three

17 different election days during the municipal year.  That's in

18 September for partisan.  If the partisan can go to second

19 primary, that would be held in October, along with any

20 nonpartisan primaries or those that do elections with runoff.

21 Finally, in November are any elections or election runoffs and

22 then the elections for the nonpartisan primaries.

23        So the schedule has always been very tight for municipal

24 elections with very little time between these, and not all

25 counties have all three types of elections, but a county like

1  Mecklenburg County, the City of Charlotte, potentially could be

2  in all three of those elections.

3      The schedule has in the past -- in 2015, there were 10

4  days of early voting instead of 17 days of early voting.  Then

5  there were 7 days of canvass in previous years to that rather

6  than 10 days of canvass.  Now we have 10 days of canvass, and

7  we have 17 days of early voting, and that -- what that causes

8  is that the -- by the time that the September election or

9  primaries are certified -- early voting for the October

10 election is required to have started the day before that

11 certification, and this also happens again in October, when the

12 October election by statute should be certified, 10 days after

13 by the county board.  Early voting for November would have

14 started the day prior to that.  So you would have to know the

15 candidates that were certified in order for you to start early

16 voting for the next election.

17 Q    And you referred to a bill that was being considered by

18 the General Assembly.  Is that House Bill 843?

19 A    Yes, it is.

20 Q    And if you look at the last page of your declaration,

21 Exhibit B, is that what the calendar would have looked like if

22 HB843 had been enacted by the General Assembly?

23 A    Yes, it is.

24 Q    With regard to what you testified to in your declaration

25 on a schedule, what are the implications of the fact that there

1  has been no change to the municipal calendar?

2  A    Right.  So the implication is is that the proposal in

3  House Bill 843 would have eliminated a second primary.  So

4  there would have only been two elections.  Now we are back to

5  having three elections.  So --

6          **JUDGE EAGLES:**  I'm sorry.  Are you saying House Bill

7  843 did not pass?

8          **THE WITNESS:**  Yes, Your Honor.

9          **JUDGE EAGLES:**  Okay.

10  **BY MR. PETERS**

11  Q    So because House Bill 843 did not pass, the situation is

12  now that there are three municipal election dates in the 2017

13  cycle?

14  A    Right.  All elections that were going to be held in

15  October would have been held together with those in September,

16  and there would have been a September and November.  Now it's

17  September, October, and November.

18  Q    And would it be accurate to say that part of the

19  assumption in your declaration was that if there were just two

20  dates for municipal elections, that special elections for the

21  legislature could be timed to coincide with municipal elections

22  that were already happening?

23  A    Yes, that was the assumption, that they could have a

24  primary and a general with the general.

25  Q    Okay.  Now, I believe you were present in the courtroom a

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 45 of 117

1 little bit earlier when Mr. Gilbert testified about geocoding

2 --

3 A    Yes, I was.

4 Q    -- and whether or not geocoding can happen when there's

5 actually an election going on.

6      Could you speak to that issue a little bit and your

7 understanding of whether the two can happen at the same time

8 and, if so, how?

9 A    I can.  I agree with Mr. Gilbert on one part of that, is

10 that if you are going to do -- you can do geocoding outside of

11 the system that's not applied.  You could work outside the

12 system in what is called a clone or a copy.  That is right, and

13 if a county is able to do that while they are conducting an

14 election and not apply it, then that could be a possibility.  A

15 lot of counties, because we have same-day registration, if

16 someone comes in and they are -- they reside at an address that

17 has not been put into the system, it's a new subdivision, what

18 will happen is the county will have to go ahead and work in

19 that very same clone.  You can only work in one clone or one

20 copy.  So any work that had been done in that clone, you would

21 have to go in and make those changes, and you'd have to apply

22 them.  So instead of what Mr. Gilbert was saying, you wait

23 until after voting has occurred, wait until after the election,

24 and then apply the copy and you move on.  You would have to

25 then, though, apply that copy so that you could then process

1  those same-day registrations.  So that is what would be a

2  problem if you had done any geocode work in that clone if you

3  had to apply that clone.

4  Q    I want to make sure I'm understanding this correctly.  So

5  are you saying that even if a clone was set up so that

6  geocoding could be done, that if somebody came in to do

7  same-day registration during early voting and they had an

8  address that was a new address for the system, such that it had

9  to be created in the system, that the only way to do that is to

10  go into the same clone, create the address, but you then have

11  to apply the clone before that person's vote can be counted?

12  Am I getting that right?

13  A    You have to apply the clone so that that -- the ballot

14  style can be generated for that voter, because that's the

15  purpose of applying the clone is so that that voter can have a

16  ballot style that's generated for them, and they can be

17  processed in the system.  So that's why it's necessary to apply

18  the clone.

19  Q    So you actually would have to apply the clone before the

20  person can vote?

21  A    Well, actually, you'd have to apply -- no, if they were

22  able to get the correct ballot style, if the county was able to

23  just be able to determine what that was, then they could do

24  that, but then after processing it -- same-day registration has

25  to go through the mail verification process within 48 hours.

         Covington, et al. v. NC, et al.  Motions  7-27-17

      Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 47 of 117

1  So they would have to be able to process that so that person

2  would have a ballot style and they would be in the system so

3  that they could go through the mail verification process.

4  Q    And the result of that would mean that while the geocoding

5  was going on, the clone in which the geocoding is going on

6  would be applied to the main system people are voting in?

7  A    That is correct.

8         JUDGE SCHROEDER:  When you say "clone," are you

9  saying just for that one voter who went through SDR, or are you

10  talking about the whole database?

11        THE WITNESS:  There is only -- you can only work in

12  one clone for the -- so all work that's being done has to be

13  done in this one clone.  So that's any changes you could be

14  making and any other -- the one voter or multiple voters --

15        JUDGE SCHROEDER:  Is the clone the complete voting

16  database?

17        THE WITNESS:  It's a copy of it.

18        JUDGE SCHROEDER:  All right.  Thank you.

19  BY MR. PETERS

20  Q    And is the copy for the county?

21  A    Yes, and it's only within the jurisdiction of the county.

22  Q    You take the database from the county and make a copy of

23  it to work in?

24  A    Yes.

25  Q    Have you seen the schedule that the Plaintiffs have

       Covington, et al. v. NC, et al.  Motions  7-27-17

1  proposed in this case for a special election in 2017 --

2  A    I have.

3  Q    -- or 2018, rather?  You have?

4  A    Yes, I have.

5  Q    Is there anything about that schedule that concerns you in

6  terms of being able to implement it?

7  A    Yes.  There are -- there are five counties that are --

8  that do not have municipal elections for this year.  So for

9  those five counties, they could go ahead, and when they get

10 their maps, they could do geocoding at that time.  They could

11 prepare for this primary in December, and I don't think there

12 would be any issues at all for those five counties.

13      Other counties that are conducting municipal elections,

14 there are multiple processes that have to go on, not to mention

15 the scheduling problems that we have currently because we have

16 three.  The filing period for the special election proposed in

17 this schedule would start in September.  So it would start in

18 September at the time that the September primaries are being

19 conducted.  It also goes through a time when the October

20 elections are getting ready to start and begin early voting.

21      So all of these things are happening when you have

22 basically three election events happening.  Different events

23 for those elections are happening simultaneously, and

24 understanding that that could be one county that might be

25 involved in all three of those types of elections, having to do

1 that at the same time.  So that's certainly one of the major

2 concerns that I would have with that schedule.

3          **JUDGE EAGLES:**  How many counties -- or how many

4 municipalities -- how many counties have municipalities which

5 will have three or at least the potential for three elections,

6 September, October, November?

7          **THE WITNESS:**  Most counties have elections in

8 November.  I would say more than 90 of the counties have

9 elections in November.  Those that would have the possibility

10 of three, I am not certain of the exact number, but it's

11 certainly a smaller number because there's only three --

12 actually, there's only two municipalities that have elections

13 in September.  That's Charlotte and Murphy.  The Cleveland

14 County Board of Education has decided they will have partisan

15 school board elections all in September.  So there's three.  So

16 those are the only three that have September.  I guess there's

17 the only possibility of three having all three, but there are

18 certainly a number that have October and November.

19 **BY MR. PETERS**

20 Q    And one of the ones you mentioned that's the possibility

21 of three is Charlotte?

22 A    Yes.

23          **MR. PETERS:**  I have no further questions, Your Honor.

24          **JUDGE EAGLES:**  Questions for the Legislative

25 Defendants?

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP   Document 181   Filed 08/09/17   Page 50 of 117

1              **MR. MCKNIGHT:**  Yes, Your Honor.

2    **BY MR. MCKNIGHT**

3    Q    Good morning, Ms. Strach.  Just a few questions for you.

4         You said that you're the executive director of the

5    bipartisan Board of Elections and Ethics Enforcement; right?

6    A    Correct.

7    Q    Do you currently have a board?

8    A    Currently, we do not.

9    Q    And do you know when you will have a board?

10   A    I do not know when we will have a board.

11   Q    Does not having a board affect what you do?

12   A    Certainly.  The actual board performs a lot of functions,

13   and certainly in election years, some of the key things that

14   they do is they actually certify elections.  For municipal

15   elections that are held in one county and not have crossover,

16   they don't certify those elections, but any municipalities that

17   cross counties would -- the State Board would be required to

18   certify those elections.  Additionally, for one-stop plans, if

19   a municipality wanted to have early voting in multiple places

20   other than their Board of Elections or different hours, if they

21   were not unanimous on that decision, it would require the State

22   Board.

23   Q    Would not have -- I think you have gone into some of this

24   already, but does not having a board affect the ability of

25   election officials to conduct an election?

1   A     Not having a board, no.  County boards of elections, they

2   can still conduct an election without a board.  The counties

3   have boards that have held over.  They are not new boards, but

4   the counties actually conduct the elections, and they

5   certainly -- as long as they have the appropriate quorum

6   requirements, they can meet and perform all the functions that

7   they can with any board.

8         **JUDGE WYNN:**  Let me ask a question.  You say you do

9   not have a board.  What does that mean?

10        **THE WITNESS:**  There are currently no members

11  appointed to the State Board of Elections and Ethics

12  Enforcement, and legislation repealed the State Board of

13  Elections and the Ethics Commission.  So we are merged as one

14  without an appointed board.

15        **JUDGE EAGLES:**  So who has not appointed?

16        **THE WITNESS:**  The Governor.

17        **JUDGE WYNN:**  So you have no members of the board?

18  Does the board itself exist?

19        **THE WITNESS:**  Yes, Your Honor.  The board itself

20  exists.  The merge of the bipartisan State Board of Elections

21  and Ethics Enforcement exists currently, but there are no --

22  the board -- the Governor has not appointed members to that

23  board yet.

24        **JUDGE WYNN:**  I guess I'm trying to understand.  If

25  you have a board that exists but there are no members on it,

Covington, et al. v. NC, et al.  Motions  7-27-17

1    what is the board?

2              **THE WITNESS:**  Well, the agency exists.

3              **JUDGE WYNN:**  So you are the executive director of the

4    agency?

5              **THE WITNESS:**  Of the agency.

6              **JUDGE WYNN:**  Not of the board?

7              **THE WITNESS:**  Of the board that doesn't exist

8    currently.

9              **JUDGE WYNN:**  I see.

10             **JUDGE SCHROEDER:**  What is the status?  It's in

11   litigation; is that right?

12             **MR. PETERS:**  That's correct.

13             **JUDGE SCHROEDER:**  You sent us a notice from the

14   Supreme Court.  What's the status of that litigation?

15             **MR. STRACH:**  Your Honor, may I address that?

16             **JUDGE SCHROEDER:**  Yes.

17             **MR. STRACH:**  And, obviously, Mr. Peters can also

18   address this.  The status, as I know it, is that the litigation

19   is captioned *Cooper v. Berger* and the Governor versus the

20   legislature.  The State Board of Elections and Ethics

21   Enforcement is not a party that I am aware of.

22             The lower trial court dismissed the case by the

23   Governor for lack of subject matter jurisdiction, and the Court

24   of Appeals -- the Governor sought a stay from the Court of

25   Appeals, which was denied.  The Governor sought sort of a stay

1  from the Supreme Court.  The State Supreme Court issued the

2  order that we filed, Your Honor.  In that they said that the

3  unimplemented parts of the act creating that board could not go

4  into effect, but the stuff that had gone into effect could.

5  The order also said that they weren't going to require

6  appointments to be made to that board, but they also weren't

7  going to stop anybody from making appointments to the board,

8  and they also said that no party can try to go back to the old

9  State Board of Elections or the State Ethics Commission.

10        The order essentially attempts to freeze everything

11 in place.

12        JUDGE SCHROEDER:  Is there a schedule for that in the

13 Supreme Court?

14        MR. STRACH:  There is.  There's an oral argument

15 date, Your Honor, scheduled for August 28.

16        JUDGE SCHROEDER:  Thank you.

17        JUDGE EAGLES:  Anything to add Mr. Peters?

18        MR. PETERS:  No, that's all correct, Your Honor.

19        JUDGE EAGLES:  All right.

20        MS. EARLS:  Your Honor, if I may add about the status

21 of that litigation?  The order that was filed by the Defendants

22 from the State Supreme Court also says that if any party

23 experiences any difficulty in administering elections because

24 of that stay that they are to come back to the Court.

25        JUDGE EAGLES:  Okay.  Everybody is nodding, the

1  record will reflect.

2          All right.  Go ahead with your questions.

3  **BY MR. MCKNIGHT**

4  Q    One more question, Ms. Strach.  If there's a challenge in

5  an election, how is not having a board -- how would that affect

6  the challenge process?

7  A    Currently, we were -- yesterday was the deadline for

8  candidate challenges, and we did have candidate challenges that

9  were filed in counties that only have two board members, which,

10 right now, the current law requires three board members.  So

11 those challenges by the way the law provides is that if -- the

12 remedy is to go from the county board to the State Board and

13 then to the Court of Appeals.  So those are headed to the Court

14 of Appeals.

15 Q    In counties with two elections and only two board members,

16 are they able to act with respect to local elections?

17 A    The ones with two board members?

18 Q    Yes, ma'am.

19 A    Currently, not at this time.

20          **MR. MCKNIGHT:**  No further questions for Ms. Strach.

21          **JUDGE EAGLES:**  Questions for the Plaintiffs?

22          **MS. EARLS:**  Thank you, Your Honor.

23                      CROSS-EXAMINATION

24 **BY MS. EARLS**

25 Q    Good morning, Ms. Strach.

1  A    Good morning.

2  Q    I want to start with the testimony you gave both in your

3  affidavit and on the stand about this conflict between the

4  canvass and the early voting periods.  I just want to make

5  clear, if a primary is held on December 5th for the House --

6  for the affected House and Senate districts, the canvass under

7  state law would be 10 days later on December 15th, right?

8  A    Yes, after the 5th, yes.

9  Q    And if a general election for those seats, House and

10 Senate seats, is not until March 6th, the 17-day early voting

11 period does not conflict in any way with the canvass; correct?

12 A    No, not for that, no.  It's just with the municipal

13 elections.

14 Q    And I want ask you about the cost estimates in your

15 affidavit.  This is at paragraphs 40 to 47, and this is -- your

16 June 13th affidavit attached and incorporated an early

17 affidavit that you filed --

18 A    Yes.

19 Q    -- October 28, 2016?  And at pages 40 to 47, and you can

20 take a moment, if you need to, and view those, but you

21 addressed the costs of a special election?

22 A    Yes.

23 Q    And am I right that if a special primary for House and

24 Senate seats in the affected counties and a special election

25 are not held together with the municipal elections, there's no

        Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 56 of 117

1  reason that municipalities would resist bearing the costs of

2  municipal elections, as you suggest here; correct?

3  A    That's correct.

4  Q    And your cost estimates assume a statewide election in all

5  counties; correct?

6  A    This did, yes.

7  Q    And so the costs logically would be lower if the special

8  elections are -- or if the counties where there is no special

9  election are excluded?

10 A    Correct.

11 Q    Now, on the issue of the fact that you have no board right

12 now, no appointed board, you addressed that in your declaration

13 in paragraph 5; am I correct?  And this is the June 13, 162-1

14 at page 2.

15 A    Yes.

16 Q    And you say there that the Board is -- "Unless and until

17 the Governor makes appointments, the State Board is unable to

18 adjust any portion of the election schedule set by law, such as

19 the length of the absentee voting period or the dates of a

20 primary general election.  So any departure from the statutory

21 election schedule must be made either by the General Assembly

22 or by an order of the Court"?

23 A    That's right.

24 Q    So any action that you might have needed from the State

25 Board to adjust state law to create the special election could

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 57 of 117

 1   be done by this Court?

 2   A    Yes.

 3            **MS. EARLS:**  No further questions.

 4            **JUDGE EAGLES:**  Further questions for either State

 5   Defendant?

 6            **MR. PETERS:**  No, Your Honor.

 7            **MR. MCKNIGHT:**  No, Your Honor.

 8            **JUDGE EAGLES:**  Thank you.  You may step down.

 9       (At 11:19 a.m., witness excused.)

10            **JUDGE EAGLES:**  Other evidence for the Defendants?

11            **MR. PETERS:**  No, Your Honor.

12            **MR. STRACH:**  No, Your Honor.

13            **JUDGE EAGLES:**  Any rebuttal evidence for the

14   Plaintiff?

15            **MS. EARLS:**  Yes, briefly, Your Honor.  We would like

16   to recall George Gilbert.

17            **JUDGE EAGLES:**  All right.  You are still under oath,

18   Mr. Gilbert.

19   **GEORGE N. GILBERT**, PLAINTIFFS' REBUTTAL WITNESS, at 11:19 a.m.,

20   testified as follows:

21                           DIRECT EXAMINATION

22   **BY MS. EARLS**

23   Q    Mr. Gilbert, you heard Ms. Strach testify about the

24   problem with creating a clone in order to do the geocoding at

25   the same time an election is going on.

             Covington, et al. v. NC, et al.  Motions  7-27-17

```
 1      First, let's just be clear.  The process of geocoding --
 2  even if you have some split precincts, if you're geocoding
 3  House and Senate districts, how long might you expect that to
 4  take in a county like Guilford County?
 5  A    I suspect that they could get it done within a week
 6  easily.
 7  Q    Now, you heard her testify that because we have same-day
 8  registration, if you're trying to do geocoding in a clone and
 9  there's a new subdivision and the voter can't be found, you'd
10  have to use that same clone.  In your view, as someone who's
11  actually administered the elections, is that a problem?
12  A    Well, no, we don't actually create a new clone and
13  re-geocode a new address every time a same-day registrant comes
14  in whose address is not already in the file.  So it really --
15  on election day -- or during early voting, we wouldn't be
16  modifying a clone.
17  Q    So how do you handle someone --
18  A    Well, you just handle it manually because it could happen
19  any time within that 17-day period, and you don't go out and
20  create a new clone and update that one address every time a
21  voter comes in.
22  Q    And how often does that happen?
23  A    Oh, you may have a handful of voters.  I mean, the vast
24  majority of same-day registrants are registering at addresses
25  that are in the geocode file.  So it's only those addresses
```

1  that were not in the geocode file that would be affected, and

2  those are, quite frankly, very rare.  In a Presidential

3  Election, we might have half a dozen or a dozen, and in most

4  elections, we might have, at most, one or two.

5          **MS. EARLS:**  Thank you.  No further questions.

6          **MR. STRACH:**  Briefly, Your Honor?

7          **JUDGE EAGLES:**  Yes.

8                      CROSS-EXAMINATION

9  **BY MR. STRACH**

10 Q   Mr. Gilbert, just to be clear, the testimony you just gave

11 is based on information from when you were retired in 2013; is

12 that correct?

13 A   That's correct.

14 Q   So you've not been there for four years?

15 A   That's correct.

16 Q   So if any of these processes change or become more

17 complex, you wouldn't know about that; is that correct?

18 A   That's correct.

19          **MR. STRACH:**  Thank you, Your Honor.  That's all I

20 have.

21          **MR. PETERS:**  Nothing.

22          **JUDGE EAGLES:**  Thank you.  You may step down.

23      (At 11:22 a.m., witness was excused.)

24          **JUDGE EAGLES:**  Any other evidence from live

25 witnesses?

          Covington, et al. v. NC, et al.  Motions  7-27-17

1           **MS. EARLS:**  Not from the Plaintiffs, Your Honor.

2           **MR. PETERS:**  No, Your Honor.

3           **MR. STRACH:**  No, Your Honor.

4           **JUDGE EAGLES:**  Okay.  Before we start hearing from

5     you all, then maybe we'll stake a short break.  Let's -- we

6     will try to take a 10-minute recess.

7           (The court recessed at 11:22 a.m.)

8           (The court was called back to order at 11:37 a.m.)

9           **JUDGE EAGLES:**  We're ready to hear from the parties

10    on the matters at issue.  It looks like Mr. Speas is ready.

11          **MR. SPEAS:**  I am, Your Honor.

12          May it please the Court, Edwin Speas with Poyner

13    Spruill, and we have two requests to the Court.  One is that

14    you order the General Assembly to enact new plans within the

15    next two weeks and present those plans to you promptly for

16    approval.  Our second request is for special elections.

17          I would like to address our motion to require the

18    General Assembly to enact new plans within two weeks and

19    present them for your approval.  Ms. Earls will then address

20    the question of special elections.

21          Your Honors, I think this case, as well as any other,

22    illustrates the extraordinary harm that occurs and that may

23    occur when valid redistricting maps are not in place in a

24    state.  I think it is absolutely correct that valid

25    redistricting plans are essential to the functioning of a

1   democracy, and harm is resulting in North Carolina today from

2   the absence of valid districts.

3           It takes at least three different forms.  First, it

4   calls -- the absence of districts calls into question the very

5   capacity of the General Assembly to govern, and it calls into

6   question the integrity of the laws that a general assembly,

7   under that cloud, might enactment.

8           Attached to our brief is an affidavit from the

9   Southern Environmental Law Center pointing out that under North

10  Carolina law, there are valid and significant, as yet

11  unanswered, questions whether the current members of the

12  General Assembly are no longer de facto but, in fact, are

13  usurpers so that the General Assembly cannot act to protect the

14  safety of and welfare of our citizens.  So I can think of no

15  greater harm that could ever fall any democracy than its

16  legislature be disabled from protecting the people.

17          There is a second form of harm, and that was

18  addressed by our witnesses.  The lack of districts denies

19  interested candidates and political parties the opportunity to

20  perform the functions for which they are -- for which they

21  exist:  To identify candidates, to support those candidates,

22  and to get those candidates elected.

23          Until there are district lines, no one can know for

24  certain what district he might be in.  In the North Carolina

25  House and Senate, you have to reside in the district in which

Covington, et al. v. NC, et al.  Motions  7-27-17

1  you run.  So in order for the political process to function,

2  districts need to be in place to protect voters and candidates

3  in our democracy.  I would suggest to you, Your Honors, that

4  one reason we don't have districts today is that it's to the

5  advantage of legislative defendants not to have those plans in

6  place.  It disadvantages the Democratic Party and Democratic

7  voters.

8          There's a third form of harm.  When a legislature is

9  illegally constituted, and I believe that the North Carolina

10  General Assembly, with 28 invalid districts, may be the most

11  illegally constituted legislative body in the history of the

12  United States, what happens?  We suggest that the history of

13  the actions of that legislative body reveal, one, a lack of

14  respect for the constitutional rights of citizens and a lack of

15  respect for the limitations on the power of the General

16  Assembly itself.  Those problems are explained far more

17  articulately and in detail than I can by the very fine brief

18  the NAACP has filed in this case.

19          The second point I would like to make is this:  The

20  General Assembly has had an opportunity to fix this problem.

21  It was 50 weeks ago that this Court said these districts are

22  unconstitutional.  Since that time, the General Assembly has

23  met in special session in December twice.  It met from

24  January 11 until June 26.  The Governor asked them to convene

25  in special session to fix this problem, and they thumbed their

Covington, et al. v. NC, et al.  Motions  7-27-17

1  nose at it.

2        So there is -- they have had an opportunity.  Should

3  they have done so before?  They will tell you they were waiting

4  on instructions from the Court.  I don't believe that a

5  legislative body composed of members sworn to uphold the

6  Constitution of the United States and North Carolina can sit on

7  its rear end and not correct violations of the constitutional

8  rights of citizens.  It's a dereliction of their duty.

9        They will say an appeal was pending.  True, but on

10 two other occasions, in the history of the state, when a plan

11 was declared unconstitutional and an appeal was pending, the

12 General Assembly enacted contingent plans.  It did so just this

13 past February.  That was a contingent plan.  It was contingent

14 on an appeal that had not yet been decided.  The same thing

15 happened in 1998.  The Federal Court declared the remedial plan

16 enacted by the General Assembly unconstitutional.  The State

17 sought a stay.  It was denied.  The General Assembly put in

18 place a contingent plan, contingent on the results of that

19 appeal.

20        So they've had the opportunity.  There was no reason

21 for them not to act, and that failure to act has caused great

22 harm to the state and its citizens.  Is two weeks enough?  The

23 General Assembly says it's enough.  There's been a statute on

24 the books since 2003 that says if a plan is declared

25 unconstitutional, the legislature needs two weeks to redraw.

Covington, et al. v. NC, et al.  Motions  7-27-17

1 Now, they'll say that just applies to state judges.  Well, it's

2 a legislative declaration --

3          **JUDGE SCHROEDER:**  You say what?  I'm sorry.

4          **MR. SPEAS:**  To state court cases, not federal cases.

5 Well, Your Honors, it is a legislative declaration in place

6 since 2003 and never altered.  If the General Assembly says it

7 needs so much time now, why didn't it amend that statute?  It

8 did not.

9          **JUDGE EAGLES:**  Well, they've had seven weeks since

10 the Supreme Court decision already; right?

11          **MR. SPEAS:**  They have, and experience tells us two

12 weeks is enough.  There's a stipulation in the record.  I don't

13 have it in front of me, but it says this:  Between February 5,

14 2016, and February 19, 2016, the General Assembly hired Tom

15 Hofeller to draw the districts, held public hearings, adopted

16 criteria, and enacted new plans.

17          And that's not the first time the General Assembly

18 has acted that promptly.  In 2002, a case with which Mr. Farr

19 is very familiar, the General Assembly struck down -- excuse

20 me -- the State Supreme Court struck down in their entirety the

21 State House and the State Senate plans because they violated

22 the Whole County Provision of the state constitution.

23          That violation was widespread.  It occurred across

24 the state.  The court -- state courts gave the General Assembly

25 two weeks to redraw it.  They did it.  So, Your Honors, two

          Covington, et al. v. NC, et al.  Motions  7-27-17

1  weeks is enough to end this harm that has resulted and is

2  resulting to the citizens of North Carolina and the Plaintiffs

3  and that can and should have been cured long ago.

4          So we would ask the Court to order the General

5  Assembly no later than two weeks from today to have in place

6  new plans and, as we've previously requested, a week thereafter

7  to present to the Court and the Plaintiffs information from

8  which the Plaintiffs and this Court can determine whether those

9  plans cure the violations of the constitutional rights of our

10  Plaintiffs.  Thank you.

11          **JUDGE WYNN:**  Mr. Speas, address whether you contend

12  we should consider appointing a special master in any event,

13  regardless of the date, in determining as to whether there

14  should be an alternate plan.  I'm thinking in terms of you have

15  objections and other procedural items that have to be taken

16  care of, and the assumption is whatever the General Assembly

17  comes up with will meet the constitutional guidelines, but if

18  it does not, it puts us in a position of then considering a

19  special master, which lengthens the time.

20          So address whether that has any input on this case

21  from your perspective.

22          **MR. SPEAS:**  If the General Assembly were to enact a

23  remedial plan and that plan not remedy the defects in the plan,

24  then I believe, and we would contend, that the obligation falls

25  to this Court to take care that a new plan be put in place; and

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 66 of 117

1 at that point, you could do it yourself, you could seek

2 competing plans from the parties, or you could hire a special

3 master.  That happened in Virginia, I think, just about two

4 years ago.

5          And I would point out that the statute that the

6 General Assembly enacted in 2003, GS 120-2.4, says that --

7 makes that very point, that the General Assembly will get the

8 first opportunity, but if it fails, then the Court can and

9 should redraw and cure these violations of the rights of North

10 Carolinians.  The legislature has had more than adequate time

11 to cure these problems.

12          **JUDGE WYNN:**  My question goes more to whether we

13 should consider appointing a special master even at this

14 juncture to prepare alternate maps to avoid delay that

15 attenuate in terms of having first to select a master, then go

16 through the objections, if, in fact, we find those maps not --

17          **MR. SPEAS:**  That would make a lot of sense, Your

18 Honor.

19          **JUDGE WYNN:**  I don't want to know if it makes sense.

20 I want to know what your position is on it.

21          **MR. SPEAS:**  Our position would be that that would be

22 a good thing for this Court to do because it would help assure

23 that this problem is resolved, that it is resolved promptly,

24 and that it's behind North Carolinians.  We would urge you to

25 do that, put in place a parallel process.

Covington, et al. v. NC, et al.  Motions  7-27-17

1          **JUDGE SCHROEDER:**  Do you intend to offer your own

2     maps during the legislative process that's going to begin at

3     some point in time?

4          **MR. SPEAS:**  Your Honor, I would expect we would offer

5     maps, yes, and we will be prepared to present maps to the

6     Court -- an alternative map to the Court, if the Court wants.

7          **JUDGE SCHROEDER:**  My recollection from the evidence

8     was there were several groups that offered maps last time

9     around.

10         **JUDGE EAGLES:**  To the legislature.

11         **JUDGE SCHROEDER:**  To the legislature.

12         **MR. SPEAS:**  There were competing maps.

13         **JUDGE SCHROEDER:**  So I guess my question is -- there

14    are complaints at times that legislatures act too quickly and

15    move things through, and we know that various groups put maps

16    in last time.  Is the two-week schedule one that contemplates

17    all interested parties being able to participate and have their

18    input on the mapmaking?

19         **MR. SPEAS:**  Well, the two-week period would be the

20    period in which the legislature would have -- use its processes

21    to draw new maps.  Competing maps may be introduced during that

22    period.

23         You are correct that during the 2011 process,

24    competing -- two sets of competing maps were introduced in the

25    House, in the Senate, and for the Congressional plan.  So I

            Covington, et al. v. NC, et al.  Motions  7-27-17

1  would expect that would happen, but beyond that, I think it

2  would also be appropriate for the Court to require the

3  Plaintiffs to present a competing plan, a plan you could

4  consider and put in place if you find the Defendants' plan

5  deficient.

6          **JUDGE SCHROEDER:**  I guess what I'm not clear on is,

7  under your proposal, you're asking for an order that the State

8  within two weeks come up with maps.  What happens after that?

9  I'm presuming that there's some possibility that you're not

10 going to agree with all of the maps.

11         **MR. SPEAS:**  That's correct.  The process that we have

12 asked the Court to put in place is that the legislature have

13 two weeks to draw them, that within a week of enactment, they

14 present to the Court and to the Plaintiffs -- I don't have it

15 right in front of me, but a set of information and answers to

16 questions from which this Court can evaluate whether or not

17 those plans cure the defects.  The Plaintiffs then have some

18 time, I think we had suggested a week, to inform the Court

19 whether we contend those plans are defective.

20         **JUDGE WYNN:**  Let me ask that question more direct.

21 Will you be able to present maps within two weeks?

22         **MR. SPEAS:**  Yes.  Other questions?

23         **JUDGE EAGLES:**  Thank you.

24         **MS. EARLS:**  May it please the Court, first let me, on

25 behalf of my clients, thank you for the opportunity to have

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 69 of 117

1 this evidentiary hearing and to present our arguments.

2        I have to start with where the Supreme Court led us

3 in its remand and its citation to *Swann versus*

4 *Charlotte-Mecklenburg* because that case starts –– the paragraph

5 that the Court cites, that very paragraph starts with the

6 observation that "Once a right and a violation have been shown,

7 the scope of a district court's equitable powers to remedy past

8 wrongs is broad, for breadth and flexibility are inherent and

9 equitable remedies."  So that's our starting point.

10        I want to say just a couple of words about the timing

11 and the ability to draw remedial maps quickly.  I need to

12 explain the significance of these two exhibits.  The green

13 areas on these maps are the areas that are not impacted at all.

14 There were no unconstitutional districts in those areas.  Those

15 clusters do not need to be redrawn.  There is no need to redraw

16 any districts in the green areas on this map.

17        The yellow areas are the areas where the cluster does

18 not change, but there is an unconstitutional district within

19 the county or cluster so the districts within that yellow area

20 need to be redrawn.

21        The white areas are the areas of the map where the

22 clusters need to change if the Whole County Provision, as it

23 was established in the *Dickson* case, you know, maximizing the

24 number of single-county clusters, then the number of two-county

25 clusters, that is actually a mathematical formula –– that if

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 70 of 117

1  you do not have any Voting Rights Act districts that overlay
2  that and knock that Whole County Provision out, under the state
3  constitution, Dr. Hofeller's affidavit says these are the
4  clusters that they have to work with.  The white areas are
5  where the cluster change and some of those clusters are
6  single-county clusters.
7          So we already know -- there's no drawing to be done.
8  Wilson County is a perfect example.  In both of these maps,
9  Wilson County is either a single-county cluster, or it's in
10 a -- I'm blanking on what county it's with on the Senate side,
11 but on the House side, Wilson County is a single-county
12 cluster.  It's a single legislative district.  There's no
13 redrawing to be done, even though it is in the white area there
14 because --
15          **JUDGE WYNN:**  Let me ask a question because from the
16 trial, as I recall it, correct me if I'm wrong, because the
17 Voting Rights Act was the basis for what the General Assembly
18 contended it initially drew these districts for, there were
19 provisions like the Whole County Provisions under the state law
20 for which they were able to, maybe not strictly, comply with.
21 That seems to be absent now, I would think.  I'm not sure, but
22 is there not a greater degree of compliance that now has to be
23 exercised with regard to the state law on this, on Whole County
24 Provisions, and would it not possibly affect much more than
25 what you have here?

Covington, et al. v. NC, et al.  Motions  7-27-17

1          **MS. EARLS:**  The first answer is yes.  It does mean --

2     if you do have a Voting Rights Act potential violation so that

3     there's no concern under the federal Voting Rights Act, then,

4     yes, the state Whole County Provision then governs absolutely

5     and controls, but the second part of your answer -- question is

6     already answered here because what Dr. Hofeller testifies in

7     his affidavit, filed back in October, is that following the

8     state Whole County Provision, these are the clusters that are

9     basically mathematically required using the 2010 Census data.

10         **JUDGE WYNN:**  I have one other question just because

11    it's just bugging me because it's out there.  We cannot live in

12    the dark that there's not another litigation going on in the

13    state Supreme Court, the *Dickson* case.  Of course, that deals

14    with the federal side of things there.  How would that affect

15    what's going on here?

16         **MS. EARLS:**  So the state --

17         **JUDGE WYNN:**  I don't mean it -- you to speculate, but

18    what are the issues before them that could parallel with things

19    we are doing here?  And I'm taking it that this is -- I'm

20    assuming it would be primarily a federal question in the State

21    Supreme Court, but the State Supreme Court can do what it wants

22    to do.  It may want to go under the state constitution or not,

23    and I don't want to get there, but how, at least in terms of

24    the federal issue before it and what's before it now, the

25    hearing that's coming up I think within the next month or two,

Covington, et al. v. NC, et al.  Motions  7-27-17

1 | will affect here.

2 | **MS. EARLS:** So the State Supreme Court has set that

3 | case on the calendar to be argued August 28. There is a

4 | briefing schedule, and we will be filing our brief next Monday.

5 | Our view is that the state constitution requires the state

6 | court to abide by the federal constitution, and the U.S.

7 | Supreme Court has said that these districts violate the federal

8 | constitution.

9 | So other than questions of -- I mean, we think that

10 | the state court --

11 | **JUDGE WYNN:** I thought you had to abide by the

12 | federal constitution regardless.

13 | **MS. EARLS:** Well, I'm just saying we're doubling down

14 | on that, Your Honor, but because we think that the state

15 | court -- that the proper course for the State Supreme Court is

16 | to remand to the trial court to issue an order finding these

17 | districts unconstitutional, that the state court has an

18 | obligation to issue a ruling, that the case is not exactly

19 | moot, but they have an obligation to issue a ruling.

20 | So could that then trigger an obligation to have a

21 | remedial process under the state court supervision?

22 | Theoretically, but I think -- and there's two separate sets of

23 | Plaintiffs, but I think once new maps are drawn, then there's

24 | no longer a need for remedy, which in some ways is another

25 | argument for why we need new maps drawn quickly. The

Covington, et al. v. NC, et al. Motions 7-27-17

1    Plaintiffs -- the final order in this case finding these

2    districts unconstitutional cannot be appealed any further.  We

3    need new districts drawn.  That will resolve any lingering

4    potential remedy responsibilities of state courts.  So that's

5    how I would answer that.

6          So what we're saying about these two exhibits is that

7    this is the basic architecture of what the districts need to

8    look like.  There are some two-county clusters that are

9    themselves a single district.  There's no redrawing to do

10   there.  The only thing left is to subdivide the single counties

11   that have multiple districts, Mecklenburg County, Wake County,

12   to subdivide those, and to divide the multiple-county

13   districts -- multiple-county clusters that have multiple

14   districts.

15         **JUDGE SCHROEDER:**  So are you saying that the green

16   districts are not going to be part of any new mapmaking, that

17   they're done?

18         **MS. EARLS:**  That's correct, Your Honor.

19         **JUDGE SCHROEDER:**  So would that mean necessarily that

20   anybody who wants to run for elections in those districts now

21   knows their district, and so they're not in this uncertainty

22   area that we've heard testimony about?

23         **MS. EARLS:**  That's right, Your Honor.  And there

24   wouldn't need to be any special election in those areas.

25   They're just not impacted by the ruling.

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 74 of 117

```
 1              JUDGE EAGLES:  Do the Defendants agree with you about
 2     that?
 3              MS. EARLS:  Well, Your Honor --
 4              JUDGE EAGLES:  Or can you tell?
 5              MS. EARLS:  This is what I can tell you.  There was a
 6     public hearing -- or, I'm sorry, there was a committee hearing
 7     yesterday of the Joint Redistricting Committee; and while this
 8     is not evidence before you, it's my understanding, and
 9     Defendants can correct me, but Representative Lewis said at
10     that hearing, when asked by another legislator do they redrew
11     all the map or just some, and he said we are waiting for
12     direction from the Court.
13              What I would say to you about why the green areas
14     don't need to be redrawn is because the state constitution also
15     says that we only redraw our districts every ten years.  Unlike
16     other states that allow mid-decade redistricting, North
17     Carolina does not under the state constitution.  So to redraw
18     districts in those green areas would be to allow the General
19     Assembly to do a mid-decade re-redistricting, which is not
20     permitted under the state constitution.
21              So when you understand that all they need to do is
22     subdivide the clusters that have multiple districts, the
23     discretion is constrained, the alternatives are not, you know,
24     as great, and it is not a time-consuming or difficult task, and
25     I will tell you --
```

Covington, et al. v. NC, et al.  Motions  7-27-17

1          **JUDGE SCHROEDER:**  You're still subject to the Voting

2    Rights Act?

3          **MS. EARLS:**  Yes.

4          **JUDGE SCHROEDER:**  And my recollection from the trial

5    was that Plaintiffs agreed that some of these districts

6    probably are still going to have to be VRA districts.

7          **MS. EARLS:**  What we agreed was that there are areas

8    of the state where you would be violating the Voting Rights Act

9    if you dismantled what is -- because of the way you have

10   majority-black counties in the northeastern part of the state,

11   if you were to dismantle those and not have majority-black

12   districts, that could be a violation of the Voting Rights Act,

13   but we have not -- and, similarly, in Mecklenburg County,

14   particularly for House districts, the black population is large

15   enough and geographically compact enough that there's likely to

16   be a majority-black district in that area of the state.  So our

17   point is there will still be majority-black districts, but

18   based on the evidence in the record in this case, we are not

19   saying that there's any place where the Whole County Provision

20   should give way to a Voting Rights Act district.

21          The other thing to know about the timing and does the

22   public have enough opportunity to have input, at that committee

23   hearing yesterday, Common Cause, a good government group,

24   submitted maps that they wanted the General Assembly to

25   consider.  So the public, to the extent there are folks out

1 there interested in participating, have drawn maps, and they

2 would have an opportunity if the General Assembly would make

3 their maps -- make their proposals public and have a public

4 hearing, they could do this in the time period we're suggesting

5 and allow for public input.

6          So let me then turn to the entirely separate question

7 of whether the equities in this case justify a special

8 election, and I want to be clear there first that the timetable

9 we've submitted is illustrative.  We think that you could --

10 there's a potential to put the dates out a little longer; that

11 is to say, to have the general election in April instead of

12 March, but we think that you could instruct the Board of

13 Elections Defendant to have a primary on December 5, a general

14 election on March 6, and allow them to determine what the

15 interim deadlines should be based on their election

16 administration considerations and for them to let you know

17 what, if any, state laws need to be modified or, you know, an

18 exception made for this case in order to implement the remedy

19 that they come up with.

20          So our scheduling was just illustrative to show you

21 that, yes, it really is possible.  Now, the State said that

22 they needed at least 13 weeks before the primary and 13 weeks

23 before the general election.  Our schedule does achieve that 13

24 weeks between the primary and the general election, and we

25 think the evidence here and the testimony here shows that, in

Covington, et al. v. NC, et al.  Motions  7-27-17

1  fact, you can get that geocoding done.  You can get the filing

2  period in.  You can get the ballots prepared.  You don't need a

3  full 13 weeks before the primary.

4          So we submitted that illustrative schedule to

5  demonstrate that it's feasible and possible, but I think the

6  election administrators are in the best position to decide what

7  should be the deadline for doing the logic and accuracy testing

8  should there be a 45-day absentee balloting period or a 50-day

9  absentee balloting period.  There's some wiggle room in the

10 schedule.

11         **JUDGE SCHROEDER:**  You're talking about a special

12 election, and then there is the 2018 election as well; correct?

13         **MS. EARLS:**  Correct.

14         **JUDGE SCHROEDER:**  So they would be overlapping at

15 some point?

16         **MS. EARLS:**  Well, in the sense that the filing period

17 for the 2018 elections would be in February.  That would be

18 after the December primary but before the March general

19 election.  So there would be some overlap there, which has

20 happened in the past when we've had special elections to fill a

21 vacant seat.  Candidates have had to file twice because they

22 want to file for the special election and then also file for

23 the general election.

24         **JUDGE WYNN:**  Well, you know, feasibility,

25 possibility, a lot of factors that are primary with the Supreme

Covington, et al. v. NC, et al.  Motions  7-27-17

1    Court, and I'm thinking in terms of the disruptiveness.

2              MS. EARLS:  So let me address that.  Part of our

3    argument concerning this notion that under state law, once the

4    finality of the determination that the districts are

5    unconstitutional has been made, the office holders are, in

6    fact, usurpers and don't have the power to act, we don't think

7    that you have to decide that issue of state law; but I think

8    that it does demonstrate that there's a real public interest at

9    stake, and it's a very strong argument, and, in fact, there is

10   a case from Connecticut where the federal court actually

11   ordered that the -- and we cite this in our brief.  The federal

12   court ordered that the legislature not take any more action

13   until they get themselves constitutionally constituted.  It was

14   the "one person, one vote" claim.  It was before the racial

15   gerrymandering theory.

16             JUDGE WYNN:  When you say constitution, you mean

17   under the state constitution?

18             MS. EARLS:  No, this was a federal "one person, one

19   vote."  The Connecticut legislature was very malapportioned,

20   and the Court said you can't -- we've decided finally that this

21   is -- you're not being elected from constitutional districts,

22   and we're going to order that you take no more action until you

23   are reconstituted.  Now, they did stay that order on the

24   condition that the legislature follow the timetable that the

25   Court was imposing for them to do that, but it shows the

1  viability of this theory and the possibility that if this

2  legislature takes actions during the period of time that they

3  are elected from unconstitutional districts, it throws open to

4  challenge those actions under state law, under our state

5  constitution and state precedent.

6        And I would also say that the disruption -- so, in

7  other words, the disruption is in not drawing new districts and

8  in not having special elections.  That's what's going to create

9  more disruption than if you go ahead and do it.

10        Also very significantly -- and that was a factor that

11  wasn't present in 2016 because arguably the appeal was still

12  pending, but now the appeal is not pending.  We're in a very

13  different --

14        **JUDGE WYNN:**  You said it throws it under state law

15  the actions of this illegally constituted General Assembly,

16  and, of course, you know, North Carolina is one of the states

17  where you can't certify questions to the Supreme Court of North

18  Carolina, even though the other four states in the district

19  allows that.  I'm wondering in the *Dickson* case is that a

20  potential issue that would be resolved because that seems to be

21  the court that really needs to decide that kind of question?

22        **MS. EARLS:**  I agree that that's the court that should

23  decide that question, but I think what you can take into

24  account -- in balancing the equities and what kind of

25  disruption might occur if you call for a special election, you

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 80 of 117

1    can take into account that the possibility that that type of

2    claim could be raised -- it shows the disruption of not having

3    special elections, and that's why we filed the affidavit of

4    Derb Carter and why the NAACP brief is significant because this

5    is not just speculation.  There are actually parties who are

6    looking at this potential claim if the legislature acts, and I

7    think that's a factor in your equitable consideration that you

8    can into account.  You don't have to decide the state law, but

9    it is certainly weighty enough that you can take that into

10   account.

11          The other very important thing I need to say about

12   disruption is to remind you about Representative Martin's

13   testimony.  Unlike 2016, when the legislature was in session,

14   and it was a long session, they had to determine a budget for

15   the state, we are now in a period of time when we're asking for

16   special elections when the legislature is not in session; and

17   so the notion that, by requiring them to campaign, you're

18   taking them away from their legislative duties carries less

19   force now with the schedule that we're requesting than it did

20   the last time we requested a special election.

21          So I think -- and, finally, I'll will say that the

22   submission by the State of North Carolina acknowledges that

23   there will be some disruption but says that if the Court, in

24   its -- in the exercise of its equitable balancing, determines

25   that rights of the Plaintiffs in this case and the public

Covington, et al. v. NC, et al.  Motions  7-27-17

1   interest demand a special election, then the State can weather

2   the disruption and conduct a special election.  I think that

3   those are all important factors on the question of disruption.

4          Let me also turn to the severity and nature of the

5   particular constitutional violation because here this is a very

6   extensive violation, impacting more of the state that's ever

7   been impacted before in redistricting litigation.  The State of

8   North Carolina's filing says that they do not dispute the

9   severity of harms that flow from unconstitutional racial

10  gerrymandering.

11         It's important to take you back to the testimony of

12  our individual Plaintiffs at the trial, and we summarized this

13  at pages 3 to 5 of the brief that we filed, and we tried to

14  summarize the multiple briefs and submissions that we've made

15  on the issue of special elections, but this is Document 156.

16  At pages 3 to 5, we recount the testimony of the Plaintiffs who

17  talked about the harm that they experienced from being assigned

18  to districts on the basis of their race, and that harm

19  continues, and this Court's actions in saying that that harm

20  needs to stop now and we need to elect people from districts

21  that aren't drawn in that way is an important factor in

22  weighing the equities.

23         And then, finally, I'd like to say that on -- the

24  third thing you're supposed to look at is the need for judicial

25  restraint, and here I think that this Court has excessively

        Covington, et al. v. NC, et al.  Motions  7-27-17

1  shown judicial restraint.  We asked for a preliminary

2  injunction before the trial, and the Court, in its wisdom,

3  determined that that was not called for at that time.

4        After the Court -- the Court's decision -- the

5  Supreme Court's decision, the 9-0 summary affirmance of this

6  Court's opinion, the legislature has done everything possible

7  to delay the absolute -- until the absolute possible last

8  minute complying with this Court's orders and the legislature's

9  obligation to uphold the constitution.

10        They filed pleadings in the Supreme Court to delay

11  you getting jurisdiction, and the only right that they were

12  protecting there was their right to file a motion for

13  reconsideration.  That motion was not filed.  I submit to you

14  there was never any intent to file that motion.  Most of their

15  briefing is about why there's no need for a special election,

16  but that's really not -- Plaintiffs shouldn't have to wait for

17  30 days for procedural wrangling in a way that really wasn't in

18  good faith because they genuinely were going to ask a 9-0

19  summary affirmance to be reconsidered.

20        So while there is a lot of talk in their briefing

21  about they come with clean hands, I submit to you that on the

22  question of remedy that has not been the case.  The State's --

23        **JUDGE EAGLES:**  You just have a few minutes left.  So

24  if you want any rebuttal time --

25        **MS. EARLS:**  Thank you.  Let me just say that the

Covington, et al. v. NC, et al.  Motions  7-27-17

1    stakes really are high in terms of whether or not there's a
2    special election.  The harm that our clients suffer is real,
3    and we ask you to order a special election in 2018.  Thank you.
4              **JUDGE EAGLES:**  All right.  Thank you.
5              **MR. PETERS:**  Thank you, Your Honor.  May it please
6    the Court, as the State and the State Board of Elections, and I
7    think it's important, said in the position statement we filed
8    with the Court, and I just want to reiterate it today, we are
9    not taking a position on the two motions that the Plaintiffs
10   have filed.  We understand the harms on both sides, potential
11   harms and the actual harms, the interest, and the other
12   considerations that the Court is faced with trying to balance
13   here.  So our goal and what we have seen as our role here is to
14   try to present the Court with the best information that we can
15   so that the Court can make the most informed decision on how to
16   balance those harms.
17             So I simply wanted to rise and say that's the extent
18   of the argument we have today.  That's the reason that we
19   provided the testimony of Ms. Strach so that the Court could
20   make as informed a decision as possible.
21             **JUDGE EAGLES:**  So are you taking any position on the
22   nature of the decisions that the legislature needs to make to
23   redistrict?  I mean, do you agree with what the Plaintiff says
24   about the legislature doesn't need to do any redistricting in
25   the green counties?

Covington, et al. v. NC, et al.  Motions  7-27-17

1          **MR. PETERS:**  I think that's one that we do not have a

2     position on and would leave that to the legislature to take a

3     position on.

4          **JUDGE EAGLES:**  All right.

5          **MR. PETERS:**  Thank you.

6          **JUDGE EAGLES:**  Thank you.

7          **MR. STRACH:**  May it please the Court, Your Honors, we

8     briefed this, I believe, fairly extensively.  We focused on the

9     criteria that the U.S. Supreme Court asked us and the Court to

10    focus on.  I'll -- other than questions from the Court, I'll

11    try to address issues that have been raised since then, if

12    that's okay.

13          One of the issues I do want -- one of the ways I want

14    to frame this for the Court is that I don't think it's

15    necessarily two separate questions:  What should be the

16    redistricting schedule versus whether there should be a special

17    election.

18          If the Court does not order a special election, then

19    there is no need to order an unduly truncated redistricting

20    timeline.  We think that the only reason that the Court should

21    order any redistricting at an unduly truncated pace would be if

22    it does order special elections so that there is some election

23    coming up.  Otherwise --

24          **JUDGE EAGLES:**  That actually -- that's an interesting

25    theory.

Covington, et al. v. NC, et al.  Motions  7-27-17

1          **MR. STRACH:**  Otherwise, Your Honor, we believe --

2          **JUDGE EAGLES:**  You might not like the result of that

3    theory.  I mean, if you tag them together, that's -- go ahead.

4          **MR. STRACH:**  Your Honor, we believe that the

5    redistricting schedule that we've proposed is plenty of time

6    for this Court to review, for the public to provide input and

7    have plans in place for the 2018 elections.

8          **JUDGE EAGLES:**  Why do you need a year and three and a

9    half months to redistrict?

10         **MR. STRACH:**  Well, Your Honor, we started with this

11   Court's order of August of 2016, and that Court's order said

12   you need to redistrict in your next regular session, and you

13   can't --

14         **JUDGE EAGLES:**  Which has come and gone.

15         **MR. STRACH:**  -- and you can't use the 2011 plans

16   anymore.  When that order was entered, there was a prior

17   legislature in place.  A new legislature took over in 2017.  So

18   it wouldn't have made any sense for a prior legislature to try

19   to begin the process of redistricting that was going to be

20   concluded by another legislature.

21         **JUDGE EAGLES:**  Why not?

22         **MR. STRACH:**  Because it's different legislatures.

23         **JUDGE EAGLES:**  Well, so?  The 2011 redistricting --

24         **MR. STRACH:**  Your Honor --

25         **JUDGE EAGLES:**  That's how it always works.

        Covington, et al. v. NC, et al.  Motions  7-27-17

1          **MR. STRACH:**  Your Honor, with all due respect, it

2     doesn't.  The 2011 redistricting was all started and finished

3     by one legislature.

4          **JUDGE EAGLES:**  Why couldn't the 2016 legislature

5     start it and finish it?

6          **MR. STRACH:**  Because they would be yielding to a 2017

7     legislature that might start all over or might have to make

8     different decisions.  They don't know.  They were new

9     legislators coming in.

10          **JUDGE EAGLES:**  In the -- okay.  Well, all right.  Go

11     ahead.

12          **MR. STRACH:**  So in 2017, Your Honor, the legislature

13     started its regular biennial regular session.  It's a two-year

14     session.  Under this Court's order in August, the legislature

15     had two years to redistrict, and that's what the General

16     Assembly decided to do.  It decided to focus in the first part

17     of 2017 on the public's business during its long session

18     because redistricting is a very arduous, difficult task.  It

19     takes a lot of time and attention.

20          **JUDGE EAGLES:**  You're saying that the legislature has

21     until the end of 2018 to redistrict for the 2018 election?

22          **MR. STRACH:**  The legislature has to make sure plans

23     are in place that can be used in the 2018 elections, and it has

24     its regular biennial session to do that, provided it can make

25     sure the plans are in place for the 2018 elections.  The

          Covington, et al. v. NC, et al.  Motions  7-27-17

schedule we have proposed does just that. If the maps are
enacted by mid-November, this Court will have several months to
review. The Board of Elections will have time --

**JUDGE EAGLES:** Several months? Because you have a
February filing; right? The filing period opens in February.

**MR. STRACH:** That's correct. The Court would have --

**JUDGE EAGLES:** So November.

**MR. STRACH:** December.

**JUDGE EAGLES:** Yeah, but, you know, briefing --
ordinarily, we try to give you a little bit of time anyway to
talk to us. You wouldn't even have the briefing completed
until the end of December, I mean, under your schedule, and
that would give hardly any time at all for us to actually think
about it.

**MR. STRACH:** Well, Your Honor, it's a lot more time
than what the Plaintiffs have proposed. If you look at their
proposed schedule attached to their latest brief, they give the
Court approximately two weeks to review the new maps.

**JUDGE EAGLES:** There's other alternatives than what
they've proposed.

**MR. STRACH:** Well, I'm just referring to what the
Plaintiffs have proposed. I think two months is a lot more
reasonable than two weeks.

Then the State Board of Elections would have at least
a month to assign the new voters, and there would be plenty of

Covington, et al. v. NC, et al. Motions 7-27-17

Case 1:15-cv-00399-TDS-JEP Document 181 Filed 08/09/17 Page 88 of 117

1  time for all that to be done before the filing period opened in

2  February.  That is the schedule that the legislature has

3  proposed.  That allows, Your Honors, for an orderly process.  I

4  think what we would request is that the Court, in considering

5  this question, focus on the factors that the Supreme Court asks

6  the Court to consider.  The Supreme Court talked about the

7  ordinary processes of governments.  It talked about the

8  intrusion on state sovereignty.

9          **JUDGE WYNN:**  That's where it gets a little difficult.

10 The Supreme Court order went to our order for you to have a

11 special election this year, and in doing that, they said, no,

12 we want you to look at these three factors here.  I don't

13 recall the Supreme Court telling us when to require the maps to

14 be drawn.  In fact, our order has been in place, as Judge

15 Eagles pointed out.

16          The problem is the order has been in place since 2016

17 and even -- the Court's order was there.  We found those

18 districts to be in violation of the constitution because they

19 were unconstitutionally considering race in the process of it.

20 It goes to the Supreme Court.  We cannot be blind to the *Harris*

21 case, which is attenuated to it.  Before that, the Supreme

22 Court looked at that case almost on all fours and says, yes,

23 racial gerrymandering.  You had to know this case was going to

24 be affirmed.  You had to know that, or it would have been a

25 surprise.  It was affirmed unanimously, and you had that time

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 89 of 117

1  period.

2         What concerns at least me is the seriousness at

3  what -- how this is being taken by the General Assembly.  This

4  is serious.  We have districts, 28 districts, that are drawn in

5  violation of the constitution, drawn in a manner so that they

6  infringe unlawfully in the use of race, and the General

7  Assembly is -- you're asking us to keep delaying it, and if we

8  delay it -- even if you bring the maps in here, that does not

9  mean they will be accepted.  Then we're put in a position we

10 put in a special master.  Then we're looking at elections way

11 down the road.

12        So if we don't look at those two considerations, on

13 the one hand, I can tell you, quite frankly, and I just want to

14 be frank about it, it does look difficult to call an election

15 for this year from my perspective; but the prospect of doing

16 something that's outside the Supreme Court order to say bring

17 those maps in here, let us take a look at them, alternatively,

18 we could and there have been courts to say we'll appoint a

19 special master right now, and if you bring those maps in here

20 and we don't like them, we're going to take those other maps if

21 we want those.  We don't want to do that kind of thing.  I

22 don't think that's the kind of the thing the court -- we want

23 to stay out of this, but we want to feel something from the

24 State that you are moving to correct this.

25        **JUDGE EAGLES:**  You don't seem serious.  You don't

Covington, et al. v. NC, et al.  Motions  7-27-17

1  seem serious.  So what's our assurance that you're serious

2  about remedying this constitutional violation?

3          **MR. STRACH:**  Well, Your Honor, with all due respect,

4  we would respectfully disagree with that.

5          **JUDGE WYNN:**  Tell me what you disagree with.

6          **JUDGE EAGLES:**  What part of that do you disagree

7  with?

8          **MR. STRACH:**  The State has been -- as soon as their

9  long session was over, they appointed the redistricting

10 committees.  The committees have met.  They are in the process.

11 They have laid out a timeline for extensive public hearing and

12 input.  There's a process.  If Your Honors want a map to come

13 back to this Court --

14         **JUDGE WYNN:**  What will your public hearings be on?

15 You've had public hearings.  I've heard testimony at the trial

16 on public hearings ad nauseam.  You've had a trial on this.  We

17 know what the problem is.  Don't we need some maps to be able

18 to move from there?

19         **MR. STRACH:**  Well, Your Honors, as the Plaintiffs

20 have pointed out, the county groupings are going to change

21 extensively.  That's going to require --

22         **JUDGE EAGLES:**  That's not what they said.

23         **MR. STRACH:**  They said that we're going to have to

24 use the groupings that comply strictly with *Stephenson*.  I did

25 hear them say that.

        Covington, et al. v. NC, et al.  Motions  7-27-17

1          **JUDGE EAGLES:**  Okay.  But do you agree that the green

2     counties on these maps will not need to be touched?

3          **MR. STRACH:**  That's my personal opinion, but that

4     will be a decision that the redistricting committees make.

5          So the -- but what we do know, Your Honors, is that

6     the county groupings are going to -- the 2011 county groupings

7     are illegal under the *Stephenson* case.  They cannot be used.

8     So we will have to go to the more strict compliance with the

9     *Stephenson* county groupings.  That's going to result in

10    significant changes to the districts within those groupings.

11    We believe that the committee members and that the public has a

12    right to comment on those groupings, on the criteria that are

13    going to be used to draw the districts within those groupings,

14    and then the districts that are formed from those groupings;

15    and we also believe that this is serious, and we believe that

16    the legislature was criticized for not giving enough process or

17    for people to review things.

18          So we --

19          **JUDGE WYNN:**  Do you believe if we enter an order for

20    you to have those maps by this earlier date, that you will not

21    have those maps in here?

22          **MR. STRACH:**  Your Honor, the legislature intends to

23    comply with whatever order this Court enters.

24          **JUDGE WYNN:**  You only are telling me it would be very

25    difficult, and it would be hard to do?

       Covington, et al. v. NC, et al.  Motions  7-27-17

1        MR. STRACH:  Your Honor --

2        JUDGE EAGLES:  But you've created those problems by

3   not doing anything over the past year.  I mean, the fact that

4   you don't -- you haven't had any hearings, the fact that you

5   don't have any evidence, the fact that you haven't put maps out

6   there, that's the legislature's fault.  They could have done

7   all of those things.  After six federal judges said that they

8   were wrong on the law, you know, you might think somebody would

9   -- who was taking it seriously would have started doing at

10  least some contingency plan.

11       MR. STRACH:  Your Honor, someone who takes it

12  seriously makes a plan to do it right, and that's what we are

13  doing.  That's what the legislature is doing.  The legislature

14  has a plan to do it right; and if the Court wants it done

15  right, then the plan that we've outlined we believe is the way

16  to go.

17       Now, whatever this Court orders, the legislature will

18  comply with, but it won't be the legislature that is the only

19  party that is hurt with an unfairly truncated process.  It will

20  be --

21       JUDGE WYNN:  We will oversee those maps.  We will

22  review them.  We will allow for objections.  If they come in

23  and they don't do those things, we can allow you to fix them.

24       MR. STRACH:  But, Your Honor, with all due respect, I

25  do not believe that that process substitutes for public

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 93 of 117

1 hearings all across the state, which is what the legislature

2 intends to do.

3     **JUDGE WYNN:** But could we not even then say, well, it

4 looks like this could use some help from public hearings?

5     The problem is we need to do something here.

6 Something needs to be done in the state of North Carolina to

7 draw these maps and have constitutional maps in North Carolina.

8 The people elected under the unconstitutional districts, in

9 fact, will continue to serve. In fact, they are the very ones

10 drawing the maps, unlike some of the cases that we've had with

11 the congressional -- I mean, you brought up the congressional

12 districts. They are not running for those congressional

13 districts. None of the congressmen drew that map. Those are

14 the legislators. This is maps, many of them, for their own

15 district, for their own purpose, their own reasons, and we, the

16 Courts, have allowed that to be done.

17     All we are saying is bring us something so we can

18 review it, and if we don't like it, we're going to let you know

19 we don't like it, and there are cases out there in which we can

20 appoint special masters. We can draw them, as you say,

21 ourselves. We don't want to do that. We want our legislature

22 to do what it's supposed to do. That's all we're asking.

23     You say if we order you to do it, you'll bring those

24 maps in here. We will review them. We will be as fair as we

25 possibly can. And say you need special -- you need special

Covington, et al. v. NC, et al.  Motions  7-27-17

1    hearings?  You need other input?  Okay, let's get it in.  This

2    is about the people of North Carolina.  It's not a

3    back-and-forth between the Plaintiffs and the Defendants here.

4    This is our state.  We've got to do something here.  Don't you

5    agree?

6            MR. STRACH:  Your Honor, we do not disagree about

7    that.  We do believe it is about the state of North Carolina

8    and its people.  This is not about politics.

9            JUDGE WYNN:  Absolutely.

10           MR. STRACH:  This is about the people, and that is

11   true.  What we have done is we have outlined a process to do

12   what's right for the people, and that's what we intend to do;

13   and if this Court wants to set a deadline for the legislature

14   to get that done, the legislature --

15           JUDGE EAGLES:  Well, we already set a deadline, and

16   you didn't follow it.

17           MR. STRACH:  We have followed it, Your Honor.  We're

18   following it now.  The deadline that was set in the August 2016

19   order is not over.

20           JUDGE EAGLES:  Okay.

21           MR. STRACH:  The actions we have taken, Your Honors,

22   are fully consistent with that order fully.

23           JUDGE WYNN:  It seems to me -- when we had the trial,

24   it seems like there was a question of whether we should

25   immediately require those districts to be drawn for 2016.  We

         Covington, et al. v. NC, et al.  Motions  7-27-17

1  said, no, that's not enough time.  Ultimately, in August, we

2  found this -- we issued an opinion and the fallout there.  So

3  we've been knowing this for two years now that these districts

4  are unconstitutional.  You took it to the Supreme Court, but

5  that's a unanimous opinion out of the Supreme Court that says

6  these districts are unconstitutional.

7          It just seems to me that in the interest of doing

8  something in compliance with the law and not having illegal

9  districts in which individuals are serving in -- and, again,

10 those people are the ones drawing the map, but I'm not going to

11 go there with that.  I'm just saying that's the instance of

12 what's going on.  It just seems to me we really need to move

13 with this and do it in a positive way, and you had plenty of

14 time.  You knew when the *Harris* case came down.  Then you knew

15 when this case -- even though the Supreme Court hadn't issued

16 its mandate, it had affirmed it.  I've rarely seen a Supreme

17 Court between the premise and the mandate change an opinion.

18 There was no hope of that even happening.

19         So you've known it since then, and the legislature

20 has had an opportunity.  I don't want to get too much into the

21 Governor brings a special session.  I know that can be

22 political.  I'm not trying to get into the politics of this,

23 but the opportunity is there, and I want to see, at least from

24 my perspective, that opportunity being exercised seriously and

25 in good faith without regard to these other things out there.

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 96 of 117

1  Everybody has got different opinions on stuff, but let's work

2  to get this done.

3          **MR. STRACH:**  That's exactly what we're doing, Your

4  Honor.  We agree with you.  That's exactly what we're doing.

5          I do want point to out -- you mentioned several

6  times, Your Honor, about who is drawing the districts.  There

7  are 28 illegal districts.  That's only about 16 percent of the

8  entire General Assembly.  Those 28 districts are currently --

9  currently elect 28 African-American Democrats.  Every other

10 district in that General Assembly is legal.  Every other member

11 of that General Assembly that's going to be drawing these

12 districts is in a legal district and is fully entitled to be

13 there.

14         **JUDGE WYNN:**  Well, I mean, we could probably go

15 back -- I don't want to go back and forth on that, but you know

16 that the drawing of those illegal districts is what affected

17 those other districts, clearly.  I mean, that's what this is

18 about.  If it was just about those districts, we wouldn't be

19 here.  It's what it did to the other ones around them.  When

20 you did those things, you used race as the basis for them.

21         **MR. STRACH:**  I'm sorry, Your Honor --

22         **JUDGE WYNN:**  I got your point, though, in terms of

23 where you're going with it.

24         **MR. STRACH:**  Thank you, Your Honor.  I would just say

25 that this Court didn't hold those other districts illegal.  It

        Covington, et al. v. NC, et al.  Motions  7-27-17

1  confined its order to 28 districts.

2          **JUDGE WYNN:**  I don't even want to get into the

3  business of whether they are illegal now for purposes for your

4  authority to draw the maps.  I just point it out that that is

5  something that's there.  That's not a decision I think we need

6  to make, at least from my perspective.

7          **MR. STRACH:**  I understand.  So suffice it to say,

8  what the legislature has tried to do is create a process that

9  is orderly, that is consistent with the factors that the U.S.

10 Supreme Court has come up with, that will put us on a track to

11 have districts that can be approved by this Court in plenty of

12 time to use in 2018, which is consistent with this Court's

13 August 2016 order.  That is what the legislature has done.  I

14 don't know any other way to say it other than to say it that

15 way.

16         **JUDGE SCHROEDER:**  Can you say how many legislative

17 days are contemplated in your proposal, or hours or days,

18 however you measure it?

19         **MR. STRACH:**  Well, Your Honor, typically the way the

20 process works is the redistricting committees meet sometimes

21 jointly to look at criteria, et cetera.  Then they meet

22 separately to look at their own maps.  They also meet jointly

23 in public hearings.  A lot of that work is often done outside

24 the active session.  It's done during adjournment periods.

25 Then the legislature comes back into session for an actual

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 98 of 117

1 redistricting.  That can last, Your Honor, from -- in 2003, it

2 lasted one day.  The legislature came in and redistricted in

3 one day.  Sometimes it can last a week or longer.  It depends

4 on how complicated the redistricting is.

5          JUDGE SCHROEDER:  You mentioned public hearings

6 around the state.

7          MR. STRACH:  Yes.

8          JUDGE SCHROEDER:  Can you explain how many of those

9 you're contemplating?

10          MR. STRACH:  We're contemplating at least three sets

11 of public hearings and trying to spread them out to give the

12 public plenty of opportunity to think about what's happening,

13 having them in August, September, and October, and then

14 following that up with a redistricting session in early

15 November once all that's been received.

16          JUDGE EAGLES:  And so would those public sessions be

17 after proposed maps have been released?

18          MR. STRACH:  Your Honor, the intent is to have the

19 public something to look at that they can comment on.  So, for

20 instance, if the committee adopts criteria, we want to have a

21 public hearing on those criteria that they can look at.  If the

22 House committee adopts a House map, we want the public to be

23 able to weigh in on that map.  If the Senate committee adopts a

24 Senate map, we want the public to weigh in on that map.

25          JUDGE EAGLES:  Well, you've had public hearings about

Covington, et al. v. NC, et al.  Motions  7-27-17

1  criteria.  I mean, that's what you did back in 2011; right?
2  You had these hearings and people -- this is -- why do you need
3  to do that again?

4          MR. STRACH:  Well, Your Honor, simply because 2011 is
5  a long time ago, I can assure you.  It seems like decades ago,
6  but people change.  New people have moved into the state.
7  People's minds have changed.  Again, this map is going to look
8  a lot different than the 2011 map, and people need to
9  understand to be able to weigh in on the criteria that the
10  legislature believes it needs to use to draw that map.

11          So we believe that that is a very critical piece of
12  this process, and then we want folks to be able to weigh in on
13  the House map, and we want them to weigh in on the Senate map.
14  That's the intent.  We believe that's an orderly process.  We
15  believe that's what the Supreme Court would expect from a
16  federal court overseeing the very delicate task of remedial
17  redistricting by a sovereign state.

18          JUDGE SCHROEDER:  What census data do you use?

19          MR. STRACH:  We will be using the 2010 Census data
20  because that's the latest census data that's available to use
21  that is actual census data.

22          JUDGE WYNN:  I'm thinking in terms of these public
23  hearings.  If the worst-case scenario, which we hope does not
24  happen, comes back with a set of maps and we say, no, these are
25  not acceptable, we then appoint a special master.  There are

          Covington, et al. v. NC, et al.  Motions  7-27-17

1 cases in which there's no public hearing.  The Court draws

2 those maps just straight up.

3         I'm thinking in terms of this case and the timing,

4 and we've got to look at the case for what it is.  2010 Census.

5 There's another census in 2020.  This is going to turn around

6 and happen, I don't care what you do, pretty soon again because

7 in 2020 you've got another census.  Another redistricting

8 happens after 2020 irrespective of this one.

9         So we're talking about a small period of time that

10 we're dealing with here, and I understand in terms of the

11 public hearings and what's there and the need for the General

12 Assembly to get this information.  If the General Assembly

13 really feels that way, why haven't you already conducted some

14 public hearings?  Why haven't you already done something in the

15 two years, if no more than the last couple of months, along

16 those lines?

17         **MR. STRACH:**  Well, Your Honor, because these maps

18 don't have to be used until the 2018 elections.  So we are

19 making sure we're getting public comment in time to be used for

20 2018 elections.  That's our deadline under the Court's current

21 order.

22         **JUDGE WYNN:**  Isn't there a problem if you -- you

23 know, you think about it.  I've run in statewide elections.  I

24 know what it was like.  You don't know the districts.  The

25 candidates have no idea what the districts are right now.  They

1  don't know want to do, where they live, a lot of

2  considerations.  As long as we don't have those maps, there's

3  just a lot of variables out there that will not be settled.

4  And what's the public going to comment on if they don't know

5  who is where?  I'm confused on that.

6        **MR. STRACH:**  They will know.  As I explained, the

7  intent is to release maps and then have public hearings, so

8  they will know.  They will absolutely be able to weigh in on --

9        **JUDGE WYNN:**  And then you will come back and

10  potentially change those maps.

11        **MR. STRACH:**  We'll take the input and the committees

12  will do what --

13        **JUDGE WYNN:**  So they still won't know because it

14  could change.  My question at this point is -- if we ask you to

15  bring us maps, those are maps.  Go have your public hearings.

16  We could say go have public hearings, and if you come back with

17  significant input, we can allow you to go back and change them,

18  but at least we'd have some maps to work with.  That's what we

19  don't have now.

20        **MR. STRACH:**  Well, Your Honor, again, the Court can

21  do whatever the Court can do.  We think that would be a

22  disservice to the public.

23        **JUDGE WYNN:**  We're trying to be fair about it.  We

24  want to be as fair as possible.  We just don't want to get in

25  the business of drawing these maps.  We really want the General

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP   Document 181   Filed 08/09/17   Page 102 of 117

1  Assembly to do its job and do it in a --

2      **JUDGE SCHROEDER:**  I can put it this way.  Your

3  schedule puts the Court in a position where we have less time

4  to consider any alternative maps if they're necessary, and

5  we're probably the least expert at doing that.  That's the

6  question about special masters, et cetera.

7      So you have a November date proposed.  Why can't it

8  be an October date, late September date, something like that,

9  something that would give us more time to react if we have to

10 deal with it?  Hopefully, we won't, but we have to plan for

11 that contingency.

12     **MR. STRACH:**  Your Honor, that's certainly the Court's

13 prerogative.  The only thing I would say on that is to the

14 extent the Court compresses the timetable we've proposed, that

15 will also compress the ability to do some of the public

16 hearings and things that we're talking about.

17     **JUDGE EAGLES:**  Well, that's your own fault.

18     **MR. STRACH:**  I'm sorry you feel that way, Your Honor,

19 but that is our position.  It's like a sliding scale.  We've

20 proposed now until November.  If the Court says October, or

21 whatever, then as you compress that, you compress the ability

22 to take public input.

23     **JUDGE EAGLES:**  So isn't the purpose of the

24 redistricting to correct the unconstitutional racial

25 gerrymandering?

Covington, et al. v. NC, et al.  Motions  7-27-17

1          MR. STRACH:  That's the only purpose.

2          JUDGE EAGLES:  That's the only purpose.  It is not to

3 start over from scratch, look at how all the elections have

4 gone in the past four times, '12, '14, '16, figure out what

5 benefits you politically, personally, whatever.  That's not the

6 purpose of the redistricting.  So I still don't understand why

7 you need so much time.  The only purpose is to correct the

8 unconstitutional racial gerrymandering.  So why do you need so

9 much time?

10          MR. STRACH:  Your Honor, to do that, as I've

11 explained, the county groupings are going to have to change

12 significantly, which means the districts themselves will have

13 to change, and the State is entitled -- so long as it corrects

14 the racial gerrymanders, the State is entitled to use and

15 follow its criteria, and that this Court would not have the

16 authority to not let the State otherwise use legitimate

17 criteria so long as the State corrects the gerrymanders.

18          JUDGE EAGLES:  The evidence at trial was that the map

19 drawing takes virtually no time.  So, I mean, what takes time

20 is this public comment, et cetera.  The map drawing itself

21 is -- I've forgotten exactly what your expert said, but it

22 didn't take him very long.

23          MR. STRACH:  Your Honor, with respect, I will go look

24 that up.  I don't recall that testimony.

25          These are essentially statewide legislative maps.

1  These are about as complicated as it gets.  In a prior case, we

2  were dealing with 13 congressional districts.  That is

3  admittedly much simpler.  That is why, frankly, that was even

4  able to be done in two weeks, and, frankly, the General

5  Assembly didn't have a choice.

6          **JUDGE EAGLES:**  Well, the General Assembly did it

7  before in two weeks back, what was it, 2002, '3?

8          **MR. STRACH:**  And, Your Honor, when they did that,

9  those maps were rejected, and I will submit that it's in part

10 because they only had two weeks to do it.

11         **JUDGE EAGLES:**  That's a good point.  Thank you.

12         **JUDGE SCHROEDER:**  What's going to happen –– we'll

13 have to issue an order, but, in the meantime, what's the plan

14 for the next couple of weeks?

15         **MR. STRACH:**  Well, Your Honor, the committee met

16 yesterday, had an organizational meeting.  Information was put

17 out there.  I would anticipate that a meeting will be scheduled

18 soon to discuss criteria, and that will be a meeting to take

19 input from the committee members, et cetera, on criteria, and

20 then another meeting will be scheduled to actually adopt

21 criteria, and then a public hearing will be held on those

22 criteria to make sure the committee is doing what the public

23 wants.

24         **JUDGE SCHROEDER:**  Is there any current plan to call

25 the General Assembly back, and, if so, what date is that?

Covington, et al. v. NC, et al.  Motions  7-27-17

1     **MR. STRACH:** Your Honor, when the General Assembly

2 adjourned June 30th, they adopted an adjournment resolution,

3 which we provided the Court with a link to that the Court can

4 read.  That adjournment resolution provides they'll come back

5 on I believe it's August 3.  They will then adjourn until

6 September 5, I believe, and then they will adjourn no later

7 than early November to ensure redistricting is completed.

8     **JUDGE SCHROEDER:** Thank you.

9     **MR. STRACH:** Your Honors, if I can simply make a

10 point or two on some of the points that have been made by the

11 Plaintiffs, in particular on this issue of usurpers, illegal

12 legislature.

13     The case that the Plaintiffs cite on that is

14 *Butterworth v. Dempsey*.  It was from the '60s.  I think it's

15 important to note that in that case, the Connecticut General

16 Assembly didn't just have a few illegal districts, 28, 10,

17 whatever.  Every single district was illegal because under

18 their state constitution population was divvied up based on

19 towns, and that created malapportionment and population

20 deviations literally in the hundreds of percentages, like 200

21 percent, 300 percent.

22     **JUDGE EAGLES:** So I just heard you tell me earlier

23 that the Whole County Provision is now being violated.  I mean,

24 didn't you say that?  You said that as a result of the

25 redistricting, it's require -- that we have required in these

Covington, et al. v. NC, et al.  Motions  7-27-17

1  districts the whole system has to be looked at again because

2  these county groupings violate the Whole County Provision.  So

3  don't we have that same exact situation here?

4          MR. STRACH:  No, Your Honor.  All the districts

5  around the 28 districts are currently legal.  When we

6  redistrict, we are going to have to change --

7          JUDGE EAGLES:  Then why do you need to redistrict

8  them if they're legal?

9          MR. STRACH:  Well, Your Honor, because there's 28

10 illegal districts, and when we deal with those 28 illegal

11 districts, we will have to change the grouping structure, and

12 that will necessarily result in changes; but that's not because

13 of any illegality found by this Court.  That's because the --

14         JUDGE EAGLES:  I'm not understanding why you have to

15 change the groupings.  That's the part I'm not getting.  My

16 last question was a bad question.  I'm not understanding why

17 you have to change the groupings.

18         MR. STRACH:  Thank you, Your Honor.  Let me try to

19 explain that.

20         JUDGE EAGLES:  Because if they're illegal, then the

21 argument you were just making -- it's not just 28 districts

22 that are illegal.

23         MR. STRACH:  Your Honor, under the *Stephenson* case,

24 the initial grouping of the counties is a mathematical formula,

25 and you have to group the single counties that will sustain --

Covington, et al. v. NC, et al.  Motions  7-27-17

1 that will hold a certain number.  Then you have to group the

2 two-county groups, three counties, and so on.  That is what you

3 would call the optimum grouping map.  That is the grouping that

4 you must follow unless there are VRA issues anywhere in the

5 state that require you then to group around VRA groupings.

6            **JUDGE EAGLES:**  Right.

7            **MR. STRACH:**  The groupings that we chose in 2011 were

8 based on the VRA districts that have been held illegal.  So we

9 will have to go back to the optimum grouping, at least to start

10 with, and then draw the districts around that.  That is,

11 though, because of state law.  That is not because of --

12            **JUDGE EAGLES:**  Well, they're still illegal, arguably,

13 I mean, the Whole County Provision.

14            **MR. STRACH:**  No, Your Honor, the districts are not

15 illegal.  The groupings are.  The districts are not.  The

16 groupings will require us to redraw the districts, but the

17 groupings -- we cannot go back to the 2011 groupings.  Perhaps

18 that's a better way to say it.

19            **JUDGE WYNN:**  I think it's a matter of semantics.  I

20 got your point in terms of the districts themselves not being

21 illegal.  The problem is that the people elected from those

22 districts were elected when the population was based upon the

23 other illegal districts, and so you're right.  The district's

24 legal, but the person that got elected there with the creation

25 of it was because the population was affected by the illegal

1  district, but I don't know why we even need to go --

2        **MR. STRACH:** Your Honor, I'm just trying to address

3  the point of the usurpers, and I'm trying to say that the

4  *Butterworth* case was an extreme --

5        **JUDGE WYNN:** I frankly don't think that's something

6  that needs to be dwelled on a lot.

7        **MR. STRACH:** Okay, Your Honor.

8        **JUDGE WYNN:** I got the point on that, and I got the

9  extreme example of the *Butterworth* case. You're right in terms

10 of that, and maybe that's not here. There are some factors

11 that can be considered in terms of what that means, and my

12 earlier comments in terms of you do have people who are making

13 decisions that are drawing the districts now, that stands

14 because at least in 28 districts, even if -- whether they come

15 from illegal or not illegal, there's something wrong with this

16 legislature in terms of how it's being drawn, but we don't need

17 to go there. We're at the remedy phase now. All we're doing

18 is trying to determine -- we're going to order an election this

19 year, or we're going -- if not, then what time period and maybe

20 in conjunction are we going to ask for these maps.

21        **MR. STRACH:** Let me just point out, Your Honor, and

22 just to finish the point on this particular point, what I

23 wanted to say is that subsequent Supreme Court cases have made

24 it very clear that even in a situation like this, no matter how

25 many districts that are illegal or what the effect of that is,

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 109 of 117

1   Your Honor, which we might disagree on, a legislature that's
2   elected under an unconstitutional plan is nonetheless a
3   legislature empowered to act.  The U.S. Supreme Court has said
4   that on multiple occasions.  So --
5           **JUDGE WYNN:**  I think we are in agreement on it.
6           **MR. STRACH:**  -- this whole --
7           **JUDGE WYNN:**  I think we're good.  All we're asking is
8   for that legislature to act.
9           **MR. STRACH:**  They will.
10          **JUDGE WYNN:**  That's the key.
11          **MR. STRACH:**  And they will, and they are.
12          Let me just make a couple of points on the election
13  schedule.  I think it's very important to note that at least in
14  my experience, if I'm proven wrong, I will be, this will be the
15  first time where you've had this many elections in a 12-month
16  period, major elections, essentially statewide elections; and
17  not only will you have that many elections, about five or so in
18  that period of time, they will be overlapping.  The municipal
19  elections will be overlapping with the proposed legislative
20  primary that the Plaintiffs have proposed, and then the March
21  general election will overlap with the filing period for a May
22  primary and a November 2018 election.
23          I cannot think of a more confusing set of election
24  rules for this -- for the public to be under, and when the
25  Court said that the Court should consider intrusion into state

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP  Document 181  Filed 08/09/17  Page 110 of 117

1  sovereignty and the normal operation of the processes of

2  government, the election schedule that's been proposed simply

3  takes a blowtorch to that and just rips it up to shreds.  In

4  fact, they're asking this Court, by judicial decree, to tell

5  staff of the elections board just do what you need to do, to

6  heck with the law, to heck with the normal rules, to heck with

7  the normal operations.  You all just do it.  That is not, we

8  would submit, what we believe the Supreme Court had in mind

9  when they entered their order.

10        **JUDGE EAGLES:**  Are you implying that the Court should

11 never order a special election no matter what the circumstances

12 because to do so would disrupt the normal orderly processes?

13        **MR. STRACH:**  No, Your Honor.

14        **JUDGE EAGLES:**  That's the implication of your

15 argument.

16        **MR. STRACH:**  It's not the implication, and that's not

17 what I'm saying.

18        **JUDGE EAGLES:**  No?  Okay.  I misunderstood you then.

19        **MR. STRACH:**  My argument is that these are extreme

20 circumstances, and the scheduled proposed by the Plaintiffs is

21 an extreme schedule, and it would take a blowtorch to the

22 normal processes of North Carolina government.  It would be

23 extremely unfair to the people, who this is about, and it would

24 be completely unworkable.  That's our position.

25        **JUDGE WYNN:**  The key with the Supreme Court opinion

Covington, et al. v. NC, et al.  Motions  7-27-17

1   is the Supreme Court didn't tell us -- didn't give us any

2   indication that we couldn't do this.  It simply said consider

3   these factors.  That's what we will do.  We will consider those

4   factors here.  The Supreme Court itself, in terms of what it

5   sent us back, simply just vacated and sent it back and affirmed

6   unanimously on the substantive part of the case and said remedy

7   -- go back and take a look at it and look at these factors here

8   in a more balanced way.  That's exactly what we will do.

9           **MR. STRACH:**  I agree, Your Honor.  I believe we're

10  reading the same order from the same sheet of music.

11          Your Honor, I do want to point out that there is

12  evidence in the record, and we've pointed it out before, that

13  to the extent the Court does order a special election, turnout

14  in these elections has historically been very, very low and

15  very, very bad; and we think that's something that the Court

16  should take into account, not only that, but also, obviously,

17  the extra money, et cetera, that such a process would cost.

18          So, Your Honors, we believe that the legislature has

19  a process in place to get maps in front of this Court.  We

20  believe that it allows -- that balances all the appropriate

21  factors.  It allows for public input.  We believes it complies

22  with this Court's order.

23          **JUDGE WYNN:**  Where is turnout under one of those

24  three factors?  Which of the three factors that does fit under?

25          **MR. STRACH:**  Well, Your Honor, I would argue that

Covington, et al. v. NC, et al.  Motions  7-27-17

1  it's the intrusion on state sovereignty.

2          **JUDGE WYNN:**  So it's Number 3?

3          **MR. STRACH:**  I believe that's one of them.

4          **JUDGE WYNN:**  Need for judicial restraint?

5          **MR. STRACH:**  I think it goes under judicial

6  restraint.  I also think it goes into the ordinary processes of

7  government because the reason the turnout is low is because the

8  Court is dispensing with a schedule that people are used to,

9  and this schedule would have an election on December 5.  I

10  can't think of a worse time of the year to have a special

11  election for turnout purposes.

12          So, Your Honor, the legislature stands ready to act.

13  The legislature wants to comply with this Court's order.  It

14  will comply with this Court's order.  It is, in fact, complying

15  right now as we speak with this Court's order.  It would like

16  to have an opportunity to remedy the defects this Court found

17  in the districts, and it will, in fact, remedy the defects this

18  Court found.

19          We have proposed a schedule, and we appreciate the

20  Court's indulgence of our position.  We appreciate the Court's

21  indulgence.  We understand the situation that we are in, and we

22  appreciate the Court's consideration.  If there's no other

23  questions --

24          **JUDGE WYNN:**  Thank you.

25          **JUDGE EAGLES:**  All right.  Thank you.

Covington, et al. v. NC, et al.  Motions  7-27-17

1    I think the Plaintiff may have, like, five or six
2  minutes, according to my clock.  The clerk may have a little
3  bit different thought.

4        **MS. EARLS:**  Thank you, Your Honors.  I will be very
5  brief.

6        The first point I want to make is that the districts
7  around the 28 districts that were declared unconstitutional
8  racial gerrymanders are illegal.  They are unconstitutional
9  under the state constitution.  That's why they need to be
10 redrawn.  The *Stephenson* -- I urge you to look at the
11 *Stephenson v. Bartlett* timetable that we put in our briefing,
12 and you will see that the State redrew in two weeks.  The Court
13 did not accept those districts, and it self-redrew in one week.
14 So the timetable in *Stephenson* is even more compressed than
15 what we are asking for here.

16       **JUDGE WYNN:**  Were there public hearings?

17       **MS. EARLS:**  No, not to my recollection.

18       **JUDGE WYNN:**  How many districts were being redrawn?

19       **MS. EARLS:**  The entire state map, more than this
20 time.  I think what you're weighing in the balance is the value
21 of public hearings in a remedial setting, which, as the Court
22 points out, is very different from when you're redrawing every
23 ten years.  You've got new census data.  There's the population
24 shifts.

25       The legislature's task is to follow the law and

       Covington, et al. v. NC, et al.  Motions  7-27-17

1  remedy the constitutional violations.  That's extraordinarily

2  different from starting with new census data, and the clusters

3  are determined already.  So the notion that they actually can't

4  accomplish the task isn't true.

5          So you're weighing the balance of the value of public

6  hearings, which are always useful, versus the value of the

7  testimony you heard this morning of people knowing as soon as

8  possible.  Candidates, political activists, people who give --

9  donate and give money to campaigns, the value of their civic

10  engagement and their ability to participate in the process I

11  submit to you weighs much more heavily than the value of having

12  some input on what's needed to -- or having extensive input

13  over months -- weeks and months.

14          They can -- with the congressional plans, they had a

15  public hearing.  They can have a public hearing in a space of

16  two weeks and get public input, but what you've heard testimony

17  to today from the real-life experiences of candidates and

18  people who support them and who are engaged in the political

19  process is that they need to know.  They're already at a

20  disadvantage from not knowing what the districts are, and

21  that's an important value in weighing why the districts need to

22  be drawn now.

23          Let me just say a quick word on the special elections

24  question and the notion that there's too many overlapping

25  elections and it will be too confusing and the turnout will be

Covington, et al. v. NC, et al.  Motions  7-27-17

1  too low.  All of these things -- the scheduling situation that

2  we are in now is because of the delay of the General Assembly

3  in being willing to draw new maps.

4          What we have to weigh in the balance there is the

5  extreme violation that occurred in this case, 28 districts

6  found unconstitutional; and what I would finally suggest to you

7  is that you don't necessarily have to decide together the

8  question of whether there's -- when the General Assembly should

9  redrew and then whether equitably there need to be special

10  elections.  You can first require a timetable for redrawing and

11  then determine whether, once we have a map, is there time for

12  elections; but I would ask that you not foreclose the second

13  issue by leaving too long to draw maps on the first issue.  I

14  think that you can -- you don't necessarily have to decide both

15  of our motions simultaneously.

16          So with that, I'll answer any questions that the

17  Court has.

18          **JUDGE EAGLES:**  No?  All right.  No questions.  Thank

19  you very much.  We will take the matter under advisement and

20  enter orders as we decide.  Thank you.

21          The Court is adjourned.

22      (END OF PROCEEDINGS AT 12:59 P.M.)

23

24                          * * * * * *

25

Covington, et al. v. NC, et al.  Motions  7-27-17

1    UNITED STATES DISTRICT COURT

2    MIDDLE DISTRICT OF NORTH CAROLINA

3    CERTIFICATE OF REPORTER

4

5

6           I,  Briana L. Bell, Official Court Reporter, certify

7    that the foregoing transcript is a true and correct transcript

8    of the proceedings in the above-entitled matter.

9

10          Dated this 9th day of August 2017.

11

12

13          _____
            Briana L. Bell, RPR
14          Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

Covington, et al. v. NC, et al.  Motions  7-27-17

Case 1:15-cv-00399-TDS-JEP   Document 181   Filed 08/09/17   Page 117 of 117