IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SANDRA LITTLE COVINGTON, et al.,      )
                                      )
                Plaintiffs,           )
       v.                             )        1:15CV399
                                      )
THE STATE OF NORTH CAROLINA, et al.,  )
                                      )
                Defendants.           )

## MEMORANDUM OPINION

Circuit Judge James A. Wynn, Jr., wrote the opinion, in which
District Judge Thomas D. Schroeder and District Judge Catherine C.
Eagles joined:

Over two years ago, in May 2015, thirty-one registered North
Carolina voters (collectively, "Plaintiffs") filed this action
alleging that the North Carolina General Assembly unjustifiably,
and therefore unconstitutionally, relied on race to draw dozens of
state legislative district lines.  Following a five-day trial,
during which the Court received testimony from two dozen witnesses
and reviewed more than 400 exhibits, Plaintiffs prevailed on their
claim that the challenged districting plans violated their rights
under the Equal Protection Clause of the Fourteenth Amendment.
Covington v. North Carolina (Covington I), 316 F.R.D. 117 (M.D.N.C.
2016).  That determination has since been summarily affirmed,
without dissent, by the Supreme Court of the United States.  North
Carolina v. Covington, 137 S. Ct. 2211 (2017) (mem.).

Now, nearly a year after this Court held the challenged legislative districts unconstitutional and almost six years after those districts were initially put in place—during which time North Carolina has conducted three primary and three general elections using racially discriminatory districting plans—Plaintiffs ask this Court to truncate the terms of legislators serving in districts that must be redrawn and order a special election to fill those seats with representatives elected under constitutional districting plans.

We conclude that the widespread, serious, and longstanding nature of the constitutional violation—among the largest racial gerrymanders ever encountered by a federal court—counsels in favor of granting Plaintiffs' request. Likewise, any intrusion on state sovereignty associated with ordering the requested elections is more than justified by the severity and scope of that violation and its adverse impact on North Carolina voters' right to choose—and hold accountable—their representatives, especially since the legislature took no action toward remedying the constitutional violation for many weeks after affirmance of this Court's order, and the Legislative Defendants have otherwise acted in ways that indicate they are more interested in delay than they are in correcting this serious constitutional violation.

Notwithstanding these weighty considerations favoring a special election, we nonetheless conclude such an election would

not be in the interest of Plaintiffs and the people of North Carolina. The compressed and overlapping schedule such an election would entail is likely to confuse voters, raise barriers to participation, and depress turnout, and therefore would not offer the vigorously contested election needed to return to the people of North Carolina their sovereignty. Accordingly, we deny Plaintiffs' request.

We recognize that legislatures elected under the unconstitutional districting plans have governed the people of North Carolina for more than four years and will continue to do so for more than two years after this Court held that the districting plans amount to unconstitutional racial gerrymanders. But at this juncture, with only a few months before the start of the next election cycle, we are left with little choice but to conclude that a special election would not be in the interest of Plaintiffs nor the people of North Carolina.

## I.  Factual and Procedural Background

In early 2011, the North Carolina General Assembly set about to conduct statewide redistricting to reflect new population and demographic data following the most recent decennial census. See N.C. Const. art. II, §§ 3, 5. As the appointed chairs of the redistricting committees in their respective chambers, Senator Robert Rucho and Representative David Lewis together led efforts to craft and approve legislative districting maps for use in both

state and federal elections in North Carolina. Covington I, 316 F.R.D. at 126. To that end, Representative Lewis and Senator Rucho engaged the assistance of an outside expert, Dr. Thomas Hofeller, who translated the legislators' policy objectives into proposed districting maps. Id. Apart from Representative Lewis and Senator Rucho, no other legislators had a substantive role in drawing the proposed maps. Id.

Upon receiving the relevant census data, and without input from either redistricting committee, Hofeller began drawing proposed maps in the spring of 2011. Id. at 126-27. Under instruction from Senator Rucho and Representative Lewis, Hofeller first searched for geographically compact minority population centers and, where possible, drew district lines around those population centers to construct majority-minority districts. Id. at 127. Although the preferred candidates of African-American voters were consistently successful in districts that were not majority-minority during recent election cycles prior to the enactment of the 2011 districting plans, id. at 126, Senator Rucho and Representative Lewis maintained (incorrectly) that Section 2 of the Voting Rights Act of 1965 necessitated creation of the new majority-minority districts in their proposed maps, id. at 127.

As a result of this approach—which elevated race over other widely recognized legitimate districting factors such as contiguity and compactness—the number of majority-African-American

districts in the resulting state House map increased from nine to thirty-two.  Id. at 126, 134, 137.  Similarly, the number of majority-African-American districts in the state Senate map increased from zero to nine.  Id. at 126.

Senator Rucho and Representative Lewis publicly released the state House and Senate districting plans on July 12, 2011.  Id. at 127.  The state Senate and House considered and adopted, with minor modifications, the proposed maps on July 27 and 28, 2011, respectively.  Id.  Also on July 28, 2011, the General Assembly adopted a revised congressional districting plan, which Hofeller produced at the direction of Senator Rucho and Representative Lewis.  Harris v. McCrory, 159 F. Supp. 3d 600, 608 (M.D.N.C. 2016), aff'd sub nom. Cooper v. Harris, 137 S. Ct. 1455 (2017).  Again reflecting the legislators' stated desire to ensure compliance with the Voting Rights Act, the 2011 congressional districting map adopted by the General Assembly increased the number of majority-minority districts from zero to two.  Id. at 608.

In sum, within three weeks and with minimal alteration, the General Assembly considered and adopted districting plans that significantly increased the number of majority-minority districts in maps that would be used to conduct state and federal elections in North Carolina from 2012 onward.

Soon after the General Assembly approved the maps, two groups of North Carolina voters filed actions in state and federal court alleging that numerous legislative districts approved by the General Assembly were unconstitutional racial gerrymanders, in violation of the North Carolina and United States Constitutions. See Harris, 159 F. Supp. 3d 600; Dickson v. Rucho, 766 S.E.2d 238 (N.C. 2014), vacated, 135 S. Ct. 1843 (2015) (mem.). A separate panel of this Court concluded that the two majority-minority districts included in the state's congressional districting plan violated the Equal Protection Clause. Harris, 159 F. Supp. 3d at 627. The Supreme Court—by written opinion—subsequently agreed that the majority-minority districts included in the 2011 congressional districting plan constituted racial gerrymanders in violation of the Equal Protection Clause. See Cooper, 137 S. Ct. 1455.

By contrast, the Supreme Court of North Carolina held that both the federal and state districting plans satisfied all "state and federal constitutional and statutory requirements." Dickson, 766 S.E.2d at 260. In April 2015, the Supreme Court of the United States unanimously vacated the state court's ruling without opinion and remanded the case for reconsideration of the federal constitutional and statutory questions presented. Dickson, 135 S. Ct. 1843. On remand, the Supreme Court of North Carolina again concluded that the state and federal districting plans complied

with federal law.  That decision was again unanimously vacated by the Supreme Court of the United States in May 2017, <u>Dickson v. Rucho</u>, 781 S.E.2d 404, 410-11 (N.C. 2015), <u>vacated</u>, 137 S. Ct. 2186 (2017) (mem.), and was reheard before the Supreme Court of North Carolina on August 28, 2017.

In the meantime, while litigation regarding the state's congressional districting plan proceeded, Plaintiffs initiated this action in May 2015.  <u>Covington I</u>, 316 F.R.D. at 128.  Echoing the earlier state-court action, Plaintiffs alleged that the 2011 state legislative districting plans constituted racial gerrymanders and thus violated their rights under the Fourteenth Amendment of the U.S. Constitution.  First Am. Compl. at 2, ECF No. 11.  To remedy this alleged constitutional violation, Plaintiffs sought an injunction barring further use of the 2011 maps and requiring the General Assembly to adopt constitutionally adequate plans for use in any future elections.  <u>Id.</u> at 92-93. Plaintiffs named as Defendants: (1) the State of North Carolina; (2) Senator Rucho, Representative Lewis, President Pro Tempore of the North Carolina Senate Philip E. Berger, and Speaker of the North Carolina House of Representatives Timothy K. Moore (collectively, the "Legislative Defendants"); and (3) the North

Carolina State Board of Elections, as well as each of the five members of that body (collectively, the "Board Defendants").[1]

In October 2015, Plaintiffs moved for a preliminary injunction barring the use of the challenged maps in the March 2016 statewide primary elections. Pls.' Mot. Prelim. Inj., ECF No. 23. In considering that motion, this Court noted—and Plaintiffs conceded—that the requested injunction, which Plaintiffs sought less than a week before the candidate filing deadline, would have delayed the impending 2016 election cycle by months. Order Den. Pls.' Mot. Prelim. Inj. (Nov. 25, 2015) at 10, ECF No. 39. With a trial on Plaintiffs' constitutional claims scheduled to begin in April 2016, this Court held that the balance of equities weighed against the requested injunction and, without opining on the merits of Plaintiffs' constitutional claims, denied the motion. Id.

---

[1] Since this case was filed, the North Carolina General Assembly passed legislation, over a gubernatorial veto, merging the Board of Elections with the State Board of Ethics to create a new State Board of Elections and Ethics Enforcement. 2017 N.C. Sess. Laws 6. Currently, the putative State Board of Elections and Ethics Enforcement has no members. The Governor of North Carolina has challenged the statute merging the two entities in state court, alleging that it violates the North Carolina Constitution's Separation-of-Powers Clause, N.C. Const. Art. I, sec. 6. That litigation is currently proceeding before the Supreme Court of North Carolina. See Cooper v. Berger, 801 S.E.2d 637 (N.C. 2017) (mem.).

A week-long trial followed, during which the parties presented testimony from many of the Plaintiffs; Senator Rucho and Representative Lewis, as well as other state legislators involved in the adoption of the challenged maps; and numerous expert witnesses, including Hofeller and Plaintiffs' own redistricting experts. On August 11, 2016, this Court unanimously concluded that Defendants unjustifiably relied on race in drawing twenty-eight majority-minority districts in the 2011 state legislative districting plans, in violation of Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment. Covington I, 316 F.R.D. at 176. In reaching this conclusion, this Court rejected Defendants' claim that, based on the evidence considered by the General Assembly, the Voting Rights Act required construction of the new majority-minority districts. Id.

Having determined that the existing maps violate the Constitution, this Court turned to consideration of an appropriate remedy. Id. at 176–77. Although acknowledging that the existing districting scheme had already caused "substantial stigmatic and representational injuries" to Plaintiffs, this Court declined to order injunctive relief prior to the impending November 2016 general election. Id. With the 2016 primary elections already held under the challenged maps and Election Day less than three months away, this Court "regrettably conclude[d]" that immediate injunctive relief was impractical. Id. at 177. Nonetheless,

recognizing Plaintiffs' entitlement to "swift injunctive relief," this Court barred the State of North Carolina from conducting any further elections using the unconstitutional maps and ordered the General Assembly to draw and enact, during its next legislative session, new state House and Senate districting plans for use in future elections. Id. at 177.

After reluctantly allowing a third general election to proceed under an unconstitutional districting scheme, this Court issued a final remedial order on November 29, 2016. Covington v. North Carolina (Covington II), No. 1:15-CV-399, 2016 WL 7667298 (M.D.N.C. Nov. 29, 2016), vacated, 137 S. Ct. 1624 (2017) (per curiam). This Court ordered the General Assembly to adopt new districting plans by March 15, 2017, and required the State to hold special primary and general elections using constitutionally adequate maps no later than "late August or early September" and "early November," respectively. Id. at *2-3. The General Assembly made no effort to draw and submit constitutional redistricting plans in advance of the March 15, 2017 deadline. Rather, Defendants sought and obtained a stay of the remedial order pending review of the merits of Plaintiffs' constitutional claims in the Supreme Court of the United States. North Carolina v. Covington, 137 S. Ct. 808 (2017) (mem.).

On June 5, 2017, the Supreme Court summarily affirmed this Court's judgment that the existing House and Senate districting

plans violated Plaintiffs' rights under the Fourteenth Amendment. Covington, 137 S. Ct. 2211. Although affirming this Court's determination on the merits of Plaintiffs' constitutional claims, the Supreme Court vacated the Court's final remedial order. Covington, 137 S. Ct. 1624. Emphasizing that "[r]elief in redistricting cases is 'fashioned in the light of well-known principles of equity,'" id. at 1625 (quoting Reynolds v. Sims, 377 U.S. 533, 585 (1964)), the Supreme Court explained that district courts must therefore "undertake an 'equitable weighing process' to select a fitting remedy for" constitutional violations, id. (quoting NAACP v. Hampton Cty. Election Comm'n, 470 U.S. 166, 183 n.36 (1985)). The Supreme Court further underscored that determining whether to order a special election, in particular, requires a "careful case-specific analysis"—an analysis that, according to the Supreme Court, this Court's remedial order performed in only a "cursory fashion." Id. at 1626.

Acknowledging that it had not previously provided guidance to district courts regarding "whether or when a special election may be a proper remedy for a racial gerrymander," the Supreme Court then identified a nonexclusive list of "obvious considerations" to guide the consideration of that question. Id. at 1625–26. Specifically, the Court explained that courts deciding whether to order special elections to redress existing racial gerrymanders should consider: (1) "the severity and nature of the particular

11

constitutional violation"; (2) "the need to act with proper judicial restraint when intruding on state sovereignty"; and (3) "the extent of the likely disruption to the ordinary processes of governance if early elections are imposed." <u>Id.</u> at 1626. The Supreme Court remanded the case to permit this Court to fashion an appropriate remedy in light of these and any other relevant considerations. <u>Id.</u>

Representing that they would not seek rehearing, Plaintiffs filed a motion with the Supreme Court requesting that the Court issue its mandate immediately, so as to allow this Court to begin the process of fashioning a remedy as quickly as possible. Appellees' Appl. Issuance Mandate Forthwith, <u>North Carolina v. Covington</u>, 137 S. Ct. 1624 (2017) (per curiam) (No. 16-1023). The Supreme Court subsequently denied Plaintiffs' motion to issue its mandate immediately. <u>North Carolina v. Covington</u>, 137 S. Ct. 2262 (2017) (mem.).

After obtaining jurisdiction on June 30, 2017, this Court moved swiftly to receive briefing on and consider motions filed by Plaintiffs (1) to set deadlines for the drawing of remedial districting plans and (2) for an expedited evidentiary hearing regarding both the timeline for drawing such remedial plans and the need for a special election. On July 27, 2017, this Court held an evidentiary hearing on these issues, during which the

parties introduced evidence, adduced testimony from several witnesses, and presented arguments.

In their briefing and arguments before this Court, the parties agreed that this Court's ruling rendered invalid much of the existing state House and Senate districting maps. Leg. Defs.' Pos. Stat. at 8, ECF No. 161; Pls.' Suppl. Br. on Remedies at 2, ECF. No. 173. In particular, although this Court's order focused on the boundaries of the twenty-eight majority-minority districts, the parties agree that the inevitable effect of any remedial plan on the lines of districts adjoining the twenty-eight districts—coupled with the North Carolina Constitution's requirement that district lines not traverse county lines, unless such a traversal is required by federal law, see Stephenson v. Bartlett, 562 S.E.2d 377, 396-98 (N.C. 2002)—means that the well over half of the state House and Senate districts must be redrawn. But Plaintiffs and Legislative Defendants remain sharply divided as to when the districts should be redrawn and whether a special election is necessary to fully remedy the violation this Court identified in August 2016.[2]

On the one hand, Plaintiffs ask this Court to order the State to draw and enact constitutionally adequate districting plans in

---

[2] State and Board Defendants took no position on Plaintiffs' proposed remedies. Pos. Stat. by State of N.C. & State Bd. of Elections at 2, ECF No. 162.

time to conduct special elections using those remedial plans in March 2018.  Pls.' Suppl. Br. on Remedies, ECF No. 173.  Under Plaintiffs' proposed schedule, the State would have until August 11, 2017, to draw remedial districting maps.  Pls.' Suppl. Br. on Remedies, Ex. 1, ECF No. 173-1.  A special primary election would follow on Tuesday, December 5, 2017, and a special general election would then be held on March 6, 2018.  Id.

By contrast, Legislative Defendants maintain that a special election is not warranted because "[t]he constitutional violation, at a minimum, is certainly 'subject to rational disagreement'" and a special election would cause severe disruption and work a substantial intrusion on state sovereignty.  Leg. Defs.' Pos. Stat. at 8, 14, 20 (quoting Allen v. State Bd. of Elections, 393 U.S. 544, 572 (1969)).  In lieu of the requested special election, Legislative Defendants proposed a schedule requiring the General Assembly to enact remedial districting plans by November 15, 2017, with revised plans then implemented for the first time during the regularly scheduled 2018 election cycle.  Leg. Defs.' Pos. Stat. at 30–31.

In an order issued on July 31, 2017, this Court declined to adopt Legislative Defendants' proposed schedule and, instead, ordered that the General Assembly enact remedial maps no later than September 1, 2017.  Covington v. North Carolina (Covington III), -- F. Supp. 3d. --, 2017 WL 3254098, at *3 (M.D.N.C. 2017).

The order further set forth that this Court would extend this deadline to September 15, 2017, provided that the General Assembly made certain showings regarding the public nature of its redistricting process.  Id.

In the same order, this Court denied Plaintiffs' request for a special election, advising that this opinion would follow.  Id. at *2.  As explained below, we conclude that, although the nature of the longstanding constitutional violation in this case is severe and infringes significantly on the rights of North Carolinians, ordering a special election at this late date would disrupt the processes of governance in ways detrimental to the people of North Carolina.

## II.  **Analysis**

In remanding this action for this Court to reconsider the appropriate remedy, the Supreme Court reiterated its settled holding that "[r]elief in redistricting cases is 'fashioned in the light of well-known principles of equity.'"  Covington, 137 S. Ct. at 1625 (quoting Reynolds, 377 U.S. at 585).  Several of these "well-known principles," id. (internal quotation marks omitted), are particularly instructive in this matter.  Thus, we note the established rule that "[o]nce a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."  Swann v. Charlotte-Mecklenburg Bd. of Educ.,

402 U.S. 1, 15 (1971).  In crafting such remedies, a court's "task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution."  Id. at 16.  And, "[a]s with any equity case, the nature of the violation determines the scope of the remedy."  Id.

In the context of redistricting cases, the Supreme Court has stated that "it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under" a districting plan held constitutionally invalid.  Reynolds, 377 U.S. at 585.  Despite this general rule, however, there may be circumstances in which "equitable considerations . . . justify a court in withholding the granting of immediately effective relief" from the injury inflicted by a constitutionally infirm districting scheme.  Id. In deciding whether to "award[] or withhold[] immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws," as well as any potential "disruption of the election process which might result from requiring precipitate changes."  Id.

As explained above, regarding the ordering of a special election, in particular, the Supreme Court identified three factors courts should weigh in considering whether to order a special election: (1) "the severity and nature of the particular

constitutional violation"; (2) "the need to act with proper judicial restraint when intruding on state sovereignty"; and (3) "the extent of the likely disruption to the ordinary processes of governance if early elections are imposed." Covington, 137 S. Ct. at 1626. We now turn to these three considerations.

A.    Nature and Severity of the Constitutional Violation

We begin by assessing the nature of the constitutional violation at issue: the North Carolina General Assembly's unjustifiable reliance on race in drawing dozens of legislative district lines. The unconstitutional districting plans, therefore, implicate both the right to vote and the Constitution's prohibition on state governments' unjustified use of race-based classifications.

Beginning with the right to vote, the Supreme Court has long recognized that the "right to vote freely for the candidate of one's choice is of the essence of a democratic society." Reynolds, 377 U.S. at 555. "As long as ours is a representative form of government, and our legislatures are those instruments of government elected directly by and directly representative of the people, the right to elect legislators in a free and unimpaired fashion is a bedrock of our political system." Id. at 562; see also Burdick v. Takushi, 504 U.S. 428, 433 (1992) ("It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'" (quoting Ill. Bd. of Elections v.

<u>Socialist Workers Party</u>, 440 U.S. 173, 184 (1979))). As the Supreme Court has emphasized, "[o]ther rights, even the most basic, are illusory if the right to vote is undermined." <u>Wesberry v. Sanders</u>, 376 U.S. 1, 17 (1964); <u>see also</u> <u>Reynolds</u>, 377 U.S. at 567 ("To the extent that a citizen's right to vote is debased, he is that much less a citizen."). Accordingly, because the right to vote is "preservative of all rights," any infringement on that right—including the General Assembly's impermissible use of race in drawing the challenged plans—strikes at the heart of the substantive rights and privileges guaranteed by our Constitution. <u>See</u> <u>Reynolds</u>, 377 U.S. at 562–63 (internal quotation marks omitted).

Regarding the use of race in drawing district lines, Section 2(b) of the Voting Rights Act, enacted pursuant to Congress's authority to enforce the Fifteenth Amendment, requires states to ensure that members of a protected class do not have "less opportunity than other members of the electorate to . . . elect representatives of their choice." 52 U.S.C. § 10301(b); <u>see also</u> <u>Voinovich v. Quilter</u>, 507 U.S. 146, 154 (1993). To that end, a state may rely on race in drawing district lines when it has "good reasons to think that it would transgress the [Voting Rights] Act if it did <u>not</u> draw race-based district lines." <u>Cooper</u>, 137 S. Ct. at 1464 (internal quotation marks omitted). Even when the Voting Rights Act does not compel states to take race into account in

drawing district lines, the Supreme Court has recognized that states have an important "interest in eradicating the effects of past racial discrimination," including through their districting plans. Shaw, 509 U.S. at 656.

In sum, state legislatures involved in the "delicate task" of redistricting, see Miller, 515 U.S. at 905, can—and, in certain circumstances, should—consider the impact of a districting plan on minority groups, including groups of voters previously subject to race-based discrimination. And, in appropriate circumstances, states may rely on race-conscious districting to protect the interests of members of minority groups subject to past discrimination.

Although race-conscious districting may be appropriate in certain circumstances, the Supreme Court also has recognized that reliance on race in districting "carr[ies] particular dangers." Shaw, 509 U.S. at 657 (1993). Even when unaccompanied by explicit animus or discriminatory intent, legislative districting that unjustifiably relies on race has persistent and malignant effects that extend well beyond the voting booth.

First, reapportionment plans that improperly group "individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin, bear[] an uncomfortable resemblance to political apartheid."

Id. at 647.  By unjustifiably relying on race to sort voters, such districting schemes "reinforce[] the perception that members of the same racial group . . . think alike, share the same political interests, and will prefer the same candidates at the polls." Id.; see also Miller v. Johnson, 515 U.S. 900, 911-12 (1995).

Second, beyond endowing such inherently suspect inferences with an official imprimatur, racial gerrymanders "also cause society serious harm." Miller, 515 U.S. at 912.  As the Supreme Court has explained, unjustifiably drawing districts based on race encourages elected representatives "to believe that their primary obligation is to represent only the members of [a particular racial] group, rather than their constituency as a whole." Shaw, 509 U.S. at 648.  Such a message is "altogether antithetical to our system of representative democracy," id., raising the specter that the electorate will be "balkanize[d] . . . into competing racial factions" and threatening "to carry us further from the goal of a political system in which race no longer matters," id. at 657; see also Miller, 515 U.S. at 912.

The harms attendant to unjustified race-based districting do not end with the enactment of an unconstitutional districting scheme.  Quite the opposite, these harms begin with the enactment of unconstitutional maps; are inflicted again and again with the use of those maps in each subsequent election cycle; and, by putting into office legislators acting under a cloud of

constitutional illegitimacy, continue unabated until new elections are held under constitutionally adequate districting plans. It is this serious and ongoing constitutional harm that this Court must remedy. See Ketchum v. City Council of City of Chi., 630 F. Supp. 551, 564 (N.D. Ill. 1985).

Legislative Defendants nonetheless assert that this factor weighs against ordering a special election because "[t]he constitutional violation, at a minimum, is certainly subject to rational disagreement." Leg. Defs.' Pos. Stat. at 20 (internal quotation marks omitted). That is patently wrong. There is no "rational disagreement" as to whether the districting plans at issue in this case violated the Constitution. This Court unanimously held that the challenged districts violate the Constitution. The Supreme Court affirmed that conclusion without argument and without dissent. And the Supreme Court unanimously held that Senator Rucho and Representative Lewis incorrectly believed that the Voting Rights Act required construction of majority-minority districts, even when members of the minority group historically had been able to elect the candidate of their choice by forming a coalition with members of the majority, Cooper, 137 S. Ct. at 1468, 1470-72—precisely the same errant belief that rendered unconstitutional the districting plans at issue here. Thus, there is no disagreement between this Court's and the Supreme

Court's conclusion that the challenged districts are unconstitutional racial gerrymanders.

Having established the serious nature of the constitutional violation and attendant harm at issue, we turn next to the relative severity of that violation in this case. Regarding the geographic scope of the violation, Defendants unjustifiably relied on race in drawing dozens of district lines, stretching from North Carolina's northeastern coast to its southern Piedmont. Due to the wide geographic dispersion of the unconstitutional lines—as well as the North Carolina Constitution's dictate that district boundaries not cross county lines unless required by federal law—the parties agree that the boundaries of as many as 116 House and Senate districts need to be redrawn. Leg. Defs.' Pos. Stat. at 8–9; Pls.' Stat. at 6. All told, the unconstitutional racial gerrymanders identified by this Court and affirmed by the Supreme Court impact nearly 70% of the House and Senate districts, touch over 75% of the state's counties, and encompass 83% of the State's population—nearly 8 million people. See Defs.' Mem. Opp. Pls.' Mot. Add. Relief, Ex. 1 (Decl. of Dr. Thomas Hofeller) at 5–6, ECF No. 136-1; Pls.' Stat. at 5. Plaintiffs assert—and Legislative Defendants do not dispute— that the districting plans at issue thus represent the most extensive unconstitutional racial gerrymander ever encountered by a federal court.

Conceding the broad scope of their constitutional violation, Legislative Defendants argue that the sheer number of districts the General Assembly must redraw to cure its constitutional violation weighs against compelling the State to conduct a special election. Leg. Defs.' Pos. Stat. at 8-9. Accepting Legislative Defendants' argument would be tantamount to concluding that the more widespread the constitutional violation and the more pervasive the injurious effects of that violation, the less license courts have to remedy that violation. But the Supreme Court has repeatedly held that "the nature of the violation determines the scope of the remedy," meaning that the scope of permissible remedies increases as the constitutional violation becomes more extensive. See Swann, 402 U.S. at 16. Therefore, if we were to accept Legislative Defendants' argument that their unconstitutional districting plans are "too big to remedy," we would provide a perverse incentive to state legislatures that choose to engage in unjustified race-based districting to do so as pervasively as possible so as to insulate their districting plans from effective judicial relief.

Contrary to Legislative Defendants' position, then, we conclude that the substantial number of legislative districts that must be redrawn to remedy the sweeping constitutional violation weighs in favor of ordering a special election.

In addition to having a broad geographic scope, the constitutional violation harms millions of individuals. Of course, Plaintiffs and other voters living in districts with lines drawn based on race suffer most directly the injurious effects attributable to the unconstitutional racial gerrymanders. As the Supreme Court has explained, the racial gerrymanders violated these citizens' constitutional right to enfranchisement untainted by "impermissible racial stereotypes." Shaw, 509 U.S. at 647. To that end, in this case, numerous Plaintiffs testified to the affront they experienced as a result of the challenged districting scheme. For instance, Plaintiff Sandra Covington told the court that she felt "plucked out of [her] district and placed into another district simply because of [her] race." Trial Tr. vol. II (Apr. 12, 2016) at 102:19-23, ECF No. 110. African-American Plaintiffs described their surprise when they learned that they had been separated from their white neighbors solely on the basis of their race and recalled the uncomfortable associations with past discrimination that this new affront brought to mind. Trial Tr. vol. I (Apr. 11, 2016) at 214:1-10, ECF No. 109 (testimony of Rev. Julian Pridgen, summarizing the reaction of many African Americans to the challenged maps as "the same stuff, new day" that "contributes to a history of systematic racism and pain").

During oral argument, Legislative Defendants sought to cabin the harms of their constitutional violation to individuals in the

twenty-eight majority-minority districts. See Hr'g Tr. (July 27, 2017) at 97:3-20, ECF No. 181 ("There are 28 illegal districts. That's only about 16 percent of the entire General Assembly. Those 28 districts . . . currently elect 28 African-American Democrats. Every other district in that General Assembly is legal."). But the Supreme Court has "consistently described a claim of racial gerrymandering as a claim that race was improperly used in the drawing of the boundaries of one or more specific electoral districts." Ala. Legislative Black Caucus v. Alabama, 135 S. Ct. 1257, 1265 (2015) (first emphasis added). Every boundary has two sides. And when, as here, a legislature shifts African Americans to a district on one side of a boundary because of their race, it also necessarily shifts non-African Americans to the adjacent district on the other side of the boundary based on their race.

Accordingly, because "separat[ion of] citizens into different voting districts on the basis of race" is the constitutional harm attributable to racial gerrymandering, see Miller, 515 U.S. at 911-12, citizens who were drawn out of districts on the basis of their race also suffer harm from the unconstitutional districting plans, see id. at 916 (explaining that, to establish a racial gerrymandering claim, a plaintiff must show that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district" (emphasis added)).

25

And the harms of the far-reaching gerrymanders invalidated by the Court are not limited to the eight million voters in districts with lines drawn based on an unjustified consideration of race. Rather, the districting plans adversely affect all North Carolina citizens to the extent their representatives are elected under a districting plan that is tainted by unjustified, race-based classifications.

At trial, Plaintiffs put forward testimony from numerous elected officials who explained that the challenged racial gerrymanders divided existing communities along racial lines, disrupting their efforts to build coalitions of voters of all races. See, e.g., Trial Tr. vol. I (Apr. 11, 2016) at 80:9-25 (testimony of Sen. Dan Blue, explaining that the challenged districting scheme suggested that "only black people will vote for black candidates and whites will vote for white candidates"); id., vol. II (Apr. 12, 2016) at 12:9-13:2 (testimony of Sen. Angela Bryant, explaining that the challenged scheme harmed the interests of multiracial communities by disrupting existing multiracial coalitions in favor of districts that paired minority communities with no such existing ties). In these ways, and many others, the constitutional violation at issue here infringed on voters' "interest in having . . . representatives elected in accordance with the Constitution." Personhuballah v. Alcorn, 155 F. Supp. 3d 552, 560-61 (E.D. Va. 2016). This is an interest shared by all

North Carolinians—not just those who reside in districts with lines drawn based on race.

Finally, regarding duration, as Plaintiffs rightly emphasize, these harms have persisted for over six years, tainting three separate election cycles and six statewide elections. Even after the Court deemed the existing maps unconstitutional, it granted the State's request to conduct the November 2016 general elections using the invalidated maps due to the infeasibility of enacting remedial districting plans and readying the State and its citizens for an election under those plans in less than three-months' time. Covington I, 316 F.R.D. at 177. That this constitutional violation has infected so many elections and deprived North Carolinians of constitutionally adequate representation during numerous state legislative sessions enhances its severity and supports imposing a more robust remedy.

*          *          *

Taken together, the effects of the racial gerrymanders identified by the Court—and affirmed by the Supreme Court—are widespread, serious, and longstanding. Beyond the immediate harms inflicted on Plaintiffs and other voters who were unjustifiably placed within and without districts based on the color of their skin, Plaintiffs—along with millions of North Carolinians of all races—have lived and continue to live under laws adopted by a state legislature elected from unconstitutionally drawn districts. The

nature and severity of this ongoing constitutional violation counsel in favor of granting Plaintiffs' request for a special election.

B.  Judicial Restraint and State Sovereignty

A second factor the Supreme Court identified as relevant to the Court's determination regarding whether to order a special election is "the need to act with proper judicial restraint when intruding on state sovereignty." Covington, 137 S. Ct. at 1626. Two considerations guide our analysis of this factor.

First, a "basic principle[] of our democratic system" is that "sovereignty is vested in the people." See U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 793-94 (1995) (internal quotations omitted).  This democratic ideal of "[t]he people's ultimate sovereignty" predates the Founding and is enshrined in the Declaration of Independence.  Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n, 135 S. Ct. 2652, 2675 (2015).  The North Carolina Constitution also expressly preserves inviolate the "[s]overeignty of the people." N.C. Const. art. I, § 2.  Because the North Carolina Constitution vests "ultimate sovereignty . . . in the people . . . they alone can say how they shall be governed." Jamison v. City of Charlotte, 80 S.E.2d 904, 915 (N.C. 1954). Accordingly, we must assess any intrusion on state sovereignty from the perspective of the people of North Carolina.

Second, the Fourteenth Amendment was "specifically designed as an expansion of federal power and an intrusion on state sovereignty." Gregory v. Ashcroft, 501 U.S. 452, 468 (1991) (internal quotation marks omitted). As a consequence, remedying a state action that violates the Fourteenth Amendment almost always entails some intrusion on state sovereignty. See Edelman v. Jordan, 415 U.S. 651, 667–68 (1974). This is particularly true in redistricting cases. Because "state legislatures have primary jurisdiction over legislative reapportionment," White v. Weiser, 412 U.S. 783, 795 (1973) (internal quotation marks omitted), remedying a state districting plan that violates the Fourteenth Amendment necessarily entails judicial invasion of a sovereign state function, see Reynolds, 377 U.S. at 584. Accordingly, that a special election will, to some degree, intrude on state sovereignty does not necessarily mean that this factor weighs against ordering such an election. Rather, a court must determine whether a special election constitutes an undue intrusion on state sovereignty or, put differently, whether such a remedy is disproportionate to the constitutional violation. With these guiding principles in mind, we turn to whether the potential intrusion on state sovereignty in this case weighs against ordering a special election.

Legislative Defendants assert that ordering a special election would harm sovereign state interests by "abrogat[ing] or

modif[ying]" a number of state laws, including: (1) provisions in the North Carolina Constitution establishing two-year terms for legislators and district residency requirements for legislative candidates; (2) a North Carolina statute providing for filling legislative vacancies arising through resignation or death by gubernatorial appointment, N.C. Gen. Stat. § 163-11—a statute Legislative Defendants maintain amounts to a "sovereign determination that special elections generally are not worth the time and expense"; and (3) constitutional provisions providing for two-year legislative sessions and allowing the General Assembly to establish its own legislative schedule. Leg. Defs.' Pos. Stat. at 15-16.

We note that some of these alleged harms amount to either a minimal intrusion on state sovereignty or no intrusion at all. In particular, a state statute governing the filling of occasional legislative vacancies arising through resignation or death says nothing about whether the people of North Carolina have concluded that a special election is "not worth the time and expense" when imposed to remedy a widespread, serious, and longstanding violation of constitutionally protected voting rights. And because sovereignty lies with the people—and the various elected officials and bodies to whom voters delegate their sovereignty by virtue of a lawfully conducted election—inconvenience to legislators elected under an unconstitutional districting plan

resulting from such legislators having to adjust their personal, legislative, or campaign schedules to facilitate a special election does not rise to the level of a significant sovereign intrusion.

That being said, a judicial order temporarily suspending North Carolinians' determination, enshrined in their Constitution, that their state legislators should serve two-year terms does amount to an intrusion on state sovereignty.[3]  In considering whether this intrusion is disproportionate to the constitutional violation at issue, we conclude that it is not unduly intrusive. Rather, the serious and widespread nature of the constitutional violation—and this Court's previous exercise of judicial restraint in declining to immediately remedy the constitutional violation—

---

[3] We note that just as holding a special election would require temporarily disregarding certain provisions in the North Carolina Constitution, so too would allowing the challenged districting plans to remain in place.  In particular, under the "Whole County" provision in the North Carolina Constitution, legislative district lines should not traverse county lines unless such traversals are required by federal law.  See N.C. Const. art. II, §§ 3(3), 5(3); Stephenson, 562 S.E.2d at 396-98.  We concluded that the General Assembly's basis for disregarding the Whole County provision—that the Voting Rights Act required the creation of majority-minority districts—was not supported by the evidence considered by the General Assembly when it adopted the districting plans.  Covington I, 316 F.R.D. at 124.  Accordingly, based on the evidence considered by the General Assembly and presented to this Court, federal law did not require disregarding the Whole County provision.

substantially outweigh the intrusion associated with temporarily shortening the terms of legislators elected in districts that must be redrawn.

As previously explained, "[t]he scope of the remedy must be proportional to the scope of the violation." Brown v. Plata, 563 U.S. 493, 531 (2011). Accordingly, a more pervasive constitutional violation may justify—indeed, demand—a more intrusive remedy. And when confronted with widespread, serious, and persisting constitutional violations, the Supreme Court has sanctioned remedies that intrude significantly on state sovereignty. See, e.g., id. at 499-502 (approving district court order requiring state to remedy Eighth Amendment violations attributable to prison overcrowding, including through the construction of new facilities, transfer of prisoners out of the state, or the early release of prisoners before completion of their sentences); Milliken v. Bradley, 433 U.S. 267, 281-89 (1977) (rejecting challenge to district court order remedying de jure segregation in Detroit school system, notwithstanding that the remedial order imposed significant curricular, training, and testing requirements that would have "a direct and substantial impact on the state treasury").

Along those lines, in cases involving unconstitutional burdens on the right to vote, including racial gerrymandering, numerous courts—including the Supreme Court—have concluded that

shortening the terms of elected officials and ordering a special election does not unduly intrude on state sovereignty, particularly when the constitutional violation is widespread or serious. See, e.g., Hadnott v. Amos, 394 U.S. 358, 367 (1969); Goosby v. Town Bd. of Town of Hempstead, 180 F.3d 476, 498 (2d Cir. 1999); Griffin v. Burns, 570 F.2d 1065, 1079–80 (1st Cir. 1978); Bell v. Southwell, 376 F.2d 659, 665 (5th Cir. 1967); Large v. Fremont Cty., No. 05-CV-0270, 2010 WL 11508507, at *15 (D. Wyo. Aug. 10, 2010); United States v. Osceola Cty., 474 F. Supp. 2d 1254, 1256 (M.D. Fla. 2006); Smith v. Beasley, 946 F. Supp. 1174, 1212–13 (D.S.C. 1996); Clark v. Roemer, 777 F. Supp. 471, 484-85 (M.D. La. 1991); Williams v. City of Dallas, 734 F. Supp. 1317, 1318, 1415 (N.D. Tex. 1990); Ketchum, 630 F. Supp. at 565–68; Tucker v. Burford, 603 F. Supp. 276, 279–80 (N.D. Miss. 1985); Cosner v. Dalton, 522 F. Supp. 350, 364 (E.D. Va. 1981); Coal. for Educ. in Dist. One v. Bd. of Elections of City of New York, 370 F. Supp. 42, 58 (S.D.N.Y. 1974).

Here, the General Assembly unjustifiably, and therefore unconstitutionally, drew 19 majority-minority House districts (out of 120 House districts), and 9 majority-minority Senate districts (out of 50 Senate districts), and dozens of other districts adjoining those majority-minority districts. It is undisputed that this violation requires redrawing nearly 70% of the state House and Senate districts, affecting over 80% of the state's

voters.  This constitutes one of the most widespread racial gerrymanders ever held unconstitutional by a federal court and is substantially more widespread than constitutional violations other courts have concluded were sufficiently broad in scope to warrant the imposition of a special election.  Compare, e.g., Smith, 946 F. Supp. at 1212-13 (ordering special election after finding 6 of 124 state house districts and 3 of 46 state senate districts constituted racial gerrymanders); Ketchum, 630 F. Supp. at 565-68 (ordering special election in 7 of 50 aldermanic wards as remedy for municipal districting plan that violated the Voting Rights Act).

The widespread scope of the constitutional violation at issue—unjustifiably relying on race to draw lines for legislative districts encompassing the vast majority of the state's voters— also means that the districting plans intrude on popular sovereignty.  Because the vote is both the mechanism through which the people delegate their sovereignty to elected officials and the mechanism by which the people ensure that elected officials "have 'an habitual recollection of their dependence on the people,'" Ariz. State Legislature, 135 S. Ct. at 2677, "[a]n aspect of sovereignty is the right of the people to vote for whom they wish," Thornton, 514 U.S. at 820; see also Powell v. McCormack, 395 U.S. 486, 540-41 (1969) ("[T]he true principle of a republic is, that the people should choose whom they please to govern them."

(alteration in original) (quoting 2 Debates on the Federal Constitution 257 (J. Elliot ed., 1876))). By unjustifiably relying on race to distort dozens of legislative district lines, and thereby potentially distort the outcome of elections and the composition and responsiveness of the legislature, the districting plans interfered with the very mechanism by which the people confer their sovereignty on the General Assembly and hold the General Assembly accountable.

In addition to the widespread nature of the constitutional violation, we also note that this Court's previous exercise of judicial restraint weighs in favor of ordering a special election. In particular, in our August 2016 opinion finding that the challenged districting plans violated the Fourteenth Amendment, this Court declined to enjoin the use of the unconstitutional districts in the impending November 2016 general election despite recognizing that the "unconstitutional, challenged districts ha[d] already caused Plaintiffs substantial stigmatic and representational injuries." Covington I, 316 F.R.D. at 176–77. Because "requir[ing] the state of North Carolina to postpone its 2016 general elections . . . would . . . create considerable confusion, inconvenience, and uncertainty among voters, candidates, and election officials," the Court allowed the "elections to proceed as scheduled under the challenged plans, despite their unconstitutionality." Id. at 177. In other words,

over a year ago, this Court recognized that it was dealing with "the unusual case in which a court would be justified in _not_ taking appropriate action to insure that no further elections [we]re conducted under the invalid plan." _Reynolds_, 377 U.S. at 585 (emphasis added).

When, as here, courts have declined to immediately remedy an unconstitutional districting plan due to a rapidly approaching election, those courts have concluded that the balance of equities favors later ordering a special election because "citizens are entitled to have their rights vindicated as soon as possible so that they can vote for their representatives under a constitutional apportionment plan." _Smith_, 946 F. Supp. at 1212; _Cosner_, 522 F. Supp. at 364. We agree, and therefore conclude that this Court's exercise of judicial restraint in allowing the State to use the unconstitutional districting plans in the 2016 elections weighs heavily in favor of ordering a special election.

Legislative Defendants nonetheless argue that this factor weighs against ordering a special election because such an "election would at least cut th[e terms of legislators elected in November 2016 to represent districts that must be redrawn] in half, effectively halving the voting power of millions of North Carolinians." Leg. Defs.' Pos. Stat. at 14. But the ordering of a new election does not dilute the votes of citizens who voted in an earlier constitutionally defective election. _See Griffin_, 570

F.2d at 1079 n.14.  On the contrary, citizens who voted in the earlier election "remain[] free to vote" in the special election. Id.  And because "[t]he Constitution protects the right of all citizens to democratic processes, not the right of any particular candidate or voters to a certain result," neither legislators nor voters have a constitutionally—or even legally—cognizable interest in legislators elected in unconstitutionally drawn districts retaining their seats for the full length of their term.  Id.  More significantly, this argument wholly disregards the rights of voters within and without the challenged districts who have had their voting power unconstitutionally distorted based on race.

*        *        *

In sum, the widespread, severe, and longstanding nature of the constitutional violations at issue justify the intrusion on state sovereignty that a special election would entail.  That this Court has already exercised restraint by delaying Plaintiffs the relief to which they are entitled further indicates that a special election would not amount to an undue federal intrusion on state sovereignty.

C.    Disruption to the Ordinary Processes of Government

Having concluded that the first two factors weigh in favor of ordering a special election, we now turn to the final factor: "the extent of the likely disruption to the ordinary processes of

governance if early elections are imposed." _Covington_, 137 S. Ct. at 1626.

In analyzing this factor, we again are guided by the foundational principle that "sovereignty itself remains with the people, by whom and for whom all government exists and acts." _Yick Wo v. Hopkins_, 118 U.S. 356, 370 (1886). To that end, the North Carolina Constitution provides that "[a]ll political power is vested in and derived from the people; all government of right originates from the people, is founded upon their will only, and is instituted solely for the good of the whole." N.C. Const. art. I, § 2; _see also_ _State Emps. Ass'n of N.C. v. N.C. Dep't of State Treasurer_, 695 S.E.2d 91, 95 (N.C. 2010) ("Government agencies and officials exist for the benefit of the people . . . ."). Accordingly, we must consider the "disruption to the ordinary processes of governance," _Covington_, 137 S. Ct. at 1626, attributable to a special election from the perspective of the _people_—specifically, North Carolinians who have long lacked constitutionally adequate representation in their General Assembly.

For this reason, we reject Legislative Defendants' claim that a special election would unduly disrupt the ordinary processes of government because "legislators . . . have established relationships with their constituents" and legislators "with redrawn districts would have every incentive to neglect their

current constituents and focus their efforts on voters residing in newly configured districts." Leg. Defs.' Pos. Stat. at 9-10. Contrary to Legislative Defendants' position, we view shifting legislators' attention from the constituents in their unconstitutional districts to constituents in constitutional districts as, at least partially, remedying Plaintiffs' injury and benefitting the people of North Carolina. In particular, because legislators will focus on representing the interests of the constituents in their new districts—rather than the districts we held constituted unconstitutional racial gerrymanders—there is less risk that the legislators will see their "primary obligation [a]s to represent only the members of [a particular racial] group, rather than their constituency as a whole." Shaw, 509 U.S. at 648.

Even though we reject Legislative Defendants' argument regarding this alleged burden on legislators imposed by a special election, we nonetheless conclude that a special election would significantly interfere with the ordinary processes of state government. We note that if the Court orders a special election, county boards of election will execute at least five elections in just over a twelve-month period: municipal elections during the

fall of 2017;[4] a special primary election in December 2017; a special general election in March 2018; a primary election in May 2018; and a general election in November 2018. Hr'g Tr. (July 27, 2017) 50:3-18, 110:11-22; Pls.' Suppl. Br. on Remedies, Ex. 1. Plaintiffs' witness George Gilbert, who served as Director of Elections for Guilford County for twenty-five years, could recollect only one instance in which five elections were conducted in a twelve-month period. Hr'g Tr. (July 27, 2017) 26:22-23, 37:22-25, 38: 1-4. The close succession during which voters would be called upon to participate in both special and regularly scheduled elections risks generating substantial voter confusion and resulting low voter turnout, as voters may believe they need only vote in state legislative elections once during a single calendar year.

Beyond the large number of elections that would take place in North Carolina over a short time frame, the insertion of a special election into the State's election calendar would create problematic scheduling overlaps. Most notably, Plaintiffs'

---

[4] According to the testimony of the Executive Director of the State Board of Elections and Ethics Enforcement, Kim Westbrook Strach, over ninety counties will hold municipal elections in November 2017, with a smaller subset of counties conducting municipal elections in both October and November 2017. Hr'g Tr. (July 27, 2017) 50:3-22. Two municipalities and one county will hold municipal elections in September, October, and November 2017. Id.

proposed schedule contemplates that the special general election for legislative candidates would occur on March 6, 2018. Pls.' Suppl. Br. on Remedies, Ex. 1. The statutory candidate filing deadline for individuals planning to run for a seat in the legislature during the regularly scheduled November 2018 general election falls between February 12 and 28, 2018. Pos. Stat. by State of N.C. & State Bd. of Elections, Ex. 1 (Decl. of Kim Westbrook Strach) at 4, ECF No. 162-1. As a practical matter, Plaintiffs' schedule would require legislative candidates to file to run in the November 2018 general election before the March 2018 general special election takes place. Candidates, therefore, would in effect be required to run two simultaneous election campaigns for the same seat. That the same candidates would be running for the same seats twice in a single calendar year—with overlapping election schedules—would further confuse voters and drive poor turnout.

We also note that Plaintiffs' proposed schedule envisions requiring the General Assembly to enact new districting maps by August 11, 2017. As we explained in our order establishing the September 1, 2017, deadline for the General Assembly to draw remedial maps—subject to a two-week extension if the General Assembly satisfied certain public disclosure conditions—Plaintiffs' proposed schedule would have allowed insufficient time for the General Assembly to obtain and incorporate public input on

its redistricting criteria and draft districting plans, and to engage in the robust debate and discussion necessary to enact plans that fully remedy the constitutional violations. Covington III, 2017 WL 3254098, at *2. Although nothing stopped the General Assembly from beginning the redistricting process earlier, we nonetheless concluded that allowing the legislature time to solicit, receive, and incorporate public feedback on its criteria and proposed plans would benefit all North Carolinians. Id.

Additionally, Plaintiffs' proposed schedule would have allowed this Court less than two weeks to review—as we must—the enacted remedial plans to determine if they are "legally acceptable." Cane v. Worcester Cty., 35 F.3d 921, 927 (4th Cir. 1994). "If the legislative body fails to respond or responds with a legally unacceptable remedy, the responsibility falls on the District Court to exercise its discretion in fashioning a near optimal plan." Id. (internal quotation marks omitted). We do not believe that allowing such a short period for judicial review of the enacted remedial plans would be in the best interests of Plaintiffs or the people of North Carolina because it would not provide this Court with adequate time to review the plans and, if necessary, fashion alternative remedial plans. Id. (explaining that a legislatively proposed plan "is a legally unacceptable remedy if it violates constitutional or statutory voting rights— that is, if it fails to meet the same standards applicable to an

original challenge of an electoral scheme" (internal quotation marks and alterations omitted)).

Because we provided the General Assembly with several more weeks to enact new districting plans than Plaintiffs' proposed schedule contemplated—and reserved more time for this Court to review those plans and, if necessary, impose our own remedial plans—continuing to otherwise adhere to Plaintiffs' timeline would push back a special primary election to early 2018 and a special general election to April 2018, at the earliest. This delay would lead to an even longer overlap between the two election cycles and an even shorter period between the two general elections, further increasing the harm to North Carolina voters.

In emphasizing the problems with Plaintiffs' proposed special election schedule, we do not mean to criticize Plaintiffs for pursuing such relief. On the contrary, Plaintiffs justifiably ask—and expect—the judiciary to remedy their serious constitutional injuries as quickly as possible. And we recognize that the procedural path of this case—with this Court obtaining jurisdiction on the last day of June 2017, Certified Copy S. Ct. J., ECF No. 158, without remedial districting plans in place—left precious little time to provide such relief before the start of the 2018 election cycle. To avoid the significant disruption caused by overlapping and compressed election cycles—while allowing adequate time for the General Assembly to enact remedial

maps and for this Court to review those maps—this Court would have to abbreviate the candidate filing period, the time for election officials to prepare ballots, or the length of absentee or early voting. Plaintiffs reasonably do not seek to shorten these other components of the election cycle, as doing so would require this Court to ignore a number of state laws designed to protect voters and the integrity of elections.

We note that the disruptions associated with Plaintiffs' proposed schedule are significantly greater than they would have been under the Court's original special election schedule. Under that plan, there would not have been any overlap between the 2017 special elections and the filing period for the 2018 election, and thus, the risk of voter confusion was smaller. The Court's original schedule also gave the General Assembly plenty of time to enact new districting plans and the Court sufficient time to review those plans. And it gave candidates time to decide whether to run and then to prepare their campaigns. Additionally, the Court gave the legislature significant leeway in scheduling the special elections, providing it with the opportunity to hold the special election in conjunction with some or all of the already-scheduled municipal elections, thus reducing costs and increasing voter participation. In sum, at this late date, this Court cannot order a special election without materially disrupting the districting

and electoral process in a manner that would harm all North Carolinians, including Plaintiffs.

Plaintiffs and the NAACP, as amicus curiae, nonetheless argue that the potential for disruption factor weighs in favor of ordering a special election because the Supreme Court's summary affirmance of this Court's decision calls into question, as a matter of state law, the authority of legislators elected in unconstitutional districts to legislate. Pls.' Suppl. Br. on Remedies at 5. In particular, according to Plaintiffs, "officers elected pursuant to an unconstitutional law are 'usurpers' and their acts are absolutely void." Id. (quoting In re Pittman, 564 S.E.2d 899, 901 (N.C. Ct. App. 2002)). Plaintiffs maintain that because nearly 70% of the districts must be redrawn to remedy the unconstitutional districting plans, the state Senate and House, as currently composed, lack the power to act. See id. at 5-8.

We agree with Plaintiffs that the absence of a legislature legally empowered to act would pose a grave disruption to the ordinary processes of state government. But Plaintiffs cite no authority from state courts definitively holding that a legislator elected in an unconstitutionally drawn district is a usurper, nor have we found any. On the contrary, Plaintiffs concede that whether the General Assembly, as currently composed, is empowered to act is an unsettled question of state law. See id. at 7. Given that this argument implicates an unsettled question of state law,

45

Plaintiffs and Amici's argument is more appropriately directed to North Carolina courts, the final arbiters of state law.

*       *       *

Although any decision to order a special election will inevitably "disrupt[] . . . the ordinary processes of governance," Covington, 137 S. Ct. at 1626, in this case the disruption stands to unduly harm North Carolina voters. Plaintiffs' proposed special election schedule would allow insufficient time to enact and review remedial districting plans and would generate voter confusion and, likely, poor voter turnout. This would undermine one of the primary goals this Court must pursue in crafting a remedy: putting districting plans and election procedures in place that will allow North Carolinians to choose their representatives under constitutional districting plans. Accordingly, this factor weighs heavily against granting Plaintiffs' requested special election.

### D.  Equitable Balancing

In sum, "taking account of 'what is necessary, what is fair, and what is workable,'" id. at 1625 (quoting New York v. Cathedral Acad., 434 U.S. 125, 129 (1977)), we must balance the widespread, serious, and longstanding nature of the constitutional violation at issue—a violation that infringes on North Carolinians' right to select their representatives—against the substantial disruption Plaintiffs' proposed election schedule would impose on the ordinary processes of state government. After carefully weighing

46

these competing factors, we conclude that "the individual and collective interests," id. at 1626 (internal quotation marks omitted), weigh in favor of denying Plaintiffs' request for a special election.[5]

We reach this conclusion because ordering a special election would entail either unduly abbreviating the process for enacting and reviewing new legislative districting plans, or ignoring a number of state laws designed to protect voters and the integrity of elections, or accepting the compressed, overlapping schedule proposed by Plaintiffs—which would likely confuse voters, raise barriers to participation, and depress turnout. We believe that pursuing any of these paths would not be in the best interests of

_____

[5] We recognize that, as the Supreme Court indicated, additional considerations aside from the three discussed above may bear on a court's determination regarding the appropriateness of ordering a special election as a remedy for a voting rights violation. Covington, 137 S. Ct. at 1626 ("We do not suggest anything about the relative weight of these factors (or others), but they are among the matters a court would generally be expected to consider in its balancing of the individual and collective interests at stake." (internal quotation marks omitted)). These additional considerations may include a state or municipal body's good or bad faith in drawing the challenged districts; the body's willingness, or lack thereof, to remedy the identified violation; and any harm that will inure to voters if they must wait until regularly scheduled elections to elect representatives under lawful districting plans. Even taking additional considerations like these into account, the Court concludes that a special election would not, at this late date, be "a fitting remedy for the legal violations [the Court] has identified." Id. at 1625.

Plaintiffs or the people of North Carolina.  Rather, Plaintiffs and North Carolinians are most likely to regain the representation by constitutionally elected legislators that they have long been denied through a vigorously contested election, using constitutional districting plans, with a fully energized and engaged electorate.

### III. <u>Conclusion</u>

For these reasons, and consistent with the Court's Order dated July 31, 2017, Plaintiffs' request for a special election is DENIED.

This the 19th Day of September, 2017.


            /s/
James A. Wynn, Jr.

            /s/
Thomas D. Schroeder

            /s/
Catherine C. Eagles