IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
NO. 1:15-CV-00399

| | |
|---|---|
| SANDRA LITTLE COVINGTON, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| STATE OF NORTH CAROLINA, *et al.* | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| _____ | ) |

**LEGISLATIVE DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTIONS**

**<u>INTRODUCTION</u>**

The North Carolina General Assembly scrupulously followed this Court's order to draw new legislative districts that do not use race as the predominant factor. The enacted 2017 House and Senate plans do not rely on race in any respect and instead follow traditional redistricting criteria such as county lines (as dictated by North Carolina state law), equal population, contiguity, keeping precincts whole, and considering municipal boundaries. Those plans also treat incumbents of both major political parties equally by ensuring incumbents can run and have a chance to win a district where otherwise allowed by state law.

Plaintiffs now attack four out of 170 total districts as continuing to be racial gerrymanders because, in plaintiffs' paradoxical view, not using race means using race too much. Yet the districts plaintiffs challenge are more compact, split fewer precincts,

and follow traditional redistricting criteria better than the original districts challenged by plaintiffs. Plaintiffs also advance purely state law challenges against several other districts. Plaintiffs' state law challenges are undermined by their own proposed districting plans which either violate state law requirements on their face or violate the same state law rules they claim the State's maps violate.

Plaintiffs' objections to the 2017 House and Senate plans are nothing more than an invitation to this Court to engage in judicial political gerrymandering by ignoring legitimate state policy choices and adopting districts drawn by plaintiffs which, among other things, pair incumbent legislators for political reasons. Plaintiffs' proposed house and senate districts target numerous Republican members of the legislature in this way, the only reason for which appears to be to punish those members for being Republican.[1] Indeed, even the Democratic members of the House (Representative Darren Jackson) and Senate (Senator Dan Blue) who introduced plaintiffs' plans during the legislative process

---

[1] Plaintiffs assert, with no evidence, that the legislature's incumbency protection criterion "cemented the harms" from the 2011 plans. (Doc. 187 at 6). The assumption that any current member of the legislature was elected because of the racial composition of an adjoining district is just that – an assumption not supported by the facts. Plaintiffs have never submitted evidence showing that any current legislator won his or her seat because of the composition of a district declared unconstitutional. Plaintiffs did not even attempt to make such a showing at trial and have not provided any factual basis for that claim in their objections. Amicus North Carolina State Conference of the NAACP makes the same leap of logic. (Doc. 188-2 at 10) (redistricting criteria allowed legislature to "lock in the partisan advantage it had secured through racially-gerrymandered maps."). But where is the evidence that "partisan" advantage was secured through the racial make-up of the 2011 maps? None exists. Each election in every district is an individual contest between two or more candidates driven by political dynamics at the time, fundraising, and numerous other factors. To state that these election results were solely the product of the racial composition of certain districts is stunningly speculative.

distanced themselves from those plans, emphasizing that they did not draw the maps and expressing skepticism about various aspects of the plans such as their compliance with traditional redistricting principles. Representative Jackson and Senator Blue could not provide explanations for the political pairings and lack of respect for traditional redistricting criteria such as precincts. (Tr. H. Redist. Comm., Aug. 25, 2017 at 59-89; Doc. 184-18); (Tr. S. Redist. Comm., Aug. 24, 2017 at 112-30; Doc. 184-17). They even discussed and introduced their own versions of many districts which conflicted with the districts drawn by plaintiffs. (Tr. H. Redist. Comm., Aug. 25, 2017 at 65-66; Doc. 184-18); (Tr. S. Redist. Comm., Aug. 24, 2017 at 52, 115, 120; Doc. 184-17).

Plaintiffs' objections must be rejected. First, included with plaintiffs' objections are multiple declarations and other evidence (much of which amounts to expert witness evidence) that neither plaintiffs nor their allies submitted to the legislature during the legislative process. This evidence may not be considered by this Court under established Supreme Court precedent and, in any event, should not be considered. If the Court decides to consider this evidence, out of fairness and respect for due process, it should (1) set a discovery period during which defendants may depose plaintiffs' witnesses and defendants may present expert witnesses of their own; (2) set a new briefing schedule on consideration of plaintiffs' objections following the discovery period and (3) allow the General Assembly to reconvene to consider the information if new districts become necessary.

Second, plaintiffs' racial gerrymandering objections are baseless. It is undisputed that the legislature did not consider racial data in drawing the 2017 districts. It is undisputed that the legislature did not have a racial "target" such as fifty percent plus one for certain districts. It is undisputed that the legislature did not have a rough proportionality goal. It is also undisputed that the legislature drew districts to protect incumbents of both parties. The legislature's adherence to traditional redistricting principles (many consistent with public input), including incumbency protection, dictated the shape of the districts, and plaintiffs' rank speculation does not prove otherwise. It was in fact the plaintiffs and their allies who sought to use race improperly in the drawing of districts without supporting evidence.

Third, plaintiffs advance numerous attacks on the 2017 districts that are based purely on state law. This Court does not have jurisdiction to consider these claims. But even if it did, the claims are meritless. For example, plaintiffs propose that this Court develop out of whole cloth a new state constitutional standard for mid-decade redistricting and impose it here after a court-imposed redrawing of districts. Plaintiffs also request that this Court adopt a novel interpretation of the Whole County Provision ("WCP") of the state constitution that would contravene *Stephenson v. Bartlett*, 355 N.C. 354, 562 S.E.2d 377 (2002) ("*Stephenson I*"); *Stephenson v. Bartlett*, 357 N.C. 301, 582 S.E.2d 247 (2003) ("*Stephenson II*"); *Dickson v. Rucho*, 367 N.C. 542, 766 S.E.2d 238, (2014) ("*Dickson I*"); and *Dickson v. Rucho*, 368 N.C. 481, 781 S.E.2d 404 (2016) ("*Dickson II*"). Finally, plaintiffs ask this Court to create a compactness standard under

the state constitution that has already been rejected by the state Supreme Court in *Stephenson* and *Dickson*.

This Court should decline the invitation to usurp the legitimate legislative authority of the elected representatives of the People of North Carolina and draw a map that is more favorable to the plaintiffs' political interests. Plaintiffs' objections should be overruled and this Court should allow elections to proceed under the 2017 House and Senate plans.

## BACKGROUND

### A. Plaintiffs have only alleged claims for alleged racial gerrymandering and not political gerrymandering or state constitutional claims.

Plaintiffs alleged a single cause of action in their complaint: that race was the predominant factor in the creation of the legislative districts. (Doc. 11 at 91-92). Plaintiffs' claim was based upon the cause of action first recognized in *Shaw v. Reno,* 509 U.S. 630 (1993) ("*Shaw I*"), and later amplified in *Shaw v. Hunt*, 517 U.S. 889 (1996) ("*Shaw II*"), as well as other Supreme Court cases dealing with racial gerrymandering. *See e.g. Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015) ("*Alabama*"). Plaintiffs' supported their racial gerrymandering claims by asserting that the districts disregarded traditional redistricting principles. (Doc. 11 at ¶¶ 73-253).

### B. The decision by the three-judge court.

The decision by this Court provided the framework used by the General Assembly in enacting the 2017 legislative plans. In that decision, the Court found that the 28 challenged districts were racial gerrymanders. The Court found that race predominated

in the drawing of the districts because of the legislature's belief that the evidence justified drawing Voting Rights Act ("VRA") districts at over 50%; that African Americans should have a number of districts roughly proportional to their population; and because of circumstantial evidence of gerrymandering in the form of violating traditional redistricting principles.

### C. Legislative proceedings to comply with the Court's order.

Shortly following this Court's order of July 31, 2017, the legislative leaders, Senator Ralph Hise and Representative David Lewis, met with the map drawing consultant, Dr. Hofeller. Redistricting concepts were discussed with Dr. Hofeller as leaders made plans to comply with the Court's Order. (Tr. Joint Redist. Comm., Aug. 10, 2017 at 2-5; Doc. 184-9). On July 26, 2017, the Senate Redistricting Committee and the House Select Committee on Redistricting met jointly ("Joint Committee") for organizational and informational purposes. (Tr. Joint Redist. Comm., July 26, 2017 at 2-4; Doc. 184-7). At that meeting, committee chairs made available to committee members information regarding 2010 Census population by county, the method of calculating ideal House and Senate districts for population purposes, maps submitted by Common Cause for House and Senate plans, maps that reflected the county grouping formula that Common Cause used, and the opportunities that would be available for public comment on proposed redistricting plans to be considered by the committee. (*Id.* at 5-7). No votes were taken at the meeting.

The Joint Committee then met on August 4, 2017, and received public comment about potential criteria for new maps. (Tr. Joint Redist. Comm., Aug. 4, 2017 at 26-69; Doc. 184-8). Among the recommendations the public made, many called for: compact and contiguous districts, to keep counties whole, to avoid dividing municipalities, and to keep racial data out of the criteria. (*Id.* at 39, 40, 41, 43-46, 53-54).

The General Assembly received this feedback and incorporated it to the extent possible. For instance, public commenter William Smith noted that "Voting precincts should not be divided," (*id.* at 43), and his comment was specifically cited by Representative Lewis in explaining the criteria at a joint meeting on August 10. (Tr. Joint Redist. Comm., Aug. 10, 2017 at 79; Doc. 184-9). Similarly, commenter Dianna Wynn asked the committee to "avoid dividing counties and municipalities where possible." (Tr. Joint Redist. Comm., Aug. 4, 2017 at 46; Doc. 184-8). She was later cited as a basis for the criterion limiting splitting municipalities by Representative Lewis. (Tr. Joint Redist. Comm., Aug. 10, 2017 at 66; Doc. 184-9).

On August 10, 2017, the Joint Committee met to adopt criteria to draw new maps. Input for the criteria was based on review of public comments from August 4, 2017, and through comments submitted through the General Assembly website, as well as proposed criteria submitted in writing by Senators Smith-Ingram, Blue and Clark. (Tr. Joint Redist. Comm., Aug. 10, 2017 at 4-5; Doc. 184-9). During the proceedings, the Joint Committee considered, and then adopted, criteria to be used in drawing new legislative plans. The criteria included:

- "Equal Population." The Joint Committee unanimously adopted this criterion. (*Id.* at 7-13).

- "Contiguity." The Joint Committee adopted this criterion by a vote of 24-14 in the House and a vote of 8-4 in the Senate. (*Id*. at 58-65).

- "County Groupings and Traversals. "The Committees shall draw legislative districts within county groupings as required by *Stephenson v. Bartlett,* 355 N.C. 354, 562 S.E.2d 377 (2002) (*Stephenson I*), *Stephenson v. Bartlett*, 357 N.C. 301, 582 S.E.2d 247 (2003) (*Stephenson II*), *Dickson v Ruch*o, 367 N.C. 542, 766 S.E.2d 238 (2014) (*Dickson I*) and *Dickson v. Rucho*, 368 N.C. 481, 781 S.E.2d 460 (2015) (*Dickson II*). Within county groupings, county lines shall not be traversed except as authorized by *Stephenson, I, Stephenson II, Dickson I, and Dickson II*." The Joint Committee unanimously adopted this criterion. (*Id.* at 18-24).

- "Compactness: The Committees shall make reasonable efforts to draw legislative districts… that improve the compactness of the current districts. In doing so, the committees may use as a guide the minimum Reock ("dispersion") and Polsby-Popper ("perimeter") scores identified by Richard H. Pildes and Richard G. Neimi in *Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluating Election-District Appearances After Shaw v Reno,* 92 Mich.L.Rev. 482 (1993)." (*Id.* at 24-25). The Joint Committee adopted this criterion, called by Representative Dollar, "[t]he most precise guidelines... that the General

Assembly's ever adopted with respect to compactness" (*id.* at 30) by a vote of 24 to 14 in the House and 9-3 in the Senate. (*Id.* at 37-43). When asked by members of the Democratic party why these two methods, Representative Lewis pointed out that "these are the two best-known….best understood…two that the courts have referred to." (*Id.* at 29).

- "Fewer Split Precincts: The committees shall make reasonable efforts to draw legislative districts in the 2017 House and Senate plans that split fewer precincts than the current legislative redistricting plans." (*Id.* at 79). The Joint Committee adopted this criterion by a vote of 24-14 in the House, and a vote of 8-4 in the Senate. (*Id.* at 98-104).

- "Municipal Boundaries: The Committees may consider municipal boundaries when drawing legislative districts in the 2017 House and Senate plans." (*Id.* at 105). The Joint Committee passed this criterion by a vote of 24-14 in the House, and a vote of 8-4 in the Senate. (*Id.* at 112-19).

- "Incumbency Protection: Reasonable efforts and political considerations may be used to avoid pairing incumbent members of the House or Senate with another incumbent in legislative districts drawn in the 2017 House and Senate plans. The Committees may make reasonable efforts to ensure voters have a reasonable opportunity to elect non-paired incumbents of either party to a district in the 2017 House and Senate plans." (*Id.* at 119). The Joint Committee passed this criterion by a vote of 24-14 in the House, and a vote of 8-4 in the Senate. (*Id.* at 125-32).

- "Election data: Political considerations and election results data may be used in the drawing of legislative districts in the 2017 House and Senate plans." (*Id.* at 132). The Joint Committee passed this criterion by a vote of 24-13 in the House, and a vote of 8-4 in the Senate. (*Id.* at 141-48).

- "No Consideration of Racial Data: Data identifying the race of individuals or voters shall not be used in the drawing of legislative districts in the 2017 House and Senate plans." (*Id.* at 148). The Joint Committee passed this criterion by a vote of 24-13 in the House, and a vote of 8-4 in the Senate. (*Id.* at 159-65).

Many of these criteria were very similar to several criteria proposed by Senators Blue and Smith-Ingram. On August 11, 2017, Representative Lewis and Senator Hise notified Dr. Hofeller of the criteria adopted by the redistricting committees and directed him to utilize those criteria when drawing districts in the 2017 plans. The criteria were also placed on legislative websites for the public to view and comment. (*Id.* at 193).

On August 19, 2017, the proposed 2017 House plan was released on the General Assembly website. On August 20, 2017, the proposed 2017 Senate plan was released on the General Assembly website. On August 21, 2017, a series of statistical information and reports were released for the proposed House and Senate plans.

On August 22, 2017 public hearings were held in seven different locations across the state on the proposed plans. (Tr. Pub. Hearings, Aug. 22, 2017 (Raleigh Site) at 8; Doc. 184-10). Input was also received from voters who submitted comments through the General Assembly website. (Tr. Joint Redist. Comm., Aug. 10, 2017 at 4-5; Doc. 184-9).

Many comments asked that districts be based upon whole counties and that the plans do a better job at preventing the division of precincts and municipalities. (*Id.* at 79; Tr. Pub. Hearings, Aug. 22, 2017 (Raleigh Site) at 38-39, Doc. 184-10).

The majority of the feedback from public hearings consisted of political statements by plaintiffs' allied organizations (which provided written talking points to their supporters) or just outright name-calling. The talking points provided by plaintiffs' allies were made a part of the legislative record. (Tr. Pub. Hearings, Aug. 22, 2017 (Raleigh site) at 15-16; Doc. 184-10). A copy of the talking points are attached as Exhibit 1. These points, or a variant of them, were repeated by many if not most of the public commenters. In addition, a large number of commenters engaged in name-calling and ad hominem attacks unrelated to redistricting.[2] (*See, e.g.,* Tr. Pub. Hearings, Aug. 22, 2017 (Raleigh site) at 13-14; Doc. 184-10 (Eva F. Lee: "Don't give the label of racists to your children. … Don't act like Nazis," and later accuses the General Assembly of "white supremacy."); 47 (Kim Eng Koo: the "current party in power" is "racist."); 53-55 (Tony Quarataro: invoking "white supremacy" and stating "Don't be a Tar Heel version of the disgrace who sits in the White House…"); 56 (Melva Fager Okun: "You are the equivalent of white supremacists.")); Tr. Pub. Hearings, Aug. 22, 2017 (Beaufort site) at 8; Doc. 184-11 (Bill Roach: "You're a supremacist. And if you happen to be white, fill in the blank."); Tr. Pub. Hearings, Aug. 22, 2017 (Jamestown site) at 24; Doc. 184-15 (Larry Cormier: "You implement racially-gerrymandered districts, white

---

[2] Much of these ad hominem attacks appear to have been inspired by the talking points. (See Ex. 1 at 1 (discussing "white supremacy")).

supremists -- supremacists, excuse me."); 37 (Chris Buczynski: "It's bullshit. I know it's bullshit. You know it's bullshit. We know what you're doing. The Supreme Court told you to fix it. So fix it. Don't hire the same asshole that drew the last racist-ass map."); Tr. Pub. Hearings, Aug. 22, 2017 (Weldon site) at 9; Doc. 184-16 (Jennifer Smyth: "There a whole lot of white folks' tip-toe around the fact that this is racist, and I'm not having it."). To the limited extent that public comments actually commented on the shape or locations of districts, those comments came from either plaintiffs or a few individuals aligned with the organizations now supporting plaintiffs. (Tr. Pub. Hearings, Aug. 22, 2017 (Fayetteville site) at 26-27; Doc. 184-13 (O'Linda Watkins, head of Moore County NAACP), 176 (T. Anthony Spearman, NC NAACP)); Tr. Pub. Hearings, Aug. 22, 2017 (Raleigh site) at 144-45; Doc. 184-10 (Rev. Pridgen, Covington plaintiff).

Despite the adopted criterion that race not be used in the drawing of districts, members of the Democratic party repeatedly pushed to draw districts based on race without submitting evidence justifying the use of race in that manner, contrary to this Court's ruling. (*See* Tr. H. Redist. Comm., Aug. 25, 2017 at 50-52, 95-103; Doc. 184-18). When the Senate Redistricting Committee met on August 24, 2017, Senators in the Democratic party such as Senators Blue and Van Duyn advocated for a racial numerical quota during the debate, which the Senate refused to entertain in the absence of evidence of legally sufficient racially polarized voting necessary to justify the use of racial quotas. (Tr. S. Redist. Comm., Aug. 24, 2017 at 67-77, 95-99; Doc. 184-17). Senators also emphasized prioritizing traditional redistricting principles. (*Id.* at 114-115). Thus, when

Senator Lowe advocated for the use of race in districts in Guilford County, Senator Hise explained that the district followed the city limits for Greensboro, thus adhering to a criterion to consider municipal lines in drawing districts. (*Id.* at 36). The Senate maps were approved by the Committee and no racial data was used in the development, drawing, or assignment of voters to districts by a vote of 9-4. (*Id.* at 46, 131).

The Senate met on August 25, 2017 to debate the proposed plan from the Senate Redistricting Committee. Senator Hise explained the criteria used to draw the proposed map. (Tr. S. Floor Session, Aug. 25, 2017 at 5-11; Doc. 184-19). During the debate, Senator Blue brought forth an amendment which adjusted two districts in Wake County. (*Id.* at 11). During debate over the amendment Senator Blue explicitly stated that the districts "are not racially gerrymandering" and that it "cures the gerrymander that the Court found in Wake County. (*Id.* at 13-14). Senator Blue's amendment passed by a unanimous vote. (*Id.* at 17). Similarly, in the prior Senate Redistricting Committee meeting, Senator Clark brought forward an amendment which would change the district lines to include his residence in the district. (Tr. S. Redist. Comm., Aug. 24, 2017 at 49-52; Doc. 184-17). Like Senator Blue, Senator Clark agreed that the district as amended would not be a racial gerrymander. (*Id.*). During this debate, Senator Clark never expressed any concern that the district as a whole was a racial gerrymander or that certain precincts had been included or excluded in the district on the basis of race. (*Id.*).

The number of precinct and municipality splits in the House plan became contentious in the House Redistricting Committee meeting when Representative Jackson

put forth a proposed House plan on behalf of the plaintiffs in this matter. (Tr. H. Redist. Comm., Aug. 25, 2017 at 46, 59; Doc. 184-17). When discussing the plaintiffs' maps, Representative Dollar noted that the plaintiff's maps double-bunked 18 individuals, 12 more than the committee's proposed plan, and appeared "to be quite political and gratuitous." (*Id.* at 61). Representative Stevens also noted that the plaintiffs' plan split at least 43 new precincts, while the committee's plan only split 19 new precincts. (*Id.* 70-73). Representative Brawley objected to the portion of plaintiffs' map in Mecklenburg County that split the cities of Matthews and Mint Hill into three districts. (*Id.* at 93-95). Representative Brawley also noted that the plaintiffs' proposed map in Mecklenburg County would likely "elect 11 Democrats and one Republican" and stated that it looked "like a partisan gerrymander of some of the most blatant type by breaking apart communities which have separate identities and putting them under the dominance of the City of Charlotte." (*Id.*). Representative Lewis went on to state that the map made by the Covington plaintiffs was "clearly [a] Democratic gerrymander." (*Id.* at 102).

The committee's proposed House map was approved by the House Redistricting Committee by a vote of 25-16. (*Id.* at 125). On August 28, 2017, the House met to consider the House plan approved by the House Redistricting committee. Representative Lewis explained the criteria used to draw the proposed map. (Tr. H. Floor Session, August 28, 2017 at 4-8; Doc. 184-20). Representative Lewis was also questioned about the need to redraw districts that did not touch districts which had been declared unconstitutional. (*Id.* at 45). Representative Lewis explained that "[t]he [C]ourt ordered

us to correct racial gerrymanders….freezing districts which do not touch the illegal district would require the core of the racial gerrymander as a starting point, and then we would be accused of racial gerrymandering all over again. Instead, we started with a blank slate….[which] has let us do some good things. It let us split fewer precincts, it let us keep more municipalities whole." (*Id.* at 45-46). Representative Lewis also pointed out that the state constitution does not contemplate court-ordered redistricting. (*Id.*). After debate on the floor, the House passed the plan by a vote of 65-47.  (*Id.* at 61).

Both the House and Senate plans met the criteria adopted by the Joint Committee. In terms of compactness, both plans were within both the Reock and Polsby-Popper score ranges. (Tr. H. Redist. Comm. at 11-12; Doc. 184-18); (Tr. S. Redist. Comm. at 14; Doc. 184-17). Both plans adopted the optimum county grouping required by the WCP.  As a result, for example, the House plan split only 40 counties. (Tr. H. Redist. Comm. at 11; Doc. 184-17). This compares to 60 split counties in the 2001 plan and 49 in the 2011 plan. (*Id.*). The House plan also had fewer municipal splits than many in prior years, with only 78 splits, compared to 123 in 2009 and 144 in 2011. (*Id.* at 11-12). The House plan also reduced the number of split precincts with 49 total split precincts in the plan, but with 30 of those remaining from untouched districts from the 2011 plan. (*Id.* at 12-13). Comparatively, the 2009 House plan had 285 split precincts, and the 2011 plan had 395 split precincts. (*Id.*).  In addition, the Senate plan split only 12 counties. (Tr. S. Redist. Comm. at 6; Doc. 184-17).  This compares to 51 split counties in the 2001 plan and 19 in the 2011 plan. (*Id.*). The Senate plan also had fewer municipal splits than many in prior

years, with only 61 splits, compared to 86 in 2011. (*Id.* at 9). The Senate plan also reduced the number of split precincts with 9 total split precincts in the plan. (*Id.* at 8). Comparatively, the 2003 Senate plan had 55 split precincts, and the 2011 plan had 257 split precincts. (*Id.*).

The 2017 plans also complied with the incumbency protection criterion. Except where the WCP required the pairing of incumbents, the 2017 plans provide all incumbents of both parties a district in which that incumbent has a fair chance of being elected. *Alabama*, 135 S. Ct. at 1263, 1270 ("Alabama sought to achieve numerous traditional districting objectives, such as compactness, not splitting counties or precincts, minimizing change, and protecting incumbents."); *Vieth v. Jubelirer*, 541 U.S. 267, 298 (2004) (calling incumbency protection "a traditional and constitutionally acceptable districting principle"); *Bush v. Vera*, 517 U.S. 952, 964 (1996) (recognizing incumbency protection as a "legitimate state goal"); *Karcher v. Daggett,* 462 U.S. 725, 740 (1983) (holding that "avoiding contests between incumbent [r]epresentatives" is justified); *White v. Weiser*, 412 U.S. 783, 791 (1973) (stating that where the state chose to consider, as a redistricting criterion, a policy "aimed at maintaining existing relationships between incumbent congressmen and their constituents and preserving the seniority [of] the members" that the court would "not disparage this interest"); *Burns v. Richardson*, 384 U.S. 73, 89 (1973) (holding that "district boundaries [which] may have been drawn in a way that minimizes the number of contests between present incumbents does not in and of itself establish invidiousness").

On the other hand, the House and Senate plans submitted by the Covington plaintiffs paired numerous Republican incumbents with Democrats in districts that the Democratic candidate would likely win. The Covington House plan paired at least 16 incumbents and the Covington Senate plan paired at least six incumbents. The legislators who introduced these plans as proposed amendments were not able to provide a non-political reason for why the Covington plaintiffs proposed to eliminate those Republican members from the legislature. In targeting Republican incumbents, the Covington plaintiffs sometimes sacrificed other traditional redistricting principles. For example, Covington House District 107 targets a Republican incumbent in Mecklenburg County by using water contiguity through Lake Norman to split the town of Cornelius. The proposed district would have removed a heavily Republican precinct in Cornelius and placed it into a Democratic district while making the district overall less compact. No explanation was offered by the amendment sponsor for this district.

## ARGUMENT

A. **Evidence submitted by plaintiffs outside of the legislative record should be excluded and not considered by the Court. Moreover, that evidence demonstrates that this case is moot and new claims must be filed.**

In support of their objections, plaintiffs submitted five declarations. Three of these declarations are from declarants providing what amounts to expert testimony on various aspects of the enacted plans including compactness, political performance, and alleged racial gerrymandering. None of the information presented by these declarations was submitted to the legislature during the process of enacting redistricting plans. Two

of the declarations are from Democratic state senators who were either on the redistricting committee or present during floor debate on the plans.[3] The state senator declarations provide detailed information about concerns they have with the enacted plans that was not presented by either senator on the Senate floor in debate or in committee.

Under Supreme Court precedent, these declarations must be excluded. In *Shaw II*, the appellants used information that was not presented to the legislature to demonstrate the legislature's motive in a racial gerrymandering case. The Supreme Court rejected such evidence. The Court held that the evidence was not relevant because "[o]bviously these reports….were not before the General Assembly when it enacted Chapter 7. And there is little to suggest that the legislature considered the historical events and social-science data that the reports recount…." *Id.* at 910. Similarly, the declarations described above were not before the General Assembly when it enacted the 2017 plans and should therefore not be considered by this Court in considering plaintiffs' objections.

---

[3] One of the declarations is from Senator Ben Clark who claims that his district (Senate District 21) continues to be racially gerrymandered. (Doc. 187-8). During the legislative process, Senator Clark introduced an amendment to modify Senate District 21 to include his residence. *See infra* at 38. In his declaration, Senator Clark now suggests that his own amendment contributed to a racial gerrymander. (Doc. 187-8 at ¶ 14). Interestingly, however, Senator Clark has conceded that the legislature "eliminated the racial gerrymandering" in the 2017 plans. See http://www.wral.com/new-legislative-maps-crack-door-for-democrats-or-do-they-/16895968/. In addition, Senator Clark conceded during the legislative process that he believed the amendment to Senate District 21 that he offered was legal saying, "I believe the amendment I'm providing is legal under all legal theories. It just changes the distribution of the population by approximately 300." (Tr. S. Redis. Comm. Aug. 24, 2017 at 51; Doc. 184-17).

In any event, the Court should exclude the declarations out of respect for fairness and the rule of law. The plaintiffs had numerous opportunities during the legislative process to submit these declarations and any others. Indeed, plaintiffs had their legislative allies submit plaintiffs' proposed alternative plans as proposed amendments during the legislative process. Because plaintiffs withheld these declarations, the legislature did not have the benefit of reviewing them and possibly modifying the plans based on the information. If the Court decides to consider the declarations, out of fairness and due process concerns, at a minimum the Court should (1) set a new discovery period during which defendants may depose plaintiffs' witnesses and defendants may present expert witnesses of their own; (2) set a new briefing schedule on consideration of plaintiffs' objections following the discovery period; and (3) allow the General Assembly to reconvene to consider the information if new districts become necessary.

Finally, the fact that plaintiffs can support their new claims only by developing new expert testimony and fact witnesses demonstrates that this matter is moot and that if plaintiffs want to pursue additional claims, they must file a new lawsuit. "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997). "A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)

(quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).   Here, this Court has enjoined the use of the 2011 legislative plans and those plans will not be used. Moreover, the legislature has now enacted new plans for the 2018 elections.   There is therefore nothing left for this Court to do.[4]

Similarly, plaintiffs no longer have a concrete stake in the outcome of the case because they face no realistic threat of injury from the 2011 legislative plans.   To maintain a live case or controversy:

> [t]he parties must continue to have a "personal stake in the outcome" of the lawsuit. . . . . This means that, throughout the litigation, the plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision."

*Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477–78 (1990)). For this reason, the doctrine of mootness is often characterized as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its

---

[4] The so-called "objections" filed by plaintiffs do not change this result. While this Court has the authority ultimately to enjoin some or all of the new 2017 redistricting plans, it may only do so in the context of an actual live case or controversy between the parties, which does not exist absent a new lawsuit.  Plaintiffs have not cited any authority for the proposition that filing "objections" to a new redistricting plan may substitute for a live case or controversy created by a new lawsuit.  Of course, had this Court taken it upon itself to draw districts itself in the first instance, such authority would have been exercised under the case or controversy that previously existed between the parties. However, now that the legislature has adopted new plans to replace the 2011 plans, the case filed by plaintiffs over those plans is moot.  For this same reason, plaintiffs' claim that the burden has shifted to the legislature to prove that the districts are not racial gerrymanders is incorrect (Doc. 187 at 19).  None of the cases cited on that point by plaintiffs involve redistricting, and for good reason.  Once the legislature enacts a new map, the controversy reflected by the old map dissolves rendering the case moot.

existence (mootness)." *Arizonans for Official English*, 520 U.S. at 68 n.22; *cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (explaining that Article III standing requires the plaintiff to identify "a concrete and imminent invasion of a legally protected interest that is neither conjectural nor hypothetical"); *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon the validity of a statute upon complaint of one who fails to show that he is injured by its operation."). Because the claims asserted by all plaintiffs are directed at legislation that has now been repealed and replaced, plaintiffs cannot demonstrate that they are likely to be harmed by the challenged redistricting plans. Plaintiffs' inability to identify any threat of injury deprives them of a concrete stake in the outcome of this case, rendering the case moot and divesting this Court of subject matter jurisdiction.

**B.    This Court's review of the 2017 plans is at most limited to plaintiffs' racial gerrymandering claims.**

Plaintiffs' arguments show that they simply disagree with the policy judgments made by the General Assembly in enacting the 2017 House and Senate plans and want the Court to toss the General Assembly's policy prerogatives aside and replace them with the plaintiffs' political preferences.  The Supreme Court has recently instructed district courts to decline such overtures.  *See Perry v. Perez*, 565 U.S. 388, 394 (2012) (stating that, in case where court adopted an interim map, a district court cannot "displac[e] legitimate state policy judgments with the court's own preferences" and finding that when "the District Court exceeded its mission to draw interim maps that do not violate the Constitution or the Voting Rights Act, and substituted its own concept of 'the collective

public good' for the Texas Legislature's determination of which policies serve 'the interests of the citizens of Texas,'" the court erred."). In *Perez*, the Supreme Court found that the district court overstepped its bounds when it declined to give as much effect as possible to policy judgments made by the Texas legislature in previous districting plans even though the court sought to adopt a map "without regard to political considerations." *Id.* at 396 (explaining that the district court had available to it "the benefit of a recently enacted plan to assist it" and "the court had neither the need nor the license to cast aside that vital aid.").

Similarly, plaintiffs' attack on districts for reasons other than alleged racial gerrymandering is foreclosed by Supreme Court precedent. In *Upham v. Seamon*, 456 U.S. 37 (1982), the Supreme Court considered a three-judge court's rejection and redrawing of a congressional plan enacted by the Texas legislature. There the United States Attorney General objected to two districts and refused to preclear them under Section 5 of the VRA. *Id.* at 38-39. The three-judge court proceeded to draw a remedial plan which resolved the Attorney General's Section 5 objections to those two districts. *Id.* at 39-40. The three-judge court, however, did not stop there. The three-judge court also redrew several other districts which it perceived did not meet the non-retrogression standard of Section 5. *Id.* at 39-40.

This was error. The Supreme Court reiterated the principles for judicial review of redistricting plans:

> From the beginning, we have recognized that "reapportionment is primarily a matter for legislative consideration and determination, and that judicial

relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." We have adhered to the view that state legislatures have "primary jurisdiction" over legislative reapportionment . . . . Just as a federal district court, in the context of legislative reapportionment, should follow the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution, we hold that a district court should similarly honor state policies in the context of congressional reapportionment. In fashioning a reapportionment plan or in choosing among plans, a district court should not pre-empt the legislative task nor 'intrude upon state policy any more than necessary.'

*Id.* (citing *White v. Weiser*, 412 U.S. 783, 794–95 (1973) (internal citations and quotations omitted)). *See also Harris v. McCrory*, Case No. 13-949 (Doc. 171 at 4) (citing *Upham* and agreeing that review by a three-judge court of redistricting plan in this context is "limited") (Gregory, J.).

The Court also explained it is error for a lower court to order a remedial plan "that reject[s] state policy choices more than [is] necessary to meet the *specific constitutional violations involved.*" *Upham*, 456 U.S. at 39-40 (citing *Whitcomb v. Chavis*, 403 U.S. 124, 160–61 (1971)) (emphasis added). Further, an "appropriate reconciliation of these two goals [meeting Constitutional requirements and State political policy] can only be reached if the district court's modifications of a state plan are *limited to those necessary* to cure any constitutional or statutory defect." *Id.* (emphasis added). Under these established principles, it was erroneous for the three-judge court to make changes to districts that were not the subject of the original Section 5 objection.

The Fourth Circuit, in a case cited by plaintiffs, has similarly rejected court-drawn remedial plans that strayed from the original violation. In *McGhee v. Granville Cnty., N.C.*, 860 F.2d 110 (4th Cir. 1998), the court explained:

> Where, however, the legislative body does respond with a proposed remedy, a court may not thereupon simply substitute its judgment of a more equitable remedy for that of the legislative body; it may only consider whether the proffered remedial plan is legally unacceptable because it violates anew constitutional or statutory voting rights—that is, whether it fails to meet *the same standards applicable to an original challenge of a legislative plan in place.*

*Id.* at 115-18 (emphasis added). Thus, as in *Upham*, a court may not roam around the new map seeking other districts to "remedy." Instead, the court must "accord great deference to legislative judgments about the exact nature and scope of the proposed remedy, reflecting as it will a variety of political judgments about the dynamics of an overall electoral process that rightly pertain to the legislative prerogative of the state and its subdivisions." *Id.*

As in *Upham*, the Fourth Circuit in *McGhee* rejected a remedial plan that went beyond fixing the original violation found by the district court. *Id.* at 120. *McGhee* was a Section 2 vote dilution case where plaintiffs challenged the at-large electoral system for county commissioners in Granville County, North Carolina. *Id.* at 112-113. The county responded to the Section 2 violation by adopting a new plan which increased the number of county commissioners from five to seven, and replaced the at-large system with seven single-member districts. *Id.* at 113. The plaintiffs, however, were not satisfied. They conceded that the single-member districts drawn by the county gave African American

voters the best opportunity to elect representatives of choice that could be given them under a solely single-member districting plan. *Id.* Nonetheless, they requested that the district court impose a unique system of voting called "limited voting," wherein commissioners would continue to be elected at-large, but voters would be allowed only three votes or less if they chose when voting for commissioners. *Id.* at 114. The district court agreed and imposed plaintiffs' remedy on the county. *Id.*

The Fourth Circuit unanimously reversed. It held that the district court's remedy had gone beyond the "specific violation alleged and established" – "'vote dilution' by the 'submergence' of minority voters' potential voting power through the use of an at-large electoral process." *Id.* at 115. Indeed, the plaintiffs' "concession" that the violation had been remedied through redistricting "establish[ed] the plan as a legally adequate one that should have been accepted in deference to the affected local government's primary jurisdiction to ordain its electoral process." *Id.* at 118. The Fourth Circuit also rejected any argument that the possibility that the county's remedial plan might violate Section 2 in other ways should result in a court-imposed plan: "[w]hether other elements of the County's remedial plan may *now or in time cause different forms of cognizable [Section] 2 harm* to these persons as a discrete sub-group of the original plaintiff class *is not before us.* We *only* determine here that as to the class of which they are members in this litigation the County plan adequately remedies the dilution-by-submergence *violation specifically alleged and established* in respect of that entire class." *Id.* at 119 n.10 (emphasis added).

Moreover, this Court lacks jurisdiction as a three-judge court to consider any claims outside of alleged racial gerrymandering. When Congress enacted the current version of 28 U.S.C. § 2284, Congress intended to "reduce sharply the class of cases requiring the convening of a three-judge court." *City of Philadelphia v. Klutznick*, 503 F.Supp. 657, 658 (E.D. Pa. 1980). Three-judge district court panels are statutory in nature with "a limited sphere of operation" whose "technical requirements relating to jurisdiction are to be strictly construed." *Jehovah's Witnesses in State of Wash. v. King County Hospital Unit No. 1 (Harborview)*, 278 F. Supp. 488, 493 (W.D. Wash.1967), aff'd, 390 U.S. 598, rehearing denied, 391 U.S. 961. The policy behind convening a three-judge court is that a single judge should not "be empowered to invalidate a state statute under a federal claim." *Id.* Therefore, the attacked state action must be based on the Constitutionally-challenged statute. *Id.* This requirement also extends to any other claims a plaintiff might bring in the lawsuit.

It is well established that "any rights asserted by the plaintiffs under other federal statutes or Constitutional provisions can be asserted only before the [single district judge]." *Robertson v. Bartles*, 148 F.Supp.2d 443, 461 (D.N.J. 2001) (*quoting Gordon v. Executive Comm. of the Democratic Party of Charleston*, 335, F.Supp. 166, 170 (D.S.C. 1971.) Even if the claims involve issues closely related to those in representation claims, but fall outside the statutory language of 28 U.S.C. § 2284, the Court should dismiss the case for lack of jurisdiction. *Adams v. Clinton*, 90 F.Supp.2d, 35, 38-39 (D.D.C. 2000) (*citing Public Serv. Comm'n v. Brashear Freight Lines*, 312 U.S. 621, 625 (1941)

(holding that a three-judge court should not consider "questions not within the statutory purpose for which the two additional judges ha[ve] been called")).

Separation of claims is especially important when claims arise under state law. In *Robertson,* a three-judge panel properly convened under 28 U.S.C. § 2284, refused to hear a claim brought by the same plaintiffs against defendant alleging that the one-year residency requirement in the New Jersey Constitution was likewise unconstitutional. *Robertson,* 148 F.Supp. at 461. The court refused to hear the case on the grounds that the case belonged either in State court or at the very least before a single district court judge. *Id.* at 459, 461-62. Likewise, in *Perez v. Ledesma,* 401 U.S. 82, 86-87 (1971) the Supreme Court refused to review a portion of the three-judge panel's decision involving a local ordinance, because the Supreme Court found that the panel had no jurisdiction to hear the claim over the local ordinance, only jurisdiction to hear what was conferred in 28 U.S.C. § 2284.

An unconstitutional application of valid state law is likewise improper for a three-judge court to hear, as the statutory purpose of convening a three-judge court is to provide "procedural protection against state wide doom by a federal court of a state's legislative policy." *Keiser v. Bell*, 332 F.Supp. 608,613 (E.D. Pa. 1971) (quoting *Phillips v. United States*, 312 U.S. 246, 251 (1941). In writing for a unanimous court in *Phillips,* Justice Frankfurter made an important clarification, noting that "an attack on lawless exercise of authority is *not* an attack upon the constitutionality of a statute conferring the authority. *Phillips,* 312 U.S. at 252 (emphasis added). Thus, plaintiffs' arguments that the

General Assembly violated various alleged state constitutional provisions in the 2017 plans may not be heard by this court.

### C. Plaintiffs' racial gerrymandering objections are politically-motivated and legally baseless.

The constitutional deficiencies identified by this Court have been completely remedied by the 2017 plans. In order to ensure that race was not the predominant motive in the drawing of new districts, the legislature adopted criteria expressly prohibiting the consideration of race in the drawing of new plans. As a result, data regarding the race of voters was not used in the drawing of the districts, and, in fact, was not even loaded into the computer used by the map drawer to construct the districts. When the proposed new map was released, no race data accompanied it. While members of the Democratic party repeatedly tried to inject the improper use of race into the legislative process, those members refused to provide evidence of legally sufficient racially polarized voting that would justify race-based districts. Accordingly, race was not and could not have been the predominate motive for any of the districts, much less the four districts to which plaintiffs now object.

Moreover, in attempting to comply with this Court's Order, the legislature hewed much more closely to traditional redistricting principles such as compactness and following county and precinct lines than prior legislatures in enacting legislative districts. A mere visual review of the new plan demonstrates that fewer counties are divided, a minimal number of precincts were split, and that the overall plan and each district is significantly more compact than prior plans.

1. **Plaintiffs cannot show that any district in the 2017 House and Senate plans is a racial gerrymander because the General Assembly followed traditional, race-neutral districting principles in enacting these plans.**

In their objections, plaintiffs argue that four districts—House Districts 21 and 57 and Senate Districts 21 and 28—should be rejected by the Court because they continue to be racial gerrymanders. It is undisputed that the legislature did not use racial data in drawing the 2017 plans and plaintiffs have not brought forward evidence that such data was used. Instead, plaintiffs' premise their objections on circumstantial evidence from looking at district lines. But this evidence is insufficient because the district lines are clearly explained by traditional redistricting principles. *See Alabama*, 135 S. Ct. at 1270 (stating that, to prove race predominated in drawing districts, the "plaintiff must prove that the legislature subordinated *traditional race-neutral districting principles* ... to racial considerations.") (citing *Miller v. Johnson*, 515 U.S. 900, 916 (1995)) (emphasis in original); *Easley v. Cromartie*, 532 U.S. 234, 249 (2001) ("After all, the Constitution does not place an *affirmative* obligation upon the legislature to avoid creating districts that turn out to be heavily, even majority, minority. It simply imposes an obligation not to create such districts for predominantly racial, as opposed to political or traditional, districting motivations.") (emphasis in original); *Miller*, 515 U.S. at 916 (stating that, to prove that race was the predominant motivating factor, "a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations. Where these or other race-

neutral considerations are the basis for redistricting legislation, and are not subordinated to race, a State can 'defeat a claim that a district has been gerrymandered on racial lines.'") (citations omitted); *Shaw I*, 509 U.S. at 646–48 (stating that following "traditional districting principles such as compactness, contiguity, and respect for political subdivisions" are not constitutionally required but "are objective factors that may serve to defeat a claim that a district has been gerrymandered on racial lines.").

All four of the districts plaintiffs contend are racial gerrymanders—like all of the districts in the 2017 House and Senate plans—were drawn using the traditional redistricting criteria adopted by the Joint Committee with no consideration of racial data regarding the population placed into the districts. (*See* Doc. 184-37). Ironically, in claiming that House Districts 21 and 57 and Senate Districts 21 and 28 continue to be racial gerrymanders, it is plaintiffs and their allies in the General Assembly who repeatedly sought to inject illegal considerations of race into the redistricting process. Though they criticize the General Assembly for not consulting racial data, they have identified no evidence in the legislative record that would have justified drawing districts based on race. A review of plaintiffs' objections to each of these districts demonstrates this is so:

### a. Senate District 28

Plaintiffs object to Senate District 28 on the grounds that this district allegedly continues to retain its "core shape" and "follows the contours of the black population of Greensboro while majority-white areas of the city are left out of the district." (Doc. 187

- 30 -

at 25-26). Plaintiffs' objections ignore the legislative record and the map of the district which make clear that the only "contours" followed when drawing Senate District 28 were the Greensboro city boundaries and the then-existing precinct boundaries in Guilford County. (*See* Tr. S. Redis. Comm. Aug. 24, 2017 at 36, 111; Doc. 184-17) (explanation by Senator Hise that Senate District 28 tracked the Greensboro city limits consistent with the criteria adopted by the committee to consider municipal boundaries when drawing the district lines); (Tr. S. Floor. Session, Aug. 25, 2017 at 30; Doc. 184-19) (explaining how precinct boundaries affected the lines of Senate District 28).

A map of District 28 with an overlay of the city and precinct boundaries shows that the district is made up of all whole precincts in the eastern parts of the city of Greensboro, along with precincts containing satellite annexations of Greensboro to the east of those whole precincts. (See attached Exhibit 2).



Accordingly, the BVAP level in District 28 is naturally occurring as it is the result

of the population residing in those whole precincts that were included in the district.[5]  A

review of maps contained in the Declaration of Anthony Fairfax, submitted by plaintiffs

in support of their objections, shows that this is the case.  The maps in Mr. Fairfax's

declaration show that, to draw a district anchored in eastern Greensboro that tracks the

---

[5] This should be no surprise to plaintiffs as their counsel has conceded that such districts
can occur. (Trial Tr., Vol. I, pp. 17, 18; Trial Tr., Vol. V, p. 175; Doc. 181 at 76).  It is
also consistent with the Supreme Court's statements on this issue in *Bush v. Vera,* 517
U.S. 952, 967 (1996).

city boundaries with a lower BVAP, the General Assembly would be required to engage in a highly race-driven draw of the district using mechanical racial targets, contrary to their adopted criteria. (*See* Doc. 187-6 at 7).

A review of the legislative record and alternative maps offered during the redistricting process demonstrates that this is true. For example, in the August 24, 2017 Senate Redistricting Committee hearing, Senator Van Duyn discussed alternative maps she had drawn with Senator McKissick and outside consultant Kareem Crayton that sought to return Senate District 28 "to the percentage of African-Americans that we had in 2003." (*See* Tr. S. Redis. Comm. Aug. 24, 2017 at 97, 103-04; Doc. 184-17). Senator Van Duyn confirmed that, in drawing an alternative, "we used criteria that included reducing the percentage of African-American voters in the district." (Tr. S. Redis. Comm. Aug. 24, 2017 at 100; Doc. 184-17).

On August 25, 2017, while the 2017 Senate plan was first considered on the Senate floor, Senator Robinson offered an amendment that included alternative versions of the Senate districts in Guilford County, including Senate District 28, that she developed with Senator McKissick and Mr. Crayton, the outside consultant. (Tr. S. Floor Session, Aug. 25, 2017 at 26; Doc. 184-19; Doc. 184-32). Although Senator Robinson's proposed alternative map contains an "L-shaped" version of District 28 just like the enacted version to which plaintiffs now object, her proposal contained several features that the enacted version of Senate District 28 does not.

First, consistent with Senator Van Duyn's testimony the previous day in the Senate Redistricting Committee, Senator Robinson admitted that she drew her version of Senate District 28 with the goal of having a black voting age population of 45 percent.[6] When pressed by Senator Bishop as to where the 45 percent target came from, Senator Robinson responded that she had relied upon her "own experience" in the district. (*Id.* at 26-28). In attempting to explain Senator Robinson's 45 percent target for her district, Senator Blue acknowledged that no study of racially polarized voting had been conducted with respect to District 28 but argued that the map could be approved if it contained a percentage of black voting age population that the members living in the affected districts had agreed to. (*Id.* at 35-36).[7]

Second, in addition to expressly considering race in violation of the adopted criteria, Senator Robinson's proposed map also would have split seven municipalities in Guilford County as opposed to four that were split in the 2011 map and three that were split in the 2017 Senate plan. (*Id.* at 31). Senator Robinson ultimately withdrew her amendment and alternative map before it was considered by the Senate. (*Id.* at 52).

On August 28, 2017, when the Senate met to consider the 2017 Senate plan on third reading, at Senator Hise's invitation, Senator Robinson presented another proposed

---

[6] According to the data in plaintiffs' objections, the BVAP in the pre-2011 version of Senate District 28 was 44.18%. (Doc. 187 at 18). Thus, the 45 percent BVAP target Senator Robinson acknowledged is consistent with the goal Senator Van Duyn outlined in the Senate Redistricting Committee of returning Senate District 28 to the BVAP level in the district in 2003.

[7] The Legislative Defendants are aware of no Supreme Court cases stating that it is permissible to racially gerrymander districts so long as the legislative members residing in those districts agree to it.

amendment that included alternative versions of the Senate districts in Guilford County which she acknowledged was based on the one she had withdrawn August 25. (Tr. S. Floor Session, Aug. 28, 2017 at 9; Doc. 184-21). Senator Hise pointed out that Senator Robinson's proposal "continue[d] to ignore the committee's criteria" because her map "is still clearly a district drawn on the basis of race." (*Id.* at 10). Senator Hise also pointed out that Senator's Robinson's proposal appeared to be an effort to make neighboring Senate District 27, held by Republican Senator Wade, a district that was easier for Democrats to win and continued to unnecessarily divide municipalities, contrary to the adopted criteria. (*Id.*). Senator Robinson acknowledged that her goal in offering the amendment was to make the Senate districts in Guilford County "more aligned with the 2003" when Democrats controlled the General Assembly. (*Id.* at 11, 13). Senator Robinson's amendment was defeated by a 12-33 vote on the Senate floor. (*Id.* at 18).

Testimony given at the public hearings provided no substantive input for how Senate District 28 should be drawn or any specific suggestions for improving the version of the district released to the public before the hearing. For example, Rev. Julian Pridgen, a plaintiff in this case, testified that because Senate District 28 contained "greater than 50 percent black in voting age population," the General Assembly "failed to remedy the racial gerrymanders the federal court hailed were unconstitutional" but provided no explanation as to how race predominated in the drawing of the district. (Tr. Pub. Hearings, Aug. 22, 2017 (Raleigh site) at 144; Doc. 184-10). Similarly, two individuals testified that Senate District 28 was an example of a district where they

believed that race still predominated but no one provided any explanation or factual support for this contention. (*Id.* at 149, 194). Bob Hall, Executive Director of Democracy NC, told the General Assembly that Senate District 28 was one where "you're packing more African-Americans into the districts." (*Id.* at 166). Yet, data cited by plaintiffs in their objections shows that testimony was false: The BVAP in Senate District 28 declined from 56.49% in 2011 to 50.52% under the 2017 Senate Plan. (Doc. No. 187 at 18).[8]

Because the General Assembly relied upon traditional redistricting criteria, including municipal and precinct boundaries in constructing Senate District 28, plaintiffs cannot show that this district is a racial gerrymander.

### b. Senate District 21

Plaintiffs object to the 2017 version of Senate District 21 because they contend that the General Assembly "made only minimal changes to the district" and because the district "still has a BVAP of 47.51% which is ten percentage points higher than the overall cluster BVAP of 36.86%." (Doc. 187 at 28). Plaintiffs' objection to Senate District 21 boils down to this: if the BVAP of either of the senate districts in the Hoke-Cumberland grouping is over 36% then that makes the district a racial gerrymander. In addition to the fact that this is not the legal standard for defining a racial gerrymander, remedying this objection would require setting a mechanical target in both districts within

---

[8] Bob Hall made the same erroneous assertion with respect to Senate District 21 where the BVAP also declined from 2011 according to plaintiffs' objections. (Doc. 187 at 19) (stating that the BVAP in Senate District 21 declined from 52.51% under the 2011 plans to 48.46% under the 2017 Senate plan).

the Hoke-Cumberland grouping in violation of *Alabama*.  *See* 135 S. Ct. at 1273-74.

Drawing districts that contain this type of proportionate representation would require

subordinating all traditional redistricting principles to race. This is precisely what the

General Assembly did not do.

Instead, by placing some of the most densely populated and urban precincts in

Senate District 21, the General Assembly preserved the heart of Fayetteville.  A map of

District 21 with an overlay of the city and precinct boundaries in Cumberland County

shows that the district is composed primarily of whole precincts in the northern and

central portions of the City of Fayetteville.  (See Exhibit 3).



Additionally, the Senate adopted an amendment offered by Senator Clark, the incumbent in District 21, to include additional communities in close proximity to the existing district that Senator Clark stated would benefit from being included in the district. His amendment created the extension of the district seen in Exhibit 3. Including these portions of Cumberland County in Senate District 21 is consistent with the incumbency protection criteria adopted by the redistricting committees: Senator Clark had previously represented the areas of Cumberland County included in the district and had announced his intention to move into the Vander community of Cumberland County

and wanted to continue to serve in the district. (Tr. S. Redis. Comm. Aug. 24, 2017 at 50; Doc. 184-17) (Senator Hise encouraging support for Senator Clark's amendment because it was consistent with the adopted criteria of incumbency protection).

In offering his amendment, Senator Clark stated that the Vander community would be a "more appropriate fit" in Senate District 21. (Tr. S. Redis. Comm. Aug. 24, 2017 at 49; Doc. 184-17). Even though the amendment reduced the compactness of the district, when questioned by Senator Bishop, Senator Clark stated that he believed the amendment to Senate District 21 that he offered was legal saying, "I believe the amendment I'm providing is legal under all legal theories. It just changes the distribution of the population by approximately 300." (*Id.* at 51). Accordingly, plaintiffs cannot demonstrate that Senate District 21 is a racial gerrymander.

### c. House District 57

Plaintiffs object to the 2017 version of House District 57 for essentially the same reasons that they object to Senate District 28. (Doc. 187 at 30). But House District 57 is not a racial gerrymander for the same reasons that Senate District 28 was not: it followed the Greensboro city boundaries and the then-existing precinct boundaries in Guilford County. A map of House District 57 with an overlay of the Greensboro city boundaries and precinct lines demonstrates how closely the lines of the district track those boundaries. (See Exhibit 4).



Like Senate District 28, House District 57 is anchored in eastern Greensboro. The district contains 17 whole precincts in eastern Greensboro, one precinct containing eastern satellite annexations of the city of Greensboro, and eight precincts in central Greensboro which contain the home of the Democratic incumbent, Representative Pricey Harrison, and surrounding areas. Residents of Greensboro make up 96.87% of the population of the district, with the remainder being contained in between and around satellite annexations of the city. (*See* Doc. 184-3 at 11).

Contrary to plaintiffs' objections, the BVAP level in District 57 is naturally occurring and is a result of the population residing in those whole precincts that were included in the district and there is no evidence otherwise. As with Senate District 28, a review of maps contained in the Fairfax Declaration show that drawing a House District

57 at a lower BVAP would have required the General Assembly to engage in a highly race-conscious draw that would have required setting a mechanical racial target and ignoring the adopted criteria. (Doc. 187-6 at 9).

In their objections, plaintiffs complain about the inclusion or exclusion of certain communities from House District 57. Plaintiffs, for example, complain that the district excluded certain precincts in the Irving Park community but this issue was never raised during the public hearings on in any of the legislative debate. In fact, during the House Redistricting Committee Hearing, Representative Pricey Harrison, the incumbent in House District 57, testified that she thought the Midland Park (not Irving Park) neighborhood "could've been included in the district" and that doing so "would've achieved a little bit more racial balance." (Tr. H. Redist. Comm. Aug. 25, 2017 at 119-20; Doc. 184-18). Representative Harrison never offered any amendment to add this neighborhood and, in any event, including or excluding a neighborhood from a district because of the race of its residents was contrary to the adopted criteria. Beyond this race-based suggestion from Representative Harrison, the General Assembly received no other specific input about which communities or precincts should be included in House District 57.

The only alternative map offered involving this district was the statewide House map submitted by Representative Jackson on behalf of the plaintiffs in this case and would have double-bunked Representative Harrison with a Republican incumbent in

violation of the adopted criteria. These facts demonstrate that House District 57 is not a racial gerrymander.

### d. House District 21

Plaintiffs contend that House District 21 remains a racial gerrymander due to its "irregular shape" although they acknowledge the BVAP in the district dropped from 51.90% in the 2011 version to 42.34% in the 2017 version. A review of a map of House District 21 shows that any alleged "irregular shape" of the district can be explained by the shape of precincts in Sampson County and the location of the residence of the district's Democratic incumbent, Larry Bell. (See attached Exhibit 5).



This map shows that the district contains a group of compact precincts in Goldsboro and southern Wayne County and contiguous precincts in eastern Sampson County that connect those precincts with those in and around the precinct where Representative Bell resides. A review of the "stat pack" data shows that the district is one that Representative Bell stood a reasonable chance of being re-elected consistent with the adopted incumbency protection criteria. (Doc. 184-2).

The only alternative map containing a different version of House District 21 was a statewide map submitted by the plaintiffs in this matter through Representative Jackson and, under that map, incumbent Representatives William Brisson and Larry Bell were double-bunked in a single district, identified as House District 22, while plaintiffs' version of House District 21 had no incumbent legislator at all.[9] (Doc. 184-28). During a House Redistricting Committee meeting, Representative David Lewis noted that this double-bunking was unnecessary and violated the incumbency protection criteria adopted by the House redistricting committee. (Tr. H. Redist. Comm. Aug. 25, 2017 at 56-57; Doc. 184-18). No alternative map was produced that protected these incumbents as successfully as the 2017 House Plan.

No substantive input was provided at the public hearing as to how House District 21 should be drawn or modified. The only speaker to directly address this district at the public hearing was Tyler Swanson, who identified himself as a speaking on behalf of the North Carolina NAACP. He criticized the shape of the district but provided no specific suggestions for how it should have been drawn in compliance with the adopted criteria. Accordingly, plaintiffs' claims that House District 21 is a racial gerrymander are baseless.

---

[9] Plaintiffs' selection of Representative Brisson for double-bunking in their map is interesting. Though plaintiffs claim in their objections that "all of the Democratic legislators voted against the 2017 enacted maps on second reading" (Doc. 187 at 17), that is not true. Legislative records show that Representative Brisson, a Democrat, voted for both the adopted House and Senate maps on the second and third reading.

**2. None of the alternative maps proposed by Plaintiffs during the legislative process or after the fact in support of their objections show that any of the four districts listed in their objections are racial gerrymanders.**

Plaintiffs claim that their proposed alternative House and Senate maps demonstrate that the four districts they now challenge could have been drawn more compactly while "meeting population goals and other race-neutral redistricting criteria." A review of these maps shows this claim is false.

In the Senate, Senator Blue offered a proposed alternative statewide Senate map on behalf of the plaintiffs on August 25, 2017. (Doc. 187-34). Among other things, this map failed to follow the adopted criteria by unnecessarily double-bunking multiple incumbents throughout the state, including Senator Robinson and Senator Wade in Senate District 28. (Tr. S. Floor. Session, Aug. 25, 2017 at 52; Doc. 184-19). Senator Blue distanced himself from the plaintiffs' map and could not explain the plan's significant double-bunking. Contrary to their assertions, plaintiffs' proposed Senate map is not more compact than the adopted 2017 Senate plan under either measure of compactness contained in the adopted criteria. As plaintiffs' own compactness comparison shows, the mean Reock scores for plaintiffs' proposed Senate map and the adopted 2017 Senate plan are exactly the same and there is a difference of only 0.01 between the mean Polsby-Popper scores of the two plans. (Doc. 187-7).

In the House, Representative Darren Jackson offered a proposed alternative House map on behalf of the plaintiffs on August 25, 2017. (Doc. 184-28). Like plaintiffs' proposed Senate maps, contrary to the adopted criteria, plaintiffs' alternative

map unnecessarily double-bunks multiple incumbents, including incumbents in both House Districts 57 and 21. Though plaintiffs claim in the Declaration of Bill Gilkeson that "[t]he Polsby-Popper scores for the House plans show that Plaintiffs' alternative House map is significantly more compact, on average, than the 2017 Enacted House map," (Doc. 187-7), this assertion appears to be due to the fact that Mr. Gilkeson conflated the statistics for the standard deviation and mean Polsby-Popper scores. In reality, the mean Polsby-Popper score for the 2017 enacted House plan is 0.32 compared with a score of 0.33 for the plaintiffs' proposed House plan, a difference of only 0.01. (*Compare* Doc. 187-11 *with* Doc. 184-28). Mr. Gilkeson's declaration correctly shows that there is only a 0.01 difference between the mean Reock scores for the 2017 enacted House plan and the plaintiffs' proposed House plan. (Doc. 187-7).

In addition to the fact that there is no difference between the mean compactness scores of the enacted plans and the plaintiffs' proposed plans and the fact that it is undisputed that plaintiffs unnecessarily double-bunk multiple incumbents in violation of the adopted criteria, plaintiffs also concede that their plans split more municipalities than the adopted plan. (Doc. 187-7 at 6-7). When considered together, these factors, among others, refute plaintiffs' claim that their proposed maps show that the 2017 House and Senate plans could have been drawn in a more compact manner while following other race-neutral redistricting criteria.

Finally, plaintiffs purport to offer what they describe as "Cromartie maps" in Mr. Gilkeson's declaration which he claims show that "it is possible to achieve the same

political outcome without using race as a predominant motive for selecting which voters to include or exclude from the district." (Doc. 187-7 at 20). As an initial matter, these maps should not be considered by the Court as they were not provided to the legislature during the legislative process of enacting the 2017 plans. The other problem with Mr. Gilkeson's claim is that these are not true *Cromartie* demonstrative maps. Instead, Mr. Gilkeson cherry-picked two statewide races in which Republican candidates did extremely well to "prove" that his proposed maps could have achieved the same political outcome as the adopted versions of Senate Districts 21 and 28 and House District 57. In drawing the adopted plans, results from 10 different elections were considered. (Doc. 184-2; 184-5). This point is illustrated by the following charts, which are also attached as Exhibits 6 and 7. Exhibit 6 compares the past political outcomes of the enacted Senate plan, the Covington Senate plan, and Mr. Gilkeson's Senate plan. The highlighted column demonstrates the fallacy of Mr. Gilkeson's analysis and that the Covington plans and Gilkeson plans were motivated primarily by political considerations.

| District | TBVAP | US Senate 2010 | | US President 2012 | | Governor 2012 | | Lieutenant Gov 2012 | | US Senate 2014 | | US President 2016 | | US Senate 2016 | | Governor 2016 | | Lt. Governor 2016 | | Attorney General 2016 | | All Contests | | Incumbent Drawn out of District |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | D Vote | R Vote | D Vote | R Vote | D Vote | R Vote | D Vote | R Vote | D Vote | R Vote | D Vote | R Vote | D Vote | R Vote | D Vote | R Vote | D Vote | R Vote | D Vote | R Vote | Total D Wins | Total R Wins | |
| **Plaintiffs** | | | | | | | | | | | | | | | | | | | | | | | | |
| SD 19 | 32.63% | 47.06% | 51.23% | 51.06% | 47.64% | 55.41% | 44.59% | 48.12% | 55.41% | 49.75% | 49.93% | 46.63% | 49.25% | 49.25% | 47.42% | 49.91% | 47.90% | 49.62% | 47.10% | 53.58% | 46.42% | 9 | 1 | NO |
| SD 21 | 41.03% | 61.32% | 37.05% | 52.66% | 46.41% | 63.83% | 33.87% | 68.90% | 31.10% | 64.08% | 32.70% | 62.91% | 33.10% | 62.10% | 34.15% | 62.52% | 34.93% | 62.81% | 33.68% | 66.20% | 33.80% | 10 | 1 | NO |
| **Enacted** | | | | | | | | | | | | | | | | | | | | | | | | |
| SD 19 | 25.99% | 44.21% | 54.06% | 37.48% | 51.51% | 44.61% | 53.23% | 50.59% | 49.41% | 44.44% | 51.71% | 43.98% | 52.49% | 45.06% | 52.63% | 44.44% | 52.31% | 48.49% | 51.51% | | | 1 | 9 | NO |
| SD 21 | 47.51% | 64.97% | 33.51% | 70.53% | 28.58% | 67.25% | 30.49% | 72.03% | 27.97% | 67.79% | 29.17% | 67.07% | 29.36% | 66.21% | 30.37% | 66.14% | 31.45% | 66.83% | 29.80% | 70.04% | 29.96% | 10 | 0 | NO |
| **Gikleson** | | | | | | | | | | | | | | | | | | | | | | | | |
| SD 19 | 31.19% | 45.11% | 53.14% | 50.61% | 48.42% | 47.72% | 50.19% | 53.59% | 46.61% | 48.05% | 48.44% | 42.25% | 47.52% | 49.14% | 48.35% | 47.80% | 49.48% | 47.82% | 49.61% | 51.82% | 48.10% | 3 | 7 | NO |
| SD 21 | 42.53% | 64.94% | 33.49% | 70.03% | 29.05% | 66.72% | 30.94% | 71.50% | 28.50% | 67.25% | 30.62% | 66.84% | 31.55% | 64.91% | 31.49% | 65.54% | 30.61% | 65.71% | 31.26% | | | 10 | 0 | NO |
| **Plaintiffs** | | | | | | | | | | | | | | | | | | | | | | | | |
| SD 24 | 16.95% | 34.15% | 63.35% | 39.25% | 59.69% | 34.83% | 63.07% | 39.90% | 60.10% | 37.90% | 58.39% | 39.04% | 57.26% | 37.86% | 58.84% | 42.70% | 55.42% | 37.60% | 59.53% | 42.66% | 57.34% | 0 | 10 | NO |
| SD 27 | 30.65% | 50.49% | 47.47% | 61.88% | 36.89% | 55.20% | 42.16% | 61.95% | 38.05% | 60.32% | 37.21% | 64.08% | 31.51% | 62.10% | 34.94% | 65.21% | 37.20% | 30.62% | 62.14% | 34.74% | 66.84% | 10 | 0 | YES |
| SD 28 | 44.66% | 59.14% | 39.32% | 67.24% | 31.93% | 62.31% | 35.87% | 67.58% | 32.42% | 64.82% | 32.87% | 65.55% | 31.17% | 64.52% | 32.58% | 67.55% | 30.41% | 64.76% | 32.50% | 68.34% | 31.66% | 10 | 0 | NO |
| SD 29 (E26) | 8.39% | 23.19% | 74.02% | 28.15% | 70.64% | 24.57% | 73.45% | 29.35% | 70.65% | 26.69% | 69.31% | 26.12% | 70.56% | 25.83% | 70.17% | 30.73% | 67.01% | 25.97% | 71.49% | 30.46% | 69.54% | 0 | 10 | NO |
| **Enacted** | | | | | | | | | | | | | | | | | | | | | | | | |
| SD 24 | 18.68% | 36.36% | 61.16% | 41.57% | 57.32% | 37.22% | 60.64% | 42.46% | 57.54% | 40.47% | 55.76% | 41.03% | 55.49% | 40.14% | 56.54% | 44.53% | 53.58% | 39.90% | 57.24% | 45.02% | 54.98% | 0 | 10 | NO |
| SD 26 (F29) | 16.66% | 30.20% | 66.95% | 36.90% | 62.03% | 33.28% | 64.79% | 37.93% | 62.07% | 33.77% | 62.15% | 32.27% | 64.49% | 29.25% | 66.88% | 34.36% | 61.33% | 32.42% | 64.49% | 34.97% | 36.51% | 63.49% | 0 | 10 | NO |
| SD 27 | 12.71% | 33.08% | 64.82% | 40.21% | 58.59% | 34.12% | 63.74% | 40.18% | 59.87% | 41.56% | 55.88% | 41.71% | 51.72% | 41.66% | 55.73% | 48.05% | 49.81% | 41.61% | 55.63% | 46.69% | 53.11% | 0 | 10 | NO |
| SD 28 | 50.52% | 71.88% | 26.58% | 79.28% | 19.78% | 73.90% | 23.73% | 79.67% | 20.33% | 77.44% | 20.24% | 77.88% | 18.66% | 76.89% | 20.34% | 79.38% | 18.61% | 76.98% | 19.91% | 80.42% | 19.58% | 10 | 0 | NO |
| **Gikleson** | | | | | | | | | | | | | | | | | | | | | | | | |
| SD 24 | 19.45% | 37.70% | 59.87% | 42.84% | 56.07% | 38.50% | 59.38% | 43.69% | 56.31% | 41.32% | 54.44% | 42.18% | 54.36% | 41.31% | 55.47% | 45.65% | 52.50% | 40.44% | 54.53% | 46.15% | 53.85% | 0 | 10 | NO |
| SD 27 | 20.78% | 37.29% | 60.54% | 45.97% | 52.89% | 40.11% | 57.67% | 45.99% | 54.01% | 45.35% | 52.05% | 48.42% | 47.22% | 46.28% | 50.56% | 52.19% | 45.59% | 46.40% | 50.74% | 51.15% | 48.85% | 3 | 7 | YES |
| SD 28 | 43.27% | 62.51% | 35.77% | 72.63% | 26.35% | 66.70% | 30.92% | 72.87% | 27.13% | 69.96% | 27.62% | 72.14% | 23.95% | 70.80% | 26.32% | 74.21% | 23.70% | 70.87% | 26.00% | 74.78% | 25.22% | 10 | 0 | NO |
| SD 29 (E26) | 14.90% | 30.38% | 67.03% | 35.14% | 63.78% | 31.62% | 66.52% | 36.33% | 63.67% | 33.71% | 62.49% | 31.58% | 65.45% | 31.52% | 64.04% | 35.76% | 62.08% | 31.76% | 65.75% | 35.90% | 64.10% | 0 | 10 | NO |
| **Plaintiffs** | | | | | | | | | | | | | | | | | | | | | | | | |
| SD 37 | 28.71% | 55.21% | 42.81% | 62.72% | 36.00% | 48.74% | 49.17% | 61.84% | 38.16% | 62.88% | 34.25% | 66.60% | 27.54% | 61.63% | 34.73% | 67.58% | 29.77% | 60.92% | 35.12% | 67.06% | 32.94% | 9 | 1 | NO |
| SD 38 | 46.17% | 66.35% | 31.90% | 73.97% | 25.05% | 64.52% | 33.80% | 73.76% | 26.24% | 72.04% | 25.10% | 71.28% | 24.64% | 69.02% | 27.16% | 71.25% | 26.22% | 68.63% | 27.80% | 73.32% | 26.68% | 10 | 0 | NO |
| SD 39 | 16.43% | 34.54% | 62.69% | 58.78% | 48.42% | 50.46% | 34.87% | 61.93% | 63.49% | 46.59% | 53.41% | 47.54% | 49.60% | 53.01% | 41.73% | 49.06% | 47.25% | 53.85% | 43.76% | 47.64% | 44.11% | 54.11% | 45.89% | 4 | 6 | YES |
| SD 40 | 30.15% | 52.66% | 45.60% | 60.73% | 38.08% | 49.70% | 48.41% | 60.16% | 39.84% | 60.13% | 37.17% | 61.63% | 33.66% | 59.68% | 36.64% | 62.10% | 35.47% | 58.33% | 37.91% | 63.82% | 36.18% | 10 | 0 | NO |
| SD 41 | 30.03% | 51.75% | 46.57% | 58.12% | 40.88% | 46.87% | 51.50% | 57.53% | 42.47% | 58.26% | 39.05% | 58.38% | 36.40% | 56.93% | 39.33% | 61.57% | 35.59% | 55.37% | 40.65% | 61.18% | 38.82% | 5 | 1 | NO |
| **Plaintiffs** | | | | | | | | | | | | | | | | | | | | | | | | |
| SD 37 | 42.73% | 70.58% | 27.43% | 76.14% | 22.65% | 64.06% | 33.70% | 75.67% | 24.33% | 75.58% | 21.56% | 75.01% | 19.75% | 71.53% | 24.67% | 76.04% | 21.19% | 70.95% | 24.74% | 75.94% | 24.06% | 10 | 0 | NO |
| SD 38 | 48.46% | 71.61% | 26.93% | 76.92% | 22.04% | 67.34% | 30.94% | 76.88% | 23.12% | 77.33% | 20.38% | 76.22% | 20.08% | 74.82% | 21.82% | 75.88% | 21.81% | 74.44% | 22.41% | 78.42% | 21.58% | 10 | 0 | NO |
| SD 39 | 6.62% | 31.61% | 66.50% | 38.03% | 60.85% | 24.25% | 74.31% | 36.04% | 63.96% | 39.77% | 57.75% | 40.48% | 48.86% | 40.51% | 56.18% | 46.40% | 50.74% | 49.12% | 48.23% | 49.30% | 50.83% | 25 | 25 | NO |
| SD 40 | 38.88% | 64.51% | 33.79% | 72.51% | 26.40% | 61.83% | 36.32% | 72.25% | 27.75% | 71.45% | 25.32% | 71.64% | 24.09% | 69.92% | 26.30% | 71.54% | 26.02% | 69.20% | 27.27% | 74.24% | 25.76% | 10 | 0 | NO |
| SD 41 | 14.25% | 38.46% | 59.46% | 46.53% | 52.13% | 33.96% | 64.21% | 45.39% | 54.61% | 46.66% | 49.95% | 49.73% | 45.06% | 46.83% | 48.91% | 52.95% | 43.92% | 45.60% | 50.96% | 51.84% | 48.16% | 3 | 7 | NO |

The same is true for those versions of the House plan (Exhibit 7):

| District | TBVAP | US Senate 2010 | | US President 2012 | | Governor 2012 | | Lieutenant Gov 2012 | | US Senate 2014 | | US President 2016 | | US Senate 2016 | | Governor 2016 | | Lt. Governor 2016 | | Attorney General 2016 | | All Contests | | Incumbent Drawn out of District |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | D Vote | R Vote | D Vote | R Vote | D Vote | R Vote | D Vote | R Vote | D Vote | R Vote | D Vote | R Vote | D Vote | R Vote | D Vote | R Vote | D Vote | R Vote | D Vote | R Vote | Total D Wins | Total R Wins | |
| **Plaintiffs** | | | | | | | | | | | | | | | | | | | | | | | | |
| HD 57 | 22.38% | 47.51% | 50.24% | 58.77% | 39.73% | 51.56% | 45.56% | 58.79% | 41.21% | 58.81% | 38.69% | 63.00% | 31.88% | 60.64% | 36.40% | 66.71% | 31.12% | 60.54% | 36.07% | 65.91% | 34.09% | 9 | 1 | N |
| HD 58 | 44.28% | 56.69% | 41.75% | 62.37% | 36.80% | 58.22% | 40.03% | 63.09% | 36.91% | 60.49% | 37.12% | 59.23% | 37.72% | 58.68% | 38.67% | 61.56% | 36.61% | 59.00% | 38.64% | 62.44% | 37.56% | 10 | 0 | N |
| HD 59 | 44.76% | 55.53% | 42.72% | 64.26% | 34.91% | 59.66% | 38.46% | 64.97% | 35.03% | 60.69% | 36.93% | 62.93% | 31.81% | 61.50% | 35.83% | 64.96% | 33.19% | 61.88% | 35.59% | 65.29% | 34.71% | 10 | 0 | N |
| HD 60 | 42.75% | 57.53% | 40.86% | 67.32% | 31.88% | 62.75% | 35.42% | 67.88% | 32.12% | 64.12% | 33.57% | 65.86% | 31.31% | 64.57% | 32.36% | 67.17% | 30.77% | 65.11% | 32.13% | 68.52% | 31.48% | 10 | 0 | N |
| HD 61 | 25.08% | 41.55% | 56.34% | 52.47% | 46.37% | 46.11% | 51.54% | 52.59% | 47.41% | 50.40% | 46.65% | 53.59% | 41.56% | 52.71% | 43.73% | 57.40% | 40.17% | 52.61% | 44.08% | 57.48% | 42.52% | 8 | 2 | N |
| HD 62 | 15.06% | 33.71% | 64.17% | 42.68% | 56.15% | 36.37% | 61.20% | 42.48% | 57.52% | 41.52% | 55.89% | 44.96% | 50.61% | 42.96% | 53.74% | 49.29% | 48.42% | 42.74% | 54.32% | 47.61% | 52.39% | 1 | 9 | N |
| **Enacted** | | | | | | | | | | | | | | | | | | | | | | | | |
| HD 57 | 60.75% | 81.20% | 17.39% | 86.99% | 12.10% | 82.21% | 15.49% | 87.36% | 12.64% | 85.07% | 12.79% | 84.62% | 12.13% | 83.48% | 14.07% | 85.39% | 12.76% | 83.59% | 13.28% | 86.54% | 11.48% | 10 | 0 | N |
| HD 58 | 42.66% | 63.92% | 34.42% | 73.09% | 25.92% | 67.33% | 30.94% | 73.49% | 26.51% | 71.26% | 26.29% | 72.74% | 23.57% | 71.78% | 25.12% | 74.57% | 23.25% | 71.86% | 25.04% | 75.69% | 24.31% | 10 | 0 | N |
| HD 59 | 22.22% | 38.24% | 59.87% | 46.60% | 56.27% | 38.35% | 59.68% | 43.70% | 54.15% | 43.05% | 54.26% | 42.24% | 54.53% | 41.81% | 55.15% | 46.80% | 52.03% | 42.01% | 55.49% | 46.33% | 53.67% | 0 | 10 | Y |
| HD 60 | 40.06% | 57.73% | 40.31% | 67.53% | 31.55% | 61.82% | 36.06% | 67.67% | 32.33% | 64.78% | 32.59% | 66.12% | 30.27% | 64.61% | 32.03% | 68.80% | 29.53% | 65.01% | 31.74% | 68.91% | 31.09% | 10 | 0 | N |
| HD 61 | 11.47% | 33.66% | 64.22% | 41.33% | 57.44% | 35.08% | 62.47% | 41.36% | 57.48% | 39.42% | 54.65% | 45.59% | 49.48% | 43.68% | 53.06% | 49.98% | 47.80% | 43.27% | 53.65% | 48.67% | 51.33% | 1 | 9 | N |
| HD 62 | 13.95% | 34.11% | 63.68% | 41.92% | 56.89% | 35.75% | 61.05% | 42.88% | 56.11% | 43.44% | 53.86% | 43.32% | 54.19% | 44.65% | 52.10% | 47.58% | 48.43% | 53.83% | 48.55% | 51.45% | 1 | 9 | N |
| **Gikleson** | | | | | | | | | | | | | | | | | | | | | | | | |
| HD 57 | 41.40% | 60.47% | 37.48% | 72.39% | 26.39% | 66.27% | 31.01% | 72.81% | 27.19% | 69.49% | 28.10% | 72.92% | 22.70% | 70.88% | 24.46% | 75.25% | 22.72% | 70.92% | 25.76% | 75.31% | 24.69% | 10 | 0 | N |
| HD 58 | 45.55% | 65.38% | 33.08% | 74.19% | 24.91% | 68.69% | 29.14% | 74.51% | 25.49% | 72.41% | 25.24% | 73.58% | 22.82% | 72.66% | 24.39% | 75.32% | 22.53% | 72.49% | 24.19% | 76.46% | 23.54% | 10 | 0 | N |
| HD 59 | 30.23% | 44.29% | 54.04% | 49.41% | 49.60% | 45.05% | 52.98% | 50.45% | 49.55% | 48.74% | 48.49% | 47.44% | 49.49% | 46.70% | 51.59% | 47.25% | 50.34% | 51.26% | 46.36% | 25.19% | 74.66% | 4 | 6 | N |
| HD 60 | 38.85% | 55.38% | 42.60% | 65.63% | 33.45% | 59.89% | 37.97% | 65.73% | 34.72% | 65.64% | 34.19% | 65.89% | 31.11% | 63.18% | 33.60% | 67.35% | 30.60% | 63.22% | 32.74% | 9 | 1 | N |
| HD 61 | 13.70% | 34.62% | 63.29% | 45.43% | 53.53% | 76.01% | 61.05% | 42.88% | 57.12% | 46.18% | 50.02% | 47.86% | 44.68% | 52.10% | 47.82% | 45.65% | 45.76% | 46.86% | 44.57% | 53.49% | 45.79% | 1 | 9 | N |
| HD 62 | 21.62% | 37.70% | 60.20% | 47.78% | 51.02% | 39.74% | 58.08% | 45.47% | 54.53% | 45.31% | 52.19% | 47.82% | 48.03% | 45.83% | 51.25% | 51.52% | 46.47% | 45.99% | 51.44% | 50.39% | 49.61% | 2 | 8 | N |

As a result, plaintiffs' proposed "Cromartie maps" fail to show that the "legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles." *Easley v. Cromartie*, 532 U.S. 234, 258 (2001).

### 3. Dr. Hofeller's participation in the 2017 redistricting process does not show that race predominated in drawing the districts.

Plaintiffs contend that failing to look at racial data does not mean that race did not predominate because Dr. Hofeller "does not need access to racial data to know that if he draws a district in approximately the same way the racially gerrymandered district was drawn, it would achieve the same effect, illegally separating black voter [sic] from white voters based on their race." (Doc. 187 at 35). In support of this contention, plaintiffs cite deposition testimony from a case involving a challenge to the 2016 Congressional Districts in which they claim Dr. Hofeller "said exactly that." (*Id.*). But Dr. Hofeller didn't say "exactly that." Instead, in answering a question about how he ensured that the 2016 Congressional Plan complied with the VRA, Dr. Hofeller responded that the First Congressional District, located in the northeastern part of the state, was the only district in which that was a concern and because it "was drawn in the general area that District 1 has been in for decades," he knew the "new configuration was going to be acceptable under the Voting Rights Act." (Deposition of Thomas B. Hofeller ("Hofeller Dep."), p. 246) (Doc. 187-12)). Dr. Hofeller added that because racial data regarding the district was available prior to the district's enactment, if his assumption about VRA compliance had been incorrect, someone would have objected. (*Id.*).

Dr. Hofeller's knowledge about the racial demographics of the First Congressional District, which he also testified was the only VRA district in the State's congressional plan since the *Shaw* decision struck down a version of the former Twelfth Congressional District in the early 1990s, (*id.* at 247), does not prove that he had committed to memory

racial data in the four districts plaintiffs challenge here, all of which are located in other areas of the State. In any event, plaintiffs' contentions regarding Dr. Hofeller at best show nothing more than that Dr. Hofeller was conscious of racial demographics in the state, something plaintiffs concede the Supreme Court has said legislatures are *always aware of* when drawing district lines and does *not* mean that race predominated in drawing the district lines. (Doc. 187 at 34-35) (quoting *Shaw I*, 509 U.S. at 646)) ("redistricting differs from other kinds of state decisionmaking in that the legislature always is *aware* of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination.") (emphasis in original); *see also Bush*, 517 U.S. at 958–59 ("Strict scrutiny does not apply merely because redistricting is performed with consciousness of race."); *Miller*, 515 U.S. at 915–16 ("The courts, in assessing the sufficiency of a challenge to a districting plan, must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus. Redistricting legislatures will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process.") (citations omitted).[10]

---

[10] Plaintiffs' citation of testimony by Dr. James G. Gimpel in the same case, in which he was also testifying about the 2016 congressional plan, is similarly unavailing and, if anything shows only that the legislature was aware of race which, as discussed above, the Supreme Court has recognized is both true and permissible in any redistricting process. Dr. Gimpel also admitted that his comments about whether the General Assembly considered race when drawing the 2016 congressional map was "speculation" and that he

**D.** **This Court does not have jurisdiction to consider plaintiffs' state constitutional claims. In any event, they are without merit.**

Plaintiffs challenge several districts in the 2017 plans on purely state constitutional grounds. While this Court may not consider these claims for the reasons discussed in Section B above, it is also foreclosed from ruling on contested issues of state law. As this Court recently recognized, an "unsettled issue of state law . . .is more appropriately directed to North Carolina courts, the final arbiters of state law." (Doc. 191 at 46-47). Plaintiffs would have this Court rule upon at least three such issues: (1) what districts can be changed by the legislature in drawing new maps after court-ordered redistricting; (2) whether the traversal rule from *Pender County v. Bartlett,* 361 N.C. 491, 649 S.E.2d 364 (2007)*, aff'd, Bartlett v. Strickland,* 556 U.S. 1 (2009) ("*Pender County*") in a two-county grouping applies in county groupings larger than three counties, or instead whether it is the number of traversals that determine WCP compliance in those groupings; and (3) the extent to which any state law requirements for compactness exists. While the answers to these issues are easily resolved in favor of how the State drew the 2017 districts affected by these issues, at a minimum this Court must defer to the North Carolina courts on them.

In any event, plaintiffs' state-law objections are invalid. First, plaintiffs claim that the legislature modified certain districts that did not "touch" districts that were declared unconstitutional by this Court. Plaintiffs assert that changing these districts violates the

---

had not seen any discussion of this issue. (Deposition of Dr. James G. Gimpel at 167) (Doc. 187-13).

provision of the state constitution stating that districts drawn for one census shall not be altered until the next census. However, nothing in that constitutional provision or in the case law interpreting it addresses changing districts in response to court-ordered redistricting. Read literally, plaintiffs' interpretation would mean a court would be powerless to order the legislature to redistrict in response to a court order. This is obviously not the case. Instead, plaintiffs ask the Court to adopt a new standard under this provision that they have devised out of whole cloth – districts which do not "touch" challenged districts must be frozen in place. No such standard exists under North Carolina law and this Court should decline to create one.

Moreover, adopting such a standard would perpetuate a racial gerrymander by forcing a legislature to use the core of the racially gerrymandered district to draw the new district and those immediately surrounding it. Plaintiffs' objections complain that four of the 2017 districts are again racially gerrymandered in part because the new districts were supposedly formed around the core of the old district. (Doc. 187 at 22, 25, 30). Yet that is precisely what plaintiffs' new constitutional rule would force the legislature to do in county groupings with districts that did not touch districts ruled unconstitutional. The legislature would have to start drawing the new districts using the core of the old districts. Not only would this make the new district more susceptible to being labeled a racial gerrymander, it would also reduce or eliminate the legislature's ability to eliminate the hallmarks of gerrymanders by, for instance, eliminating split precincts, or changing surrounding districts to more closely follow municipal boundaries. Put simply, plaintiffs'

proposed constitutional amendment would have the ironic effect of causing a legislature trying to eliminate a racial gerrymander to draw a new gerrymander instead.

Relatedly, plaintiffs ignore the ripple effect that changing one district has on other districts in the same county grouping. In Wake County, for example, plaintiffs complain that 2011 districts 36, 37, 40, and 41 do not touch invalid 2011 districts 33 and 38 and therefore may not be modified for this court-ordered redistricting. (Doc. No. 187-7 at 14). Plaintiffs ignore, however, that many of the valid 2011 districts are just one or a few precincts away from the invalid districts. (See attached Exhibit 8). Given population equality requirements, when even a small change to one of the invalid districts is made it ripples the population into the bordering district which then ripples into the districts about which plaintiffs complain. Plaintiffs' standard is thus both constitutionally suspect and unrealistic.

Finally, the Covington plaintiffs are not serious about their new constitutional rule as demonstrated by their own proposed plans. The Covington House plan, for example, changes districts in Onslow County even though none of the districts in Onslow in the 2011 House plan were declared unconstitutional by this Court or "touch" unconstitutional districts. (*Compare* Doc. 184-1 (Districts 14, and 15) *and* Doc. 184-28 (same) *with* http://www.ncleg.net/GIS/Download/District_Plans/DB_2011/House/Lewis-Dollar-Dockham_4/Maps/mapGrouping.pdf (same)). This objection is baseless and should be rejected.

Next, plaintiffs claim that a district in Cabarrus County as well as House District 10 violate the WCP because districts are not solely contained within counties in those groupings which have the population to support more than one district. In making this argument, plaintiffs are ignoring the traversal rule from the *Stephenson* and *Dickson* line of cases and misinterpreting *Pender County*. *Pender County* involved a two-county grouping of Pender County and New Hanover County. The North Carolina Supreme Court held that to comply with the WCP in that two-county grouping, Pender County must be kept whole so that the Pender County line is traversed only once when gaining population in New Hanover County.

In a two-county grouping, keeping the county with the smaller population whole inherently minimizes the total number of traversals in the grouping. This is consistent with *Dickson II*, the North Carolina Supreme Court's latest statement on this issue, in which the Court held that the number of traversals must be minimized inside of county groupings once the counties are grouped properly under the WCP. *Dickson II*, at 532 (after the county groupings are properly established, *Stephenson I* requires that "the resulting interior county lines ... may be crossed or traversed ... only to the extent necessary to comply with the ... 'one-person, one-vote' standard") (internal citations omitted) The parties here do not dispute that the 2017 plans adopt the correct county groupings under the WCP. Accordingly, under *Dickson II*, each grouping must contain the fewest number of traversals possible in creating districts which comply with equal population requirements. Nothing in *Dickson II* or prior cases held that the legislature

should sacrifice the traversal rule in favor of plaintiffs' proposed "county spanning" rule (Doc. 187-7 at 18) which finds no support in any of those cases. In fact, in both of the county groupings plaintiffs complain about, the 2017 plans have fewer traversals than the Covington House plan. (*Compare* Doc. 184-28 *with* Doc. 184-1). Thus, the Covington plans do not comply with the WCP, and this objection should be rejected.

Finally, plaintiffs allege that one Senate district in Mecklenburg County is not compact. Plaintiffs ignore that the district complies with the compactness guidelines adopted by the legislature, guidelines which were based on a respected scholarly article on compactness, and had never been adopted by the North Carolina legislature in the past. In any event, once again *Dickson II* forecloses this claim. The *Dickson* plaintiffs made nearly an identical claim there that plaintiffs here are making. However, the state Supreme Court held:

> Separately, plaintiffs argue that this Court should consider the purported lack of compactness of the districts created by the General Assembly and the harm resulting from splitting precincts. While these may be valid considerations, neither constitutes an independent legal basis for finding a violation, and we are unaware of any justiciable standard by which to measure these local factors. *See Vera,* 517 U.S. at 999, 116 S.Ct. at 1972, 135 L.Ed.2d at 284 (Kennedy, J., concurring) ("Districts not drawn for impermissible reasons or according to impermissible criteria may take any shape, even a bizarre one," so long as "the bizarre shape ... is [not] attributable to race-based districting unjustified by a compelling interest.").

*Dickson II*, at 533. Finally, plaintiffs also ignore that the 2017 district they challenge (Senate District 41) is nearly identical in shape to the same district that same superior court approved in 2002 (2002 Senate District 40) despite supposedly setting a new standard on compactness, as shown below. (*Compare* Doc. 184-4 (Senate District 41)

*with*

http://www.ncleg.net/representation/Content/Plans/PlanPage_DB_2003.asp?Plan=Interim
_Senate_Redistricting_Plan_for_NC_2002_Elections&Body=Senate (Senate District
40)).



Accordingly, this objection is frivolous and should be rejected.

## CONCLUSION

Based on the foregoing, the Court should overrule plaintiffs' objections, and allow
North Carolina's 2018 legislative elections to proceed under the 2017 House and Senate
Plans.

This the 22nd day of September, 2017.

OGLETREE, DEAKINS, NASH
SMOAK & STEWART, P.C.

/s/ Phillip J. Strach
Phillip J. Strach
N.C. State Bar No. 29456
Michael D. McKnight
N.C. State Bar No. 36932
phil.strach@ogletreedeakins.com
michael.mcknight@ogletreedeakins.com
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina 27609
Telephone:  (919) 787-9700
Facsimile:  (919) 783-9412

*Counsel for Legislative Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I, Phillip J. Strach, have served the foregoing **NOTICE OF FILING** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Edwin M. Speas, Jr.
Carolina P. Mackie
Poyner Spruill LLP
P.O. Box 1801 (27602-1801)
301 Fayetteville St., Suite 1900
Raleigh, NC  27601
espeas@poynerspruill.com
johale@poynerspruill.com
cmackie@poymerspruill.com
*Attorneys for Plaintiffs*

Anita S. Earls
Allison J. Riggs
Southern Coalition for Social Justice
1415 Highway 54, Suite 101
Durham, NC  27707
anita@southerncoalition.org
allisonriggs@southerncoalition.org
*Attorneys for Plaintiffs*

Alexander McC. Peters
Senior Deputy Attorney General
N.C. Department of Justice
Apeters@ncdoj.gov
P.O. Box 629
Raleigh, NC 27602
*Attorneys for Defendants*

This the 22nd day of September, 2017.

OGLETREE, DEAKINS, NASH
SMOAK & STEWART, P.C.


/s/ Phillip J. Strach

31255185.1