IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
NO. 1:15-CV-00399

| | | |
|---|---|---|
| SANDRA LITTLE COVINGTON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **LEGISLATIVE DEFENDANTS'** |
| v. | ) | **RESPONSE TO SPECIAL** |
| | ) | **MASTER'S DRAFT REPORT** |
| STATE OF NORTH CAROLINA, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## INTRODUCTION

Legislative defendants continue to object to the irregular and inappropriate process the Court has adopted in this case. The Court, and therefore, the special master, lack jurisdiction over the districts enacted by the legislature on August 31, 2017 ("2017 plans") because the legislature fully complied with this Court's judgment and the case is now moot.

In any event, none of the special master's proposed districts should be adopted until the Court explains how all of the districts challenged by plaintiffs in their objections ("Subject Districts") fail to remedy constitutional violations and gives North Carolina an opportunity to either correct them or seek appellate review.[1]

---

[1] The process adopted by the Court for the appointment of the special master violates Rule 53, Fed. R. Civ. P., and the constitutional sovereignty of the State of North Carolina, including its legislature. Legislative defendants incorporate by reference all of their prior objections related to the appointment of Professor Persily as special master. D.E. 204. Legislative defendants renew their request to conduct a deposition or voir dire of the special master to examine the apparent conflicts raised by legislative defendants in prior briefing.

Indeed, absent a definitive ruling from the Court explaining how and why the 2017 Senate Districts 21 and 28 and House Districts 21 and 57 fail to remedy federal constitutional violations found by the Court, the special master has been left to speculate on the criteria that the Court might ultimately approve for redrawing these districts. While it is not completely clear what specific criteria the special master followed because they have not been articulated, it appears that the special master has engaged in racial sorting to establish districts with racial targets for black voting age population ("BVAP") without citing or developing any evidence of legally significant racially polarized voting that might otherwise justify the use of race.[2] Because the special master has considered race—without justification or standard articulated by the Court or by him—in the drawing of his districts, those proposed districts—not the Subject Districts—are racial gerrymanders.

The special master should also recommend that the 2017 plans' changes to House Districts 36, 37, 40, and 41 in Wake County and House District 105 in Mecklenburg County not be enjoined by the Court. Neither the Court nor the special master has

---

[2] The Supreme Court has made clear that a record must include evidence of statistically significant racially polarized voting *in a specific geographic area* before race can be considered in drawing a district encompassing that area. *Cooper v. Harris*, 137 S.Ct. 1455, 1471 (2017) ("*Harris*"). Indeed, in *Harris* the Supreme Court held that even though the record before the North Carolina General Assembly contained expert reports documenting statewide racially polarized voting, the evidence wasn't sufficiently "local" enough to justify the State's consideration of race in drawing specific districts. *Id.* and n.5. Here, the special master does not even have evidence of statewide racially polarized voting before him, much less evidence of statistically significant racially polarized voting in the districts that he created employing racial sorting. If the State's record evidence in *Harris* was insufficient to support the use of race in redistricting, certainly the complete dearth of any such evidence before the special master prevents him from considering it.

jurisdiction to consider state constitutional claims made against the State of North Carolina, nor may the Court defer addressing the issue of its jurisdiction, once asserted, while it conducts an analysis of the merits of those claims. But, in any case, the special master has modified these districts based upon an erroneous interpretation of the North Carolina Constitution apparently adopted by the Court. Nothing under federal law would prevent the North Carolina General Assembly from adopting completely new, statewide districting plans at any time – much less changing "non-adjoining" districts whose shape and location were directly caused by the placement of the illegal districts. Whether any such action would violate the North Carolina Constitution is a question reserved to the Supreme Court of North Carolina and should not be decided by the special master or the Court.

## 1. This case is moot.

As previously explained by legislative defendants, this matter is moot and if plaintiffs want to pursue additional claims, they must file a new lawsuit. "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997). "A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). Here, the Court has enjoined the use of the 2011 legislative plans and those plans will not be used. Moreover,

the legislature has now enacted new plans for the 2018 elections. There is therefore nothing left for the Court or the special master to do.[3]

Similarly, plaintiffs no longer have a concrete stake in the outcome of the case because they face no realistic threat of injury from the 2011 legislative plans. To maintain a live case or controversy:

> [t]he parties must continue to have a "personal stake in the outcome" of the lawsuit. . . . . This means that, throughout the litigation, the plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision."

*Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477–78 (1990)). For this reason, the doctrine of mootness is often characterized as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Official English*, 520 U.S. at 68 n.22; *cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (explaining that Article III standing requires the plaintiff to identify "a concrete and imminent invasion of a legally protected

---

[3]    The so-called "objections" filed by plaintiffs do not change this result. While the Court has the authority ultimately to enjoin some or all of the 2017 plans, it may only do so in the context of an actual live case or controversy between the parties, which does not exist absent a new lawsuit. Of course, a new lawsuit would permit the parties to engage in discovery and develop a factual record that the Court is preventing through the irregular process it has adopted in this case.

Moreover, plaintiffs have not cited any authority for the proposition that filing "objections" to a new redistricting plan may substitute for a live case or controversy created by a new lawsuit. Of course, had the Court (improperly) taken it upon itself to draw districts in the first instance, such authority would have been exercised under the case or controversy that previously existed between the parties. However, now that the legislature has adopted new plans to replace the 2011 plans, the case filed by plaintiffs over those plans is moot. *See Stephenson v. Bartlett*, 358 N.C. 219, 595 S.E.2d 112 (2004) ("*Stephenson III*").

interest that is neither conjectural nor hypothetical"); *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon the validity of a statute upon complaint of one who fails to show that he is injured by its operation."). Because the claims asserted by all plaintiffs are directed at legislation that has now been repealed and replaced, plaintiffs cannot demonstrate that they are likely to be harmed by the challenged redistricting plans. Plaintiffs' inability to identify any threat of injury deprives them of a concrete stake in the outcome of this case, rendering the case moot and divesting this Court of subject matter jurisdiction.

**2.    It is an abuse of discretion for the special master to propose a plan before a final ruling on the constitutionality of the Subject Districts and without giving the General Assembly a chance to remedy any allegedly unlawful districts.**

The special master should recommend to the Court that no districts be drawn by the special master or adopted by the Court until: (1) the Court makes a definitive ruling that explains why any of the specific subject districts are illegal; and (2) gives the State an opportunity to either remedy these new illegalities or seek appellate review.

First, it is inappropriate for the Court to authorize the special master to ask the legislative defendants to comment on, or propose revisions of, districts drawn by the special master when the legislative defendants do not themselves speak for the entire General Assembly. The General Assembly speaks for itself through legislation it enacts on a majority-rule basis. A few members of the legislature, even if they are leaders, are not authorized to state how the entire legislature would vote on, or amend, draft districts proposed by a law professor. The General Assembly spoke with one voice on August 31,

5

2017 when it adopted the 2017 plans, and those plans are the plans supported by the General Assembly.

In any event, it is inappropriate for the special master, or a Court, to fashion a remedy before a legal violation has been found. It is axiomatic in our legal system that a remedy may not be fashioned until a legal violation has been found. That settled order of operations exists not just because there is no entitlement to a remedy until a wrong has been proven, but because "the scope of the remedy is determined by the nature and extent of the constitutional violation." *Milliken v. Bradley*, 418 U.S. 717, 745 (1974). A remedy is "[t]he means of enforcing a right or preventing or redressing a wrong." *Remedy*, Black's Law Dictionary (10th ed. 2014). A remedy, by its nature, thus cannot be crafted without first identifying the wrong to which it is addressed.

Basic examples illustrate this commonsense principle: judges do not issue provisional sentences before a defendant is found guilty; juries do not make provisional damages awards before adjudicating liability; and courts do not craft provisional remedies before finding a constitutional violation.[4] Those kinds of anticipatory remedial proceedings are alien to our legal system not only because of the presumption of innocence that applies across all legal contexts, but also because of the fundamental unfairness that would result from forcing a defendant to expend resources helping to craft an anticipatory judicial remedy for a wrong that has not even been proven to exist.

---

[4] To be sure, courts may *impose* temporary remedies during the pendency of litigation, *see, e.g.*, Fed. R. Civ. P. 65; *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), but that is quite different from anticipatorily crafting a remedy that will be imposed only in the event liability is later found.

The principle that a defendant may not be forced to help craft a judicial remedy for a violation that has not yet been found holds particular force in the redistricting context. The Supreme Court has repeatedly admonished that "reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court." *Chapman v. Meier*, 420 U.S. 1, 27 (1975); *accord Perry v. Perez*, 565 U.S. 388, 392 (2012); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 414 (2006) (plurality opinion); *Miller v. Johnson*, 515 U.S. 900, 915 (1995). Accordingly, courts have no business drawing maps (or empowering special masters to do so) unless and until the State's own maps have been adjudicated invalid, or "an intervening event—most commonly … a census—renders the current plan unusable." *Perry*, 565 U.S. at 392.

Even then, if the State itself is "fully prepared to adopt a [districting] plan" in time for the next regularly scheduled election should its existing plan be invalidated, it is the obligation of the judiciary to give the State the opportunity to do so. *Growe v. Emison*, 507 U.S. 25, 37 (1993). Only "when the governmental body is *unable or unwilling* to fulfill its legislative duties" does it become "the 'unwelcome obligation' of the court to devise and impose a plan" of its own. *Ramos v. Koebig*, 638 F.2d 838, 844 (5th Cir. 1981) (emphasis added) (citation omitted).

Indeed, most of the time judicial intervention occurs when the legislature has failed to enact a remedial plan by a court-imposed deadline. *See, e.g.*, *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 555-56 (E.D. Va. 2016) (district court appointed special master after Virginia General Assembly "convened but failed to act"); *Larios v. Cox*, 306

7

F. Supp. 2d 1212, 1213 (N.D. Ga. 2004) (district court appointed special master after Georgia General Assembly proved "unable to meet [court-imposed] deadline"); *Jackson v. Nassau Cty. Bd. of Supervisors*, 157 F.R.D. 612, 614-15 (E.D.N.Y. 1994) (district court appointed special master after "deadlock and consequential failure" of Nassau County Board of Supervisors to recommend redistricting plan). Beyond that, such intervention has occurred only in the rare instance when there is no time for the legislature to convene and enact a new plan before the next election, *see, e.g.*, *Rodriguez v. Pataki*, 207 F.Supp.2d 123, 124-25 (S.D.N.Y. 2002) (district court appointed special master because "the 'eleventh hour' is upon us, if indeed it has not already passed"); *Beens v. Erdahl*, 336 F.Supp. 715, 719 (D. Minn. 1972) (district court appointed special masters after state legislature adjourned "and was not scheduled to reconvene until after the 1972 general elections").

Moreover, even in the rare instance when a district court is compelled to draw maps itself, the Supreme Court has made abundantly clear that the Court does not possess some freewheeling power to "substitute[] its own concept of 'the collective public good' for the [State] Legislature's determination of which policies serve 'the interests of [its] citizens.'" *Perry*, 565 U.S. at 396. Instead, the Court's task is to draw "maps that comply with the Constitution and the Voting Rights Act, *without* displacing legitimate state policy judgments with the court's own preferences." *Id.* (emphasis added). Accordingly, while a court must "take care not to incorporate into the interim plan any legal defects in the state plan," it may not go beyond that and "modify" aspects of the plan that do not suffer from "any legal flaw." *Id.*

8

*A fortiori*, a court may not draw new maps (or empower a special master to do so) before even finding a violation to remedy.[5]  Indeed, drawing remedial maps in the absence of an adjudicated or admitted problem with the existing maps is a recipe for precisely the kind of constitutional disaster that *Perry* is supposed to prevent.  After all, a court cannot ensure that it is confining itself to its assigned task of remedying "legal defects in the state plan," *id.*, if it does not first identify what the legal defects are.  Drawing remedial maps in the absence of an adjudicated or acknowledged wrong to remedy is therefore bound to devolve into an impermissible effort to "displac[e] legitimate state policy judgments with the court's own preferences." *Id.*

The Court did not and could not identify any authority that supports the flawed approach the special master is now working under.  Instead, the Court cited *Reynolds v. Sims*, 377 U.S. 533, 585-87 (1964), which it described in a parenthetical as "affirming remedial districting map drawn by a district court after district court found state legislature's first proposed remedial map failed to remedy constitutional violation."  D.E. 206 at 4.  That is a plainly inaccurate description of *Reynolds*, which actually *forecloses* the district court's one-chance-only rule.

In *Reynolds*, the district court announced in April 1962 that the state's districting plan—which had not been adjusted since 1901—was invalid.  *Id.* at 545.  By July 1962,

---

[5] *Perry* involved an unusual circumstance in which the district court was forced to draw interim maps in the absence of an adjudicated legal violation because the intervening census conceddly had "render[ed] the current plan unusable," but the State's newly enacted plan had not yet gained preclearance under Section 5 of the Voting Rights Act from the separate district court that was conducting the preclearance proceedings.  *Id.* at 342.  Obviously, no comparable circumstances exist here, as the district court itself has the power to determine the validity of the 2017 plans anytime it chooses to do so.

9

the legislature still had not enacted *any* remedial plan for the upcoming November 1962 election; instead, it had enacted only two alternative reapportionment plans that would "take effect for the *1966* elections." *Id.* at 543 (emphasis added). The district court was thus faced with the unwelcome task of deciding what districts should govern the 1962 election. The court concluded that it could not use either of the plans drawn for the 1966 elections because both contained fatal defects. *Id.* at 546-51. So the court combined "the best parts" of the two "as a temporary and provisional measure" for the 1962 election only—a solution that the Supreme Court approved, noting that the district court had "properly refrained from acting … until the Alabama Legislature had been given an opportunity to remedy the admitted discrepancies" itself. *Id.* at 586-87. Thus, as to the 1962 election, *Reynolds* stands only for the proposition (undisputed here) that a district court may impose temporary districts when a state legislature is given a reasonable opportunity to redistrict *but fails to timely act.*

More important here is *Reynolds*' discussion of the 1966 election, which plainly forecloses the existence of any one-chance-only rule. If there really was such a rule, then the state legislature had already wasted its one chance by enacting the two alternative plans that the district court and the Supreme Court held "constitutionally invalid." *Id.* at 568-69. But instead of holding that the district court was now free to impose its own plan for the 1966 election, the Supreme Court made clear that the state had a sovereign right to try again, and that the district court could intervene only if the "Legislature fail to enact a constitutionally valid, permanent apportionment scheme." *Id.* at 587.

10

*Reynolds* thus serves only to reinforce the rule that district courts may impose court-drawn maps only in the truly rare circumstance when, after a state's own plan has been adjudicated or admitted legally deficient, the State is unwilling or unable to produce a remedial map—*i.e.*, only when "a last-minute federal-court rescue" is the only option. *Growe*, 507 U.S. at 37. Indeed, legislative defendants are aware of no other redistricting case in which a district court has taken upon itself, over the objection of the State, the "unwelcome obligation" of imposing court-drawn maps, *Connor v. Finch*, 431 U.S. 407, 415 (1977), when the legislature concededly stands ready and willing to do so itself. The Court's outright refusal to give the legislature a chance to remedy any perceived deficiencies in the 2017 plan itself is therefore entirely unprecedented—presumably because it is impossible to reconcile with the Supreme Court's repeated admonishments that "reapportionment is primarily the duty and responsibility of the State." *Chapman*, 420 U.S. at 27.

The Court essentially asked the special master for an advisory opinion prior to making any findings on liability. As legislative defendants have argued previously, this is at best an improper delegation of authority to the special master under Rule 53, Fed. R. Civ. P. Regardless, the special master should assist the Court by explaining why none of the Subject Districts violate the federal constitution. In the alternative, the special master should request the Court to first make a final judgment concerning the 2017 plan and then give defendants an opportunity to cure these new defects or seek appropriate appellate review.

3. **The Court's direction to the special master to modify House Districts 36, 37, 40, 41, and 105 is based upon an incorrect interpretation of North Carolina's State Constitution and constitutes a new claim not previously alleged over which the Court and the special master lack jurisdiction.**

The special master should advise the Court that no changes should be made in House Districts 36, 37, 40, and 41 in Wake County and House District 105 in Mecklenburg County. *See* D.E. 204, Legislative Defendants' Opposition to Appointment of Nathaniel Persily as Special Master, at 6. The Court has directed the special master to revise these districts based upon a new claim, not previously raised in any pleadings, that these districts violate N.C. Const. art. IV §§ 3(4) and 5(4). Neither the Court nor the special master have jurisdiction to consider these claims. *Pennhurst State Sch. and Hosp. v. Holderman*, 465 U.S. 89, 117 (1984); *Ala. Legislative Black Caucus v. Ala.*, No. 12-CV-691 (July 27, 2015) (Doc. 265) (reaffirming holding that court lacked subject matter jurisdiction to decide whether a state complied with its own state constitution in creating a redistricting plan). Moreover, this jurisdictional question having been raised, it is fundamental error for the Court to conduct merits proceedings, such as the special master's district drawing, as to this state-law issue without first deciding subject matter jurisdiction. *Sinochem Int'l Co. v. Malay Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007) ("[A] federal court has leeway 'to choose among threshold grounds for denying audience to a case on the merits'" but "[d]ismissal short of reaching the merits means that the court will not 'proceed at all' to an adjudication of the cause").

Besides lacking−and needing to first rule on− jurisdiction to consider this state law claim, the Court's interpretation of these constitutional processes is erroneous. Both of

these sections of the North Carolina Constitution state that legislative districts "shall remain unaltered until the return of another decennial census . . . " N.C. Const. art. II §§ 3(3) and 5(1). Read literally, this provision would bar the State from drawing any districts even those declared illegal by a federal court. But of course state constitutional law obligates the Supreme Court of North Carolina to harmonize the State Constitution with all federal requirements. *Stephenson v. Bartlett*, 355 N.C. 354, 368-70, 562 S.E.2d 377, 388-89 (2002) ("*Stephenson I*"). The General Assembly has also exercised broad discretion to revise district plans found illegal by federal courts and the federal courts have acknowledged this broad discretion. *Gingles v. Edmiston*, 590 F.Supp. 345, 377-84 (E.D.N.C. 1984), *aff'd in part and rev'd in part sub nom., Thornburg v. Gingles,* 478 U.S. 30 (1986).

Neither the plaintiffs nor the Court cite any precedent to support their novel construction of the North Carolina Constitution that would allow the General Assembly to change illegal districts and districts that adjoin illegal districts, but not allow the General Assembly to modify districts that do not adjoin illegal districts. It is obvious from a review of the 2017 plans that the General Assembly's location and construction of all of the 2017 districts in Wake and Mecklenburg Counties was the result of the way the General Assembly constructed the districts found to be illegal. For example, to comply with the equal population requirements of the North Carolina Constitution, "non-adjoining" districts had to be based in part on divided precincts because precincts were divided in both the illegal districts and the districts that adjoined illegal districts. Further, the shapes and locations of the non-adjoining districts were directly caused by the

13

location of the illegal districts because of the General Assembly's then-understanding that majority-black districts had to be created before any other districts in both Wake and Mecklenburg Counties. *Stephenson I*, 355 N.C. at 383, 562 S.E.2d at 397. This created a domino effect on all districts within Wake and Mecklenburg Counties of the placement and location of the majority-black districts that have now been declared unconstitutional.

Finally, the Court's erroneous construction of the North Carolina Constitution violates several principles of State law regarding the proper interpretation of the State Constitution. The North Carolina Supreme Court has often said that "[e]very presumption favors the validity of a statute. It will not be declared invalid unless its unconstitutionality be determined beyond reasonable doubt." *Baker v. Martin*, 330 N.C. 331, 334, 410 S.E.2d 887, 889 (1991) (*quoting Gardner v. Reidsville*, 269 N.C. 581, 595, 153 S.E.2d 139, 150 (1967)). This is so because the acts of the legislature are effectively the acts of the people. *State ex rel. Martin*, 325 N.C. 438, 448-49, 385 S.E.2d 473, 478 (1989). *See also Pope v. Easley*, 354 N.C. 544, 546, 556 S.E.2d 265, 267 (2001) (The legislative power rests "with the people and is exercised through the General Assembly, which functions as the arm of the electorate).

An act of the people's elected representatives is thus an act of the people and is presumed valid *unless it conflicts with the Constitution.*") (citation omitted) (emphasis added)). "[I]f there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action." *Baker*, 330 N.C. at 338, 410 S.E.2d at 891 (citations omitted). The 2017 legislative districts must be presumed as satisfying North Carolina law unless it can be shown beyond a reasonable

14

doubt that the subject districts exceed an express limitation of legislative power contained in the Constitution. Indeed, it is well established that "a court will not adjudge an act of the Legislature invalid, unless its violation of the Constitution is . . . *clear, complete, and unmistakable*". *Kornegay v. City of Goldsboro*, 180 N.C. 441, 445, 105 S.E. 187, 189 (1920) (citations omitted) (emphasis added). "And, as between two permissible interpretations, that should always be adopted which will uphold the law." *Id.* (citations omitted). This is because the "propriety, wisdom, and expediency of legislation is exclusively a legislative question" and there is no ground for judicial interference "unless the act . . . is *unmistakably* in excess of legislative power." *Id.* (citations omitted) (emphasis added). Under these mandates of state law, there is no basis for the special master to recommend to the Court that the subject non-adjoining districts in Wake and Mecklenburg Counties be replaced by the versions proposed by the special master.

4. **The special master has improperly engaged in racial sorting to create districts with a mechanical target of black voting age population between 39% and 43.6%.**

In its order of November 1, 2017, the Court authorized the special master to "consider data identifying the race of individuals or voters to the extent necessary to ensure that his plan cures the unconstitutional racial gerrymanders and otherwise complies with federal law." D.E. 206 at 9. In so doing, the Court not only preemptively usurped the legislature's power to remedy any deficiencies in the 2017 plan, but empowered the special master to draw remedial maps that will not abide by the Supreme Court's command to "take guidance from the State's recently enacted plan in drafting an interim plan." *Perry*, 565 U.S. at 393. Nowhere is this clearer than in the legislature's

15

policy decision not to consider race. We are aware of no precedent supporting the proposition that a legislature must consider race when enacting districts to replace illegal racial gerrymanders. The only legitimate reason for a legislature to consider race relates to a state's potential liability under Section 2 of the Voting Rights Act. But, there is no authority that obligates a state to draw new districts either based upon race or designed to avoid future Section 2 claims.

Of course a state can elect to run the risk of using race to draw districts to avoid potential Section 2 liability. But a state may do so only where there is a strong basis in evidence that the minority group is geographically compact and in sufficient numbers to constitute a majority in a single member district, is politically cohesive, and there is evidence of legally significant racially polarized voting. *Harris*, 137 S.Ct. at 1470-1471; *Bartlett v. Strickland*, 556 U.S. 1, 8-11 (2009). There is no authority for using race to draw Section 2 districts with a majority black voting age population absent the presence of legally significant racially polarized voting. This is the heart of the Court's prior decision in this case. Further, in the absence of Section 5, there is no authority for the State or a special master to sort voters based upon race to create districts with less than 50% BVAP. *Georgia v. Ashcroft*, 529 U.S. 461, 491-92 (Kennedy, J., concurring).

Yet racial sorting is exactly what the Court authorized the special master to do when it directed him to "consider data identifying the race of individuals or voters to the extent necessary to ensure that his plan cures the unconstitutional racial gerrymanders . . . ." D.E. 206 at 8, 9. Respectfully, legislative defendants believe this instruction was erroneous and an improper delegation of authority to the special master prior to any final

16

ruling by the Court explaining why each of the Subject Districts is unconstitutional. The Court did not explain to the parties or the special master how Senate Districts 21 and 28 and House Districts 21 and 57 remain racial gerrymanders or fail to cure federal constitutional violations. Instead, the Court expressed concerns – without explaining them – that those districts "preserve the core shape of the unconstitutional district, divide counties and municipalities along racial lines, and are less compact than their benchmark version." No explanation or evidence was cited by the Court to support these "concerns," as they relate to any of those four districts.

Nor did the Court explain how the General Assembly's use of incumbency and political data in drawing its proposed remedial districts "embedded, incorporated and perpetuated the impermissible use of race." D.E. 206 at 2. There is no precedent for this holding. It cannot be reconciled to the General Assembly's use of incumbency and political data to create the 1997 version of North Carolina's Twelfth Congressional District. This district retained most of the population centers found in the illegal 1992 Twelfth Congressional District and was intentionally designed to elect a Democratic candidate and protect a Democratic incumbent. Yet the 1997 Twelfth Congressional District was affirmed by the Supreme Court even though – unlike the 2017 legislative districts – it did not follow traditional districting principles other than political affiliation. *Easley v. Cromartie*, 532 U.S. 234 (2000); *Hunt v. Cromartie*, 526 U.S. 541, 551 ("Our prior decisions have made clear that a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the state was conscious of that fact.") It is difficult if not

17

impossible to reconcile this Court's ruling that the General Assembly's consideration of incumbency "perpetuated the impermissible use of race" given the holding in *Cromartie* affirming a district that was based solely on political criteria.

As disadvantaged as the special master is by the Court's failure to explain how any specific Subject District fails to cure the federal constitutional remedies, the special master candidly stated that his proposed districts are "attempts to remedy the *suspected* constitutional infirmity by removing any residuum of racial predominance that may have been expressed in the 2017 configuration of that district." D.E. 213 at p. 5 (emphasis added). The special master exacerbated the Court's lack of guidance to the parties by giving only a "summary explanation of the principles that guided" the creation of his proposed districts. D.E. 213 at 1. The special master conceded that "greater detail as to the plan's compliance with applicable law" and a "more complete explanation of the rationale" for his plans would only be provided after the parties commented on the plans without that information. In this sense, the special master is simply perpetuating the Court's legal error in not disclosing the evidence relied upon by the Court and how that evidence applied to the Subject Districts before forcing the legislative defendants to comment on the special master's premature draft plans.

In any event, leaving aside the question of what constitutes an acceptable or unacceptable "racial residuum" – an issue that has not yet been explained by the Court – it is clear that one of the steps taken by the special master was to sort voters by race – to decrease the BVAP in his proposed districts to a mechanically targeted range between 39% and 43%.

The legislature clearly did not consider a target range for the "right" percentage of BVAP to include in each district. Instead, the General Assembly adopted a criterion that race should not be considered in constructing the 2017 districts. And, unlike the 2011 redistricting process (where the legislature required VRA districts to have at least 50% BVAP based on its understanding of the extent of legally sufficient racially polarized voting) the percentage BVAP in each of the 2017 Subject Districts was the natural result of non-racial criteria used by the General Assembly to draw them. *Ala. Legislative Black Caucus v. Ala.*, 135 S.Ct. 1257, 1270 (2015) (plaintiffs must prove that the legislature subordinated traditional districting principles including respect for political subdivisions, incumbency, and political affiliation to race); *Bush v. Vera*, 517 U.S. 952, 967 (1996) (where traditional redistricting principles are followed they cannot be said to have been "subordinated to race.")

In contrast to the legislature's decision that race should not be considered, the special master apparently has attempted to remove the "residuum" of "racial predominance" by reducing the BVAP in the Subject Districts to a range of 39% to 43%. This was expressly authorized by the Court, which allowed the special master to engage in racial sorting so long as the percentage BVAP hits a target that might be more acceptable to the Court.

There is no precedent for authorizing racial sorting as a remedy for "correcting" allegedly racially gerrymandered districts. Nor is there any precedent to support a finding that the BVAP in the enacted districts is "too much" of a "residuum" but that the BVAP in the special master's proposed districts is "just right." It defies precedent to

19

express a "concern" about racial predominance where race was not used to draw the districts and the districts were instead obviously based upon whole counties, whole precincts, municipal lines, and incumbency protection. The only rational way to understand the Court's "concern" is that the special master has been directed to sort voters because of their race to create districts with lower BVAP and which allegedly bear less of a resemblance to the challenged districts. That is certainly how it appears the special master has interpreted the concern, and in doing so he, like the Court, has not articulated any standard other than referencing a nebulous "residuum." Such standards, which amount to no standards at all, will lead to the federal judiciary judging racial "beauty contests" much like the Supreme Court has warned against in assessing the geographic appearance of districts. *Bush*, 517 U.S. at 977.

## CONCLUSION

The process under which the special master is proceeding is irregular and inappropriate. It defies precedent, ignores state sovereignty, and imposes race-based redistricting on the State against its will. Unless and until the Court issues a final ruling on the constitutionality of the Subject Districts, the special master should propose in his report to the Court the districts as drawn in 2017 by the North Carolina General Assembly.

This 17th day of November, 2017.

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

/s/ Phillip J. Strach
Phillip J. Strach
N.C. Bar No. 29456
Michael D. McKnight
N.C. Bar No. 36932
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina 27609
Phone: (919) 787-9700
Facsimile: (919) 783-9412
Email:phil.strach@ogletreedeakins.com
*Attorneys for Legislative Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of November, 2017, I have served the foregoing **LEGISLATIVE DEFENDANTS' RESPONSE TO SPECIAL MASTER'S DRAFT REPORT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Edwin M. Speas, Jr.
Carolina P. Mackie
Poyner Spruill LLP
P.O. Box 1801 (27602-1801)
301 Fayetteville St., Suite 1900
Raleigh, NC  27601
espeas@poynerspruill.com
johale@poynerspruill.com
cmackie@poymerspruill.com
*Attorneys for Plaintiffs*

Anita S. Earls
Allison J. Riggs
Southern Coalition for Social Justice
1415 Highway 54, Suite 101
Durham, NC  27707
anita@southerncoalition.org
allisonriggs@southerncoalition.org
*Attorneys for Plaintiffs*

Alexander McC. Peters
Senior Deputy Attorney General
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

/s/ Phillip J. Strach
Phillip J. Strach
N.C. Bar No. 29456
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina 27609
Phone: (919) 787-9700
Facsimile: (919) 783-9412
Email: phil.strach@ogletreedeakins.com

32056372.1