IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
NO. 1:15-CV-00399

| | |
|---|---|
| SANDRA LITTLE COVINGTON, *et al.*, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> STATE OF NORTH CAROLINA, *et al.* ) <br> ) <br> Defendants. ) <br> ) | **LEGISLATIVE DEFENDANTS' RESPONSE TO PLAINTIFFS' PROPOSED MODIFICATIONS TO SPECIAL MASTER'S DRAFT PLAN** |

## INTRODUCTION

Plaintiffs' requested modifications to the special master's draft plans demonstrate why the legislature's 2017 plans should be adopted by the special master and the Court. The special master should submit to the Court the enacted 2017 plans and, at a minimum, reject plaintiffs' proposed political modifications to his plans.

The modifications that plaintiffs' request highlight how the Court has substituted its policy choices for those of the legislature. The legislature chose not to use race in drawing the 2017 plans; the Court has placed the special master in the position of making the predominant criterion in his map the drawing of districts to a particular racial quota. In addition, the legislature adopted a policy preference of using election data to ensure that incumbents of both parties were drawn into districts they could potentially win. The Court instructed the special master not to use election data (D.E. 206 at 7) and limited the non-pairing of incumbents to a "distinctly subordinate consideration" to other criteria (D.E. 206 at 7).

In following the Court's criteria, the special master's draft plan apparently causes political problems for numerous Democratic incumbents. Plaintiffs now seek political relief for those political problems. As legislative defendants have explained previously, however, all line-drawing in redistricting has political consequences, even when the mapdrawer purportedly uses only "nonpartisan" criteria. That is why the Constitution commits this task to the political branches and the Supreme Court has repeatedly affirmed that it must be performed by those who are politically accountable, not unelected judges or special masters. In adopting its incumbency protection criteria, the legislature established a policy designed to avoid the very problem plaintiffs' legislative allies are now faced with. If the special master is going to follow the State's policy preferences, then he should recommend the enacted 2017 plans to the Court. At a minimum, the special master should reject the political modifications requested by plaintiffs.

1. **The State's policy preferences have been displaced.**

The special master's draft plans, and the plaintiffs' response to them, offer a stark picture of how many of the State's redistricting policies have been negated by the Court in favor of its preferences. The legislature adopted a criterion expressly declining to consider race in the drawing of districts, but the Court has allowed the special master to consider race anyway.[1] As a result of the legislature's race-neutral approach, the black

---

[1] The legislature's decision not to draw race-based districts required it to re-group the counties under the county grouping requirements of *Stephenson v. Bartlett*, 355 N.C. 354, 562 S.E.2d 377 (2002) and *Dickson v. Rucho,* 368 N.C. 481, 781 S.E.2d 404 (2015). The

voting age population ("BVAP") of House Districts 21 and 57 and Senate Districts 21 and 28 were randomly distributed, from a low of 42.34% to a high of 60.75%. Unlike the legislature's plans, these districts in the special master's plan are in a narrow range of 39% to 43% BVAP. In order to draw districts within this range, the special master often had to sacrifice other redistricting policies followed by the State. For instance, the special master split numerous precincts in House District 21, gave less consideration to the Greensboro municipal lines in House District 57 and Senate District 28, moved House District 61 to the center of Greensboro (thereby creating less compact districts in Greensboro),[2] and gave less consideration to the Fayetteville municipal lines in Senate District 21.[3]

More importantly, in service of his predominant goal of eliminating any alleged "residuum" of race from the legislature's plans,[4] which resulted in adherence to an apparent target BVAP between 39% and 43%, the special master's version of these

---

Court instructed the special master to use the county groupings adopted by the legislature. (D.E. 206 at 6)

[2] In moving House District 61 from suburban Greensboro to central Greensboro, the special master negated the legislature's policy choice to create a suburban district that followed city lines. By doing so, the special master was also apparently able to achieve a racial target of 39% to 43% in the three districts he drew in the center of Greensboro, most dramatically in House District 61, in which the special master ramped up the BVAP from 11.47% in the 2017 plan to 41.64% in his draft plan.

[3] In Cumberland County, the special master also made a different policy choice than the legislature related to Senate Districts 19 and 21. For unknown reasons, the special master removed a precinct containing most of Fort Bragg that the legislature had placed in Senate District 19 and placed it into Senate District 21 instead.

[4] To the extent the special master is referring to an alleged "residuum" of race in the 2017 plans from the 2011 version of the districts, it is unclear why the 2011 plans have any relevance to the special master's work. Absent a Section 5 preclearance requirement, the baseline plans for analysis are the 2017 plans enacted by the legislature. The 2017 plans stand or fall on their own as to any alleged racial gerrymandering.

3

districts shifted some of the core of the districts to other locations in the county. The effect of this in Guilford was to double-bunk Representative Quick and Representative Hardister in House District 59; Representative Harrison and Representative Blust in House District 61; and Senator Wade and Senator Robinson in Senate District 27. In Wake County, the special master's effort to comply with the Court's ruling on a state constitutional issue caused the double-bunking of Representative Ball and Representative Martin in House District 49.

Under the 2017 plans, no double-bunking occurs that was not required by following state county-grouping constitutional requirements. Moreover, incumbents of both parties were drawn into districts in which the 2016 incumbents had a reasonable chance of being elected (based on prior election results). Under the Supreme Court's most recent pronouncements on these issues, the legislature's criteria should have been followed. The Supreme Court has made abundantly clear that the Court does not possess some freewheeling power to "substitute[] its own concept of 'the collective public good' for the [State] Legislature's determination of which policies serve 'the interests of [its] citizens.'" *Perry v. Perez*, 565 U.S. 388, 396 (2012). Instead, the Court's task is to draw "maps that comply with the Constitution and the Voting Rights Act, *without* displacing legitimate state policy judgments with the court's own preferences." *Id.* (emphasis added). Accordingly, while a court must "take care not to incorporate into the interim plan any legal defects in the state plan," it may not go beyond that and "modify" aspects of the plan that do not suffer from "any legal flaw." *Id.* To date, neither the Court nor the special master have explained any specific "legal flaw" in the State adopting

4

protection of incumbents as a redistricting criterion, or any other "legal flaw" at all for that matter. The cases cited by the Court recognize that fact. (D.E. 206 at 8 (citing *Wyche v. Madison Par. Police Jury*, 769 F.2d 265, 268 (5th Cir. 1985) (noting that "the protection of incumbents" is a factor that is "appropriate in the legislative development of an apportionment plan"))

### 2. The special master should reject plaintiffs' requested political relief.

The Court and the special master having displaced the legislature's chosen policy preferences, it is not surprising that the draft plans would pair incumbents and have other political ramifications. The Supreme Court has repeatedly noted that it would be "mindless" to think that districting can ever be a neutral process. As explained by the Court:

> Politics and political consideration are inseparable from districting and apportionment. The political profile of a State, its party registration, and voting records are available precinct by precinct, ward by ward. These subdivisions may not be identical with census tracts but, when overlaid on a census map, it requires no special genius to recognize the political consequences of drawing a district line along one street rather than another. It is not only obvious, but absolutely unavoidable, that the location and shape of districts may determine the political complexion of the area. District lines are rarely neutral phenomena. They can well determine what district will be predominantly Democratic, predominantly Republican, or make a close race likely. Redistricting may put incumbents against one another or make very difficult the election of the most experienced legislator. The reality is that districting inevitably has and is intended to have substantial political consequences.
> It may be suggested that those who redistrict and reapportion should work with census, not political, data and achieve population equity without regard for political impact. But the *politically mindless* approach may produce, whether intended or not, the most grossly gerrymandered results; and, in any case, it is most unlikely that the political impact of such a plan would remain undiscovered by the time it was proposed or adopted, in which event the results would be both known and, if not changed, intended.

5

*Davis v. Bandemer*, 478 U.S. 109, 128-29 (1986) (quoting *Gaffney v. Cummings*, 412 U.S. 735, 752-53 (1973)) (emphasis added).

The self-evident fact that there is no such thing as a politically neutral district line has been repeatedly recognized by the Supreme Court and its Justices. *Bandemer*, 478 U.S. at 129 n.10 ("'The key concept to grasp is that there are no neutral lines for legislative districts . . . every line drawn aligns partisans and interest blocs in a particular way different from putting the line in some other place.'") (citation omitted); *Vieth v. Jubelirer*, 541 U.S. 267, 302-09 (2004) (criteria such as contiguity and compactness are not politically neutral) (Kennedy, J., concurring in judgment) (citations omitted); *Id.* at 343 ("the choice to draw a district line one way, not another, always carries some consequence for politics, save in a mythical state with voters of every political identity distributed in an absolutely growing uniformity) (Souter, Ginsburg, J. J., dissenting); *Id.* at 359 (in a system of single-member districts the use of traditional districting principles is rarely, if ever, politically neutral) (Breyer, J., dissenting).

Plaintiffs now ask the special master to rescue some incumbents but not others. All of the incumbents for whom plaintiffs seek relief are Democrats. Plaintiffs do not seek relief for any affected Republican incumbents.[5] Plaintiffs' political motivations have already been recognized and rejected by the Court. (D.E. 206 at 2 ("The Court is concerned that, among other things, some of the districts proposed by the Plaintiffs may

---

[5] While Democratic Representative Quick is double-bunked with Republican Representative Hardister, plaintiffs seek to move Representative Quick out of a district that is more likely to elect a Republican candidate and into an adjoining district that is more likely to elect a Democratic candidate.

6

be the result of impermissible political considerations.")) These requests should be rejected.

First, the Court instructed the special master that non-pairing of incumbents should be a "distinctly subordinate consideration" in his plans. Plaintiffs do not offer any non-political justification for their request to un-pair the Democratic incumbents for whom they seek relief. Un-pairing these incumbents cannot be justified as a state redistricting policy because the state's policy was to draw separate districts in which the incumbents had a reasonable opportunity to be elected. Justifying plaintiffs' modifications by referencing the State's criteria would not only violate that criteria, it would amount to cherry-picking incumbents who benefit from the criteria in favor of one political party.

Next, plaintiffs' proposed modifications would, by their own admission, violate other traditional redistricting criteria. For instance, placing Representative Quick into an adjoining House district would require the special master to either split a new precinct or make his existing district less compact. (D.E. 216 at 2-3) In Wake County, plaintiffs propose re-splitting a precinct that had not been split by the special master. (D.E. 216 at 3-4) In requesting that Democratic Representatives Ball and Martin be un-paired, plaintiffs reduce several of the compactness scores in multiple districts.[6] (D.E. 216 at 4-

---

[6] Moreover, the population ripples created by plaintiffs' proposed changes in Wake County illustrate why eliminating the racial gerrymandering found in the 2011 districts necessarily requires the legislature to have the ability to change all of the districts within any given county grouping, including a single-county grouping such as Wake County. As demonstrated by plaintiffs' requested change to House District 40, the population ripple in changing a district affects more than just "adjoining" districts. Plaintiffs' proposed change to House District 40 overpopulates adjoining House District 49. Removing population from House District 49 requires changing a district that did not

7

5) Given the lack of any non-political reason justifying plaintiffs' proposed modifications, the special master should certainly not violate neutral criteria to further a political outcome. In protecting incumbents, the special master should "take guidance from the State's recently enacted plan in drafting an interim plan," *Perry*, 565 U.S. at 393, and submit the State's 2017 plans.

## CONCLUSION

Plaintiffs' requested modifications and the special master's proposed plans demonstrate why the legislature's 2017 plans should be adopted by the special master and the Court. If the special master is going to follow the state's policy preferences, then he should recommend the enacted 2017 plans to the Court. At a minimum, the special master should reject plaintiffs' proposed political modifications.

---

originally adjoin House District 40. Plaintiffs' claim that the "obvious" choice to receive the extra population is House District 34 (D.E. 216 at 4) but it would be just as legitimate for a legislature to choose a different non-adjoining district to receive the population caused by the change to House District 40. In this respect, the Court's mandate to the special master not to change districts that did not adjoin unconstitutional districts is a substitution of the Courts' policy preference for the legislature's preference, under the guise of state law.

This 21st day of November, 2017.

                            OGLETREE, DEAKINS, NASH,
                            SMOAK & STEWART, P.C.

                            /s/ Phillip J. Strach
                            Phillip J. Strach
                            N.C. Bar No. 29456
                            Michael D. McKnight
                            N.C. Bar No. 36932
                            4208 Six Forks Road, Suite 1100
                            Raleigh, North Carolina 27609
                            Phone: (919) 787-9700
                            Facsimile: (919) 783-9412
                            Email:phil.strach@ogletreedeakins.com
                            *Attorneys for Legislative Defendants*

# CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of November, 2017, I have served the foregoing **LEGISLATIVE DEFENDANTS' RESPONSE TO PLAINTIFFS' PROPOSED MODIFICATIONS TO SPECIAL MASTER'S DRAFT REPORT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Edwin M. Speas, Jr. | Anita S. Earls |
| Carolina P. Mackie | Allison J. Riggs |
| Poyner Spruill LLP | Southern Coalition for Social Justice |
| P.O. Box 1801 (27602-1801) | 1415 Highway 54, Suite 101 |
| 301 Fayetteville St., Suite 1900 | Durham, NC 27707 |
| Raleigh, NC 27601 | anita@southerncoalition.org |
| espeas@poynerspruill.com | allisonriggs@southerncoalition.org |
| johale@poynerspruill.com | *Attorneys for Plaintiffs* |
| cmackie@poymerspruill.com | |
| *Attorneys for Plaintiffs* | |
| | Alexander McC. Peters |
| | Senior Deputy Attorney General |
| | N.C. Department of Justice |
| | P.O. Box 629 |
| | Raleigh, NC 27602 |

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

/s/ Phillip J. Strach
Phillip J. Strach
N.C. Bar No. 29456
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina 27609
Phone: (919) 787-9700
Facsimile: (919) 783-9412
Email: phil.strach@ogletreedeakins.com

32072076.1