IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SANDRA LITTLE COVINGTON, et al.,   )
                                         )
               Plaintiffs,       )
      v.                         )      1:15-CV-399
                                           )
THE STATE OF NORTH CAROLINA, et al.,   )
              Defendants.      )

## SPECIAL MASTER'S RECOMMENDED PLAN AND REPORT

On November 1, 2017, the United States District Court for the Middle District of North Carolina sitting as a three-judge panel comprised of the Honorable James A. Wynn, Judge of the United States Court of Appeals for the Fourth Circuit, the Honorable Thomas D. Schroeder, Chief Judge for the Middle District of North Carolina, and the Honorable Catherine C. Eagles, United States District Judge for the Middle District of North Carolina, (hereinafter "the Court") appointed me as Special Master in the above captioned case. Appointment Order, Nov. 1, 2017, ECF No. 206 (hereinafter the "Order"). The Order directed the Special Master, by December 1, 2017, "to submit a report and proposed plans to remedy the unconstitutional racial gerrymander" of various districts in the 2011 Enacted Senate and House districting plans for the North Carolina General Assembly. *Id.* at 5. Herein provided is the Plan and Report called for in the Court's Order.

Exhibit 1 presents statewide and selected county maps of the Special Master's Recommended Plan, along with analogous maps from the Enacted 2011 and 2017 Plans for comparison. Exhibit 2 presents population deviations for all districts in the Special Master's Recommended Plan, the Enacted 2011 Plan, and the Enacted 2017 Plan. Exhibit 3 presents

Reock and Polsby-Popper compactness statistics for all districts in the Special Master's Recommended Plan, the Enacted 2011 Plan, and the Enacted 2017 Plan. Exhibit 4 presents a report on splits of county and municipality boundaries for all districts in the Special Master's Recommended Plan, the Enacted 2011 Plan, and the Enacted 2017 Plan. Exhibit 5 presents a report on splits of 2010 Voter Tabulation Districts (hereinafter "precincts"), as provided by the U.S. Census Bureau, for all districts in the Special Master's Recommended Plan, the Enacted 2011 Plan, and the Enacted 2017 Plan. Exhibit 6 provides a breakdown of the districts by Voting Age Population for Census-designated racial and ethnic groups for all districts in the Special Master's Recommended Plan, the Enacted 2011 Plan, and the Enacted 2017 Plan. Exhibit 7 provides statewide and county maps for the Special Master's Draft Plan, as well as associated statistical reports. Exhibit 8 includes the briefs and maps filed by Plaintiffs in response to the Special Master's Draft Plan. Exhibit 9 includes briefs provided by the Legislative Defendants in response to the Special Master's Draft Plan. Exhibit 10 provides color maps of alternatives to the Recommended Senate and House Plans for Guilford County. Exhibit 11 provides a list of the incumbents assigned to each district in the Special Master's Recommended House and Senate Plans. Exhibit 12 provides the Plaintiffs' Proposed House and Senate Plans. Exhibit 13 provides the Court's November 1st Order Appointing the Special Master. In addition to the above, the Court, the parties, and the North Carolina General Assembly have been provided with 2010 Census block equivalency files and shapefiles for the Special Master's Draft Plan, the Special Master's Recommended Plan, and alternate plans, as well as a "stat pack" with computer generated reports describing features of the Recommended Plan in detail.

## Background

On August 11, 2016, the Court struck down twenty-eight districts in the State House of Representatives and Senate plans enacted in 2011 by the North Carolina General Assembly (hereinafter Enacted 2011 Plans). *Covington v. North Carolina*, 316 F.R.D. 117, 176 (M.D.N.C. 2016), *aff'd in relevant part*, 137 S. Ct. 2211 (2017) (mem.). The Court ruled those districts unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. In particular, the Court found that those districts were drawn with race as their predominant purpose in violation of *Shaw v. Reno*, 509 U.S. 630 (1993), and its progeny, and that neither section 2 nor section 5 of the Voting Rights Act of 1965 justified doing so. 316 F.R.D. at 167-77.

Following the 2016 election and additional proceedings in both the District Court and the United States Supreme Court, the North Carolina General Assembly passed a remedial redistricting plan on August 31, 2017 (hereinafter the Enacted 2017 Plan), approximately one year after the Court's decision striking down the Enacted 2011 Plan. On September 15, 2017, Plaintiffs filed objections to three Senate districts and nine House districts. Plaintiffs contended that Enacted 2017 Senate Districts 28 and 21 and Enacted 2017 House Districts 21 and 57 continued to violate the Equal Protection Clause in that, even in their revised configurations, race continued to be the predominant factor in their construction. They also alleged that certain districts violated the North Carolina State Constitution. They claimed that Enacted 2017 House Districts 36, 37, 40, 41, and 105 were redrawn in violation of the provision of the state constitution that prohibits redistricting more than once per decade. *See* N.C. CONST. art. II, §§ 3(4), 5(4). Because those districts did not adjoin the districts ruled unconstitutional racial gerrymanders, the Plaintiffs argued, redrawing those districts was not necessary to address the constitutional infirmities identified in the Court's decision. They also argued that Enacted 2017

House Districts 10 and 83 violated the state constitution's Whole County Provision, N.C. Const. art. II, §§ 3(3), 5(3), because the General Assembly could have drawn a plan in which those districts traversed fewer counties or in which fewer counties were split by certain districts. Finally, the Plaintiffs claimed that Enacted 2017 Senate District 41 was noncompact to the point of violating the Whole County Provision. After Legislative Defendants filed their response, the Court held a hearing on those objections on October 12, 2017.

On November 1, 2017, the Court issued the Order appointing a Special Master and raising concerns as to the legality of the Enacted 2017 Plan. In particular, the Court expressed "serious concerns that 2017 Enacted Senate Districts 21 and 28 and 2017 Enacted House Districts 21 and 57 fail to remedy the identified constitutional violation" from the Enacted 2011 Plan. The Order explained:

> Among other concerns, some or all of the proposed remedial districts preserve the core shape of the unconstitutional version of the district, divide counties and municipalities along racial lines, and are less compact than their benchmark version. In some cases, the General Assembly's use of incumbency and political data in drawing its proposed remedial districts embedded, incorporated, and perpetuated the impermissible use of race that rendered unconstitutional the 2011 districts. The 2017 Enacted Districts do not appear to cure the constitutional violations found as to 2011 Enacted House Districts 21 and 57 and Senate Districts 21 and 28.

Order at 1-2. In other words, the Court emphasized that, despite the 2017 revisions, the constitutional infirmity identified in some of the 2011 districts remains. The district boundaries may have moved somewhat, but according to the Court, some districts continue to violate, in critical respects, the Constitution's prohibition against unjustified and excessive use of race in the design of districts.

For House districts in Wake and Mecklenburg Counties, the Court expressed a different set of concerns related to the Enacted 2017 Plan's violation of the North Carolina State Constitution. As described above with respect to the Plaintiffs' objections to the 2017 Plan, several of the districts in those counties did not need to be redrawn in order to remedy the constitutional infirmity as to racial predominance in the Enacted 2011 House Districts 33, 38, 99, 102, and 107. Because the North Carolina Constitution prohibits redistricting more than once a decade, the Court observed that any lines redrawn in 2017 must be justified by a need to correct some legal infirmity (*e.g.*, unconstitutional racial gerrymandering) in the plan adopted following the decennial census. As the Court has concluded, "[u]nless required by Court order, the General Assembly was prohibited by the North Carolina Constitution from redrawing these districts. N.C. Const. art. II §§ 3(4), 5(4)." Order at 2. As is shown in the Special Master's Recommended Plan, it was, indeed, possible to reconfigure the districts deemed unconstitutional while retaining the Enacted 2011 districts that did not adjoin them.

### The Charge to the Special Master

The Court determined that appointment of a Special Master was necessary because of the "fast approaching filing period for the 2018 election cycle and the specialized expertise necessary to draw district maps." Order at 4. The Court confronted a problem familiar to redistricting cases. The tightness of the election schedule and especially the impending candidate-filing deadline often makes it extremely challenging, within the necessary time period, to perform all the tasks necessary to have a plan in place. It requires the Court to evaluate a state's plan, to issue an opinion explaining the legal infirmities therein, to appoint a Special Master (after the parties have had an opportunity to object), to have that Special Master draw a remedial plan (often with input from the parties), to have a hearing and entertain objections to

the Special Master's Plan, to make any warranted changes to the Special Master's Plan, and then to adopt the Plan as the Court's plan. Allowing the Special Master to begin his work once the Court has made its initial determination that a remedial plan will be necessary is one way to ensure that the Court's plan will be ready in time for candidates to know in which districts they will need to file to run for office. Of course, in the end, regardless of the sequencing of the tasks above, the Court will only adopt a plan if it determines, after hearing from the parties, that the plan remedies the legal infirmity the Court has identified in the state's plan.

With these time pressures in mind, the Court issued an order on November 1, 2017, appointing a Special Master and defining his responsibilities. The Court ordered the Special Master to develop, by December 1, 2017, redistricting plans that addressed the infirmities of the Enacted 2017 Plans for the North Carolina General Assembly, as identified in the order and reflected in the Court's earlier opinion in *Covington*, 316 F.R.D. 117. Order at 5. The Order laid out specific criteria that would guide production of the Special Master's Plan, as well as a procedure for developing the plan. *See* Order at 9-10 (detailing principles of the plan and other aspects of the process, such as a bar on ex parte communication, permission for hiring assistants and using state resources, and authorization for a release on a draft plan to garner feedback).

In particular, the Court ordered that "[i]n drawing remedial districts, the Special Master shall":

> a.   Redraw district lines for the Subject Districts and any other districts within the applicable 2017 county grouping necessary to cure the unconstitutional racial gerrymanders. As to House District 57, the redrawn lines shall also ensure that the unconstitutional racial gerrymanders in 2011 Enacted House Districts 58 and 60 are cured. As to 2011 Enacted House Districts 33, 38, 99, 102, and 107, no 2011 Enacted House Districts which do not adjoin those

districts shall be redrawn unless it is necessary to do so to meet the mandatory requirements set forth in Paragraphs 2(b) through 2(e) of this Order, and if the Special Master concludes that it is necessary to adjust the lines of a non-adjoining district, the Special Master shall include in his report an explanation as to why such adjustment is necessary.

b.      Use the 2010 Federal Decennial Census Data;

c.      Draw contiguous districts with a population as close as possible to 79,462 persons for the House Districts and 190,710 persons for the Senate Districts, though a variance up to +/- 5% is permitted and authorized if it would not conflict with the primary obligations to ensure that remedial districts remedy the constitutional violations and otherwise comply with state and federal law, would enhance compliance with state policy as set forth in subsection (f) below, and would not require redrawing lines for an additional district.

d.      Adhere to the county groupings used by the General Assembly in the 2017 Enacted Senate and House Plans;

e.      Subject to any requirements imposed by the United States Constitution or federal law, comply with North Carolina constitutional requirements including, without limitation, the Whole County Provision as interpreted by the North Carolina Supreme Court.

f.      Make reasonable efforts to adhere to the following state policy objectives, so long as adherence to those policy objectives does not conflict with the primary obligations of ensuring that remedial districts remedy the constitutional violations and otherwise comply with state and federal law:

      i.      Split fewer precincts than the 2011 Enacted Districts;

      ii.      Draw districts that are more compact than the 2011 Enacted Districts, using as a guide the minimum Reock ("dispersion") and Polsby-Popper ("perimeter") scores . . . ; and

iii.    Consider municipal boundaries and precinct lines.

g.      After redrawing the districts, in view of the policy decision by the General Assembly that efforts to avoid pairing incumbents are in the interest of North Carolina voters, the Special Master may adjust district lines to avoid pairing any incumbents who have not publicly announced their intention not to run in 2018, but only to the extent that such adjustment of district lines does not interfere with remedying the constitutional violations and otherwise complying with federal and state law. Additionally, the Special Master shall treat preventing the pairing of incumbents as "a distinctly subordinate consideration" to the other traditional redistricting policy objectives followed by the State. . . .

h.      Except as authorized in Paragraph 2(g), the Special Master shall not consider incumbency or election results in drawing the districts. . . .

i.      The Special Master may consider data identifying the race of individuals or voters to the extent necessary to ensure that his plan cures the unconstitutional racial gerrymanders and otherwise complies with federal law.

Order at 5-7 (internal citations omitted).

The Court further specified what should be contained in the Special Master's Report accompanying the Plan:

a.  At least one recommended redistricting plan for each Subject District;

b.  For each county or county grouping encompassing a Subject District, a color map showing the recommended remedial plan;

c.  For each Subject District, an analysis (i) explaining the proposed remedial plan and the recommendation of that plan over the 2017 Enacted Districts or the Plaintiffs' proposed districts; (ii) covering any matters required elsewhere in this Order; and (iii) discussing any criteria, issues, or questions which the Special Master believes may arise or which will otherwise aid the Court;

d.  A comparison of the Special Master's districts with the related 2011 and 2017 Enacted Districts as to population deviations; compactness; county, municipal, and precinct splits; incumbency pairing; Black Voting Age Population; and

any other relevant criteria; and

    e.   A "stat pack" for the recommended plans.

Order at 12-13.

## Creation of the Special Master's Plan

The one-month deadline for constructing the Recommended Plan required that preliminary work begin immediately following the Appointment Order on November 1. Among other tasks, the preliminary work included becoming familiar with the earlier decisions of the Court, with the filings of the parties to that point, and with the 2011 and 2017 redistricting plans for the North Carolina General Assembly. In addition, drawing the Draft Plan required the purchase of certain software (Maptitude for Redistricting by Caliper Corporation) and hardware.

Given the intense partisan concerns that always surround processes of this sort and the critical importance of nonpartisanship to the legitimacy of the Special Master's work, the Special Master's Plan needed to be compliant with the applicable law, transparent in its following of the Court's Order, and based on the articulated state redistricting principles. Experience in several similar redistricting disputes counseled in favor of gathering much-needed feedback from the parties in the formulation of the plan. Therefore, any draft redistricting plan would need to be submitted to the parties with enough time for them to raise objections and make suggestions. In particular, because the issues surrounding incumbency present knotty problems for any nonpartisan plan of this sort, the Draft Plan would ignore incumbent residence and then be altered following advice from the parties on how to "unpair incumbents" – that is, to the extent possible, to ensure that one and only one incumbent seeking reelection was placed in any given district. This principle was one explicitly called for by the Court's Order, based on the state's

articulated goal in its redistricting plan under review. Because the parties are in a better position to know which incumbents plan to run for reelection[1] and whether a proposed redistricting plan might change their electoral calculations, it is necessary to get some input from the parties throughout the process to make sure that any such "unpairing" was something that the incumbents themselves desired. However, per the Court's Order, the Recommended Plan would honor any request by the parties to unpair incumbents, so long as it did not violate the other criteria in the Order.

That strategy and those goals led to the creation of the Special Master's Draft Plan. With respect to the 2017 Enacted Districts for which the Court raised concerns as to racial predominance, the Draft Plan provided a limited remedy, constructed of compact districts made of whole precincts that respected political subdivision lines, specifically the boundaries of Census Designated Places ("CDPs"), which usually refer to city boundaries. Of course, sometimes these criteria were in tension with each other – for example, when a city is, itself, noncompact and noncontiguous, as is frequently the case in North Carolina, or when precinct boundaries cross municipal boundaries. Nevertheless, these factors comprise the kind of nonpartisan redistricting principles typical of court-drawn plans. Although any change in district lines will have partisan, electoral, or incumbency-related effects, a redistricting plan adhering to these principles is less open to the charge of partisan manipulation than one based on more amorphous criteria as to how communities "ought" to be represented.

---

[1] The Court ordered the parties to provide the Special Master by November 8, 2017, with a list of incumbents running for reelection, along with their address and the date they were first elected. *See* Order at 9. The Legislative Defendants provided such a list on November 8, although the Plaintiffs and Defendants could not agree on whether Representative Larry Bell was running for reelection. ECF No. 209. By later notice, Representative Bell confirmed he was not running for reelection. Larry Bell Declaration, Nov. 10, 2017, ECF No. 211. The Plaintiffs and Defendants also disagreed on the address for Senator Trudy Wade. With the release of the Special Master's Draft Plan and Report, the parties were ordered to submit the data on incumbent address as a geographic layer to be incorporated into Maptitude for Redistricting (the geographic information system used to construct the Special Master's Plan). The Legislative Defendants did so on November 14, 2017. ECF No. 214.

Construction of the Draft Plan could only proceed, however, after analysis and rejection of the Plaintiffs' proposed remedial plans. In its Order, the Court expressed its "concern[] that among, other things, some of the districts proposed by Plaintiffs may be the result of impermissible political considerations." Order at 2. The Legislative Defendants, moreover, characterized the Plaintiffs' remedial plan as motivated by partisan concerns. *See* Legislative Defendants' Response to Plaintiffs' Objections at 2, ECF No. 192 ("Plaintiffs' proposed house and senate districts target numerous Republican members of the legislature . . . , the only reason for which appears to be to punish those members for being Republican."); *id.* at 47 ("the Covington plans . . . were motivated primarily by political considerations"). Of course, political considerations admittedly played a role in the Enacted 2011 and 2017 Plans, as they do in most redistricting plans.

The Special Master's Plan, however, could not be drawn on a similarly political basis. First, the Court prohibited the Special Master from considering election results in drawing districts, and permitted consideration of incumbency only to the limited degree of unpairing incumbents after drawing the plan. Order at 7-8. Second, Supreme Court precedent makes clear that courts lack "political authoritativeness" and must act "in a manner free from any taint of arbitrariness and discrimination" in drawing remedial plans. *Wise v. Lipscomb*, 437 U.S. 535, 541 (1978) (quoting *Connor v. Finch*, 431 U.S. 408, 417 (1977)). A nonpartisan approach to redistricting is absolutely critical to bolstering the legitimacy of the Special Master's Plan. Third, the Court tasked the Special Master with remedying a legal problem, not with addressing political unfairness. The Special Master's Plan must be evaluated on the basis of its correction of the state and federal constitutional problems for which the Court has ordered a remedial plan.

It shall make revisions only to the extent necessary to remedy the legal infirmity in the legislature's plan. *See Perry v. Perez*, 565 U.S. 388, 394 (2012).

Given those considerations and the specific criteria for the Special Master's Plans called for in the Court Order, the Plaintiffs' proposed plans could not be adopted as the Special Master's Plan. To be clear, the Plaintiffs' proposals complied with applicable law. The plans were composed of equipopulous districts that complied with one person, one vote, and at least on the face of them, they did not appear to use race as the predominant factor in their creation. However, even leaving the allegation of partisanship aside, the Plaintiffs' plans fell short according to the Court's criteria and redrew more districts than were necessary to remedy the legal violation. In any event, the Special Master's Recommended Plan does a better job in complying with such criteria.

The Plaintiffs submitted two sets of plans as part of this litigation. What they describe in their briefing as "the Plaintiffs' Plans," are presented as Exhibit 12. However, they also included alternative plans for some districts (so-called "*Cromartie* Demonstrative Maps") provided by their expert witness William R. Gilkeson, Jr. *See* Plaintiffs' Objections to Defendants' Remedial Districts and Memorandum of Law, at 2-23, ECF No. 187-7. Neither warranted adoption as the Special Master's Plan.

First, the Plaintiffs' Plans redrew more districts than necessary to remedy the constitutional violations. Their Proposed House and Senate Plans for Guilford County redrew all of the districts there, despite the fact that they challenged only one district in each plan (Enacted 2017 House District 57 and Enacted 2017 Senate District 28), which were the only

Guilford districts for which the Court expressed constitutional concerns.[2]  They also completely reorganized the districts in Wayne, Sampson, and Johnston Counties to deal with the constitutional objection to Enacted 2017 House District 21. Likewise, the plans for Wake and Mecklenburg Counties, while reinstating the Enacted 2011 districts deemed unnecessarily redrawn to cure the Equal Protection violations there, redrew several districts that did not need to be redrawn to harmonize the 2017 and 2011 districts.

Second, in some areas the Plaintiffs' Plans did a poor job of respecting municipal lines. This was especially the case in Guilford County, once again, wherein a single district (Plaintiffs' House District 57) was located within Greensboro, with all of the remaining districts in the County extending from outside Greensboro to pick up slices of the city.  The *Cromartie* Demonstrative Map for those districts fared better, but even it placed two districts largely within Greensboro, whereas a third (as demonstrated in the Special Master's Draft and Recommended Plans) is possible.  The remaining districts in that alternative plan, therefore, extended from outside Greensboro to take in significant portions of Greensboro.

Finally, several of the Plaintiffs' proposed districts were noncompact.  This was especially the case in their proposed House districts for Wayne, Sampson, and Johnston Counties.  Plaintiffs' House District 76 followed the border of Johnston County with Nash, Wilson, and Wayne Counties, but it then snaked south to follow Wayne County's border with Sampson, Duplin and Lenoir.  Plaintiffs' District 28 occupied most of southern Johnston County but entered Sampson County with a fishhook-style intrusion.  Similarly, Plaintiffs' Senate Plan for Guilford County, while attempting to place two districts that straddle Greensboro, contained

---

[2] This is also the case for the *Cromartie* Demonstrative Maps.  That proposal for the Guilford Senate Districts unnecessarily redraws the Guilford County portion of Senate District 29, which is primarily anchored in Randolph County.

one district (Plaintiffs' District 28) which spanned nearly the entire midsection of the county, but also needlessly traveled southwest to split the CDP of High Point. As a result, Plaintiffs' Senate Districts 24 and 29 filled in the "leftover" territory in northern and southern Guilford County in a decidedly noncompact fashion.

For these reasons, along with the general warning issued by the Court to avoid adopting a plan tainted by political considerations, the Special Master declined to adopt the Plaintiffs' Plan and set out to craft the Draft Plan and eventually, the Recommended Plan. The remainder of this Report explains why the Special Master's Recommended Plans solve the constitutional problems the Court identified in the 2017 Enacted Plans, and are superior according to the criteria the Court laid down in its order.

### Release of the Special Master's Draft Plan and Order

The Special Master's Draft Plan and Order were released on November 13, 2017, to give the parties an opportunity to propose revisions and, in particular, to make suggestions as to how to unpair incumbents. *See* Exhibit 7. The Draft Plan also included an order to the parties to submit objections and revisions by November 17, 2017. Reply briefs were to be submitted by November 21, 2017, at which time the parties were "encouraged to identify which proposed changes of the plaintiffs and defendants, if any, were jointly supported by the parties." *Id.* at 19. The parties were also ordered to supply by November 14, 2017, in electronic form, a geographic layer . . . that includes the location of the residences of all current incumbents in the North Carolina General Assembly." *Id.* The Legislative Defendants did so on November 14.

The parties filed their responses to the Special Master's Draft Plan on November 17, 2017. *See* Exhibits 8 and 9. The Plaintiffs offered several suggestions related to unpairing certain incumbents. In particular, they proposed revisions (two scenarios, in fact) that would unpair two incumbents in Draft Plan House District 59, by moving Draft Plan District 58 south to pick up the residence of Representative Amos Quick. They also proposed several changes to the Draft Plan's districts in Wake County. They proposed restoring a split precinct in House District 40 that was split in the 2011 Plan. They also proposed revisions that would unpair incumbents placed together into Draft Plan House District 49. In particular, Plaintiffs proposed moving the boundaries of Draft Plan House District 34 so that it would capture the residence of Representative Grier Martin. Although the Special Master's Draft Plan paired incumbents in other districts, as well, the Plaintiffs did not propose changes to any other districts.

The Legislative Defendants took a different approach in their response to the Special Master's Draft Plan. *See* Legislative Defendants' Response to Special Master's Draft Report, Nov. 17, 2017, ECF No. 215. They did not propose changes to any specific districts. Indeed, they argued it was "inappropriate for the Court to authorize the special master to ask legislative defendants to comment on, or propose revisions of, districts drawn by the special master when the legislative defendants do not themselves speak for the entire General Assembly." *Id.* at 5. Instead, the Defendants reiterated their earlier objections to the appointment of the Special Master, argued that the Court and Special Master were without jurisdiction or authority to craft a remedial plan, and maintained that the Court's Order misinterpreted the North Carolina State Constitution. As mentioned above, the Legislative Defendants also argued that the Special Master's Draft Plan "improperly engaged in racial sorting" by adopting racial targets for the redrawn districts. However, the Legislative Defendants did not offer any suggestions as to how

to unpair incumbents or how to redraw individual districts, except insofar as they urged the adoption of the 2017 Plan.

On November 21, 2017, the parties filed reply briefs addressing the proposed revisions to the Special Master's Draft Plan.  Because the Legislative Defendants had objected to any revisions to the Enacted 2017 Districts and suggested none of their own, the Plaintiffs limited their reply to legal arguments as to the requirements of the North Carolina Constitution and the precedent regarding race-based redistricting.  *See* Plaintiffs' Response to Legislative Defendants' November 17, 2017 Filing, November 21, 2017, ECF No. 217.  The Legislative Defendants, in their reply, objected *en masse* to all of the changes proposed by the Plaintiffs.   Legislative Defendants' Response to Plaintiffs' Proposed Modifications to Special Master's Draft Plan, Nov. 21, 2017, ECF No. 218.  They reiterated their position as to racial targeting in the Special Master's Draft Plan, and raised new concerns as to split precincts in House District 21, respect for municipal lines in Greensboro and Fayetteville, and the noncompactness of certain Guilford County districts.  They also alleged that the Plaintiffs' proposed revisions only attempted to unpair Democrats, and as such, should not be honored by the Special Master in revising the Draft Plan.  The Legislative Defendants, however, did not offer any suggestions as to how other incumbents might be unpaired, let alone concrete suggestions as to how the Draft Plan should be revised.  In their view, the Special Master should advocate for the General Assembly and urge the Court to adopt the 2017 Enacted Plan.

As explained in greater detail in the descriptions of the individual districts, feedback from the parties led to several changes to the Special Master's Draft House Plan.  In response to the Legislative Defendants' concern as to split precincts in Draft House District 21, the Special Master's Recommended House Plan repairs all of the split precincts but one (located in the

Sampson County portion of the district), which is equal to the number of split precincts in the Enacted 2017 version of the district. The Recommended House Plan also responds to the Plaintiffs' concerns as to the incumbent pairing in the Wake County districts. Based on criticism from the Legislative Defendants and suggestions from the Plaintiffs, the Recommended Plan modified the Guilford County House districts from the Draft Plan. As a result of these modifications, the districts in the Recommended House Plan are more compact, do not pair any incumbents, and disturb fewer districts from the 2017 Enacted Plan. No changes were made to the Draft Senate Plan to produce the Recommended Senate Plan.

## Overview of the Special Master's Recommended Plan

The Court's Order mandated that the Special Master's Final Plan and Report contain an evaluation of the recommended districts and a comparison with the Enacted 2011 and 2017 Plans. Specifically, the Order requested "a comparison of the Special Master's Districts with the related 2011 and 2017 Enacted Districts as to population deviations; compactness; county, municipal and precinct splits; incumbency pairing; Black Voting Age Population; and any other relevant criteria." Order at 12-13. A detailed description of each district follows, but a few general points as to the redrawn districts can provide some context. Tables displaying data on the redrawn Senate Districts 21 and 28 and House Districts 21 and 57 are included within the text here, adjoining districts are further described in the detailed descriptions of the districts, and full statistics for all districts are included as attached Exhibits.

First, all of the districts in the Special Master's Plan comply with the law. The Court identified several areas of federal and state law in its order. The Special Master's plan must

comply with the equal population requirement ("one person, one vote") of the Fourteenth Amendment to the United States Constitution. It also must avoid running afoul of that same Amendment's prohibition against unjustified racial predominance in districting, which was the central constitutional flaw the Court identified in the Enacted 2011 Districts. Finally, the Special Master's Plan must comply with the requirements of the North Carolina Constitution, including the Whole County Provision referenced above.[3]

The Special Master's Recommended Plan complies with one person, one vote. The Court directed that the Special Master's Plan be comprised of "contiguous districts with a population as close as possible to 79,462 persons for the House Districts and 190,710 persons for the Senate Districts, though a variance up to +/- 5% is permitted and authorized" to comply with the other criteria in the Order. Order at 6. All of the districts in the Special Master's Recommended Plan comply with one person, one vote, in that their total population according to the 2010 Census was within five percent of the "ideal" population for each district. *See* Table A below and Exhibit 2. In some areas, as with the House Districts in Wayne and Sampson Counties, this proved quite difficult (as is revealed in both the Enacted 2017 Plan and the Special Master's Recommended Plan). The district deviations there necessarily equal five percent because the Whole County Provision of the State Constitution requires working within a county grouping to achieve equipopulous districts, if possible. For example, if a county's population totals 210% of the ideal district population, then two districts, each exactly 105% of an ideal population district, must be drawn. The deviations in the districts of the Special Master's

---

[3] Of course, the Special Master's Plan must also comply with the Voting Rights Act. *See* 52 U.S.C § 10301. No violations of the Voting Rights Act have been alleged with respect to the districts under review. Moreover, remedial plans for violations of the Voting Rights Act might require consideration of the kind of election data that the Court has barred the Special Master from considering in the construction of the Recommended Plan.

Recommended Plan do not materially differ from those in the 2011 or 2017 Plans, as all comply with one person, one vote.

**Table A. Comparison of Population Deviations from Ideal Size Among Selected Districts[4]**

| District | Population Deviation | | | | | Percent Deviation | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2011 Plan | 2017 Plan | **Rec. Plan** | chg in abs dev from 2011 | chg in abs dev from 2017 | 2011 Plan | 2017 Plan | **Rec. Plan** | chg in abs dev from 2011 | chg in abs dev from 2017 |
| Senate 21 | -7,508 | -6,394 | **-7,196** | -312 | +802 | -3.9% | -3.4% | **-3.8%** | -0.1% | +0.4% |
| Senate 28 | 8,729 | 6,428 | **7,404** | -1,325 | +976 | 4.6% | 3.4% | **3.9%** | -0.7% | +0.5% |
| House 21 | 3,558 | 3,972 | **3,969** | +411 | -3 | 4.5% | 5.0% | **5.0%** | +0.5% | 0.0% |
| House 57 | -118 | 3,293 | **3,841** | +3,723 | +548 | -0.1% | 4.1% | **4.8%** | +4.7% | +0.7% |

Second, the Special Master's Recommended Plan complies with the constitutional prohibition on the predominant use of race in the construction of districts. *See Ala. Legis. Black Caucus v. Alabama*, 135 S. Ct. 1257, 1267 (2015). As is evident from the maps and accompanying statistics, the Recommended Plan is guided by traditional districting principles, such as compactness, contiguity, and respect for precinct and municipal boundaries. Unlike several districts in the 2011 and 2017 Enacted Plans, districts in the Special Master's Recommended Plan do not track precincts based on their racial composition, nor (contrary to the Legislative Defendants' assertions) do they set out to hit some preordained racial target. The fact that the districts happen to reduce the Black Voting Age Population (BVAP) in the redrawn districts, while increasing it in adjoining districts, is to be expected whenever a plan replaces racial predominance with other redistricting principles. *See* Table B below and Exhibit 6. The Special Master's Recommended Plan addresses the constitutional infirmity in the underlying

---

[4] The Special Master is greatly indebted to Professor Patrick Egan of the NYU Department of Politics for assistance in producing the tables, images, and exhibits for this Report and the Draft Report. Professor Egan did not play a role in construction of the plans themselves.

districts by redrawing them irrespective of the race of the inhabitants the districts would then capture. That practice is abundantly clear from the district boundaries, which track municipal lines wherever possible.

Traditional districting principles, such as compactness and respect for political subdivision lines, are the touchstones against which courts often measure racial predominance. Although racial predominance, like any other motivation, can be proven by way of direct or circumstantial evidence, violation of traditional districting principles, such as compactness, can "be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines." *Miller v. Johnson*, 515 U.S. 900, 913 (1995); *see also Covington*, 316 F.R.D. at 129 ("In general, [a *Shaw* claim] requires proof that 'the legislature subordinated traditional race-neutral districting principles, including . . . compactness, contiguity, and respect for political subdivisions . . . to racial considerations.'") (quoting *Miller*, 515 U.S. at 916). As such, a remedial plan grounded on these traditional districting principles will be less likely to replicate – even inadvertently – any racial predominance in the underlying plan.

Indeed, for this very reason, the Special Master's Plan is inoculated against the kind of attack that the Legislative Defendants seek to lodge with respect to racial predominance. In their briefs addressing the Special Master's Draft Plan, the Legislative Defendants argue that "[t]he special master has improperly engaged in racial sorting to create districts with a mechanical target of black voting age population between 39% and 43.6%." Legislative Defendants' Response to Special Master's Draft Report, at 15, ECF No. 215. They maintain that by frankly stating that the Special Master's Draft Plan removed "any residuum of racial predominance that

may have been expressed in the 2017 configuration of the district" the Special Master must have carefully constructed the remedial districts to hit race-based targets.[5] *Id.* at 18.

That claim is false, and the maps themselves belie that interpretation.[6] The Special Master's Plan removes the racial predominance of the Enacted 2017 Districts by replacing the constitutionally tainted districts with others that adhere to explicitly race-neutral criteria. To be sure, the Court authorized the Special Master to consider racial data in the construction of the plans "to the extent necessary to ensure that his plan cures the unconstitutional racial gerrymanders." Order at 8-9. However, as is clear from the Special Master's Draft Plan, the remedial districts were drawn not with any racial target in mind, but in order to maximize compactness, preserve precinct boundaries, and respect political subdivision lines.

This approach grew directly from the Court's Order. The Court expressed concerns with the Enacted 2017 Districts, in that "some or all of the proposed remedial districts preserve the core shape of the unconstitutional version of the district, divide counties and municipalities along racial lines, and are less compact than their benchmark version." Order at 2. To address those identified legal problems, the Special Master's Draft Plan does not preserve the core shape of the

---

[5] In their reply brief, the Legislative Defendants correct their misinterpretation of the Draft Report's mention of removing any "residuum of racial predominance." *See* Legislative Defendants Response to Plaintiffs' Proposed Modifications to Special Master's Draft Plan, Nov. 17, 2017, at 3 n.4. ECF Doc. 218. In a footnote they acknowledge: "To the extent the special master is referring to an alleged "residuum" of race in the 2017 plans from the 2011 version of the districts, it is unclear why the 2011 plans have any relevance to the special master's work. Absent a Section 5 preclearance requirement, the baseline plans for analysis are the 2017 plans enacted by the legislature. The 2017 plans stand or fall on their own as to any alleged racial gerrymandering." *Id.* The Legislative Defendants correctly understand the Special Master's intended use of the word "residuum of racial predominance," as referring to the constitutional infirmities identified in the 2011 Plan that remained in the 2017 Plan. Indeed, the point made in the Special Master's Draft Plan was precisely the one suggested by the Court in its Order, when it expressed concerns that preserving the core shape and other characteristics of the 2011 Districts perpetuated the unconstitutional features of those districts. *See* Order at 2. The 2017 plans cannot "stand on their own" if they substantially preserve the 2011 districts already deemed unconstitutional. Indeed, the task assigned to the Special Master was to design a plan that cures any constitutional infirmity remaining in the 2017 Plan that the Court had identified already in its decision striking down the analogous 2011 Districts.
[6] The actual statistics as to Black Voting Age Population in the districts undermine this claim as well, but that issue is addressed in the discussion of the districts themselves.

unconstitutional version of the district, avoids dividing counties and municipalities, and attempts to enhance compactness.  Hitting some arbitrary racial target was not a goal of the Special Master's Plan.  Rather, the Special Master sought to create remedial districts that, without question, extirpated the unconstitutional racial predominance from the 2011 Districts that the Court has identified as reemerging in the Enacted 2017 Plan.

**Table B. Comparison of Black Voting Age Population (BVAP) % Among Selected Districts**

| District | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 |
|---|---|---|---|---|---|
| Senate 21 | 51.5% | 47.5% | **42.1%** | -9.4% | -5.4% |
| Senate 28 | 56.5% | 50.5% | **43.6%** | -12.9% | -6.9% |
| House 21 | 51.9% | 42.3% | **39.0%** | -12.9% | -3.3% |
| House 57 | 50.7% | 60.8% | **38.4%** | -12.3% | -22.4% |

Finally, different considerations factored into the creation of the plan for the districts in Wake and Mecklenburg Counties, given that the Plan was designed to remedy a different type of legal violation there.  (One should note, however, that certain districts in those counties, which the Special Master retained, such as Recommended District 38, fall outside the supposed race-based range that the Defendants allege was motivating the Special Master in the construction of the remedial districts.)  The Court's Order was quite specific in its goal to recreate the districts from the 2011 plan that did not adjoin the unconstitutional districts.  As explained in greater detail below, in order to deal with the excess population created by merging two different redistricting plans together, several of the districts in Wake County, but only three additional districts in Mecklenburg County needed to be redrawn.  The principle guiding the Special Master's plans for those counties was simply to draw compact districts that achieved population

equality, using whole precincts to the extent possible, while redrawing the minimal number of districts necessary to resolve the state constitutional problem.[7]

In addition to these legal requirements, the Court urged the Special Master to "make reasonable efforts to adhere to the following state policy objectives." Order at 6-7. Those included splitting fewer precincts than the 2011 Enacted Districts, drawing districts that are more compact than the 2011 Enacted Districts (using the Reock and Polsby-Popper measures), and considering municipal boundaries and precinct lines. The Special Master's Recommended Plans comply with all these additional objectives.

To the extent possible, each district in the Special Master's Recommended Plan is made of whole precincts. In its evaluation of the Enacted 2011 Plan, the Court noted that, of the 2,692 precincts in North Carolina, the Enacted 2011 Senate Plan split 257 precincts, and the Enacted 2011 House Plan split 395 precincts. *Covington*, 316 F.R.D. at 137. The Court noted evidence that precincts were split in the Enacted 2011 Plans "for the purpose of separating voters according to race." *Id*. The split precincts in the Special Master's Recommended Plan either are required by one person one vote, as in House District 21, or they were mandated by the Court when it directed the Special Master to restore the 2011 Districts in Wake and Mecklenburg Counties. As a result, the total number of split precincts in the Special Master's Plan is higher than the Enacted 2017 Plans, but much lower than the Enacted 2011 Plans. *See* Table C below and Exhibit 5. In the four districts about which the Court raised concerns as to racial predominance only two precincts are split by the Special Master's Recommended Plan. In contrast, the Enacted 2011 Plan, which did not pay much attention to precinct lines, split eighty-

---

[7] In a short email to the Court on November 13, I confirmed that this was the correct interpretation of their Order.

eight precincts in just these four districts and the Enacted 2017 Plan split a total of seven

precincts for those four districts.

**Table C. Comparison of Precinct (VTD) Splits Among Selected Districts**

| District | 2011 Plan | 2017 Plan | Rec. Plan | chg from 2011 | chg from 2017 |
|----------|-----------|-----------|-----------|---------------|---------------|
| Senate 21 | 33 | 3 | **0** | -33 | -3 |
| Senate 28 | 15 | 2 | **0** | -15 | -2 |
| House 21 | 25 | 2 | **2** | -23 | 0 |
| House 57 | 15 | 0 | **0** | -15 | 0 |

The Court also ordered the Special Master to "draw districts that are more compact than

the 2011 Enacted Districts." Order at 7. Compactness is a traditional districting principle, an

aesthetic value, and a geometric concept. *See* 316 F.R.D. at 141 (comparing mathematical

measures of compactness with "an 'eyeball' approach") (quoting *Bush v. Vera*, 517 U.S. 952,

960 (1996)). In evaluating the Enacted 2011 Plan, the Court concluded that compactness was

"given little consideration" and that "compactness was subordinated to . . . racial goals

throughout the redistricting." *Id.* at 138. It noted, in particular, the lack of compactness in the

majority-minority districts in the plan, which suggested the predominant role of race in their

construction. *Id.* at 142-66. Compactness measures for the four remedial districts are presented

in Table D below; scores for the entire plan appear in Exhibit 3.

The Court urged the evaluation of district compactness (at least as comparing the Special

Master's Plan to the Enacted 2011 Districts) based on two particular mathematical scores: the

Reock and the Polsby-Popper Measures. The Reock test is "an area-based measure that . . .

computes the ratio of the area of the district to the area of the minimum enclosing circle for the

district." Caliper Corporation, *Maptitude for Redistricting: Supplemental User's Guide*, 117-19 (2010) (citations omitted). The Polsby-Popper test "computes the ratio of the district area to the area of a circle with the same perimeter: 4(pi)Area/(Perimeter squared)." *Id.* (citations omitted). For both measures, a score of 0 is the least compact, and a score of 1 is the most compact.

These particular measures served as significant constraints in formulating the Recommended Plan. Both measures compare a district to a circle, and circles cannot tessellate to serve as building blocks for larger shapes, let alone for counties and municipalities that often have irregular boundaries. No districting plan can be made up of districts with perfect Reock or Polsby-Popper compactness scores. Moreover, many shapes that appear visually compact, such as longer rectangles, will score poorly according to these measures, even though they may perform well according to "the eyeball test."[8] (Indeed, a perfect square district will merely earn a Reock score of 0.66.) For this reason, mathematical scores of compactness ordinarily need to be supplemented with a common sense appreciation for the geometric constraints imposed by the irregular precinct building blocks of a plan, as well as the noncompact shapes of political subdivisions, such as counties and cities.

With those caveats, the Special Master's Recommended Plan scores well on the compactness measures the Court's Order suggested for evaluation. Unsurprisingly, the Special Master's Plan scores better than the extremely noncompact districts in the Enacted 2011 Plan. It also has higher Reock and Polsby-Popper Scores than the 2017 Districts. Indeed, Recommended Senate District 28, which comes about as close as one can to creating a circle out of whole

---

[8] As will be seen in the longer description of individual districts below, the peculiarity of these measures explains some of the changes made in Guilford County from the Draft House Plan to the Recommended House Plan.

precincts, has one of the highest compactness scores one will see in a districting plan – a Reock score of .70.

**Table D. Comparison of Compactness Scores Among Selected Districts**

| District | | Reock | | | | | | Polsby-Popper | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 | | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 |
| Senate 21 | .34 | .42 | **.48** | +.14 | +.06 | | .06 | .25 | **.35** | +.29 | +.10 |
| Senate 28 | .25 | .40 | **.70** | +.45 | +.30 | | .12 | .17 | **.28** | +.16 | +.11 |
| House 21 | .19 | .29 | **.40** | +.21 | +.11 | | .08 | .12 | **.28** | +.20 | +.16 |
| House 57 | .39 | .37 | **.44** | +.05 | +.07 | | .17 | .28 | **.37** | +.20 | +.09 |

The Court's Order requires the Special Master to consider municipal boundaries. Order at 7. The Court determined that "little to no attention was paid to political subdivisions" in the Enacted 2011 Plan. 316 F.R.D. at 138. The 2017 Plan fares better, but in the areas of concern to the Court, several districts continue to ignore municipal boundaries.

To be clear, municipalities must be split by any redistricting plan. Because the population of towns and cities does not subdivide neatly into units equal to the ideal population of a district, several districts must traverse municipal boundaries. Moreover, respecting municipal boundaries often conflicts with the goals of compactness and avoiding precinct splits. As displayed in the maps below, several North Carolina cities are themselves bizarrely shaped and even noncontiguous, due to annexations. Precincts also split towns and cities, so that a plan made up of whole precincts will often split municipal boundaries. Moreover, some precincts span two municipalities, such that a decision to follow precinct lines will lead to splits of municipalities.

# Boundaries of Selected Census Designated Places (CDPs)

## Goldsboro



## Greensboro



## Raleigh



As difficult a principle as respecting political subdivisions may be for any North Carolina redistricting plan to follow, the Special Master's Recommended Plan pays great attention to the boundaries of municipalities. *See* Table E below and Exhibit 4. The plan does this, not only because such a consideration is a traditional districting principle ordered by the Court, but also to avoid any charges of racial predominance or partisan bias. Unlike respecting "communities of interest," municipal boundaries are the kinds of non-partisan guideposts that a court-drawn plan can follow without being accused of playing favorites among contending definitions of relevant communities deserving of protection.

The power of this principle in determining the boundaries of the Special Master's Recommended Plan is evident from a simple examination of the district maps. For example, Recommended Senate District 28, like Recommended House District 61, is almost entirely contained by the boundaries of Greensboro. By altering the lines in House Districts 21 and 22, the Recommended Plan respects (to the extent possible given precinct lines) the boundaries of Clinton and retains the portion of Enacted House District 21 that contains (also to the extent possible given precinct lines) the city of Goldsboro. To be sure, the Special Master's Recommended Plan must split certain municipalities to comply with the law and other principles ordered by the Court. But municipal boundaries guided the drawing of the Recommended Plan to an extent that distinguishes it from both the Enacted 2011 and 2017 Plans.

**Table E. Comparison of Municipality (CDP) Splits Among Selected Districts**

| District | 2011 Plan | 2017 Plan | Rec. Plan | chg from 2011 | chg from 2017 |
|----------|-----------|-----------|-----------|---------------|---------------|
| Senate 21 | 5 | 4 | **2** | -3 | -2 |
| Senate 28 | 4 | 2 | **1** | -3 | -1 |
| House 21 | 10 | 7 | **7** | -3 | 0 |
| House 57 | 2 | 1 | **2** | 0 | +1 |

Finally, the Court ordered the Special Master to avoid pairing incumbents. However, the Court made clear that "the Special Master shall treat preventing the pairing of incumbents as 'a distinctly subordinate consideration' to the other traditional redistricting policy objectives followed by the state." Order at 7 (quoting *Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*, 996 F. Supp. 2d 1353, 1363 (N.D. Ga. 2014)). The Court also made clear that such unpairing should occur "[*a*]*fter redrawing the districts*" and "only to the extent that such adjustment of district lines does not interfere with remedying the constitutional violations and otherwise complying with federal and state law." *Id.* (emphasis added).

As the Court's Order recognizes, incorporation of incumbency-related concerns necessarily puts the Special Master and any court in a difficult position. *See* Order at 6 (quoting *Wise v. Lipscomb*, 437 U.S. 535, 541 (1978) (noting that courts lack "political authoritativeness" and must act "in a manner free from any taint of arbitrariness or discrimination" in drawing remedial districts")). While recognizing that any change in district lines will have political and partisan effects, it is critical that the process of line-drawing be nonpartisan and transparent in its treatment of incumbency. To achieve that goal and to respect the Court's Order that incumbency be considered only "after redrawing the districts," the Special Master drew the Draft Plan without consideration of incumbency and released it to the parties and the public. The parties

were then invited to make suggestions as to how incumbents should be unpaired. The Plaintiffs did so; the Legislative Defendants refused, but nevertheless objected to all of the Plaintiffs' suggested modifications as motivated by partisanship.

Per the Court's Order, the Special Master's Recommended Plan unpairs all incumbents to the extent possible. Indeed, no incumbents are paired in the Recommended House Plan, and only two incumbents remain paired in the Recommended Senate Plan (in Recommended Senate District 27). To avoid even the appearance of partisanship, no incumbents paired in the Draft House Plan remain paired in the Recommended House Plan. With respect to the incumbent pairing in Recommended Senate District 27, the Special Master has provided the Court with two scenarios that resolve the pairing in the event the Court comes to a different determination as to whether doing so conflicts with the other principles in the plan. See Exhibit 10. Moreover, since the Draft Plan was released prior to the incorporation of incumbency in the Recommended Plan, the Court has available to it a plan that ignores incumbency should it determine that the incumbent unpairings conflict with the other principles identified in the Court's Order. As difficult as it is to incorporate incumbency into a nonpartisan plan built around other traditional districting principles, the Special Master's Recommended Plan is successful in doing so.

**Detailed Description of the Districts in the Special Master's Recommended Plan**

*Senate Districts 19 and 21*

The Court struck down District 21 in the 2011 Senate Plan as a violation of the Fourteenth Amendment's prohibition on excessive race consciousness in districting. *See Covington*, 316 F.R.D. at 146-47 (describing it as a noncompact, majority-minority district that

split precincts and municipalities along racial lines). The Court continues to harbor serious constitutional concerns with the district as redrawn in 2017. *See* Order at 1. These arise, no doubt, because of the district's noncompact shape in the Enacted 2017 Plan – in particular, the long extension into Fayetteville that seems surgically designed to capture heavily African American precincts, while evading heavily white precincts.

The Special Master's Recommended Plan attempts to remedy any constitutional infirmity in Enacted 2017 District 21 by utilizing whole precincts to create a compact district that, like its predecessors, spans Hoke and Cumberland counties. It begins by uniting split precincts in the northern part of the district; thereby moving Fort Bragg and Spring Lake into District 21. Doing so avoids the axe-like shape of the intrusion into Fayetteville that characterized the Enacted 2017 version of the district. Unlike the 2017 version of the district, Recommended District 21 is constructed of whole precincts – not a single one is divided in the construction of this district. The district includes just enough of Fayetteville so as to comply with one person, one vote. The boundaries of the district are determined by the shape of the precinct boundaries. As noted in Table F below, the Recommended Districts split fewer precincts and achieve much higher compactness scores than either the Enacted 2011 or Enacted 2017 versions of the districts. No changes were made to these districts between the Draft Plan and the Recommended Plan.

# North Carolina Senate: Hoke and Cumberland Counties

## 2011 Plan



## 2017 Plan



## Special Master's Recommended Plan



**Table F. Cumberland and Hoke Counties: Comparison of Senate Plans**

## Population Deviations from Ideal Size

| | Population Deviation | | | | | | Percent Deviation | | | | |
| District | 2011 Plan | 2017 Plan | **Rec. Plan** | chg in abs dev from 2011 | chg in abs dev from 2017 | | 2011 Plan | 2017 Plan | **Rec. Plan** | chg in abs dev from 2011 | chg in abs dev from 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 19 | -7,529 | -8,643 | **-7,841** | 312 | -802 | | -3.9 | -4.5 | **-4.1** | 0.2 | -0.4 |
| 21 | -7,508 | -6,394 | **-7,196** | -312 | 802 | | -3.9 | -3.4 | **-3.8** | -0.1 | 0.4 |
| average | -7,519 | -7,519 | **-7,519** | 0 | 0 | | -3.9 | -4.0 | **-4.0** | -0.1 | 0.0 |

## Measures of Compactness

| | Reock | | | | | | Polsby-Popper | | | | |
| District | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 | | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 19 | .45 | .45 | **.51** | .06 | .06 | | .05 | .20 | **.30** | .25 | .10 |
| 21 | .34 | .42 | **.48** | .14 | .06 | | .06 | .25 | **.35** | .29 | .10 |
| average | .40 | .44 | **.50** | .10 | .06 | | .06 | .23 | **.33** | .27 | .10 |

## Splits of Municipalities and Precincts

| | Municipalities (CDPs) | | | | | | Precincts (VTDs) | | | | |
| District | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 | | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 19 | 5 | 4 | **2** | -3 | -2 | | 33 | 3 | **0** | -33 | -3 |
| 21 | 5 | 4 | **2** | -3 | -2 | | 33 | 3 | **0** | -33 | -3 |
| total | 10 | 8 | **4** | -6 | -4 | | 66 | 6 | **0** | -66 | -6 |

## Black Voting Age Population (BVAP) %

| District | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 |
|---|---|---|---|---|---|
| 19 | 22.5 | 26.0 | **31.7** | 9.2 | 5.7 |
| 21 | 51.5 | 47.5 | **42.1** | -9.4 | -5.4 |

*Senate District 28 and the Surrounding Districts in Guilford County*

For similar reasons explained above as to District 21, the Court struck down the 2011 version of Senate District 28. *See Covington*, 316 F.R.D. at 147-48 (describing Enacted 2011 Senate District 28 as a non-compact, majority-minority district that split municipalities so as "to achieve the 50%-plus-one goal"). The 2017 incarnation of the district is much more compact than its predecessor and is largely contained within the CDP of Greensboro. However, the Court continues to harbor constitutional concerns as to racial predominance with regard to the district's 2017 configuration, no doubt because of the District's tracking of the African American precincts in Greensboro. As expressed in the Special Master's Recommended Plan, the newly configured district is a compact district – a circle of precincts, which is the shape privileged by the Reock and Polsby-Popper compactness measures set out as criteria in the Court's Order. The newly drawn district is contained almost completely within the city (CDP) of Greensboro, and is made up of whole precincts. 2017 Enacted Senate District 26 remains untouched, per the Court's order that the Special Master's Plan may only alter districts adjoining the Subject Districts. District 24 is slightly changed by moving west to the Greensboro CDP border to accommodate the new boundaries of District 28. District 27 "retreats" from most of central Greensboro so as to contain much of the outskirts of Greensboro along with nearby towns of Summerfield, Oak Ridge, and Stokesdale.

# North Carolina Senate: Guilford County

## 2011 Plan



## 2017 Plan



## Special Master's Recommended Plan



## Table G. Comparisons of Senate Plans for Guilford County

### Population Deviations from Ideal Size

| | Population Deviation | | | | | | Percent Deviation | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| District | 2011 Plan | 2017 Plan | **Rec. Plan** | chg in abs dev from 2011 | chg in abs dev from 2017 | | 2011 Plan | 2017 Plan | **Rec. Plan** | chg in abs dev from 2011 | chg in abs dev from 2017 |
| 27 | 456 | 4,653 | **-756** | 300 | -3,897 | | 0.2 | 2.4 | **-0.4** | 0.2 | -2.0 |
| 28 | 8,729 | 6,428 | **7,404** | -1,325 | 976 | | 4.6 | 3.4 | **3.9** | -0.7 | 0.5 |
| abs avg | 4,593 | 5,541 | **4,080** | -513 | -1,461 | | 2.4 | 2.9 | **2.2** | -0.2 | -0.7 |

### Measures of Compactness

| | Reock | | | | | | Polsby-Popper | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| District | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 | | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 |
| 27 | .39 | .43 | **.46** | .07 | .03 | | .13 | .15 | **.20** | .07 | .05 |
| 28 | .25 | .40 | **.70** | .45 | .30 | | .12 | .17 | **.28** | .16 | .11 |
| average | .32 | .42 | **.58** | .26 | .17 | | .13 | .16 | **.24** | .12 | .08 |

### Splits of Municipalities and Precincts

| | Municipalities (CDPs) | | | | | | Precincts (VTDs) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| District | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 | | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 |
| 27 | 8 | 6 | **6** | -2 | 0 | | 14 | 1 | **0** | -14 | -1 |
| 28 | 4 | 2 | **1** | -3 | -1 | | 15 | 2 | **0** | -15 | -2 |
| total | 12 | 8 | **7** | -5 | -1 | | 29 | 3 | **0** | -29 | -3 |

### Black Voting Age Population (BVAP) %

| District | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 |
|---|---|---|---|---|---|
| 27 | 17.0 | 12.7 | **18.3** | 1.3 | 5.6 |
| 28 | 56.5 | 50.5 | **43.6** | -12.9 | -6.9 |

As stated earlier in the discussion of incumbency, Recommended Senate District 27 is the only district in the Recommended Plans that contains two incumbents. It pairs Senator Gladys Robinson with Senator Trudy Wade. Neither the Plaintiffs nor the Defendants have urged the Special Master to unpair these incumbents. To resolve this incumbent pairing would require significant restructuring of the district.

While not resolving this incumbent pairing in the Recommended Plan, the Special Master has provided the Court with two scenarios that would unpair these incumbents. The easiest way to do so would be to draw Senator Wade's residence into Recommended Senate District 28. The scenario provided below and in Exhibit 10 – titled Alternate Senate Plan 1 – demonstrates how this could be done with minimal disruption to the plan. The scenario "trades" the precinct containing Senator Wade's residence with one to the east, moving Senator Wade into Recommended District 28. The Special Master has not recommended this alternative because it effectively takes both Senator Wade and Senator Robinson out of the territory that comprises most of their present districts. However, if the Court were looking to unpair incumbents with minimal disruption to the Recommended Plan, this scenario would provide the easiest path to doing so.

It is also possible to draw Senator Robinson's residence into District 28, for which she currently serves as the incumbent. The most minimal way to do so, as depicted below in Guilford Senate Alternate 2, is to connect the precincts between her home and Recommended District 28. Enacted 2017 Senate District 28 splits the precinct containing her home, as does Guilford Senate Alternate 2, but moving the entire precinct could achieve the same result. These moves must be compensated for elsewhere in the plan. This alternative plan does so by moving three precincts in the northern part of Recommended District 28 into District 27, but any number

of precincts along the outside of District 28 could achieve the same result. The only reason the Special Master has not included this revision in the Recommended Plan is that it does decrease the compactness of District 28, and causes District 28 to traverse into High Point. Also, no one has yet called for this kind of revision. However, the two incumbents could be unpaired without violating any provision of state or federal law.

# North Carolina Senate: Guilford County Alternate Plans

## Special Master's Recommended Plan



## Alternate 1



## Alternate 2



*House Districts 21 and 22*

As with the Senate Districts described above, the Court struck down Enacted 2011 House District 21 as a violation of the Equal Protection Clause of the Fourteenth Amendment. 316 F.R.D. at 155-56. In its 2011 incarnation, the district spanned portions of three counties, divided seven municipalities and multiple precincts, in order to reach majority-minority status. *Id.* The Enacted 2017 version, which remains somewhat bizarre in shape, continues to join Goldsboro in Wayne County with portions of eastern Sampson County splitting the town of Clinton in half. The Court's suspicions as to the remaining racial predominance in Enacted 2017 House District 21 grow, no doubt, from the fact that the included precincts in Sampson are correlated with the racial percentages in those precincts. More specifically, the district continues to include the more heavily African American precincts in the County, while excluding the heavily white precincts nearby.

The Special Master's Recommended House Plan addresses the district's lack of compactness by placing the Sampson County precincts closest to the Wayne County border into Recommended District 21. It thereby avoids the selective inclusion of heavily African American precincts that characterized the 2011 and 2017 versions of the district. The District continues to retain its configuration in Wayne County, which is principally defined by the boundaries of Goldsboro. It extends up to the boundaries of Clinton and only includes a tiny portion of it (83 people) because of a small intrusion by the nearby precinct. Because Districts 21, 22 and 10 approach the upper limit (almost exactly five percent deviation) of what is permissible under one-person, one-vote, a precinct must be split in Sampson County. This is true for both the Enacted 2017 House Plan as well as the Recommended House Plan. The Special Master's Draft House District 21 split more than one precinct to gain additional compactness for the district and

to avoid the small intrusion into Clinton.  Given the Legislative Defendants' expressed concerns as to split precincts, the Special Master's Recommended Plan made small revisions so that only one precinct in Sampson County is split, as in the Enacted 2017 District 21.

# North Carolina House: Bladen, Sampson and Wayne Counties

## 2011 Plan



## 2017 Plan



## Special Master's Recommended Plan



## Table H. Comparisons of House Plans for Bladen, Sampson and Wayne Counties

### Population Deviations from Ideal Size

| | Population Deviation | | | | | | Percent Deviation | | | | |
| District | 2011 Plan | 2017 Plan | **Rec. Plan** | chg in abs dev from 2011 | chg in abs dev from 2017 | | 2011 Plan | 2017 Plan | **Rec. Plan** | chg in abs dev from 2011 | chg in abs dev from 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 21 | 3,558 | 3,972 | **3,969** | 411 | -3 | | 4.5 | 5.0 | **5.0** | 0.5 | 0.0 |
| 22 | 3,503 | 3,972 | **3,975** | 472 | 3 | | 4.4 | 5.0 | **5.0** | 0.6 | 0.0 |
| abs avg | 3,531 | 3,972 | **3,972** | 442 | 0 | | 4.4 | 5.0 | **5.0** | 0.6 | 0.0 |

### Measures of Compactness

| | Reock | | | | | | Polsby-Popper | | | | |
| District | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 | | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 21 | .19 | .29 | **.40** | .21 | .11 | | .08 | .12 | **.28** | .20 | .16 |
| 22 | .43 | .48 | **.46** | .03 | -.02 | | .20 | .20 | **.26** | .06 | .06 |
| average | .31 | .39 | **.43** | .12 | .05 | | .14 | .16 | **.27** | .13 | .11 |

### Splits of Municipalities and Precincts

| | Municipalities (CDPs) | | | | | | Precincts (VTDs) | | | | |
| District | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 | | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 21 | 10 | 7 | **7** | -3 | 0 | | 25 | 2 | **2** | -23 | 0 |
| 22 | 3 | 4 | **3** | 0 | -1 | | 11 | 1 | **1** | -10 | 0 |
| total | 13 | 11 | **10** | -3 | -1 | | 36 | 3 | **3** | -33 | 0 |

### Black Voting Age Population (BVAP) %

| District | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 |
|---|---|---|---|---|---|
| 21 | 51.9 | 42.3 | **39.0** | -12.9 | -3.3 |
| 22 | 26.8 | 28.2 | **31.5** | 4.7 | 3.3 |

## North Carolina House: Bladen, Sampson and Wayne Counties
## Comparison with Draft Plan

### 2017 Plan



### Special Master's Draft Plan



### Special Master's Recommended Plan



*House District 57 and Surrounding Districts in Guilford County*

The Court determined that Enacted 2011 House Districts 57, 58, and 60 in Guilford County were drawn with race as their predominant factor. 316 F.R.D. at 163-64. The Court found that those three districts "contain[ed] 70.67% of the city of Greensboro, but manage[d] to capture 88.39% of Greensboro's African-American voting age population." *Id*. at 164. Several of the most non-compact features of those districts are cut away in the Enacted 2017 versions of the districts. However, the Court continues to harbor concerns as to racial predominance in Enacted 2017 District 57, no doubt because the district retains a Black Voting Age Population (BVAP) of 60.75% by largely tracking the heavily African American precincts in northeastern Greensboro in a reverse "L shaped" pattern.

The directions from the Court with respect to redrawing this district are more specific than for others in the remedial plan. "As to House District 57," the Court's Order directs, "the redrawn lines shall also ensure that the unconstitutional racial gerrymanders in 2011 Enacted House Districts 58 and 60 are cured." Order at 5. This direction presents additional constraints as to how the districts adjoining District 57 must be drawn. In particular, in redrawing District 57, one must make sure not to recreate one of the districts previously struck down. However, of the Enacted 2011 House Districts determined to be unconstitutional, only Enacted 2017 House District 57 continues to pose a constitutional problem for the Court and needs to be redrawn.

The Special Master's Recommended Plan redraws House District 57, but keeps intact the other "Subject Districts" (House Districts 58 and 60) as redrawn in the 2017 Plan. In redrawing House District 57, the Recommended Plan creates it as a north Greensboro district, made up of whole precincts, which largely follows the city lines. It takes one precinct out of Enacted 2017

House District 59 that contains the section of northeastern Greensboro to the east of Lake Townshend.  Its northern boundary is determined by the precincts that track the northern city limits of Greensboro, which it takes from Enacted 2017 District 62.  Its eastern boundary also follows the precincts that include northeastern Greensboro.  Its northwest boundary includes enough precincts so as to include the residence of Representative John Blust, who is the only incumbent included in the district.  The district includes a majority of the people who were drawn into the Enacted 2017 version of his district (42,350 of the 80,732 people in the Enacted 2017 version of the district).  It fills in by moving south so as to create a compact district with a Reock score of .44 and a Polsby-Popper score of .37.  It is therefore more compact than the Enacted 2017 version of the district, which has a Reock Score of .37 and a Polsby-Popper Score of .28, or the Enacted 2011 version of the District, which had a Reock score of .39 and Polsby-Popper score of .17.

The Recommended Plan makes minor changes to District 59.  Because of the precinct in northeastern Greensboro transferred from Enacted 2017 District 59 into Recommended District 57, Recommended District 59 moves west over the northern boundary of Recommended District 57 to include two additional precincts.  It extends up to its current boundary in Summerfield – that is, the northwestern boundary of Enacted 2011 House District 59.

Recommended House District 62 extends along the western expanse of Guilford County.  Because of the territory it cedes to Recommended House Districts 59 and 57, it must move south to comply with one person, one vote.  It therefore contains the portions of Enacted 2017 House Districts 61 and 62 that had touched the county border, up to the point where its boundaries are determined by Enacted 2017 House District 60.  It extends into Greensboro just slightly in order to pick up the necessary population to comply with one person, one vote.  (Most of its population

and its incumbent are from Enacted House District 61, but the Recommended Plan keeps the same numbering as the Enacted 2017 Plan for ease of comparison.)

Recommended House District 61 is a compact district fully contained within central Greensboro. It extends to the eastern border of the city, picking up the southernmost section of Enacted 2017 House District 57 and a majority (48,789) of its people. Unlike the Enacted 2017 House District 57, though, it extends west, meeting Recommended District 62 where it enters Greensboro. Its southern border is determined by the northernmost boundaries of Enacted 2017 District 58 (which remains unchanged in the Recommended Plan).

The Recommended Guilford County House Districts provide a narrowly tailored remedy to address the constitutional infirmity identified by the Court in Enacted 2017 District 57. They do so while splitting zero precincts, and achieving a higher average compactness score (on both the Reock and Polsby-Popper measures) than the Enacted 2011 plan, per the Court's order. They respect the boundaries of Greensboro by anchoring three districts largely within its borders. They do this while retaining two of the Enacted 2017 Districts in their entirety, making minimal changes to a third, and pairing no incumbents in a single district.

# North Carolina House: Guilford County

## 2011 Plan



## 2017 Plan



## Special Master's Recommended Plan



**Table I. Comparison of House Plans for Guilford County**

**Population Deviations from Ideal Size**

| District | Population Deviation | | | | | Percent Deviation | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2011 Plan | 2017 Plan | **Rec. Plan** | chg in abs dev from 2011 | chg in abs dev from 2017 | 2011 Plan | 2017 Plan | **Rec. Plan** | chg in abs dev from 2011 | chg in abs dev from 2017 |
| 57 | -118 | 3,293 | **3,841** | 3,723 | 548 | -0.1 | 4.1 | **4.8** | 4.7 | 0.7 |
| 58 | -407 | 2,675 | **2,675** | 2,268 | 0 | -0.5 | 3.4 | **3.4** | 2.9 | 0.0 |
| 59 | 3,813 | 445 | **-5** | -3,808 | -440 | 4.8 | 0.6 | **0.0** | -4.8 | -0.6 |
| 60 | 1,065 | 2,394 | **2,394** | 1,329 | 0 | 1.3 | 3.0 | **3.0** | 1.7 | 0.0 |
| 61 | 3,600 | 1,557 | **292** | -3,308 | -1,265 | 4.5 | 2.0 | **0.4** | -4.1 | -1.6 |
| 62 | 3,681 | 1,270 | **2,437** | -1,244 | 1,167 | 4.6 | 1.6 | **3.1** | -1.5 | 1.5 |
| abs avg | 2,114 | 1,939 | **1,941** | -173 | 2 | 2.7 | 2.4 | **2.4** | -0.3 | 0.0 |

**Measures of Compactness**

| District | Reock | | | | | Polsby-Popper | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 |
| 57 | .39 | .37 | **.44** | .05 | .07 | .17 | .28 | **.37** | .20 | .09 |
| 58 | .38 | .44 | **.44** | .06 | .00 | .20 | .18 | **.18** | -.02 | .00 |
| 59 | .40 | .39 | **.41** | .01 | .02 | .21 | .25 | **.23** | .02 | -.02 |
| 60 | .22 | .29 | **.29** | .07 | .00 | .08 | .21 | **.21** | .13 | .00 |
| 61 | .30 | .32 | **.37** | .07 | .05 | .13 | .22 | **.28** | .15 | .06 |
| 62 | .48 | .47 | **.30** | -.18 | -.17 | .36 | .50 | **.31** | -.05 | -.19 |
| average | .36 | .38 | **.38** | .01 | -.01 | .19 | .27 | **.26** | .07 | -.01 |

# Splits of Municipalities and Precincts

## Municipalities (CDPs)

| District | 2011 Plan | 2017 Plan | Rec. Plan | chg from 2011 | chg from 2017 |
|---|---|---|---|---|---|
| 57 | 2 | 1 | **2** | 0 | 1 |
| 58 | 1 | 2 | **2** | 1 | 0 |
| 59 | 6 | 6 | **7** | 1 | 1 |
| 60 | 2 | 4 | **4** | 2 | 0 |
| 61 | 5 | 3 | **1** | -4 | -2 |
| 62 | 4 | 1 | **4** | 0 | 3 |
| total | 20 | 17 | **20** | 0 | 3 |

## Precincts (VTDs)

| 2011 Plan | 2017 Plan | Rec. Plan | chg from 2011 | chg from 2017 |
|---|---|---|---|---|
| 15 | 0 | **0** | -15 | 0 |
| 15 | 0 | **0** | -15 | 0 |
| 11 | 0 | **0** | -11 | 0 |
| 16 | 0 | **0** | -16 | 0 |
| 12 | 0 | **0** | -12 | 0 |
| 7 | 0 | **0** | -7 | 0 |
| 76 | 0 | **0** | -76 | 0 |

# Black Voting Age Population (BVAP) %

| District | 2011 Plan | 2017 Plan | Rec. Plan | chg from 2011 | chg from 2017 |
|---|---|---|---|---|---|
| 57 | 50.7 | 60.8 | **38.4** | -12.3 | -22.4 |
| 58 | 51.1 | 42.7 | **42.7** | -8.5 | 0.0 |
| 59 | 13.6 | 22.2 | **18.8** | 5.2 | -3.4 |
| 60 | 51.4 | 40.1 | **40.1** | -11.3 | 0.0 |
| 61 | 15.3 | 11.5 | **40.3** | 25.0 | 28.9 |
| 62 | 13.3 | 14.0 | **11.5** | -1.9 | -2.5 |

## Response to Criticism of the Draft House Plan for Guilford County, Explanation of Changes Made in the Recommended Plan, and Provision of Alternative Plans

Several considerations led to revisions from the Special Master's Draft Plan to the Recommended Plan in Guilford County. First, the Plaintiffs made recommendations as to unpairing incumbents in Draft Plan District 59, to which the Legislative Defendants objected. Second, the Legislative Defendants, while not suggesting any changes, broadly criticized the plan as disrespecting state policy choices. Finally, in analyzing those criticisms and evaluating

the plan, the Special Master sought to improve the compactness of the districts to ensure that they met the Court's criterion that the Special Master's plan score higher than the Enacted 2011 Districts on the Reock and Polsby-Popper measures.

The Recommended Plan does not pair any incumbents. Moreover, every single incumbent retains a majority of his or her constituency from the 2017 Enacted Plan. By retaining Enacted 2017 House District 58, which had been altered by the Draft Plan, it now avoids the incumbent pairing in that district from the Draft Plan and need not address the Legislative Defendants' criticisms of potential partisanship in the Plaintiffs' plan to unpair them. Moreover, by retaining two Enacted 2017 House Districts (58 and 60) in their entirety, and a third (59) with minor revisions, the Recommended Plan respects, to the extent possible, the policy decisions the legislature made regarding Guilford County districts. It alters districts only to the extent necessary to remedy the constitutional infirmity in Enacted 2017 District 57.

Second, the Legislative Defendants made the following unfounded criticisms of the Special Master's Draft Plan. First, they argued that the plan "negated the legislature's policy choice to create a suburban district that followed city lines." Defendants' Reply Brief, at 3 n.2 ECF No. 218. If such was the legislature's goal, it failed to achieve it with the 2017 Enacted Districts. Neither Enacted 2017 District 61 nor 62 (the supposed suburban districts Legislative Defendants reference) track city lines. Quite the opposite, they both intrude substantially into the city of Greensboro. Roughly 36,000 of the inhabitants of Enacted 2017 District 61 (almost half of the district's population) reside within the Greensboro CDP limits. The majority of people (51,747 out of 80,732) living in Enacted 2017 District 62, live within Greensboro. In contrast, for both the Recommended and Draft Plans, 80 percent of the district's inhabitants are outside of

the Greensboro CDP (65,385 out of 81,899 for the Recommended Plan, and 72,946 out of 82,023 for the Draft Plan).[9]

Third, the Legislative Defendants argued that the Draft Plan created less compact districts in Greensboro. Defendants Reply Brief, at 3 ECF No. 218. While mere visual examination suggests this criticism seems misplaced, a plan could be created with higher compactness scores for the Reock and Polsby-Popper measures preferred by the Court, while also remedying the constitutional problems with Enacted 2017 House District 57 and redrawing as few districts as possible. The Recommended Plan, thereby, complies with the Court's Order to "draw districts that are more compact than the 2011 Enacted Districts, using as a guide the Reock ('dispersion') and Polsby-Popper ('perimeter') scores." Order at 8. Whereas the average Reock and Polsby-Popper scores for the Enacted 2011 Guilford County Districts were .36 and .19, respectively, the averages for the Recommended Plan are .38 and .26 (which is roughly the same as the Enacted 2017 Plans). Compactness scores for a majority of the Guilford County districts in the Recommended Plan are now superior to those in both the Enacted 2011 and Enacted 2017 Plans.

The final criticism lodged by the Legislative Defendants against the Draft Plan was that it engaged in racial targeting. That criticism was unfounded with respect to the Draft Plan, and remains so with the Recommended Plan. The race-neutral criteria that animated both plans are apparent on their face. By replacing Enacted House District 57 with Recommended House Districts 57 and 61, the plan remedies the perceived constitutional infirmity that arises from Enacted 2017 House District 57's tracking of the African American population in eastern

---

[9] For some reason, the Legislative Defendants also suggest that the "Special Master gave less consideration to Greensboro municipal lines in House District 57." Defendants Reply Brief at 3, ECF No. 218. I confess, I do not understand the criticism. Draft District 57 followed the municipal lines of Greensboro. It contained (and tracked) some of the non-contiguous portions of Greensboro that are northeast of the central city, but Enacted 2017 District 57 did so as well.

Greensboro. It does so by drawing compact, horizontal districts going east-west, made of complete precincts, rather than following the reverse L-shaped pattern of the Enacted 2017 Districts. Recommended House District 57 has a BVAP of 38.4% and Recommended House District 61 has a BVAP of 40.3%. They achieve these levels not through intentional targeting, but through an attempt to avoid what the Court suggests are the constitutionally suspect geographic choices made in construction of the 2011 and 2017 districts. These decreases in the African American population are to be expected from a plan that remedies a district judged to be racially predominant.

To be clear, the Special Master considers the Draft House Plan for Guilford County to be one the Court can adopt, and should be considered as an option. However, the Recommended Plan does a better job in satisfying the Court's articulated criteria and in responding to the parties' concerns. The Draft Plan alters more districts than the Recommended Plan in order to fit three districts completely within Greensboro. In doing so, it has lower scores on the Court's preferred compactness measures. However, were the Court to adopt the Draft Plan, it would remedy the perceived constitutional infirmity of the districts in Guilford County.

Per the Court's request in its Order for the Special Master to discuss "issues, or questions which the Special Master believes may arise or which will otherwise aid the Court," Order at 13, the Special Master wants to alert the Court to yet another option to address the issue of incumbency, precinct splits, and municipality splits in northwest Greensboro. The Recommended Plan resolves the incumbency pairing from the Draft Plan in northwestern Greensboro in a compact way that includes all of the Greensboro precincts that follow the CDP lines and that includes Representative Blust's residence and a majority of his constituents under the Enacted 2017 House Plan. One of those precincts straddles both Greensboro and

Summerfield (containing roughly 700 people in the CDP of Summerfield).  That precinct is included in Recommended House District 57 because doing so increases the compactness of the district and the plan.  However, to avoid one more intrusion over municipal borders, the precinct could be split or it could easily be taken out, with single precinct "trades" occurring between Recommended District 62, 61, and 57.  Such a plan is presented below and in Exhibit 10 as the Guilford Alternate House Plan.  The Special Master endorses this plan as an alternative to the Recommended Plan.  The change was not made in the Recommended Plan, however, because it would lower the compactness scores of the districts and the plan on the Reock and Polsby-Popper measures preferred by the Court.

# North Carolina House: Guilford County Plan Comparisons

### 2017 Plan



### Special Master's Draft Plan



### Special Master's Recommended Plan



### Alternate Plan



### *Wake County Districts*

In Wake County, the Court struck down Enacted 2011 House Districts 33 and 38 as racially predominant in violation of the Equal Protection Clause. 316 F.R.D., at 159-60. Only one of the benchmark districts (i.e., those existing immediately prior to enactment of the 2011 plan) had BVAP percentages over 40 percent. However, the Court found that the Enacted 2011 Plan split municipalities, precincts, communities of interest, and neighborhoods along racial lines to hit a racial target in those districts that exceeded 50 percent. The Court concluded, "[w]hen viewed in light of the strong statewide evidence, it is clear that Defendants drew district boundaries in Wake County with the primary goal of creating two majority-black districts. The district specific evidence supports our finding that race predominated in drawing of House Districts 33 and 38." *Id.*, at 160.

The legal infirmity in the districts in Wake County is characteristically different than those in the previous districts described and therefore requires a different type of remedy. The Court has not called into question any of the 2017 districts that themselves were redrawn to address the racial predominance of their prior incarnations. Rather, the Court has called into question under the North Carolina Constitution the Enacted 2017 Districts that were unnecessarily redrawn to address racial predominance in the Enacted 2011 Districts. In Wake County, the districts deemed unnecessary to be redrawn are 2011 House Districts 36, 37, 40 and 41. By redrawing those districts, which did not adjoin the unconstitutional districts in Wake County, the 2017 Enacted Plan raises concerns for the Court under the provision of the state constitution that prohibits redistricting more than once a decade. *See* N.C. CONST. art. II, §§ 3(4), 5(4).

To address this violation of the state constitution, the Court has ordered the Special

Master to recreate the Enacted 2011 House Districts 36, 37, 40 and 41 in their 2011 form.  Once

redrawn, it becomes necessary to reallocate populations among the districts that did, in fact,

adjoin the previously unconstitutional districts.  Reinstating these particular 2011 districts, most

of which adhere to the western and southern county boundaries, provides an exterior frame

within which the reallocation of population must occur.  The remaining Enacted 2017 districts

are the basemap from which the Special Master's Recommended Plan is created, but significant

redrawing must occur in some districts because of the "leftover" territory that remains once the

2011 districts are reinstated.  (The task is similar to fitting several square pegs into a round hole

– the pegs need to be reshaped if they are going to "fit.")

For the most part, the configurations of the Wake County districts in the Recommended

Plan are determined by attaching to each of the Enacted 2017 House Districts the "leftover"

territory" that exists immediately next to them once the 2011 Districts are reinstated.  For

example, Enacted 2017 House District 33 moves to the Johnston County border to pick up the

territory left there once House District 36 reassumes its 2011 form.  Because Recommended

House District 33 moves southeast to the border, Recommended District 11 must fill in the "gap"

left behind by both 33 and 36.  Once 2011 Enacted House District 40 is recreated, Enacted 2017

District 49 is pushed east and Enacted 2017 District 34 is pushed north to assume their form in

the Recommended Plan.  Enacted 2017 Districts 38 and 39 are kept completely intact, while

Enacted 2017 District 35 undergoes very minor alterations to respond to the recreation of

Enacted 2011 House District 40.

Per the Court's instruction, the Recommended Plan for Wake County is far superior on

compactness scores and precinct splits to the 2011 Enacted Plan.  Recreating the 2011 Districts –

some of which were noncompact and split precincts – will naturally increase the number of precinct splits and decrease (just slightly) the compactness scores of the Recommended Plan as compared to the 2017 Enacted Plan. Altering only the districts necessary to remedy the identified state constitutional problems with the Enacted 2017 Districts, while reinstalling the Enacted 2011 Districts, leaves limited options for reconfiguring the districts. This is a virtue, not a vice, of the Court's Order, the principles from which largely determine the reconfiguration of the districts in Wake County.

# North Carolina House: Wake County

## 2011 Plan



## 2017 Plan



## Special Master's Recommended Plan



# Table J. Comparisons of House Plans for Wake County

## Population Deviations from Ideal Size

| District | Population Deviation | | | | | | Percent Deviation | | | | |
| | 2011 Plan | 2017 Plan | **Rec. Plan** | chg in abs dev from 2011 | chg in abs dev from 2017 | | 2011 Plan | 2017 Plan | **Rec. Plan** | chg in abs dev from 2011 | chg in abs dev from 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | 3,755 | 3,804 | **2,879** | -876 | -925 | | 4.7 | 4.8 | **3.6** | -1.1 | -1.2 |
| 33 | 3,106 | 3,182 | **3,880** | 774 | 698 | | 3.9 | 4.0 | **4.9** | 1.0 | 0.9 |
| 34 | 3,621 | -1,514 | **3,363** | -258 | 1,849 | | 4.6 | -1.9 | **4.2** | -0.4 | 2.3 |
| 35 | -1,566 | 3,266 | **-2,520** | 954 | -746 | | -2.0 | 4.1 | **-3.2** | 1.2 | -0.9 |
| 36 | 3,911 | 2,464 | **3,911** | 0 | 1,447 | | 4.9 | 3.1 | **4.9** | 0.0 | 1.8 |
| 37 | 3,856 | 2,490 | **3,856** | 0 | 1,366 | | 4.9 | 3.1 | **4.9** | 0.0 | 1.8 |
| 38 | 3,941 | 3,599 | **3,599** | -342 | 0 | | 5.0 | 4.5 | **4.5** | -0.5 | 0.0 |
| 39 | 1,932 | 3,593 | **3,593** | 1,661 | 0 | | 2.4 | 4.5 | **4.5** | 2.1 | 0.0 |
| 40 | -2,853 | 1,213 | **-2,853** | 0 | 1,640 | | -3.6 | 1.5 | **-3.6** | 0.0 | 2.1 |
| 41 | 3,404 | 1,277 | **3,404** | 0 | 2,127 | | 4.3 | 1.6 | **4.3** | 0.0 | 2.7 |
| 49 | 3,804 | 3,537 | **3,799** | -5 | 262 | | 4.8 | 4.5 | **4.8** | 0.0 | 0.3 |
| abs avg | 3,250 | 2,722 | **3,423** | 173 | 702 | | 4.1 | 3.4 | **4.3** | 0.2 | 0.9 |

## Measures of Compactness

| District | Reock | | | | | | Polsby-Popper | | | | |
| | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 | | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | .31 | .41 | **.33** | .02 | -.08 | | .19 | .34 | **.26** | .07 | -.08 |
| 33 | .47 | .45 | **.54** | .07 | .09 | | .22 | .29 | **.41** | .19 | .12 |
| 34 | .39 | .34 | **.44** | .05 | .10 | | .10 | .29 | **.43** | .33 | .14 |
| 35 | .43 | .32 | **.35** | -.08 | .03 | | .26 | .33 | **.35** | .09 | .02 |
| 36 | .37 | .31 | **.37** | .00 | .06 | | .34 | .21 | **.34** | .00 | .13 |
| 37 | .34 | .44 | **.34** | .00 | -.10 | | .22 | .48 | **.22** | .00 | -.26 |
| 38 | .31 | .32 | **.32** | .01 | .00 | | .18 | .30 | **.30** | .12 | .00 |
| 39 | .22 | .43 | **.43** | .21 | .00 | | .11 | .40 | **.40** | .29 | .00 |
| 40 | .28 | .52 | **.28** | .00 | -.24 | | .24 | .38 | **.24** | .00 | -.14 |
| 41 | .28 | .42 | **.28** | .00 | -.14 | | .25 | .40 | **.25** | .00 | -.15 |
| 49 | .43 | .44 | **.46** | .03 | .02 | | .16 | .44 | **.31** | .15 | -.13 |
| average | .35 | .40 | **.38** | .03 | -.02 | | .21 | .35 | **.32** | .11 | -.03 |

## Splits of Municipalities and Precincts

| | Municipalities (CDPs) | | | | | | Precincts (VTDs) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| District | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 | | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 |
| 11 | 2 | 3 | **3** | 1 | 0 | | 9 | 1 | **3** | -6 | 2 |
| 33 | 2 | 2 | **2** | 0 | 0 | | 13 | 1 | **2** | -11 | 1 |
| 34 | 2 | 1 | **1** | -1 | 0 | | 14 | 0 | **0** | -14 | 0 |
| 35 | 5 | 3 | **3** | -2 | 0 | | 2 | 1 | **1** | -1 | 0 |
| 36 | 5 | 5 | **5** | 0 | 0 | | 5 | 3 | **5** | 0 | 2 |
| 37 | 4 | 4 | **4** | 0 | 0 | | 4 | 1 | **4** | 0 | 3 |
| 38 | 2 | 1 | **1** | -1 | 0 | | 13 | 0 | **0** | -13 | 0 |
| 39 | 6 | 3 | **3** | -3 | 0 | | 15 | 1 | **1** | -14 | 0 |
| 40 | 5 | 1 | **5** | 0 | 4 | | 4 | 0 | **4** | 0 | 4 |
| 41 | 4 | 4 | **4** | 0 | 0 | | 7 | 0 | **7** | 0 | 7 |
| 49 | 1 | 3 | **2** | 1 | -1 | | 3 | 0 | **5** | 2 | 5 |
| total | 38 | 30 | **33** | -5 | 3 | | 89 | 7 | **32** | -57 | 25 |

## Black Voting Age Population (BVAP) %

| District | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 |
|---|---|---|---|---|---|
| 11 | 14.8 | 14.3 | **16.5** | 1.7 | 2.2 |
| 33 | 51.4 | 44.2 | **45.1** | -6.3 | 0.9 |
| 34 | 17.0 | 15.8 | **13.1** | -3.9 | -2.7 |
| 35 | 17.4 | 15.6 | **16.2** | -1.2 | 0.7 |
| 36 | 7.7 | 9.3 | **7.7** | 0.0 | -1.5 |
| 37 | 13.8 | 14.3 | **13.8** | 0.0 | -0.5 |
| 38 | 51.4 | 48.3 | **48.3** | -3.1 | 0.0 |
| 39 | 26.5 | 35.5 | **35.5** | 9.0 | 0.0 |
| 40 | 9.8 | 7.7 | **9.8** | 0.0 | 2.0 |
| 41 | 7.4 | 8.1 | **7.4** | 0.0 | -0.7 |
| 49 | 8.9 | 12.8 | **13.3** | 4.4 | 0.5 |

**Explanation of Changes from the Draft House Plan to the Recommended House Plan for Wake County**

In response to Plaintiffs' suggestions related to the incumbent pairing in the Draft Plan, the Recommended Plan makes minor changes. These involve a swap between Draft House Districts 34 and 49, to unpair the two incumbents there, while ensuring that Recommended House District 41 complies with the Court's Order that it retain its configuration under the Enacted 2011 Plan. The Recommended Plan adopts these minor revisions because they do not undermine the other features of the plan, and as a result, no incumbents are then paired in the Recommended House Plan.

The suggested change is explained in full in Plaintiffs' Response and Proposed Modification to the Special Master's Draft Plan included in Exhibit 8. Representatives Cynthia Ball and Grier Martin were both paired in Draft House District 49. They are easily unpaired by moving Draft District 34 south to pick up the precincts between its border and Representative Martin's residence, and then compensating by moving two nearby precincts into District 49. This can be done while also ensuring that Enacted House District 40 is restored to its 2011 version. This modification ensures that no incumbents are paired in the Special Master's Recommended House Plan.

**North Carolina House: Wake County Comparisons with Draft Plan**

**2017 Plan**



**Special Master's Draft Plan**



**Special Master's Recommended Plan**



*Mecklenburg County Districts*

In Mecklenburg County, the Court struck down Enacted 2011 Districts 99, 102, and 107 as unconstitutional racial gerrymanders. The Court found that the legislature had increased the BVAP percentages over the benchmark plan so as to intentionally create majority-minority districts. It did so by drawing districts that tracked the precincts with significant African American population shares and even broke precincts in order to fulfill that goal. *See* 316 F.R.D. at 164-65.

The Court, however, does not harbor any suspicions about residual racial predominance in any of those districts. Rather, the legal problem to be solved in Mecklenburg, as in Wake, concerns the districts that were unnecessarily redrawn to deal with the constitutional infirmity in the Subject Districts. Because the Court ordered only the recreation of 2011 Enacted House District 105, which exists in the southernmost corner of Mecklenburg County, only three additional districts, which border it, needed to be redrawn.

Once Enacted 2011 House District 105 is recreated, Districts 92, 103, and 104 need to be redrawn to fill in the space vacated as 105 retreats to the border. The Recommended House Plan for Mecklenburg County makes the minimum changes necessary to address the state constitutional problem identified by the court. Each of those districts from the Enacted 2017 Plan then converges on the northern border of Enacted 2011 District 105. As District 105 moves south, Districts 92, 103, and 104 move into the territory closest to each one of those districts. The exact configurations are determined by a decision to keep precincts whole (outside of those already split by 2011 Enacted District 105), to keep the districts in the area relatively compact and contiguous, and to make only the changes necessary to remedy the constitutional violation.

The precincts in this area of Mecklenburg County are themselves quite noncompact so any remedial plan, limited to these three districts, will have lower compactness scores than their predecessor districts. The recreation of 2011 Enacted District 105, which is less compact than 2017 Enacted District 105, also inevitably affects the compactness of its adjoining districts.

# North Carolina House: Mecklenburg County

## 2011 Plan



## 2017 Plan



## Special Master's Recommended Plan



## Table K. Comparisons of House Plans for Mecklenburg County

**Population Deviations from Ideal Size**

| | Population Deviation | | | | | Percent Deviation | | | | |
| District | 2011 Plan | 2017 Plan | **Rec. Plan** | chg in abs dev from 2011 | chg in abs dev from 2017 | 2011 Plan | 2017 Plan | **Rec. Plan** | chg in abs dev from 2011 | chg in abs dev from 2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| 92 | -1,751 | -2,290 | **-2,224** | 473 | -66 | -2.2 | -2.9 | **-2.8** | 0.6 | -0.1 |
| 103 | -3,790 | -3,081 | **-1,656** | -2,134 | -1,425 | -4.8 | -3.9 | **-2.1** | -2.7 | -1.8 |
| 104 | -3,389 | -2,593 | **-3,829** | 440 | 1,236 | -4.3 | -3.3 | **-4.8** | 0.6 | 1.6 |
| 105 | -3,750 | -3,495 | **-3,750** | 0 | 255 | -4.7 | -4.4 | **-4.7** | 0.0 | 0.3 |
| abs avg | 3,170 | 2,865 | **2,865** | -305 | 0 | 4.0 | 3.6 | **3.6** | -0.4 | 0.0 |

**Measures of Compactness**

| | Reock | | | | | Polsby-Popper | | | | |
| District | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| 92 | .16 | .44 | **.40** | .24 | -.04 | .10 | .25 | **.29** | .19 | .04 |
| 103 | .34 | .27 | **.19** | -.15 | -.08 | .18 | .32 | **.25** | .07 | -.07 |
| 104 | .55 | .49 | **.35** | -.20 | -.14 | .33 | .35 | **.29** | -.04 | -.06 |
| 105 | .37 | .49 | **.37** | .00 | -.12 | .30 | .37 | **.30** | .00 | -.07 |
| average | .36 | .42 | **.33** | -.03 | -.10 | .23 | .32 | **.28** | .06 | -.04 |

**Splits of Municipalities and Precincts**

| | Municipalities (CDPs) | | | | | Precincts (VTDs) | | | | |
| District | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 | 2011 Plan | 2017 Plan | **Rec. Plan** | chg from 2011 | chg from 2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| 92 | 3 | 2 | **2** | -1 | 0 | 11 | 0 | **2** | -9 | 2 |
| 103 | 5 | 5 | **4** | -1 | -1 | 12 | 0 | **3** | -9 | 3 |
| 104 | 2 | 2 | **1** | -1 | -1 | 9 | 2 | **3** | -6 | 1 |
| 105 | 3 | 1 | **3** | 0 | 2 | 7 | 1 | **7** | 0 | 6 |
| total | 13 | 10 | **10** | -3 | 0 | 39 | 3 | **15** | -24 | 12 |

**Black Voting Age Population (BVAP) %**

| District | 2011 Plan | 2017 Plan | Rec. Plan | chg from 2011 | chg from 2017 |
|---|---|---|---|---|---|
| 92 | 18.2 | 30.2 | **28.0** | 9.8 | -2.2 |
| 103 | 13.1 | 7.7 | **8.1** | -5.0 | 0.4 |
| 104 | 8.2 | 6.2 | **6.8** | -1.4 | 0.6 |
| 105 | 9.5 | 8.3 | **9.5** | 0.0 | 1.3 |

## <u>CONCLUSION</u>

The Special Master's Recommended Plans for the North Carolina Senate and House of Representatives eliminate all of the constitutional infirmities the Court has identified in the plans enacted by the North Carolina General Assembly in 2017. The Court has appointed the Special Master to solve specific and identified problems in the existing state redistricting plans. The Recommended Plans do so. They represent a limited response to a select number of districts that require alteration to comply with the law.

The role a Special Master serves in a redistricting dispute is determined by the purpose for which he or she is appointed. In this case, it was to provide an available remedy for identified violations of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and of the North Carolina Constitution's prohibition on redistricting more than once a decade. At times, the Legislative Defendants have asked the Special Master to advocate on their behalf or to speak for the Court. *See* Legislative Defendants' Response to Special Master's Draft Report, at 2, 5, 11, 12, ECF No. 215. The Special Master declines both of those invitations. Even on the expedited schedule in the present case (as in many redistricting cases, given the election calendar), there will be ample time for the parties to present arguments

regarding the Court's evaluation of the 2017 Enacted Plans for the North Carolina Senate and House of Representatives.

With this Report and Plan, the Special Master has provided the Court with redistricting plans that satisfy the criteria stated in the Order. The Recommended Districts solve the legal problems the Court has identified, while complying with one person, one vote, promoting compactness, reducing precinct splits, following municipal lines, and avoiding almost all pairings of incumbents. With the Draft Plan and other alternatives, the Special Master has also provided options to the Court should it wish to strike the balance among the criteria in the Order in a different way than done with the Recommended Plans. If, with the benefit of a hearing and additional briefing, the Court requires modification of the Recommended Plan, the Special Master stands ready to provide additional assistance.

SUBMITTED, this the 1st day of December, 2017.

Nathaniel Persily
Special Master