IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
NO. 1:15-CV-00399

| | |
|---|---|
| SANDRA LITTLE COVINGTON, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | **LEGISLATIVE DEFENDANTS'** |
| v. ) | **RESPONSE TO SPECIAL** |
| ) | **MASTER'S RECOMMENDED** |
| STATE OF NORTH CAROLINA, *et al.* ) | **PLAN AND REPORT** |
| ) | |
| Defendants. ) | |
| ) | |

## INTRODUCTION

The special master's final report demonstrates why the process adopted by the Court is unworkable and inappropriate. A court may not draw new maps (or empower a special master to do so) before finding a violation to remedy. *Perry v. Perez*, 132 S. Ct. 934, 941 (2012). Drawing remedial maps in the absence of an adjudicated or admitted problem with the existing maps is a recipe for precisely the kind of constitutional disaster that *Perry* is supposed to prevent. After all, a court cannot ensure that it is confining itself to its assigned task of remedying "legal defects in the state plan," *id.*, if it does not first identify what the legal defects are. This process is therefore bound to devolve into an impermissible effort to "displac[e] legitimate state policy judgments with the court's own preferences." *Id.*

The special master's recommended plan does just that. Neither the Court nor its special master has explained how race allegedly predominated in the drawing of House Districts 21 and 57 and Senate Districts 28 and 21 in the State's 2017 plans ("challenged

districts").[1]   Instead, the Court and the special master have simply assumed racial predominance. With no specific guidance from the Court, the special master has chosen to displace the State's conscious decision *not* to use race with a conscious decision *to use* race. This is both constitutionally suspect and diametrically opposed to the legislature's legitimate policy objectives.[2]

The special master's recommended plan illustrates this problem.  The special master's version of each of the challenged districts is not meaningfully different from the enacted 2017 version of these districts except in two ways: the special master's districts (1) systematically reduce the black voting age population ("BVAP") in each district, and (2) favor Democrats (*See* Colin Campbell and Bruce Henderson, *Redrawn election maps would help Democrats,* NEWS AND OBSERVER, NOV. 28, 2017) (copy attached).  Other than these two differences, the special master's plan boils down to a beauty contest between his districts and the challenged districts. *Bush v. Vera,* 517 U.S. 952, 977 (1996) (judicial scrutiny of redistricting plans should not devolve into a beauty contest between competing districts).  The Court is now being asked to throw this beauty pageant to the special master in order to impose on the State a racial gerrymander that favors one

---

[1] Legislative defendants also object to the special master's redrawing of the other Subject Districts in Wake County and Mecklenburg County for the same reasons explained in their prior briefing. (D.E. 192 at 21-28, 51-56; 215 at 12-15; 218 at 5-8)  Put simply, the location of the districts this Court declared unlawful in those counties affected the location of all other districts in those counties, regardless of whether those districts adjoined an unlawful district.  This prior briefing is incorporated herein by reference.

[2] The legislative defendants have previously explained the flaws in the Court's failure to explain or rule on the Subject Districts prior to drawing new districts, and that briefing is incorporated herein by reference.  (D.E. 204 at 1-8; 215 at 1-12)

political party. *Cf. Connor v. Finch*, 431 U.S. 407, 414 (1977) (a district court is held to "stricter standards" in redistricting than a legislature).

A district by district analysis of the special master's recommended plan reveals the special master's single-minded focus on race. By justifying a lower BVAP on the concept of "residual" racial predominance, the special master used a racial gerrymandering remedial process to circumvent the Supreme Court's decisions in *Bartlett v. Strickland*, 556 U.S. 1 (2009), and *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006) ("*LULAC*") by imposing what amount to influence districts on the State. This is doubly wrong. The special master admits there are no Voting Rights Act ("VRA") concerns regarding the 2017 plans, and, in any case, the Supreme Court has held that influence districts may not be imposed on a state as a VRA remedy. There is certainly no reason to think they may be imposed under the guise of a racial gerrymandering "remedy."

The Court should reject this flawed approach and instead overrule the plaintiffs' objections to the 2017 plans. At a minimum, the Court should issue a final order forthwith so that meaningful appellate action may be taken, or the legislature may re-draw the districts, if necessary, as it stands ready to do. More appropriately, the Court should dismiss the case as moot, or allow plaintiffs to amend their Complaint and pursue these new claims against new districts in the ordinary course.

## I. A district by district analysis demonstrates the special master's single-minded focus on race.

This Court authorized the special master to use racial data in drawing new districts. The Court also expressed a "concern" that the location of the challenged districts "perpetuated" the racially gerrymandered 2011 districts. The special master interpreted this concern as mandating that he remove any "residuum" of racial predominance in the 2011 districts from the 2017 version of those districts. (D.E. 213 at 5)

The special master's focus on an alleged "residuum" of racial predominance was a legal error that this Court should reject. The special master did not cite any authority that a district could be an illegal racial gerrymander based on a "residuum" of race. Nor is it clear how it could be. A district is racially gerrymandered only if race predominated in the drawing of that district. Race either predominated in the drawing of the district or it did not. We are aware of no authority in which a district was found to be a racial gerrymander where only a "residuum" of a prior illegal district remained present in a new district.

The special master's misunderstanding of racial predominance is illustrated by a key admission in the final report. According to the special master, it is possible for a legislature (or special master) to "inadvertently" draw a district with a racially predominant motive. (D.E. 220 at 20) As with his novel "residuum" concept, the special master cites no authority for "accidental" racial motive. Indeed, from the *Shaw* cases to the present, the Supreme Court has made it clear that the legal wrong in racial

4

gerrymandering is an intentional, and unjustified, focus on race in drawing a district. The harm from racial gerrymandering is the stigma associated with the State intentionally using race to sort voters into districts. *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (laws classifying citizens based on race "threaten to stigmatize individuals by reason of their membership in a racial group").

Under *Shaw* and its progeny, and by definition, it is not possible to both "inadvertently" *and* intentionally sort voters based on race. To say that too many minority voters can be "inadvertently" sorted into a district is to actually say that the *effect* of the line drawing was to *result* in a district in which the BVAP is too high. And because racial gerrymandering claims are focused on intentional racial classification, such claims also do not address vote dilution. *Shaw*, 509 U.S. at 641 ("appellants did not claim that the [redistricting plan] unconstitutionally diluted white voting strength") (internal quotations omitted). A legal harm from "accidentally" placing "too many" minority voters in a district might at best be a packing claim under the VRA, but the special master admits there are no VRA issues in the challenged districts.[3] (D.E. 220 at 18 n.3)

---

[3] "Packing" occurs only when a redistricting plan avoids the creation of additional single member majority black districts by creating a fewer number of majority black districts with super majorities of African Americans. *Voinovich v. Quilter*, 507 U.S. 146, 153-154 (1993). The Court in *Voinovich* expressly rejected claims that the redistricting plan engaged in "packing" by refusing to create districts where African Americans' preferred candidates would have "influence" on who would be elected.

5

Neither the Court nor the special master performed a district by district analysis of alleged racial predominance in the challenged districts.[4] This alone should require rejection of the report. As the Supreme Court recently explained about racial predominance:

> The ultimate object of the inquiry, however, is the legislature's predominant motive for the design of the district as a whole. A court faced with a racial gerrymandering claim therefore must consider all of the lines of the district at issue; any explanation for a particular portion of the lines, moreover, must take account of the districtwide context. Concentrating on particular portions in isolation may obscure the significance of relevant districtwide evidence, such as stark splits in the racial composition of populations moved into and out of disparate parts of the district, or the use of an express racial target. A holistic analysis is necessary to give that kind of evidence its proper weight.

*Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 800 (2017). A vague description of districts is certainly not a holistic analysis and would require at a minimum discovery and possibly a trial to gather evidence for such an analysis.

What is clear from *Bethune-Hill* is that the special master's attempt to win a beauty pageant with the challenged districts does not protect his work from being racially-based. A district by district analysis of the special master's version of the challenged districts demonstrates that the special master's fixation on a racial "residuum" was used to lower the BVAP of each district to an undisclosed target level. Moreover, use of traditional redistricting principles does not explain the difference in BVAP levels.

The special master attempts to explain the lower BVAP result with the following remarkable statement: "The fact that the districts happen to reduce the [BVAP] in the

---

[4] Instead, the special master appears to have treated the Court's earlier order as a final order on liability.

redrawn districts, while increasing it in adjoining districts, is to be expected whenever a plan replaces racial predominance with other redistricting principles." (D.E. 220 at 19) This statement is mere *ipse dixit* – the special master cites no authority supporting it. Moreover, it is demonstrably incorrect. There are, in fact, areas of the State in which following traditional districting principles results in higher BVAP districts. These are areas of the State where even plaintiffs concede higher BVAP districts are "naturally occurring." (Trial Tr., Vol. I, pp. 17, 18; Trial Tr., Vol. V, p. 175; Doc. 181 at 76); *see also Bush,* 517 U.S. at 967. House Districts 23 and 27 are examples in which following the Whole County Provisions ("WCP") of the state Constitution result in districts with BVAP over 50%. Following whole precincts in western Mecklenburg County also results in a district (House District 101) over 50%-- a district which plaintiffs have never challenged. Indeed, in the special master's recommended House plan, redrawn District 33 (which the special master would presumably contend complies with traditional districting principles) *increases* in BVAP from 44.2% to 45.1%. (D.E. 220 at 61) Moreover, the special master's versions of the challenged districts are drawn in a narrow BVAP range of 38.4% to 43.6%. (D.E. 220 at 22) The special master cites no authority supporting the fact that drawing new districts in accordance with traditional redistricting principles would not only lower the BVAP but also lower it to within a narrow range.

## Senate District 21

Below are maps of the 2017 SD 21 and the special master's recommended SD 21.

**2017 SD 21**                    **SM SD 21**



The most significant difference in these two versions of SD 21 is the BVAP. The 2017 SD 21 is only 47.5% BVAP while the special master dropped the BVAP to 42.1%. The special master's report does not explain why 47.5% BVAP amounts to racial predominance (or "residuum") while 42.1% BVAP is legally acceptable. The report also does not explain which features of the 2017 SD 21 are evidence of alleged racial predominance or residuum.

The district differences are primarily explained by two policy choices, neither of which has anything to do with race. First, the special master excluded from SD 21 a precinct requested by the Democratic incumbent that the incumbent represented includes his new residence. It is undisputed that the precinct was included in SD 21 at his request and had nothing to do with race. Second, and more significantly, the special master decided to include in SD 21 a precinct containing Fort Bragg. Prior Democratic-controlled legislatures put the Fort Bragg precinct in SD 21 because much of the

8

population in this district is not registered to vote in North Carolina. (*See* https://www.ncga.state.nc.us/representation/Content/Plans/PlanPage_DB_2003.asp?Plan=2003_Senate_Redistricting_Plan&Body=Senate). This had the effect of maximizing the Democratic voting strength in both of the Senate districts in Cumberland County. In contrast, the legislature placed the Fort Bragg precinct in SD 19 in 2017 in order to provide the Republican incumbent in SD 19 with an opportunity to win that district, consistent with the legislature's policy preference of protecting incumbents of all parties.[5]

In all other respects, there is no reason why the 2017 SD 21 should not win the special master's beauty contest. The recommended SD 21 splits only two fewer municipalities than the 2017 SD 21, but also includes less of Fayetteville in the district in favor of the special master's preference for putting Fort Bragg and Spring Lake in the district instead. This is in direct violation of the State's policy preference for keeping as much as Fayetteville in this district as possible. While the recommended SD 21 splits zero precincts, the 2017 SD 21 split only two precincts – one of which was to accommodate the Democratic incumbent (precinct G1) and the other was a "split" of a precinct with no population (precinct G11). The special master's claim that it split three

---

[5] Under the version of SD 19 and 21 preferred by Democrats (as in the 2003 plan), plaintiffs and the special master, military population living at Fort Bragg but not registered to vote in North Carolina would be placed in SD 21. This allows for the placement of more voters who favor Democrats in SD 19 and transforms the two Cumberland-Hoke Senate districts into Democratic districts. In contrast, the legislature put the Fort Bragg population into SD 19 which resulted in the placement of more Democratic voters in SD 21. This resulted in SD 21 being a district that can elect the current Democratic incumbent and SD 19 being a district that can elect the current Republican incumbent.

precincts is incorrect because one of the three "splits" (precinct G2) followed an existing precinct line. The 2017 version of SD 21 had 24 precincts in total. It would be absurd to say that splitting two (or even three) out of 24 precincts constitutes racial predominance. Finally, the compactness measures are not significantly different between the 2017 district and the special master's recommended district.

The court should decline to adopt a district that reduces BVAP for the sake of reducing BVAP and negates legitimate policy decisions as to the placement of the Fort Bragg precinct and the division of the city of Fayetteville. Where slight differences in compactness tests are the result of legitimate policy decisions by the General Assembly, compactness tests cannot possibly provide a basis for the special master to recommend that his proposed SD 21 replace the 2017 enacted version. Moreover, there is no standard that can be used (or applied uniformly throughout the State at this time or for future redistricting) to judge a district based solely on how it "looks." Both of these versions of SD 21 were primarily based upon whole precincts. To the extent the special master's district is "prettier" it is primarily because of the placement of the Fort Bragg precinct and the protrusion into central Cumberland County requested by a Democratic incumbent. These are not sufficient reasons to reject the 2017 SD 21.

## Senate District 28

Pictured below are the 2017 SD 28 and the recommended SD 28.

**2017 SD 28**                              **SM SD 28**



Again, the most significant difference in these two versions of SD 28 is the BVAP. The 2017 SD 28 is 50.5% BVAP while the special master dropped the BVAP to 43.6%. The special master's report does not explain why 50.5% BVAP amounts to racial predominance (or "residuum") while 43.6% BVAP is just right. The report also does not explain which features of the 2017 SD 28 are evidence of alleged racial predominance or residuum.

The difference in the shape of the 2017 SD 28 and the recommended SD 28 are explained by policy decisions which have nothing to do with race. The legislature drew SD 28 in an inverted "L" shape which tracks the outer boundaries of the city of Greensboro and moves further into Greensboro only as necessary to pick up required population. This shape also allowed the legislature to include the incumbent of SD 28 in

11

the district. Interestingly, as seen in the below picture of the special master's Alternate 2 for SD 28, when the special master tried to include the incumbent in the district, it resulted in a shape that is very similar to the 2017 SD 28:



Notably, while the special master claims this alternate draw is constitutional, it includes many of the same precincts as the 2017 SD 28 and splits another municipality.

Ultimately, the special master chose to draw SD 28 in a jagged circular form which nonetheless still includes many of the same precincts in the 2017 version of the district. The primary difference is that the special master overruled the legislature's policy decision to create an outer Greensboro district which included the incumbent. The special master instead drew a district that looks like a circular saw blade for no apparent reasons other than to win a beauty pageant with the 2017 SD 28 while also reducing the BVAP.

In all other respects, the 2017 SD 28 follows traditional redistricting principles almost equally to the recommended SD 28. The 2017 district split only two

municipalities while the recommended district splits one. The only reason the 2017 district split another municipality was to achieve the legislature's policy goal of including the incumbent in the district. Similarly, the 2017 plan split only two precincts, again primarily to protect the Democratic incumbent (precinct HP), and improve compactness (precinct JEF2—another split that involved zero population) while the recommended district splits zero precincts. There are 60 total precincts in the 2017 SD 28. Splitting two out of 60 precincts obviously does not constitute racial predominance. The compactness scores of the recommended districts are slightly better but only because the special master went to great lengths to draw a district resembling a circular saw blade while reducing the BVAP of the 2017 district.

## House District 21

Pictured below are the 2017 HD 21 and the recommended HD 21.

**2017 HD 21**

**SM HD 21**



Again, the most significant difference in these two versions of HD 21 is the BVAP. The 2017 HD 21 is 42.3% BVAP while the special master dropped the BVAP to 39.0%. The special master's report does not explain why 42.3% BVAP amounts to racial predominance (or "residuum") while 39.0% is acceptable. This is particularly puzzling since the special master's version of Senate District 21 was 42.1%--nearly identical to the 2017 BVAP for House District 21. The report also does not explain which features of the 2017 HD 21 are evidence of alleged racial predominance or residuum.

14

The shape difference between the 2017 HD 21 and the recommended HD 21 are explained by policy decisions which had nothing to do with race. The shape of the 2017 HD 21 is based upon the legislature's decision to use whole precincts to construct a district which would give the 2016 incumbent a reasonable opportunity to win.[6] The differences between the 2017 HD 21 and the special master's version are not because the special master more closely followed traditional redistricting principles. The 2017 district and the recommended district split the same number of municipalities and precincts. The compactness scores of the recommended district are slightly higher but only because the legislature did not split an irregularly-shaped precinct in Sampson County. Moreover, the Polsby-Popper score of the neighboring district, HD 22, actually decreases under the recommended plan. It is nonsensical to conclude that a racial gerrymandering claim can be avoided simply by making a challenged district slightly more mathematically compact while making adjoining districts less mathematically compact.

---

[6] Plaintiffs filed a statement by the incumbent for HD 21 indicating that he does not intend to run for reelection in 2018 but no evidence (including the incumbent's statement) exists that the incumbent made these intentions known to the redistricting committee or the General Assembly at the time the 2017 districts were enacted.

<u>**House District 57**</u>

Pictured below are the 2017 HD 57 and the recommended HD 57.

**2017 HD 57**                                         **SM HD 57**



Again, the most significant difference in these two versions of HD 57 is the BVAP. The 2017 HD 57 is 60.8% BVAP while the special master dropped the BVAP to 38.4%. The special master's report does not explain why 60.8% BVAP amounts to racial predominance (or "residuum") but 38.4% does not. The report also does not explain which features of the 2017 HD 57 (other than its BVAP level) are evidence of alleged racial predominance or residuum.

The shape difference between the 2017 HD 57 and the recommended HD 57 are explained by policy decisions which had nothing to do with race. The 2017 district is based upon whole precincts located primarily in eastern Greensboro. All of these precincts are primarily located on the outer boundary of Greensboro. The special master included many of these same precincts within the recommended district but then chose to

16

move the district west into Greensboro. The primary reason for doing this appears to be so that HD 61 could be moved from the western part of Guilford County in the 2017 plan to the eastern part of Greensboro in the recommended plan. The primary effect of this move was to reduce the BVAP of HD 57 to 38.4% and then ramp up the BVAP in HD 61 from 11.5% to an astonishing 40.3%. No doubt if the legislature had boosted the BVAP of any of the districts in the 2017 plan in this manner, such a district would have been labeled a racial gerrymander.

Traditional redistricting principles do not explain the differences between these districts. In fact, the recommended HD 57 actually splits one more municipality than the 2017 HD 57. Both versions of the district split zero precincts. Significantly, however, when considering all of the districts in Guilford County, the special master's recommended plan overall splits three more municipalities than the 2017 plan. Moreover, the recommended plan contains numerous districts in Guilford with lower Reock or Polsby-Popper scores than the 2017 districts. (D.E. 220 at 49)

## II. Imposing what amounts to influence districts on the State under the guise of a racial gerrymandering "remedy" is inappropriate and unconstitutional.

The special master's tactic of shaving the alleged "residuum" of race off of the 2017 districts would effectively transform the racial gerrymandering remedy into an imposition of influence districts on a State in the absence of findings of legally sufficient racially polarized voting. The legislature intentionally blinded itself to race and racial data and instead followed traditional redistricting principles better than any state legislature in modern history. The BVAP that happened to result from this approach in

17

the challenged districts ranged from a low of 42.3% to a high of 60.8%. The special master, having knowledge of these BVAP levels, the shape and locations of the districts, and access to computerized data, used that information to change the so-called racial "residuum" to create districts in a much narrower range from 39% to 43%. Moreover, the special master created a new 41.64% district in the House Guilford County plan by ramping up the BVAP of HD 61. Thus, the effect of the special master's proposed "remedy" is the creation of five influence districts.

Under the VRA, imposing influence districts on the State in this manner would be unconstitutional. In *LULAC*, the Supreme Court rejected the argument that Section 2 requires influence districts because "the opportunity 'to elect representatives of their choice' . . . requires more than the ability to influence the outcome between some candidates, none of whom is [the minority group's] candidate of choice." 548 U.S. at 445-46; *see also Strickland*, 556 U.S. at 13. The Court explained that "[i]f § 2 were interpreted to protect this kind of influence, it would unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions." *LULAC*, 548 U.S. at 446 (citing *Georgia v. Ashcroft*, 539 U.S. 461, 491 (2003) (Kennedy, J., concurring)).

The special master is asking the Court to replace districts drawn without regard to race with influence districts which benefit one political party over another. If the Court adopts his report, the Court will be in effect using a racial gerrymandering "remedy" to do what it could not do under the VRA.

Using a racial gerrymandering case and the concept of a "racial residuum" to impose what amount to influence districts on a State "would grant minority voters a right

18

to preserve their strength for the purposes of forging an advantageous political alliance," a right that is not available to any other voters. *Strickland*, 556 U.S. at 14-15 (quoting *Hall v. Virginia*, 385 F.3d 421, 431 (4th Cir. 2004) (internal quotations omitted)). Nothing in federal law "grants special protection to a minority group's right to form political coalitions." *Id.* at 15. Nor does federal law grant minority groups any right to the maximum possible voting strength. *Id.* at 15-16. Where, as here, the Court has yet to explain why any of the challenged districts are allegedly illegal, there is no legal basis for the Court to inject itself into the political and policy decisions made by the legislature when it enacted the 2017 plans without regard to race. The Court should reject the special master's report, immediately issue a final decision on plaintiffs' objections to the 2017 plans, and, if necessary, engage in an appropriate remedial process.[7]

### III. The special master's political choices should be rejected.

The legislature adopted a policy of protecting incumbents of both parties by ensuring that incumbents would be drawn into a district the incumbent had a reasonable chance of winning where other mandatory criteria did not dictate otherwise. This is a traditional redistricting principle that the Supreme Court has permitted. *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1263, 1270 (2015) ("Alabama sought to achieve numerous traditional districting objectives, such as compactness, not splitting counties or precincts, minimizing change, and protecting incumbents."); *Vieth v. Jubelirer*, 541 U.S. 267, 298 (2004) (calling incumbency protection "a traditional and

---

[7] Legislative defendants have previously briefed their position on an appropriate remedial process and incorporate that briefing by reference herein. (D.E. 204, 215, 218)

constitutionally acceptable districting principle"); *Bush*, 517 U.S. at 964 (recognizing incumbency protection as a "legitimate state goal"). This Court, without explaining how such a policy was evidence of racial predominance, nonetheless overruled the legislature's policy choice, in violation of *Perry*, *supra*, and directed the special master to treat incumbency as a "distinctly subordinate criteria."

The special master then ignored the Court's new incumbency policy. The special master's draft report revealed that several Democratic incumbents were paired in the same district. In their response to the draft report, plaintiffs asked the special master to un-pair these incumbents. However, the plaintiffs did not offer any justification for the un-pairing other than political reasons.

The special master agreed to allow plaintiffs' requests and submitted a final plan that un-pairs numerous Democratic incumbents, even where doing so required him to make changes to his draft districts in a way that did not improve the scoring of the districts under traditional redistricting principles. Thus, the only basis upon which the special master could have awarded plaintiffs this relief was to un-do the political problem his draft districts created. If incumbency protection is a "distinctly subordinate criteria," then this was inappropriate and should be rejected.

## CONCLUSION

The Court should reject the special master's final report and overrule the plaintiffs' objections to the 2017 plans. At a minimum, the Court should issue a final order forthwith so that meaningful appellate action may be taken, or the legislature may re-draw the districts, if necessary, as it stands ready to do. More appropriately, the Court

should dismiss the case as moot, or allow plaintiffs to amend their Complaint and pursue these new claims against new districts in the ordinary course.

This 8th day of December, 2017.

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

/s/ Phillip J. Strach
Phillip J. Strach
N.C. Bar No. 29456
Michael D. McKnight
N.C. Bar No. 36932
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina 27609
Phone: (919) 787-9700
Facsimile: (919) 783-9412
Email:phil.strach@ogletreedeakins.com
*Attorneys for Legislative Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 8th day of December, 2017, I have served the foregoing **LEGISLATIVE DEFENDANTS' RESPONSE TO SPECIAL MASTER'S RECOMMENDED PLAN AND REPORT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Edwin M. Speas, Jr.
Carolina P. Mackie
Poyner Spruill LLP
P.O. Box 1801 (27602-1801)
301 Fayetteville St., Suite 1900
Raleigh, NC 27601
espeas@poynerspruill.com
johale@poynerspruill.com
cmackie@poymerspruill.com
*Attorneys for Plaintiffs*

Allison J. Riggs
Southern Coalition for Social Justice
1415 Highway 54, Suite 101
Durham, NC 27707
anita@southerncoalition.org
allisonriggs@southerncoalition.org
*Attorneys for Plaintiffs*

Alexander McC. Peters
Senior Deputy Attorney General
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

/s/ Phillip J. Strach
Phillip J. Strach
N.C. Bar No. 29456
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina 27609
Phone: (919) 787-9700
Facsimile: (919) 783-9412
Email: phil.strach@ogletreedeakins.com

32206078.1

32206078.1

22