# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SANDRA LITTLE COVINGTON, *et al.*,

        Plaintiffs,

v.

    No. 1:15-cv-399

THE STATE OF NORTH CAROLINA, *et al,*

        Defendants.

## PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S RECOMMENDED PLAN

## I. This Court Has the Authority to Ensure a Fully Remedial and Legal Plan Is Put in Place in this Case

### A. Courts must ensure full remedies to constitutional violations.

Despite Defendants' protestations about the process used by this Court and the Special Master to finally remedy the long-existing racial gerrymanders in North Carolina's state legislative districts, this Court has properly acted to ensure that Plaintiffs are afforded a full remedy to their constitutional injuries. *See* Pls.' Objections to Remedial Districts at 17-19, ECF 187; *see also* Pls.' Reply Br. on Scope of Review, at 3-12, ECF 199. A court's responsibility after finding constitutional liability has never been to simply rubber-stamp with approval the state's remedial efforts. *Id.* (collecting cases).

As a primary matter, Defendants' reliance on *Perry v. Perez*, 565 U.S. 388 (2012), is inapposite. Def.s' 11/21 Br. at 4-5, ECF 218. In *Perry*, there had not yet been *any* determination of legal violations in the enacted plans, and the Supreme Court was articulating a standard for the district court's development of interim plans where no such

1

illegal acts had been identified and Section 5 preclearance had not yet been granted. *Id.* at 391-92. In contrast, here, the Supreme Court held that twenty eight districts were unconstitutional racial gerrymanders and the question before the district court is whether the state has adequately remedied the constitutional violations already adjudged. Thus, *Perry* is uninformative on the standard applicable to this Court in its remedial review.

The proper standard is this: not only does this Court have the duty and authority to ensure that the voters in this state injured by the 2011 redistricting plan are afforded a remedy, the Defendants bear the affirmative duty of demonstrating to this Court that they have fully eradicated the identified constitutional violations. The Supreme Court has unequivocally stated: "If the State perpetuates policies and practices traceable to its prior system that continue to have a segregative effects….and such policies are without sound [] justification and can be practicably eliminated, **the State has not satisfied its burden of proving that it has dismantled its prior system**." *United States v. Fordice*, 505 U.S. 717, 731 (1992) (emphasis added); *see also Yonkers Branch-NAACP v. Yonkers*, 251 F.3d 31, 33 n.2 (2nd Cir. 2001) (in the education context, a "remedy is not complete until 'vestiges' of segregation that have a present discriminatory effect have been eliminated"); *Knight v. Alabama*, 14 F.3d 1534, 1541 (11th Cir. 1994) (when plaintiffs have shown that a current law or policy is traceable to past segregation, "the burden of proof then falls upon the State, and not the aggrieved plaintiffs, to establish that it has dismantled its prior de jure segregated system.") (internal quotations omitted); *Thompson v. United States HUD*, 348 F. Supp. 2d 398, 413 (D. Md. 2005) (in housing case, Fourteenth Amendment

2

violations "may confer upon governments an affirmative duty to remedy past wrongs" and court will assess "whether Defendants have unmet remedial obligations"); Pls.' Objections at 19 (collecting other cases).

Segregation in the redistricting context is equally harmful and deserving of a full remedy, *see Shaw v. Reno*, 509 U.S. 630, 647 (1993), and thus the same remedial rules should apply. *See* Pls.' Objections at 17-19. That is, the unconstitutional racial legislation, and its effects, must be eliminated, "root and branch." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971). Defendants have failed to demonstrate that the remedial maps eliminated the 2011 discrimination. Instead of supporting their remedial plans with facts or precedent, they simply assert that any legislation, even a remedial redistricting plan necessitated by large-scale constitutional violations, is assumed to be constitutional and should be upheld. Def.s' 11/17 Br. at 14-15, ECF 215; *see also* 9/19 Opinion at 2, ECF 191. Defendants read the law wrong on this.

But even if Plaintiffs do bear the burden of demonstrating the inadequacies of the remedial plan, and they do not, Plaintiffs have carried that burden. The Court should make the specific findings detailed below, *infra* Section IIA-B, in holding that the remedial plans enacted by the General Assembly in 2017 were inadequate.

Finally, the Court should reject Defendants' spurious argument that this Court cannot afford Plaintiffs the adequate remedies they are due because this case is moot. Def.s' 11/17 Br. at 3-5. The United States Supreme Court has recently rejected such an argument. In *Knox v. SEIU, Local 1000*, 567 U.S. 298, 308 (2012), the Supreme Court

held that judicial supervision over the implementation of an ordered remedy is sufficient to prevent a case from becoming moot. The *Knox* court held that "a live controversy remain[ed]" where petitioners disputed the adequacy of a Union's implementation of a court-ordered refund notice, holding that the defendant "is not entitled to dictate unilaterally the manner in which" a remedy is developed. *Id.* Defendants' mootness theory played out would mean that a legislature that had drawn a map declared to be unconstitutional could make minor tweaks to that map and send the litigation process back to the starting line, all but guaranteeing its ability to preserve an unconstitutional map for the entire decade. This is neither legal nor equitable, and the Court should reject such machinations.

B.     The Court Is Not Obliged to Give the Legislature Unlimited Chances to Fix Unconstitutional Redistricting Plans.

While courts generally are obligated to give the legislature the first chance to remedy violations in a redistricting plan, they are not required to give the legislature limitless chances to do so. *See* Pls.' Resp. to Defendants' Opp'n at 1-2, ECF 205 (collecting cases). Were that the case, the incentive for the legislature to enact a full remedy would be non-existent: it could keep reaping the benefits from unconstitutional actions for an entire decade by making only minimal corrections on each remedial pass.

Time is of the essence here: filing for the 2018 elections begins in less than two months. N.C. Gen. Stat. § 163-106(b). Even if the legislature were entitled to yet another chance to redraw the districts, and it is not, there is not time for it to reconvene, enact new legislation, and have this Court again analyze its adequacy without disrupting

4

the 2018 election cycle. Moreover, the fact that time is now an issue is entirely of the legislature's own doing: this Court first put the legislature on notice that districts needed to be remedied in August of 2016. *Covington v. N.C.,* 316 F.R.D. 117, 177 (2016). For over a year, the legislature took no action to avail itself of its rights to redraw. That long delay cannot now be used to unsettle election processes and potentially subject Plaintiffs and all North Carolinians to a fourth election under unconstitutional districts.

This Court gave the General Assembly the "first opportunity" to correct the extensive constitutional violations, and it gave the legislature more than the bare minimum amount of time required under state law. *Compare* N.C. Gen. Stat. §120-2.4 (requiring that courts give the General Assembly two weeks to enacted a remedial plan) *with* 7/31/17 Order at 7, ECF 180 (ordering the legislature to submit a remedial plan in four weeks). Thus, this Court has met any obligation to allow the legislature an initial opportunity to right its wrong, and when faced with legislative foot-dragging, the Court is not required to do more.

Finally, the Special Master himself gave the legislature another chance to inform how the legislature's policies could be best effectuated when he invited the parties to offer specific suggestions for improvement on a draft map. Special Master's Draft Plan at 19, ECF 212. He specifically invited suggestions on incumbent unpairing and district line placement. *Id.* Rather than provide that input, Defendants instead decried the appointment of the Special Master and provided very little specific guidance. *See* Def.'s 11/17 Br. at 1-3. This is another example of why, when the legislature has squandered its

5

ability to direct and inform the development of a full remedy, the Court and Plaintiffs need not suffer more opportunities for legislative delay.

## II.    The Special Master's Recommended Plan Corrects the Continuing Unconstitutionality and Other Legal Infirmities Present in the 2017 Enacted Plan

### A.    Racial Gerrymanders Remain Uncorrected in the 2017 Enacted Plans

Between the evidence offered in Plaintiffs' Objections, essentially uncontested (and certainly unrebutted) by Defendants, and Special Master's analysis, this Court has before it ample circumstantial evidence of racial predominance in the four districts where Plaintiffs allege that the racial gerrymander has not been cured. This evidence supports both the conclusion that Defendants have failed to meet their burden, and an independent conclusion that race continues to predominate in the design of these districts.

In arguing that race could not have predominated in the four districts identified by the Court, Defendants rely heavily on their claim that their mapdrawer did not consider racial data. But the General Assembly hired the same mapdrawer to draw the 2017 plans it used in 2011, who knew where black voters lived in these regions of the state because he packed them into the unconstitutional districts in the first place. Dr. Hofeller testified that he had spent hundreds of hours in 2010 and 2011 studying North Carolina geography in preparing redistricting plans, and had focused heavily on examining where majority black districts could have been drawn. *See* Hofeller Excerpt, ECF 187-12; *see also* Gimpel Excerpt at 4, ECF 187-13 (explaining that racial data is unnecessary if the mapdrawer retained the general shape of districts where racial data was explicitly used).

6

A simple visual comparison of the 2011 districts to the 2017 districts confirms this was, in fact, what happened. As the Court observed, several of the legislature's remedial districts "preserve the core shape" of the 2011 districts. 11/11 Order at 2, ECF 206. Taking a racial gerrymander and smoothing out a few of the edges cannot be considered an adequate remedy to the constitutional harm inflicted. Taken to its logical conclusion, Defendants' argument would mean that a legislature could turn off the race overlay and enact the exact same districts found to have been racial gerrymanders because the lack of racial data would preclude a finding of racial predominance. The Supreme Court has rejected such "mindless" line-drawing tactics. *Davis v. Bandemer*, 478 U.S. 109, 129 (1986) (reasoning that "it is most unlikely that the [racial] impact of such a plan would remain undiscovered by the time it was proposed or adopted, in which event the results would be both known and, if not changed, intended").[1] Defendants' arguments here are not credible, from a legal or factual perspective.

       *1.     SD21*

Senate District 21 as redrawn in 2017 exemplifies the superficial changes made to unconstitutional districts in an attempt to evade a meaningful remedy for injured voters. The changes to this district are cosmetic at best. Some of the most far-reaching appendages are trimmed, but the district retains the same bizarre configuration as in the unconstitutional 2011 version. Every majority black precinct in Hoke and Cumberland

---

[1] Defendants cite the same language in support of their baseless arguments that the Special Master has drawn a Democratic partisan gerrymander, Def.s' 11/21 Br. at 5-6, but that guidance is more applicable here, where the state is wrongly arguing that it can create a safe harbor by being "mindless" to race.

Counties is assigned to SD21.  Fairfax Decl. at 4, ECF 187-6.  SD21 continues to cut through downtown Fayetteville, picking up only the majority black precincts, as well as almost all of the city's majority-black census blocks.  Pls.' Objections at 25-26.  The BVAP in SD21 is substantially higher than the BVAP in the overall two county cluster, indicating that the high BVAP in the district is not a natural consequence of the black population in this county cluster.  Moreover, the BVAP of the portion of SD21 in Cumberland County is 51.66%, which the BVAP in SD19 is only 25.99%.  *Id.* at 25.

Beyond this geographic and demographic evidence, the unrebutted analysis performed by Dr. Herschlag of Duke University confirmed that race predominated in the construction of SD21.  Using traditional, non-racial redistricting criteria (equal population, compactness, and preservation of precincts), Dr. Herschlag ran a program that created nearly 80,000 simulated maps for Senate Districts in Cumberland County.  Herschlag Decl. at 3, ECF 187-10.  Not a single one of those packed as many African Americans into a district as did the 2017 plan.  *Id.* at 5.

Additionally, SD21 representative Senator Clark submitted a declaration highlighting both the racial predominance in the district construction and the pre-textual nature of the state's defense of the district.  Sen. Clark noted that despite claims that the district was designed to keep Fayetteville together, the district excluded the most central precinct in downtown Fayetteville—CC2204.  That precinct of course was predominantly white.  Clark Decl. at 4-5, ECF 187-8.  Likewise, proponents' claims that they wanted to keep Fort Bragg in SD19 because most of the base is in Cumberland is not true—most of

8

the base is in Hoke County, and thus should be in SD21. *Id*. at 6-7. Finally, Plaintiffs additionally offered to the Court a "*Cromartie* map" of SD21 and SD19 to demonstrate that political considerations could not explain the shape of the districts. Gilkeson Decl. at 18-19, ECF 187-7. Plaintiffs' *Cromartie* map demonstrates that it is possible to draw districts in this cluster that perform similarly without predominantly relying on race to divide the districts. *Id*.

The Special Master's observations confirm this Court's belief that the district's "noncompact shape in the Enacted 2017 Plan—in particular, the long extension into Fayetteville that seems surgically designed to capture heavily African-American precincts, while evading heavily white precincts" is damning evidence that race continues to predominate. Special Master's Recommended Plan, at 31, ECF 220 ("S.M. Report"). Instead, by following the traditional redistricting criteria that the state itself claimed to prioritize, the Special Master constructed a district in which race did not predominate, thus confirming the continuing constitutional infirmity.

Between the Plaintiffs' and Special Master's evidence, it is plain that Defendants do not satisfy their burden in proving the constitutional violation was remedied, and there is ample circumstantial evidence to conclude that race unjustifiably predominated in the construction of the 2017 version of SD21.

Defendants' briefing does not help their case: the BVAP in the remedial district was not the central problem—it was that the district maintained the same general configuration of the unconstitutional racial gerrymander, thus perpetuating the

9

segregative effect. The changing story as to why a large Fort Bragg precinct was put into SD19 instead of SD21 should likewise trouble the Court. The state backs away from its earlier claim about trying to keep Fort Bragg whole and now says that it wanted to put that precinct into SD19 to strengthen the voting power of Republicans in that district. Defendants' own purported non-racial justifications—effectively underpopulating a district for partisan gain—still raises other constitutional concerns and cannot be accepted by this Court. *See Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 347-48 (4th Cir. 2016) (underpopulating a district to obtain partisan advantage violates the Fourteenth Amendment). Finally, Defendants complain that Fayetteville is divided in the Special Master's map, Def.s' Br. at 9-10, but because of its size, Fayetteville must be divided in any map. The necessary division of Fayetteville in the Special Master's Recommended Plan, however, is not made along racial lines, and that is the distinction that matters for remedial purposes.

     *2.    SD28*

     With respect to SD28, Plaintiffs presented evidence that, other than the removal of a spindly arm that grabbed voters in High Point, the district's core shape and other features of its racially-gerrymandered predecessor remained. To achieve majority-black voting age population, the mapdrawer continued to use the reverse-L shape to grab essentially all of the black population in Greensboro while excluding the white populations in Greensboro. Pls.' Objections at 22-24. The mapdrawer did not need to have racial data on his computer screen because the district is drawn as it was in 2011.

And just as before, every majority black precinct in Greensboro is included in SD28. Fairfax Decl., at 5.

In particular, the splits of the several precincts in the 2017 version of SD28 are strong evidence of continuing racial predominance. The JEF2 precinct is split in this plan, but not along municipal lines. Instead, it is split to include the pieces of the precinct that contain high concentrations of black voters. Robinson Decl., at 5, ECF 187-5. In repairing some of the precincts split in the 2011 plan, more heavily African-American precincts were included in 2017 SD28, whereas more heavily white precincts were excluded from the district. *Id*. at 5-6. Thus, the legislature's decision to place a significant number of voters within or without a [this] district" is strong evidence that race continues to predominate. *Ala. Leg. Black Caucus v. Ala.*, 135 S. Ct. 1257, 1270 (2015) ("*ALBC*"). Finally, Plaintiffs again offered a *Cromartie* demonstrative map to demonstrate that political considerations could not explain the high BVAP in the district. Gilkeson Decl., at 20-21, ECF 187-7. The Special Master likewise recognized and documented "the District's tracking of the African American precincts in Greensboro." ECF 220 at 34.

Defendants' arguments against the Special Master's plan are no more availing here. Again, the BVAP reduction in the Special Master's plan is not the most significant distinction between his map and the legislature's—the absence of race dictating who is included and excluded from the district is. Moreover, if respecting municipal boundaries is important, like Defendants claim it was with SD21, Defendants should fully embrace

11

the Special Master's recommended version of the district. Finally, Defendants' criticism of the Special Master's SD28's "jagged circular form" represents a total disconnect from reality—by respecting municipal boundaries and drawing a nearly perfectly compact district, the Special Master has ensured that race did not predominate in the construction of the district.

### 3. HD57

Significantly, in its purported "remedy" to the unconstitutional packing of black voters into HD57 in the 2011, in 2017 the legislature **increased** the BVAP of the district by a large margin. As in 2011, the 2017 version of HD57 continues to split Greensboro along racial lines. With respect to the district's shape, the new district has carved off the Sedalia tail, but an inspection of who is moved in and out of the district reveals the inappropriate factors involved: "the 2017 plan adds a prominent heavily populated African-American community to HD57 and removes a prominent heavily white neighborhood" to dramatically increase the district's BVAP. Robinson Decl., at 10, ECF 187-5. The removal of Irving Park, a white neighborhood, from the district it has been a part of for some time, and the addition of heavily black southeast Greensboro, which has not been a part of that district, is evidence of racial predominance. *ALBC*, 135 S. Ct. at 1270.

The Special Master's analysis of the district confirms Plaintiffs' objections. He noted that "the district retains a Black Voting Age Population (BVAP) of 60.75% by largely tracking the heavily African American precincts in northeastern Greensboro in a

12

reverse "L shaped" pattern." S.M. Report at 45. And his recommended version of the district demonstrates how the district can be drawn without race predominating. *Id*. at 48.

Defendants' criticisms of the recommended plan once again fall flat. As the Special Master noted, they complain that the recommended plan "negated the legislature's policy choice to create a suburban district that followed city lines. If such was the legislature's goal, it failed to achieve it with the 2017 Enacted Plan. Neither Enacted 2017 District 61 or 62 (the supposed suburban districts Legislative Defendants reference) track city lines. Quite the opposite, they both intrude substantially into the city of Greensboro." S.M. Report at 51 (internal citations omitted). And because the legislature increased the BVAP substantially in HD57, drawing a constitutional district in which black voters are unpacked unremarkably increases the BVAP in neighboring districts. The Court should reject Defendants' complaints with regard to this district.

### 4. HD21

Plaintiffs assembled equally damning evidence that race continued to predominate in the 2017 version of HD21. In striking down the 2011 version, this Court relied upon the district's compactness and geography as circumstantial evidence that race predominated. *Covington*, 316 F.R.D. at 155-56. In "remedying" the racial gerrymander, the legislature made the 2017 version even **less** compact (the lowest Reock score of all House Districts—2017 Reock score of 0.12 compared to 2011 score of 0.19). Pls.' Objections at 30. The district is still irregularly-shaped, with only superficial changes made (the district being oddly shaped in two counties, rather than three, like in 2011). *Id*.

13

at 31.  Every majority black precinct in Sampson and Wayne Counties, with the exception of one, is included in HD21.  Fairfax Decl., at 6.  The racial density maps produced by Mr. Fairfax highlight how, in the city of Clinton, split by the district, only the census blocks and precincts with a substantial black population were included within HD21.  *Id.* at 6-7.

The Special Master confirmed Plaintiffs' suspicions that race continues to predominate in this district.  He noted that the district was "bizarre in shape, continues to join Goldsboro in Wayne County with portions of eastern Sampson County splitting the town of Clinton in half."  S.M. Report at 40.  Likewise, he observed "the included precincts in Sampson are correlated with the racial percentages in those precincts.  More specifically, the district continues to include the more heavily African American precincts in the County, while excluding the heavily white precincts nearby."  *Id.*  Thus, the Court has ample evidence that the 2017 version of this district does not remedy the problem.

Remarkably, Defendants still argue the only difference between the Special Master's and 2017 district is a decrease in BVAP.  The Special Master's district is much more regularly shaped and did not split municipalities on the basis of race.  Unsurprisingly, by not engaging in racial sorting, the resulting district has a slightly lower BVAP. S.M. Report at 40-43.  Defendants also continue to stand by their position that the district must be drawn that way to protect the incumbency of an African-American legislator who widely and publicly announced that he was not running for re-election.  The legislature did not go to extremes to avoid pairing white legislators who

14

were not running for re-election. Lauren Horsch, *See the Proposed NC Senate Map*, NEWS & OBSERVER, Aug. 20, 2017, http://www.newsobserver.com/news/politics-government/politics-columns-blogs/under-the-dome/article168312342.html; *see also infra* 17-18. Such arguments only buttress Plaintiffs' arguments that the legislature continued to employ a single-minded racial focus in how they "remedied" at least some of the 2011 unconstitutional districts.

    B.    <u>The 2017 Enacted Plan Plainly Violates the State Constitution and Thus Cannot be Approved as a Remedy</u>

Defendants continue to mischaracterize the nature of the state constitutional flaw present in the remedial House districts in Wake and Mecklenburg Counties. Def.s' Br. at 2, n.1. The state constitution's prohibition on mid-decade redistricting does not establish that in remedial redistricting, a mapdrawer may never adjust districts that do not immediately adjoin the unconstitutional districts. Instead, what the state law's plain and unequivocal prohibition means is that a federal court order can only authorize a legislature acting in a remedial role to change as many districts as is necessary to correct the constitutional violation. This is important for two reasons: this Court's orders (1) should be as narrow as possible, so as to avoid interfering with 2011 legislative preferences, *Perez*, 565 U.S. at 394, and (2) should limit the extent to which the state constitution should give way to federal law, so as to avoid intrusion on state sovereignty, *North Carolina v. Covington*, 581 U.S. ___, 137 S. Ct. 1624, 1626 (2017) (per curiam).

There are now two maps that demonstrate that the legislature went further than was necessary to remedy the constitutional violations in these two counties. Plaintiffs'

15

proposed map, submitted to the legislature during the remedial process, corrects the two racially-gerrymandered House Districts in Wake while leaving as much of the legal portions of the 2011 plan in place as possible. And "[a]s is shown in the Special Master's Recommended Plan, it was, indeed, possible to reconfigure the districts deemed unconstitutional while retaining the Enacted 2011 districts that did not enjoin them." S.M. Report at 5. Because this Court may not order the state constitution be compromised more than is absolutely necessary to correct the federal constitutional flaws, the Court must sustain Plaintiffs' objections on this front.

    C.    <u>The Court and the Special Master Exercised Extensive Deference to All Constitutional Legislative Judgments</u>

This Court has employed a Special Master to narrowly adjust districts in the 2017 enacted plans where Defendants either did not cure the racial gerrymandering or exceeded the authority conferred by the Court's order, thereby violating the state constitutional mid-decade redistricting prohibition. The Court did not authorize a full redrawing of the plans, nor did it instruct the Special Master to address all of Plaintiffs' objections. *See* Pls.' Objections at 1. Thus, the appointment of the Special Master, and ordering into effect his Recommend Plan, represent a minimal intrusion on legislative prerogatives, and only affect the small number of 2017 districts that perpetuate the legislature's early unconstitutional activities.

The Recommended Plan does not "favor Democrats." Instead, the Plan, which was not informed by any political data and instead relies on the very same traditional redistricting criteria allegedly followed by the State, eliminates the continuing

16

discriminatory effect of the 2011 racial gerrymanders. The fact that by doing so, some of the districts become more compact and respectful of political subdivisions does not render this process a "beauty contest." It is simply evidence that supports Plaintiffs' claims that race, not traditional redistricting criteria, dictated the challenged districts' shapes in 2017.

Defendants' attacks the Special Master's Recommended Plan as constituting political choices are incorrect for several reasons. First, Defendants assail the Special Master's plan for failing to respect the legislature's policy of incumbency protection. As a primary matter, the specific criteria adopted focuses on not pairing incumbents, rather than ensuring every incumbent currently serving will be re-elected. Adopted Criteria, ECF 184-37. The Special Master did, to the best of his ability, respect that policy, and thus no House members are paired in his Recommended Plan. But that was not an immovable policy objective for the legislature, as the 2017 plans did pair Republican incumbents.[2] The Special Master provided the parties with a "Draft Plan [that] would ignore incumbent residence and then be altered following advice from the parties on how to 'unpair incumbents," S.M. Report at 9, and noted that he would honor any request to unpair incumbents "so long as it did not violate the other criteria in the Order." *Id.* at 10. Thus, the Recommended Plan is appropriately deferential to this policy choice.

---

[2] *see* https://www.ncleg.net/documentsites/committees/house2017-183/2017%20House%20Redistricting%20Plan/Stat%20Pack%20for%20Proposed%20Plan/NC%20HOUSE%202017_Incumbents_8.21.17.pdf;
https://www.ncleg.net/documentsites/committees/senate2017-154/2017%20Senate%20Redistricting%20Plan/NC%20SENATE%202017_Incumbents_8.21.17.pdf

More significantly, when incumbency was attained by illegal and illegitimate means, it is not an acceptable criterion. It only ensures that the harms of the 2011 plans continue, and that legislators who directed the state's gerrymandered mapdrawing continue to reap the fruits of that illegal action. *See, e.g., Georgia State Conference of NAACP v. Fayette County Bd. of Comm'rs*, 996 F.Supp.2d 1353, 1363 (N.D. Ga. 2014) ("The consideration of a traditional redistricting principle like incumbent protection is subordinate to the goal of remedying…the requirements of the Constitution."); *Rodriguez v. Harris County*, Texas, 964 F. Supp. 2d 686, 745 (S.D. Tex. 2013) ("Given that Plaintiffs contend that the selection and application of the traditional redistricting principles chosen by the County dilutes their voting power, it would be unfair to require Plaintiffs to draw maps in strict accordance with the county's priorities [which would] preclud[e] any meaningful view of dilutive effect, if any, of the County's choice and application of its chosen redistricting principles.")

Beyond incumbency, in the few instances where Defendants constructively did point out ways in which the Special Master could better follow the adopted criteria, such as splitting fewer precincts, the Special Master incorporated that advice. *See, e.g.,* S.M. Report at 16 (restoring split precincts in Draft HD 21).

Second, Defendants incredibly continue to allege that the Special Master engaged in racially-dictated line-drawing, and thus it is he, not the legislature, that is guilty of racial gerrymandering. Def.s' Br. at 2 (claiming the Recommended Plan "systematically reduces" the BVAP in districts). Plaintiffs thoroughly addressed this spurious allegation

18

previously, and adopt those arguments herein. *See* Pls.' Resp. to Def.s' Filing at 3-5, ECF 217. Defendants then turn to accusing the Special Master of intentionally creating "influence" districts in the Recommended Plan, Def.s' Br. at 17, but this argument is no more persuasive than the previous accusation. The Special Master employed the same traditional redistricting criteria that the legislature purported to use, and assiduously avoided using race to assign voters to or away from districts. Because Defendants did not do this, the Special Master's Recommended Plan, in comparison to the 2017 Plan, had the unremarkable consequence of increasing the BVAP slightly in districts adjacent to the packed and racially gerrymandered districts. This is not the purposeful creation of influence districts—it is simple arithmetic. In Defendants' apparent (and erroneous) view of the law, black voters are simply pawns in the redistricting game. If there is racially polarized voting, they must be packed into majority-black districts. If there is not, they must be fractured into insignificant numbers in districts so as to ensure they have no political power. This is as offensive as it is incorrect. With respect to the four districts at issue here, the legislature abdicated its duty to fully remedy the unconstitutionality. The Special Master appropriately remedied these four districts in his Recommended Plan, employing traditional redistricting criteria, and they should be ordered into effect.

## III. Conclusion

For the foregoing reasons, Plaintiffs respectfully request that this Court sustain Plaintiffs' objections to the 2017 Enacted Plans and order into effect the Special Master's Recommended Plan.

Respectfully submitted this 13th day of December, 2017.

**POYNER SPRUILL LLP**

**SOUTHERN COALITION FOR SOCIAL JUSTICE**

By: /s/ Edwin M. Speas, Jr.
Edwin M. Speas, Jr.
N.C. State Bar No. 4112
espeas@poynerspruill.com
Caroline P. Mackie
N.C. State Bar No. 41512
cmackie@poynersspruill.com
P.O. Box 1801 (27602-1801)
301 Fayetteville St., Suite 1900
Raleigh, NC 27601
Telephone: 919-783-6400
Facsimile: 919-783-1075

*Counsel for Plaintiffs*

By: /s/ Allison J. Riggs
Allison J. Riggs
N.C. State Bar No. 40028
Allison@southerncoalition.org
Jaclyn A. Maffetore
N.C. State Bar No. 50849
Jaclyn@southerncoalition.org
1415 Highway 54, Suite 101
Durham, NC 27707
Telephone: 919-323-3909
Facsimile: 919-323-3942

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this date I have electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will provide electronic notification of the same to the following:

Alexander M. Peters
James Bernier
Special Deputy Attorney General
Office of the Attorney General
P.O. Box 629
Raleigh, NC 27602
apeters@ncdoj.gov

*Counsel for Defendants*

Thomas A. Farr
Phillip J. Strach
Michael D. McKnight
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
4208 Six Forks Road, Suite 1100
Raleigh, NC 27602
thomas.farr@ogletreedeakins.com
phillip.strach@ogletreedeakins.com
michael.mcknight@ogletreedeakins.com

*Counsel for Defendants*

This 13th day of December, 2017.

/s/ Allison J. Riggs
Allison J. Riggs

*Counsel for Plaintiffs*

## CERTIFICATE OF WORD COUNT

I certify that the foregoing **PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S RECOMMENDED PLAN** contains 4,961 words as counted by the word count feature of Microsoft Word 2016, and thereby complies with Local Rule 7.3(d)(1) and this Court's Order dated November 1, 2017.

This 13th day of December, 2017.

/s/ Allison J. Riggs
Allison J. Riggs

*Counsel Plaintiffs*