IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
NO. 1:15-CV-00399

| | |
|---|---|
| SANDRA LITTLE COVINGTON, *et al.*, | ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| STATE OF NORTH CAROLINA, *et al.* | ) ) |
| Defendants. | ) ) ) |

**LEGISLATIVE DEFENDANTS' REPLY IN SUPPORT OF OBJECTIONS TO SPECIAL MASTER'S RECOMMENDED PLAN AND REPORT**

**INTRODUCTION**

Plaintiffs' Response to the legislative defendants' objections to the special master's recommended plan and report ("Response") exposes their attempt to use the racial gerrymandering cause of action to obtain a remedy not available in racial gerrymandering cases or even vote dilution cases under the Voting Rights Act ("VRA"). Plaintiffs also invite the Court to commit reversible error by placing the burden of proof on the legislature to *dis*prove racial predominance rather than on plaintiffs to prove it in the first instance. And they seek all of this without discovery or a trial or even a final ruling on whether the districts at issue are unlawful. The Court should reject this flawed approach and instead overrule the plaintiffs' objections to the 2017 plans. At a minimum, the Court should issue a final order forthwith so that meaningful appellate action may be taken, or the legislature may re-draw the districts, if necessary, as it stands ready to do. More appropriately, the Court should dismiss the case as moot, or allow plaintiffs to

amend their Complaint and pursue these new claims against new districts in the ordinary course.

## I. The burden of proof remains on the plaintiffs and plaintiffs have cited no redistricting cases to the contrary.

Plaintiffs invite the Court to place the burden of proof on the legislature to *dis*prove that race was the predominant motive in the drawing of the challenged districts. Plaintiffs cite no applicable authority for that novel position.

Instead, plaintiffs cite cases from the education and housing context. (Response at 2-3) In these cases, courts were supervising administrative implementation of judgments to ensure no continuing effects of discrimination in those areas.[1] Plaintiffs are unable to cite any racial gerrymandering cases in which the court put the burden on the state to prove it had eliminated the effects of ongoing discrimination. That is because the harm in gerrymandering cases is not the effects of discrimination, but the intent to sort voters based on race. Nor have they cited any redistricting cases in which the court did not respect the presumption of constitutionality afforded acts of the legislature. *Miller v. Johnson,* 515 U.S. 900, 915 (1995) (good faith of the legislature must be presumed unless plaintiffs demonstrate racial predominance).

Once the legislature has enacted new districts which removed the intent to classify voters based on race, the burden remains on the plaintiffs to demonstrate that race nonetheless predominated in the new plan. To do otherwise would stand the racial

---

[1] Moreover, "redistricting differs from other kinds of state decisionmaking in that the legislature always is *aware* of race when it draws district lines, just as it is aware of ... a variety of other demographic factors." *Shaw v. Reno,* 509 U.S. 630, 646, (1993) ("*Shaw I*"). Therefore, more caution and deference is warranted by courts in redistricting cases.

gerrymandering claim on its head by replacing the "intent" harm it was designed to address with an "effects" standard similar to vote dilution claims under the VRA.

### II. Plaintiffs are seeking to use a racial gerrymandering remedy to obtain a remedy rejected by the Supreme Court under the VRA.

Plaintiffs' citation of the housing and education discrimination cases demonstrates that what they are actually seeking here is a vote dilution-type remedy in which minorities are "unpacked" from districts drawn by the legislature and placed into lower BVAP districts such as those sought in *Bartlett v. Strickland*, 556 U.S. 1 (2009). Of course, the Supreme Court rejected the imposition of crossover districts in *Strickland* and so-called influence districts in *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006) ("*LULAC*").

That plaintiffs are seeking this result is made clear by their Response. Plaintiffs continue to insist that this is "a racial packing" case. (Response at 6 (legislature's mapdrawer allegedly "packed" minorities in districts); 12 (legislature's House District 57 allegedly constitutes "unconstitutional packing")) So-called "packing" has nothing to do with racial gerrymandering. "Packing" is a vote dilution claim and it occurs only when a redistricting plan avoids the creation of additional single member majority black districts by creating a fewer number of majority black districts with super majorities of African Americans. *Voinovich v. Quilter*, 507 U.S. 146, 153-154 (1993). Under a packing scheme, the relevant question is whether there are "too many" minorities in a particular district.

Racial gerrymandering cases and the cause of action recognized under *Shaw I* and its progeny do not come from the racial discrimination or segregation cases but instead from the anti-quota line of cases. The Supreme Court's cites in the racial gerrymandering cases to *Richmond v. J.A. Croson*, 488 U.S. 469 (1989) and *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) make it clear that these cases are all about the imposition of quotas. Racial gerrymandering involves the stigma associated with the State intentionally using race to sort voters into districts through the imposition of quotas. *Shaw I*, 509 U.S. at 643 (laws classifying citizens based on race "threaten to stigmatize individuals by reason of their membership in a racial group"). Such claims do not involve vote dilution. *Shaw I*, 509 U.S. at 641 ("appellants did not claim that the [redistricting plan] unconstitutionally diluted white voting strength") (internal quotations omitted).

Thus, the relevant precedents for evaluating new districts drawn in response to finding of racial gerrymandering are cases like *Miller, supra*; *Bush v. Vera*, 517 U.S. 952, 977 (1996), and the *Shaw* line of cases, culminating in *Easley v. Cromartie*, 532 U.S. 234 (2001). In none of those cases did the Supreme Court flip the burden of proof on the State in evaluating alleged racial predominance in existing or re-drawn districts. In *Cromartie*, for example, the State re-drew Congressional District 12 and asserted that it was motivated by political gerrymandering rather than racial gerrymandering. The Supreme Court analyzed racial predominance in the re-drawn district in the same manner as it had analyzed the original district.

As demonstrated by *Cromartie*, the relevant issue in whether a re-drawn racial gerrymandered district is acceptable is whether the State improperly used race in drawing

4

district lines, not whether there are "too many" minorities "packed" in the district. Nor has the Supreme Court found it necessary in these cases to analyze whether a re-drawn racially gerrymandered district passed muster based on the "influence" of minority voters in surrounding districts. Put simply, the remedy in a case where an unnecessary remedial quota has been imposed is not to impose a different quota but to eliminate the quota altogether.[2] That is what has been done in all of the anti-quota cases including the related redistricting cases in *Shaw I* and its progeny. That plaintiffs are single-mindedly focused on vote dilution concepts demonstrates that they are not seeking a true racial gerrymandering remedy.

### III. Plaintiffs have not met their burden of proving racial predominance in any of the challenged districts.

Plaintiffs have fallen woefully short in attempting to establish racial predominance in any of the challenged districts. Plaintiffs, like the special master, make the initial mistake of not even conducting the kind of racial predominance analysis the Supreme Court announced just this year is required. As the Supreme Court recently explained about racial predominance:

> The ultimate object of the inquiry, however, is the legislature's predominant motive for the design of the district as a whole. A court faced with a racial

---

[2] Because the remedy is to eliminate the quota and not to eliminate the lingering effects of historical discrimination, as would be the case in a vote dilution or school desegregation case, a complete remedy is achieved once the quota has been eliminated. Eliminating the quota can cause minority admissions, hiring, or the percentage of minorities in a given legislative district to go up or to go down depending upon the nonracial criteria used in each of those processes. As a result the percentage of minorities admitted or hired in any given year would vary. Likewise, districts drawn to nonracial criteria should be expected to have varying minority percentages not a narrow range as is the case with the special master's proposed maps.

5

> gerrymandering claim therefore must consider all of the lines of the district at issue; any explanation for a particular portion of the lines, moreover, must take account of the districtwide context. Concentrating on particular portions in isolation may obscure the significance of relevant districtwide evidence, such as stark splits in the racial composition of populations moved into and out of disparate parts of the district, or the use of an express racial target. A holistic analysis is necessary to give that kind of evidence its proper weight.

*Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 800 (2017). Taking vague potshots at the challenged districts is certainly not a holistic analysis, which would require at a minimum discovery and possibly a trial to gather evidence for such an analysis.

Moreover, cherry-picking alleged deficiencies in compliance with traditional redistricting principles does not satisfy the *Bethune-Hill* standard. Simply identifying an alleged conflict with traditional redistricting principles is not sufficient to demonstrate racial predominance. *Bethune-Hill*, 137 S. Ct. at 797-98. Instead, plaintiffs must prove that "race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale." *Id.* (internal citations omitted). Indeed, "the constitutional violation in racial gerrymandering cases stems from the racial purpose of state action, not its stark manifestation." *Id.* at 798 (internal citations and quotations omitted).

Plaintiffs must resort to vague criticisms, "interocular" comparisons (i.e., beauty contests), and cherry-picking supposed deviations from traditional redistricting principles because the challenged districts follow those principles better than any North Carolina legislative plans in modern history. As the Supreme Court explained:

6

> As a practical matter, in many cases, perhaps most cases, challengers will be unable to prove an unconstitutional racial gerrymander without evidence that the enacted plan conflicts with traditional redistricting criteria. In general, legislatures that engage in impermissible race-based redistricting will find it necessary to depart from traditional principles in order to do so. And, in the absence of a conflict with traditional principles, it may be difficult for challengers to find other evidence sufficient to show that race was the overriding factor causing neutral considerations to be cast aside. In fact, this Court to date has not affirmed a predominance finding, or remanded a case for a determination of predominance, without evidence that some district lines deviated from traditional principles. See *Alabama,* 575 U.S., at ——, 135 S.Ct., at 1265–1266; *Hunt v. Cromartie,* 526 U.S. 541, 547, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Bush v. Vera,* 517 U.S. 952, 962, 966, 974, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (plurality opinion); *Shaw II, supra,* at 905–906, 116 S.Ct. 1894; *Miller, supra,* at 917, 115 S.Ct. 2475; *Shaw I, supra,* at 635–636, 113 S.Ct. 2816.

*Bethune-Hill*, 137 S. Ct. at 799.

As legislative defendants have explained in prior briefing, which is incorporated herein by reference (D.E. 192, 215, 218, 224), there are no meaningful conflicts with traditional redistricting criteria in the challenged districts. For instance, plaintiffs criticize the shape of Senate District ("SD") 21, but it is nearly the same shape as the special master's version but for the exclusion of Fort Bragg in the 2017 version. The exclusion of Fort Bragg in the 2017 version was to ensure that both incumbents in the county grouping would reside in a district each would have a reasonable opportunity to win – itself a valid traditional redistricting criteria.[3] While plaintiffs claim that majority black precincts were included in SD 21, they provide no competent evidence that race,

---

[3] Plaintiffs' claim that most of Fort Bragg is in Hoke County is highly misleading. The part of Fort Bragg located in Hoke County is a land mass with almost no population. Nearly all of the Fort Bragg population is located in Cumberland County. This argument demonstrates the thin reeds plaintiffs must rely on to try and show that the challenged districts are based on race.

7

rather than the legislature's desire to construct a district that each incumbent could possibly win, resulted in the selection of such precincts. *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) (approving incumbency protection as a valid redistricting principle). As explained in legislative defendants' incorporated prior briefing, the analysis performed by Dr. Herschlag and the so-called "Cromartie" maps produced by plaintiffs do not demonstrate that race and not incumbency protection explain the precincts that are located in the 2017 SD 21. (D.E. 192 at 17-20, 29-50)

Similarly, with SD 28, plaintiffs rely primarily on the interocular test. Plaintiffs claim that the 2017 SD 28 is "drawn as it was in 2011", yet just two sentences before they admit that the so-called "spindly arm" into High Point was removed. In pursuit of their frivolous objections to SD 28 plaintiffs complain that precinct JEF2 is supposedly "split along racial lines" but fail to disclose that the split affects *zero population*. Relatedly, plaintiffs criticize House District ("HD") 57 for supposedly "tracking" minority precincts. However, many minority precincts are obviously located next to each other and in order to draw contiguous districts, precincts must be followed contiguously. Similarly, plaintiffs criticize HD 21 as being "bizarre" in shape but again ignore that the precinct which creates that "bizarre" shape was not split. This heads-you-lose-tails-I-win approach to racial predominance analysis violates the standard set out in *Bethune-Hill* and nearly every racial gerrymandering case preceding it.

## CONCLUSION

The Court should reject the special master's final report and overrule the plaintiffs' objections to the 2017 plans. At a minimum, the Court should issue a final

8

order forthwith so that meaningful appellate action may be taken, or the legislature may re-draw the districts, if necessary, as it stands ready to do. More appropriately, the Court should dismiss the case as moot, or allow plaintiffs to amend their Complaint and pursue these new claims against new districts in the ordinary course.

This 15th day of December, 2017.

> OGLETREE, DEAKINS, NASH,
> SMOAK & STEWART, P.C.
>
> /s/ Phillip J. Strach
> Phillip J. Strach
> N.C. Bar No. 29456
> Michael D. McKnight
> N.C. Bar No. 36932
> 4208 Six Forks Road, Suite 1100
> Raleigh, North Carolina 27609
> Phone: (919) 787-9700
> Facsimile: (919) 783-9412
> Email:phil.strach@ogletreedeakins.com
> *Attorneys for Legislative Defendants*

# CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of December, 2017, I have served the foregoing **LEGISLATIVE DEFENDANTS' REPLY IN SUPPORT OF OBJECTIONS TO SPECIAL MASTER'S RECOMMENDED PLAN AND REPORT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Edwin M. Speas, Jr.
Carolina P. Mackie
Poyner Spruill LLP
P.O. Box 1801 (27602-1801)
301 Fayetteville St., Suite 1900
Raleigh, NC 27601
espeas@poynerspruill.com
johale@poynerspruill.com
cmackie@poymerspruill.com
*Attorneys for Plaintiffs*

Allison J. Riggs
Southern Coalition for Social Justice
1415 Highway 54, Suite 101
Durham, NC 27707
anita@southerncoalition.org
allisonriggs@southerncoalition.org
*Attorneys for Plaintiffs*

Alexander McC. Peters
Senior Deputy Attorney General
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

/s/ Phillip J. Strach
Phillip J. Strach
N.C. Bar No. 29456
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina 27609
Phone: (919) 787-9700
Facsimile: (919) 783-9412
Email: phil.strach@ogletreedeakins.com

32346533.1

10

Case 1:15-cv-00399-TDS-JEP   Document 230   Filed 12/15/17   Page 10 of 10