IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:15-CV-00399

| | |
|---|---|
| SANDRA LITTLE COVINGTON, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| STATE OF NORTH CAROLINA, *et al.* | ) |
| | ) |
| Defendants. | ) |

**LEGISLATIVE DEFENDANTS' EMERGENCY MOTION TO STAY PENDING SUPREME COURT REVIEW AND REQUEST FOR EXPEDITED RULING**

Legislative defendants respectfully move this Court to stay pending appeal to the United States Supreme Court its Memorandum Opinion and Order ("Order") enjoining elections under certain election districts duly enacted by the North Carolina legislature in 2017 ("Subject Districts"). (D.E. 242) Because of the exigent nature of the circumstances, including that the 2018 filing period for legislative offices is just a few weeks away, legislative defendants request a ruling on this motion no later than January 22, 2018 so that legislative defendants can immediately seek a stay from the United States Supreme Court if necessary. In support of this motion, legislative defendants show the Court:

1. On August 11, 2016, this Court entered its judgment that 28 districts in the 2011 House and Senate plans were racial gerrymanders. The Court's order did not set any deadline for the enactment of new redistricting plans other than to require new districts in place in time for the 2018 elections.

1

2. On November 29, 2016, this Court entered an order requiring the North Carolina General Assembly to enact new plans on or before March 15, 2017 and ordering a special election in the fall of 2017. Shortly thereafter, the Supreme Court stayed this Court's order, including its March 15, 2017 deadline for enacting new maps. 137 S. Ct. 808 (2017 (mem.). This Court's order ultimately was vacated by the Supreme Court and is a nullity, including the Court's March 15, 2017 deadline for enacting new plans. 137 S. Ct. 1624 (2017) (per curiam).

3. On June 5, 2017, the Supreme Court affirmed this Court's August 2016 judgment and the mandate was issued on June 30, 2017. Legislative defendants then promptly informed the Court of their plan to enact new districts in time for the 2018 elections.

4. By order dated July 31, 2017, this Court gave the legislature until September 1, 2017 to enact new districts to replace the districts found to be racial gerrymanders.

5. On August 31, 2017, the North Carolina legislature enacted new redistricting plans for the North Carolina House of Representatives and the North Carolina Senate (the "2017 plans"). Under *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978), these plans were the duly enacted legislative redistricting plans for North Carolina and therefore the "governing law."

6. On October 12, 2017, the Court held a hearing on plaintiffs' Objections to the 2017 plans. Despite repeated objections by legislative defendants, this Court declined

to require plaintiffs to file a new lawsuit or amend their Complaint to assert their new claims against the 2017 plans.

7. After this Court's hearing on plaintiffs' Objections, the Court did not enter a final ruling on the legality of the Subject Districts. Instead, the Court appointed a special master, over the legislative defendants' objections, to draft "remedial" districts "[i]n anticipation of the likely possibility" that the Court would later invalidate the 2017 plans. (D.E. 202)

8. The legislative defendants repeatedly objected to this procedure. (D.E. 204, 215, 218, 224, 225, 230) Legislative defendants also asked the Court to enter a final ruling on the plaintiffs' Objections no later than December 2017 in order to preserve the legislature's right to cure any defects in the 2017 plans found by the Court.

9. On December 11, 2017, legislative defendants asked this Court to expedite its ruling so that there would be enough time for legislative defendants to enact new districts after a final ruling by this Court, and to appeal to the Supreme Court. (D.E. 225) This motion was denied. (D.E. 228)

10. On January 21, 2018, only three weeks before the beginning of the filing period for legislative elections, this Court entered its Order enjoining the use of the Subject Districts and imposing the special master's version of the Subject Districts and numerous additional districts.

### This Court's Order is Already Resulting in Irreparable Injury

11. Without a stay, irreparable injury will continue to occur to the General Assembly, the State, and North Carolina voters and candidates. *Hollingsworth v. Perry*,

3

558 U.S. 183, 190 (2010). Since August 31, 2017, voters and candidates have become accustomed to the 2017 plans and have been making electoral plans using those districts. Now, just a few weeks before candidate filing, this Court has disrupted those plans, and thrown months of planning into confusion.

12. The filing period begins February 12, 2018. The Subject Districts as drawn in the 2017 plans have been available for review by candidates and voters for almost five months, and the public has reasonably relied on those districts being in place when filing opens. Now, just weeks before filing, the Court's decision will require voters and candidates to become familiar with several dozen brand new districts in multiple counties. For candidates, this likely means reassessing or rearranging plans they had to mount campaigns in the Subject Districts. This is the precise situation the Supreme Court has directed lower courts to be mindful of avoiding given the very real risks that court orders changing election rules close to an election may "result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). This Court's last-minute decision altering dozens of districts on the eve of the filing period creates precisely the confusion that the *Purcell* doctrine aims to avoid.

13. The Court's actions also harm North Carolina's sovereign interests, as "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (citing *New Motor Vehicle Bd. Of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)). That injury is exacerbated in the redistricting context, as districting plans effectuate the State's "constitutional responsibility for the establishment

4

and operation of its own government, as well as the qualifications of an appropriately designated class of public office holders." *Gregory v. Ashcroft*, 501 U.S. 452, 462 (1991); *see* U.S. Const. art. IV §4. Accordingly, this Court's order requiring North Carolina to use the special master's plan in the fast-approaching 2018 election cycle is itself sufficient irreparable injury to warrant a stay.

14. This Court's actions are directly contrary to the Supreme Court's admonition that "a lawful, legislatively enacted plan [is] preferable to one drawn by the courts." *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 416 (2006) (Opinion of Kennedy, J.) ("*LULAC*"). As explained in *LULAC*, the legislature has a constitutional right "to replace a court-drawn plan with one of its own design" and "no presumption of impropriety should attach to the legislative decision to act." *Id.* This Court's actions otherwise violate the Supreme Court's "assumption that [preferring] a court-drawn plan to a legislature's replacement [is] contrary to the ordinary and proper operation of the political process." *Id.*

15. There is not enough time for the legislature to enact new plans without creating even more disruption to the election schedule than this Court's ruling has already created. This is irreparable injury to the voters, candidates, and the peoples' elected representatives and the Order should therefore be stayed.

**There is More Than A "Fair Prospect" That the Order Will Be Reversed or Vacated**

16. There is more than a "fair prospect" (*Hollingsworth*, 558 U.S. at 190) that the Supreme Court will reverse or vacate this Court's order. As an initial matter, the Supreme Court is likely to vacate this Court's order because this case became moot as

5

Case 1:15-cv-00399-TDS-JEP   Document 243   Filed 01/21/18   Page 5 of 11

and operation of its own government, as well as the qualifications of an appropriately designated class of public office holders." *Gregory v. Ashcroft*, 501 U.S. 452, 462 (1991); *see* U.S. Const. art. IV §4. Accordingly, this Court's order requiring North Carolina to use the special master's plan in the fast-approaching 2018 election cycle is itself sufficient irreparable injury to warrant a stay.

14. This Court's actions are directly contrary to the Supreme Court's admonition that "a lawful, legislatively enacted plan [is] preferable to one drawn by the courts." *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 416 (2006) (Opinion of Kennedy, J.) ("*LULAC*"). As explained in *LULAC*, the legislature has a constitutional right "to replace a court-drawn plan with one of its own design" and "no presumption of impropriety should attach to the legislative decision to act." *Id.* This Court's actions otherwise violate the Supreme Court's "assumption that [preferring] a court-drawn plan to a legislature's replacement [is] contrary to the ordinary and proper operation of the political process." *Id.*

15. There is not enough time for the legislature to enact new plans without creating even more disruption to the election schedule than this Court's ruling has already created. This is irreparable injury to the voters, candidates, and the peoples' elected representatives and the Order should therefore be stayed.

**There is More Than A "Fair Prospect" That the Order Will Be Reversed or Vacated**

16. There is more than a "fair prospect" (*Hollingsworth*, 558 U.S. at 190) that the Supreme Court will reverse or vacate this Court's order. As an initial matter, the Supreme Court is likely to vacate this Court's order because this case became moot as

soon as the legislature repealed the 2011 plans and replaced them with the 2017 plans. *See, e.g.*, *Growe v. Emison*, 507 U.S. 25, 39 (1993). The Supreme Court is also likely to reverse or vacate this Court's order on the merits. With respect to SD21, SD28, HD21, and HD57, this Court invalidated those districts as racial gerrymanders even though all parties agree that the legislature *did not use race* in designing those districts. Instead of treating the race-neutral line-drawing as dispositive, this Court applied a fundamentally flawed test that asks whether the *effects* of the 2017 Plan remedied the *intent* of the 2011 Plan. That mismatched inquiry has no basis in the Supreme Court's jurisprudence, and resulted in the invalidation of districts that were neither drawn with illicit motive nor ever proven to have dilutive effect on minority voting rights.

17. This Court then used its new racial gerrymandering test to displace the legislature's otherwise legitimate use of election data and incumbency protection in the 2017 plans. The Court created a new rule which will force legislatures to abandon the use of any election data in redistricting in racial gerrymandering cases unless the legislature *affirmatively uses race-based redistricting*.[1] Under the Court's test, after a racial gerrymandering finding, if the legislature uses election data and retention of district cores to protect incumbents (of both parties) then the legislature is under an affirmative obligation to use race to "ensure that its reliance [on incumbency protection] did not serve to perpetuate the effects of the racial gerrymander." (D.E. 242 at 44) This rule finds no support in the Supreme Court's racial gerrymandering jurisprudence.

---

[1] This is consistent with this Court's instruction to the special master regarding consideration of "data identifying the race of individuals or voters" in drawing new districts. (D.E. 206 at 8)

6

18. In taking that approach, this Court rejected arguments from the legislative defendants that the Court was using the racial gerrymandering remedial process to impose districts that would be unconstitutional even as a Voting Rights Act ("VRA") remedy. Racial gerrymandering cases and the cause of action recognized under *Shaw v. Reno*, 509 U.S. 630, 643 (1993) ("*Shaw I*") and its progeny do not come from the racial discrimination or segregation cases but instead from the anti-quota line of cases. Racial gerrymandering involves the stigma associated with the State intentionally using race to sort voters into districts through the imposition of quotas. *Shaw I*, 509 U.S. at 643 (laws classifying citizens based on race "threaten to stigmatize individuals by reason of their membership in a racial group"). Such claims do not involve vote dilution. *Shaw I*, 509 U.S. at 641 ("appellants did not claim that the [redistricting plan] unconstitutionally diluted white voting strength") (internal quotations omitted). Thus, the relevant precedents for evaluating new districts drawn in response to finding of racial gerrymandering are cases like *Miller v. Johnson*, 515 U.S. 900 (1995), *Bush v. Vera,* 517 U.S. 952, 977 (1996), and the *Shaw* line of cases, culminating in *Easley v. Cromartie,* 532 U.S. 234 (2001). In *Cromartie*, for example, the State redrew Congressional District 12 and asserted that it was motivated by political gerrymandering rather than racial gerrymandering. The Supreme Court analyzed racial predominance in the redrawn district in the same manner as it had analyzed the original district.

19. In concluding that the 2017 districts looked "too much" like the 2011 districts (D.E. 242 at 42), the Court did not even attempt to analyze whether the shape of the 2017 districts was dictated by the legislature's legitimate use of election data and not

7

Case 1:15-cv-00399-TDS-JEP   Document 243   Filed 01/21/18   Page 7 of 11

race. Instead, the Court put the legislature in a "lose-lose" position by declaring that under its new standard, use of election data to protect incumbents was suddenly now legally suspect. In *Cromartie*, the Supreme Court acknowledged that party affiliation is sometimes highly correlated with race, and admonished courts not to just assume that race was used without trying to account for the role of political factors. *Cromartie*, 532 U.S. at 249 ("After all, the Constitution does not place an *affirmative* obligation upon the legislature to avoid creating districts that turn out to be heavily, even majority, minority. It simply imposes an obligation not to create such districts for predominantly racial, as opposed to political or traditional districting motivations.") (emphasis in original). This Court stood that rule on its head, and instead assumed that because race often correlates with party, use of election data is suspect regardless of whether it was intended to be a proxy for race. *But see Perry v. Perez*, 565 U.S. 388, 394 (2012) (a district court cannot "displac[e] legitimate state policy judgments with the court's own preferences" or "substitute[] its own concept of 'the collective public good'" for the state's citizens).

### The Supreme Court Will Likely Reverse This Court's Attempt to Create A New State Constitutional Standard For <u>Mid-Decade Redistricting Under the North Carolina Constitution</u>

20. This Court clearly lacked the jurisdiction and authority to impose new districts in Wake and Mecklenburg counties where none of the 2017 districts were challenged as continuing to be racial gerrymanders.

21. To begin with, this Court failed to determine the threshold issue of whether any plaintiff challenging the 2011 districts resides in the redrawn Wake and Mecklenburg districts. The Supreme Court has found that plaintiffs do not have standing in

8

redistricting cases unless they reside in the district at issue. *United States v. Hays*, 515 U.S. 737, 744-45 (1995). This Court made no attempt to determine whether any plaintiff resides in the Wake and Mecklenburg districts and there is no record evidence that any do. Accordingly, for this reason alone, the Court's decision is likely to be reversed.

22. In addition, while this Court justified its consideration of a state constitutional claim as being within its "pendent" jurisdiction, the Court cited no case in which "pendent" jurisdiction existed in the absence of an actual lawsuit asserting such a claim. No lawsuit has been filed in this Court challenging the 2017 Wake and Mecklenburg districts as violating the state constitution. The Court has not cited any authority in which post-trial "objections" could serve as such a jurisdictional basis. And for good reason – it is a manifest violation of the legislative defendants' due process rights to truncate an entire case—discovery, motions, and trial—into hearings on "objections" in which the defendants do not get to depose witnesses, take discovery, or even cross-examine the primary witness—the Court's special master.

23. Moreover, this Court conceded that when it is confronted with an "unsettled question of state law" it should not exercise jurisdiction. (D.E. 242 at 67) The Court also admitted that the "Supreme Court of North Carolina has not addressed the scope of the General Assembly's authority to engage in mid-decade redistricting when a decennial districting plan is found to violate the Constitution or federal law." (D.E. 242 at 61) This admission should have ended the Court's consideration of this claim. Instead, the Court proceeded not only to consider the claim but also to invent a new state constitutional standard for mid-decade redistricting under the state constitution. (D.E. 242 at 62)

9

(revising districts not allowed unless "necessary to remedy the [violation of federal law"). This Court then imposed new districts on the State in the absence of any guidance from the state courts on this matter. This improper use of the power of a federal court is likely to be reversed.

WHEREFORE, the Court should stay its Order pending Supreme Court review. Because of the exigent nature of the circumstances, including that the 2018 filing period for legislative offices is just a few weeks away, legislative defendants request a ruling on this motion no later than January 22, 2018 so that legislative defendants can immediately seek a stay from the United States Supreme Court if necessary.

Respectfully submitted this 21st day of January, 2018.

OGLETREE, DEAKINS, NASH
SMOAK & STEWART, P.C.

/s/ Phillip J. Strach
Phillip J. Strach
N.C. State Bar No. 29456
Michael D. McKnight
N.C. State Bar No. 36932
phil.strach@ogletreedeakins.com
michael.mcknight@ogletreedeakins.com
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina 27609
Telephone: (919) 787-9700
Facsimile: (919) 783-9412
*Counsel for Legislative Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of January, 2018, I have served the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Edwin M. Speas, Jr. | Allison J. Riggs |
| Carolina P. Mackie | Southern Coalition for Social Justice |
| Poyner Spruill LLP | 1415 Highway 54, Suite 101 |
| P.O. Box 1801 (27602-1801) | Durham, NC 27707 |
| 301 Fayetteville St., Suite 1900 | allisonriggs@southerncoalition.org |
| Raleigh, NC 27601 | *Attorneys for Plaintiffs* |
| espeas@poynerspruill.com | |
| cmackie@poymerspruill.com | |
| *Attorneys for Plaintiffs* | |

                                          Alexander McC. Peters
                                          Senior Deputy Attorney General
                                          N.C. Department of Justice
                                          P.O. Box 629
                                          Raleigh, NC 27602

                                          OGLETREE, DEAKINS, NASH,
                                          SMOAK & STEWART, P.C.

                                          /s/ Phillip J. Strach
                                          Phillip J. Strach
                                          N.C. Bar No. 29456
                                          4208 Six Forks Road, Suite 1100
                                          Raleigh, North Carolina 27609
                                          Phone: (919) 787-9700
                                          Facsimile: (919) 783-9412
                                          Email: phil.strach@ogletreedeakins.com

                                                                      32693429.1

11

Case 1:15-cv-00399-TDS-JEP   Document 243   Filed 01/21/18   Page 11 of 11