IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| SANDRA LITTLE COVINGTON, et al., | ) ) ) | |
| Plaintiffs, | ) ) | 1:15CV399 |
| v. | ) ) | |
| THE STATE OF NORTH CAROLINA, et al., | ) ) ) | |
| Defendants. | ) | |

Before WYNN, Circuit Judge, SCHROEDER, Chief District Judge, and EAGLES, District Judge.

### MEMORANDUM ORDER

PER CURIAM:

Before the Court is Legislative Defendants' motion to stay this Court's order approving remedial districts pending appeal to the United States Supreme Court. (ECF No. 243.) Plaintiffs oppose a stay (ECF No. 245), and the State of North Carolina and the State Board of Elections and its members ("State Board Defendants") take no position on the motion, but the State urges that "a swift decision on a remedy would advance the public interest." (ECF No. 246 at 1.) For the reasons set forth below, the motion will be denied.

I.

The factual record demonstrates that this Court has moved with reasonable dispatch at every turn, Legislative Defendants

have themselves acknowledged that the Court's remedy would be timely, and a stay would only prolong the constitutional harms that have persisted for more than six years.

On August 11, 2016, this Court unanimously found that the North Carolina General Assembly unjustifiably relied on race in the drawing of twenty-eight majority-minority House and Senate districts in the 2011 State legislative redistricting plans, in violation of the Equal Protection Clause of the Fourteenth Amendment. *Covington v. North Carolina*, 316 F.R.D. 117, 176 (M.D.N.C. 2016) (*Covington I*), *aff'd*, 137 S. Ct. 2211 (2017). In light of the then-upcoming November 2016 election cycle, we denied Plaintiffs' request for a special election and reluctantly permitted a third biennial general election (2012, 2014, and 2016) to proceed under an unconstitutional redistricting scheme. We issued a final remedial order on November 29, 2016, that required the General Assembly to adopt new districting plans by March 15, 2017, and ordered a special election in the fall of 2017. *Covington v. North Carolina* (*Covington II*), No. 1:15-CV-399, 2016 WL 7667298, at *2-3 (M.D.N.C. Nov. 29, 2016), *vacated*, -- U.S. --, 137 S. Ct. 1624, (2017). The General Assembly made no effort to draw and submit remedial constitutional districts before this deadline.

Instead, Legislative Defendants sought and obtained a stay of our remedial order pending review of the constitutional claims by

the Supreme Court. *North Carolina v. Covington*, -- U.S. --, 137 S. Ct. 808 (2017) (mem.) On June 5, 2017, the Supreme Court summarily affirmed, without dissent, this Court's judgment that the 2011 House and Senate districting plans were racial gerrymanders in violation of Plaintiffs' Fourteenth Amendment Rights. *North Carolina v. Covington*, -- U.S. --, 137 S. Ct. 2211 (2017) (mem.) The Court vacated the final remedial order requiring a mid-cycle election, however, and directed a "careful case-specific analysis" to determine an appropriate remedy. *North Carolina v. Covington*, -- U.S. --, 137 S. Ct. 1624, 1626 (2017).

After obtaining jurisdiction from the Supreme Court, this Court set and held a July 27, 2017 hearing, at which we received evidence, briefing, and argument regarding the appropriate remedy for the constitutional violations. Legislative Defendants opposed a special election and acknowledged that they had not taken any action to draw remedial districts (other than creating new redistricting committees and proposing public hearings); they proposed a schedule that would require the General Assembly to enact remedial districts by November 15, 2017, to be implemented in the 2018 election. (ECF No. 161 at 30; ECF No. 181 at 87, 91.) In support of this proposal, Legislative Defendants represented that adopting "a goal of enacting new plans by the end of the year . . . would leave time for this Court's review and implementation of the plans in an orderly way in 2018." (ECF No. 161 at 29.)

3

We declined to adopt Legislative Defendants' proposed schedule and gave the General Assembly until September 1, 2017, "to enact new House and Senate districting plans remedying the constitutional deficiencies" with the districts found unconstitutional in this Court's August 2016 opinion and order. *Covington v. North Carolina* (*Covington III*), -- F. Supp.3d. --, 2017 WL 3254098, at *3 (M.D.N.C. July 31, 2017). Our order explained that we selected the September deadline to ensure adequate time "(1) to review the General Assembly's enacted remedial district plans, and (2) if the enacted plans prove constitutionally deficient, to draw and impose its own remedial plan." *Id.*

On August 31, 2017, the General Assembly enacted new redistricting plans for the House and Senate (the "2017 Plans") to be implemented for the 2018 elections. In expedited briefing, Plaintiffs filed objections to 12 of the 116 remedial districts, alleging that those districts failed to remedy the identified racial gerrymander or were otherwise legally unacceptable. (ECF No. 187.) The State and the State Board Defendants took no position on Plaintiffs' objections.

Shortly thereafter, on October 12, 2017, we held a hearing on Plaintiffs' objections to the 2017 Plans. After carefully reviewing Plaintiffs' objections, we informed the parties of our concern that nine district configurations (the "Subject

4

Districts") within the 2017 Plans either failed to remedy the racial gerrymanders or were otherwise legally unacceptable. (ECF No. 202.) After the parties could not agree on a Special Master, we indicated our intent to appoint Dr. Nathaniel Persily of Stanford University to assist the Court in evaluating and, if necessary, redrawing the Subject Districts in light of the approaching filing period for the 2018 elections, and we provided the parties an opportunity to object to his appointment. (*Id.*) Three days later, we overruled Legislative Defendants' objections and appointed Dr. Persily as Special Master. (ECF No. 206.) Describing our concerns with the Subject Districts and setting forth the Special Master's duties and responsibilities, we gave the Special Master until December 1, 2017, to file a report with recommended plans for each of the Subject Districts, an explanation of those plans, and a comparison of the recommended plans with both the 2011 enacted maps and the 2017 Plans. (*Id.*)

On November 14, 2017, the Special Master filed draft reconfigurations of the Subject Districts as well as an explanation of his rationale behind those reconfigurations, and invited comments from the parties. (ECF No. 213.) After considering those comments, the Special Master revised his maps and filed his Recommended Plans and Report on December 1, 2017. (ECF No. 220 ("Recommended Plans").)

On January 5, 2017, the Court held a hearing during which the

5

Special Master presented his Recommended Plans and addressed numerous questions raised by the parties. Legislative Defendants introduced expert and lay testimony relating to alleged infirmities of the Recommended Plans. The State and State Board Defendants took no position on Plaintiffs' objections or the Special Master's Recommended Plans. During the hearing, State Board Defendants confirmed that, if the court approved a final redistricting plan three weeks prior to the beginning of the February 12, 2018 candidate filing period, they would be able to assign voters to their respective districts and determine the proper administrative procedures for permitting candidates to file for election without additional delay. (ECF No. 244 at 138-40.)

On January 19, 2018, more than three weeks ahead of the commencement of the candidate filing period, we entered our memorandum opinion and order, rejecting Plaintiffs' proposed maps and approving the General Assembly's 2017 Plans except as modified by the Special Master's Recommended Plans, which were adopted. (ECF No. 242 ("Final Order").)[1]

Shortly thereafter, Legislative Defendants filed the present motion, seeking to stay the Final Order pending appeal to the Supreme Court and requesting an expedited ruling. We ordered that responses be filed within 48 hours. As noted, Plaintiffs urge

---

[1] On January 21, 2018, the Court issued an amended opinion. All subsequent citations herein are to the amended version.

that the motion be denied (ECF No. 245), and the State and State Board Defendants take no position, but the State urges a swift decision on the remedial districts. (ECF No. 246.)

II.

Federal Rule of Civil Procedure 62 provides for a stay of a final judgment involving injunctive relief. A court must consider four factors when considering whether to issue a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

"A stay is not a matter of right, even if irreparable injury might otherwise result." *Nken*, 556 U.S. at 433 (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)). Rather, it is "an exercise of judicial discretion," and "[t]he propriety of its issue is dependent upon the circumstances of the particular case." *Id.* (citations omitted). It is considered "'extraordinary relief' for which the moving party bears a 'heavy burden,'" and "[t]here is no authority to suggest that this type of relief is any less extraordinary or the burden any less exacting in the redistricting context." *Larios v. Cox*, 305 F. Supp. 2d 1335, 1336

7

(N.D. Ga. 2004) (quoting *Winston-Salem/Forsyth Cty. Bd. of Educ. v. Scott*, 404 U.S. 1221, 1231 (1971) (Burger, C.J., in chambers)). Even though Legislative Defendants have filed notice of appeal to the Supreme Court (ECF No. 247), this Court retains jurisdiction to consider the application for stay. *See* Fed. R. Civ. P. 62(c); Fed. R. App. P. 8(a)(1)(A); *Personhubullah v. Alcorn*, 155 F. Supp. 3d 552, 558-59, 561 (E.D. Va. 2016) (denying request for stay in redistricting case after Supreme Court set earlier liability determination for oral argument).

Legislative Defendants do not specifically address the traditional four-factor test.[2] Nevertheless, in our judgment, Legislative Defendants fall far short of meeting their "heavy burden" to obtain the extraordinary relief of a stay under the unique facts of this case.

### A.

First, Legislative Defendants have not made a "strong showing" that they are likely to prevail on the merits. They reprise their contention that this Court's order finding the 2011 districts unconstitutional rendered this proceeding moot,

---

[2] Legislative Defendants rely on *Perry v. Hollingsworth*, which outlines the standard for a Circuit Justice to consider an in-chambers stay application. 558 U.S. 183, 190 (2010); *see Rostker v. Goldberg*, 448 U.S. 1306, 1308 (1980) (outlining the "principles that control a Circuit Justice's consideration of in-chambers stay applications"). As a result, Legislative Defendants fail to adequately consider whether the stay would substantially injure other interested parties or be in the public interest.

8

requiring the filing of a new lawsuit to pursue further challenges to their 2017 Plans. This argument has no merit and ignores the remedial posture of this case.

The 2017 Plans were enacted pursuant to an order of this Court, not on the Legislative Defendants' own initiative or as a result of any pending state court proceeding. Accordingly, this court discharged its ongoing duty to ensure that the proffered remedial plan remedied the constitutional violation. *Chapman v. Meier*, 420 U.S. 1, 27 (1975) (noting if the state fails to enact "a constitutionally acceptable" remedial districting plan, then "the responsibility falls on the District Court"). To hold otherwise would vitiate this Court's responsibility to ensure that the constitutional violation is remedied. And holding otherwise would contradict Legislative Defendants' prior acknowledgement of this Court's obligation to review and approve the General Assembly's proposed remedial plans. (ECF No. 161 at 29 (explaining that Legislative Defendants' proposed schedule "of enacting new plans by the end of the year . . . would leave time for this Court's review and implementation of the plans in an orderly way in 2018").)

In fulfilling our responsibility to ensure the constitutionality of the remedial redistricting plans, we found that the Legislative Defendants failed to remedy the racial gerrymanders within House Districts 21 and 57 and Senate Districts

9

21 and 28. (ECF No. 242 at 59-60.) Legislative Defendants now contend that in doing so we set forth a "new racial gerrymandering test" that requires legislatures to "affirmatively use[] race[]" in redistricting. (ECF No. 243 at 6.) This contention is erroneous and misunderstands our decision.

For reasons explained in our 92-page opinion, we found that in the *remedial context* the General Assembly should be conscious of the prior racially-drawn districts to ensure that its remedial plan remedies the racial gerrymander, particularly where, as here, the General Assembly *chooses* to rely on redistricting criteria highly correlated with race, like preserving the "cores" of unconstitutional districts or using election data to ensure incumbents elected in the racially gerrymandered districts will prevail in their remedial districts. (ECF No. 242 at 44.) Notably, in responding to Plaintiffs' objections as to the Wake and Mecklenburg County districts, Legislative Defendants relied on the *exact same principle*, stating that a remedial plan drawn to preserve the "core of [a] racially gerrymandered district" "would perpetuate [the] racial gerrymander." (ECF No. 192 at 52.)

We did not simply find that the districts looked "too much" like the enacted 2011 districts, as the Legislative Defendants suggest. (ECF No. 243 at 7.) Rather, we found that the districts "'partake *too much* of the infirmity' of their racial gerrymandered versions" to remedy the constitutional violation. (ECF No. 242 at

10

42 (quoting *Lane v. Wilson*, 307 U.S. 268, 275 (1939) (emphasis added)).[3] We reached this conclusion after conducting a district-specific analysis to determine whether each district's configuration carried forward the constitutional violation, considering a variety of statistical data and testimony. Our determination that race continued to predominate in the drawing of the Subject Districts rested on extensive fact finding, which will be reviewed under a highly deferential clear error standard. *See Harris v. McCrory*, No. 1:13CV949, 2016 WL 6920368, at *1 (M.D.N.C. Feb. 9, 2016) (concluding Defendants failed to make a "strong showing" they were likely to succeed on merits on appeal of racial gerrymandering decision, where decision rested on extensive factual findings subject to clear error review); *Personhuballah*, 155 F. Supp. 3d at 559 (same).

To be sure, "the Constitution does not place an *affirmative* obligation upon the legislature to avoid creating districts that turn out to be heavily, even majority, minority." *Easley v. Cromartie*, 532 U.S. 234, 249 (2001). As we noted, however, in the remedial context political considerations such as incumbency protection and election data must give way to remedying the constitutional violation. (ECF No. 242 at 39.) *See Cromartie*,

---

[3] For example, the 2017 Plans proposed replacing House District 57, which we found to be a racial gerrymander designed to create a majority-minority district with a minimum 50%-plus black voting age population, with a remedial version that *increased* the district's black voting age population from 50.69 percent to 60.75 percent. (ECF No. 242 at 57.)

11

532 U.S. at 262 n.3 (Thomas, J., dissenting) (characterizing as "questionable" the proposition that "the goal of protecting incumbents is legitimate even where, as here, individuals are incumbents by virtue of their election in an unconstitutional racially gerrymandered district"); *Jeffers v. Clinton,* 756 F. Supp. 1195, 1199-1200 (E.D. Ark. 1990); *cf. Personhuballah*, 155 F. Supp. 3d at 564 ("[A]t some point political concerns must give way when there is a constitutional violation that needs to be remedied.").

With regard to the violations of the North Carolina Constitution's prohibition on mid-decade redistricting, this Court properly exercised pendent jurisdiction over those claims, particularly given that "this Court's order governed the scope of the General Assembly's redistricting authority." (ECF No. 242 at 31.) Legislative Defendants now argue for the first time that Plaintiffs lack standing to raise such objections. (ECF No. 243 at 9.) While the Supreme Court has not addressed the application of the standing doctrine set forth in *United States v. Hays* in the remedial context, at least one court has cast doubt on the proposition that the court's duty to ensure that the constitutional violation has been remedied can be so readily frustrated. *Cf. Shaw v. Hunt*, No. 92-202-CIV-5-BR, slip op. at 7 (E.D.N.C. Sept. 12, 1997) ("We are doubtful that the non-inclusion of successful plaintiffs in any particular reconfigured district that is assumed

12

to be *the* specific remedial district could be thought, because of the *Hays* residence requirement, to deprive them of standing to challenge the remedial plan as inadequate for the purpose at issue.") Taken to its logical conclusion, Legislative Defendants' contention would make a federal court, which must review and approve any remedial plan, complicit in a redistricting that obviously violates State law, yet without consequence. That is precisely what Legislative Defendants seek to do here--to use this Court's remedial order as a vehicle for empowering the General Assembly to exceed its authority under the State constitution. We decline that invitation.

This would be an unjust result given this Court's "independent duty" to ensure that the remedial plan remedies the constitutional violation *and* otherwise complies with applicable law, particularly where the constitutional violation arises from Legislative Defendants' failure to comply with this Court's order. *Wilson v. Jones*, 130 F. Supp. 2d 1315, 1322 (S.D. Ala. 2000), *aff'd sub nom.*, *Wilson v. Minor*, 220 F.3d 1297 (11th Cir. 2000); *McGhee v. Granville Cty., N.C.*, 860 F.2d 110, 115 (4th Cir. 1988); *Large v. Fremont Cty., Wyo.*, 670 F.3d 1133, 1138, 1148-49 (10th Cir. 2012) (rejecting governmental entity's proposed districting plan to remedy Voting Rights Act violation because it failed to comply with state law). At a minimum, in any event, Legislative

13

Defendants' new contention appears far from likely to prevail, and thus fails to meet the standard for a stay.

B.

Second, Legislative Defendants fail to establish irreparable injury to themselves and others on whose behalf they seek to apply.

Legislative Defendants contend that "[w]ithout a stay, irreparable injury will continue to occur to the General Assembly, the State, and North Carolina voters and candidates." (ECF No. 243 at 3.) Defendants further argue that the Court's actions "harm North Carolina's sovereign interests" by preventing the use of the enacted 2017 Plans in the 2018 election. (*Id.* at 4.) Given that Legislative Defendants have already represented to the Court that they lack the ability to speak on behalf of the General Assembly, however, it is unclear what authority they have to represent the interests of "the State, and North Carolina voters and candidates" as well as "North Carolina's sovereign interests." (ECF No. 215 at 5 (explaining that "the legislative defendants do not themselves speak for the entire General Assembly" and therefore that "[a] few members of the legislature, even if they are leaders, are not authorized to state how the entire legislature would vote on, or amend, draft districts proposed by [the Special Master]").) Legislative Defendants have not alleged they will be personally harmed by the Court's Final Order. Indeed, this Court cannot determine how they could be, much less irreparably so, where all

14

Legislative Defendants' districts were left unchanged in the Special Master's Recommended Plans.

Even assuming that Legislative Defendants are entitled to represent the interests of the General Assembly or the State, they fail to demonstrate irreparable harm absent a stay. While we acknowledge the implementation of these redistricting plans may cause some hardship to some of the legislators' campaigns, "inconvenience to legislators elected under an unconstitutional districting plan resulting from such legislators having to adjust their personal, legislative, or campaign schedules . . . does not rise to the level of a significant sovereign intrusion." *Covington v. North Carolina* ("*Covington IV*"), -- F. Supp. 3d --, 2017 WL 4162335, at *11 (M.D.N.C. 2017); *Johnson v. Mortham*, 926 F. Supp. 1540, 1542 (N.D. Fla. 1996) ("[T]he mere administrative inconvenience the Florida Legislature and Florida elections officials will face in redistricting simply cannot justify denial of Plaintiffs' fundamental rights.")[4]

Furthermore, the implementation of the redistricting plans well in advance of the 2018 candidate filing period and relatively limited scope of the changes to the 2017 Plans further minimize

---

[4] To the extent Legislative Defendants contend that administrative interests should be considered, a grant of a stay would surely frustrate the State's request for "a swift decision on a remedy." (ECF No. 246 at 1.)

any potential harm to the interests of the State or individual legislators. The candidate filing period does not begin until February 12, 2018,[5] more than three weeks after the entry of this Court's Final Order, and the primary elections will not take place until May 8, 2018. *See* N.C. Gen. Stat. § 163A-700(b) (establishing that primary elections for state legislatures will be held "on Tuesday next after the first Monday in May preceding each general election to be held in November"). As Legislative Defendants acknowledged during the hearing held on January 5, 2018, the State Board Defendants have recognized that three weeks would be a sufficient period to address any concerns from an election administration standpoint. (ECF No. 244 at 139-140.) Further, Legislative Defendants' criticism that this Court has entered a "last-minute" decision is undermined by their previous assurance to this Court that the General Assembly could "enact[] new plans by the end of the year, which would leave time for this Court's review and implementation of the plans in an orderly way in 2018." (ECF No. 161 at 29.)

The Special Master's Recommended Plans adopted by this Court alter only nine district configurations, retain an overwhelming number of districts under the 2017 Plans, and reinstate five of

---

[5] The filing period currently runs to the end of the month of February. (ECF No. 244 at 137.) The General Assembly has the authority to adjust these dates. *See* N.C. Gen. Stat. § 163A-970.

the unchallenged districts in the 2011 House plan.  Further, the Special Master filed his Recommended Plans on December 1, 2017, such that potential candidates have had notice of those district lines since that time.  The Recommended Plans also pair only two incumbents and therefore do not pose a significant hurdle to incumbents running in their new districts.

Accordingly, the Court finds that Legislative Defendants have not demonstrated that they would be irreparably harmed absent a stay.

C.

With regard to the third factor, the issuance of a stay would likely substantially injure, even irreparably harm, other parties interested in the proceeding, namely Plaintiffs and North Carolina voters.

"Deprivation of a fundamental right, such as limiting the right to vote in a manner that violates the Equal Protection Clause, constitutes irreparable harm."  *Personhuballah*, 155 F. Supp. 3d at 560 (quoting *Mortham*, 926 F. Supp. at 1543).  Delaying Plaintiffs' requested relief pending the outcome on appeal would present a substantial risk that the State would not be able to implement the Special Master's Recommended Plans in time for the 2018 elections in the event that the Supreme Court affirms this Court's judgment.  The risk of harm is particularly acute where Plaintiffs and other North Carolina voters have already cast their

ballots under unconstitutional district plans in 2012, 2014, and 2016 (the latter while this lawsuit was pending). Under these circumstances, this Court is "reluctant to grant a stay with the effect of 'giv[ing] appellant the fruits of victory whether or not the appeal has merit.'" *Id.* (quoting *Jimenez v. Barber*, 252 F.2d 550, 553 (9th Cir. 1958)). We thus decline to give Legislative Defendants "the fruits of victory for another election cycle," while forcing North Carolina voters to cast ballots under unconstitutional maps for a fourth consecutive biennial election, especially where Legislative Defendants have resisted all attempts to timely develop remedial plans. *Id.*

Legislative Defendants contend that implementing the Subject Districts risks voter confusion. Relying on *Purcell v. Gonzalez*, 549 U.S. 1 (2006), they argue that "[t]his Court's last-minute decision altering dozens of districts on the eve of the filing period creates precisely the confusion the *Purcell* doctrine aims to avoid." (ECF No. 243 at 4.)

In *Purcell,* the Supreme Court recognized that the substantial risk of voter confusion arising from changes to election law or procedures on the eve of an election may warrant a stay pending appeal. *Purcell*, 549 U.S. at 4–5. However, unlike *Purcell*, where the election was "weeks" away, *id.* at 3, this is not "a voting case decided on the eve of an election" where the balance of the equities favors maintaining the status quo, *Veasey v. Perry*, 769

18

F.3d 890, 892 (5th Cir. 2014). Legislative Defendants identify no case in which a court relied on the risk of voter confusion to permit the use of an unconstitutional districting plan before the start of an election cycle and over nine months before any general election is set to take place. Indeed, several courts have expressly rejected such arguments with less time before the general election, even where no remedial redistricting plan had been implemented. *See Larios*, 305 F. Supp. 2d at 1344 (rejecting similar disruption argument when general election was "more than eight months away"); *Flateau v. Anderson*, 537 F. Supp. 257, 261, 266 (S.D.N.Y. 1982) (rejecting disruption argument when candidate filing period had not yet begun and general election was seven months away).

Therefore, we find that this third factor weighs heavily in favor of denying Legislative Defendants' motion.

D.

Finally, we consider the public interest and find that it weighs strongly against a stay in this case. The harms to Plaintiffs constitute harms to every voter in the Subject Districts. As the Supreme Court has noted, once a redistricting plan is found to be unconstitutional, "it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). For

19

the reasons stated above, this is not a case where any equitable considerations justify the withholding immediate relief. *Id.* Indeed, as the State observes, "a swift decision on a remedy would advance the public interest." (ECF No. 246 at 1.)

III.

For these reasons, Legislative Defendants' motion for stay is DENIED.

SO ORDERED.

For the Court:

/s/ James A. Wynn, Jr.
United States Circuit Judge

/s/ Thomas D. Schroeder
United States District Judge

/s/ Catherine C. Eagles
United States District Judge

January 26, 2018